CLOSED, TEB

# U.S. District Court
## Southern District of Florida (Miami)
## CIVIL DOCKET FOR CASE #: 1:07-cv-20389-JEM

| | |
|---|---|
| Coffee Bean Trading-Roasting, LLC v. Coffee Holding, Inc. | Date Filed: 02/13/2007 |
| Assigned to: Judge Jose E. Martinez | Jury Demand: None |
| Cause: 28:1332 Diversity-Other Contract | Nature of Suit: 190 Contract: Other |
| | Jurisdiction: Diversity |

**Plaintiff**

**Coffee Bean Trading-Roasting, LLC**
*a Delaware limited liability company*

represented by **Jose Manuel Ferrer**
Baker & McKenzie
1111 Brickell Avenue
Suite 1700
Miami, FL 33131-3214
305-789-8980
Fax: 789-8953
Email: jose.ferrer@bakernet.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Coffee Holding, Inc.**
*a Nevada corporation*

represented by **Christopher F. Graham**
Thacher Proffitt & Wood LLP
50 Main Street
White Plains, NY 10606
US
Email: cgraham@tpw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Roger Squitero**
Katz Barron Squitero Faust & Berman
2699 S Bayshore Drive
7th Floor
Miami, FL 33133-5408
305-856-2444
Fax: 285-9227
Email: jrs@katzbarron.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark Shiels Auerbacher**
Katz Barron Squitero Faust

2699 S Bayshore Drive
7th Floor
Miami, FL 33133-5408
305-856-2444
Fax: 285-9227
Email: msa@katzbarron.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Coffee Holding, Inc.**                   represented by **Mark Shiels Auerbacher**
*a Nevada corporation*                     (See above for address)
                                           *ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Coffee Bean Trading-Roasting, LLC**
*a Delaware limited liability company*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/13/2007 | 1 | VERIFIED COMPLAINT against Coffee Holding, Inc. Filing fee $ 350. Receipt#: 954710, filed by Coffee Bean Trading-Roasting, LLC.(el) (Entered: 02/13/2007) |
| 02/13/2007 | 2 | MOTION for Temporary Restraining Order and Supporting Memorandum of law by Coffee Bean Trading-Roasting, LLC. Responses due by 2/28/2007 (el) (Entered: 02/13/2007) |
| 02/13/2007 | 3 | NOTICE OF FILING AFFIDAVIT signed by : Ernesto Aguila in support of 2 MOTION for Temporary Restraining Order by Coffee Bean Trading-Roasting, LLC. (el) (Entered: 02/13/2007) |
| 02/13/2007 | 4 | Summons Issued as to Coffee Holding, Inc. by serving registered agent: CSC Services of Nevada,Inc. (el) (Entered: 02/13/2007) |
| 02/14/2007 | 5 | ORDER Setting Hearing on Motion 2 MOTION for Temporary Restraining Order: Motion Hearing set for 2/16/2007 03:00 PM in Miami Division before Judge Jose E. Martinez. Signed by Judge Jose E. Martinez on 2/14/2007 (lc1) (Entered: 02/14/2007) |
| 02/14/2007 | 6 | Order Requiring Parties to Meet and File Joint Scheduling Report. Signed by Judge Jose E. Martinez on 02/14/2007 (dq) (Entered: 02/14/2007) |
| 02/14/2007 | 7 | NOTICE of Compliance *WITH COURT ORDER* by Coffee Bean Trading-Roasting, LLC re 5 Order Setting Hearing on Motion (Ferrer, Jose) (Entered: 02/14/2007) |
| 02/15/2007 | 8 | MOTION attend hearing telephonically by Coffee Holding, Inc.. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Text of Proposed Order Order Approving Telephonic Appearance)(Auerbacher, Mark) (Entered: 02/15/2007) |
| 02/15/2007 | 9 | Endorsed ORDER granting 8 Unopposed Motion to Allow Defendant's Attorney, Christopher F. Graham to Attend Hearing on Plaintiff's Motion for Temporary Restraining Order Telephonically Signed by Judge Jose E. Martinez on 2/15/2007 (lc1) (Entered: 02/15/2007) |
| 02/15/2007 | 10 | MOTION Transfer Venue re 1 Complaint, 2 MOTION for Temporary Restraining Order by Coffee Holding, Inc.. (Attachments: # 1 Text of Proposed Order Order Granting Motion to Transfer Venue)(Auerbacher, Mark) (Entered: 02/15/2007) |
| 02/15/2007 | 16 | MOTION for Admission Pro Hac Vice of Christopher F. Graham, Filing Fee $75, Receipt #954943. (cw) (Entered: 02/19/2007) |
| 02/16/2007 | 11 | MOTION Dismiss Motion for Temporary Restraining Order re 2 MOTION for Temporary Restraining Order, 3 Affidavit by Coffee Holding, Inc.. (Auerbacher, Mark) (Entered: 02/16/2007) |
| 02/16/2007 | 12 | AFFIDAVIT in Opposition re 2 MOTION for Temporary Restraining Order, 10 MOTION Transfer Venue re 1 Complaint, 2 MOTION for Temporary Restraining Order, 11 MOTION Dismiss Motion for Temporary Restraining Order re 2 MOTION for Temporary Restraining Order, 3 Affidavit filed by Coffee Holding, Inc.. (Attachments: # 1 Affidavit Andrew Gordon# 2 Exhibit Exhibits A & B# 3 Affidavit Salvatore Reda)(Auerbacher, Mark) (Entered: 02/16/2007) |
| 02/16/2007 | 13 | ORDER denying 2 Motion for Temporary Restraining Order Signed by Judge Jose E. Martinez on 2/16/2007 (lc1) (Entered: 02/16/2007) |
| 02/16/2007 | 14 | Order Denying Plaintiff's Motion for Temporary Restraining Order (D.E. No. 2) and Directing Expedited Response to Defendant's Motion to Enforce a Forum Selection Clause and To Transfer Venue. Signed by Judge Jose E. Martinez on 2/16/2007 (lc1) (Entered: 02/16/2007) |
| 02/16/2007 | 15 | Notice of Docket Correction: The wrong document was attached to docket number 13. The correct document is located at docket number 14. re 13 Order on Motion for Temporary Restraining Order (lc1) (Entered: 02/16/2007) |
| 02/23/2007 | 17 | Minute Entry: for proceedings held before Judge Jose E. Martinez: Motion Hearing held on 2/16/2007 re 2 MOTION for Temporary Restraining Order filed by Coffee Bean Trading-Roasting, LLC, (Court Reporter Larry Herr.) (wh) (Entered: 02/23/2007) |
| 02/23/2007 | 18 | ORDER granting 16 Motion to Appear Pro Hac Vice Name of Attorney Christopher F. Graham for Coffee Holding, Inc. Signed by Judge Jose E. Martinez on 2/23/2007 (ls) (Entered: 02/26/2007) |
| 02/26/2007 | 19 | RESPONSE in Opposition re 10 MOTION Transfer Venue re 1 Complaint, 2 MOTION for Temporary Restraining Order *IN OPPOSITION TO DEFENDANT'S MOTION TO ENFORCE A FORUM SELECTION CLAUSE AND TRANSFER VENUE* filed by Coffee Bean |

| | | Trading-Roasting, LLC. (Ferrer, Jose) (Entered: 02/26/2007) |
|---|---|---|
| 02/26/2007 | 20 | Plaintiff's MOTION TO CONSIDER THE FILING OF ITS RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER VENUE TIMELY re 19 Response in Opposition to Motion, by Coffee Bean Trading-Roasting, LLC. (Attachments: # 1 Exhibit A# 2 Text of Proposed Order)(Ferrer, Jose) (Entered: 02/26/2007) |
| 02/27/2007 | 21 | RESPONSE in Opposition re 20 Plaintiff's MOTION TO CONSIDER THE FILING OF ITS RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER VENUE TIMELY re 19 Response in Opposition to Motion, filed by Coffee Holding, Inc.. (Attachments: # 1)(Auerbacher, Mark) (Entered: 02/27/2007) |
| 03/02/2007 | 22 | RESPONSE *Plaintiff's Reply to Defendant's Objection to Motion to Consider the Filing of its Response in Opposition to Defendant's Motion to Transfer Venue Timely* filed by Coffee Bean Trading-Roasting, LLC. (Ferrer, Jose) (Entered: 03/02/2007) |
| 03/02/2007 | 23 | REPLY to Response to Motion re 20 Plaintiff's MOTION TO CONSIDER THE FILING OF ITS RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER VENUE TIMELY re 19 Response in Opposition to Motion, filed by Coffee Holding, Inc.. (Auerbacher, Mark) (Entered: 03/02/2007) |
| 03/05/2007 | 24 | SUMMONS Returned Executed Coffee Holding, Inc. served on 2/21/2007, answer due 3/13/2007. (bs) (Entered: 03/05/2007) |
| 03/05/2007 | 25 | NOTICE by Coffee Holding, Inc. re 23 Reply to Response to Motion, *to Transfer Venue* (Auerbacher, Mark) (Entered: 03/05/2007) |
| 03/06/2007 | 26 | Plaintiff's MOTION to Strike 23 Reply to Response to Motion, *CERTAIN PORTIONS OF DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO ENFORCE A FORUM SELECTION CLAUSE AND TO TRANSFER VENUE OR, ALTERNATIVELY, FOR LEAVE TO FILE SURREPLY* by Coffee Bean Trading-Roasting, LLC. Responses due by 3/20/2007 (Ferrer, Jose) (Entered: 03/06/2007) |
| 03/07/2007 | 27 | RESPONSE in Opposition re 26 Plaintiff's MOTION to Strike 23 Reply to Response to Motion, *CERTAIN PORTIONS OF DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO ENFORCE A FORUM SELECTION CLAUSE AND TO TRANSFER VENUE OR, ALTERNATIVELY, FOR LEAVE TO FILE SURREPLY* filed by Coffee Holding, Inc.. (Auerbacher, Mark) (Entered: 03/07/2007) |
| 03/12/2007 | 28 | RESPONSE to 27 Response in Opposition to Motion, *PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE OR, ALTERNATIVELY, FOR LEAVE TO FILE A SURREPLY* filed by Coffee Bean Trading-Roasting, LLC. (Ferrer, Jose) (Entered: 03/12/2007) |
| 03/13/2007 | 29 | *Coffee Holding, Co. Inc.'s* ANSWER to Complaint *Coffee Bean Trading-Roasting LLC*, First COUNTERCLAIM against Coffee Bean Trading- |

| | | |
|---|---|---|
| | | Roasting, LLC by Coffee Holding, Inc..(Auerbacher, Mark) (Entered: 03/13/2007) |
| 03/21/2007 | 30 | Corporate Disclosure Statement by Coffee Bean Trading-Roasting, LLC. (Ferrer, Jose) (Entered: 03/21/2007) |
| 03/21/2007 | 31 | NOTICE by Coffee Bean Trading-Roasting, LLC re 30 Corporate Disclosure Statement *OF CORRECTING CERTIFICATE OF SERVICE* (Ferrer, Jose) (Entered: 03/21/2007) |
| 03/21/2007 | 32 | Emergency MOTION for Temporary Restraining Order by Coffee Holding, Inc.. Responses due by 4/4/2007 (Attachments: # 1) (Auerbacher, Mark) (Entered: 03/21/2007) |
| 03/23/2007 | 33 | ORDER REQUIRING RESPONSE TO DEFENDANT'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER. Signed by Judge Jose E. Martinez on 3/23/2007.(lc1) (Entered: 03/23/2007) |
| 03/23/2007 | 34 | Corporate Disclosure Statement by Coffee Holding, Inc., Coffee Holding, Inc.. (Auerbacher, Mark) (Entered: 03/23/2007) |
| 03/23/2007 | | Reset Deadlines as to 32 Emergency MOTION for Temporary Restraining Order. Response due by 4/2/2007 (dm) (Entered: 03/26/2007) |
| 03/27/2007 | 35 | RESPONSE in Opposition re 32 Emergency MOTION for Temporary Restraining Order *and Cross-Motion to Appoint a Receiver to Orderly Dissolve Company* filed by Coffee Bean Trading-Roasting, LLC. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D) (Ferrer, Jose) (Entered: 03/27/2007) |
| 03/27/2007 | 36 | NOTICE by Coffee Bean Trading-Roasting, LLC re 32 Emergency MOTION for Temporary Restraining Order, 35 Response in Opposition to Motion, *of Filing Affidavit of Ernesto Aguila in Opposition to Coffee Holding's Motion for Temporary Restraining Order and in Support of Cross-Motion to Appoint a Receiver* (Attachments: # 1 Affidavit of Ernesto Aguila)(Ferrer, Jose) (Entered: 03/27/2007) |
| 03/29/2007 | 37 | Defendant's MOTION to Strike 36 Notice (Other), Notice (Other), 35 Response in Opposition to Motion, by Coffee Holding, Inc., Coffee Holding, Inc.. Responses due by 4/12/2007 (Auerbacher, Mark) (Entered: 03/29/2007) |
| 04/02/2007 | 38 | *PLAINTIFF'S ANSWER AND AFFIRMATIVE DEFENSES TO COUNTS V AND VI* - ANSWER to Counterclaim by Coffee Bean Trading-Roasting, LLC.(Ferrer, Jose) (Entered: 04/02/2007) |
| 04/02/2007 | 39 | Plaintiff's MOTION to Dismiss 29 Answer to Complaint, Counterclaim - *CERTAIN COUNTS OF DEFENDANT'S COUNTERCLAIM* by Coffee Bean Trading-Roasting, LLC. Responses due by 4/16/2007 (Ferrer, Jose) (Entered: 04/02/2007) |
| 04/02/2007 | 40 | NOTICE by Coffee Bean Trading-Roasting, LLC re 3 Affidavit *PLAINTIFF'S NOTICE OF FILING EXCLUDED EXHIBIT TO* |

| | | |
|---|---|---|
| | | *AFFIDAVIT OF ERNESTO AGUILA* (Attachments: # 1 Exhibit A) (Ferrer, Jose) (Entered: 04/02/2007) |
| 04/03/2007 | 41 | REPLY to Response to Motion re 32 Emergency MOTION for Temporary Restraining Order filed by Coffee Holding, Inc.. (Auerbacher, Mark) (Entered: 04/03/2007) |
| 04/06/2007 | 42 | RESPONSE in Opposition re 37 Defendant's MOTION to Strike 36 Notice (Other), Notice (Other), 35 Response in Opposition to Motion, *for a Temporary Restraining Order* filed by Coffee Bean Trading-Roasting, LLC. (Ferrer, Jose) (Entered: 04/06/2007) |
| 04/10/2007 | 43 | RESPONSE in Opposition re 32 Emergency MOTION for Temporary Restraining Order, 37 Defendant's MOTION to Strike 36 Notice (Other), Notice (Other), 35 Response in Opposition to Motion, *to Plaintiff's Cross-Motion to Appoint a Receiver* filed by Coffee Holding, Inc., Coffee Holding, Inc.. (Auerbacher, Mark) (Entered: 04/10/2007) |
| 04/13/2007 | 44 | REPLY to Response to Motion re 37 Defendant's MOTION to Strike 36 Notice (Other), Notice (Other), 35 Response in Opposition to Motion, *Reply in Further Support* filed by Coffee Holding, Inc., Coffee Holding, Inc.. (Auerbacher, Mark) (Entered: 04/13/2007) |
| 04/13/2007 | 45 | RESPONSE to 43 Response in Opposition to Motion, *PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S CROSS-MOTION TO APPOINT RECEIVER* filed by Coffee Bean Trading-Roasting, LLC. (Ferrer, Jose) (Entered: 04/13/2007) |
| 04/16/2007 | 46 | MEMORANDUM in Opposition re 39 Plaintiff's MOTION to Dismiss 29 Answer to Complaint, Counterclaim -*CERTAIN COUNTS OF DEFENDANT'S COUNTERCLAIM* filed by Coffee Holding, Inc.. (Attachments: # 1 Exhibit A thru C)(Auerbacher, Mark) (Entered: 04/16/2007) |
| 04/19/2007 | 47 | REPORT REGARDING Joint Scheduling by Coffee Bean Trading-Roasting, LLC. (Attachments: # 1 Exhibit PreTrial Deadlines and Trial Date# 2 Exhibit Election to Jurisdiction)(Ferrer, Jose) (Entered: 04/19/2007) |
| 04/19/2007 | 48 | ORDER denying 32 Emergency Motion for Temporary Restraining Order. Signed by Judge Jose E. Martinez on 4/19/2007. (ls) (Entered: 04/20/2007) |
| 04/19/2007 | 49 | ORDER granting 37 Motion to Strike Certain Portions of 35 Response in Opposition to Motion. Signed by Judge Jose E. Martinez on 4/19/2007. (ls) (Entered: 04/20/2007) |
| 04/20/2007 | 50 | ORDER denying as moot 39 Motion to Dismiss, granting 10 Motion to Enforce a Forum Selection Clause and to Transfer Venue, granting 20 Motion to consider the filing of its Response in opposition to defendant's Motion to Transfer Venue timely, denying 26 Motion to Strike certain portions of defendant's Reply in support of its Motion to Enforce a Forum |

| | | |
|---|---|---|
| | | Selection Clause and to Transfer Venue or, alternatively, for Leave to File Surreply; Directing Clerk to Transfer case to the USDC, District of Delaware; Closing Case. Signed by Judge Jose E. Martinez on 4/20/2007. (ls) (Entered: 04/20/2007) |
| 04/25/2007 | 51 | Transmittal Letter Sent With Certified Copies of Transfer Order and Docket Sheet, To: USDC, District of Delaware (ls) (Entered: 04/25/2007) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 05/02/2007 10:54:34 | | | |
| **PACER Login:** | ud0037 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:07-cv-20389-JEM |
| **Billable Pages:** | 4 | **Cost:** | 0.32 |

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.: 07-20389

COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

**CIV-MARTINEZ**

MAGISTRATE
BANDSTRA



    Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,

    Defendant.

_____/

## VERIFIED COMPLAINT

Plaintiff, Coffee Bean Trading-Roasting, LLC ("Coffee Bean"), sues defendant, Coffee

Holding, Inc. ("Coffee Holding"), and alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1.    Coffee Bean is a limited liability company organized and operating under the laws

of the State of Delaware.

2.    Coffee Holding is a corporation organized and operating under the laws of the

State of Nevada.

3.    This action involves claims of breach of contract, breach of fiduciary duty, breach

of the implied contractual covenant of good faith and fair dealing, and injunctive relief where the

matter in controversy exceeds the sum or value of $75,000 and is between citizens of different

states, and this Court, therefore, has original jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

4.     Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. §§ 1391(a)(2) because a substantial part of the events or omissions giving rise to the claims occurred, and the property that is the subject of the action is situated, in the Southern District of Florida.

5.     Coffee Bean has retained the undersigned to represent it in this action and has agreed to pay them a reasonable fee for their services.

## FACTS COMMON TO ALL CLAIMS

### The Operating Agreement

6.     On or about March 10, 2006, Coffee Bean and Coffee Holding entered into that certain Limited Liability Company Agreement of Café La Rica, LLC (the "Operating Agreement") pursuant to which the parties formed and organized Café La Rica, LLC ("Café La Rica") for the purpose of "engag[ing] in the roasting, packaging and sale of Café La Rica and other branded coffee products, and to engage in any other lawful act or activity, as determined by the Board of Managers from time to time, for which limited liability companies may be organized under the [Delaware Limited Liability Company Act]." A true and correct copy of the Operating Agreement is attached hereto as Exhibit A.

7.     The Operating Agreement was intended to be "the sole source of agreement" of the members of Café La Rica which, at all times relevant to this action, have been Coffee Bean and Coffee Holding, each owning a fifty (50) percent interest in the Company. *See* Operating Agreement at ¶ 2.2.

8.     The Operating Agreement established, amongst other things, a Board of Managers (the "Board of Managers") responsible for "[t]he management of the Company and all decisions concerning the business affairs of the Company[.]" The Board of Managers was to consist of

two managers, each having one vote with respect to all matters requiring the vote of the Board of Managers. Moreover, no individual manager was to have the right to act unilaterally on behalf of Café La Rica without the written consent of the other manager absent authorization by resolution of the Board of Managers. *See* Operating Agreement at ¶ 7.1.

9.    The initial Board of Managers of Café La Rica was comprised of Andrew Gordon, who is also the President and Chief Executive Officer of Coffee Holding (based in New York, NY), and Ernesto Aguila (based in Miami, FL). However, Coffee Holding, through Mr. Gordon, has at all times relevant to this action acted as Café La Rica's de facto manager with full control over all of its business and financial operations, except for the day-to-day sales and collection activities which Mr. Aguila has handled from Miami, FL.

10.    The Operating Agreement provides that it shall be governed and construed in accordance with the laws of the State of Delaware. *See* Operating Agreement at ¶ 14.8.

<u>The Expense Sharing Agreement</u>

11.    On March 10, 2006, contemporaneously with the execution of the Operating Agreement, Coffee Holding and Café La Rica entered into that certain Expense Sharing and Services Agreement (the "Expense Sharing Agreement") pursuant to which Coffee Holding agreed to provide certain services on behalf of, and the supply of certain coffee products to, Café La Rica. A copy of the Expense Sharing Agreement is attached hereto as Exhibit B.

12.    Specifically, Coffee Holding agreed (1) to provide, amongst other services, administrative services and support, and other bookkeeping, accounting and similar services, in exchange for a payment to Coffee Holding by Café La Rica in an amount equal to 5% of Café La Rica's monthly sales; and (2) to supply Café La Rica with as much coffee inventory as requested by Café La Rica at fair market prices. *See* Expense Sharing Agreement at §§ 1, 2.

13.     The Expense Sharing Agreement required Coffee Holding to "maintain appropriate written records and documentation with respect to amounts reimbursed by and among [Coffee Holding] and [Café La Rica]" pursuant to the Expense Sharing Agreement. *See* Expense Sharing Agreement at § 6.

## COUNT I – BREACH OF THE OPERATING AGREEMENT

14.     Coffee Bean realleges and incorporates by reference paragraphs 1 through 13 above.

15.     Coffee Holding, as manager of Café La Rica, has always had exclusive access to Café La Rica's financial statements, including its balance sheet, statement of profit and loss and changes in Members' accounts, and statement of cash flows.

16.     Pursuant to the Operating Agreement, Coffee Holding was required to "provide reports to the Members, including a balance sheet, a statement of profit and loss and changes in Members' accounts and a statement of cash flows [the "Financial Statements"], within fifteen (15) days of the end of each month." *See* Operating Agreement at ¶ 4.2.

17.     Coffee Holding has breached the Operating Agreement by failing, despite repeated written requests, to provide Coffee Bean with the Financial Statements or to otherwise provide any financial information and documentation to Coffee Bean.

18.     Coffee Bean has suffered and continues to suffer significant financial damages as a direct, foreseeable, and proximate result of Coffee Holding's breach of the Operating Agreement.

WHEREFORE, Coffee Bean demands judgment against Coffee Holding for damages, together with pre and post judgment interest, costs, and any other and further relief this Court deems equitable, just and proper.

## COUNT II – BREACH OF THE EXPENSE SHARING AGREEMENT

19.     Coffee Bean realleges and incorporates by reference paragraphs 1 through 13 above.

20.     Under the Expense Sharing Agreement, Coffee Holding agreed to (1) provide administrative services and support, and other bookkeeping, accounting and similar services, in exchange for a payment to Coffee Holding by Café La Rica in an amount equal to 5% of Café La Rica's monthly sales (the "Expense Reimbursement"); and (2) to supply Café La Rica with as much coffee inventory as requested by Café La Rica at fair market prices.

21.     Coffee Holding has breached the Expense Sharing Agreement by charging Café La Rica, and, as the Manager of Café La Rica, paying itself amounts in excess of the Expense Reimbursement for services that clearly fall within the class of services covered by the Expense Sharing Agreement.   Coffee Holding also has failed to keep adequate records to justify the payments it has made to itself pursuant to the Expense Sharing Agreement.

22.     Coffee Holding has also breached the Expense Sharing Agreement by selling coffee to Café La Rica at prices well above fair market prices.

23.     Café La Rica has suffered and continues to suffer damages as a direct, foreseeable, and proximate result of Coffee Holding's breach of the Expense Sharing Agreement.

24.     Coffee Bean brings this action derivatively in the right of Café La Rica to recover a judgment in its favor and against Coffee Holding for its breaches of the Expense Sharing Agreement.   Any effort to cause Coffee Holding to bring this action is not likely to succeed because Coffee Holding is unlikely to agree to sue itself.

Baker & McKenzie LLP, 1111 Brickell Avenue, Suite 1700, Miami, Florida  33131 – (305) 789-8900

WHEREFORE, Coffee Bean demands judgment against Coffee Holding for damages, together with pre and post judgment interest, costs, and any other and further relief this Court deems equitable, just and proper.

## COUNT III – BREACH OF FIDUCIARY DUTY

25.     Coffee Bean realleges and incorporates by reference paragraphs 1 through 13 above.

26.     Coffee Holding, by virtue of its role as manager of Café La Rica and otherwise, owes Café La Rica and Coffee Bean a fiduciary duty to act in the best interest of Café La Rica and its members as a whole.

27.     Under the Expense Sharing Agreement, Coffee Holding agreed to supply Café La Rica with as much coffee inventory as requested by Café La Rica at fair market prices.  Thus, Coffee Holding occupies dual roles as both the manager and, by virtue of the Expense Sharing Agreement, a supplier of Café La Rica.

28.     Coffee Holding, in its role as manager of Café La Rica, was solely responsible for, and never consulted with Coffee Bean or anyone at Café La Rica with respect to, its purchases of coffee from itself on behalf of Café La Rica.

29.     Beginning in or about March, 2006, Coffee Holding consistently purchased from itself more coffee than Café La Rica needed for its operations.  Coffee Holding did this knowingly and purposefully in order to create grossly exaggerated accounts payables in favor of itself to the detriment of Café La Rica.  Coffee Holding has also knowingly and purposefully invoiced Café La Rica for coffee that was never delivered.

Baker & McKenzie LLP, 1111 Brickell Avenue, Suite 1700, Miami, Florida  33131 – (305) 789-8900

30.     Coffee Holding has breached its fiduciary duties to Café La Rica and Coffee Bean by intentionally undertaking the above-described actions, essentially putting its interests over the interests of Café La Rica and its members as a whole.

31.     Café La Rica and Coffee Bean have suffered and continue to suffer damages as a direct, foreseeable, and proximate result of Coffee Holding's breach of its fiduciary duties to Café La Rica and Coffee Bean.

32.     Coffee Bean brings this action individually and derivatively in the right of Café La Rica to recover a judgment in its favor and against Coffee Holding for its breach of the fiduciary duties Coffee Holding owes Café La Rica and Coffee Bean.  Any effort to cause Coffee Holding to bring this action is not likely to succeed because Coffee Holding is unlikely to agree to sue itself.

WHEREFORE, Coffee Bean demands judgment against Coffee Holding for damages, together with pre and post judgment interest, costs, and any other and further relief this Court deems equitable, just and proper.

## COUNT IV – BREACH OF THE IMPLIED
## CONTRACTUAL COVENANT OF GOOD FAITH AND FAIR DEALING

33.     Coffee Bean realleges and incorporates by reference paragraphs 1 through 13 above.

34.     Under the Expense Sharing Agreement, Coffee Holding agreed to supply Café La Rica with as much coffee inventory as requested by Café La Rica at fair market prices.  Thus, Coffee Holding occupies dual roles as both the manager and, by virtue of the Expense Sharing Agreement, a supplier of Café La Rica.

Baker & McKenzie LLP, 1111 Brickell Avenue, Suite 1700, Miami, Florida  33131 – (305) 789-8900

35.     Coffee Holding, in its role as manager of Café La Rica, was solely responsible for, and never consulted with Coffee Bean or anyone at Café La Rica with respect to, its purchases of coffee from itself on behalf of Café La Rica.

36.     By entering into the Expense Sharing Agreement, Coffee Holding implicitly covenanted to deal fairly and in good faith with Café La Rica with respect to any purchases of coffee it made from itself on behalf of Café La Rica.

37.     Beginning in or about March, 2006, Coffee Holding consistently purchased from itself more coffee than Café La Rica needed for its operations.   Coffee Holding did this knowingly and purposefully in order to create grossly exaggerated accounts payables in favor of itself to the detriment of Café La Rica.   Coffee Holding has also knowingly and purposefully invoiced Café La Rica for coffee that was never delivered.

38.     Coffee Holding breached the covenant of good faith and fair dealing implied in the Expense Sharing Agreement by undertaking the above-described acts.

39.     Café La Rica has suffered and continues to suffer damages as a direct, foreseeable, and proximate result of Coffee Holding's breach of the implied covenant of good faith and fair dealing.

40.     Coffee Bean brings this action derivatively in the right of Café La Rica to recover a judgment in its favor and against Coffee Holding for its breaches of the implied contractual covenant of good faith and fair dealing.   Any effort to cause Coffee Holding to bring this action is not likely to succeed because Coffee Holding is unlikely to agree to sue itself.

WHEREFORE, Coffee Bean demands judgment against Coffee Holding for damages, together with pre and post judgment interest, costs, and any other and further relief this Court deems equitable, just and proper.

## COUNT V – ACCOUNTING

41.     Coffee Bean realleges and incorporates by reference paragraphs 1 through 13 above.

42.     Coffee Holding is required to "maintain appropriate written records and documentation with respect to amounts reimbursed by and among [Coffee Holding] and [Café La Rica]" pursuant to the Expense Sharing Agreement. *See* Expense Sharing Agreement at § 6.

43.     Coffee Holding has, at all time material to this action, had direct supervision and control of written records and documentation for the amounts it claims it is owed for sales of coffee to Café La Rica, but has failed to account to Café la Rica and Coffee Bean for those amounts.   A fiduciary relationship exists between the parties and a duty rests upon Coffee Holding to render an account of those amounts to Café La Rica and Coffee Bean.

44.     In light of the foregoing, Café La Rica's and Coffee Bean's remedies at law are inadequate.

WHEREFORE, Café La Rica and Coffee Bean demand an accounting of all amounts claimed due, if any, by Coffee Holding for sales of coffee to Café La Rica.

## COUNT VI – PERMANENT AND TEMPORARY INJUNCTION

45.     Coffee Bean realleges and incorporates by reference paragraphs 1 through 13 above.

46.     Since in or about March, 2006, when Café La Rica began doing business, it has become an established and successful business with substantial relationships and numerous customers and additional prospective customers, and has developed significant good will with various vendors and suppliers.

Baker & McKenzie LLP, 1111 Brickell Avenue, Suite 1700, Miami, Florida  33131 – (305) 789-8900

47.     Coffee Holdings has, under the Expense Sharing Agreement, purchased from itself more coffee than Café La Rica needed for its operations. Coffee Holding did this knowingly and purposefully in order to create grossly exaggerated accounts payables in favor of itself and unilaterally permitted balances to build up on its own account.

48.     In or about February, 2007, Coffee Holding began threatening to make a preferential payment to itself of the entire accumulated balance on its account in disregard of Café La Rica's other creditors and payroll obligations.

49.     When Coffee Bean refused to consent to such preferential treatment of Coffee Holding's account payable, Coffee Holding unilaterally declared Café La Rica dissolved and began notifying Café La Rica's customers, suppliers, vendors and potential investors that Café La Rica "has closed down." Based on Mr. Gordon's statements, at least one potential investor has already stated that it is not interested in making an offer to invest in Café La Rica until this matter is settled.

50.     On February 7, 2007, Mr. Gordon sent a fax to Washington Mutual Bank ("Washington Mutual"), where Café La Rica maintains its Miami operating account, advising Washington Mutual that Café La Rica has purportedly been dissolved – a claim that is blatantly false – and instructing it to prevent Mr. Aguila, who has traditionally controlled Café La Rica's operating account with Washington Mutual, from exerting any control over that bank account.

51.     Based on Mr. Gordon's false representations, Washington Mutual froze the account, preventing Café La Rica from paying its vendors and suppliers and meeting its payroll obligations. Copies of Mr. Gordon's letter of February 7, 2007 and Washington Mutual's letter of February 8, 2007 in response to same are attached hereto as Composite Exhibit C.

Baker & McKenzie LLP, 1111 Brickell Avenue, Suite 1700, Miami, Florida  33131 – (305) 789-8900

52.     Café La Rica has no adequate remedy at law because the amount of the damage caused by the lost profits and good will that will result from Coffee Holding's continued interference are impossible to determine and of a character that cannot be remedied by money. Moreover, since the acts of Coffee Holding will continue in the future unless restrained, Café La Rica has no adequate remedy at law for damages. Coffee Holding's acts are irreparably harming Café La Rica by destroying Café La Rica's customer base, ruining its relationship with its customers, vendors, and potential investors, risking the loss of its work staff, and basically causing it to go out of business.

53.     Coffee Bean brings this action derivatively in the right of Café La Rica to recover a judgment in its favor and against Coffee Holding for its breaches of the fiduciary duties Coffee Holding owes Café La Rica and Coffee Bean. Any effort to cause Coffee Holding to bring this action is not likely to succeed because Coffee Holding is unlikely to agree to sue itself.

WHEREFORE, Coffee Bean demands judgment for a temporary and permanent injunction restraining Coffee Holding and Mr. Gordon from further interfering with Café La Rica's business and affairs.

DATED this 13th day of February, 2007.

Respectfully submitted,

BAKER & McKENZIE LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131
Telephone: (305) 789-8900
Facsimile: (305) 789-8953

By: _____
        Jose M. Ferrer
        Florida Bar No. 173746

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## CAFÉ LA RICA, LLC

A LIMITED LIABILITY COMPANY

ORGANIZED UNDER THE LAWS OF

THE STATE OF DELAWARE



# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ....................................................................................1

| | | |
|---|---|---|
| 1.1 | Act ..................................................................................................1 |
| 1.2 | Additional Capital Contribution ....................................................1 |
| 1.3 | Affiliate ..........................................................................................1 |
| 1.4 | Agreement ......................................................................................2 |
| 1.5 | Annual Independent Audit ..............................................................2 |
| 1.6 | Assignee or "Transferee" ..............................................................2 |
| 1.7 | Bankrupt Member ..........................................................................2 |
| 1.8 | Board of Managers .........................................................................2 |
| 1.9 | Business Day ..................................................................................3 |
| 1.10 | Capital Account ..............................................................................3 |
| 1.11 | Capital Contribution .......................................................................3 |
| 1.12 | Certificate of Formation .................................................................3 |
| 1.13 | Code ................................................................................................3 |
| 1.14 | Coffee Bean Trading ......................................................................2 |
| 1.15 | Coffee Holding ...............................................................................2 |
| 1.16 | Commitment ....................................................................................3 |
| 1.17 | Company .........................................................................................4 |
| 1.18 | Company Property...........................................................................4 |
| 1.19 | Confidential Information .................................................................2 |
| 1.20 | Default Interest Rate .......................................................................4 |
| 1.21 | Delinquent Member.........................................................................4 |
| 1.22 | Disposition (Dispose) .....................................................................4 |
| 1.23 | Dissociation....................................................................................5 |
| 1.24 | Dissolution Event ...........................................................................5 |
| 1.25 | Distribution.....................................................................................5 |
| 1.26 | Economic Interest ...........................................................................5 |
| 1.27 | Effective Date .................................................................................5 |
| 1.28 | Equity Offering ...............................................................................5 |
| 1.29 | Exhibit A ........................................................................................5 |
| 1.30 | Fair Market Value ..........................................................................5 |
| 1.31 | Fiscal Year......................................................................................6 |
| 1.32 | Gross Asset Value ..........................................................................6 |
| 1.33 | Initial Capital Contribution ............................................................8 |
| 1.34 | Initial Membership Interest ............................................................8 |
| 1.35 | Initial Sharing Ratio .......................................................................8 |
| 1.36 | Initial Value ....................................................................................8 |
| 1.37 | Management Right ...........................................................................8 |
| 1.38 | Manager ..........................................................................................4 |
| 1.39 | Member ...........................................................................................8 |
| 1.40 | Membership Interest .......................................................................9 |
| 1.41 | Minimum Working Capital .............................................................4 |
| 1.42 | Net Cash Flow ................................................................................9 |
| 1.43 | New Securities................................................................................9 |

i

1.44   Offering Allocation ................................................................9
1.45   Officer ....................................................................................9
1.46   Organization ..........................................................................9
1.47   Person ...................................................................................10
1.48   Principal Office .....................................................................10
1.49   Proceeding ............................................................................10
1.50   Profits and Losses .................................................................10
1.51   Property .................................................................................12
1.52   Regulations ...........................................................................12
1.53   Regulatory Allocations .........................................................12
1.54   Related Person ........................................................................6
1.55   Securities Act .......................................................................12
1.56   Share .....................................................................................15
1.57   Sharing Ratio ........................................................................15
1.58   Substitute Member ................................................................15
1.59   Tax Characterization and Additional Tax Terms ..................15
1.60   Winding Up Sale ...................................................................17

ARTICLE II FORMATION ......................................................................18

2.1    Organization ..........................................................................18
2.2    Agreement .............................................................................18
2.3    Name ......................................................................................19
2.4    Term .......................................................................................19
2.5    Registered Agent and Office .................................................19
2.6    Principal Office .....................................................................20

ARTICLE III PURPOSE; NATURE OF BUSINESS ................................20

ARTICLE IV ACCOUNTING AND RECORDS .......................................21

4.1    Records to be Maintained ......................................................21
4.2    Reports to Members ..............................................................21
4.3    Annual Audit .........................................................................9
4.4    Tax Returns and Reports .......................................................21

ARTICLE V CLASSES OF MEMBERSHIP; NAMES AND ADDRESSES OF MEMBERS ...22

ARTICLE VI RIGHTS AND DUTIES OF MEMBERS; RESTRICTIVE COVENANTS .........22

6.1    No Management Rights as Members ......................................22
6.2    Liability of Members .............................................................22
6.3    Indemnification .....................................................................22
6.4    Representations, Warranties and Covenants ..........................22
6.5    Conflicts of Interest ..............................................................23
6.6    Restrictive Covenants ...........................................................24

ARTICLE VII BOARD OF MANAGERS AND OFFICERS .....................26

7.1    Board of Managers ................................................................26
7.2    Voting ....................................................................................26

ii

| | | |
|---|---|---|
| 7.3 | Term of Office as a Member of the Board of Managers | 27 |
| 7.4 | Incapacitation of a Manager | 12 |
| 7.5 | Officers | 27 |
| 7.6 | Authority to Bind the Company | 28 |
| 7.7 | Actions of the Board of Managers | 30 |
| 7.8 | Indemnification | 30 |
| 7.9 | Resignation and Removal; Replacement | 30 |
| 7.10 | Other Activities | 31 |
| 7.11 | Distributions | 31 |
| 7.12 | Expenses | 31 |
| 7.13 | Affiliates; Fees | 31 |

ARTICLE VIII CONTRIBUTIONS AND CAPITAL ACCOUNTS ..................32

| | | |
|---|---|---|
| 8.1 | Initial Capital Contributions | 32 |
| 8.2 | Indemnification | 13 |
| 8.3 | Shares | 32 |
| 8.4 | Additional Capital Contributions | 33 |
| 8.5 | Enforcement of Commitments | 34 |
| 8.6 | Capital Account | 35 |
| 8.7 | No Obligation to Restore Deficit Balance | 38 |
| 8.8 | Withdrawal; Successors | 38 |
| 8.9 | Interest | 38 |
| 8.10 | Investment of Capital Contributions and Company Cash | 38 |
| 8.11 | Repayment of Capital Contribution. | 39 |

ARTICLE IX ALLOCATIONS AND DISTRIBUTIONS ..................40

| | | |
|---|---|---|
| 9.1 | Profits and Losses | 40 |
| 9.2 | Profits | 40 |
| 9.3 | Special Allocations | 40 |
| 9.4 | Curative Allocations | 46 |
| 9.5 | Section 754 Election | 47 |
| 9.6 | Other Allocation Rules | 47 |
| 9.7 | Distribution of Net Cash Flow. | 50 |
| 9.8 | Allocation of Gain or Loss upon Winding Up. | 51 |

ARTICLE X TAXES ..................53

| | | |
|---|---|---|
| 10.1 | Tax Matters Partner | 54 |

ARTICLE XI TRANSFER OF MEMBERSHIP INTEREST ..................55

| | | |
|---|---|---|
| 11.1 | Compliance with Securities Laws and this Agreement | 55 |
| 11.2 | Transfer of Shares; Admission of Substitute Member | 55 |
| 11.3 | Dispositions Not in Compliance with this Article Void | 56 |
| 11.4 | Transfer to Affiliate of a Member | 56 |
| 11.5 | Future Sales and Preemptive Rights | 57 |

ARTICLE XII DISSOCIATION OF A MEMBER ..................58

| | | |
|---|---|---|
| 12.1 | Dissociation | 58 |

[TPW: NYLEGAL:460852.1] 19499-00000  03/09/2006 06:00 PM

| | | |
|---|---|---|
| 12.2 | Rights of Dissociating Member | 59 |
| **ARTICLE XIII DISSOLUTION AND WINDING UP** | | **60** |
| 13.1 | Dissolution | 60 |
| 13.2 | Effect of Dissolution | 61 |
| 13.3 | Distribution of Assets on Dissolution | 61 |
| 13.4 | Winding Up and Certificate of Dissolution | 63 |
| **ARTICLE XIV MISCELLANEOUS** | | **63** |
| 14.1 | Termination of License | 26 |
| 14.2 | Notices | 63 |
| 14.3 | Headings | 64 |
| 14.4 | Entire Agreement | 64 |
| 14.5 | Binding Agreement | 64 |
| 14.6 | Saving Clause | 64 |
| 14.7 | Counterparts | 65 |
| 14.8 | Governing Law | 65 |
| 14.9 | No Partnership Intended for Nontax Purposes | 65 |
| 14.10 | No Rights of Creditors and Third Parties | 66 |
| 14.11 | Customers/Non-Compete | 27 |
| 14.12 | Confidentiality | 27 |
| 14.13 | Dispute Resolution | 66 |
| 14.14 | General Interpretive Principles | 70 |

[TPW: NYLEGAL:460852.1] 19499-00000 03/09/2006 06:00 PM

# LIMITED LIABILITY COMPANY AGREEMENT
## OF
### CAFÉ LA RICA, LLC

This Limited Liability Company Agreement of **Café La Rica, LLC,** a limited liability company organized pursuant to the Delaware Limited Liability Company Act, is entered into and shall be effective as of the Effective Date, by and among the Company and the persons executing this Agreement as Members.

## ARTICLE I
## DEFINITIONS

For purposes of this Agreement, unless the context clearly indicates otherwise, the following terms shall have the following meanings:

1.1 **Act.** The Delaware Limited Liability Company Act and all amendments thereto.

1.2 **Additional Capital Contribution.** An additional Capital Contribution payable by a Member to the Company pursuant to Article VIII.

1.3 **Affiliate.** With respect to any Person, any entity controlling, controlled by or under common control with such Person. "Control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of over 50% of the voting securities of such Person, by contract or otherwise.

1.4 **Agreement.** This Limited Liability Company Agreement including all amendments adopted in accordance with this Agreement and the Act.

1.5 **Annual Independent Audit.** Annual Independent Audit shall have the meaning set forth in Section 4.3.

1.6 **Assignee or "Transferee."** A transferee of an Economic Interest who has not been admitted as a Substitute Member. Unless otherwise clear from the context of its use, the term "transferee" is synonymous with the term "Assignee."

1.7 **Bankrupt Member.** A Member who: (a) files a petition in bankruptcy, or is adjudicated as bankrupt or insolvent, or makes an assignment for the benefit of creditors, or an arrangement pursuant to any bankruptcy law; (b) discontinues or dissolves its business; or (c) has a receiver appointed for such Member or such Member's business and such receiver is not discharged within sixty (60) days.

1.8 **Board of Managers.** A Board constituted with those Persons selected to manage the affairs of the Company under Article VII hereof.

1.9 **Business Day.** Any day other than Saturday, Sunday or any legal holiday observed in the State of Delaware.

1.10 **Capital Account.** The account maintained for a Member or an Assignee determined in accordance with Article VIII.

1.11 **Capital Contribution.** A Member's Initial Capital Contribution plus any Additional Capital Contribution made by the Member in accordance with this Agreement. A Capital Contribution includes (a) the amount of any money contributed by the Member to the Company (including liabilities of the Company assumed by the Member as provided in section 1.704-1(b)(2)(iv)(c) of the Regulations), and (b) the Gross Asset Value of any Property contributed to the Company by such Member (net of liabilities secured by such contributed Property that the Company is considered to assume or take subject to under section 752 of the Code).

1.12 **Certificate of Formation.** The Certificate of Formation of the Company, as amended from time to time, filed with the Secretary of State of the State of Delaware.

1.13 **Code.** The Internal Revenue Code of 1986, as amended and in effect from time to time.

1.14 **Coffee Bean Trading.** The Coffee Bean Trading-Roasting LLC, a Delaware limited liability company.

1.15 **Coffee Holding.** Coffee Holding Co., Inc., a Nevada corporation.

1.16 **Commitment.** The Initial Capital Contribution and Additional Capital Contributions that a Member is obligated to make.

1.17 **Company.** Café La Rica, LLC, a limited liability company formed under the laws of Delaware, and any successor limited liability company

1.18 **Company Property.** Any Property owned by the Company.

1.19 **Confidential Information.** Confidential Information shall have the meaning set forth in Section 14.10.

1.20 **Default Interest Rate.** The prime rate published by the Wall Street Journal, New York City edition, for the last Business Day on which a Commitment is payable.

1.21 **Delinquent Member.** Delinquent Member shall have the meaning set forth in Section 8.4.

1.22 **Disposition (Dispose).** Any sale, assignment, exchange, mortgage, pledge, grant, hypothecation or other transfer, absolute or as security or encumbrance (including dispositions by operation of law).

1.23 **Dissociation.** Any action which causes a Person to cease to be a Member as described in Article XIII hereof.

1.24 **Dissolution Event.** An event, the occurrence of which will result in the dissolution of the Company under Article XIII.

1.25 **Distribution.** A transfer of Property to a Member on account of a Membership Interest.

1.26 **Economic Interest.** The right to receive allocations of Profits and Losses, Distributions, returns of capital and distribution of assets upon a dissolution of the Company.

1.27    **Effective Date.** March 10, 2006.

1.28    **Equity Offering.** Equity Offering shall have the meaning set forth in Section 11.5.

1.29    **Exhibit A.** Exhibit A to this Agreement setting forth the name, address, Initial Capital Contribution, Initial Membership Interest and Initial Sharing Ratio of each Member.

1.30    **Fair Market Value.**

(a)     As of any date, the fair market value of an asset on such date as determined in good faith by the Board of Managers.  For this purpose, the Board of Managers may in its reasonable and prudent discretion value assets that are restricted by law, contract, market conditions (including trading volume relative to the Company's holding) or otherwise as to salability or transferability at an appropriate discount, based on the nature and term of such restrictions.

(b)     With respect to any Membership Interest or Shares, fair market value shall be based on the Company being operated as a going concern without any adjustment for marketability or minority interest.  Fair market value shall be determined, in accordance with the preceding sentence, in good faith by the Board of Managers.

1.31    **Fiscal Year.** The twelve month period ending on October 31 of each calendar year.

1.32    **Gross Asset Value.** Gross Asset Value, with respect to any Company asset, means the adjusted basis of such asset for federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any Company asset contributed by a Member to the Company shall be the Fair Market Value of such Company asset as of the date of such contribution;

(b)     The Gross Asset Value of each Company asset shall be adjusted to equal its Fair Market Value, as of the following times:  (i) the acquisition of an additional Membership Interest by any new or existing Member in exchange for more than a de minimis Capital Contribution unless the Board of Managers determines that such adjustment is not necessary to reflect the relative Economic Interests of the Members in the Company; (ii) the Distribution by the Company to a Member of more than a de minimis amount of Company assets (other than cash) as consideration for all or part of its Membership Interest unless the Board of Managers determines that such adjustment is not necessary to reflect the relative Economic Interests of the Members in the Company; and (iii) the liquidation of the Company within the meaning of section 1.704-1(b)(2)(ii)(g) of the Regulations;

(c)     The Gross Asset Value of a Company asset distributed to any Member shall be the Fair Market Value of such Company asset as of the date of Distribution thereof;

(d)     The Gross Asset Value of each Company asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted basis of such Company asset pursuant to section 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to section 1.704-1(b)(2)(iv)(m) of the Regulations; and

3

(e)     If the Gross Asset Value of a Company asset has been determined or adjusted pursuant to paragraph (a), (b) or (d) above, such Gross Asset Value shall thereafter be adjusted to reflect the depreciation or amortization taken into account with respect to such Company asset for purposes of computing Profits and Losses.

1.33     **Initial Capital Contribution.** With respect to any Member, the Initial Capital Contribution set forth in Exhibit A opposite the name of such Member.

1.34     **Initial Membership Interest.** With respect to any Member, the Initial Membership Interest (as represented in Shares) set forth in Exhibit A opposite the name of such Member.

1.35     **Initial Sharing Ratio.** With respect to any Member, the Initial Sharing Ratio set forth in Exhibit A opposite the name of such Member.

1.36     **Initial Value.** With respect to any Member, the Initial Value set forth on Exhibit A opposite the name of such Member.

1.37     **Management Right.** The right, if any, of a Member to participate in the management of the Company, to vote on any matter and to grant or withhold consent or approval of actions of the Company.

1.38     **Manager.** Manager shall have the meaning set forth in Section 7.1.

1.39     **Member.** A party executing this Agreement and a Substitute Member.

1.40     **Membership Interest.** A Member's Economic Interest and Management Right which shall be represented by Shares of the Company.

1.41     **Minimum Working Capital.** The Minimum Working Capital shall mean $100,000.

1.42     **Net Cash Flow.** Net Cash Flow shall mean, with respect to any fiscal period of the Company, all cash revenues of the Company during that period, decreased by, without duplication, (a) cash expenditures for operating expenses, (b) capital expenditures to the extent not made from reserves, (c) repayment of principal on any financing and (d) taxes.

1.43     **New Securities.** Means any equity interests in the Company issued after the date of this Agreement whether now authorized or not, including, but not limited to, Shares, Membership Interests or any warrants, options, convertible securities or other contracts or rights to purchase Shares, Membership Interests or securities of the Company.

1.44     **Offering Allocation.** Offering Allocation shall have the meaning set forth in Section 11.5.

1.45     **Officer.** Any individual appointed as an officer of the Company in accordance with Section 7.4.

1.46     **Organization.** A Person other than a natural person.  Organization includes, without limitation, corporations (both non-profit and other corporations), partnerships (both limited and general), joint ventures, limited liability companies and unincorporated associations, but the term does not include joint tenancies and tenancies by the entirety.

4

1.47    **Person.** An individual, trust, estate or any Organization permitted to be a member of a limited liability company under the laws of the State of Delaware.

1.48    **Principal Office.** The Principal Office of the Company set forth in Section 2.6.

1.49    **Proceeding.** Any administrative, judicial or other adversary proceeding, including, without limitation, litigation, arbitration, administrative adjudication, mediation and appeal or review of any of the foregoing.

1.50    **Profits and Losses.** For each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or period, determined in accordance with section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(a)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Section shall be added to such taxable income or loss;

(b)    Any expenditures of the Company described in section 705(a)(2)(B) of the Code or treated as section 705(a)(2)(B) of the Code expenditures pursuant to section 1.704-1(b)(2)(iv)(i) of the Regulations (other than expenses in respect of which an election is properly made under section 709 of the Code), and not otherwise taken into account in computing Profits or Losses pursuant to this Section, shall be subtracted from such taxable income or loss;

(c)    In the event the Gross Asset Value of any Company asset is adjusted pursuant to paragraph (b) or (d) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such Company asset for purposes of computing Profits or Losses;

(d)    Gain or loss resulting from any disposition of any Company asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Company asset disposed of, notwithstanding that the adjusted tax basis of such Company asset may differ from its Gross Asset Value;

(e)    In accordance with section 1.704-1(b)(2)(iv)(g)(3) of the Regulations, depreciation with respect to any Company asset shall be computed by reference to the adjusted Gross Asset Value of such asset, notwithstanding that the adjusted tax basis of such Company asset differs from its Gross Asset Value; and

(f)    Notwithstanding any other provisions of this definition, Profits and Losses shall not include allocations under section 704(c) (which are set forth at Section 9.3(i) hereof) or Regulatory Allocations.

1.51    **Property.** Any property, real or personal, tangible or intangible, including money, and any legal or equitable interest in such property, but excluding services and promises to perform services in the future.

1.52    **Regulations.** The final and temporary federal income tax regulations promulgated by the United States Treasury Department under the Code as such regulations may be amended from time to

[TPW: NYLEGAL:460852.1] 19499-00000  03/09/2006 06:00 PM

time, or if no final or temporary regulations with respect to a tax issue are then in effect, proposed regulations then in effect if approved by the Board of Managers. All references herein to a specific section of the Regulations shall be deemed also to refer to any corresponding provision of succeeding Regulations.

1.53    **Regulatory Allocations.** Regulatory Allocations shall mean the allocations set forth at Sections 9.3(a) through (g).

1.54    **Related Person.** Means:

With respect to a particular individual:

    (a)    each member of such individual's Family;

    (b)    any Person that is directly or indirectly controlled by any one or more members of such individual's Family;

    (c)    any Person in which members of such individual's Family hold (individually or in the aggregate) a Material Interest; and

    (d)    any Person with respect to which one or more members of such individual's Family serves as a director, officer, partner, executor or trustee (or in a similar capacity).

With respect to a specified Person other than an individual:

    (a)    any Person that directly or indirectly controls, is directly or indirectly controlled by or is directly or indirectly under common control with such specified Person;

    (b)    any Person that holds a Material Interest in such specified Person;

    (c)    each Person that serves as a director, officer, partner, executor or trustee of such specified Person (or in a similar capacity);

    (d)    any Person in which such specified Person holds a Material Interest; and

    (e)    any Person with respect to which such specified Person serves as a general partner or a trustee (or in a similar capacity).

For purposes of this definition, (a) "control" (including "controlling," "controlled by," and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and shall be construed as such term is used in the rules promulgated under the Securities Act; (b) the "Family" of an individual includes (i) the individual, (ii) the individual's spouse, (iii) any other natural person who is related to the individual or the individual's spouse within the second degree and (iv) any other natural person who resides with such individual; and (c) "Material Interest" means direct or indirect beneficial ownership (as defined in Rule 13d-3 under the Securities Exchange Act of 1934) of voting securities or other voting interests representing at least ten percent (10%) of the outstanding voting power of a Person or equity securities or other equity interests representing at least ten percent (10%) of the outstanding equity securities or equity interests in a Person.

1.55    **Securities Act.** The Securities Act of 1933, as amended.

1.56   **Share.**  A share of a Membership Interest as described in Section 8.2.

1.57   **Sharing Ratio.**  With respect to any Member as of any date, the ratio (expressed as a percentage) of (a) such Member's Shares to (b) the aggregate outstanding Shares of all Members, or such other ratio as shall be agreed by all Members from time to time.  The Initial Membership Interest and the Initial Sharing Ratio of each Member are set forth in Exhibit A, and Exhibit A shall be amended as necessary to conform to any changes thereto agreed to by the Members.  In the event all or any portion of a Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Membership Interest and Sharing Ratio of the transferor to the extent it relates to the transferred Membership Interest.

1.58   **Substitute Member.**  An Assignee who has been admitted to all of the rights of membership pursuant to Section 11.2.

1.59   **Tax Characterization and Additional Tax Terms.**  It is intended that the Company be characterized and treated as a partnership for, and solely for, federal, state and local income tax purposes.  For such purpose, the Company shall be subject to all of the provisions of subchapter K of chapter 1 of subtitle A of the Code, and all references to a "Partner," to "Partners" and to the "Partnership" in this Agreement (including the provisions of Articles VIII and IX) and in the provisions of the Code and Regulations cited in this Agreement shall be deemed to refer to a Member, the Members and the Company, respectively.  In addition, the following terms shall have the following meanings:

   (a)   Adjusted Capital Account Deficit shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

      (i)   Credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to section 1.704-1(b)(2)(ii)(c) or the penultimate sentences of sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

      (ii)   Debit to such Capital Account the items described in sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

   (b)   Nonrecourse Deductions has the meaning set forth in section 1.704-2(b)(1) of the Regulations.

   (c)   Nonrecourse Liability has the meaning set forth in section 1.704-2(b)(3) of the Regulations.

   (d)   Partner Nonrecourse Debt has the meaning set forth in section 1.704-2(b)(4) of the Regulations.

   (e)   Partner Nonrecourse Debt Minimum Gain means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with section 1.704-2(i)(3) of the Regulations.

     (f)    <u>Partner Nonrecourse Deductions</u> has the meaning set forth in sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Regulations.

     (g)    <u>Partnership Minimum Gain</u> has the meaning set forth in sections 1.704-2(b)(2) and 1.704-2(d) of the Regulations.

    1.60    **Winding Up Sale.** Winding Up Sale shall have the meaning set forth in Section 9.9(a).

## ARTICLE II
## FORMATION

    2.1    **Organization.** The Members hereby organize the Company as a Delaware limited liability company pursuant to the provisions of the Act.

    2.2    **Agreement.** For and in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members executing this Agreement hereby agree to the terms and conditions of this Agreement, as it may from time to time be amended; provided, however, that this Agreement shall not be effective unless and until the following agreements are fully executed by the appropriate parties: (a) a Lease Agreement between the Company and Perc Enterprises, in form attached hereto as <u>Exhibit B</u>; (b) an Expense Sharing Agreement between the Company and Coffee Holding, in the form attached hereto as <u>Exhibit C</u>; (c) a License Agreement between the Company and Coffee Bean Trading, in the form attached hereto as <u>Exhibit D</u>; (d) a License Agreement between the Company and Coffee Holding, in form attached hereto as <u>Exhibit E</u>; and (e) an Employment Agreement between the Company and Mr. Ernesto Aguila in the form attached hereto as <u>Exhibit F</u>. It is the express intention of the Members that this Agreement shall be the sole source of agreement of the parties with respect to the subject matter hereof, and, except to the extent a provision of this Agreement expressly incorporates federal income tax rules by reference to sections of the Code or Regulations or is expressly prohibited or ineffective under the Act, this Agreement shall govern, even when inconsistent with, or different than, the provisions of the Act or any other law or rule. To the extent any provision of this Agreement is prohibited or ineffective under the Act, this Agreement shall be considered amended to the smallest degree possible in order to make this Agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a way to make any provision of this Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

    2.3    **Name.** The name of the Company is Café La Rica, LLC, and all business of the Company shall be conducted under that name or under any other name determined by the Board of Managers but, in any case, only to the extent permitted by applicable law.

    2.4    **Term.** The term of the Company shall be perpetual unless the Company shall be sooner dissolved and its affairs wound up in accordance with the Act or this Agreement.

    2.5    **Registered Agent and Office.** The registered agent for the service of process and the registered office shall be that Person and location reflected in the Certificate of Formation as filed in the office of the Secretary of State of the State of Delaware. The Board of Managers may, from time to time, change the registered agent or office through appropriate filings with the Secretary of State of the State of Delaware. In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Board of Managers shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be. If the Board of Managers shall fail to designate a

replacement registered agent or change of address of the registered office, any Member may designate a replacement registered agent or file a notice of change of address.

2.6 **Principal Office.** The Principal Office of the Company shall be located at 2131 NW 72nd Avenue, Miami, Florida 33122.

## ARTICLE III
## PURPOSE; NATURE OF BUSINESS

The purpose of the Company is to engage in the roasting, packaging and sale of Café La Rica and other branded coffee products, and to engage in any other lawful act or activity, as determined by the Board of Managers from time to time, for which limited liability companies may be organized under the Act. The Company shall have the authority to do all things necessary or convenient to accomplish its purposes and operate its business as described in this Article III. The Company exists only for the purposes specified in this Article III. The authority granted to the Board of Managers under this Agreement to bind the Company shall be limited to actions necessary or convenient to the purposes specified in this Article III and to the extent provided by Section 6.6.

## ARTICLE IV
## ACCOUNTING AND RECORDS

4.1 **Records to be Maintained.** The Company shall maintain at the Principal Office, the Company's books and records, including financial statements of the Company and all other documents and data regarding the Company, which shall be open to inspections by the Members or their agents at any reasonable time.

4.2 **Reports to Members.** The Board of Managers shall provide reports to the Members, including a balance sheet, a statement of profit and loss and changes in Members' accounts and a statement of cash flows, within fifteen (15) days of the end of each month.

4.3 **Annual Audit.** Within ninety (90) days of the end of each Fiscal Year, the Board of Managers shall cause the annual financial statements of the Company to be audited by the independent registered public accounting firm responsible for conducting the audit of the financial statements of Coffee Holding for the same period ("**Annual Independent Audit**").

4.4 **Tax Returns and Reports.** The Board of Managers, at the Company's expense, shall prepare and timely file income tax returns of the Company in all jurisdictions where such filings are required, and shall prepare and deliver to each Member, within the time prescribed by the Code and any extensions applicable thereto, as provided by the Code or applicable regulations, all information returns required by the Code and Company information necessary for the preparation of the Members' federal income tax returns.

## ARTICLE V
## CLASSES OF MEMBERSHIP; NAMES AND ADDRESSES OF MEMBERS

There shall be only one class of Members. The names and addresses of the Members are as stated on Exhibit A.

## ARTICLE VI
## RIGHTS AND DUTIES OF MEMBERS; RESTRICTIVE COVENANTS

6.1     **No Management Rights as Members.** No Member shall have authority as a Member to bind the Company.

6.2     **Liability of Members.** No Member shall be liable as such for the debts, obligations or liabilities of the Company.

6.3     **Indemnification.** A Member shall indemnify the Company for any costs or damages incurred by the Company as a result of any unauthorized action by such Member.

6.4     **Representations, Warranties and Covenants.** Each Member, and in the case of a trust or other Organization, the person(s) executing this Agreement on behalf of such trust or other Organization, hereby represents and warrants to the Company and to each other Member that: (a) if that Member is a trust or other Organization, it has the requisite power to enter into this Agreement and to perform its obligations hereunder and that the person(s) executing this Agreement on behalf of such trust or other Organization has the requisite power to do so; and (b) the Member is acquiring its interest in the Company for the Member's own account as an investment and without an intent to distribute the interest. The Members acknowledge that their interests in the Company have not been registered under the Securities Act or any state securities laws and may not be resold or transferred without appropriate registration or the availability of an exemption from such requirements.

6.5     **Conflicts of Interest.**

(a)     The Members shall account to the Company and hold as trustee for it any Property, Profit or benefit derived by the Member, without the consent of all of the other Members, in the conduct and winding up of the Company business or from a use or appropriation by the Member of Company Property, including information developed exclusively for the Company and opportunities expressly offered to the Company.

(b)     A Member does not violate a duty or obligation to the Company merely because the Member's conduct furthers the Member's own interest. A Member may lend money to and transact other business with the Company. The rights and obligations of a Member who lends money to or transacts business with the Company are the same as those of a Person who is not a Member, subject to other applicable law. No transaction with the Company shall be voidable solely because a Member has a direct or indirect interest in the transaction if the transaction is fair to the Company.

6.6     **Restrictive Covenants.** Notwithstanding anything contained herein to the contrary, the Company shall not take any of the following actions without the prior written consent of each Member:

(a)     amend the Certificate of Formation or this Agreement;

(b)     purchase any interest in the stock, assets or business of any corporation, partnership or other entity other than in the ordinary course of the Company's business;

(c)     appoint or discharge any members of the Board of Managers of the Company, other than pursuant to the provisions set forth in Article VII;

10

(d)     enter into any arrangement which will result in the merger, consolidation, dissolution, liquidation, winding up or cessation of the Company or the business activities of the Company;

(e)     dispose of, purchase or lease any asset of the Company other than in the ordinary course of the Company's business;

(f)     issue any New Securities;

(g)     require Additional Capital Contributions from the Members;

(h)     admit any new Members or permit the withdrawal of any existing Member;

(i)     file a voluntary petition or otherwise initiate proceedings to have the Company adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Company, or file a petition seeking or consenting to reorganization or relief of the Company as debtor under any applicable federal or state law relating to bankruptcy, insolvency, or other relief for debtors with respect to the Company; or seek or consent to the appointment of any trustee, receiver, conservator, assignee, sequestrator, custodian, liquidator (or other similar official) of the Company or of all or any substantial part of the properties and assets of the Company, or make any general assignment for the benefit of creditors of the Company, or admit in writing the inability of Company to pay its debts generally as they become due or declare or effect a moratorium on the Company debt or take any action in furtherance of any such action;

(j)     sell or transfer any asset of the Company to a Related Person unless such sale or transfer is made at Fair Market Value;

(k)     increase or decrease the number of Managers the Company is authorized to have; or

(l)     authorize additional Shares.


## ARTICLE VII
## BOARD OF MANAGERS AND OFFICERS

7.1     **Board of Managers.** The management of the Company and all decisions concerning the business affairs of the Company shall be made by the Board of Managers. The Board of Managers shall consist of two (2) managers, one of which shall be elected by each of the Members. Each Manager shall have one (1) vote with respect to all matters requiring the vote of the Board of Managers. No individual member of the Board of Managers (a "**Manager**") shall have the right to act on behalf of the Company without the written consent of the other Manager or absent authorization by resolution of the Board of Managers. The initial Board of Managers shall consist of those persons listed on Exhibit G hereto.

7.2     **Voting.** Except as otherwise provided in this Agreement, the affirmative vote of a majority of the members of the Board of Managers shall constitute the act of the Board of Managers. If there are only two members on the Board of Managers, then the affirmative vote of both members shall constitute the act of the Board of Managers.

[TPW: NYLEGAL:460852.1] 19499-00000  03/09/2006 06:00 PM

7.3     **Term of Office as a Member of the Board of Managers.**  Each member of the Board of Managers shall serve until his or her removal by the Member who appointed him or her or any resignation of such member of the Board of Managers pursuant to Section 7.8.  A member of the Board of Managers may be removed by the Member who appointed him or her at any time, with or without cause.

7.4     **Incapacitation of a Manager.**  In the event that any Manager becomes incapacitated such that he or she us incapable in any material respect of performing the services required by such Manager in accordance with this Agreement on a regular ongoing basis for a period of sixty (60) days, such Manager shall automatically be removed from the Board of Managers and replaced by a newly elected Manager as shall be determined by the Member who appointed such incapacitated Manager to the Board of Managers.

7.5     **Officers.**  The Board of Managers may appoint one or more Officers of the Company as it shall determine from time to time advisable with such titles as the Board of Managers deems appropriate.  Any two or more offices may be held by the same person.  All Officers shall have such authority and perform such duties in the management and operation of the Company as may be prescribed by the Board of Managers or this Agreement.  Any Officer may be removed at any time, with or without cause, by the Board of Managers, and any vacancy occurring in any office shall be filled by the Board of Managers.  The initial Officers of the Company shall be as set forth on Exhibit H hereto.

7.6     **Authority to Bind the Company.**  The Officers shall have such authority as is granted by the Board of Managers (including, if authorized, the authority to bind the Company), subject to the authority of the Board of Managers.  The Board of Managers has the power, on behalf of the Company, to do all things necessary or convenient to carry out the business and affairs of the Company (as described in Article III), including, without limitation:

(a)     To institute, prosecute and defend any Proceeding in the Company's name;

(b)     To conduct the Company's business, establish Company offices and exercise the powers of the Company;

(c)     To employ, contract and deal with, from time to time, Persons, including any Member or Affiliate of any Member, in connection with the management and operation of the Company's business, including without limitation, suppliers, customers, tradespeople, brokers, accountants and attorneys, on such terms as the Board of Managers shall determine;

(d)     To purchase liability and other insurance to protect the Company's business and Property;

(e)     To establish reserve funds of the Company to provide for future requirements for operations, contingencies or any other purpose that the Board of Managers deems necessary or appropriate;

(f)     To make such elections under the Code and other relevant tax laws as to the treatment of items of Company income, gain, loss, deduction and credit, and as to all other relevant matters as the Board of Managers, with the advice of the Company's accountants and attorneys, deems necessary or appropriate, including without limitation, elections referred to in section 754 of the Code (subject to Section 9.6), the determination of which items of cash outlay shall be capitalized or treated as current expenses, and the selection of the method of accounting and bookkeeping procedures to be used by the Company;

12

(g)     To pay as a Company expense any and all costs or expenses associated with the formation, development, organization and operation of the Company;

(h)     To deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement; and

(i)     To execute, acknowledge and deliver any and all instruments to effectuate the foregoing.

All Company cash shall be deposited in a bank account selected by the Board of Managers, and all disbursements of Company cash shall be approved in advance by those Persons designated by the Board of Managers.

7.7     **Actions of the Board of Managers.** The Board of Managers has the power to bind the Company as provided in this Article VII. No Person dealing with the Company shall have any obligation to inquire into the power or authority of any Person designated by the Board of Managers to act on behalf of the Company.

7.8     **Indemnification.** The Company shall indemnify the Board of Managers and any officers or agents appointed by the Board of Managers for all costs, losses, liabilities and damages paid or incurred in connection with the business of the Company, to the fullest extent provided or allowed by the laws of the State of Delaware.

7.9     **Resignation and Removal; Replacement.** Any member of the Board of Managers may resign upon at least 30 days' prior written notice to the Members. In the event of the resignation or removal of any member of the Board of Managers, the Member who appointed such member of the Board of Managers shall appoint a replacement member of the Board of Managers.

7.10    **Other Activities.** The members of the Board of Managers, in their capacity as such, shall not be required to devote their full time to the management of the Company business, but only so much of their time as the Board of Managers deems necessary or appropriate for the proper management of such business. The members of the Board of Managers, and any of their Affiliates, may engage or possess an interest, independently or with others, in other businesses or ventures of every nature and description, and neither the Company nor any Member shall have any rights in or to such ventures or the income or profits derived therefrom.

7.11    **Distributions.** Each Member shall look solely to the assets of the Company for all Distributions and a share of Profits or Losses and shall have no recourse therefor (upon dissolution or otherwise) against the Board of Managers or any of the other Members.

7.12    **Expenses.** The Company shall pay directly or reimburse the Board of Managers for certain expenses of the Company incurred by the Board of Managers in the management of the Company's business. Such expenses may include but are not limited to: (a) costs of borrowed money and taxes applicable to the Company; (b) fees and expenses paid to suppliers, tradespeople, brokers, consultants and other agents; (c) costs of insurance as required in connection with the conduct of the business of the Company; and (d) expenses incurred by the Company for tax return preparation.

7.13    **Affiliates; Fees.** The Board of Managers is specifically authorized to employ, contract and deal with, from time to time, any Member or Affiliate of any Member, and in connection therewith to pay such Person's fees, prices or other compensation; provided that such employment, contracts and dealings are necessary or appropriate for the Company's purposes, and the fees, prices or other

13

compensation paid by the Company therefor is, in the judgment of the Board of Managers, reasonable and typical or competitive with the fees, prices or other compensation customarily paid for similar Property or services.

Nothing herein contained shall be construed as a guaranty by the Board of Managers of the performance by any Affiliate, designee or nominee of its obligations under any contract between any such Affiliate, designee or nominee and the Company.

## ARTICLE VIII
## CONTRIBUTIONS AND CAPITAL ACCOUNTS

8.1     **Initial Capital Contributions.** Concurrently with the execution and delivery of this Agreement, each Member shall make the Initial Capital Contribution described for that Member on Exhibit A. No Member shall have the right to withdraw or be repaid any Capital Contribution except as provided in this Agreement.

8.2     **Indemnification.** Each Member shall indemnify the other Members and the Company against any and all liabilities of such indemnifying Member which are imputed to the other Members or the Company.

8.3     **Shares.** The Company shall issue Shares to represent each Member's Membership Interest. The total number of Shares that the Company is authorized to issue is one thousand (1,000) Shares. The Company may authorize additional Shares only with the written consent of, and with terms and conditions approved by, the Board of Managers and subject to the provisions of Section 11.5. The initial number of issued and outstanding Shares is set forth on Exhibit A.

8.4     **Additional Capital Contributions.** In the event the Board of Managers determines that the Company does not have sufficient operating revenues or other available funds to pay any amount which the Board of Managers determines to be required for any Company purpose, the Board of Managers shall, if reasonable under the circumstances, attempt to obtain financing in the amount required; *provided, however,* that the Board of Managers shall not obtain such financing if it would cause a default under any Company obligation. If such financing cannot be obtained within a reasonable time and upon terms and conditions approved by the Board of Managers, the Board of Managers may, pursuant to Section 6.6 above, solicit and accept on behalf of the Company Additional Capital Contributions from the Members. Unless otherwise agreed by all Members, any Additional Capital Contribution shall be made by the Members pro rata, based on their respective Sharing Ratios. In the event that a Member does not make such an Additional Capital Contribution, then its Membership Interest, including its Sharing Ratio, in the Company shall be diluted as a result of the Additional Capital Contributions then being made by the other Members. A Member is not obligated to make an Additional Capital Contribution unless such Member affirmatively agrees to such obligation in writing.

8.5     **Enforcement of Commitments.** In the event any Member (a "**Delinquent Member**") fails to perform the Delinquent Member's Commitment, the Board of Managers shall give the Delinquent Member a notice of such failure. If the Delinquent Member fails to perform the Commitment (including the payment of any costs associated with the failure and interest at the Default Interest Rate) within ten Business Days of the giving of such notice, the Board of Managers may take such action as it deems appropriate, including but not limited to:

(a)     Enforcing the Commitment in the court of appropriate jurisdiction in the state in which the Principal Office is located or the state of the Delinquent Member's address as reflected in this Agreement; *provided, however,* that a Member shall have no personal liability for any Additional Capital Contribution and, in any proceeding to enforce the obligation of a Member to make all or part of any such Additional Capital Contribution, the Board of Managers shall have recourse solely to the Delinquent Member's interest in the Company.  Each Member expressly agrees to the jurisdiction of such courts but only for purposes of such enforcement.

(b)     Selling the Delinquent Member's Shares, including a sale to another Member or to another Person.

(c)     Allowing Members, except the Delinquent Member, to make Additional Capital Contributions and adjusting the Sharing Ratios and Shares of the Members in proportion to the new Capital Contribution levels.

(d)     Reducing the Delinquent Member's Membership Interest and Shares.

(e)     Issuing new Shares to Members who make Additional Capital Contributions in place of the Delinquent Member; provided that such Shares may be entitled to a priority return and such other rights as shall be determined by the Board of Managers.

8.6     **Capital Account.** A separate capital account shall be maintained for each Member throughout the term of the Company in accordance with the rules of section 1.704-1(b)(2)(iv) of the Regulations as in effect from time to time. Except as otherwise provided in section 1.704-1(b)(2)(iv) of the Regulations, each Member's Capital Account shall initially consist of such Member's Initial Capital Contribution, and shall be maintained in accordance with the following provisions:

(a)     Each Member's Capital Account shall be credited with: (i) such Member's Additional Capital Contributions; and (ii) such Member's share of Profits and items of income and gain that are specially allocated to such Member pursuant to Article IX (other than any income or gain allocated to such Member pursuant to Section 9.3(i) in accordance with section 704(c) of the Code).

(b)     Each Member's Capital Account shall be debited with: (i) the amount of money distributed to such Member by the Company (including liabilities of such Member assumed by the Company as provided in section 1.704-1(b)(2)(iv)(c) of the Regulations) other than amounts which are in repayment of debt obligations of the Company to such Member; (ii) the Gross Asset Value of Property distributed to such Member (net of liabilities secured by such distributed Property that such Member is considered to assume or take subject to under section 752 of the Code); and (iii) such Member's share of Losses and items of loss and deduction that are specially allocated to such Member pursuant to Article IX (other than any deduction or loss allocated to such Member pursuant to Section 9.3(i) in accordance with section 704(c) of the Code).

(c)     If the Gross Asset Value of a Company asset differs from its adjusted tax basis, the Members' Capital Accounts shall be adjusted to reflect only allocations to them of depreciation, amortization and gain or loss as computed for book purposes (and not for tax purposes) with respect to such Company asset.  In such event, items of book depreciation, amortization and gain or loss shall be calculated in conformity with the rules of section 1.704-1(b)(2)(iv)(g) of the Regulations.

15

(d)     All such contributions, allocations and Distributions shall be credited or charged, as the case may be, to the appropriate Capital Accounts of the respective Members to whom they apply as of the time the contributions, allocations or Distributions are made.

(e)     The Capital Account of a transferee Member shall include the appropriate portion of the Capital Account of the Member from whom the transferee Member's interest was obtained.

(f)     In determining the amount of any liability, there shall be taken into account section 752 of the Code and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with section 1.704-1(b) of the Regulations, and shall be interpreted and applied in a manner consistent with such Regulations. Consistent with such intention, the value of any Property (other than cash) (i) contributed to the Company by a Member, (ii) distributed to a Member from the Company or (iii) owned by the Company and subject to a revaluation upon the occurrence of certain events shall be the Fair Market Value of such Property (net of liabilities secured by such Property that the Company or such Member, as the case may be, is considered to assume or take subject to under section 752 of the Code) on the date of contribution, Distribution or revaluation, as applicable.

8.7     **No Obligation to Restore Deficit Balance.**  No Member shall be required to restore any deficit balance in its Capital Account.

8.8     **Withdrawal; Successors.**  A Member shall not be entitled to withdraw any part of its Capital Account or to receive any Distribution from the Company, except as specifically provided in this Agreement.  Any Member, including any additional or substitute Member, who shall receive a Membership Interest or whose Membership Interest shall be increased by means of a transfer to it of all or part of the Membership Interest of another Member, shall have a Capital Account with respect to such interest initially equal to the Capital Account with respect to such interest of the Member from whom such interest is acquired.

8.9     **Interest.**  Except as otherwise provided in this Agreement, no Member shall be entitled to interest or other return on such Member's Capital Contribution or on any Profits retained by the Company.

8.10     **Investment of Capital Contributions and Company Cash.**  The Capital Contributions of the Members and any cash held by the Company from time to time shall be invested, until such time as such funds shall be used for other Company purposes, in demand, money market or time deposits or obligations, securities, investments or other instruments constituting cash equivalents.  Such investments shall be made by the Board of Managers for the benefit of the Company.

8.11     Repayment of Capital Contribution.

(a)     The members of the Board of Managers shall have no personal liability for the repayment of any Capital Contributions of any Member, and no Member shall have liability for the repayment of any Capital Contributions of any other Member.  The repayment of any Capital Contribution shall be made only to the extent of available Company assets in accordance with the terms of this Agreement.

16

(b)     Except as otherwise provided in this Agreement, no Member shall have priority over any other Member as to the return of its Capital Contribution or as to Distributions of cash made by the Company.

(c)     Except as otherwise provided in this Agreement, a Member shall not be entitled to (i) demand or receive Property other than cash in return for its Capital Contribution or (ii) receive any funds or Property of the Company.

# ARTICLE IX
## ALLOCATIONS AND DISTRIBUTIONS

9.1     **Profits and Losses.** Profits and Losses, and each item of Company income, gain, loss, deduction, credit and tax preference with respect thereto, for each Fiscal Year (or shorter period in respect of which such items are to be allocated) shall be allocated among the Members as provided in this Article IX.

9.2     **Allocation of Profits and Losses.** All items of Profits and Losses for any Fiscal Year shall be allocated to the Members in proportion to their respective Sharing Ratios.

9.3     **Special Allocations.** The following special allocations shall be made:

(a)     <u>Loss Limitation.</u> The Losses allocated pursuant to Section 9.2 shall not exceed the maximum amount of Losses that may be allocated to a Member without causing such Member to have an Adjusted Capital Account Deficit at the end of the Fiscal Year. If some, but not all of the Members would have adjusted Capital Account Deficits as a consequence of the allocations of Losses pursuant to Section 9.2, the limitation in this Section 9.3(a) shall be applied by allocating Losses pursuant to Section 9.3(a) only to those Members (allocated pro rata if more than one) who would not have an Adjusted Capital Account Deficit as a consequence of receiving such an allocation. All Losses in excess of the limitations set forth in this Section 9.3(a) shall be allocated among the Members in proportion to their respective Sharing Ratios.

(b)     <u>Minimum Gain Chargeback.</u> Except as otherwise provided in section 1.704-2(f) of the Regulations, notwithstanding any other provision of this Article IX, if there is a net decrease in Partnership Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Partnership Minimum Gain, determined in accordance with section 1.704-2(g) of the Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Regulations. This Section 9.3(b) is intended to comply with the minimum gain chargeback requirement in section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

(c)     <u>Partner Minimum Gain Chargeback.</u> Except as otherwise provided in section 1.704-2(i)(4) of the Regulations, notwithstanding any other provision of this Article IX, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Partner Nonrecourse Debt Minimum Gain as of the beginning of the Fiscal Year attributable to such Partner Nonrecourse Debt, determined in accordance with section 1.704-2(i)(5) of the Regulations, shall be specially

<div align="center">17</div>

allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with section 1.704-2(i)(4) of the Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Regulations. This Section 9.3(c) is intended to comply with the minimum gain chargeback requirement in section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently therewith.

(d)     Qualified Income Offset.  In the event any Member unexpectedly receives any adjustments, allocations or Distributions described in section 1.704-1(b)(2)(ii)(d)(4), section 1.704-1(b)(2)(ii)(d)(5) or section 1.704-1(b)(2)(ii)(d)(6) of the Regulations which increase a Member's Adjusted Capital Account Deficit, items of Company income and gain shall be specially allocated to the Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible, provided that an allocation pursuant to this Section 9.3(d) shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IX have been tentatively made as if this Section 9.3(d) were not in this Agreement.

(e)     Gross Income Allocation.  In the event any Member has an Adjusted Capital Account Deficit, such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 9.3(e) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IX have been made as if Section 9.3(d) and this Section 9.3(e) were not in this Agreement.

(f)     Nonrecourse Deductions.  Nonrecourse Deductions for any Fiscal Year shall be specially allocated among the Members in proportion to their Sharing Ratios.

(g)     Partner Nonrecourse Deductions.  Any Partner Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with section 1.704-2(i)(1) of the Regulations.

(h)     Certain Book-ups.  To the extent an adjustment to (i) the adjusted tax basis of any Company asset pursuant to section 734(b) or section 743(b) of the Code is required to be taken into account in determining Capital Accounts or (ii) pursuant to section 1.704-1(b)(2)(iv)(f) of the Regulations, the Gross Asset Value of any Company asset is permitted to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated, as provided in section 1.704-1(b)(2)(iv)(m) or section 1.704-1(b)(2)(iv)(g) of the Regulations, respectively, as an item of Profit (if the adjustment increases such basis or Gross Asset Value of the asset) or Loss (if the adjustment decreases such basis or Gross Asset Value), and such Profit or Loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Regulations.

[TPW: NYLEGAL:460852.1] 19499-00000 03/09/2006 06:00 PM

(i)   Mandatory Allocations under Section 704(c) of the Code.

(i)   In the event section 704(c) of the Code or the principles of section 704(c) of the Code applicable under section 1.704-1(b)(2)(iv) of the Regulations require allocations of income, gain, deduction or loss in a manner different than that set forth above, the provisions of section 704(c) of the Code and the Regulations thereunder shall control such allocations among the Members. Any item of Company income, gain, loss and deduction with respect to any Property (other than cash) that has been contributed by a Member to the capital of the Company and which is required or permitted to be allocated to such Member for income tax purposes under section 704(c) of the Code so as to take into account the variation between the tax basis of such Property and its Fair Market Value at the time of its contribution shall be allocated solely for income tax purposes in the manner so required or permitted under section 704(c) of the Code using the "traditional method" described in section 1.704-3(b) of the Regulations; *provided, however,* that any other method allowable under applicable Regulations may be used for any contribution of Property if the contributing Member and the Board of Managers agree as to the use of such other method.

(ii)   In the event the Gross Asset Value of any Company asset is adjusted pursuant to Section 9.3(h) in accordance with section 1.704-1(b)(2)(iv)(f) of the Regulations, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in a manner consistent with Section 9.3(i)(i).

(iii)   Except as provided in Sections 9.4(h)(i) and (ii), for United States federal, state and local income tax purposes, the income, gains, losses and deductions of the Company shall, for each taxable period, be allocated among the Members in the same manner and in the same proportion that such items have been allocated among the Members' respective Capital Accounts.

9.4   **Curative Allocations.** The Regulatory Allocations are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction. Therefore, notwithstanding any other provision of this Article IX (other than the Regulatory Allocations), the Board of Managers shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Section 9.2. In exercising its discretion under this Section 9, the Board of Managers shall take into account future Regulatory Allocations under Sections 9.3(b) and 9.3(c) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 9.3(f) and 9.3(g).

9.5   **Section 754 Election.** Upon a transfer by a Member of an interest in the Company, which transfer is permitted by the terms of this Agreement, or upon the death of a Member or the Distribution of any Company Property to one or more Members, the Board of Managers, upon the request of one or more of the transferees or distributees, shall cause the Company to file an election on behalf of the Company to cause the basis of the Company's Property to be adjusted for federal income tax purposes in the manner prescribed in section 734 or 743 of the Code, as the case may be. The cost of preparing

19

such election and any additional accounting expenses of the Company occasioned by such election shall be borne by such transferees or distributees.

9.6     Other Allocation Rules.

(a)     For purposes of determining the Profits, Losses or any other item allocable to any period (including allocations to take into account any changes in any Member's Sharing Ratio during a Fiscal Year and any transfer of any interest in the Company), Profits, Losses and any such other item shall be determined on a daily, monthly or other basis, as determined by the Board of Managers using any permissible method under section 706 of the Code and the Regulations thereunder.

(b)     Notwithstanding the above, allocations made pursuant to this Article IX shall be made annually within one hundred and five (105) days after the end of the Fiscal Year, but in no event may such allocations be made later than required by the Code.

(c)     The Members are aware of the income tax consequences of the allocations made by this Article IX and hereby agree to be bound by the provisions of this Article IX in reporting their shares of Company income and loss for income tax purposes.

(d)     Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of section 1.752-3(a)(3) of the Regulations, the Members' interests in Company Profits are in proportion to their Sharing Ratios.

(e)     To the extent permitted by section 1.704-2(h)(3) of the Regulations, the Board of Managers shall endeavor to treat Distributions made from the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt as Distributions that are not allocable to an increase in minimum gain to the extent that such Distributions would not cause or increase an Adjusted Capital Account Deficit for any Member.

(f)     Except as otherwise provided in this Article IX, an allocation of Company Profits or Losses to a Member shall be treated as an allocation to such Member of the same share of each item of income, gain, loss and deduction taken into account in computing such Profits or Losses.

(g)     For purposes of determining the character (as ordinary income or capital gain) of any Profits allocated to the Members pursuant to this Article IX, such portion of Profits that is treated as ordinary income attributable to the recapture of depreciation shall, to the extent possible, be allocated among the Members in the proportion which (i) the amount of depreciation previously allocated to each Member bears to (ii) the total of such depreciation allocated to all Members. This Section 9.6(g) shall not alter the amount of allocations among the Members pursuant to this Article IX, but merely the character of income so allocated.

(h)     Except for arrangements expressly described in this Agreement, no Member shall enter into (or permit any Person related to the Member to enter into) any arrangement with respect to any liability of the Company that would result in such Member (or a person related to such Member under section 1.752-4(b) of the Regulations) bearing the economic risk of loss (within the meaning of section 1.752-2 of the Regulations) with respect to such liability unless such arrangement has been approved by all Members. To the extent a Member is permitted to guarantee the repayment of any Company indebtedness under this Agreement, each of the other

20

Members shall be afforded the opportunity to guarantee such Member's pro rata share of such indebtedness, determined in accordance with the Members' respective Sharing Ratios.

9.7    **Distribution of Net Cash Flow.**

(a)    <u>Amounts and Timing</u>.  Provided that the Company's working capital shall not fall below the Minimum Working Capital level, and subject to the provisions of Section 13.3 and applicable law, Net Cash Flow for each Fiscal Year of the Company, shall be distributed to the Members in proportion to their respective Sharing Ratios within 30 days of the completion of the Annual Independent Audit, or at such earlier time or times as may be designated by the Board of Managers.

(b)    <u>Amounts Withheld</u>.  The Board of Managers is authorized to withhold from Distributions, or with respect to allocations, to the Members any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local tax law.  Any amounts required to be withheld pursuant to the Code or any provision of any state or local tax law with respect to any payment, distribution or allocation to the Company or the Members shall be treated as an amount distributed to the Member with respect to which such amount was withheld pursuant to this Section 9.7 for all purposes under this Agreement.

(c)    <u>Draws for Payment of Estimated Taxes</u>.  The Company shall pay to each Member an annual draw, not to exceed the amount reasonably necessary to provide for payment by the Members of any federal, state and local estimated taxes with respect to Profits allocated to the Members pursuant to this Article IX, and each such draw, if any, shall be treated as a loan from the Company to each Member receiving such draw and shall be deemed repaid by reducing the amount of each subsequent Distribution to the Member receiving such draw pursuant to this Section 9.7 by the lesser of (i) the entire amount otherwise distributable to the Member receiving such draw and (ii) the entire amount of any unrepaid draws pursuant to this Section 9.7(c).

9.8    **Allocation of Gain or Loss upon Winding Up.**

(a)    <u>Gain or Loss Realized on Sale of Company Property</u>.  Upon the winding up of the Company, as provided in Article XIII, net gain or loss realized on the sale or sales of Company Property (each such sale a "**Winding Up Sale**") shall be allocated among the Members in accordance with Section 9.2.

(b)    <u>Distributions in Kind</u>.  In the event that, upon a winding up of the Company, pursuant to Section 13.3, either (i) any Company Property is required to be distributed in kind, or (ii) the Board of Managers elects to distribute any Company Property in kind, the book value of such Property shall be adjusted to its Fair Market Value as of the date of such Distribution, and the amount of such adjustments shall be allocated to the Members' Capital Accounts in the manner provided in Section 9.8(a) as though such Property had been sold at its Fair Market Value and gain or loss had been realized.

[TPW: NYLEGAL:460852.1] 19499-00000  03/09/2006 06:00 PM

# ARTICLE X
## TAXES

10.1    **Tax Matters Partner.** Coffee Holding shall be the Tax Matters Partner of the Company pursuant to section 6231(a)(7) of the Code.  If Coffee Holdingshall cease to act as the Tax Matters Partner for any reason, the Members shall select another Member (subject to such Member's approval) to be the Tax Matters Partner.  The Tax Matters Partner shall receive no additional compensation from the Company for its services in that capacity, but all expenses incurred by the Tax Matters Partner in such capacity shall be borne by the Company.  The Tax Matters Partner is authorized to employ such accountants, attorneys and agents as it, in its sole discretion, determines is necessary to or useful in the performance of its duties.  The Tax Matters Partner is authorized to represent the Company before the Internal Revenue Service and any other governmental agency with jurisdiction, and to sign such consents and to enter into settlements and other agreements with such agencies as the Tax Matters Partner or its duly authorized officer deems necessary or advisable.  Each Member shall give prompt notice to each other Member of any and all notices it receives from the Internal Revenue Service concerning the Company, including any notice of a 30 day appeal letter and any notice of deficiency in tax concerning the Company's federal income tax returns.  The Tax Matters Partner shall give each Member periodic status reports regarding any negotiations between the Internal Revenue Service and the Company.  The Tax Matters Partner shall serve in a similar capacity with respect to any similar tax related or other election provided by state or local laws.

# ARTICLE XI
## TRANSFER OF MEMBERSHIP INTEREST

11.1    **Compliance with Securities Laws and this Agreement.** No Shares have been registered under the Securities Act or under any applicable state securities laws.  A Member may not transfer (a transfer, for purposes of this Agreement, shall be deemed to include, but not be limited to, any sale, transfer, assignment, pledge, creation of a security interest or other disposition) any Shares, except upon compliance with the applicable federal and state securities laws and this Agreement.  The Board of Managers shall have no obligation to register any Shares under the Securities Act or under any applicable state securities laws, or to make any exemption therefrom available to any Member except to the extent provided in any Registration Rights Agreement entered into by the Company with respect thereto.

11.2    **Transfer of Shares; Admission of Substitute Member.** Except for those transfers permitted by this Article XI, a Member may transfer Shares and give the transferee the right to become a Member only after the following terms and conditions have been satisfied:

(a)    The transferee shall also be the transferee of all or part of the transferor's Economic Interest or shall be the owner of an Economic Interest;

(b)    The Members holding all of the Shares that are not the subject of the transfer shall have consented in writing to the transfer of such Shares and the admission of the Substitute Member;

(c)    The transferor and the transferee shall have complied with such other requirements as the non-transferring Members may reasonably impose, including the conditions that the transferee:

(i)    Adopt and approve in writing all the terms and provisions of this Agreement then in effect; and

22

(ii)     Pay such fees as the Board of Managers may reasonably require to pay the costs of the Company in effecting such substitution; and

(d)     The Board of Managers shall have consented to the transfer.

11.3     **Dispositions Not in Compliance with this Article Void.**  Any attempted Disposition of a Membership Interest, or any part thereof, not in compliance with this Article shall be void when made and ineffectual and shall not bind the Company.

11.4     **Transfer to Affiliate of a Member.**  Notwithstanding anything herein to the contrary, any Member may transfer its Shares to any Affiliate or direct or indirect subsidiary thereof that is controlled by or under common control with it, and any such transferee shall have the right to become a Substitute Member, subject to compliance with Section 11.1.

11.5     **Future Sales and Preemptive Rights**.

(a)     The Company will not offer or sell any New Securities (an "**Equity Offering**") unless it first offers to each Member the right to purchase a portion of such New Securities which is equal to the total number of New Securities to be sold in the Equity Offering multiplied by a fraction, the numerator of which is the number of Shares owned by such Member on a fully diluted basis, and the denominator of which is the total number of Shares of the Company then outstanding on a fully diluted basis (an "**Offering Allocation**").  The Company shall immediately notify each Member of the terms or the proposed terms of an Equity Offering (the "**Company's Notice**").  The Company's Notice shall include the Offering Allocation for each Member.  If the Member wishes to purchase New Securities pursuant to the Company's Notice, such Member shall notify the Company in writing within thirty (30) days after receipt of the Company's Notice stating how many of such New Securities such Member desires to purchase.  Each Member shall be entitled to purchase up to that number of New Securities equal to such Member's respective Offering Allocation.  To the extent the Members do not elect to purchase any or all of such New Securities, the Company shall have up to ninety (90) days to complete the Equity Offering upon the same terms specified in the Company's Notice.  If the Company later changes the terms of the Equity Offering in any material respect, the Company shall first re-offer such New Securities to the Members pursuant to the procedure set forth above.  Any New Securities which are offered or sold (or issued) by the Company in the Equity Offering shall, unless otherwise consented to in writing by each Member, be sold to any purchaser only for cash.

(b)     The closing of the purchase of New Securities by the Members pursuant to this Section 11.5 shall occur at the Principal Office of the Company concurrently with the closing of the Equity Offering, or at such other time as the Company and the Members may mutually determine.

## ARTICLE XII
## DISSOCIATION OF A MEMBER

12.1     **Dissociation.**  A Person shall cease to be a Member upon the happening of any of the following events:

(a)     The resignation or withdrawal of the Member;

(b)     The Member becoming a Bankrupt Member;

[TPW: NYLEGAL:460852.1] 19499-00000  03/09/2006 06:00 PM

(c)      The Member breaching this Agreement and not curing such breach within sixty (60) days of a non-breaching Member providing written notice of such breach pursuant to Section 13.1(c) below;

(d)      In the case of a Member who is a natural person, the death of the Member or the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's personal estate;

(e)      In the case of a Member that is a trust or who is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

(f)      In the case of a Member that is a separate Organization other than a corporation, the dissolution and commencement of winding up of the separate Organization;

(g)      In the case of a Member that is a corporation, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter; or

(h)      In the case of a Member that is an estate, the distribution by the fiduciary of the estate's entire interest in the Company.

12.2     **Rights of Dissociating Member.**  In the event any Member dissociates prior to the expiration of the term of this Agreement, such Member shall be entitled to participate in the dissolution and winding up of the Company pursuant to Article XIII, to the same extent as any other Member except that, if such Dissociation results from a withdrawal of the Member in violation of this Agreement, any Distributions to which such Member would have been entitled shall be reduced by that portion of the damages, if any, sustained by the Company as a result of the Dissolution Event and winding up that is chargeable to the Capital Accounts of the other Members.

## ARTICLE XIII
## DISSOLUTION AND WINDING UP

13.1     **Dissolution.**  The Company shall be dissolved without further action by the Members and its affairs wound up upon the first to occur of any of the following events (each of which shall constitute a Dissolution Event):

(a)      The unanimous written consent of the Members;

(b)      A Member materially breaches this Agreement and a non-breaching Member provides sixty (60) days written notice to the other Members of such breach, during which sixty (60) day period, the breaching Member shall have the opportunity to cure such breach; provided, however, that, the other Members shall have the opportunity to elect to continue the Company without the breaching Member, in which case the breaching Member shall be dissociated pursuant to Article XII above;

(c)      A Member ceases to be a Member pursuant to Article XII above;

(d)      A Member becomes a Bankrupt Member;

[TPW: NYLEGAL:460852.1] 19499-00000 03/09/2006 06:00 PM

(e)     A material breach of any agreement between the Company and a Member or between Members; or

(f)     A Member elects to dissolve the Company pursuant to Section 14.12 below.

13.2    **Effect of Dissolution.**  Upon dissolution, the Company shall not be terminated and shall continue until the winding up of the affairs of the Company is completed and a certificate of dissolution has been issued by the Secretary of State of the State of Delaware.

13.3    **Distribution of Assets on Dissolution.**  Upon the winding up of the Company, the Board of Managers shall take full account of the assets and liabilities of the Company, and shall apply and distribute the assets and any proceeds therefrom in the following order:

(a)     First, to the payment of the debts and liabilities of the Company to creditors, including Members and affiliates of Members who are creditors, to the extent permitted by law, in satisfaction of such debts and liabilities, and to the payment of necessary expenses of liquidation;

(b)     Second, to the setting up of any reserves which the Board of Managers may deem necessary or appropriate for any anticipated obligations or contingencies of the Company arising out of or in connection with the operation or business of the Company.  Such reserves may be paid over by the Board of Managers to an escrow agent or trustee selected by the Board of Managers to be disbursed by such escrow agent or trustee in payment of any of the aforementioned obligations or contingencies and, if any balance remains at the expiration of such period as the Board of Managers shall deem advisable, shall be distributed by such escrow agent or trustee in the manner hereinafter provided; and

(c)     Then, to the Members in accordance with positive Capital Account balances taking into account all Capital Account adjustments for the Company's taxable year in which the liquidation occurs.  Liquidation proceeds shall be paid within sixty (60) days of the end of the Company's taxable year in which the liquidation occurs.  Such Distributions shall be in cash or Property (which need not be distributed proportionately) or partly in both, as determined by the Board of Managers.

To the extent possible after making all distributions under Sections 13.3(a) and (b) (and without violating Section 13.3(c)), the assets contributed to the Company by each Member shall be distributed to such contributing Member.  In the event that the Company is unable to comply with the obligations set forth in Sections 13.3(a) and (b) above without liquidating such assets, the Board of Managers shall determine which assets to liquidate to comply with such obligations.  In such case, the remainder of the assets shall be distributed to the contributing Member of such assets.

13.4    **Winding Up and Certificate of Dissolution.**  The winding up of the Company shall be completed when all debts, liabilities and obligations of the Company have been paid and discharged or reasonably adequate provision therefor has been made, and all of the remaining Property of the Company has been distributed to the Members.  Upon the completion of the winding up of the Company, a certificate of dissolution shall be delivered to the Secretary of State of the State of Delaware for filing.  The certificate of dissolution shall set forth the information required by the Act.

## ARTICLE XIV
## MISCELLANEOUS

14.1    **Termination of License.**  In the event that the certain License Agreement between the Company and Coffee Bean Trading, dated as of the date hereof, is terminated for any reason, the Company shall change its name from Café La Rica as soon as reasonably possible.

14.2    **Notices.**  Notices to the Board of Managers shall be sent to the Principal Office of the Company with a copy to Matthew Dyckman, Esq., Thacher Proffitt & Wood LLP, 1700 Pennsylvania Avenue, NW, Suite 800, Washington, DC 20006 and Robert F. Hudson, Jr., Esq., Baker & McKenzie LLP, Mellon Financial Center, 1111 Brickell Avenue, Suite 1700, Miami, Florida, 33131.  Notices to the other Members shall be sent to their addresses set forth on Exhibit A.  Any Member may require notices to be sent to a different address by giving notice to the other Members in accordance with this Section 14.1.  Any notice or other communication required or permitted hereunder shall be in writing, and shall be deemed to have been given with receipt confirmed if and when delivered personally, or when sent by a recognized overnight delivery service, delivered by courier, or sent by facsimile, to such Members at such address.

14.3    **Headings.**  All Article and Section headings in this Agreement are for convenience of reference only and are not intended to qualify the meaning of any Article or Section.

14.4    **Entire Agreement.**  This Agreement constitutes the entire agreement among the parties and supersedes any prior agreement or understanding among them respecting the subject matter of this Agreement except as specifically provided herein.

14.5    **Binding Agreement.**  This Agreement shall be binding upon, and inure to the benefit of, the parties hereto, their successors, heirs, legatees, devisees, assigns, legal representatives, executors and administrators, except as otherwise provided herein.

14.6    **Saving Clause.**  If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid, shall not be affected thereby.  If the operation of any provision of this Agreement would contravene the provisions of the Act, such provision shall be void and ineffectual.

14.7    **Counterparts.**  This Agreement may be executed in several counterparts, and all so executed shall constitute one agreement, binding on all the parties hereto, even though all parties are not signatories to the original or the same counterpart.  Any counterpart of either this Agreement or the Certificate of Formation shall for all purposes be deemed a fully executed instrument.  For purposes of this Agreement, facsimile as well as scanned and emailed signatures shall be deemed to be original signatures.

14.8    **Governing Law; Jurisdiction; Venue.**  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of laws principles thereof.  To the fullest extent permitted by law, the parties hereto hereby (i) submit to the jurisdiction of the state and federal courts located in the State of Delaware for purposes of any legal action or proceeding brought under or in connection with this Agreement, (ii) agree that exclusive venue of any such action or proceeding may be laid in the State of Delaware and (iii) waive any claim that the same is an inconvenient forum.

[TPW: NYLEGAL:460852.1] 19499-00000  03/09/2006 06:00 PM

14.9  **No Partnership Intended for Nontax Purposes.** The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership under either the Delaware Uniform Partnership Act or the Delaware Uniform Limited Partnership Act. The Members do not intend to be partners one to another or partners as to any third party. To the extent any Member, by word or action, represents to another person that any Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Members who incur personal liability by reason of such wrongful representation.

14.10  **No Rights of Creditors and Third Parties.** This Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members and their permitted successors and assignees. This Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person. Except and only to the extent provided by applicable statute, no such creditor or any third party shall have any rights under this Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

14.11  **Customers/Non-compete.**

(a)  In the event that the Company is dissolved, each Member shall retain the exclusive right to conduct business with the customers such Member introduced to the Company and the Members agree to divide the Company's new customers evenly among the Members.

(b)  Throughout the duration of this Agreement, neither Coffee Bean nor any of its Affiliates will render any services directly related to the roasting, packaging or sale of coffee either, as an independent contractor to or joint venture partner with any entity that is in direct competition with Coffee Holding or the Company.

(c)  Throughout the duration of this Agreement, Coffee Holding shall not engage Mr. Ernesto Aguila in employment.

14.12  **Confidentiality.** It is recognized that during their work on behalf of the Company, the Members may have occasion to conceive, create, develop, review, or receive information that is considered by the Company or another Member to be confidential or proprietary, including without limitation information relating to the business of the Company, including inventions, patent, trademark and copyright applications, improvements, know-how, specifications, drawings, cost data, process flow diagrams, customer and supplier lists, bills, ideas, and/or any other written material referring to the same ("**Confidential Information**"). Both during the term of this Agreement and thereafter, the Members agree to maintain the confidence of the Confidential Information unless or until such Confidential Information has been made public by an act or omission of a Member other than itself.

14.13  Dispute Resolution.

(a)  Whenever the Members shall have any dispute among themselves relating to the interpretation, construction or implementation of this Agreement, the Members shall resolve such dispute as follows:

(i)  First, each Member involved in such dispute shall use its good faith efforts to negotiate a resolution thereof by engaging in discussions with the other Members so involved at reasonable times and places, by telephone or otherwise, during the sixty (60) day period following notice by a Member to each of the other Members of its belief that there is a dispute which requires resolution in such manner;

27

(ii)     Second, if the Members are unable to resolve such dispute through good faith negotiations during the sixty (60) day period provided in Section 14.11(a)(i), the Members shall refer the dispute to mediation in accordance with the Judicial Arbitration and Mediation Services, Inc. (J·A·M·S) (www.jamsadr.com) mediation procedures; and

(iii)     Third, if the Members are unable to resolve such dispute through mediation, any Member involved in such dispute may bring an action or proceeding in any court having jurisdiction thereof pursuant to Section 14.7; provided that each Member waives its right to trial by jury and its right to consequential, special and/or punitive damages.

(b)     Whenever the Members shall be deadlocked or shall otherwise be in dispute with respect to the relations among the Members or between the Members and the Company or any other matter related thereto, the Members shall resolve such dispute as follows:

(i)     First, each Member involved in such dispute shall use its good faith efforts to negotiate a resolution thereof by engaging in discussions with the other Members so involved at reasonable times and places, by telephone or otherwise, during the sixty (60) day period following notice by a Member to each of the other Members of its belief that there is a dispute which requires resolution in such manner;

(ii)     Second, if the Members are unable to resolve such dispute through good faith negotiations during the sixty (60) day period provided in Section 14.12(b)(i), the Members shall refer the dispute to mediation in accordance with the Judicial Arbitration and Mediation Services, Inc. (J·A·M·S) (www.jamsadr.com) mediation procedures; and

(iii)     Third, if the Members are unable to resolve such dispute through mediation, any Member involved in such dispute may elect to dissolve the Company, in which case the Company shall dissolve in accordance with Article XIII above.

14.14   **General Interpretive Principles.** For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)     The terms defined in this Agreement include the plural as well as the singular;

(b)     Accounting terms not otherwise defined herein have the meanings given to them in accordance with generally accepted accounting principles in the United States;

(c)     References herein to "Sections," "paragraphs" and other subdivisions without reference to a document are to designated Sections, paragraphs and other subdivisions of this Agreement;

(d)     A reference to a paragraph without further reference to a Section is a reference to such paragraph as contained in the same Section in which the reference appears, and this rule shall also apply to other sub-divisions;

(e)     The words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

[TPW: NYLEGAL:460852.1] 19499-00000  03/09/2006 06:00 PM

(f)     The term "include" or "including" shall mean without limitation by reason of enumeration.

29

MHR-14-2006 10:22 From:COFFEE HOLDING CO. 17187684731 To:2217693 P.2/2

MHR-10-2006 13:59 From:COFFEE HOLDING CO. 17187684731 To:2217693 P.3/6

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

THE COMPANY:

Caffé La Rica, LLC

By: _____

Name: ANDREW GORDON

Title: MANAGER

MEMBERS:

Coffee Holding Co., Inc

By: _____

Name: ANDREW GORDON

Title: ~~PRESIDENT~~ PRESIDENT/CEO

The Coffee Bean Trading-Roasting LLC

By: _____

Name:

Title:

[TPW: NYLEGAL:60822? 1] 19459-00000 03/09/2006 06:00 PM

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

**THE COMPANY:**

Café La Rica, LLC

By: _____
        Name:
        Title:

**MEMBERS:**

Coffee Holding Co., Inc.

By: _____
        Name:
        Title:

The Coffee Bean Trading-Roasting LLC

By: _____
        Name: Alberto Lensi
        Title: Manager

[TPW: NYLEGAL:460632.1] 19499-00000 03/09/2006 06:00 PM

**EXHIBIT A**

| Name and Address of Member | Initial Capital Contribution | Initial Membership Interest (as represented by number of Shares) | Initial Sharing Ratio |
|---|---|---|---|
| Coffee Holding Co., Inc.<br><br>4401 First Avenue<br>Brooklyn, NY 11232<br>Attn: Andrew Gordon, President and Chief Executive Officer<br><br>Phone: (718) 832-0800<br>Fax: (718) 832-0892<br>Email: agordon@coffeeholding.com | $250,000 in cash, plus the equipment specified in Exhibit I attached to the Agreement | 500 | 50% |
| The Coffee Bean Trading-Roasting LLC<br><br>c/o Comjet AG,<br>Dubihuus<br>3780 Gstaad<br>Switzerland<br><br>Phone: 011-41-33-748-6620<br>Telecopier: 011-41-33-748-6621<br><br>and:<br><br>5701 Miami Lakes Drive East<br>Miami Lakes, FL 33014<br>Attn: Sonia Aguila | All intellectual property, equipment and coffee inventory and packaging materials specified in Exhibit J attached to the Agreement | 500 | 50% |
| | | | |
| **TOTAL** | | **1,000** | **100%** |

**EXHIBIT B**

[Form of Lease Agreement between the Company and Perc Enterprises]

**EXHIBIT C**

**[Form of Expense Sharing Agreement between the Company and Coffee Holding]**

**EXHIBIT D**

**[Form of License Agreement between the Company and Coffee Bean Trading]**

**EXHIBIT E**

[Form of License Agreement between the Company and Coffee Holding]

**EXHIBIT F**

**[Form of Employment Agreement between the Company and Mr. Ernesto Aguila]**

**EXHIBIT G**

The initial Board of Managers of the Company shall consist of the following persons:

1. Ernesto Aguila

2. Andrew Gordon

**EXHIBIT H**

The initial Officers of the Company shall be as follows:

**Name**                    **Title**

David Gordon              Production Manager

**EXHIBIT I**

**Capital Contributions of Coffee Holding Co, Inc.**

| Item |
|---|
| Cash |
| Equipment: <br><br> 1.  One brand new ICA Hi-Vac 50 brick pack machine – this will be ready to ship directly to Miami from Genoa, Italy the first week of May <br><br> 2.  One Jabez Burns 23R – 4 bag roaster plus two additional that need to be refurbished and assembled <br><br> 3.  Two Modern Processing 888 grinders <br><br> 4.  Various screw conveyors – elevators and stainless steel coffee hoppers <br><br> 5.  One Key Pack fractional machine – this is an older model but will add to our capacity none the less <br><br> 6.  Two 3M box taping machines |
| Lease Subject to Condition Subsequent – License for use of the Café Caribe trademark under the terms set forth in the licensing agreement |

**EXHIBIT J**

**Capital Contributions of Coffee Bean Trading Roasting LLC**

| **Item** |
|---|
| Equipment: |
|       1.    Sample Roaster STS |
|       2.    Roll Tad Machine |
|       3.    Sample Grinder |
|       4.    Pour Over Machine |
|       5.    Roaster JB 23-R |
|       6.    Holding Bins x4 |
|       7.    Grinder 777 |
|       8.    Grinder JB |
|       9.    Frac Pack Machine |
|       10.    Frac Pack Printer |
|       11.    Box Tunnel |
|       12.    Action Pack Machine |
|       13.    Heat Sealer |
|       14.    Transport Equipment |
|       15.    Hi/Lo Machine |
| Inventory |
| Packaging |
| Office Equipment |
| Air Compressor |
| License Subject to Condition Subsequent – License for use of the Café La Rica trademark under the terms set forth in the licensing agreement |

## EXPENSE SHARING AND SERVICES AGREEMENT

This Expense Sharing and Services Agreement (the "Agreement") is made as of this _10_ day of March, 2006, by and between Coffee Holding, Co., Inc., a Nevada corporation (the "Company"), and Café La Rica, LLC (the "Venture"), a Delaware limited liability company.

WHEREAS, the Company and Coffee Bean Trading-Roasting LLC, a Delaware limited liability company ("CBT") entered into an operating agreement governing the operation of the Venture on March _10_, 2006 (the "Operating Agreement");

WHEREAS, the Venture engages in the roasting, grinding, packaging and sale of Café La Rica and other branded coffee products;

WHEREAS, other than as set forth herein, the Company and CBT will share in the profits of all activities of the Venture pursuant to their respective Sharing Ratios;

WHEREAS, the Company has entered into a license with the Venture, permitting the Venture to roast, grind, package and sell its Café Caribe brand of coffee;

WHEREAS, as further set forth herein, in certain geographic areas and on certain routes the Members of the Venture will share in the profits for the sale of Café Caribe, and in certain geographic areas and on certain routes, the Venture will instead receive a fee from the Company for the roasting, grinding and packaging of Café Caribe;

WHEREAS, the Company and its employees will perform certain services on behalf of the Venture and incur costs associated with such services;

WHEREAS, the Company will also supply certain products, including coffee beans, to the Venture; and

WHEREAS, the Company and the Venture have agreed to formalize the method for sharing the expenses discussed above.

NOW, THEREFORE, the Company and the Venture agree as follows:

### SECTION 1

### SERVICES PROVIDED BY THE COMPANY TO THE VENTURE

1.1    Services Provided by the Company to the Venture:

The Company shall provide to the Venture certain services, including:

(a)    administrative services and support, including the use of the personnel, office space and equipment of the Company, including photocopy machines, computers and other equipment, primarily in connection with the Venture's back office operations;

(b)    bookkeeping, accounting and similar services;

[TPW: WA:3151734.5] 19499-00000  03/09/2006 10:42 AM



**EXHIBIT**

B

(c)     participation in the Company's employee benefit plans by the Venture's employees;

(d)     payment of slotting fees for the Venture by the Company; and

(e)     certain other services agreed upon by the Venture and the Company.

1.2     Reimbursement of Expenses:

As set forth herein, the Venture shall reimburse the Company for the provision of the services set forth in Section 1.1 above.  Because the Venture and the Company agree that it is difficult to determine the exact cost of such services to the Company, the Venture and the Company agree that the Venture shall pay to the Company on a monthly basis an amount equal to 5.0% of the Venture's monthly sales (the "Expense Reimbursement"). The Venture and the Company agree that the payment of the Expense Reimbursement to the Company by the Venture shall satisfy all of the Venture's obligations to the Company for the provision of the services set forth in Section 1.1 above, including any salaries or fees attributable to the provision of such services by the Company to the Venture.

## SECTION 2

## SUPPLIES PROVIDED BY THE COMPANY TO THE VENTURE

The Company agrees to supply the Venture with as much coffee inventory as requested by the Venture, of commercially reasonable quality, at fair market prices, to be paid by the Venture within fifteen (15) business days of the end of each month.

## SECTION 3

## SERVICES PROVIDED BY THE VENTURE TO THE COMPANY

The Venture shall generally engage in the roasting, grinding, packaging and sale of Café La Rica and other coffee products.  However, the Venture may also, at the election of the Venture, roast, grind and package certain other coffee products for the Company, including the Company's Café Caribe brand, for a fee, instead of sharing in the profits for the sale of such coffee pursuant to the Members' respective Sharing Ratios.

For the roasting, grinding and packaging by the Venture of any other coffee brands of the Company, including the Café Caribe brand, the Company agrees to pay a monthly fee for such services within fifteen (15) business days of the end of each month, in an amount equal to (i) $0.18 per each 10 oz. brick of coffee.

Notwithstanding anything to the contrary in this Agreement, the Members shall share in the profits for all roasting, grinding, packaging and sales of the Café Caribe brand by the Venture for sale on all DSD routes, as well as to all WalMart stores and distribution centers and all Publix stores and distribution centers, within the State of Florida, pursuant to their respective Sharing Ratios.

2

## SECTION 4

## AMENDMENTS

This Agreement may be amended or modified at any time by mutual agreement of the Company and the Venture, subject to the prior approval of the Board of Directors of the Company and the Members of the Venture.

## SECTION 5

## TERMINATION

This Agreement shall remain in effect until the earlier of the dissolution or winding up of the Venture, the dissociation or withdrawal of a Member from the Venture, a material breach, termination or expiration of the Operating Agreement, the sale or transfer of any interest in the Venture (other than pursuant to the terms of the Operating Agreement) or the mutual written agreement of the parties hereto to terminate this Agreement.

## SECTION 6

## PERIODIC REVIEWS; RECORDS

Both parties to this Agreement shall periodically review the overall allocation of expenses between the Company and the Venture, and shall maintain appropriate written records and documentation with respect to amounts reimbursed by and among the Company and the Venture pursuant to this Agreement.

## SECTION 7

## MISCELLANEOUS

7.1     All terms not defined herein shall have the meaning set forth in the Operating Agreement.

7.2     All Article and Section headings in this Agreement are for convenience of reference only and are not intended to qualify the meaning of any Article or Section.

7.3     This Agreement constitutes the entire agreement among the parties and supersedes any prior agreement or understanding among them respecting the subject matter of this Agreement except as specifically provided herein.

7.4     This Agreement shall be binding upon, and inure to the benefit of, the parties hereto, their successors, heirs, legatees, devisees, assigns, legal representatives, executors and administrators, except as otherwise provided herein.

7.5     This Agreement may be executed in several counterparts, and all so executed shall constitute one agreement, binding on all the parties hereto, even though all parties are not signatories to the original or the same counterpart. For purposes of this Agreement, facsimile as well as scanned and emailed signatures shall be deemed to be original signatures.

3

7.6     All notices under this Agreement, including any and all amendments to the exhibits which comprise a part of this Agreement, shall, unless specified to the contrary, be in writing and shall be addressed as follows:

If to the Venture, to:

_____

_____

_____

If to the Company, to:

_____

_____

_____

or to such other address as such party shall designate by written notice given to the other party. All notices required hereunder will be delivered personally or sent by facsimile or certified or registered mail or via overnight courier service unless otherwise specified herein to authorized personnel of the addressee. If given personally, the notice will be deemed effective on the date of delivery. If sent by facsimile, the notice will be deemed effective on the date successfully sent. If sent by overnight courier, the notice will be deemed effective on the second following business day in the jurisdiction to which sent. If sent by mail, the notice will be deemed effective on the tenth day following posting or on the actual date of receipt, whichever is earlier.

7.7     This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of laws principles thereof.

7.8     The failure of any provision of this Agreement shall in no manner affect the right to enforce the same, and the waiver by any party of any breach of any provision of this Agreement shall not be construed to be a waiver by such party of any succeeding breach of such provision or a waiver by such party of any breach of any other provision. The failure on the part of either party hereto to exercise or enforce any right conferred upon it hereunder shall not be deemed to be a waiver of any such rights or operate to bar the exercise or enforcement thereof at any time or times thereafter.

7.9     The article headings are placed herein merely as a matter of convenience and are not to be construed as a part of this Agreement.

7.10    This Agreement shall not be assignable by either party without the written consent of the other party hereto.

[TPW: WA:3151734.5] 19499-00000  03/09/2006 10:42 AM

MAR-10-2006 13:59 From:COFFEE HOLDING CO.    17187684731                To:2217693              P.576

IN WITNESS WHEREOF, the Company and the Venture have executed this Expense Sharing and Services Agreement by their duly authorized officers or managers as of the date first written above

COFFEE HOLDING CO., INC.

By:_____

    Andrew Gordon
    President and Chief Executive Officer


CAFÉ LA RICA, LLC

By:_____

    Ernesto Aguila
    Manager

5

IN WITNESS WHEREOF, the Company and the Venture have executed this Expense Sharing and Services Agreement by their duly authorized officers or managers as of the date first written above.

**COFFEE HOLDING CO., INC.**

By: _____
    Andrew Gordon
    President and Chief Executive Officer

**CAFÉ LA RICA, LLC**

By: _____
    Ernesto Aguila
    Manager

5

# Coffee Holding Company Inc.

Roasters & Packers

4401 FIRST AVENUE – P.O. BOX 320208
OUTSIDE N.Y. STATE 1-800-458-2233

Telephone: 718-832-0800
Fax      : 718-832-0892

Email: coffeeholding@AOL.com
Web Site: www.Coffeeholding.com

To: Washington Mutual
Attn: Sig..y Hernandez
Fax: 305-825-8195

Fax: 718-768-4731

This is a 4 page fax, including cover page.

Please take the necessary steps to stop ███████ Aguila from controlling this bank account.

I have enclosed information about the LLC account statement of authority and the letter of dissolution and winding up of café La Rica, LLC.

Regards,

Andrew Gordon

95™ 382-0438
Anabel

EXHIBIT

C

**Washington Mutual**

Legal Services Department
8050 S.W. 10th Street
Building 4 – Suite 1000
Plantation, Florida 33324
Telephone: (954) 382-0438
Fax: (954) 382-4369



February 8, 2007

VIA FEDERAL EXPRESS
TO BOTH ADDRESSEES

Mr. Andrew Gordon
4401 First Avenue
Brooklyn, NY 11232

Mr. Ernesto Aguila
2131 N.W. 72nd Avenue
Miami, FL 33122

Re:     **Café La Rica, LLC, account ending 551**

Dear Messrs. Gordon and Aguila:

The undersigned represents Washington Mutual Bank (hereinafter "the Bank"). A copy of Mr. Gordon's letter dated February 7, 2007, addressed to Signey Hernandez, has been forwarded to me, a copy of which is enclosed.

Please be advised that pursuant the Conflicting Demands and Disputes section (pages 38 and 39) of our Business Account Disclosures and Regulations, which govern the above entity's account with the Bank, we have placed a restraint on the above referenced account.

The Bank does not wish to be embroiled in this dispute, therefore, we propose the following alternatives regarding the above account:

1.      Each of you agrees, in writing, that the funds shall remain frozen until this dispute is resolved by and between you. Final disbursement of these funds would occur upon delivery of a document signed by each of you, together with the appropriate documentation from the state of Delaware, evidencing that Café La Rica, LLC, has been dissolved; or

2.      A Court Order from a court of proper jurisdiction for release or such other instructions regarding the subject account.

Alternatively, if you are not able to agree to this escrow type arrangement, the Bank will commence an interpleader action and deliver the funds to the Registry of the Court. You can then litigate the issue of ownership before the Court. In accordance with Florida law, the Bank would request attorneys' fees and costs in conjunction with such an action.

A collective decision on this matter must be communicated in writing to the undersigned on or before February 16, 2007. I look forward to hearing from you so that we can amicably resolve this matter.

Very truly yours,

LUCIA A. SANTOS
Vice President and Counsel

LAS/ms

Generally, your account is assigned to the financial center at which you open your account if opened in person. Your account opening documents may identify the state or other pricing region to which your account has been assigned. If you are uncertain to which financial center your account is assigned in our records, contact us at the number shown at the end of these *Account Disclosures and Regulations*.

If you move to another state in which we (the bank holding your account) have financial centers or otherwise wish to change your financial center of assignment, you may request and we, at our option, may agree to change your financial center of assignment and the state or other pricing region to which your account is assigned. Such change will not automatically occur when you change your address in our records.

## Cash Vouchers and Cash Dispensing Machines

At some of our financial centers, certain tellers do not have access to cash for processing withdrawals or other cash back transactions. If you complete a transaction with one of these tellers, you will receive a voucher for any cash payable to you. Your account records, however, will reflect a debit for the amount of the voucher. Your cash will be dispensed to you at the cash dispensing machine at that same financial center at which you conducted the related transaction. Your use of the access number to receive the cash is a separate non-account based transaction.

The voucher will include an access number. This number is used on the keypad or scanner at the cash dispensing machine. You must use the access number within the time frame noted on the voucher (or by the financial center closing time on the calendar day you conduct the transaction, if earlier). If you do not receive your cash related to a voucher within that time frame noted, the access number will expire. If you return your original voucher to us, a new access number will be issued if such request is made before the financial center closes that calendar day and the voucher has not been used. If the voucher is not redeemed by the time we close the financial center on the calendar day it is issued, an official check will be issued in the amount due under the voucher; the official check may, at our option, be held at the financial center for your pick up, mailed to you at the address of record for the account related to the transaction for which the voucher was issued, or deposited to any of your accounts with us (immediately or at a later time, without interest).

You must safeguard this voucher as you would cash. If you loose the voucher, tell us immediately so we may invalidate the voucher. If the voucher has not been redeemed, it is the same calendar day as the voucher was issued and we have not closed the financial center for the day, the voucher will be reissued. If we determine that the voucher has been redeemed, whether by you or a third party, at our option, the voucher may not be replaced and you may not be reimbursed. The voucher is not transferable or negotiable.

At some of our Financial Centers, we may offer electronic processes to expedite your deposit and withdrawal transaction(s) with the teller or other representative, including use of an electronic pad to identify you and your account, and to confirm the transaction in place of paper tickets. These ticketless transactions are teller-initiated transactions and are not considered electronic funds transfers. By initiating deposits and withdrawals at these financial centers, you agree to the electronic processing and record of the transaction in place of a paper record.

## Changes to Your Account Type

If you have an account with us and choose to change from one account type to another, we may, at our option, require you to close your existing account and open a new account with a new account number or change the product features to the new account type and

maintain the existing account number. If we allow or require you to maintain the same account number, previous activity on your prior account will apply to the new account, unless we, at our option, decide otherwise. This means, for example, that if you are required to maintain a minimum balance or average balance to avoid a monthly fee on the new account type, the balance for the entire statement cycle, including the balance prior to the change to the new account, will apply in the balance calculation. If the new account is a Limited Transaction Account, we may count transactions that posted to the account prior to the change and you may be assessed excess activity fees based on activity occurring prior to the change. If you are assessed Overdraft Charges or Non-Sufficient Funds Charges based on the number of NSF Transactions during a prior period (e.g., the prior 12 months), we may consider NSF Transaction activity prior to the date of the change in determining whether and the amount of charges to be assessed.

## Collections

In our discretion, we can help you collect bond coupons, checks, or drafts in U.S. or foreign currency or other items which we determine, at our discretion, are not suitable for automated collection procedures. If we do, we accept these items "for collection" which means we will send the check, draft or item directly to the issuer's bank for payment. When we receive payment, we will credit your account. If the item is lost, stolen, or destroyed in the collection process, we will not credit your account for the item nor will we otherwise be liable for the item. If the collection item is returned to us unpaid, we will return the item to you (as soon as we receive it).

Checks or drafts accepted, received or sent by the Bank from or to another financial institution to be processed for collection, whether or not paid, will be assessed a collection fee by the Bank, as set forth in the *Statement of Fees*, and may be assessed a collection and other fees and costs by the other financial institution. In the event you request special handling of a collection item, such as tracking or expedited delivery, you will also be charged any out-of-pocket expense. Any such fees and costs will be deducted from your account or from the amount of the proceeds remitted to or from your account, as applicable.

## Conflicting Demands and Disputes

Nothing in these *Account Disclosures and Regulations* shall be deemed to require the Bank, and the Bank shall not be required, to make payment from or provide services related to an account to a depositor, or to any trust or P.O.D. account beneficiary or payee, or any other person claiming an interest in any funds deposited in the account, if the Bank has actual knowledge (as defined in the *Account Ownership* section of these *Account Disclosures and Regulations*) of, or otherwise believes there may be, a dispute between the depositors, beneficiaries, payees, or other persons concerning the account including, without limit, their respective rights of ownership to or authority to act with respect to the funds contained in or proposed to be withdrawn or previously withdrawn from the account, or in the event the Bank is otherwise uncertain as to who is entitled to the funds pursuant to the contract of deposit, or otherwise receives instructions which Bank determines, in its discretion, to be unclear or conflicting. In any such case, the Bank may, at its option and without liability, notify all depositors, beneficiaries, payees, or other persons claiming an interest in the account of either its uncertainty as to who is entitled to the distributions or the existence of any dispute, and may also, without notice and without liability, refuse to disburse any funds contained in the account to or on the instruction of any depositor and/or trust or P.O.D. account beneficiary or payee thereof, and/or other persons claiming an interest therein, return items presented

37

38

against the account ... "Refer To Maker" or similar notation until such time as, at our o...

(1) All such depositors, beneficiaries, payees and/or other persons claiming an interest in the account have consented, in writing or other form satisfactory to Bank, to the requested payment; or

(2) The payment is authorized or directed by a court of proper jurisdiction; or

(3) Where one of the parties to the account has notified the Bank of the dispute, that party withdraws the notice; or

(4) Where the dispute involves a deceased accountholder, the successor of the deceased accountholder agrees in writing to the distribution (if permitted by State Law); or

(5) We receive proof satisfactory to us in our sole discretion that the dispute has been resolved, or other satisfactory documentation or assurances are received by us; or

(6) Subject to the *Resolution of Disputes* section in this publication, request instructions from a court of competent jurisdiction, or arbitrator, or referee regarding distribution of the account.

We may also, at our discretion, request instructions from a court and/or interplead the funds in the account at your expense. However, the Bank may, at its option and without liability, pay or permit withdrawal of any funds on deposit in an account to a depositor and/or agent of a depositor and/or trust or P.O.D. account beneficiary or payee, and/or other person claiming an interest therein, even when the Bank has actual knowledge of the existence of the dispute, if the payee shall execute to the Bank, in form and with security (in Idaho, "sureties") acceptable to it, which, except in Idaho, at Bank option may be a bond in an amount which is double the amount of deposit or the adverse claim, whichever is less) an indemnification indemnifying the Bank from any and all liability, loss, damage, costs, and expenses, for and on account of the payment of the adverse claim or the dishonor of the check or other order of the person in whose name the deposit stands on the books of the Bank. In no event will we be liable for any delay or refusal to follow instructions which occur as a result of a dispute over the authority or control of your account.

### Credit Reporting Agencies/Reporting/Verification

By requesting to open an account with the Bank, or by agreeing to be a signer on an account or obtaining any other service from us, you (and, if acting in a representative capacity, individually and for such entity or principal) agree that we may obtain credit information from check or credit reporting agencies, and/or by any other means. We may do so at the time you open the account, request the service, at any time while your account is open, or the service is available, or after your account or service is closed if you owe us any amounts related to your account or service, and may use such information for any purpose in our discretion except as prohibited by law, including, without limit, for review of your eligibility to obtain or retain an account or service requested by you or which we may, at our option, wish to consider offering you.

Without limiting anything else to the contrary herein, if you do not handle your account or service in a satisfactory manner and/or we to charge off your account as a loss, or as otherwise permitted by law, we may report such negative information to check or credit reporting agencies.

39

### Customer P...nsibilities and Limit on Time to Assert Claims

You agree to...cise reasonable control over all bank checks, unissued checks, time or certificates of deposit, passbooks, cards (of any kind), personal and user identification numbers and codes and access devices and any other item, instrument or card related to any of the above It is your responsibility to keep all of the above information and items safe and secure and to promptly discover and immediately report if any of them are, or believed to be at risk of becoming, missing in time to prevent misuse.

You agree to notify us immediately if any of these items may be lost, stolen or used without your authorization, or if you believe there is an error in your periodic statement or that an unauthorized transaction has occurred or may occur on your account or otherwise may be related to any of the above. In addition to any other liability you may have hereunder, and except as limited by applicable law, if you give your Personal Identification Number (PIN), User ID and any other code or other access device to anyone, you will be liable for any use made of such until you advise us that such person is not authorized to use them. You acknowledge that your account, service or any of the above may have to be closed if any of these events occurs. In addition, you assume full responsibility for the monitoring and reviewing the work of your employees, agents (including Authorized Signers) and accountants.

You are responsible for exercising reasonable promptness and care in examining your account statements, and, if provided, originals or imaged copies of cancelled checks, advices of debit or credit, transaction reports, or your account activity through the internet if we provide you such access via online banking services, to determine whether any payment or debit was not authorized because of an alteration of an item or because a signature or endorsement on the item was unauthorized, or for any error, forgery, alteration, unauthorized transaction, including an unauthorized payment order, or other problem (collectively, a Problem). The parties agree that reasonable promptness means within fourteen (14) calendar days from the date that the statement, advice or transaction report or other information is sent or otherwise made available to you, whichever first occurs.

If you discover or should have discovered a Problem, you must promptly notify us in writing of the relevant facts. You should also report the Problem to us orally by contacting your branch of account or the telephone number at the end of these *Account Disclosures and Regulations*. However, your oral report shall not relieve you of your obligation to report the Problem to us in writing, except where required by law. Your written report must identify the specific items, debits or credits that you are challenging and the nature of the Problem.

In addition, if your claim involves a series of items containing unauthorized signatures or alterations by the same wrongdoer, you shall be precluded from asserting against us any unauthorized signature or alteration by the same wrongdoer on any item paid in good faith that you do not report within fourteen (14) calendar days after the first item in the series or first statement containing that item was sent or made available to you, whichever first occurs. By these provisions, the parties intend to define a reasonable time period for the "Repeater Rule," as provided in §4-406(d) of the UCC.

Without regard to the care or lack of care of either you or us, without limiting the foregoing: (a) if you fail within thirty (30) calendar days after the statement or item is sent or made available to you, whichever occurs first, to discover and report with respect to an item (i) your unauthorized signature, (ii) any unauthorized or missing endorsement, or (iii) any alteration on an item, you shall be precluded from asserting against us the unauthorized signature, the unauthorized or missing endorsement or alteration on that item; (b) if you fail within thirty (30) calendar days after the statement or other advice of debit or execution of a wire transfer Payment Order is sent or made

40

JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

## I. (a) PLAINTIFFS

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

**(b)** County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Jose M. Ferrer, Esq.
Baker & McKenzie LLP
1111 Brickell Avenue, Suite 1700
Miami, FL 33131

**DEFENDANTS**

COFFEE HOLDING, INC., a Nevada corporation,

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

07 20389

Attorneys (If Known)

CIV-MARTINEZ   MAGISTRATE
BANDSTRA

**(d)** Check County Where Action Arose: ☒ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE / HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

1:2007 CV20389/JEM/TEB

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 690 Other |  | ☐ 490 Cable/Sat TV |
|  | ☐ 355 Motor Vehicle Product Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☒ 190 Other Contract |  | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability |  | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) |  |
| ☐ 196 Franchise |  | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty |  | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other |  | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights |  | ☐ 950 Constitutionality of State Statutes |
|  | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition |  |  |

| TORTS | |
|---|---|
| **PERSONAL INJURY** | **PERSONAL PROPERTY** |
| ☐ 362 Personal Injury - Med. Malpractice | ☐ 370 Other Fraud |
| ☐ 365 Personal Injury - Product Liability | ☐ 371 Truth in Lending |
| ☐ 368 Asbestos Personal Injury Product Liability | ☐ 380 Other Personal Property Damage |
|  | ☐ 385 Property Damage Product Liability |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Re-filed (see VI below)

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page):

a) Re-filed Case ☐ YES ☒ NO   b) Related Cases ☐ YES ☒ NO

JUDGE _____   DOCKET NUMBER _____

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

Breach of Limited Liability Operating Agreement.

LENGTH OF TRIAL via _5_ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE 2-13-07

FOR OFFICE USE ONLY

AMOUNT 350 –   RECEIPT # 954710   IFP

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.: _____07 - 20389_____

COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

    Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,

    Defendant.

_____/

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND SUPPORTING MEMORANDUM OF LAW

Plaintiff, Coffee Bean Trading-Roasting, LLC ("Coffee Bean"), pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, hereby moves the Court, on an emergency basis, for the entry of a temporary restraining order prohibiting Defendant, Coffee Holding, Inc. ("Coffee Holding"), its officers, directors, agents, employees, and those persons in active concert or participation with them, from interfering with the operation of Café La Rica, LLC ("Café La Rica"), and from communicating directly with Café La Rica's customers, vendors, suppliers, and investors, and in support thereof states as follows:

### PRELIMINARY STATEMENT

I.    <u>The Parties</u>.

Coffee Bean is a limited liability company organized and operating under the laws of the State of Delaware. Coffee Holding is a corporation organized and operating under the laws of the State of Nevada. Coffee Bean and Coffee Holding each own a fifty (50) percent membership

interest in Café La Rica, a Delaware limited liability company with its principal place of business in Miami-Dade County, Florida. Since March, 2006, when it began doing business, Café La Rica has become an established and successful business with substantial relationships and numerous customers and additional prospective customers, and has developed significant good will with various vendors and suppliers. Café La Rica currently employs a workforce of five persons. *See* Affidavit of Ernesto Aguila in Support of Motion for Temporary Restraining Order ("Aguila Affidavit") at ¶ 2.

II.    The Operating Agreement.

On or about March 10, 2006, Coffee Bean and Coffee Holding entered into that certain Limited Liability Company Agreement of Café La Rica, LLC (the "Operating Agreement") pursuant to which the parties formed and organized Café La Rica for the purpose of "engag[ing] in the roasting, packaging and sale of Café La Rica and other branded coffee products, and to engage in any other lawful act or activity, as determined by the Board of Managers from time to time, for which limited liability companies may be organized under the [Delaware Limited Liability Company Act]." A copy of the Operating Agreement is attached hereto as Exhibit A.

The Operating Agreement established, amongst other things, a Board of Managers (the "Board of Managers") responsible for "[t]he management of the Company and all decisions concerning the business affairs of the Company[.]" The Board of Managers was to consist of two managers, each having one vote with respect to all matters requiring the vote of the Board of Managers. Moreover, no individual manager was to have the right to act unilaterally on behalf of Café La Rica without the written consent of the other manager absent authorization by resolution of the Board of Managers. *See* Operating Agreement at ¶ 7.1.

Baker & McKenzie LLP, 1111 Brickell Avenue, Suite 1700, Miami, Florida  33131 – (305) 789-8900

The initial Board of Managers of Café La Rica was comprised of Andrew Gordon, who is also the President and Chief Executive Officer of Coffee Holding, and Ernesto Aguila. However, Coffee Holding, through Mr. Gordon, has at all times relevant to this action acted as Café La Rica's de facto manager with full control over all of its operations, except for the day-to-day sales and collection activities which Mr. Aguila has handled from Florida. *See* Aguila Affidavit at ¶ 3.

III.    The Expense Sharing Agreement.

On March 10, 2006, contemporaneously with the execution of the Operating Agreement, Coffee Holding and Café La Rica entered into that certain Expense Sharing and Services Agreement (the "Expense Sharing Agreement") pursuant to which Coffee Holding agreed to provide certain services on behalf of and supply certain products to Café La Rica. A copy of the Expense Sharing Agreement is attached hereto as Exhibit B. Specifically, Coffee Holding agreed, amongst other things not material to the foregoing motion, to supply Café La Rica with as much coffee inventory as requested by Café La Rica at fair market prices. *See* Expense Sharing Agreement at §§ 1, 2. Thus, Coffee Holding occupies dual roles as both the manager and, by virtue of the Expense Sharing Agreement, a supplier of Café La Rica.

IV.    Factual Basis for the Relief Requested.

Since March, 2006, Coffee Holding has sold coffee to Café La Rica pursuant to the Expense Sharing Agreement. Coffee Holding, in its role as the Manager of Café La Rica, was solely responsible for, and never consulted with Coffee Bean or anyone at Café La Rica with respect to, its purchases of coffee from itself on behalf of Café La Rica. Coffee Holding unilaterally permitted balances to build up on its own account. *See* Aguila Affidavit at ¶ 5.

Baker & McKenzie LLP, 1111 Brickell Avenue, Suite 1700, Miami, Florida  33131 – (305) 789-8900

In February, 2007, Coffee Holding began threatening to make a preferential payment to itself of the entire accumulated balance on its account in disregard of Café La Rica's other creditors and payroll obligations.  When Coffee Bean refused to consent to such preferential treatment of Coffee Holding's account payable, Andrew Gordon, Coffee Holding's President and Chief Executive Officer, threatened to close down the company unilaterally.  Consistent with his threats, Mr. Gordon unilaterally declared Café La Rica dissolved and began notifying Café La Rica's customers, suppliers, vendors and potential investors that Café La Rica "has closed down." Based on Mr. Gordon's statements, at least one potential investor has already stated that it is not interest in making an offer to invest in Café La Rica until this matter is settled, and various of Café La Rica's coffee suppliers have either refused to ship any more coffee or have refused to extend any credit terms to Café La Rica. *See* Aguila Affidavit at ¶ ¶ 6, 7.

On February 7, 2007, Mr. Gordon sent a fax to Washington Mutual Bank ("Washington Mutual"), where Café La Rica maintains its operating account, advising Washington Mutual that Café La Rica had purportedly been dissolved and wound up – a claim that is blatantly false – and instructing it to prevent Mr. Aguila, who has traditionally controlled Café La Rica's operating account with Washington Mutual, from exerting any control over that bank account. Based on Mr. Gordon's false representations, Washington Mutual froze the account, preventing Café La Rica from paying its vendors and suppliers and meeting its payroll obligations.  Copies of Mr. Gordon's letter of February 7, 2007 and Washington Mutual's letter of February 8, 2007 in response to same are attached hereto as Composite Exhibit C.  As a result of Café La Rica's failure to meet its payroll obligations, several of Café La Rica's employees may quit. *See* Aguila Affidavit at ¶ 8.

Coffee Bean has brought this action individually and derivatively on behalf of Café La Rica seeking, among other things, permanent and temporary injunctive relief to prevent Mr. Gordon from unilaterally seeking to dissolve Café La Rica and from otherwise interfering with the business and affairs of Café La Rica.

## MEMORANDUM OF LAW

### I.    The Applicable Standard.

A temporary injunction may be granted without written or oral notice to the adverse party or that party's attorney only if (1) it clearly appears from specific facts shown by affidavit that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required.  Fed. R. Civ. P. 65(b).  A restraining order is not permanent, but is issued only to maintain status quo until a hearing can be had on a motion for preliminary injunction.  *See Schiavo v. Schiavo*, 358 F.Supp.2d 1161, 1163 (M.D. Fla. 2005).  In passing upon a motion for temporary restraining order, it is not the function of the court to determine the merits of the case, but rather the court in issuing the order, is merely maintaining status quo among the parties until full adjudication of the claims of all parties can be had. *See id.*

### II.    The Entry of a Restraining Order Under the Facts of this Case is Proper.

Mr. Aguila's affidavit in support of this motion clearly establishes that Coffee Holding's acts in interfering with the normal, day-to-day operations of Café La Rica are irreparably harming Café La Rica.  If not restrained, Coffee Holding's interference will destroy Café La Rica's customer base, ruin its relationship with its customers, vendors, and potential investors,

cause it to lose its work staff, and basically force it out of business. Café La Rica has no adequate remedy at law because the amount of the damage caused by the lost profits and good will that will result from Coffee Holding's continued interference is impossible to determine and of a character that cannot be remedied by money. Moreover, since the acts of Coffee Holding will continue in the future unless restrained, Café la Rica has no adequate remedy at law for damages. *See Shah v. Shah,* 1986 Del. Ch. LEXIS at 15 (Ct. Chancery 1986).

The entry of a temporary restraining order is particularly appropriate here because Coffee Holding does not have a right to unilaterally dissolve Café La Rica. The Operating Agreement provides as follows regarding the limited circumstances under which a member may seek to dissolve Café La Rica:

13.1 Dissolution. The Company shall be dissolved without further action by the Members and its affairs wound up upon the first to occur of any of the following events (each of which shall constitute a Dissolution Event):

(a) The unanimous written consent of the Members;

(b) A member materially breaches this Agreement and a non-breaching Member provides sixty (60) days written notice to the other Members of such breach, during which sixty (60) day period, the breaching Member shall have the opportunity to cure such breach; provided, however that, the other Members shall have the opportunity to elect to continue the Company without the breaching Member, in which case the breaching Member shall be dissociated pursuant to Article XII above;

(c) A Member ceases to be a Member pursuant to Article XII above;

(d) A Member becomes a Bankrupt Member;

(e) A material breach of any agreement between the Company and a Member or between Members; or

(f) A Member elects to dissolve the Company pursuant to Section 14.12 below.

None of the events that would give rise to the non-judicial dissolution of the company are present in this case. Although Coffee Holding claims, in a letter dated February 5, 2007 to

Coffee Bean, that Café La Rica has breached the Expense Sharing Agreement by failing to pay Coffee Holding for coffee it sold to Café La Rica (thus providing a purported basis for the dissolution of Café La Rica under paragraph 13.1(e) of the Operating Agreement), Coffee Holding has failed and refused, despite repeated written demands, to provide any financial information that would support the bona fides of this asserted account payable, nor an accounting of what Coffee Holdings has done with the funds of Cafe La Rica to cause such an alleged deficiency in payments. Copies of Coffee Holdings letter to Coffee Bean and the undersigned's response to same are attached hereto as Composite Exhibit D. Consequently, there is no legally cognizable basis for Coffee Holding's attempts at, basically, destroying Café La Rica's business.

## CONCLUSION

If Coffee Holding is not enjoined from interfering with the business of Café La Rica, Café La Rica will suffer irreparably harmed to the detriment of all partners, including Coffee Holding and Coffee Bean. Thus, Coffee Bean respectfully requests the entry of a temporary restraining order to prevent Coffee Holding from interfering with the business and affairs of Café la Rica. Specifically, Coffee Bean requests the entry of an order prohibiting Coffee Holding, its officers, directors, agents, employees, and those persons in active concert or participation with them, from (1) communicating directly with Café La Rica's customers, vendors, suppliers, and investors, (2) communicating with Washington Mutual regarding Café La Rica's account, and (3) otherwise representing to anyone that Café La Rica has been dissolved.

## CERTIFICATION PURSUANT TO FED. R. CIV. P. 65(b)

I HEREBY CERTIFY that a true and correct copies of the foregoing motion and the complaint in this action were served this ⎱3ᵗʰ day of February, 2007 by facsimile and overnight delivery upon Coffee Holding's attorney, Matthew Dyckman, Esq., Thacher, Proffitt & Wood,

LLP, 1700 Pennsylvania Avenue, N.W., Suite 800, Washington, D.C. 20006; and upon Coffee

Holding's President and Chief Executive Officer, Andrew Gordon, 4401 First Avenue,

Brooklyn, NY 11232. Additional notice should not be required before the entry of an order

granting the relief requested because further delay will likely precipitate the very actions sought

to be enjoined and will therefore be productive of additional damage to Café La Rica and Coffee

Bean.

<div align="center">

### CERTIFICATE OF SERVICE

</div>

I HEREBY CERTIFY that a true and correct copy of the foregoing was delivered this

13th day of February, 2007 to a certified process server to be served along with the summons

and complaint in this action upon Coffee Holding, Inc.

Respectfully submitted,

BAKER & McKENZIE LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131
Telephone: (305) 789-8900
Facsimile: (305) 789-8953

By: _____
Jose M. Ferrer
Florida Bar No. 173746

MIADMS/306624.1

<div align="center">

8

Baker & McKenzie LLP, 1111 Brickell Avenue, Suite 1700, Miami, Florida 33131 – (305) 789-8900

</div>

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## CAFÉ LA RICA, LLC

A LIMITED LIABILITY COMPANY

ORGANIZED UNDER THE LAWS OF

THE STATE OF DELAWARE


EXHIBIT

A

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ............................................................................1

| | | |
|---|---|---|
| 1.1 | Act | 1 |
| 1.2 | Additional Capital Contribution | 1 |
| 1.3 | Affiliate | 1 |
| 1.4 | Agreement | 2 |
| 1.5 | Annual Independent Audit | 1 |
| 1.6 | Assignee or "Transferee" | 2 |
| 1.7 | Bankrupt Member | 2 |
| 1.8 | Board of Managers | 2 |
| 1.9 | Business Day | 3 |
| 1.10 | Capital Account | 3 |
| 1.11 | Capital Contribution | 3 |
| 1.12 | Certificate of Formation | 3 |
| 1.13 | Code | 3 |
| 1.14 | Coffee Bean Trading | 2 |
| 1.15 | Coffee Holding | 2 |
| 1.16 | Commitment | 3 |
| 1.17 | Company | 4 |
| 1.18 | Company Property | 4 |
| 1.19 | Confidential Information | 2 |
| 1.20 | Default Interest Rate | 4 |
| 1.21 | Delinquent Member | 4 |
| 1.22 | Disposition (Dispose) | 4 |
| 1.23 | Dissociation | 5 |
| 1.24 | Dissolution Event | 5 |
| 1.25 | Distribution | 5 |
| 1.26 | Economic Interest | 5 |
| 1.27 | Effective Date | 5 |
| 1.28 | Equity Offering | 5 |
| 1.29 | Exhibit A | 5 |
| 1.30 | Fair Market Value | 5 |
| 1.31 | Fiscal Year | 6 |
| 1.32 | Gross Asset Value | 6 |
| 1.33 | Initial Capital Contribution | 8 |
| 1.34 | Initial Membership Interest | 8 |
| 1.35 | Initial Sharing Ratio | 8 |
| 1.36 | Initial Value | 8 |
| 1.37 | Management Right | 8 |
| 1.38 | Manager | 4 |
| 1.39 | Member | 8 |
| 1.40 | Membership Interest | 9 |
| 1.41 | Minimum Working Capital | 4 |
| 1.42 | Net Cash Flow | 9 |
| 1.43 | New Securities | 9 |

i

1.44   Offering Allocation .................................................................9
1.45   Officer ...................................................................................9
1.46   Organization .........................................................................9
1.47   Person ..................................................................................10
1.48   Principal Office ....................................................................10
1.49   Proceeding ...........................................................................10
1.50   Profits and Losses ...............................................................10
1.51   Property ...............................................................................12
1.52   Regulations ..........................................................................12
1.53   Regulatory Allocations ........................................................12
1.54   Related Person ......................................................................6
1.55   Securities Act .......................................................................12
1.56   Share ....................................................................................15
1.57   Sharing Ratio .......................................................................15
1.58   Substitute Member ...............................................................15
1.59   Tax Characterization and Additional Tax Terms ..................15
1.60   Winding Up Sale ..................................................................17

ARTICLE II FORMATION ................................................................18

2.1   Organization .........................................................................18
2.2   Agreement ............................................................................18
2.3   Name ....................................................................................19
2.4   Term .....................................................................................19
2.5   Registered Agent and Office .................................................19
2.6   Principal Office ....................................................................20

ARTICLE III PURPOSE; NATURE OF BUSINESS ................................20

ARTICLE IV ACCOUNTING AND RECORDS .....................................21

4.1   Records to be Maintained ....................................................21
4.2   Reports to Members .............................................................21
4.3   Annual Audit .........................................................................9
4.4   Tax Returns and Reports ......................................................21

ARTICLE V CLASSES OF MEMBERSHIP; NAMES AND ADDRESSES OF MEMBERS ...22

ARTICLE VI RIGHTS AND DUTIES OF MEMBERS; RESTRICTIVE COVENANTS .........22

6.1   No Management Rights as Members .....................................22
6.2   Liability of Members ............................................................22
6.3   Indemnification ....................................................................22
6.4   Representations, Warranties and Covenants .........................22
6.5   Conflicts of Interest .............................................................23
6.6   Restrictive Covenants ..........................................................24

ARTICLE VII BOARD OF MANAGERS AND OFFICERS ......................26

7.1   Board of Managers ..............................................................26
7.2   Voting ..................................................................................26

7.3     Term of Office as a Member of the Board of Managers ..................................27
7.4     Incapacitation of a Manager ..................................................................12
7.5     Officers ......................................................................................27
7.6     Authority to Bind the Company ..................................................................28
7.7     Actions of the Board of Managers ..............................................................30
7.8     Indemnification .............................................................................30
7.9     Resignation and Removal; Replacement ..........................................................30
7.10    Other Activities ............................................................................31
7.11    Distributions ...............................................................................31
7.12    Expenses ....................................................................................31
7.13    Affiliates; Fees ............................................................................31

ARTICLE VIII CONTRIBUTIONS AND CAPITAL ACCOUNTS ....................................................32

8.1     Initial Capital Contributions ...............................................................32
8.2     Indemnification .............................................................................13
8.3     Shares ......................................................................................32
8.4     Additional Capital Contributions ............................................................33
8.5     Enforcement of Commitments ..................................................................34
8.6     Capital Account .............................................................................35
8.7     No Obligation to Restore Deficit Balance ....................................................38
8.8     Withdrawal; Successors ......................................................................38
8.9     Interest ....................................................................................38
8.10    Investment of Capital Contributions and Company Cash ........................................38
8.11    Repayment of Capital Contribution. ..........................................................39

ARTICLE IX ALLOCATIONS AND DISTRIBUTIONS ...........................................................40

9.1     Profits and Losses ..........................................................................40
9.2     Profits .....................................................................................40
9.3     Special Allocations .........................................................................40
9.4     Curative Allocations ........................................................................46
9.5     Section 754 Election ........................................................................47
9.6     Other Allocation Rules ......................................................................47
9.7     Distribution of Net Cash Flow ...............................................................50
9.8     Allocation of Gain or Loss upon Winding Up. .................................................51

ARTICLE X TAXES ....................................................................................53

10.1    Tax Matters Partner .........................................................................54

ARTICLE XI TRANSFER OF MEMBERSHIP INTEREST .........................................................55

11.1    Compliance with Securities Laws and this Agreement ..........................................55
11.2    Transfer of Shares; Admission of Substitute Member ..........................................55
11.3    Dispositions Not in Compliance with this Article Void .......................................56
11.4    Transfer to Affiliate of a Member ...........................................................56
11.5    Future Sales and Preemptive Rights ..........................................................57

ARTICLE XII DISSOCIATION OF A MEMBER ...............................................................58

12.1    Dissociation ................................................................................58

iii

Page

12.2   Rights of Dissociating Member .......................................................................59
ARTICLE XIII DISSOLUTION AND WINDING UP .......................................................60
13.1   Dissolution ....................................................................................................60
13.2   Effect of Dissolution .....................................................................................61
13.3   Distribution of Assets on Dissolution ...........................................................61
13.4   Winding Up and Certificate of Dissolution ...................................................63
ARTICLE XIV MISCELLANEOUS ...............................................................................63
14.1   Termination of License ..................................................................................26
14.2   Notices ..........................................................................................................63
14.3   Headings ........................................................................................................63
14.4   Entire Agreement ..........................................................................................64
14.5   Binding Agreement ........................................................................................64
14.6   Saving Clause ................................................................................................64
14.7   Counterparts ..................................................................................................65
14.8   Governing Law ..............................................................................................65
14.9   No Partnership Intended for Nontax Purposes ...............................................65
14.10  No Rights of Creditors and Third Parties ......................................................66
14.11  Customers/Non-Compete ..............................................................................27
14.12  Confidentiality ..............................................................................................27
14.13  Dispute Resolution ........................................................................................66
14.14  General Interpretive Principles ......................................................................70

[TPW: NYLEGAL:460852.1] 19499-00000  03/09/2006 06:00 PM

# LIMITED LIABILITY COMPANY AGREEMENT
## OF
### CAFÉ LA RICA, LLC

This Limited Liability Company Agreement of **Café La Rica, LLC**, a limited liability company organized pursuant to the Delaware Limited Liability Company Act, is entered into and shall be effective as of the Effective Date, by and among the Company and the persons executing this Agreement as Members.

## ARTICLE I
## DEFINITIONS

For purposes of this Agreement, unless the context clearly indicates otherwise, the following terms shall have the following meanings:

1.1     **Act.** The Delaware Limited Liability Company Act and all amendments thereto.

1.2     **Additional Capital Contribution.** An additional Capital Contribution payable by a Member to the Company pursuant to Article VIII.

1.3     **Affiliate.** With respect to any Person, any entity controlling, controlled by or under common control with such Person. "Control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of over 50% of the voting securities of such Person, by contract or otherwise.

1.4     **Agreement.** This Limited Liability Company Agreement including all amendments adopted in accordance with this Agreement and the Act.

1.5     **Annual Independent Audit.** Annual Independent Audit shall have the meaning set forth in Section 4.3.

1.6     **Assignee or "Transferee."** A transferee of an Economic Interest who has not been admitted as a Substitute Member.  Unless otherwise clear from the context of its use, the term "transferee" is synonymous with the term "Assignee."

1.7     **Bankrupt Member.** A Member who: (a) files a petition in bankruptcy, or is adjudicated as bankrupt or insolvent, or makes an assignment for the benefit of creditors, or an arrangement pursuant to any bankruptcy law; (b) discontinues or dissolves its business; or (c) has a receiver appointed for such Member or such Member's business and such receiver is not discharged within sixty (60) days.

1.8     **Board of Managers.** A Board constituted with those Persons selected to manage the affairs of the Company under Article VII hereof.

1.9     **Business Day.** Any day other than Saturday, Sunday or any legal holiday observed in the State of Delaware.

1.10    **Capital Account.** The account maintained for a Member or an Assignee determined in accordance with Article VIII.

1.11    **Capital Contribution.** A Member's Initial Capital Contribution plus any Additional Capital Contribution made by the Member in accordance with this Agreement. A Capital Contribution includes (a) the amount of any money contributed by the Member to the Company (including liabilities of the Company assumed by the Member as provided in section 1.704-1(b)(2)(iv)(c) of the Regulations), and (b) the Gross Asset Value of any Property contributed to the Company by such Member (net of liabilities secured by such contributed Property that the Company is considered to assume or take subject to under section 752 of the Code).

1.12    **Certificate of Formation.** The Certificate of Formation of the Company, as amended from time to time, filed with the Secretary of State of the State of Delaware.

1.13    **Code.** The Internal Revenue Code of 1986, as amended and in effect from time to time.

1.14    **Coffee Bean Trading.** The Coffee Bean Trading-Roasting LLC, a Delaware limited liability company.

1.15    **Coffee Holding.** Coffee Holding Co., Inc., a Nevada corporation.

1.16    **Commitment.** The Initial Capital Contribution and Additional Capital Contributions that a Member is obligated to make.

1.17    **Company.** Café La Rica, LLC, a limited liability company formed under the laws of Delaware, and any successor limited liability company

1.18    **Company Property.** Any Property owned by the Company.

1.19    **Confidential Information.** Confidential Information shall have the meaning set forth in Section 14.10.

1.20    **Default Interest Rate.** The prime rate published by the Wall Street Journal, New York City edition, for the last Business Day on which a Commitment is payable.

1.21    **Delinquent Member.** Delinquent Member shall have the meaning set forth in Section 8.4.

1.22    **Disposition (Dispose).** Any sale, assignment, exchange, mortgage, pledge, grant, hypothecation or other transfer, absolute or as security or encumbrance (including dispositions by operation of law).

1.23    **Dissociation.** Any action which causes a Person to cease to be a Member as described in Article XIII hereof.

1.24    **Dissolution Event.** An event, the occurrence of which will result in the dissolution of the Company under Article XIII.

1.25    **Distribution.** A transfer of Property to a Member on account of a Membership Interest.

1.26    **Economic Interest.** The right to receive allocations of Profits and Losses, Distributions, returns of capital and distribution of assets upon a dissolution of the Company.

2

1.27   **Effective Date.** March 10, 2006.

1.28   **Equity Offering.** Equity Offering shall have the meaning set forth in Section 11.5.

1.29   **Exhibit A.** Exhibit A to this Agreement setting forth the name, address, Initial Capital Contribution, Initial Membership Interest and Initial Sharing Ratio of each Member.

1.30   **Fair Market Value.**

(a)   As of any date, the fair market value of an asset on such date as determined in good faith by the Board of Managers. For this purpose, the Board of Managers may in its reasonable and prudent discretion value assets that are restricted by law, contract, market conditions (including trading volume relative to the Company's holding) or otherwise as to salability or transferability at an appropriate discount, based on the nature and term of such restrictions.

(b)   With respect to any Membership Interest or Shares, fair market value shall be based on the Company being operated as a going concern without any adjustment for marketability or minority interest. Fair market value shall be determined, in accordance with the preceding sentence, in good faith by the Board of Managers.

1.31   **Fiscal Year.** The twelve month period ending on October 31 of each calendar year.

1.32   **Gross Asset Value.** Gross Asset Value, with respect to any Company asset, means the adjusted basis of such asset for federal income tax purposes, except as follows:

(a)   The initial Gross Asset Value of any Company asset contributed by a Member to the Company shall be the Fair Market Value of such Company asset as of the date of such contribution;

(b)   The Gross Asset Value of each Company asset shall be adjusted to equal its Fair Market Value, as of the following times: (i) the acquisition of an additional Membership Interest by any new or existing Member in exchange for more than a de minimis Capital Contribution unless the Board of Managers determines that such adjustment is not necessary to reflect the relative Economic Interests of the Members in the Company; (ii) the Distribution by the Company to a Member of more than a de minimis amount of Company assets (other than cash) as consideration for all or part of its Membership Interest unless the Board of Managers determines that such adjustment is not necessary to reflect the relative Economic Interests of the Members in the Company; and (iii) the liquidation of the Company within the meaning of section 1.704-1(b)(2)(ii)(g) of the Regulations;

(c)   The Gross Asset Value of a Company asset distributed to any Member shall be the Fair Market Value of such Company asset as of the date of Distribution thereof;

(d)   The Gross Asset Value of each Company asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted basis of such Company asset pursuant to section 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to section 1.704-1(b)(2)(iv)(m) of the Regulations; and

3

(e)     If the Gross Asset Value of a Company asset has been determined or adjusted pursuant to paragraph (a), (b) or (d) above, such Gross Asset Value shall thereafter be adjusted to reflect the depreciation or amortization taken into account with respect to such Company asset for purposes of computing Profits and Losses.

1.33    **Initial Capital Contribution.** With respect to any Member, the Initial Capital Contribution set forth in <u>Exhibit A</u> opposite the name of such Member.

1.34    **Initial Membership Interest.** With respect to any Member, the Initial Membership Interest (as represented in Shares) set forth in <u>Exhibit A</u> opposite the name of such Member.

1.35    **Initial Sharing Ratio.** With respect to any Member, the Initial Sharing Ratio set forth in <u>Exhibit A</u> opposite the name of such Member.

1.36    **Initial Value.** With respect to any Member, the Initial Value set forth on <u>Exhibit A</u> opposite the name of such Member.

1.37    **Management Right.** The right, if any, of a Member to participate in the management of the Company, to vote on any matter and to grant or withhold consent or approval of actions of the Company.

1.38    **Manager.** Manager shall have the meaning set forth in Section 7.1.

1.39    **Member.** A party executing this Agreement and a Substitute Member.

1.40    **Membership Interest.** A Member's Economic Interest and Management Right which shall be represented by Shares of the Company.

1.41    **Minimum Working Capital.** The Minimum Working Capital shall mean $100,000.

1.42    **Net Cash Flow.** Net Cash Flow shall mean, with respect to any fiscal period of the Company, all cash revenues of the Company during that period, decreased by, without duplication, (a) cash expenditures for operating expenses, (b) capital expenditures to the extent not made from reserves, (c) repayment of principal on any financing and (d) taxes.

1.43    **New Securities.** Means any equity interests in the Company issued after the date of this Agreement whether now authorized or not, including, but not limited to, Shares, Membership Interests or any warrants, options, convertible securities or other contracts or rights to purchase Shares, Membership Interests or securities of the Company.

1.44    **Offering Allocation.** Offering Allocation shall have the meaning set forth in Section 11.5.

1.45    **Officer.** Any individual appointed as an officer of the Company in accordance with Section 7.4.

1.46    **Organization.** A Person other than a natural person. Organization includes, without limitation, corporations (both non-profit and other corporations), partnerships (both limited and general), joint ventures, limited liability companies and unincorporated associations, but the term does not include joint tenancies and tenancies by the entirety.

1.47     **Person.** An individual, trust, estate or any Organization permitted to be a member of a limited liability company under the laws of the State of Delaware.

1.48     **Principal Office.** The Principal Office of the Company set forth in Section 2.6.

1.49     **Proceeding.** Any administrative, judicial or other adversary proceeding, including, without limitation, litigation, arbitration, administrative adjudication, mediation and appeal or review of any of the foregoing.

1.50     **Profits and Losses.** For each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or period, determined in accordance with section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(a)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Section shall be added to such taxable income or loss;

(b)     Any expenditures of the Company described in section 705(a)(2)(B) of the Code or treated as section 705(a)(2)(B) of the Code expenditures pursuant to section 1.704-1(b)(2)(iv)(i) of the Regulations (other than expenses in respect of which an election is properly made under section 709 of the Code), and not otherwise taken into account in computing Profits or Losses pursuant to this Section, shall be subtracted from such taxable income or loss;

(c)     In the event the Gross Asset Value of any Company asset is adjusted pursuant to paragraph (b) or (d) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such Company asset for purposes of computing Profits or Losses;

(d)     Gain or loss resulting from any disposition of any Company asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Company asset disposed of, notwithstanding that the adjusted tax basis of such Company asset may differ from its Gross Asset Value;

(e)     In accordance with section 1.704-1(b)(2)(iv)(g)(3) of the Regulations, depreciation with respect to any Company asset shall be computed by reference to the adjusted Gross Asset Value of such asset, notwithstanding that the adjusted tax basis of such Company asset differs from its Gross Asset Value; and

(f)     Notwithstanding any other provisions of this definition, Profits and Losses shall not include allocations under section 704(c) (which are set forth at Section 9.3(i) hereof) or Regulatory Allocations.

1.51     **Property.** Any property, real or personal, tangible or intangible, including money, and any legal or equitable interest in such property, but excluding services and promises to perform services in the future.

1.52     **Regulations.** The final and temporary federal income tax regulations promulgated by the United States Treasury Department under the Code as such regulations may be amended from time to

[TPW: NYLEGAL:460852.1] 19499-00000 03/09/2006 06:00 PM

time, or if no final or temporary regulations with respect to a tax issue are then in effect, proposed regulations then in effect if approved by the Board of Managers. All references herein to a specific section of the Regulations shall be deemed also to refer to any corresponding provision of succeeding Regulations.

1.53 **Regulatory Allocations.** Regulatory Allocations shall mean the allocations set forth at Sections 9.3(a) through (g).

1.54 **Related Person.** Means:

With respect to a particular individual:

    (a) each member of such individual's Family;

    (b) any Person that is directly or indirectly controlled by any one or more members of such individual's Family;

    (c) any Person in which members of such individual's Family hold (individually or in the aggregate) a Material Interest; and

    (d) any Person with respect to which one or more members of such individual's Family serves as a director, officer, partner, executor or trustee (or in a similar capacity).

With respect to a specified Person other than an individual:

    (a) any Person that directly or indirectly controls, is directly or indirectly controlled by or is directly or indirectly under common control with such specified Person;

    (b) any Person that holds a Material Interest in such specified Person;

    (c) each Person that serves as a director, officer, partner, executor or trustee of such specified Person (or in a similar capacity);

    (d) any Person in which such specified Person holds a Material Interest; and

    (e) any Person with respect to which such specified Person serves as a general partner or a trustee (or in a similar capacity).

For purposes of this definition, (a) "control" (including "controlling," "controlled by," and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and shall be construed as such term is used in the rules promulgated under the Securities Act; (b) the "Family" of an individual includes (i) the individual, (ii) the individual's spouse, (iii) any other natural person who is related to the individual or the individual's spouse within the second degree and (iv) any other natural person who resides with such individual; and (c) "Material Interest" means direct or indirect beneficial ownership (as defined in Rule 13d-3 under the Securities Exchange Act of 1934) of voting securities or other voting interests representing at least ten percent (10%) of the outstanding voting power of a Person or equity securities or other equity interests representing at least ten percent (10%) of the outstanding equity securities or equity interests in a Person.

1.55 **Securities Act.** The Securities Act of 1933, as amended.

6

1.56    **Share.** A share of a Membership Interest as described in Section 8.2.

1.57    **Sharing Ratio.** With respect to any Member as of any date, the ratio (expressed as a percentage) of (a) such Member's Shares to (b) the aggregate outstanding Shares of all Members, or such other ratio as shall be agreed by all Members from time to time. The Initial Membership Interest and the Initial Sharing Ratio of each Member are set forth in Exhibit A, and Exhibit A shall be amended as necessary to conform to any changes thereto agreed to by the Members. In the event all or any portion of a Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Membership Interest and Sharing Ratio of the transferor to the extent it relates to the transferred Membership Interest.

1.58    **Substitute Member.** An Assignee who has been admitted to all of the rights of membership pursuant to Section 11.2.

1.59    **Tax Characterization and Additional Tax Terms.** It is intended that the Company be characterized and treated as a partnership for, and solely for, federal, state and local income tax purposes. For such purpose, the Company shall be subject to all of the provisions of subchapter K of chapter 1 of subtitle A of the Code, and all references to a "Partner," to "Partners" and to the "Partnership" in this Agreement (including the provisions of Articles VIII and IX) and in the provisions of the Code and Regulations cited in this Agreement shall be deemed to refer to a Member, the Members and the Company, respectively. In addition, the following terms shall have the following meanings:

(a)    Adjusted Capital Account Deficit shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i)    Credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to section 1.704-1(b)(2)(ii)(c) or the penultimate sentences of sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(ii)    Debit to such Capital Account the items described in sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

(b)    Nonrecourse Deductions has the meaning set forth in section 1.704-2(b)(1) of the Regulations.

(c)    Nonrecourse Liability has the meaning set forth in section 1.704-2(b)(3) of the Regulations.

(d)    Partner Nonrecourse Debt has the meaning set forth in section 1.704-2(b)(4) of the Regulations.

(e)    Partner Nonrecourse Debt Minimum Gain means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with section 1.704-2(i)(3) of the Regulations.

[TPW: NYLEGAL:460852.1] 19499-00000 03/09/2006 06:00 PM

(f)    Partner Nonrecourse Deductions has the meaning set forth in sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Regulations.

(g)    Partnership Minimum Gain has the meaning set forth in sections 1.704-2(b)(2) and 1.704-2(d) of the Regulations.

1.60    **Winding Up Sale.** Winding Up Sale shall have the meaning set forth in Section 9.9(a).

# ARTICLE II
# FORMATION

2.1    **Organization.** The Members hereby organize the Company as a Delaware limited liability company pursuant to the provisions of the Act.

2.2    **Agreement.** For and in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members executing this Agreement hereby agree to the terms and conditions of this Agreement, as it may from time to time be amended; provided, however, that this Agreement shall not be effective unless and until the following agreements are fully executed by the appropriate parties: (a) a Lease Agreement between the Company and Perc Enterprises, in form attached hereto as Exhibit B; (b) an Expense Sharing Agreement between the Company and Coffee Holding, in the form attached hereto as Exhibit C; (c) a License Agreement between the Company and Coffee Bean Trading, in the form attached hereto as Exhibit D; (d) a License Agreement between the Company and Coffee Holding, in form attached hereto as Exhibit E; and (e) an Employment Agreement between the Company and Mr. Ernesto Aguila in the form attached hereto as Exhibit F. It is the express intention of the Members that this Agreement shall be the sole source of agreement of the parties with respect to the subject matter hereof, and, except to the extent a provision of this Agreement expressly incorporates federal income tax rules by reference to sections of the Code or Regulations or is expressly prohibited or ineffective under the Act, this Agreement shall govern, even when inconsistent with, or different than, the provisions of the Act or any other law or rule. To the extent any provision of this Agreement is prohibited or ineffective under the Act, this Agreement shall be considered amended to the smallest degree possible in order to make this Agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a way to make any provision of this Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

2.3    **Name.** The name of the Company is Café La Rica, LLC, and all business of the Company shall be conducted under that name or under any other name determined by the Board of Managers but, in any case, only to the extent permitted by applicable law.

2.4    **Term.** The term of the Company shall be perpetual unless the Company shall be sooner dissolved and its affairs wound up in accordance with the Act or this Agreement.

2.5    **Registered Agent and Office.** The registered agent for the service of process and the registered office shall be that Person and location reflected in the Certificate of Formation as filed in the office of the Secretary of State of the State of Delaware. The Board of Managers may, from time to time, change the registered agent or office through appropriate filings with the Secretary of State of the State of Delaware. In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Board of Managers shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be. If the Board of Managers shall fail to designate a

8

replacement registered agent or change of address of the registered office, any Member may designate a replacement registered agent or file a notice of change of address.

2.6 **Principal Office.** The Principal Office of the Company shall be located at 2131 NW 72nd Avenue, Miami, Florida 33122.

# ARTICLE III
## PURPOSE; NATURE OF BUSINESS

The purpose of the Company is to engage in the roasting, packaging and sale of Café La Rica and other branded coffee products, and to engage in any other lawful act or activity, as determined by the Board of Managers from time to time, for which limited liability companies may be organized under the Act. The Company shall have the authority to do all things necessary or convenient to accomplish its purposes and operate its business as described in this Article III. The Company exists only for the purposes specified in this Article III. The authority granted to the Board of Managers under this Agreement to bind the Company shall be limited to actions necessary or convenient to the purposes specified in this Article III and to the extent provided by Section 6.6.

# ARTICLE IV
## ACCOUNTING AND RECORDS

4.1 **Records to be Maintained.** The Company shall maintain at the Principal Office, the Company's books and records, including financial statements of the Company and all other documents and data regarding the Company, which shall be open to inspections by the Members or their agents at any reasonable time.

4.2 **Reports to Members.** The Board of Managers shall provide reports to the Members, including a balance sheet, a statement of profit and loss and changes in Members' accounts and a statement of cash flows, within fifteen (15) days of the end of each month.

4.3 **Annual Audit.** Within ninety (90) days of the end of each Fiscal Year, the Board of Managers shall cause the annual financial statements of the Company to be audited by the independent registered public accounting firm responsible for conducting the audit of the financial statements of Coffee Holding for the same period ("**Annual Independent Audit**").

4.4 **Tax Returns and Reports.** The Board of Managers, at the Company's expense, shall prepare and timely file income tax returns of the Company in all jurisdictions where such filings are required, and shall prepare and deliver to each Member, within the time prescribed by the Code and any extensions applicable thereto, as provided by the Code or applicable regulations, all information returns required by the Code and Company information necessary for the preparation of the Members' federal income tax returns.

# ARTICLE V
## CLASSES OF MEMBERSHIP; NAMES AND ADDRESSES OF MEMBERS

There shall be only one class of Members. The names and addresses of the Members are as stated on Exhibit A.

9

## ARTICLE VI
## RIGHTS AND DUTIES OF MEMBERS; RESTRICTIVE COVENANTS

6.1    **No Management Rights as Members.**  No Member shall have authority as a Member to bind the Company.

6.2    **Liability of Members.**  No Member shall be liable as such for the debts, obligations or liabilities of the Company.

6.3    **Indemnification.**  A Member shall indemnify the Company for any costs or damages incurred by the Company as a result of any unauthorized action by such Member.

6.4    **Representations, Warranties and Covenants.**  Each Member, and in the case of a trust or other Organization, the person(s) executing this Agreement on behalf of such trust or other Organization, hereby represents and warrants to the Company and to each other Member that: (a) if that Member is a trust or other Organization, it has the requisite power to enter into this Agreement and to perform its obligations hereunder and that the person(s) executing this Agreement on behalf of such trust or other Organization has the requisite power to do so; and (b) the Member is acquiring its interest in the Company for the Member's own account as an investment and without an intent to distribute the interest. The Members acknowledge that their interests in the Company have not been registered under the Securities Act or any state securities laws and may not be resold or transferred without appropriate registration or the availability of an exemption from such requirements.

6.5    **Conflicts of Interest**.

(a)    The Members shall account to the Company and hold as trustee for it any Property, Profit or benefit derived by the Member, without the consent of all of the other Members, in the conduct and winding up of the Company business or from a use or appropriation by the Member of Company Property, including information developed exclusively for the Company and opportunities expressly offered to the Company.

(b)    A Member does not violate a duty or obligation to the Company merely because the Member's conduct furthers the Member's own interest. A Member may lend money to and transact other business with the Company. The rights and obligations of a Member who lends money to or transacts business with the Company are the same as those of a Person who is not a Member, subject to other applicable law. No transaction with the Company shall be voidable solely because a Member has a direct or indirect interest in the transaction if the transaction is fair to the Company.

6.6    **Restrictive Covenants**. Notwithstanding anything contained herein to the contrary, the Company shall not take any of the following actions without the prior written consent of each Member:

(a)    amend the Certificate of Formation or this Agreement;

(b)    purchase any interest in the stock, assets or business of any corporation, partnership or other entity other than in the ordinary course of the Company's business;

(c)    appoint or discharge any members of the Board of Managers of the Company, other than pursuant to the provisions set forth in Article VII;

10

(d)      enter into any arrangement which will result in the merger, consolidation, dissolution, liquidation, winding up or cessation of the Company or the business activities of the Company;

(e)      dispose of, purchase or lease any asset of the Company other than in the ordinary course of the Company's business;

(f)      issue any New Securities;

(g)      require Additional Capital Contributions from the Members;

(h)      admit any new Members or permit the withdrawal of any existing Member;

(i)      file a voluntary petition or otherwise initiate proceedings to have the Company adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Company, or file a petition seeking or consenting to reorganization or relief of the Company as debtor under any applicable federal or state law relating to bankruptcy, insolvency, or other relief for debtors with respect to the Company; or seek or consent to the appointment of any trustee, receiver, conservator, assignee, sequestrator, custodian, liquidator (or other similar official) of the Company or of all or any substantial part of the properties and assets of the Company, or make any general assignment for the benefit of creditors of the Company, or admit in writing the inability of Company to pay its debts generally as they become due or declare or effect a moratorium on the Company debt or take any action in furtherance of any such action;

(j)      sell or transfer any asset of the Company to a Related Person unless such sale or transfer is made at Fair Market Value;

(k)      increase or decrease the number of Managers the Company is authorized to have; or

(l)      authorize additional Shares.

## ARTICLE VII
## BOARD OF MANAGERS AND OFFICERS

7.1    **Board of Managers.** The management of the Company and all decisions concerning the business affairs of the Company shall be made by the Board of Managers. The Board of Managers shall consist of two (2) managers, one of which shall be elected by each of the Members. Each Manager shall have one (1) vote with respect to all matters requiring the vote of the Board of Managers. No individual member of the Board of Managers (a "**Manager**") shall have the right to act on behalf of the Company without the written consent of the other Manager or absent authorization by resolution of the Board of Managers. The initial Board of Managers shall consist of those persons listed on <u>Exhibit G</u> hereto.

7.2    **Voting.** Except as otherwise provided in this Agreement, the affirmative vote of a majority of the members of the Board of Managers shall constitute the act of the Board of Managers. If there are only two members on the Board of Managers, then the affirmative vote of both members shall constitute the act of the Board of Managers.

11

7.3     **Term of Office as a Member of the Board of Managers.** Each member of the Board of Managers shall serve until his or her removal by the Member who appointed him or her or any resignation of such member of the Board of Managers pursuant to Section 7.8. A member of the Board of Managers may be removed by the Member who appointed him or her at any time, with or without cause.

7.4     **Incapacitation of a Manager.** In the event that any Manager becomes incapacitated such that he or she us incapable in any material respect of performing the services required by such Manager in accordance with this Agreement on a regular ongoing basis for a period of sixty (60) days, such Manager shall automatically be removed from the Board of Managers and replaced by a newly elected Manager as shall be determined by the Member who appointed such incapacitated Manager to the Board of Managers.

7.5     **Officers.** The Board of Managers may appoint one or more Officers of the Company as it shall determine from time to time advisable with such titles as the Board of Managers deems appropriate. Any two or more offices may be held by the same person. All Officers shall have such authority and perform such duties in the management and operation of the Company as may be prescribed by the Board of Managers or this Agreement. Any Officer may be removed at any time, with or without cause, by the Board of Managers, and any vacancy occurring in any office shall be filled by the Board of Managers. The initial Officers of the Company shall be as set forth on Exhibit H hereto.

7.6     **Authority to Bind the Company.** The Officers shall have such authority as is granted by the Board of Managers (including, if authorized, the authority to bind the Company), subject to the authority of the Board of Managers. The Board of Managers has the power, on behalf of the Company, to do all things necessary or convenient to carry out the business and affairs of the Company (as described in Article III), including, without limitation:

(a)     To institute, prosecute and defend any Proceeding in the Company's name;

(b)     To conduct the Company's business, establish Company offices and exercise the powers of the Company;

(c)     To employ, contract and deal with, from time to time, Persons, including any Member or Affiliate of any Member, in connection with the management and operation of the Company's business, including without limitation, suppliers, customers, tradespeople, brokers, accountants and attorneys, on such terms as the Board of Managers shall determine;

(d)     To purchase liability and other insurance to protect the Company's business and Property;

(e)     To establish reserve funds of the Company to provide for future requirements for operations, contingencies or any other purpose that the Board of Managers deems necessary or appropriate;

(f)     To make such elections under the Code and other relevant tax laws as to the treatment of items of Company income, gain, loss, deduction and credit, and as to all other relevant matters as the Board of Managers, with the advice of the Company's accountants and attorneys, deems necessary or appropriate, including without limitation, elections referred to in section 754 of the Code (subject to Section 9.6), the determination of which items of cash outlay shall be capitalized or treated as current expenses, and the selection of the method of accounting and bookkeeping procedures to be used by the Company;

12

(g)     To pay as a Company expense any and all costs or expenses associated with the formation, development, organization and operation of the Company;

(h)     To deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement; and

(i)     To execute, acknowledge and deliver any and all instruments to effectuate the foregoing.

All Company cash shall be deposited in a bank account selected by the Board of Managers, and all disbursements of Company cash shall be approved in advance by those Persons designated by the Board of Managers.

7.7     **Actions of the Board of Managers.** The Board of Managers has the power to bind the Company as provided in this Article VII. No Person dealing with the Company shall have any obligation to inquire into the power or authority of any Person designated by the Board of Managers to act on behalf of the Company.

7.8     **Indemnification.** The Company shall indemnify the Board of Managers and any officers or agents appointed by the Board of Managers for all costs, losses, liabilities and damages paid or incurred in connection with the business of the Company, to the fullest extent provided or allowed by the laws of the State of Delaware.

7.9     **Resignation and Removal; Replacement.** Any member of the Board of Managers may resign upon at least 30 days' prior written notice to the Members. In the event of the resignation or removal of any member of the Board of Managers, the Member who appointed such member of the Board of Managers shall appoint a replacement member of the Board of Managers.

7.10     **Other Activities.** The members of the Board of Managers, in their capacity as such, shall not be required to devote their full time to the management of the Company business, but only so much of their time as the Board of Managers deems necessary or appropriate for the proper management of such business. The members of the Board of Managers, and any of their Affiliates, may engage or possess an interest, independently or with others, in other businesses or ventures of every nature and description, and neither the Company nor any Member shall have any rights in or to such ventures or the income or profits derived therefrom.

7.11     **Distributions.** Each Member shall look solely to the assets of the Company for all Distributions and a share of Profits or Losses and shall have no recourse therefor (upon dissolution or otherwise) against the Board of Managers or any of the other Members.

7.12     **Expenses.** The Company shall pay directly or reimburse the Board of Managers for certain expenses of the Company incurred by the Board of Managers in the management of the Company's business. Such expenses may include but are not limited to: (a) costs of borrowed money and taxes applicable to the Company; (b) fees and expenses paid to suppliers, tradespeople, brokers, consultants and other agents; (c) costs of insurance as required in connection with the conduct of the business of the Company; and (d) expenses incurred by the Company for tax return preparation.

7.13     **Affiliates; Fees.** The Board of Managers is specifically authorized to employ, contract and deal with, from time to time, any Member or Affiliate of any Member, and in connection therewith to pay such Person's fees, prices or other compensation; provided that such employment, contracts and dealings are necessary or appropriate for the Company's purposes, and the fees, prices or other

13

compensation paid by the Company therefor is, in the judgment of the Board of Managers, reasonable and typical or competitive with the fees, prices or other compensation customarily paid for similar Property or services.

Nothing herein contained shall be construed as a guaranty by the Board of Managers of the performance by any Affiliate, designee or nominee of its obligations under any contract between any such Affiliate, designee or nominee and the Company.

## ARTICLE VIII
## CONTRIBUTIONS AND CAPITAL ACCOUNTS

8.1 **Initial Capital Contributions.** Concurrently with the execution and delivery of this Agreement, each Member shall make the Initial Capital Contribution described for that Member on Exhibit A. No Member shall have the right to withdraw or be repaid any Capital Contribution except as provided in this Agreement.

8.2 **Indemnification.** Each Member shall indemnify the other Members and the Company against any and all liabilities of such indemnifying Member which are imputed to the other Members or the Company.

8.3 **Shares.** The Company shall issue Shares to represent each Member's Membership Interest. The total number of Shares that the Company is authorized to issue is one thousand (1,000) Shares. The Company may authorize additional Shares only with the written consent of, and with terms and conditions approved by, the Board of Managers and subject to the provisions of Section 11.5. The initial number of issued and outstanding Shares is set forth on Exhibit A.

8.4 **Additional Capital Contributions.** In the event the Board of Managers determines that the Company does not have sufficient operating revenues or other available funds to pay any amount which the Board of Managers determines to be required for any Company purpose, the Board of Managers shall, if reasonable under the circumstances, attempt to obtain financing in the amount required; *provided, however,* that the Board of Managers shall not obtain such financing if it would cause a default under any Company obligation. If such financing cannot be obtained within a reasonable time and upon terms and conditions approved by the Board of Managers, the Board of Managers may, pursuant to Section 6.6 above, solicit and accept on behalf of the Company Additional Capital Contributions from the Members. Unless otherwise agreed by all Members, any Additional Capital Contribution shall be made by the Members pro rata, based on their respective Sharing Ratios. In the event that a Member does not make such an Additional Capital Contribution, then its Membership Interest, including its Sharing Ratio, in the Company shall be diluted as a result of the Additional Capital Contributions then being made by the other Members. A Member is not obligated to make an Additional Capital Contribution unless such Member affirmatively agrees to such obligation in writing.

8.5 **Enforcement of Commitments.** In the event any Member (a "**Delinquent Member**") fails to perform the Delinquent Member's Commitment, the Board of Managers shall give the Delinquent Member a notice of such failure. If the Delinquent Member fails to perform the Commitment (including the payment of any costs associated with the failure and interest at the Default Interest Rate) within ten Business Days of the giving of such notice, the Board of Managers may take such action as it deems appropriate, including but not limited to:

14

(a)     Enforcing the Commitment in the court of appropriate jurisdiction in the state in which the Principal Office is located or the state of the Delinquent Member's address as reflected in this Agreement; *provided, however,* that a Member shall have no personal liability for any Additional Capital Contribution and, in any proceeding to enforce the obligation of a Member to make all or part of any such Additional Capital Contribution, the Board of Managers shall have recourse solely to the Delinquent Member's interest in the Company. Each Member expressly agrees to the jurisdiction of such courts but only for purposes of such enforcement.

(b)     Selling the Delinquent Member's Shares, including a sale to another Member or to another Person.

(c)     Allowing Members, except the Delinquent Member, to make Additional Capital Contributions and adjusting the Sharing Ratios and Shares of the Members in proportion to the new Capital Contribution levels.

(d)     Reducing the Delinquent Member's Membership Interest and Shares.

(e)     Issuing new Shares to Members who make Additional Capital Contributions in place of the Delinquent Member; provided that such Shares may be entitled to a priority return and such other rights as shall be determined by the Board of Managers.

8.6     **Capital Account.** A separate capital account shall be maintained for each Member throughout the term of the Company in accordance with the rules of section 1.704-1(b)(2)(iv) of the Regulations as in effect from time to time. Except as otherwise provided in section 1.704-1(b)(2)(iv) of the Regulations, each Member's Capital Account shall initially consist of such Member's Initial Capital Contribution, and shall be maintained in accordance with the following provisions:

(a)     Each Member's Capital Account shall be credited with: (i) such Member's Additional Capital Contributions; and (ii) such Member's share of Profits and items of income and gain that are specially allocated to such Member pursuant to Article IX (other than any income or gain allocated to such Member pursuant to Section 9.3(i) in accordance with section 704(c) of the Code).

(b)     Each Member's Capital Account shall be debited with: (i) the amount of money distributed to such Member by the Company (including liabilities of such Member assumed by the Company as provided in section 1.704-1(b)(2)(iv)(c) of the Regulations) other than amounts which are in repayment of debt obligations of the Company to such Member; (ii) the Gross Asset Value of Property distributed to such Member (net of liabilities secured by such distributed Property that such Member is considered to assume or take subject to under section 752 of the Code); and (iii) such Member's share of Losses and items of loss and deduction that are specially allocated to such Member pursuant to Article IX (other than any deduction or loss allocated to such Member pursuant to Section 9.3(i) in accordance with section 704(c) of the Code).

(c)     If the Gross Asset Value of a Company asset differs from its adjusted tax basis, the Members' Capital Accounts shall be adjusted to reflect only allocations to them of depreciation, amortization and gain or loss as computed for book purposes (and not for tax purposes) with respect to such Company asset. In such event, items of book depreciation, amortization and gain or loss shall be calculated in conformity with the rules of section 1.704-1(b)(2)(iv)(g) of the Regulations.

[TPW: NYLEGAL:460852.1] 19499-00000  03/09/2006 06:00 PM

(d)     All such contributions, allocations and Distributions shall be credited or charged, as the case may be, to the appropriate Capital Accounts of the respective Members to whom they apply as of the time the contributions, allocations or Distributions are made.

(e)     The Capital Account of a transferee Member shall include the appropriate portion of the Capital Account of the Member from whom the transferee Member's interest was obtained.

(f)     In determining the amount of any liability, there shall be taken into account section 752 of the Code and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with section 1.704-1(b) of the Regulations, and shall be interpreted and applied in a manner consistent with such Regulations. Consistent with such intention, the value of any Property (other than cash) (i) contributed to the Company by a Member, (ii) distributed to a Member from the Company or (iii) owned by the Company and subject to a revaluation upon the occurrence of certain events shall be the Fair Market Value of such Property (net of liabilities secured by such Property that the Company or such Member, as the case may be, is considered to assume or take subject to under section 752 of the Code) on the date of contribution, Distribution or revaluation, as applicable.

8.7    **No Obligation to Restore Deficit Balance.**  No Member shall be required to restore any deficit balance in its Capital Account.

8.8    **Withdrawal; Successors.**  A Member shall not be entitled to withdraw any part of its Capital Account or to receive any Distribution from the Company, except as specifically provided in this Agreement.   Any Member, including any additional or substitute Member, who shall receive a Membership Interest or whose Membership Interest shall be increased by means of a transfer to it of all or part of the Membership Interest of another Member, shall have a Capital Account with respect to such interest initially equal to the Capital Account with respect to such interest of the Member from whom such interest is acquired.

8.9    **Interest.**  Except as otherwise provided in this Agreement, no Member shall be entitled to interest or other return on such Member's Capital Contribution or on any Profits retained by the Company.

8.10   **Investment of Capital Contributions and Company Cash.**  The Capital Contributions of the Members and any cash held by the Company from time to time shall be invested, until such time as such funds shall be used for other Company purposes, in demand, money market or time deposits or obligations, securities, investments or other instruments constituting cash equivalents.  Such investments shall be made by the Board of Managers for the benefit of the Company.

8.11   Repayment of Capital Contribution.

(a)     The members of the Board of Managers shall have no personal liability for the repayment of any Capital Contributions of any Member, and no Member shall have liability for the repayment of any Capital Contributions of any other Member.  The repayment of any Capital Contribution shall be made only to the extent of available Company assets in accordance with the terms of this Agreement.

16

(b)     Except as otherwise provided in this Agreement, no Member shall have priority over any other Member as to the return of its Capital Contribution or as to Distributions of cash made by the Company.

(c)     Except as otherwise provided in this Agreement, a Member shall not be entitled to (i) demand or receive Property other than cash in return for its Capital Contribution or (ii) receive any funds or Property of the Company.

# ARTICLE IX
## ALLOCATIONS AND DISTRIBUTIONS

9.1     **Profits and Losses.** Profits and Losses, and each item of Company income, gain, loss, deduction, credit and tax preference with respect thereto, for each Fiscal Year (or shorter period in respect of which such items are to be allocated) shall be allocated among the Members as provided in this Article IX.

9.2     **Allocation of Profits and Losses.** All items of Profits and Losses for any Fiscal Year shall be allocated to the Members in proportion to their respective Sharing Ratios.

9.3     **Special Allocations.** The following special allocations shall be made:

(a)     <u>Loss Limitation.</u>  The Losses allocated pursuant to Section 9.2 shall not exceed the maximum amount of Losses that may be allocated to a Member without causing such Member to have an Adjusted Capital Account Deficit at the end of the Fiscal Year.  If some, but not all of the Members would have adjusted Capital Account Deficits as a consequence of the allocations of Losses pursuant to Section 9.2, the limitation in this Section 9.3(a) shall be applied by allocating Losses pursuant to Section 9.3(a) only to those Members (allocated pro rata if more than one) who would not have an Adjusted Capital Account Deficit as a consequence of receiving such an allocation.  All Losses in excess of the limitations set forth in this Section 9.3(a) shall be allocated among the Members in proportion to their respective Sharing Ratios.

(b)     <u>Minimum Gain Chargeback.</u>  Except as otherwise provided in section 1.704-2(f) of the Regulations, notwithstanding any other provision of this Article IX, if there is a net decrease in Partnership Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Partnership Minimum Gain, determined in accordance with section 1.704-2(g) of the Regulations.  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Regulations.  This Section 9.3(b) is intended to comply with the minimum gain chargeback requirement in section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

(c)     <u>Partner Minimum Gain Chargeback.</u>  Except as otherwise provided in section 1.704-2(i)(4) of the Regulations, notwithstanding any other provision of this Article IX, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Partner Nonrecourse Debt Minimum Gain as of the beginning of the Fiscal Year attributable to such Partner Nonrecourse Debt, determined in accordance with section 1.704-2(i)(5) of the Regulations, shall be specially

allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with section 1.704-2(i)(4) of the Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Regulations. This Section 9.3(c) is intended to comply with the minimum gain chargeback requirement in section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently therewith.

(d) _Qualified Income Offset_. In the event any Member unexpectedly receives any adjustments, allocations or Distributions described in section 1.704-1(b)(2)(ii)(d)(4), section 1.704-1(b)(2)(ii)(d)(5) or section 1.704-1(b)(2)(ii)(d)(6) of the Regulations which increase a Member's Adjusted Capital Account Deficit, items of Company income and gain shall be specially allocated to the Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible, provided that an allocation pursuant to this Section 9.3(d) shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IX have been tentatively made as if this Section 9.3(d) were not in this Agreement.

(e) _Gross Income Allocation_. In the event any Member has an Adjusted Capital Account Deficit, such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 9.3(e) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IX have been made as if Section 9.3(d) and this Section 9.3(e) were not in this Agreement.

(f) _Nonrecourse Deductions_. Nonrecourse Deductions for any Fiscal Year shall be specially allocated among the Members in proportion to their Sharing Ratios.

(g) _Partner Nonrecourse Deductions_. Any Partner Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with section 1.704-2(i)(1) of the Regulations.

(h) _Certain Book-ups_. To the extent an adjustment to (i) the adjusted tax basis of any Company asset pursuant to section 734(b) or section 743(b) of the Code is required to be taken into account in determining Capital Accounts or (ii) pursuant to section 1.704-1(b)(2)(iv)(f) of the Regulations, the Gross Asset Value of any Company asset is permitted to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated, as provided in section 1.704-1(b)(2)(iv)(m) or section 1.704-1(b)(2)(iv)(g) of the Regulations, respectively, as an item of Profit (if the adjustment increases such basis or Gross Asset Value of the asset) or Loss (if the adjustment decreases such basis or Gross Asset Value), and such Profit or Loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Regulations.

[TPW: NYLEGAL:460852.1] 19499-00000 03/09/2006 06:00 PM

(i)    Mandatory Allocations under Section 704(c) of the Code.

(i)    In the event section 704(c) of the Code or the principles of section 704(c) of the Code applicable under section 1.704-1(b)(2)(iv) of the Regulations require allocations of income, gain, deduction or loss in a manner different than that set forth above, the provisions of section 704(c) of the Code and the Regulations thereunder shall control such allocations among the Members. Any item of Company income, gain, loss and deduction with respect to any Property (other than cash) that has been contributed by a Member to the capital of the Company and which is required or permitted to be allocated to such Member for income tax purposes under section 704(c) of the Code so as to take into account the variation between the tax basis of such Property and its Fair Market Value at the time of its contribution shall be allocated solely for income tax purposes in the manner so required or permitted under section 704(c) of the Code using the "traditional method" described in section 1.704-3(b) of the Regulations; *provided, however,* that any other method allowable under applicable Regulations may be used for any contribution of Property if the contributing Member and the Board of Managers agree as to the use of such other method.

(ii)   In the event the Gross Asset Value of any Company asset is adjusted pursuant to Section 9.3(h) in accordance with section 1.704-1(b)(2)(iv)(f) of the Regulations, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in a manner consistent with Section 9.3(i)(i).

(iii)  Except as provided in Sections 9.4(h)(i) and (ii), for United States federal, state and local income tax purposes, the income, gains, losses and deductions of the Company shall, for each taxable period, be allocated among the Members in the same manner and in the same proportion that such items have been allocated among the Members' respective Capital Accounts.

9.4    **Curative Allocations.** The Regulatory Allocations are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction. Therefore, notwithstanding any other provision of this Article IX (other than the Regulatory Allocations), the Board of Managers shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Section 9.2. In exercising its discretion under this Section 9, the Board of Managers shall take into account future Regulatory Allocations under Sections 9.3(b) and 9.3(c) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 9.3(f) and 9.3(g).

9.5    **Section 754 Election.** Upon a transfer by a Member of an interest in the Company, which transfer is permitted by the terms of this Agreement, or upon the death of a Member or the Distribution of any Company Property to one or more Members, the Board of Managers, upon the request of one or more of the transferees or distributees, shall cause the Company to file an election on behalf of the Company to cause the basis of the Company's Property to be adjusted for federal income tax purposes in the manner prescribed in section 734 or 743 of the Code, as the case may be. The cost of preparing

19

such election and any additional accounting expenses of the Company occasioned by such election shall be borne by such transferees or distributees.

9.6    Other Allocation Rules.

(a)    For purposes of determining the Profits, Losses or any other item allocable to any period (including allocations to take into account any changes in any Member's Sharing Ratio during a Fiscal Year and any transfer of any interest in the Company), Profits, Losses and any such other item shall be determined on a daily, monthly or other basis, as determined by the Board of Managers using any permissible method under section 706 of the Code and the Regulations thereunder.

(b)    Notwithstanding the above, allocations made pursuant to this Article IX shall be made annually within one hundred and five (105) days after the end of the Fiscal Year, but in no event may such allocations be made later than required by the Code.

(c)    The Members are aware of the income tax consequences of the allocations made by this Article IX and hereby agree to be bound by the provisions of this Article IX in reporting their shares of Company income and loss for income tax purposes.

(d)    Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of section 1.752-3(a)(3) of the Regulations, the Members' interests in Company Profits are in proportion to their Sharing Ratios.

(e)    To the extent permitted by section 1.704-2(h)(3) of the Regulations, the Board of Managers shall endeavor to treat Distributions made from the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt as Distributions that are not allocable to an increase in minimum gain to the extent that such Distributions would not cause or increase an Adjusted Capital Account Deficit for any Member.

(f)    Except as otherwise provided in this Article IX, an allocation of Company Profits or Losses to a Member shall be treated as an allocation to such Member of the same share of each item of income, gain, loss and deduction taken into account in computing such Profits or Losses.

(g)    For purposes of determining the character (as ordinary income or capital gain) of any Profits allocated to the Members pursuant to this Article IX, such portion of Profits that is treated as ordinary income attributable to the recapture of depreciation shall, to the extent possible, be allocated among the Members in the proportion which (i) the amount of depreciation previously allocated to each Member bears to (ii) the total of such depreciation allocated to all Members. This Section 9.6(g) shall not alter the amount of allocations among the Members pursuant to this Article IX, but merely the character of income so allocated.

(h)    Except for arrangements expressly described in this Agreement, no Member shall enter into (or permit any Person related to the Member to enter into) any arrangement with respect to any liability of the Company that would result in such Member (or a person related to such Member under section 1.752-4(b) of the Regulations) bearing the economic risk of loss (within the meaning of section 1.752-2 of the Regulations) with respect to such liability unless such arrangement has been approved by all Members. To the extent a Member is permitted to guarantee the repayment of any Company indebtedness under this Agreement, each of the other

20

Members shall be afforded the opportunity to guarantee such Member's pro rata share of such indebtedness, determined in accordance with the Members' respective Sharing Ratios.

### 9.7 Distribution of Net Cash Flow.

(a)    Amounts and Timing.    Provided that the Company's working capital shall not fall below the Minimum Working Capital level, and subject to the provisions of Section 13.3 and applicable law, Net Cash Flow for each Fiscal Year of the Company, shall be distributed to the Members in proportion to their respective Sharing Ratios within 30 days of the completion of the Annual Independent Audit, or at such earlier time or times as may be designated by the Board of Managers.

(b)    Amounts Withheld.    The Board of Managers is authorized to withhold from Distributions, or with respect to allocations, to the Members and to pay over to any federal, state or local government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local tax law.  Any amounts required to be withheld pursuant to the Code or any provision of any state or local tax law with respect to any payment, distribution or allocation to the Company or the Members shall be treated as an amount distributed to the Member with respect to which such amount was withheld pursuant to this Section 9.7 for all purposes under this Agreement.

(c)    Draws for Payment of Estimated Taxes.    The Company shall pay to each Member an annual draw, not to exceed the amount reasonably necessary to provide for payment by the Members of any federal, state and local estimated taxes with respect to Profits allocated to the Members pursuant to this Article IX, and each such draw, if any, shall be treated as a loan from the Company to each Member receiving such draw and shall be deemed repaid by reducing the amount of each subsequent Distribution to the Member receiving such draw pursuant to this Section 9.7 by the lesser of (i) the entire amount otherwise distributable to the Member receiving such draw and (ii) the entire amount of any unrepaid draws pursuant to this Section 9.7(c).

### 9.8 Allocation of Gain or Loss upon Winding Up.

(a)    Gain or Loss Realized on Sale of Company Property.    Upon the winding up of the Company, as provided in Article XIII, net gain or loss realized on the sale or sales of Company Property (each such sale a "**Winding Up Sale**") shall be allocated among the Members in accordance with Section 9.2.

(b)    Distributions in Kind.    In the event that, upon a winding up of the Company, pursuant to Section 13.3, either (i) any Company Property is required to be distributed in kind, or (ii) the Board of Managers elects to distribute any Company Property in kind, the book value of such Property shall be adjusted to its Fair Market Value as of the date of such Distribution, and the amount of such adjustments shall be allocated to the Members' Capital Accounts in the manner provided in Section 9.8(a) as though such Property had been sold at its Fair Market Value and gain or loss had been realized.

21

# ARTICLE X
## TAXES

10.1 **Tax Matters Partner.** Coffee Holding shall be the Tax Matters Partner of the Company pursuant to section 6231(a)(7) of the Code. If Coffee Holdingshall cease to act as the Tax Matters Partner for any reason, the Members shall select another Member (subject to such Member's approval) to be the Tax Matters Partner. The Tax Matters Partner shall receive no additional compensation from the Company for its services in that capacity, but all expenses incurred by the Tax Matters Partner in such capacity shall be borne by the Company. The Tax Matters Partner is authorized to employ such accountants, attorneys and agents as it, in its sole discretion, determines is necessary to or useful in the performance of its duties. The Tax Matters Partner is authorized to represent the Company before the Internal Revenue Service and any other governmental agency with jurisdiction, and to sign such consents and to enter into settlements and other agreements with such agencies as the Tax Matters Partner or its duly authorized officer deems necessary or advisable. Each Member shall give prompt notice to each other Member of any and all notices it receives from the Internal Revenue Service concerning the Company, including any notice of a 30 day appeal letter and any notice of deficiency in tax concerning the Company's federal income tax returns. The Tax Matters Partner shall give each Member periodic status reports regarding any negotiations between the Internal Revenue Service and the Company. The Tax Matters Partner shall serve in a similar capacity with respect to any similar tax related or other election provided by state or local laws.

# ARTICLE XI
## TRANSFER OF MEMBERSHIP INTEREST

11.1 **Compliance with Securities Laws and this Agreement.** No Shares have been registered under the Securities Act or under any applicable state securities laws. A Member may not transfer (a transfer, for purposes of this Agreement, shall be deemed to include, but not be limited to, any sale, transfer, assignment, pledge, creation of a security interest or other disposition) any Shares, except upon compliance with the applicable federal and state securities laws and this Agreement. The Board of Managers shall have no obligation to register any Shares under the Securities Act or under any applicable state securities laws, or to make any exemption therefrom available to any Member except to the extent provided in any Registration Rights Agreement entered into by the Company with respect thereto.

11.2 **Transfer of Shares; Admission of Substitute Member.** Except for those transfers permitted by this Article XI, a Member may transfer Shares and give the transferee the right to become a Member only after the following terms and conditions have been satisfied:

(a) The transferee shall also be the transferee of all or part of the transferor's Economic Interest or shall be the owner of an Economic Interest;

(b) The Members holding all of the Shares that are not the subject of the transfer shall have consented in writing to the transfer of such Shares and the admission of the Substitute Member;

(c) The transferor and the transferee shall have complied with such other requirements as the non-transferring Members may reasonably impose, including the conditions that the transferee:

(i) Adopt and approve in writing all the terms and provisions of this Agreement then in effect; and

22

(ii)    Pay such fees as the Board of Managers may reasonably require to pay the costs of the Company in effecting such substitution; and

(d)    The Board of Managers shall have consented to the transfer.

**11.3    Dispositions Not in Compliance with this Article Void.** Any attempted Disposition of a Membership Interest, or any part thereof, not in compliance with this Article shall be void when made and ineffectual and shall not bind the Company.

**11.4    Transfer to Affiliate of a Member.** Notwithstanding anything herein to the contrary, any Member may transfer its Shares to any Affiliate or direct or indirect subsidiary thereof that is controlled by or under common control with it, and any such transferee shall have the right to become a Substitute Member, subject to compliance with Section 11.1.

**11.5    Future Sales and Preemptive Rights.**

(a)    The Company will not offer or sell any New Securities (an "**Equity Offering**") unless it first offers to each Member the right to purchase a portion of such New Securities which is equal to the total number of New Securities to be sold in the Equity Offering multiplied by a fraction, the numerator of which is the number of Shares owned by such Member on a fully diluted basis, and the denominator of which is the total number of Shares of the Company then outstanding on a fully diluted basis (an "**Offering Allocation**"). The Company shall immediately notify each Member of the terms or the proposed terms of an Equity Offering (the "**Company's Notice**"). The Company's Notice shall include the Offering Allocation for each Member. If the Member wishes to purchase New Securities pursuant to the Company's Notice, such Member shall notify the Company in writing within thirty (30) days after receipt of the Company's Notice stating how many of such New Securities such Member desires to purchase. Each Member shall be entitled to purchase up to that number of New Securities equal to such Member's respective Offering Allocation. To the extent the Members do not elect to purchase any or all of such New Securities, the Company shall have up to ninety (90) days to complete the Equity Offering upon the same terms specified in the Company's Notice. If the Company later changes the terms of the Equity Offering in any material respect, the Company shall first re-offer such New Securities to the Members pursuant to the procedure set forth above. Any New Securities which are offered or sold (or issued) by the Company in the Equity Offering shall, unless otherwise consented to in writing by each Member, be sold to any purchaser only for cash.

(b)    The closing of the purchase of New Securities by the Members pursuant to this Section 11.5 shall occur at the Principal Office of the Company concurrently with the closing of the Equity Offering, or at such other time as the Company and the Members may mutually determine.

## ARTICLE XII
## DISSOCIATION OF A MEMBER

**12.1    Dissociation.** A Person shall cease to be a Member upon the happening of any of the following events:

(a)    The resignation or withdrawal of the Member;

(b)    The Member becoming a Bankrupt Member;

23

(c)     The Member breaching this Agreement and not curing such breach within sixty (60) days of a non-breaching Member providing written notice of such breach pursuant to Section 13.1(c) below;

(d)     In the case of a Member who is a natural person, the death of the Member or the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's personal estate;

(e)     In the case of a Member that is a trust or who is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

(f)     In the case of a Member that is a separate Organization other than a corporation, the dissolution and commencement of winding up of the separate Organization;

(g)     In the case of a Member that is a corporation, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter; or

(h)     In the case of a Member that is an estate, the distribution by the fiduciary of the estate's entire interest in the Company.

12.2     **Rights of Dissociating Member.** In the event any Member dissociates prior to the expiration of the term of this Agreement, such Member shall be entitled to participate in the dissolution and winding up of the Company pursuant to Article XIII, to the same extent as any other Member except that, if such Dissociation results from a withdrawal of the Member in violation of this Agreement, any Distributions to which such Member would have been entitled shall be reduced by that portion of the damages, if any, sustained by the Company as a result of the Dissolution Event and winding up that is chargeable to the Capital Accounts of the other Members.

## ARTICLE XIII
## DISSOLUTION AND WINDING UP

13.1     **Dissolution.** The Company shall be dissolved without further action by the Members and its affairs wound up upon the first to occur of any of the following events (each of which shall constitute a Dissolution Event):

(a)     The unanimous written consent of the Members;

(b)     A Member materially breaches this Agreement and a non-breaching Member provides sixty (60) days written notice to the other Members of such breach, during which sixty (60) day period, the breaching Member shall have the opportunity to cure such breach; provided, however, that, the other Members shall have the opportunity to elect to continue the Company without the breaching Member, in which case the breaching Member shall be dissociated pursuant to Article XII above;

(c)     A Member ceases to be a Member pursuant to Article XII above;

(d)     A Member becomes a Bankrupt Member;

24

(e)     A material breach of any agreement between the Company and a Member or between Members; or

(f)     A Member elects to dissolve the Company pursuant to Section 14.12 below.

13.2   **Effect of Dissolution.**  Upon dissolution, the Company shall not be terminated and shall continue until the winding up of the affairs of the Company is completed and a certificate of dissolution has been issued by the Secretary of State of the State of Delaware.

13.3   **Distribution of Assets on Dissolution.**  Upon the winding up of the Company, the Board of Managers shall take full account of the assets and liabilities of the Company, and shall apply and distribute the assets and any proceeds therefrom in the following order:

(a)     First, to the payment of the debts and liabilities of the Company to creditors, including Members and affiliates of Members who are creditors, to the extent permitted by law, in satisfaction of such debts and liabilities, and to the payment of necessary expenses of liquidation;

(b)     Second, to the setting up of any reserves which the Board of Managers may deem necessary or appropriate for any anticipated obligations or contingencies of the Company arising out of or in connection with the operation or business of the Company.  Such reserves may be paid over by the Board of Managers to an escrow agent or trustee selected by the Board of Managers to be disbursed by such escrow agent or trustee in payment of any of the aforementioned obligations or contingencies and, if any balance remains at the expiration of such period as the Board of Managers shall deem advisable, shall be distributed by such escrow agent or trustee in the manner hereinafter provided; and

(c)     Then, to the Members in accordance with positive Capital Account balances taking into account all Capital Account adjustments for the Company's taxable year in which the liquidation occurs.  Liquidation proceeds shall be paid within sixty (60) days of the end of the Company's taxable year in which the liquidation occurs.  Such Distributions shall be in cash or Property (which need not be distributed proportionately) or partly in both, as determined by the Board of Managers.

To the extent possible after making all distributions under Sections 13.3(a) and (b) (and without violating 13.3(c)), the assets contributed to the Company by each Member shall be distributed to such contributing Member.  In the event that the Company is unable to comply with the obligations set forth in Sections 13.3(a) and (b) above without liquidating such assets, the Board of Managers shall determine which assets to liquidate to comply with such obligations.  In such case, the remainder of the assets shall be distributed to the contributing Member of such assets.

13.4   **Winding Up and Certificate of Dissolution.**  The winding up of the Company shall be completed when all debts, liabilities and obligations of the Company have been paid and discharged or reasonably adequate provision therefor has been made, and all of the remaining Property of the Company has been distributed to the Members.  Upon the completion of the winding up of the Company, a certificate of dissolution shall be delivered to the Secretary of State of the State of Delaware for filing. The certificate of dissolution shall set forth the information required by the Act.

## ARTICLE XIV
## MISCELLANEOUS

**14.1    Termination of License.**  In the event that the certain License Agreement between the Company and Coffee Bean Trading, dated as of the date hereof, is terminated for any reason, the Company shall change its name from Café La Rica as soon as reasonably possible.

**14.2    Notices.**  Notices to the Board of Managers shall be sent to the Principal Office of the Company with a copy to Matthew Dyckman, Esq., Thacher Proffitt & Wood LLP, 1700 Pennsylvania Avenue, NW, Suite 800, Washington, DC 20006 and Robert F. Hudson, Jr., Esq., Baker & McKenzie LLP, Mellon Financial Center, 1111 Brickell Avenue, Suite 1700, Miami, Florida, 33131. Notices to the other Members shall be sent to their addresses set forth on Exhibit A.  Any Member may require notices to be sent to a different address by giving notice to the other Members in accordance with this Section 14.1. Any notice or other communication required or permitted hereunder shall be in writing, and shall be deemed to have been given with receipt confirmed if and when delivered personally, or when sent by a recognized overnight delivery service, delivered by courier, or sent by facsimile, to such Members at such address.

**14.3    Headings.**  All Article and Section headings in this Agreement are for convenience of reference only and are not intended to qualify the meaning of any Article or Section.

**14.4    Entire Agreement.**  This Agreement constitutes the entire agreement among the parties and supersedes any prior agreement or understanding among them respecting the subject matter of this Agreement except as specifically provided herein.

**14.5    Binding Agreement.**  This Agreement shall be binding upon, and inure to the benefit of, the parties hereto, their successors, heirs, legatees, devisees, assigns, legal representatives, executors and administrators, except as otherwise provided herein.

**14.6    Saving Clause.**  If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid, shall not be affected thereby.  If the operation of any provision of this Agreement would contravene the provisions of the Act, such provision shall be void and ineffectual.

**14.7    Counterparts.**  This Agreement may be executed in several counterparts, and all so executed shall constitute one agreement, binding on all the parties hereto, even though all parties are not signatories to the original or the same counterpart.  Any counterpart of either this Agreement or the Certificate of Formation shall for all purposes be deemed a fully executed instrument.  For purposes of this Agreement, facsimile as well as scanned and emailed signatures shall be deemed to be original signatures.

**14.8    Governing Law; Jurisdiction; Venue.**  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of laws principles thereof.  To the fullest extent permitted by law, the parties hereto hereby (i) submit to the jurisdiction of the state and federal courts located in the State of Delaware for purposes of any legal action or proceeding brought under or in connection with this Agreement, (ii) agree that exclusive venue of any such action or proceeding may be laid in the State of Delaware and (iii) waive any claim that the same is an inconvenient forum.

[TPW: NYLEGAL:460852.1] 19499-00000  03/09/2006 06:00 PM

14.9 **No Partnership Intended for Nontax Purposes.** The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership under either the Delaware Uniform Partnership Act or the Delaware Uniform Limited Partnership Act. The Members do not intend to be partners one to another or partners as to any third party. To the extent any Member, by word or action, represents to another person that any Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Members who incur personal liability by reason of such wrongful representation.

14.10 **No Rights of Creditors and Third Parties.** This Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members and their permitted successors and assignees. This Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person. Except and only to the extent provided by applicable statute, no such creditor or any third party shall have any rights under this Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

14.11 **Customers/Non-compete.**

(a) In the event that the Company is dissolved, each Member shall retain the exclusive right to conduct business with the customers such Member introduced to the Company and the Members agree to divide the Company's new customers evenly among the Members.

(b) Throughout the duration of this Agreement, neither Coffee Bean nor any of its Affiliates will render any services directly related to the roasting, packaging or sale of coffee either, as an independent contractor to or joint venture partner with any entity that is in direct competition with Coffee Holding or the Company.

(c) Throughout the duration of this Agreement, Coffee Holding shall not engage Mr. Ernesto Aguila in employment.

14.12 **Confidentiality.** It is recognized that during their work on behalf of the Company, the Members may have occasion to conceive, create, develop, review, or receive information that is considered by the Company or another Member to be confidential or proprietary, including without limitation information relating to the business of the Company, including inventions, patent, trademark and copyright applications, improvements, know-how, specifications, drawings, cost data, process flow diagrams, customer and supplier lists, bills, ideas, and/or any other written material referring to the same ("**Confidential Information**"). Both during the term of this Agreement and thereafter, the Members agree to maintain the confidence of the Confidential Information unless or until such Confidential Information has been made public by an act or omission of a Member other than itself.

14.13 Dispute Resolution.

(a) Whenever the Members shall have any dispute among themselves relating to the interpretation, construction or implementation of this Agreement, the Members shall resolve such dispute as follows:

(i) First, each Member involved in such dispute shall use its good faith efforts to negotiate a resolution thereof by engaging in discussions with the other Members so involved at reasonable times and places, by telephone or otherwise, during the sixty (60) day period following notice by a Member to each of the other Members of its belief that there is a dispute which requires resolution in such manner;

[TPW: NYLEGAL:460852.1] 19499-00000 03/09/2006 06:00 PM

      (ii)     Second, if the Members are unable to resolve such dispute through good faith negotiations during the sixty (60) day period provided in Section 14.11(a)(i), the Members shall refer the dispute to mediation in accordance with the Judicial Arbitration and Mediation Services, Inc. (J·A·M·S) (www.jamsadr.com) mediation procedures; and

      (iii)    Third, if the Members are unable to resolve such dispute through mediation, any Member involved in such dispute may bring an action or proceeding in any court having jurisdiction thereof pursuant to Section 14.7; provided that each Member waives its right to trial by jury and its right to consequential, special and/or punitive damages.

    (b)     Whenever the Members shall be deadlocked or shall otherwise be in dispute with respect to the relations among the Members or between the Members and the Company or any other matter related thereto, the Members shall resolve such dispute as follows:

      (i)     First, each Member involved in such dispute shall use its good faith efforts to negotiate a resolution thereof by engaging in discussions with the other Members so involved at reasonable times and places, by telephone or otherwise, during the sixty (60) day period following notice by a Member to each of the other Members of its belief that there is a dispute which requires resolution in such manner;

      (ii)     Second, if the Members are unable to resolve such dispute through good faith negotiations during the sixty (60) day period provided in Section 14.12(b)(i), the Members shall refer the dispute to mediation in accordance with the Judicial Arbitration and Mediation Services, Inc. (J·A·M·S) (www.jamsadr.com) mediation procedures; and

      (iii)    Third, if the Members are unable to resolve such dispute through mediation, any Member involved in such dispute may elect to dissolve the Company, in which case the Company shall dissolve in accordance with Article XIII above.

  14.14  **General Interpretive Principles.** For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

    (a)     The terms defined in this Agreement include the plural as well as the singular;

    (b)     Accounting terms not otherwise defined herein have the meanings given to them in accordance with generally accepted accounting principles in the United States;

    (c)     References herein to "Sections," "paragraphs" and other subdivisions without reference to a document are to designated Sections, paragraphs and other subdivisions of this Agreement;

    (d)     A reference to a paragraph without further reference to a Section is a reference to such paragraph as contained in the same Section in which the reference appears, and this rule shall also apply to other sub-divisions;

    (e)     The words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

[TPW: NYLEGAL:460852.1] 19499-00000  03/09/2006 06:00 PM

(f)    The term "include" or "including" shall mean without limitation by reason of enumeration.

[TPW: NYLEGAL:460852.1] 19499-00000  03/09/2006 06:00 PM

MAR-14-2006 10:22 From:COFFEE HOLDING CO. 17187694731 To:2217693 P.2/2

MAR-10-2006 13:59 From:COFFEE HOLDING CO. 17187694731 To:2217693 P.5/6

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

**THE COMPANY:**

Café La Rica, LLC

By: _____
 Name: ANDREW GORDON
 Title: MANAGER

**MEMBERS:**

Coffee Holding Co., Inc

By: _____
 Name: ANDREW GORDON
 Title: MANAGER PRESIDENT / CEO

The Coffee Bean Trading-Roasting LLC

By: _____
 Name:
 Title:

[TPW: NYLEGAL:602652.1] 19459-00000 03/09/2006 06:00 PM

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

THE COMPANY:

Café La Rica, LLC

By: _____
    Name:
    Title:

MEMBERS:

Coffee Holding Co., Inc.

By: _____
    Name:
    Title:

The Coffee Bean Trading-Roasting LLC

By: _____
    Name: Alberto Lensi
    Title: Manager

**EXHIBIT A**

| Name and Address of Member | Initial Capital Contribution | Initial Membership Interest (as represented by number of Shares) | Initial Sharing Ratio |
|---|---|---|---|
| Coffee Holding Co., Inc.<br><br>4401 First Avenue<br>Brooklyn, NY 11232<br>Attn: Andrew Gordon, President and Chief Executive Officer<br><br>Phone: (718) 832-0800<br>Fax: (718) 832-0892<br>Email: agordon@coffeeholding.com | $250,000 in cash, plus the equipment specified in Exhibit I attached to the Agreement | 500 | 50% |
| The Coffee Bean Trading-Roasting LLC<br><br>c/o Comjet AG,<br>Dubihuus<br>3780 Gstaad<br>Switzerland<br><br>Phone: 011-41-33-748-6620<br>Telecopier: 011-41-33-748-6621<br><br>and:<br><br>5701 Miami Lakes Drive East<br>Miami Lakes, FL 33014<br>Attn: Sonia Aguila | All intellectual property, equipment and coffee inventory and packaging materials specified in Exhibit J attached to the Agreement | 500 | 50% |
| | | | |
| **TOTAL** | | 1,000 | 100% |

**EXHIBIT B**

**[Form of Lease Agreement between the Company and Perc Enterprises]**

**EXHIBIT C**

**[Form of Expense Sharing Agreement between the Company and Coffee Holding]**

**EXHIBIT D**

**[Form of License Agreement between the Company and Coffee Bean Trading]**

**EXHIBIT E**

**[Form of License Agreement between the Company and Coffee Holding]**

**EXHIBIT F**

**[Form of Employment Agreement between the Company and Mr. Ernesto Aguila]**

**EXHIBIT G**

The initial Board of Managers of the Company shall consist of the following persons:

1. Ernesto Aguila

2. Andrew Gordon

**EXHIBIT H**

The initial Officers of the Company shall be as follows:

| <u>Name</u> | <u>Title</u> |
| --- | --- |
| David Gordon | Production Manager |

**EXHIBIT I**

**Capital Contributions of Coffee Holding Co, Inc.**

| Item |
| --- |
| Cash |
| Equipment:<br><br>1. One brand new ICA Hi-Vac 50 brick pack machine – this will be ready to ship directly to Miami from Genoa, Italy the first week of May<br><br>2. One Jabez Burns 23R – 4 bag roaster plus two additional that need to be refurbished and assembled<br><br>3. Two Modern Processing 888 grinders<br><br>4. Various screw conveyors – elevators and stainless steel coffee hoppers<br><br>5. One Key Pack fractional machine – this is an older model but will add to our capacity none the less<br><br>6. Two 3M box taping machines |
| Lease Subject to Condition Subsequent – License for use of the Café Caribe trademark under the terms set forth in the licensing agreement |

**EXHIBIT J**

**Capital Contributions of Coffee Bean Trading Roasting LLC**

| **Item** |
|---|
| Equipment: |
|       1.      Sample Roaster STS |
|       2.      Roll Tad Machine |
|       3.      Sample Grinder |
|       4.      Pour Over Machine |
|       5.      Roaster JB 23-R |
|       6.      Holding Bins x4 |
|       7.      Grinder 777 |
|       8.      Grinder JB |
|       9.      Frac Pack Machine |
|       10.      Frac Pack Printer |
|       11.      Box Tunnel |
|       12.      Action Pack Machine |
|       13.      Heat Sealer |
|       14.      Transport Equipment |
|       15.      Hi/Lo Machine |
| Inventory |
| Packaging |
| Office Equipment |
| Air Compressor |
| License Subject to Condition Subsequent – License for use of the Café La Rica trademark under the terms set forth in the licensing agreement |

## EXPENSE SHARING AND SERVICES AGREEMENT

This Expense Sharing and Services Agreement (the "Agreement") is made as of this _10_ day of March, 2006, by and between Coffee Holding, Co., Inc., a Nevada corporation (the "Company"), and Café La Rica, LLC (the "Venture"), a Delaware limited liability company.

WHEREAS, the Company and Coffee Bean Trading-Roasting LLC, a Delaware limited liability company ("CBT") entered into an operating agreement governing the operation of the Venture on March _10_, 2006 (the "Operating Agreement");

WHEREAS, the Venture engages in the roasting, grinding, packaging and sale of Café La Rica and other branded coffee products;

WHEREAS, other than as set forth herein, the Company and CBT will share in the profits of all activities of the Venture pursuant to their respective Sharing Ratios;

WHEREAS, the Company has entered into a license with the Venture, permitting the Venture to roast, grind, package and sell its Café Caribe brand of coffee;

WHEREAS, as further set forth herein, in certain geographic areas and on certain routes the Members of the Venture will share in the profits for the sale of Café Caribe, and in certain geographic areas and on certain routes, the Venture will instead receive a fee from the Company for the roasting, grinding and packaging of Café Caribe;

WHEREAS, the Company and its employees will perform certain services on behalf of the Venture and incur costs associated with such services;

WHEREAS, the Company will also supply certain products, including coffee beans, to the Venture; and

WHEREAS, the Company and the Venture have agreed to formalize the method for sharing the expenses discussed above.

NOW, THEREFORE, the Company and the Venture agree as follows:

### SECTION 1

### SERVICES PROVIDED BY THE COMPANY TO THE VENTURE

1.1     Services Provided by the Company to the Venture:

The Company shall provide to the Venture certain services, including:

(a)     administrative services and support, including the use of the personnel, office space and equipment of the Company, including photocopy machines, computers and other equipment, primarily in connection with the Venture's back office operations;

(b)     bookkeeping, accounting and similar services;

[TPW: WA:3151734.5] 19499-00000  03/09/2006 10:42 AM



(c)     participation in the Company's employee benefit plans by the Venture's employees;

(d)     payment of slotting fees for the Venture by the Company; and

(e)     certain other services agreed upon by the Venture and the Company.

1.2     Reimbursement of Expenses:

As set forth herein, the Venture shall reimburse the Company for the provision of the services set forth in Section 1.1 above. Because the Venture and the Company agree that it is difficult to determine the exact cost of such services to the Company, the Venture and the Company agree that the Venture shall pay to the Company on a monthly basis an amount equal to 5.0% of the Venture's monthly sales (the "Expense Reimbursement"). The Venture and the Company agree that the payment of the Expense Reimbursement to the Company by the Venture shall satisfy all of the Venture's obligations to the Company for the provision of the services set forth in Section 1.1 above, including any salaries or fees attributable to the provision of such services by the Company to the Venture.

SECTION 2

SUPPLIES PROVIDED BY THE COMPANY TO THE VENTURE

The Company agrees to supply the Venture with as much coffee inventory as requested by the Venture, of commercially reasonable quality, at fair market prices, to be paid by the Venture within fifteen (15) business days of the end of each month.

SECTION 3

SERVICES PROVIDED BY THE VENTURE TO THE COMPANY

The Venture shall generally engage in the roasting, grinding, packaging and sale of Café La Rica and other coffee products. However, the Venture may also, at the election of the Venture, roast, grind and package certain other coffee products for the Company, including the Company's Café Caribe brand, for a fee, instead of sharing in the profits for the sale of such coffee pursuant to the Members' respective Sharing Ratios.

For the roasting, grinding and packaging by the Venture of any other coffee brands of the Company, including the Café Caribe brand, the Company agrees to pay a monthly fee for such services within fifteen (15) business days of the end of each month, in an amount equal to (i) $0.18 per each 10 oz. brick of coffee.

Notwithstanding anything to the contrary in this Agreement, the Members shall share in the profits for all roasting, grinding, packaging and sales of the Café Caribe brand by the Venture for sale on all DSD routes, as well as to all WalMart stores and distribution centers and all Publix stores and distribution centers, within the State of Florida, pursuant to their respective Sharing Ratios.

2

## SECTION 4

## AMENDMENTS

This Agreement may be amended or modified at any time by mutual agreement of the Company and the Venture, subject to the prior approval of the Board of Directors of the Company and the Members of the Venture.

## SECTION 5

## TERMINATION

This Agreement shall remain in effect until the earlier of the dissolution or winding up of the Venture, the dissociation or withdrawal of a Member from the Venture, a material breach, termination or expiration of the Operating Agreement, the sale or transfer of any interest in the Venture (other than pursuant to the terms of the Operating Agreement) or the mutual written agreement of the parties hereto to terminate this Agreement.

## SECTION 6

## PERIODIC REVIEWS; RECORDS

Both parties to this Agreement shall periodically review the overall allocation of expenses between the Company and the Venture, and shall maintain appropriate written records and documentation with respect to amounts reimbursed by and among the Company and the Venture pursuant to this Agreement.

## SECTION 7

## MISCELLANEOUS

7.1     All terms not defined herein shall have the meaning set forth in the Operating Agreement.

7.2     All Article and Section headings in this Agreement are for convenience of reference only and are not intended to qualify the meaning of any Article or Section.

7.3     This Agreement constitutes the entire agreement among the parties and supersedes any prior agreement or understanding among them respecting the subject matter of this Agreement except as specifically provided herein.

7.4     This Agreement shall be binding upon, and inure to the benefit of, the parties hereto, their successors, heirs, legatees, devisees, assigns, legal representatives, executors and administrators, except as otherwise provided herein.

7.5     This Agreement may be executed in several counterparts, and all so executed shall constitute one agreement, binding on all the parties hereto, even though all parties are not signatories to the original or the same counterpart. For purposes of this Agreement, facsimile as well as scanned and emailed signatures shall be deemed to be original signatures.

3

7.6     All notices under this Agreement, including any and all amendments to the exhibits which comprise a part of this Agreement, shall, unless specified to the contrary, be in writing and shall be addressed as follows:

If to the Venture, to:

_____

_____

_____

If to the Company, to:

_____

_____

_____

or to such other address as such party shall designate by written notice given to the other party. All notices required hereunder will be delivered personally or sent by facsimile or certified or registered mail or via overnight courier service unless otherwise specified herein to authorized personnel of the addressee. If given personally, the notice will be deemed effective on the date of delivery. If sent by facsimile, the notice will be deemed effective on the date successfully sent. If sent by overnight courier, the notice will be deemed effective on the second following business day in the jurisdiction to which sent. If sent by mail, the notice will be deemed effective on the tenth day following posting or on the actual date of receipt, whichever is earlier.

7.7     This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of laws principles thereof.

7.8     The failure of any provision of this Agreement shall in no manner affect the right to enforce the same, and the waiver by any party of any breach of any provision of this Agreement shall not be construed to be a waiver by such party of any succeeding breach of such provision or a waiver by such party of any breach of any other provision. The failure on the part of either party hereto to exercise or enforce any right conferred upon it hereunder shall not be deemed to be a waiver of any such rights or operate to bar the exercise or enforcement thereof at any time or times thereafter.

7.9     The article headings are placed herein merely as a matter of convenience and are not to be construed as a part of this Agreement.

7.10    This Agreement shall not be assignable by either party without the written consent of the other party hereto.

4

MAR-10-2006 13:59 From:COFFEE HOLDING CO.   17187684731   To:2217893   P.576

IN WITNESS WHEREOF, the Company and the Venture have executed this Expense Sharing and Services Agreement by their duly authorized officers or managers as of the date first written above

**COFFEE HOLDING CO., INC.**

By: _____

    Andrew Gordon
    President and Chief Executive Officer


**CAFÉ LA RICA, LLC**

By: _____

    Ernesto Aguila
    Manager

5

IN WITNESS WHEREOF, the Company and the Venture have executed this Expense Sharing and Services Agreement by their duly authorized officers or managers as of the date first written above.

COFFEE HOLDING CO., INC.

By:_____
    Andrew Gordon
    President and Chief Executive Officer

CAFÉ LA RICA, LLC

By:_____
    Ernesto Aguila
    Manager

[TPW: WA:3151734.5] 19499-00000  03/09/2006 10:42 AM

# (CHC)

# *Coffee Holding Company Inc.*

**Roasters & Packers**
4401 FIRST AVENUE – P.O. BOX 320208
OUTSIDE N.Y. STATE 1-800-458-2233

Telephone: 718-832-0800
Fax: 718-832-0892

Email: coffeeholding@AOL.com
Web Site: www.Coffeeholding.com

To: Washington Mutual
Attn: Sign.y Hernandez
Fax: 305-825-8195

Fax: 718-768-4731

This is a 4 page fax, including cover page.

Please take the necessary steps to stop ~~Silvio Aguila~~ from controlling this bank account.

I have enclosed information about the LLC account statement of authority and the letter of dissolution and winding up of café La Rica, LLC.

Regards,

Andrew Gordon

954-382-0438
Anabel

EXHIBIT
C



**Washington Mutual**

Legal Services Department
8050 S.W. 10th Street
Building 4 – Suite 1000
Plantation, Florida 33324
Telephone: (954) 382-0438
Fax: (954) 382-4369

February 8, 2007

VIA FEDERAL EXPRESS
TO BOTH ADDRESSEES

Mr. Andrew Gordon
4401 First Avenue
Brooklyn, NY 11232

Mr. Ernesto Aguila
2131 N.W. 72nd Avenue
Miami, FL 33122

Re:  **Café La Rica, LLC, account ending 551**

Dear Messrs. Gordon and Aguila:

The undersigned represents Washington Mutual Bank (hereinafter "the Bank"). A copy of Mr. Gordon's letter dated February 7, 2007, addressed to Signey Hernandez, has been forwarded to me, a copy of which is enclosed.

Please be advised that pursuant the Conflicting Demands and Disputes section (pages 38 and 39) of our Business Account Disclosures and Regulations, which govern the above entity's account with the Bank, we have placed a restraint on the above referenced account.

The Bank does not wish to be embroiled in this dispute, therefore, we propose the following alternatives regarding the above account:

1. Each of you agrees, in writing, that the funds shall remain frozen until this dispute is resolved by and between you. Final disbursement of these funds would occur upon delivery of a document signed by each of you, together with the appropriate documentation from the state of Delaware, evidencing that Café La Rica, LLC, has been dissolved; or

2. A Court Order from a court of proper jurisdiction for release or such other instructions regarding the subject account.

Alternatively, if you are not able to agree to this escrow type arrangement, the Bank will commence an interpleader action and deliver the funds to the Registry of the Court. You can then litigate the issue of ownership before the Court. In accordance with Florida law, the Bank would request attorneys' fees and costs in conjunction with such an action.

A collective decision on this matter must be communicated in writing to the undersigned on or before February 16, 2007. I look forward to hearing from you so that we can amicably resolve this matter.

Very truly yours,

LUCIA A. SANTOS
Vice President and Counsel

LAS/ms

Generally, your account is assigned to the financial center at which you open your account if opened in person. Your account opening documents may identify the state or other pricing region to which your account has been assigned. If you are uncertain to which financial center your account is assigned in our records, contact us at the number shown at the end of these *Account Disclosures and Regulations*.

If you move to another state in which we (the bank holding your account) have financial centers or where otherwise wish to change your financial center of assignment, you may request and we, at our option, may agree to change your financial center of assignment and the state or other pricing region to which your account is assigned. Such change will not automatically occur when you change your address in our records.

### Cash Vouchers and Cash Dispensing Machines

At some of our financial centers, certain tellers do not have access to cash for dispensing withdrawals or other cash back transactions. If you complete a transaction with one of these tellers, you will receive a voucher for any cash payable to you. Your account records, however, will reflect a debit for the amount of the voucher. Your cash will be dispensed to you at the cash dispensing machine at that same financial center at which you conducted the related transaction. Your use of the access number to receive the cash is a separate non-account based transaction.

The voucher will include an access number. This number is used on the keypad or scanner at the cash dispensing machine. You must use the access number within the time frame noted on the voucher (or by the financial center closing time on the calendar day you conduct the transaction, if earlier). If you do not receive your cash related to a voucher within that time frame noted, the access number will expire. If you return your original voucher to us, a new access number will be issued if such request is made before the financial center closes that calendar day and the voucher has not been used. If the voucher is not redeemed by the time we close the financial center on the calendar day it is issued, an official check will be issued in the amount due under the voucher; the official check may, at our option, be held at the financial center for your pick up, mailed to you at the address of record for the account related to the transaction for which the voucher was issued, or deposited to any of your accounts with us (immediately or at a later time, without interest).

You must safeguard this voucher as you would cash. If you loose the voucher, tell us immediately so we may invalidate the voucher. If the voucher has not been redeemed, it is the same calendar day as the voucher was issued and we have not closed the financial center for the day, the voucher will be reissued. If we determine that the voucher has been redeemed, whether by you or a third party, at our option, the voucher may not be replaced and you may not be reimbursed. The voucher is not transferable or negotiable.

At some of our Financial Centers, we may offer electronic processes to expedite your deposit and withdrawal transaction(s) with the teller or other representative, including use of an electronic pad to identify you and your account, and to confirm the transaction in place of paper tickets. These ticketless transactions are teller-initiated transactions and are not considered electronic funds transfers. By initiating deposits and withdrawals at these financial centers, you agree to the electronic processing and record of the transaction in place of a paper record.

### Changes to Your Account Type

If you have an account with us and choose to change from one account type to another, we may, at our option, require you to close your existing account and open a new account with a new account number or change the product features to the new account type and

maintain an existing account number. If we allow or require you to maintain the same account number, previous activity on your prior account will apply to the new account, unless we, at our option, decide otherwise. This means, for example, that if you are required to maintain a minimum balance or average balance to avoid a monthly fee on the new account type, the balance for the entire statement cycle, including the balance prior to the change to the new account, will apply in the balance calculation. If the new account is a Limited Transaction Account, we may count transactions that posted to the account prior to the change and you may be assessed excess activity fees based on activity occurring prior to the change. If you are assessed Overdraft Charges or Non-Sufficient Funds Charges based on the number of NSF Transactions during a prior period (e.g., the prior 12 months), we may consider NSF Transaction activity prior to the date of the change in determining whether and the amount of charges to be assessed.

### Collections

In our discretion, we can help you collect bond coupons, checks, or drafts in U.S. or foreign currency or other items which we determine, at our discretion, are not suitable for automated collection procedures. If we do, we accept these items "for collection" which means we will send the check, draft or item directly to the issuer's bank for payment. When we receive payment, we will credit your account. If the item is lost, stolen, or destroyed in the collection process, we will not credit your account for the item nor will we otherwise be liable for the item. If the collection item is returned to us unpaid, we will return the item to you (as soon as we receive it).

Checks or drafts accepted, received or sent by the Bank from or to another financial institution to be processed for collection, whether or not paid, will be assessed a collection fee by the Bank, as set forth in the *Statement of Fees*, and may be assessed a collection and other fees and costs by the other financial institution. In the event you request special handling of a collection item, such as tracking or expedited delivery, you will also be charged any out-of-pocket expense. Any such fees and costs will be deducted from your account or from the amount of the proceeds remitted to or from your account, as applicable.

### Conflicting Demands and Disputes

Nothing in these *Account Disclosures and Regulations* shall be deemed to require the Bank, and the Bank shall not be required, to make payment from or provide services related to an account to a depositor, or to any trust or P.O.D. account beneficiary or payee, or any other person claiming an interest in any funds deposited in the account, if the Bank has actual knowledge (as defined in the *Account Ownership* section of these *Account Disclosures and Regulations*) of, or otherwise believes there may be, a dispute between the depositors, beneficiaries, payees, or other persons concerning the account including, without limit, their respective rights of ownership to or authority to act with respect to the funds contained in or proposed to be withdrawn or previously withdrawn from the account, or in the event the Bank is otherwise uncertain as to who is entitled to the funds pursuant to the contract of deposit, or otherwise receives instructions which Bank determines, in its discretion, to be unclear or conflicting. In any such case, the Bank may, at its option and without liability, notify all depositors, beneficiaries, payees, or other persons claiming an interest in the account of either its uncertainty as to who is entitled to the distributions or the existence of any dispute, and may also, without notice and without liability, refuse to disburse any funds contained in the account to or on the instruction of any depositor and/or trust or P.O.D. account beneficiary or payee thereof, and/or other persons claiming an interest therein, return items presented

against the account m    "Refer To Maker" or similar notation until such time as, at our op

(1) All such depositors, beneficiaries, payees and/or other persons claiming an interest in the account have consented, in writing or other form satisfactory to Bank, to the requested payment; or

(2) The payment is authorized or directed by a court of proper jurisdiction; or

(3) Where one of the parties to the account has notified the Bank of the dispute, that party withdraws the notice; or

(4) Where the dispute involves a deceased accountholder, the successor of the deceased accountholder agrees in writing to the distribution (if permitted by State Law); or

(5) We receive proof satisfactory to us in our sole discretion that the dispute has been resolved, or other satisfactory documentation or assurances are received by us; or

(6) Subject to the *Resolution of Disputes* section in this publication, request instructions from a court of competent jurisdiction, or arbitrator, or referee regarding distribution of the account.

We may also, at our discretion, request instructions from a court and/or interplead the funds in the account at your expense. However, the Bank may, at its option and without liability, pay or permit withdrawal of any funds on deposit in an account to a depositor and/or agent of a depositor and/or trust or P.O.D. account beneficiary or payee, and/or other person claiming an interest therein, even when the Bank has actual knowledge of the existence of the dispute, if the payee shall execute to the Bank, in form and with security (in Idaho, "sureties") acceptable to it, which, except in Idaho, at Bank option may be a bond in an amount which is double either the amount of deposit or the adverse claim, whichever is less) an indemnification indemnifying the Bank from any and all liability, loss, damage, costs, and expenses, for and on account of the payment of the adverse claim or the dishonor of the check or other order of the person in whose name the deposit stands on the books of the Bank. In no event will we be liable for any delay or refusal to follow instructions which occur as a result of a dispute over the authority or control of your account.

### Credit Reporting Agencies/Reporting/Verification

By requesting to open an account with the Bank, or by agreeing to be a signer on an account or obtaining any other service from us, you (and, if acting in a representative capacity, individually and for such entity or principal) agree that we may obtain credit information from check or credit reporting agencies, and/or by any other means. We may do so at the time you open the account, request the service, at any time while your account is open, or the service is available, or after your account or service is closed if you owe us any amounts related to your account or service, and may use such information for any purpose in our discretion except as prohibited by law, including, without limit, for review of your eligibility to obtain or retain an account or service requested by you or which we may, at our option, wish to consider offering you.

Without limiting anything else to the contrary herein, if you do not handle your account or service in a satisfactory manner and/or we to charge off your account as a loss, or as otherwise permitted by law, we may report such negative information to check or credit reporting agencies.

39

### Customer Responsibilities and Limit on Time to Assert Claims

You agree to exercise reasonable control over all bank checks, unissued checks, time or certificates of deposit, passbooks, cards (of any kind), personal and user identification numbers and codes and access devices and any other item, instrument or card related to any of the above It is your responsibility to keep all of the above information and items safe and secure and to promptly discover and immediately report if any of them are, or believed to be at risk of becoming, missing in time to prevent misuse.

You agree to notify us immediately if any of these items may be lost, stolen or used without your authorization, or if you believe there is an error in your periodic statement or that an unauthorized transaction has occurred or may occur on your account or otherwise may be related to any of the above. In addition to any other liability you may have hereunder, and except as limited by applicable law, if you give your Personal Identification Number (PIN), User ID and any other code or other access device to anyone, you will be liable for any use made of such until you advise us that such person is not authorized to use them. You acknowledge that your account, service or any of the above may have to be closed if any of these events occurs. In addition, you assume full responsibility for the monitoring and reviewing the work of your employees, agents (including Authorized Signers) and accountants.

You are responsible for exercising reasonable promptness and care in examining your account statements, and, if provided, originals or imaged copies of cancelled checks, advices of debit or credit, transaction reports, or your account activity through the internet if we provide you such access via online banking services, to determine whether any payment or debit was not authorized because of an alteration of an item or because a signature or endorsement on the item was unauthorized, or for any error, forgery, alteration, unauthorized transaction, including an unauthorized payment order, or other problem (collectively, a Problem). The parties agree that reasonable promptness means within fourteen (14) calendar days from the date that the statement, advice or transaction report or other information is sent or otherwise made available to you, whichever first occurs.

If you discover or should have discovered a Problem, you must promptly notify us in writing of the relevant facts. You should also report the Problem to us orally by contacting your branch of account or the telephone number at the end of these *Account Disclosures and Regulations.* However, your oral report shall not relieve you of your obligation to report the Problem to us in writing, except where required by law. Your written report must identify the specific items, debits or credits that you are challenging and the nature of the Problem.

In addition, if your claim involves a series of items containing unauthorized signatures or alterations by the same wrongdoer, you shall be precluded from asserting against us any unauthorized signature or alteration by the same wrongdoer on any item paid in good faith that you do not report within fourteen (14) calendar days after the first item in the series or first statement containing that item was sent or made available to you, whichever first occurs. By these provisions, the parties intend to define a reasonable time period for the "Repeater Rule," as provided in §4-406(d) of the UCC.

Without regard to the care or lack of care of either you or us, without limiting the foregoing: (a) if you fail within thirty (30) calendar days after the statement or item is sent or made available to you, whichever occurs first, to discover and report with respect to an item (i) your unauthorized signature, (ii) any unauthorized or missing endorsement, or (iii) any alteration on an item, you shall be precluded from asserting against us the unauthorized signature, the unauthorized or missing endorsement or alteration on that item; (b) if you fail within thirty (30) calendar days after the statement or other advice of debit or execution of a wire transfer Payment Order is sent or made

40

**Coffee Holding Co., Inc.**
**4401 First Avenue**
**Brooklyn, NY 11232**
**U.S.A.**

February 5, 2007

**VIA FACSIMILE &**
**OVERNIGHT COURIER**

Board of Managers of Café La Rica, LLC
Attn: Ernesto Aguila
Café La Rica , LLC
2131 NW 72nd Avenue
Miami, FL 33122

The Coffee Been Trading-Roasting LLC
c/o Comjet AG
Dubihuus
3780 Gstaad
SWITZERLAND
011-41-33-748-6621 (facsimile)
and
5701 Miami Lakes Drive East
Miami Lakes, FL 33014
Attn: Sonia Aguila

    Re:   **Dissolution and Winding Up of Café La Rica, LLC**

Ladies and Gentlemen:

    Please be advised that in accordance with Section 13.1(c) of the Limited Liability Company Agreement of Café La Rica, LLC (the "*LLC Agreement*"), Café La Rica, LLC a Delaware limited liability company, (the "*LLC*") has been dissolved due to a material breach of that certain Expense Sharing Agreement dated March 2006 between the LLC and its member, Coffee Holding Co., Inc. ("*CHC*").

    Please have your attorneys contact CHC's attorneys at Thacher Proffitt & Wood LLP (Matthew Dyckman at (202) 347-5647 or Michael Helmer at (908) 598-5757) to discuss an orderly winding up of the LLC business and liquidation of the LLC's assets.

ITPW: NYLEGAL:634432.1 119499-00009 02/05/2007 08:51 AM



In accordance with Section 13.2 of the LLC Agreement, you are further put on notice to continue to operate the LLC in the normal course of business and to not dispose of any assets of the LLC until the plan of liquidation has been agreed upon.

Sincerely,

COFFEE HOLDING CO., INC.

By: _____

Name: Andrew Gordon
Title: President and CEO

cc: Matthew Dyckman, Esq.
Thacher Proffitt & Wood LLP
1700 Pennsylvania Avenue, NW, Suite 800
Washington, DC 20006

Michael E. Helmer, Esq.
Thacher Proffitt & Wood LLP
25 DeForest Avenue
Summit, NJ 07901

Robert F. Hudson, Jr. Esq.
Baker & McKenzie LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, FL 33131

Coffee Holding Co. Inc.
4401 First Avenue
Brooklyn, NY 11232
Attn: Andrew Gordon, President & CEO
718-832-0892 (facsimile)

**BAKER & MCKENZIE**

**Baker & McKenzie LLP**
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131, USA

Tel: +1 305 789 8900
Fax: +1 305 789 8953
www.bakernet.com

Jose M. Ferrer
Tel: +1 305 789 8980
jose.ferrer@bakernet.com

**Via Facsimile and U.S. Mail**

Asia
Pacific
Bangkok
Beijing
Hanoi
Ho Chi Minh City
Hong Kong
Jakarta
Kuala Lumpur
Manila
Melbourne
Shanghai
Singapore
Sydney
Taipei
Tokyo

Europe &
Middle East
Almaty
Amsterdam
Antwerp
Bahrain
Baku
Barcelona
Berlin
Bologna
Brussels
Budapest
Cairo
Dusseldorf
Frankfurt / Main
Geneva
Kyiv
London
Madrid
Milan
Moscow
Munich
Paris
Prague
Riyadh
Rome
St. Petersburg
Stockholm
Vienna
Warsaw
Zurich

North & South
America
Bogota
Brasilia
Buenos Aires
Calgary
Caracas
Chicago
Chihuahua
Dallas
Guadalajara
Houston
Juarez
Mexico City
Miami
Monterrey
New York
Palo Alto
Porto Alegre
Rio de Janeiro
San Diego
San Francisco
Santiago
Sao Paulo
Tijuana
Toronto
Valencia
Washington, DC

February 8, 2007

Matthew Dyckman, Esq.
Thacher Proffitt & Wood LLP
1700 Pennsylvania Avenue, N.W., Suite 800
Washington, DC 20006

Dear Mr. Dyckman:

As you know, this firm represents the Coffee Bean Trading-Roasting, LLC ("Coffee Bean Trading"). I write to follow up on our telephone conversation of yesterday regarding your client's, Coffee Holding Co., Inc. ("Coffee Holding"), letter of February 5, 2007 purporting to dissolve Café La Rica, LLC ("Café La Rica").

Section 13.1 of the Limited Liability Company Agreement (the "Agreement"), upon which your client relies, specifically requires a "material breach of any agreement between the Company and a Member or between Members" before the company may be dissolved. We understand, from our conversation yesterday and today, that your client believes it is justified in dissolving Café La Rica because it claims that Café La Rica materially breached the Expense Sharing and Services Agreement by failing to pay Coffee Holding for coffee that Coffee Holdings claims it sold to Café La Rica. Because we have not been provided with financial information that would support the bona fides of this asserted account receivable of Coffee Holdings, nor an accounting of what Coffee Holdings has done with the funds of Café La Rica to cause such an alleged deficiency in payments, we can not acknowledge the validity of the claimed breach of the Expense Sharing and Services Agreement. Thus, we do not agree that you have established that there has been a material breach by Café La Rica with respect to that agreement, and we further reject Coffee Holding's letter purporting to dissolve Café La Rica, because it fails to establish a necessary prerequisite to your asserted position.

As a preliminary matter, it is important to highlight the rather obvious fact that Coffee Holding is not merely a creditor of Café La Rica's, but is also its de facto managing member. Coffee Holding, except for sales and collections, has always been in control of all of the operations of Café La Rica. In its role as managing member, Coffee Holding was solely responsible for, amongst other things, purchasing coffee from itself on behalf of Café La Rica. Coffee Holding never has consulted with Coffee Bean Trading or anyone else at Café La Rica with respect to any purchases of coffee by Café La Rica. In fact, as early as September 5, 2006, when this issue first surfaced, we wrote you requesting financial and other documentary support to substantiate the purported receivables in favor of Coffee Holding. To date, you have failed to provide us with any information or to otherwise contact

us in that regard. As we stated in our initial letter to you of August 14, 2006 (which also went unanswered), Coffee Holding has unilaterally permitted balances to build up on its own account. Having created the risk of loss by its credit practices, Coffee Holding cannot now recast its own management failures as a breach by Café La Rica.

Given the present dispute between our clients regarding the existence *vel non* of a material breach to justify the dissolution of Café La Rica, our client hereby invokes the dispute resolution procedure set forth in to paragraph 14.13(b) of the Agreement. Pursuant to that provision, our client will use its good faith efforts to resolve this dispute, as well as other related disputes pertaining to Coffee Holding's failure to seek financing pursuant to section 8.4 of the Agreement and charging to Café La Rica amounts for services that were clearly to be included in the 5% Expense Reimbursement fee provided for under the Expense Sharing and Services Agreement. Toward that end, we reiterate our request for full financial statements for Café La Rica, including the most current profit and loss statements and balance sheets, as well as a current list of receivables and payables, check ledgers and bank statements.

Additionally, contrary to the allegations made yesterday by Messrs. Mike Helmer, Matt Carlson and Chris Graham of your office regarding Mr. Ernesto Aguila's purported recent actions, we have investigated and have learned that Mr. Aguila has not taken any hostile or adverse actions against Coffee Holding. Specifically, Mr. Aguila has not turned off any security cameras. Two of the cameras are still operational, and the other cameras have been broken for approximately six months. Mr. Andrew Gordon has been aware that the cameras are broken, but has refused to pay to have them fixed. Mr. Aguila did confirm that he changed the passwords on the Miami bank account. However, this action was taken only after he was advised by Mr. Gordon of his intent to make a preferential payment to Coffee Holding in disregard of Café La Rica's other creditors and payroll obligations. Mr. Aguila's action with respect to the bank account was therefore taken as a loyal employee of Café La Rica to protect the interest of Café La Rica as a whole versus the interest of one particular creditor. As discussed with Mr. Helmer and Mr. Graham this morning, we have endeavored to encourage Mr. Aguila to agree to institute a joint control of the bank account so that the funds can continue to be used in the best interest of Café La Rica as a whole and he seems amenable. We understand that he has since done so.

In addition, we have learned today that Mr. Gordon has informed various suppliers, including Miami Foods, a coffee vendor, and customers of Café La Rica that the "the company, as of Monday, has closed down." This information follows on the heels of Mr. Gordon's specific threats to Mr. Aguila that Coffee Holding would seek to take away all of Café La Rica's customers. Furthermore, we have learned that another current supplier of coffee (Coex Coffee International) called Mr. Gordon earlier today, and Mr. Gordon told him that Café La Rica's is closing. Coex Coffee International had been one of the potential investors in Café La Rica, but based on these statements by Mr. Gordon, Coex has now stated that it is not interested in making an offer until this matter is settled. Thus, Mr.

**BAKER & MCKENZIE**

Gordon's conduct is not only destroying Café La Rica's customer base, but also scaring off potential investors. Thus, Coffee Holding must immediately cease and desist from making any such patently false and damaging statements. Coffee Bean Trading intends to hold Coffee Holding fully accountable for any damages it suffers as a result of your client's unjustified acts. We strongly urge you to advise your client of the serious consequences of breaching its fiduciary obligations as managing member of Café La Rica or tortiously interfering with Café La Rica's business and financial affairs.

Yours truly,

Jose M. Ferrer

cc:     Alberto Lensi
        Ernesto Aguila
        Robert F. Hudson, Jr., Esq.
        Fredric P. Taubman, Esq.
        Michael Helmer, Esq.
        Matthew Carlson, Esq.
        Chris Graham, Esq.

MIADMS/306560.1

Matthew Dyckman, Esq.
February 8, 2007

Page 3

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.: 07 - 20389

COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

      Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,

      Defendant.

_____/



## NOTICE OF FILING AFFIDAVIT OF ERNESTO AGUILA
## IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

Please take notice that, pursuant to S.D. Fla. L.R. 5.1(E), Plaintiff, Coffee Bean Trading-

Roasting, LLC, does hereby file the attached Affidavit of Ernesto Aguila in Support of Motion

for Temporary Restraining Order.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was delivered this

13th day of February, 2007 to a certified process server to be served along with the summons

and complaint in this action upon Coffee Holding, Inc.

Respectfully submitted,

BAKER & McKENZIE LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131
Telephone: (305) 789-8900
Facsimile: (305) 789-8953

By: _____
Jose M. Ferrer
Florida Bar No. 173746

MIADMS/306673.1

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.: _____

COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

      Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,

      Defendant.

_____/

## AFFIDAVIT OF ERNESTO AGUILA IN SUPPORT
## OF MOTION FOR TEMPORARY RESTRAINING ORDER

Ernesto Aguila, being duly sworn by me, the undersigned authority, notary public within and for the county and state below stated, deposes and says as follows:

1.    I am the Chief Executive Officer of Café La Rica, LLC ("Café La Rica") and am of legal age and capacity. I make this affidavit based on my personal knowledge of the facts as stated herein, or the facts as they appear in the memoranda, reports, records or data compilations of Café La Rica made at or neat the time of the occurrence of the facts or events, by, or from information transmitted by, persons with knowledge of the facts, whose regular practice it was to make and keep such records in the course of the regularly conducted business activity of Café La Rica. I routinely rely on such records in the usual course of my business.

2.    Café La Rica is a Delaware limited liability company with its principal place of business in Miami-Dade County, Florida. Coffee Bean is a limited liability company organized and operating under the laws of the State of Delaware. Coffee Holding is a corporation

organized and operating under the laws of the State of Nevada. Coffee Bean and Coffee Holding each own a fifty (50) percent membership interest in Café La Rica.

3.      Coffee Holding, through Mr. Gordon, has at all times relevant to this action acted as Café La Rica's de facto manager with full control over all of its operations, except for the day-to-day sales and collection activities which I have handled from Miami.

4.      Since March, 2006, when it began doing business, Café La Rica has become an established and successful business with substantial relationships and numerous customers and additional prospective customers, and has developed significant good will with various vendors and suppliers. Café La Rica currently employs a workforce of five persons.

5.      Since March, 2006, Coffee Holding has sold coffee to Café La Rica. Coffee Holding, in its role as the Manager of Café La Rica, was solely responsible for, and never consulted with anyone at Café La Rica with respect to, its purchases of coffee from itself on behalf of Café La Rica. Coffee Holding unilaterally permitted balances to build up on its own account.

6.      In February, 2007, Mr. Gordon began threatening to make a preferential payment to Coffee Holding of the entire accumulated balance on its account in disregard of Café La Rica's other creditors and payroll obligations. When Coffee Bean's Manager, Alberto Lensi, and I refused to consent to such preferential treatment of Coffee Holding's account payable, Mr. Gordon threatened to close down Café La Rica unilaterally.

7.      Consistent with his threats, on or about February 5, 2007, I received a letter from Mr. Gordon advising me that Coffee Holding had unilaterally dissolved Café La Rica. Mr. Gordon thereafter began notifying Café La Rica's customers, suppliers, vendors and potential investors that Café La Rica "has closed down." Based on Mr. Gordon's statements, at least one

potential investor, Coex Coffee International, has already stated that it is not interest in making an offer to invest in Café La Rica until this matter is settled, and various of Café La Rica's coffee suppliers have either refused to ship any more coffee or have refused to extend any credit terms to Café La Rica.

8.      Café La Rica maintains its operating account at Washington Mutual Bank ("Washington Mutual Bank"). I have traditionally controlled Café la Rica's operating account with Washington Mutual. On February 7, 2007, Mr. Gordon sent a fax to Washington Mutual, advising Washington Mutual that Café La Rica had purportedly been dissolved and wound up – a claim that is blatantly false – and instructing it to prevent me from exerting any control over that bank account. Based on Mr. Gordon's false representations, Washington Mutual froze the account, preventing Café La Rica from paying its vendors and suppliers and meeting its payroll obligations. As a result of Café La Rica's failure to meet its payroll obligations, I am concerned that several of its employees may quit.

9.      Café La Rica has never refused to pay any amounts legitimately owed to Coffee Holding. In fact, Café La Rica has repeatedly requested from Coffee Holding in writing financial information to support the amount of their asserted account payable. Despite Café La Rica's repeated demands in that regard, Coffee Holding has failed and refused to provide any information, or an accounting of what Coffee Holdings has done with the funds of Café La Rica to cause such an alleged deficiency in payment.

Under penalties of perjury, I declare that I have read the foregoing affidavit and the facts stated in it are true to the best of my knowledge and belief.

_____

ERNESTO AGUILA

STATE OF FLORIDA        )
                        ) ss
COUNTY OF MIAMI-DADE    )

BEFORE ME, the undersigned authority personally appeared ERNESTO AGUILA, who is personally known to me or who has produced his _drivers license_ as identification and who did (did not) take an oath.

SWORN TO AND SUBSCRIBED BEFORE ME this 13th day of February, 2007.

_____

NOTARY PUBLIC STATE OF FLORIDA

My Commission Expires:

MIADMS/306649.1

S. MILIAN
Comm# DD0372822
Expires 12/8/2008
Bonded thru (800)432-4254
Florida Notary Assn., Inc.

4

AO 440 (Rev. 10/2002) Summons in a Civil Case

# UNITED STATES DISTRICT COURT

## Southern District of Florida

Case Number: _____

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

07-20389

Plaintiff

v.

CIV-MARTINEZ

COFFEE HOLDING, INC., a Nevada
corporation,                    Defendant

### SUMMONS IN A CIVIL CASE

MAGISTRATE
BANDSTRA

TO: (Name and address of defendant)

Coffee Holding, Inc.
By serving its registered agent:
CSC Services of Nevada, Inc.
502 East John Street, Room E
Carson City, NV  89706

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Jose M. Ferrer, Esq.
Baker & McKenzie LLP
1111 Brickell Avenue, Suite 1700
Miami, FL  33131

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

Clarence Maddox
_____
CLERK

_____
(BY) DEPUTY CLERK

2/13/07
_____
DATE

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 07-20389-CIV-MARTINEZ-BANDSTRA**

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

      Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada corporation,

      Defendant.

_____/

### <u>ORDER SETTING HEARING ON PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER</u>

THIS CAUSE came before the Court upon Plaintiff's Motion for Temporary Restraining Order **(D.E. No. 2)**, filed on <u>**February 13, 2007**</u>. It is

**ADJUDGED** that a hearing shall take place before the undersigned, United States District Judge Jose E. Martinez, at the United States Courthouse, 301 N. Miami Ave., Miami, Florida 33128 on <u>**Friday, February 16, 2007 at 3:00 PM**</u>. Counsel shall be prepared to address Plaintiff's Motion for Temporary Restraining Order (D.E. No. 2). This hearing shall not exceed thirty (30) minutes. The parties shall confer prior to the hearing to determine how to split the allotted time. If the parties are unable to agree on how to split the allotted time, the Court will decide how to split the allotted time.

It shall be Plaintiff's responsibility to **immediately** serve a copy of this Order on Defendant. Plaintiff shall then certify to the Court in writing that this order was served on Defendant. Such certification shall be filed on the record no later than <u>**February 15, 2007**</u>.

Defendant is cautioned that a corporation must be represented by counsel and cannot proceed pro

se. *Palazzo v. Gulf Oil Corp.*, 764 F.2d 1381, 1385 (11th Cir. 1985).

DONE AND ORDERED in Chambers at Miami, Florida, this 14 day of February, 2007.

JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Bandstra
All Counsel of Record

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

### Case Number:  07-20389-CIV-MARTINEZ-BANDSTRA

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

       Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,

       Defendant.

_____/

### ORDER REQUIRING PARTIES TO MEET AND FILE
### JOINT SCHEDULING REPORT AND PROPOSED ORDER AND
### DIRECTING PARTIES TO FILE CERTIFICATES OF INTERESTED PARTIES

     THIS MATTER came before the Court upon a *sua sponte* review of the file.  To
efficiently, expeditiously, and economically resolve this dispute, it is hereby:

     ORDERED:

     1.     Plaintiff shall forward a copy of this Order to all Defendants, upon notice or
appearance of defense counsel or *pro se* Defendant.

     2.     Discovery in this case shall be conducted in accordance with the Federal Rules of
Civil Procedure and Southern District of Florida Local Rules (effective April 15, 2003), except
the deadlines under Local Rules 16.1.D., E., H., J., K., and L., may be modified by further order
of the Court.

     3.     **WITHIN FORTY FIVE (45) DAYS OF THE APPEARANCE OF A
DEFENDANT**, counsel and *pro se* litigants shall file a Joint Scheduling Report and Joint
Proposed Scheduling Order pursuant to Local Rule 16.1B.2, with a complete service list
containing the name, address, phone number, **fax number,** and party represented by each counsel
or pro se litigant.

     4.     Counsel for the parties and *pro se* litigants shall meet <u>in person</u> for a scheduling

conference at least **twenty one (21) days** prior to the date the above Joint Proposed Scheduling Order is due.  At this conference, the parties **shall** accomplish the following: (1) determine the appropriate case management track for the action; (2) exchange documents and witness lists in compliance with Local Rules 16.1.D; (3) develop a case management plan which sets deadlines in compliance with paragraphs A, B, and C of this Order; and (4) discuss settlement, in good faith, after reviewing the opposing parties' disclosed documents and witness lists in compliance with Local Rule 16.1.B.1.

   A. The Joint Scheduling Report shall include all information required by the eleven subsections, (a) through (k), of Local Rule 16.1.B.2.  <u>**IN ADDITION TO THE INFORMATION REQUIRED BY THAT RULE, THE REPORT SHALL INCLUDE THE FOLLOWING**</u>:  (1) whether the trial will be jury or non-jury; (2) an outline of the legal elements of each claim and defense raised by the pleadings (the parties are advised that this section shall not be a summary of allegations, but should be modeled on pattern substantive jury instructions applicable in this Court); (3) a good faith estimate of the <u>specific dollar</u> valuation of actual damages and other relief at issue; and (4) the need for variance from the discovery limitations imposed by Local Rule and/or the Federal Rules of Civil Procedure, including the grounds supporting the requested variance.  In total, the Joint Scheduling Report shall have <u>fifteen</u> numerical sections containing the above required information (eleven to comply with the Local rule, and four to comply with the additional  requirements of this Order).  <u>**Unilateral submissions are prohibited**</u>.

   B. As an attachment to the parties' Joint Scheduling Report, and in Compliance with Local Rule 16.1.B.2, the parties shall jointly complete **Attachment A** to this Order.  The parties shall insert the specific day, month, and year for each listed deadline that applies to the parties' case management plan.  In completing **Attachment A**, the parties shall take into consideration the suggested pretrial deadlines for a case set out in **Attachment B** to this Order (attachment B contains suggested deadlines for the standard case management track; attachment C contains suggested deadlines for the expedited case management track.  See Local Rule 16.1.A.2).  If the parties agree that one or more of the proposed deadlines (such as "expert witness deadlines") is not appropriate for this action, they may strike the language and omit that proposed deadline on **Attachment A**.  The parties' proposed dates **shall** include: (1) **at least**

**eight (8) weeks** between the deadline for all pretrial dispositive motions and the proposed trial date; and (2) **at least two (2) weeks** between the deadline for the pretrial stipulation and the proposed trial date.

   C. As part of the Joint Scheduling Report, the parties shall jointly complete and file with the Court the Magistrate Judge Jurisdiction Election Form appended to this Order as **Attachment D**. The Court will not accept unilateral submissions in this regard; thus, a "Yes" should be checked only if all parties agree. If the parties consent to a full disposition of the case by the Magistrate Judge, including trial and entry of final judgment, the parties shall jointly file the election form appended to this Order as **Attachment E**.

  5. The foregoing information will aid the Court in its management of this case, including the expeditious resolution of any discovery disputes, and help the parties focus on the key issues of the case at an early stage in the proceedings. Accordingly, **the parties' failure to file a joint scheduling report or otherwise comply with this Order shall result in dismissal, default, or the imposition of other appropriate sanctions, including attorney's fees and costs**.

  IT IS FURTHER ORDERED:

  6. **The parties are to submit Certificates of Interested Parties and Corporate Disclosure Statements**. The Plaintiff, Defendant, Intervenors, and *Amicus Curiae*, including governmental parties SHALL FILE a Certificate of Interested Persons and Disclosure Statement, which shall contain a **complete** list of persons, associated persons, firms, partnerships or corporations that have a financial interest in the outcome of this case, including **ALL** subsidiaries, conglomerates, affiliates, parent corporations, and other identifiable legal entities related to a party. The parties shall have **fifteen (15) days** from the date of this Order to file the original Certificate. Throughout the pendency of this action, the parties shall be under a continuing duty to amend, correct, and update the Certificate. **The parties SHALL NOT include the names of the assigned District Judge and Magistrate Judge, merely by virtue of this case being assigned to them.**

  7. Every motion filed in this case shall be accompanied by **one proposed original order** granting the motion. The order shall contain the **up-to-date service list** (names and facsimile numbers or addresses) of all counsel or pro se litigants in the case.

8.  In light of the court's "fax-back" program, additional copies of the proposed order and self-addressed stamped envelopes SHALL NOT be provided.  Further, the parties shall be under a continuing duty to ensure the Clerk of the Court is provided with the up-to-date service information.

9.  The parties SHALL NOT provide courtesy copies to Chambers, unless requested, in accordance with Local Rule 5.1.D.

DONE AND ORDERED in Chambers at Miami, Florida, this   14th  day of February, 2007.

_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Bandstra
All Counsel of Record

-4-

## <u>Pretrial Deadlines and Trial Date</u>

**DATE**
month/day/year

_____ Joinder of Additional Parties and motions for class certification.

_____ Parties shall exchange expert witness summaries and reports as required by Local Rule 16.1.K.

_____ Parties shall exchange written lists containing the names and addresses of all witnesses intended to be called at trial and only those witnesses listed shall be permitted to testify.

_____ Parties exchange rebuttal expert witness summaries and reports as required by Local Rule 16.1.K. <u>Note</u>: These provisions pertaining to <u>expert</u> witnesses do not apply to treating physicians, psychologists or other health providers (if a <u>Daubert</u> or <u>Markman</u> hearing may be necessary, the parties are to add that as an additional deadline at the bottom of Attachment A).

_____ All discovery, including expert discovery, shall be completed.

_____ A mediator must be selected.

_____ All summary judgment, _Daubert_, and other dispositive motions must be filed. A **<u>minimum of eight (8) weeks</u>** is required for the Court to review dispositive motions prior to filing of the joint pretrial stipulation. **If <u>no</u> dispositive motions will be filed, clearly note this fact in the Joint Scheduling Report.**

_____ Mediation shall be completed.

_____ All Pretrial Motions and Memoranda of Law must be filed.

_____ Joint Pretrial Stipulation must be filed.

_____ Proposed jury instructions and/or proposed findings of fact and conclusions of law must be filed.

_____ Deposition designations must be filed.

_____ Beginning of Trial Period.

_____ Additional deadlines (please specify).

[Attachment A]

## SUGGESTED PRETRIAL DEADLINES
## STANDARD CASE MANAGEMENT TRACK

**Days Before**
**Beginning of**
**Trial Period**

| | |
|---|---|
| 240 days | Joinder of Additional Parties and motions for class certification. |
| 210 days | Parties shall exchange expert witness summaries and reports as required by Local Rule 16.1.K. |
| 200 days | Parties shall exchange written lists containing the names and addresses of all witnesses intended to be called at trial and only those witnesses listed shall be permitted to testify. |
| 180 days | Parties exchange rebuttal expert witness summaries and reports as required by Local Rule 16.1.K. <u>Note</u>: These provisions pertaining to <u>expert</u> witnesses do not apply to treating physicians, psychologists or other health providers (if a <u>Daubert</u> or <u>Markman</u> hearing may be necessary, the parties are to add that as an additional deadline at the bottom of Attachment A). |
| 130 days | All discovery, including expert discovery, shall be completed. |
| 120 days | A mediator must be selected. |
| 100 days | All summary judgment, *Daubert*, and other dispositive motions must be filed. A **minimum of eight (8) weeks** is required for the Court to review dispositive motions prior to filing of the joint pretrial stipulation. **If <u>no</u> dispositive motions will be filed, clearly note this fact in the Joint Scheduling Report.** |
| 60 days | Mediation shall be completed. |
| 45 days | All Pretrial Motions and Memoranda of Law must be filed. |
| 30 days | Joint Pretrial Stipulation must be filed. |
| 7 days | Proposed jury instructions and/or proposed findings of fact and conclusions of law must be filed. |
| 1 day | Deposition designations must be filed. |

[Attachment B]

## SUGGESTED PRETRIAL DEADLINES
## EXPEDITED CASE MANAGEMENT TRACK

**Days Before**
**Beginning of**
**Trial Period**

| | |
|---|---|
| 130 days | Joinder of Additional Parties and motions for class certification. |
| 120 days | Parties shall exchange expert witness summaries and reports as required by Local Rule 16.1.K. |
| 110 days | Parties shall exchange written lists containing the names and addresses of all witnesses intended to be called at trial and only those witnesses listed shall be permitted to testify. |
| 100 days | Parties exchange rebuttal expert witness summaries and reports as required by Local Rule 16.1.K.  <u>Note</u>:  These provisions pertaining to <u>expert</u> witnesses do not apply to treating physicians, psychologists or other health providers (if a <u>Daubert</u> or <u>Markman</u> hearing may be necessary, the parties are to add that as an additional deadline at the bottom of Attachment A). |
| 75 days | All discovery, including expert discovery, shall be completed. |
| 70 days | All summary judgment, *Daubert*, and other dispositive motions must be filed. A **minimum of eight (8) weeks** is required for the Court to review dispositive motions prior to filing of the joint pretrial stipulation.  **If <u>no</u> dispositive motions will be filed, clearly note this fact in the Joint Scheduling Report.** |
| 60 days | A mediator must be selected. |
| 30 days | Mediation shall be completed. |
| 30 days | All Pretrial Motions and Memoranda of Law must be filed. |
| 10 days | Joint Pretrial Stipulation must be filed. |
| 7 days | Proposed jury instructions and/or proposed findings of fact and conclusions of law must be filed. |
| 1 day | Deposition designations must be filed. |

[Attachment C]

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 07-20389-CIV-MARTINEZ-BANDSTRA**

COFFEE BEAN TRADING-ROASTING, LLC, a
Delaware limited liability company,

      Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada corporation,

      Defendant.

_____/
_____

**ELECTION TO JURISDICTION BY A UNITED STATES
MAGISTRATE JUDGE FOR FINAL DISPOSITION OF MOTIONS**

      In accordance with the provisions of 28 U.S.C. §636(c), the undersigned parties to the above-captioned civil matter hereby jointly and voluntarily elect to have a United States Magistrate Judge decide the following motions and issue a final order or judgment with respect thereto:

1.    Motions for Costs        Yes _____   No _____

2.    Motions for Attorney's Fees   Yes _____   No _____

3.    Motions for Sanctions     Yes _____   No _____

4.    Motions to Dismiss       Yes _____   No _____

5.    Motions for Summary Judgment   Yes _____   No _____

6.    Other (specify) _____

_____       _____
(Date)                (Signature--Plaintiff's Counsel)

_____       _____
(Date)                (Signature--Plaintiff's Counsel)

_____       _____
(Date)                (Signature--Defendant's Counsel)

_____       _____
(Date)                (Signature--Defendant's Counsel)

[Attachment D]

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 07-20389-CIV-MARTINEZ-BANDSTRA**

COFFEE BEAN TRADING-ROASTING, LLC, a
Delaware limited liability company,

      Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada corporation,

      Defendant.

_____/

## ELECTION TO JURISDICTION BY A
## UNITED STATES MAGISTRATE JUDGE FOR TRIAL

In accordance with the provisions of 28 U.S.C. §636(c), the undersigned parties to the above-captioned civil matter hereby jointly and voluntarily elect to have a United States Magistrate Judge conduct any and all further proceedings in the case, including TRIAL, and entry of final judgment with respect thereto.

_____       _____
(Date)                   (Signature--Plaintiff's Counsel)

_____       _____
(Date)                   (Signature--Plaintiff's Counsel)

_____       _____
(Date)                   (Signature--Defendant's Counsel)

_____       _____
(Date)                   (Signature--Defendant's Counsel)

[Attachment E]

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.: 07-20389-CIV-MARTINEZ/BANDSTRA

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

       Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,

       Defendant.

_____/

## CERTIFICATE OF COMPLIANCE WITH COURT ORDER

Plaintiff, Coffee Bean Trading-Roasting, LLC, by and through its undersigned counsel, hereby certifies that it has this 14th day of February, 2007 complied with this Court's Order Setting Hearing on Plaintiff's Motion for Temporary Restraining Order dated February 14, 2007 (D.E. No. 5) by serving a true and correct copy of the Order upon counsel for Defendant, Christopher F. Graham, Esq. and Matthew Dyckman, Esq., by facsimile, e-mail and U.S. Mail.

Respectfully submitted,

BAKER & McKENZIE LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131
Telephone: (305) 789-8900
Facsimile: (305) 789-8953


By: _____/s/ Jose M. Ferrer_____
        Jose M. Ferrer
        Florida Bar No. 173746

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was delivered this

___14th___ day of February, 2007 to:

Christopher F. Graham, Esq.
Thacher Proffitt & Wood LLP
Two World Financial Center
New York, NY 10281
Tel.:   (212) 912-7400
Fax.:   (212) 912-7751
E-Mail: egraham@tpw.com

Matthew Dyckman, Esq.
Thacher Proffitt & Wood LLP
1700 Pennsylvania Ave., NW Suite 800
Washington, DC 20006
Tel.:   (202) 626-5647
Fax.:   (202) 626-1930

By: _____/s/ Jose M. Ferrer_____
         Jose M. Ferrer

MIADMS/306741.1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 07-20389 CIV-MARTINEZ

COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

      Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada corporation,

      Defendant.

_____/

### UNOPPOSED MOTION TO ALLOW DEFENDANT'S ATTORNEY, CHRISTOPHER F. GRAHAM TO ATTEND HEARING ON PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER TELEPHONICALLY

      Defendant, Coffee Holding, Co. Inc., a Nevada corporation, ("Coffee Holding") by and through its undersigned counsel, hereby files this Motion to Allow Christopher F. Graham ("Mr. Graham") to Attend the Motion for Temporary Restraining Order hearing set for Friday, February 16, 2007 telephonically, and as grounds states:

### Background

      This matter involves a business dispute between two parties with respect to the operation of a coffee distribution business. Coffee Holding is located in New York and its primary outside litigation counsel is Mr. Graham. Yesterday, Coffee Holding received notice of a hearing set by this Court for Friday, which provided one (1) business day notice. Mr. Graham seeks to appear in person but due to the ice storm in the Northeast and large event weekend in South Florida, he has been unable to obtain a flight to arrive in time for the hearing. As such,

CASE NO.: 07-20389 CIV-MARTINEZ

due to the exigent circumstances, Mr. Graham seeks to have the Court permit him to attend and argue on his client's behalf via a telephonic appearance. Plaintiff's counsel does not oppose this relief.

**<u>Analysis of Relief</u>**

1.      Defendant, Coffee Holding received notice yesterday of a Court hearing set before this Court on Friday, February 16, 2007 at 3:00 p.m. The notice only provided one business day notice to the Defendant with respect to the hearing on Plaintiffs' Motion for Temporary Restraining Order.

2.      Mr. Graham is Coffee Holding's primary outside litigation counsel and is located in New York City where the Defendant also has its primary operations.

3.      A Motion to have Mr. Graham admitted *pro hac vice* has already been filed with the Court.

4.      As good cause for this motion, Defendant would show that Mr. Graham has attempted to obtain a flight this evening but due to yesterday's ice storm and related winter conditions that hit the Northeast, there has been travel chaos at the local New York area airports. This includes rescheduling passengers whose flights were cancelled or postponed yesterday to flights scheduled to depart today. As such, Mr. Graham has been unsuccessful in obtaining a flight to reach Miami for tomorrow's hearing.

5.      Due to Mr. Graham's inability to obtain a flight prior to tomorrow's hearing, it is respectfully requested that he be permitted to attend

- 2 -

CASE NO.: 07-20389 CIV-MARTINEZ

telephonically.

6.      Mr. Graham conferred with Plaintiff's counsel on the relief

sought herein and he did not oppose the relief requested.

7.      This Motion is brought in good faith and not for dilatory

purposes.
Respectfully submitted,

/s/ Mark S. Auerbacher, Esq.

_____

Florida Bar No. 978220
msa@katzbarron.com
John R. Squitero, Esq.
Florida Bar No. 121196
jrs@katzbarron.com
KATZ BARRON SQUITERO
FAUST
2699 S. Bayshore Drive, 7th
Floor
Miami, Florida 33133-5408
Telephone:      (305) 856-
2444
Facsimile:      (305) 285-

9227


February 14, 2007          **COUNSEL FOR DEFENDANT**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 14, 2007, I electronically filed the
foregoing with the Clerk of the Court by using the CM/ECF system which will
send a notice of electronic filing to the following:  Jose.Ferrer@bakernet.com.
I further certify that I mailed the foregoing document and the notice of electronic
filing by first-class mail to the following recipients:

Jose Ferrer, Esq.
Baker & McKenzie, LLP,
1111 Brickell Avenue, Suite 1700
Miami, FL 33131
Telephone:      (305) 789-8900
Facsimile:      (305) 789-8953

- 3 -

CASE NO.: 07-20389 CIV-MARTINEZ

_____ /s/Mark S. Auerbacher, Esq.

C:\Documents and Settings\eap\Local Settings\Temporary Internet Files\OLKB0\HN9046.WPD

- 4 -

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 07-20389 CIV-MARTINEZ

COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

      Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada corporation,

      Defendant.

_____/

## ORDER APPROVING DEFENDANT'S ATTORNEY, CHRISTOPHER F. GRAHAM TO ATTENDING TELEPHONICALLY ON PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

      THIS CAUSE came before the Court upon a Motion, made pursuant to

the Rules of the United States District Court for the Southern District of Florida,

for the Motion to Allow Defendant's attorney, Christopher F. Graham to attend

hearing telephonically on Plaintiff's Motion for Temporary Restraining Order,

in this cause and the Court, being fully advised in the premises and having fully

reviewed the file, hereby

      ORDERED AND ADJUDGED that the motion is GRANTED.

      DONE AND ORDERED in Chambers in Miami, Florida this ____ day

of February, 2007.


_____

      JOSE E. MARTINEZ
      UNITED STATES DISTRICT

JUDGE

Copies to all counsel of record

Case No. 01-2466- CIV-MIDDLEBROOKS

Magistrate Judge Bandstra

H:\LIB\DOCS\11042034\LIT\HN9232.WPD

# UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF FLORIDA
## Miami Division

## Case Number:  07-20389-CIV-MARTINEZ-BANDSTRA

COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

     Plaintiff,

vs.

COFFEE HOLDING, CO. INC., a Nevada
corporation

     Defendant.

---

## DEFENDANT COFFEE HOLDING, CO. INC'S MOTION TO ENFORCE A FORUM SELECTION CLAUSE AND TO TRANSFER VENUE AND SUPPORTING MEMORANDUM OF LAW

Defendant Coffee Holding Co., Inc ("Coffee Holding"), pursuant to 28 U.S.C. § 1404(a),

hereby moves the Court to enforce the parties choice of venue and transfer this case to the U.S.

District Court for the District of Delaware[1], and in support thereof states the following:

### I.PRELIMINARY STATEMENT

---

[1] Alternatively, the Court should dismiss or transfer, this action pursuant to 28 U.S.C. § 1406(a) as venue is not proper in the United States District Court for the Southern District of Florida.  Federal Courts are empowered under Section 1406(a) to dismiss or transfer a case to a district in which "it could have been brought." 28 U.S.C. § 1406(a).  This Court should transfer this action to the United States District Court for the District of Delaware pursuant to Section 1406(a) because the operative agreement between the parties mandates that the only proper venue is the District Court of Delaware, thus the case is in the wrong district and should be dismissed or transferred.

As more fully set forth below, pursuant to 28 U.S.C. § 1404(a), this case should be transferred to, and litigated in, the U.S. District Court for the District of Delaware because the parties affirmatively agreed in the Limited Liability Agreement of Café La Rica, LLC (the "Operating Agreement") to litigate any causes of action arising from the Agreement in Delaware. The language of the Agreement's forum selection clause is unambiguous – the parties agreed to litigate all disputes *exclusively* in Delaware, under Delaware law. Moreover, the parties mutually agreed to waive any claim that Delaware is an inconvenient forum.

It is well settled law that, when parties enter into a forum selection clause, the party opposing a motion to transfer pursuant to 28 U.S.C. § 1404 bears a heavy burden of proving that the forum selection clause should not be enforced. The venue mandated by a contractual forum-selection clause *rarely* will be outweighed by any other factor in a 1404(a) analysis. Thus, this Court, pursuant to its power under 28 U.S.C. § 1404(a), should transfer this case to the only district court in which venue is proper, the District Court for the District of Delaware.

## II. STATEMENT OF FACTS

For purposes of this motion, the facts are set forth below.

Plaintiff, Coffee Bean Trading-Roasting, LLC ("Coffee Bean") is a limited liability company organized and operating under the laws of the State of Delaware. Defendant, Coffee Holding, is a corporation organized and operating under the laws of the State of Nevada. Neither the Plaintiff nor Defendant companies are citizens of Florida.

On March 10, 2006, Coffee Bean and Coffee Holding entered into the Operating Agreement which governed Café La Rica. Importantly, the Operating Agreement contains an exclusive forum

2

selection clause which states:

> This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of laws principles thereof. To the fullest extent permitted by law, the parties hereto hereby (i) submit to the jurisdiction of the state and federal courts located in the State of Delaware for purposes of any legal action or proceeding brought under or in connection with this Agreement, (ii) agree that *exclusive* venue of any such action or proceeding may be laid in the State of Delaware and (iii) *waive any claim that the same is an inconvenient forum.*

Operating Agreement at § 14.8 (emphasis added). (Attached to Plaintiff's Motion for Temporary Restraining Order and Supporting Memorandum of Law).

On March 10, 2006 Coffee Holding and Café La Rica also entered in an Expense Sharing and Services Agreement (the "Expense Sharing Agreement"). Under this Agreement, Coffee Holding and Café La Rica agreed that, among other things, Coffee Holding would provide coffee to Café La Rica at fair market prices. Café La Rica, in turn, was required to pay for the coffee within 15 days of the end of each month. Although Coffee Holdings provided coffee at fair market value, Café La Rica grossly failed to live up to its end of the bargain. Time and time again, Café La Rica breached the Expense Sharing Agreement by missing its payments due to Coffee Holding. In fact, Café La Rica currently owes approximately $419,000 to Coffee Holding for coffee and other expenses. As a result, by letter dated February 05, 2007, Mr. Andrew Gordon of Coffee Holdings informed Coffee Bean that due to a material breach of the Expense Sharing Agreement, and in accordance with Section 13.1(e) of the Operating Agreement, Café La Rica had been dissolved.

On February 13, 2007, notwithstanding the forum selection provisions of the Operating Agreement, Plaintiff filed a complaint in this Court alleging a series of baseless claims including, among others, breach of contract. Plaintiff additionally filed an *ex parte* Motion for a Temporary

3

Restraining Order. But Plaintiff has filed its actions in the wrong venue in direct contravention of the exclusive forum selection clause in the Operating Agreement. Accordingly, pursuant to 28 U.S.C. § 1404(a), this Court should transfer this case to the proper venue as agreed to by the parties, the U.S. District Court for the District of Delaware.

## MEMORANDUM OF LAW

### I. GOVERNING LAW UNDER 28 U.S.C. §1404 (a)

The question of whether a federal court sitting in diversity should transfer a civil action pending before it to another district where the action could have taken place is governed by 28 U.S.C. § 1404 (a) which provides as follows:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

28 U.S.C. § 1404 (a).

The question of whether a federal court should transfer a civil action based on a contractual forum-selection clause is also governed by 28 U.S.C. § 1404 (a). *Stewart Ore., Inc. v. Ricoh Corp*. 487 U.S. 22, 32 (1988). Thus, enforcement of a contractual forum selection clause is one of federal and not state law. *Id. See also P&S Business Machines, Inc., v. Canon USA, Inc.*, 331 F.3d 804, 806 (11th Cir. 2003); *In re Ricoh Corp*. 870 F. 2d 570, 573 (11th Cir. 1989).

Ordinarily, when determining if a case should be transferred under 1404(a), a federal court balances various factors, including but not limited to: convenience of the parties and witnesses, relative familiarity of the court with governing law, and judicial economy. *17 Moore's Federal Practice* § 111.3 [1][b] (Matthew Bender 3d Ed.). And, *ordinarily*, the plaintiff's choice of forum

4

is afforded considerable deference. *In re Ricoh Corp.* 870 F.2d 570, 573 (11th Cir. 1989). Traditionally, therefore, the burden to establish that the suggested new forum is more convenient falls on the movant – i.e., the defendant. *Id.*

To contrast, when a motion to transfer seeks to enforce a valid, reasonable forum selection clause, the opponent – i.e., the *plaintiff*, bears the burden of persuading the court that its choice forum is more convenient. *Id.* To that extent, the plaintiff must convince the court that it should not be held to the terms of the agreement it knowingly entered into. *Id.* As such, rarely, if ever, will a plaintiff be able to convince a court to overlook a forum selection clause. *See P&S Business Machines*, 331 F.3d 804, 806; *In re Ricoh Corp.* 870 F.2d 570; *Murray v. Quiznos Franchising LLC*, No. 8:06-CV-717-T-26MAP, 2006 WL 1529540, at *3 (M.D. Fla. May 26, 2006).

The case *In re Ricoh Corp.*, 870 F.2d 570 is illustrative. *Ricoh* involved a contractual dispute between diverse parties. The Plaintiff, an Alabama corporation, sued the defendant, a New York corporation, in Alabama. The contract the parties had entered into, however, provided that all disputes would be exclusively litigated in Manhattan. Defendant thus moved to transfer the action to New York. *See id.*, at 572. On remand[1], the District Court held that the defendant had not met its burden in demonstrating that New York was a more convenient forum. But, the Eleventh Circuit reversed, stating that the District Court had abused its discretion by not shifting the burden to the plaintiff and transferred the case to New York. *Id.*

---

[1] Initially, the District Court of Alabama held that state law governed the forum selection provisions and that forum selection clauses were not enforceable under Alabama law. The Eleventh Circuit reversed, holding that federal law governed the enforceability of a forum selection clause. On certiorari, the Supreme Court affirmed. *See Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988).

The Eleventh Circuit stated that when parties enter into a contract containing a valid, reasonable choice of forum provision, "the burden of persuasion is altered." *In re Ricoh*, 870 F.2d at 573. The court reasoned that in light of the forum selection clause, the defendant was not attempting to upset the plaintiff's choice of forum; but rather "actually trying to enforce the forum that the *plaintiff* has already chosen: the contractual venue." *Id.* (emphasis added). Moreover, the Eleventh Circuit stressed that to afford deference to a plaintiff in the face of a forum selection clause would "only encourage parties to violate their contractual obligations, the integrity of which are vital to our judicial system." *Id. citing Stewart Org. Inc.*, 487 U.S. 33 ("[E]nforcement of valid forum selection clauses, bargained for by the parties, protects and furthers the interests of the justice system (Kennedy, J. concurring).).

In sum, in adhering to the reasoning advanced by the Supreme Court, the Eleventh Circuit held that when determining whether a transfer is justified under Section 1404(a) "while other factors might 'conceivably' militate against transfer…the venue mandated by a choice of forum clause will rarely be outweighed by other 1404(a) factors." *In re Ricoh Corp.*, 870 F.2d 570, *citing Stewart*, 487 U.S. at 33 (Kennedy, J. concurring).

The one further analysis the Eleventh Circuit employs is a consideration of the parties relative bargaining power in order to determine if the forum selection clause was "freely and fairly negotiated by experienced business professionals." *Murray*, 2006 WL 1529540 at * 2, *citing Ricoh*, 870 F.2d at 574. Notably, Plaintiff's lack of financial ability does not constitute viable reason for failure to enforce a forum selection clause. *Id. citing P & S Business Machines,* 331 F.3d 807-808 (holding

that even though it was much more financially feasible for the plaintiff to litigate in the filing forum, in light of a forum selection clause, the case should nevertheless be transferred).

## II. IN THIS CASE, TRANSFER TO THE DISTRICT COURT FOR THE DISTRICT OF DELAWARE IS WARRANTED

It is patently clear that the action at bar should be transferred to the District Court of Delaware. The forum selection language found in the Operating Agreement is unambiguous. Not only did the parties "submit to the jurisdiction of the state and federal courts located in the State of Delaware for purposes of any legal action or proceeding brought under or in connection with this Agreement," but the parties agreed to *exclusive* jurisdiction and, most importantly, *waived any claim that Delaware is an inconvenient forum*.

Moreover, the parties are both sophisticated business entities represented by competent counsel. As such, Plaintiff has no basis whatsoever to argue that the forum selection clause is somehow not enforceable. Additionally, the parties agreed that Delaware law would govern. As stated above, governing law is an important factor in determining forum in a transfer motion. Finally, although some of the events giving rise to the dispute took place in Florida, Coffee Holding at all times operated out of New York, where Mr. Gordon resides. Coffee Bean's manager, who signed the Operating Agreement on behalf of the Plaintiff, resides in Switzerland. Thus, many of the events and some of the witnesses are not in Florida – therefore, not even convenience dictates that the case should remain in Florida.

In sum, in March of 2006, the parties knowingly entered into an agreement that provided that all disputes arising out of that agreement would be exclusively litigated in Delaware under Delaware law. There is therefore only one proper venue in this case, the District Court for the District of

Delaware. Plaintiff has no practical or legal basis upon which to keep the case in Florida and the Court should thus transfer this case to the District of Delaware. Defendant's counsel certifies that he conferred with Plaintiff's counsel regarding the relief sought herein but Plaintiff were not in agreement with the relief requested.

## CONCLUSION

Based on the foregoing, Coffee Holding respectfully requests that the Court transfer this case to the United States District Court for the District of Delaware and grant such other and further relief deemed just and proper.

KATZ, BARRON, SQUITERO, FAUST
2699 S. Bayshore Drive, Seventh Floor
Miami, Florida 33133
Tel: 305-856-2444
Fax: 305-285-9227

/s/ Mark S. Auerbacher, Esq.
Florida Bar No. 978220
msa@katzbarron.com
John R. Squitero, Esq.
Florida Bar No. 121196
jrs@katzbarron.com

Christopher F. Graham
Thacher Proffitt & Wood LLP
Two World Financial Center
New York, New York 10281
Tel: (212) 912-7669
Fax: (212) 912-7751
CGraham@tpw.com

COUNSEL FOR DEFENDANT

8

## **CERTIFICATE OF SERVICE**

   I hereby certify that on February 14, 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Jose.Ferrer@bakernet.com. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following recipients:

   Jose Ferrer, Esq.
   Baker & McKenzie, LLP,
   1111 Brickell Avenue, Suite 1700
   Miami, FL 33131
   Telephone:  (305) 789-8900
   Facsimile:  (305) 789-8953

          /s/Mark S. Auerbacher, Esq.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 07-20389 CIV-MARTINEZ

COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

      Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada corporation,

      Defendant.

_____/

## <u>ORDER GRANTING DEFENDANT'S MOTION TO TRANSFER VENUE</u>

THIS CAUSE came before the Court upon Defendant, Coffee Holding, Co., Inc.'s Motion to Enforce Forum Selection Clause and to Transfer Venue, made pursuant to the Rules of the United States District Court for the Southern District of Florida, in this cause and the Court being fully advised in the premises, having fully reviewed the file, the parties' papers and argument of counsel hereby

ORDERED AND ADJUDGED that:

1.     The Motion to Transfer Venue is hereby Granted; and

2.     The case is hereby transferred to the United States District Court for the District of Delaware.

DONE AND ORDERED in Chambers in Miami, Florida this _____ day of February, 2007.

_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies to all counsel of record
Magistrate Judge Bandstra

**UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division**

**Case Number: 07-20389-CIV-MARTINEZ-BANDSTRA**

COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

     Plaintiff,

vs.

COFFEE HOLDING, CO. INC., a Nevada
corporation

     Defendant.

---

**DEFENDANT COFFEE HOLDING, CO. INC'S MOTION AND SUPPORTING
MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION
<u>FOR TEMPORARY RESTRAINING ORDER</u>**

Defendant Coffee Holding Co., Inc ("Coffee Holding") hereby moves the Court to

dismiss Plaintiff Coffee Bean Trading-Roasting, LLC's ("Coffee Bean") motion for a Temporary

Restraining Order and in support thereof states as follows:

## I.     <u>PRELIMINARY STATEMENT</u>

At issue in this case is a simple contract dispute. Defendant, Coffee Holding, as a result

of consistent failure by Café La Rica to fulfill its terms of the Expense Sharing and Services

Agreement (Expense Sharing Agreement) between Coffee Holding and Café La Rica, rightfully

executed its rights and dissolved Café La Rica – a failing company.

Coffee Holding is not interfering with the normal, day to day operations of Café La Rica.

The extraordinary remedy of a temporary restraining order is clearly not available to Coffee

Bean because Coffee Bean, among other things, has not established that it will be irreparably harmed. In its motion, Coffee Bean attempts a vague argument that "the amount of damage caused by the lost profits and good will that will result from Coffee Holding's continued interference are impossible to determine and of a character that cannot be remedied by money." The law, however, is well settled in this jurisdiction – only claims that are impossible to redress through damages are entitled to a temporary restraining order. A simple contract dispute is readily amenable by money damages and thus Plaintiff's motion must be dismissed.

## II.    STATEMENT OF FACTS

The Court is respectfully referred to the Affidavit of Andrew Gordon ("Gordon Affidavit") and the Affidavit of Salvatore Reda ("Reda Affidavit") for a complete recitation of the facts pertinent to this case. For purposes of this motion, the facts are as follows below.

Defendant Coffee Holding is a Nevada corporation. Plaintiff, Coffee Bean is a Delaware limited liability company. Café La Rica is Delaware limited liability company organized pursuant to the March 10, 2006, Limited Liability Agreement of Café La Rica, LLC (the "Operating Agreement"). On that same date, Coffee Holding and Café La Rica also entered into the Expense Sharing Agreement.

Under the Expense Sharing Agreement, Coffee Holding and Café La Rica agreed that, among other things, Coffee Holding would provide coffee to Café La Rica at fair market prices. Coffee Holding lived up to its side of the bargain – Café La Rica, however, consistently failed to pay Coffee Holding for the coffee. (Gordon Affidavit at ¶ 3.) In fact, Café La Rica missed multiple payments and now owes Coffee Holdings approximately $410,000 for coffee sales and expenses. *Id*. Despite Coffee Holding's continual funding of Café La Rica, by for example, contributing $250,000 in cash and equipment and spending an additional $50,000 for working

2

capital in December 2006, Café La Rica has never been able to operate at a positive cash flow. (Gordon Affidavit at ¶ 4.) Café La Rica has been, in short, a complete failure. (Gordon Affidavit at ¶ 3; Reda Affidavit at ¶ 1.)

As a result, by letter dated February 05, 2007, Mr. Gordon informed Coffee Bean that due to a material breach of the Expense Sharing Agreement, and in accordance with Section 13.1(e) of the Operating Agreement, Café La Rica had been dissolved.

Instead of attempting to salvage Café La Rica, Mr. Aguila of Coffee Bean unilaterally changed the passcodes on Café La Rica's Washington Mutual bank account thus excluding Mr. Gordon and Coffee Holding from any access to Café La Rica's accounts and placing himself in sole control. (Gordon Affidavit at ¶ 4.) In order to rectify the situation, Mr. Gordon had no choice but to write, by letter dated February 7, 2007, to Washington Mutual instructing the bank to secure the assets of Café La Rica such that they would not be dissipated. *Id.* In direct contrast to Plaintiff's contentions, since Café La Rica's dissolution, Mr. Gordon has not attempted to contact any suppliers, customers, employees, landlord or potential investors in Café La Rica. *Id.*

On February 13, 2007, Coffee Bean filed with this Court, an *Ex Parte* Motion for a temporary restraining order ("TRO") requesting this Court to prohibit Coffee Holdings from (1) communicating directly with Café La Rica's customers, vendors, suppliers, and investors, (2) communicating with Washington Mutual regarding Café La Rica's account and (3) otherwise representing to anyone that Café La Rica has been dissolved. Importantly, on that same date, Coffee Bean filed a Verified Complaint ("Complaint") alleging various claims against Coffee Holding including, among others, breach of contract and breach of fiduciary duty – claims for which damages are an adequate remedy. Although Coffee Bean's Complaint contains a count

for Permanent and Temporary Injunction, this count is based on the same basic facts of the breach of contract and breach of fiduciary claims.

### III.    MEMORANDUM OF LAW

#### A.    Legal Standard for Obtaining a Temporary Restraining Order

It is well settled under federal law that preliminary injunctions and temporary restraining orders are *extraordinary* remedies. *Alabama v. U.S. Army Corps of Engineers,* 424 F.3d 1117, 1127 (11th Cir.2005) (emphasis added) (citing *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 506 (1959)). Thus, a TRO is available not simply when the legal right asserted has been infringed, "…but only when that legal right has been infringed by an injury for which there is *no adequate legal remedy....*" *Id*; *Acevedo v. Miami-Dade County*, No. 06-21806-CIV-MORENO, WL 2347647 (Aug. 3, 2006, S.D.Fla.).

Rule 65(b) of the Federal Rules of Civil Procedure authorizes district courts to grant preliminary injunctive relief at their discretion. *United States v. Lambert,* 695 F.2d 536, 539 (11th Cir. 1983). In exercising that discretion, courts in this Circuit must consider and balance the four recognized prerequisites to preliminary injunctive relief: (1) a substantial likelihood that the movant will prevail on the underlying merits of the case, (2) a substantial threat that the moving party will suffer irreparable damage if relief is denied, (3) a finding that the threatened injury to the movant outweighs the harm the injunction may cause defendant, and (4) a finding illustrating the extent to which granting the preliminary injunction will disserve the public interest. *Tally-Ho, Inc. v. Coast Community College District,* 889 F.2d 1018, 1022 (11th Cir. 1989). Importantly, the plaintiffs have the burden of persuasion on *all* of the preliminary injunction factors. *United States v. Jefferson County,* 720 F.2d 1511 (11th Cir.1 983) (emphasis added).

4

In order to demonstrate that the movant will suffer irreparable harm, the movant must establish that all threatened injuries could not be redressed on an existing legal theory. *Our Company, Inc. v. Eagle Snacks, Inc.*, 812 F. Supp.6, 7 (D. Me. 1993). In fact, the absence of an adequate remedy at law is a *fundamental* requirement for the court to exercise its equitable powers and grant injunctive relief. *Alabama,* 424 F.3d at 1127; *Newman v. Alabama,* 683 F.2d 1312, 1319 (11th Cir.1982); *Acevedo* WL 2347647 at * 3 (denying Plaintiffs' motion for a temporary restraining order because plaintiffs had an adequate remedy at law).

The above case, *Our Company*, is instructive. In that case, much like the case at bar, a snack food distributor sought damages from snack food producer's termination of a distributor agreement. *Our Company*, 812 F. Supp at 6. The district court held that "there is no showing that any loss sustained as a result of the termination of the Distributor Agreement is of some unique character or nature that would disqualify it from being the subject of an assessment of legal damages." *Id.* at 8. The court went on to hold that the fact that "damages may be difficult to determine in amount, is not sufficient to establish irreparable injury." *Id.*

### B. <u>Plaintiffs Are Not Entitled to a Temporary Restraining Order</u>

1. <u>Plaintiffs Have Not Demonstrated That They Will Suffer Irreparable Harm</u>

As stated above, the standard to establish that a movant will suffer irreparable injury is very stringent. Plaintiff is far short of demonstrating any such kind of injury. In its motion, Plaintiff merely states that its damages are "impossible to determine and of a character that cannot be remedied by money." (Plaintiff's Motion for Temporary Restraining Order at 6.)

Crucially, the case at bar is a contract dispute. At issue is not whether Coffee Holding is now "interfering" with the operations of Café La Rica but whether (1) Café La Rica breached the Expense Sharing Agreement, and (2) whether Coffee Holding properly dissolved Café La Rica.

Courts fashion legal remedies arising out of contract disputes everyday – the mere fact that Plaintiff vaguely asserts that the damages are "impossible to determine" quite simply does not rise to the level required to demonstrate that the extraordinary remedy of a TRO is warranted.

 2. **Plaintiff Has Not Demonstrated a Substantial Likelihood that It will Prevail on the Underlying Merits of the Case**

In order to obtain a TRO, a plaintiff must demonstrate that it will prevail on the merits. Plaintiffs have established no such thing. Pursuant to the clear terms of the Expense and Sharing Agreement, Coffee Holding rightfully dissolved Café La Rica due to a material breach by Café La Rica. Café La Rica was seriously deficient in payment to Coffee Holding and Coffee Holding did the only thing it could to shield itself and other creditors from serious financial risk – dissolve Café La Rica. As such, Plaintiff has not demonstrated that it will prevail on the merits. Quite to the contrary, Coffee Holding is likely to prevail as it simply executed it rights under the Expense Sharing Agreement; thus, plaintiff is not entitled to a TRO.

 3. **Plaintiff Has Not Established that the Threatened Injury to the Plaintiff Outweighs the Harm the Injunction May Cause Defendant**

Plaintiff has clearly not established that the threatened injury to Coffee Bean outweighs the harm such a TRO may cause to Coffee Holding. First, Plaintiff conveniently fails to mention that it was Ernesto Aguila of Coffee Bean that unilaterally changed the account passcodes to the Café La Rica accounts therefore forcing Coffee Holdings to contact Washington Mutual in order to regain some control of Café La Rica's accounts. Thus, should Coffee Holding be forced to cease all communications it has with Washington Mutual it will lose whatever control it did have and thus be more harmed than the Plaintiff. If anything, it is Plaintiffs and Mr. Aguila's actions that pose a significant risk to Coffee Holding and Café La Rica's other creditors.

    4.    <u>Granting the TRO will Disserve the Public Interest</u>

There is not doubt that Café La Rica has failed as a venture – and, was failing from its inception. Therefore, to prohibit Coffee Holdings from disclosing the fact that a failed venture is no longer in existence disserves all of Café La Rica's customers, creditors, employees and investors. These entities have the right to know that Café La Rica is, at best, in dire financial circumstances. Thus, to grant the TRO and prohibit Coffee Holdings from putting interested entities on notice of Café La Rica's financial crisis is to disserve the public. As such, the TRO should not be granted.

Plaintiffs have not established that <u>even one</u> of the requirements for a TRO has been met and as such this Court should deny Plaintiff's motion in its entirety.

## <u>CONCLUSION</u>

Based on the foregoing, Coffee Holding respectfully requests that the Court to deny Plaintiff's Motion for a Temporary Restraining Order and grant such other and further relief deemed just and proper.

                Respectfully submitted,

                /s/ Mark S. Auerbacher, Esq.
                Florida Bar No. 978220
                msa@katzbarron.commailto:slc@katzbarron.com
                John R. Squitero, Esq.
                Florida Bar No. 121196
                jrs@katzbarron.com
                KATZ BARRON SQUITERO FAUST
                2699 S. Bayshore Drive, 7th Floor
                Miami, Florida 33133-5408
                Telephone:    (305) 856-2444
                Facsimile:    (305) 285-9227

February 16, 2007            **COUNSEL FOR DEFENDANT**

**CERTIFICATE OF SERVICE**

I hereby certify that on February 16, 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Jose.Ferrer@bakernet.com. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following recipients:

Jose Ferrer, Esq.
Baker & McKenzie, LLP,
1111 Brickell Avenue, Suite 1700
Miami, FL 33131
Telephone:       (305) 789-8900
Facsimile:       (305) 789-8953

/s/Mark S. Auerbacher, Esq.

H:\LIB\DOCS\03281001\PLDG\HN9524.DOC

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 07-20389 CIV-MARTINEZ

COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

      Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada corporation,

      Defendant.

_____/

## NOTICE OF FILING AFFIDAVITS IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

      Pursuant to Rule 5.1(E), S.D. Fla. L.R., Defendant, Coffee Holding Co.,

Inc. ("Coffee Holding") hereby gives notice of filing the Affidavits of Andrew

Gordon and Salvatore Reda (collectively, "Affidavits") in the above-referenced

matter.  The Affidavits are being filed by the Defendant, Coffee Holding  in

opposition to Plaintiff's Motion for Temporary Restraining Order, which is set

for hearing Friday, February 16, 2007 at 3:00 p.m.

                    Respectfully submitted,

                    /s/ Mark S. Auerbacher, Esq.

_____

                    Florida Bar No. 978220
                    msa@katzbarron.com
                    John R. Squitero, Esq.
                    Florida Bar No. 121196
                    jrs@katzbarron.com
                    KATZ BARRON SQUITERO
                    FAUST
                    2699 S. Bayshore Drive, 7th
                    Floor
                    Miami, Florida 33133-5408
                    Telephone:  (305)  856-
                    2444

CASE NO.: 07-20389 CIV-MARTINEZ

Facsimile:       (305) 285-9227

February 16, 2007               **COUNSEL FOR DEFENDANT**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 16, 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:  Jose.Ferrer@bakernet.com. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following recipients:

Jose Ferrer, Esq.
Baker & McKenzie, LLP,
1111 Brickell Avenue, Suite 1700
Miami, FL 33131
Telephone:       (305) 789-8900
Facsimile:       (305) 789-8953

                          /s/Mark S. Auerbacher,
Esq.

H:\LIB\DOCS\03281001\NOTICE\HN9405.WPD

- 2 -

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case Number: 07-20389-CIV-MARTINEZ-BANDSTRA

| | |
|---|---|
| COFFEE BEAN TRADING-ROASTING, LLC, a<br>Delaware limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>COFFEE HOLDING, INC., a Nevada corporation,<br><br>Defendant. | Case No. 07-20389 |

## AFFIDAVIT OF ANDREW GORDON IN OPPOSITION TO MOTION FOR TRO AND IN SUPPORT OF MOTION TO CHANGE VENUE.

| | |
|---|---|
| STATE OF NEW YORK | ) |
| | ) ss: |
| COUNTY OF KINGS | ) |

ANDREW GORDON, being duly sworn, deposes and says:

1. I am the president of Defendant Coffee Holding Co., Inc., a Nevada corporation and have personal knowledge of the facts stated herein. I strongly disagree with the factual allegations contained in the Complaint and in the affidavit of Ernesto Aguila.

2. Café La Rica is a Delaware limited liability company with 2 members---the plaintiff and the defendant in this case. Plaintiff is also a Delaware limited liability company. Article XIV, Section 14.8 of the Limited Liability Company Agreement between the members provides that "This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of laws principles thereof. To the fullest extent permitted by law, the parties hereto hereby (i) submit to the jurisdiction of the state and

federal courts located in the State of Delaware for purposes of any legal action or proceeding brought under or in connection with this Agreement, (ii) agree that exclusive venue of any such action or proceeding may be laid in the State of Delaware and (iii) waive any claim that the same is an inconvenient forum." This case should be removed to the District of Delaware.

3.     This lawsuit is a desperate attempt by Plaintiff to salvage a venture that has been a dismal failure almost since inception leading to my letter of February **[5]**, 2007 dissolving the LLC. Café La Rica has accumulated some $430,000 in losses since inception and has never been able to operate at a positive cash flow. Coffee Holding has sold some $530,000 in coffee to Café La Rica since March 2006. During this time, Coffee Holding has been paid only some $150,000 by Café La Rica and is owed some $410,000 for coffee sales and expenses. All of this amount is long overdue as Café La Rica was required to pay for coffee it received from Coffee Holding within 15 days of the end of each month pursuant to Section 2 of the Expense Sharing Agreement between Coffee Holding and Café La Rica. This key fact is left out of Plaintiff's pleadings---repeatedly.

4.     At no time did Coffee Holding "overcharge" Café La Rica for coffee sales. At no time did Coffee Holding bill Café La Rica for coffee it did not ship. Instead, Coffee Holding has continually funded Café La Rica's operations by contributing $250,000 in cash and equipment with a book value exceeding $335,000 in March of 2006 and an additional $50,000 in working capital into Café La Rica in December, 2006. Coffee Holding also advanced a $19,000 security deposit for Café La Rica's leased premises which has not been reimbursed and is owed $20,000 for an insurance premium paid by Coffee Holding on behalf of Café La Rica. To my knowledge, plaintiff has never contributed any cash or coffee to Café La Rica.

- 2 -

5.      Café La Rica's financial woes are squarely attributable to management miscues by Ernesto Aguila and the neglect and indifference of plaintiff. For example, immediately upon the company's inception, Mr. Aguila leased an expensive Chrysler 300 at nearly $700 per month and charged it to the company. In addition, Mr. Aguila fired key employees and replaced them with family members including his wife Sonia Aguila at a salary of over $40,000 annually. Lastly, Mr. Aguila was in charge of all coffee purchases and sales---[nearly 50% of which were purchased from suppliers other than Coffee Holding.] Attached as Exhibit A are many emails between Mr. Aguila and Coffee Holding by which Mr. Aguila is ordering coffee. All of Mr. Aguila's emails are signed "Chief Executive Officer Café La Rica" so the assertion that I was in "full control" of Café La Rica is nonsense. These emails, going back over a seven(7) month period prove that Mr. Aguila was repeatedly demanding coffee from Coffee Holding. For example, on December 22, 2006, Mr. Aguila wrote: "I need this coffee (120 bags) here by Tuesday no later than Wednesday next week." On December 13, 2006 Mr. Aguila wrote: "I will need additional 50 bags of Colombians:" On December 12, 2006, Mr. Aguila wrote: "The total coffee that I need is as follows" and he listed some 96,000 pounds of coffee. On December 7, 2006 Mr. Aguila wrote: "Just get me what he has I need it bad." On September 22, 2006 Mr. Aguila wrote: "we are in need of brazils, Colombians, and Viets. We always close out the month with large production. This week alone we are going to need around 20,000 lbs of green coffee." On August 22, 2006 Mr. Aguila wrote: "I only need a couple of pounds this week." On July 7, 2006 Mr. Aguila detailed Café La Rica's coffee needs in another email to Coffee Holding. Mr. Aquila's own emails contradict the allegations that "Coffee Holding unilaterally permitted balances to build up" "and never consulted with anyone at Cafe La Rica with respect to , its purchases of coffee from itself on behalf of Cafe La Rica." Likewise attached as Exhibit B are

- 3 -

the financial reports for November and December 2006 that were provided to Mr. Aguila. These show losses in both months and accumulated losses for 2006 of over $430,000. These financials, as well as the substantial debt to Coffee Holdings and lack of capital at Café La Rica show that the company is not a "successful business" as claimed by Mr. Aguila.

6.     Mr. Aguila unilaterally changed the passcodes on the bank account of Café La Rica effectively excluding me from Café La Rica's account and putting them under his sole control. Mr. Aguila also withdrew at least $20,000 from that account after receiving the notice of dissolution. I have also been unable to access the security cameras monitoring Café La Rica's premises since the dissolution notice was sent. As these acts were inconsistent with dissolution, as well as good faith and a change of prior practice, I notified Washington Mutual to preserve assets of Café La Rica so they would not be dissipated. I was contacted by 2 suppliers of Café La Rica. I made no attempts to contact any suppliers and have had no contacts with Café La Rica's customers, employees, landlord or potential investors in Café La Rica. For example, Coex Coffee intermittently contacts me about Mr. Aguila of their receivable from Café La Rica. We did not discuss any potential investment in Café La Rica.

7.     Mr. Aguila's actions pose a significant irreparable economic threat to Coffee Holding and the other creditors of Café La Rica. Café La Rica has no working capital and is not operating cash-flow positive. Dissolution and winding up Café La Rica will minimize the risk to all creditors that Mr. Aguila will continue to waste the assets of Café La Rica. It is unfortunate that the venture has not made money and Coffee Holding cannot continue to subsidize the losses forever.

Dated: February 16, 2007

- 4 -

FEB-16-2007 13:53 FROM:CUTTER HULUING CO. 1718/584(3) 18:551(593 P.6'7

ANDREW GORDON

Sworn to before me on this
16th day of February, 2007

_____
       NOTARY PUBLIC

02-16-2007 12:55 From:COFFEE HOLDING CO.   17187684731   To:5165365589   P.6/6

Sworn to before me on this
16th day of February, 2007

NOTARY PUBLIC

GERARD DeCAPUA
Notary Public, State of New York
No. 02DE4860607
Qualified in Kings County
Commission Expires May 5, 2010

- 5 -

EXHIBIT A

**Sam Elway**

| | |
|---|---|
| **From:** | Ernesto Aguila [eaguila@cafelarica.com] |
| **Sent:** | Friday, December 22, 2006 2:30 PM |
| **To:** | David Gordon |
| **Cc:** | Sam Elway; Andy Gordon |
| **Subject:** | coffee |

David,

Happy holidays.

I need the balance of the Viets that I requited in the beginning of the month. I have a PO from Navarro that I am short 120 bags of Viets to complete this order.

My commitment to Andy this month was 150k, and with this last order we should come in around 160k, but I need this coffee here by Tuesday no later than Wednesday next week.

Horacio does not have any Viets until January 2007, so I need you to make this happen ASAP and I thank you.

Please advice,

Ernesto G. Aguila
Chief Executive Officer

*Cafe La Rica, LLC*
2131 NW 72nd Avenue
Miami, Florida 33122
Ph.: (305) 591-0040
Fax: (305) 591-0760


--
No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.5.432 / Virus Database: 268.15.26/597 - Release Date: 12/21/2006 6:45 PM

**Sam Elway**

| | |
|---|---|
| **From:** | Ernesto Aguila [eaguila@cafelarica.com] |
| **Sent:** | Wednesday, December 13, 2006 12:45 PM |
| **To:** | Sam Elway |
| **Subject:** | viets |

Sam,

Please inform Andy that by tomorrow we will be out of Viets. Sam this is a short month, and we need to have all of our needs here early to produce and deliver the goods.

Horaico is already Three days late on the 50 bags of Colombians that I ordered. I just informed him that I will need additional 50 bags of Colombians.

Thank you,

Ernesto G. Aguila
Chief Executive Officer

*Cafe La Rica, LLC*
2131 NW 72nd Avenue
Miami, Florida 33122
Ph.: (305) 591-0040
Fax: (305) 591-0760

No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.5.432 / Virus Database: 268.15.18/585 - Release Date: 12/13/2006 11:49 AM

## Sam Elway

From:    Ernesto Aguila [eaguila@cafelarica.com]
Sent:    Tuesday, December 12, 2006 11:06 AM
To:      Sam Elway
Subject: RE: viets

Yes,

Ernesto G. Aguila
Chief Executive Officer

## Cafe La Rica, LLC

2131 NW 72nd Avenue
Miami, Florida 33122
Ph.: (305) 591-0040
Fax: (305) 591-0760

---

From: Sam Elway [mailto:selway@coffeeholding.com]
Sent: Tuesday, December 12, 2006 11:02 AM
To: Ernesto Aguila
Subject: RE: viets

Over and above the 220 that David arranged ??

---

From: Ernesto Aguila [mailto:eaguila@cafelarica.com]
Sent: Tuesday, December 12, 2006 10:59 AM
To: Sam Elway
Subject: viets

Sam,

Good morning I need 225 bags of Viets for Monday; I have an order for this amount of coffee.

Please advice,

Thanks,

Ernesto G. Aguila
Chief Executive Officer

**Sam Elway**

**From:** Ernesto Aguila [eaguila@cafelarica.com]
**Sent:** Tuesday, December 12, 2006 2:24 PM
**To:** Sam Elway
**Subject:** RE: viets

Sam,

I will hit my target number of $150,000

The total coffee request that I need is as follows for the month:

| Viets: | 67,000 lbs | @ | .75= | $50,250 |
|---|---|---|---|---|
| Brazil: | 14,500 lbs | @ | $1.15 | $16,675 |
| Colombians: | 14,500 lbs. | @ | $1.02 | $14,790 |

This is the same amount that I requested on 11-29-06; the only thing that I have change is the mix to lower our cost per pound. This mix cost is $6,505 less than what I requested on 11-29-06.

Please advice,
Thanks,

Ernesto G. Aguila
Chief Executive Officer

*Cafe La Rica, LLC*
2131 NW 72nd Avenue
Miami, Florida 33122
Ph.: (305) 591-0040
Fax: (305) 591-0760

**From:** Sam Elway [mailto:selway@coffeeholding.com]
**Sent:** Tuesday, December 12, 2006 1:46 PM
**To:** Ernesto Aguila
**Subject:** RE: viets

Ernesto

I have forwarded your request for the viets to Andy and before moving forward he would like to know if with this coffee you will able to have sales come to $150,000 in December?

**From:** Ernesto Aguila [mailto:eaguila@cafelarica.com]
**Sent:** Tuesday, December 12, 2006 11:06 AM
**To:** Sam Elway
**Subject:** RE: viets

Yes,

Ernesto G. Aguila
Chief Executive Officer

## *Cafe La Rica, LLC*

2131 NW 72nd Avenue
Miami, Florida 33122
Ph.: (305) 591-0040
Fax: (305) 591-0760

**From:** Sam Elway [mailto:selway@coffeeholding.com]
**Sent:** Tuesday, December 12, 2006 11:02 AM
**To:** Ernesto Aguila
**Subject:** RE: viets

Over and above the 220 that David arranged ??

**From:** Ernesto Aguila [mailto:eaguila@cafelarica.com]
**Sent:** Tuesday, December 12, 2006 10:59 AM
**To:** Sam Elway
**Subject:** viets

Sam,

Good morning I need 225 bags of Viets for Monday; I have an order for this amount of coffee.

Please advice,

Thanks,

Ernesto G. Aguila
Chief Executive Officer

## *Cafe La Rica, LLC*

2131 NW 72nd Avenue

**Sam Elway**

| | |
|---|---|
| **From:** | Ernesto Aguila [eaguila@cafelarica.com] |
| **Sent:** | Thursday, December 07, 2006 11:44 AM |
| **To:** | Sam Elway |
| **Subject:** | RE: coffees |

Yes,

Just get me what he has I need it bad.

Ernesto G. Aguila
Chief Executive Officer

## *Cafe La Rica, LLC*

2131 NW 72nd Avenue
Miami, Florida 33122
Ph.: (305) 591-0040
Fax: (305) 591-0760

**From:** Sam Elway [mailto:selway@coffeeholding.com]
**Sent:** Thursday, December 07, 2006 11:30 AM
**To:** Ernesto Aguila
**Subject:** FW: coffees

FYI

**From:** David Gordon
**Sent:** Thursday, December 07, 2006 11:25 AM
**To:** Sam Elway
**Subject:** FW: coffees

Let him know there are only 200 bags - let me know and I will do the release.

I cannot find any of the naturals (50 bags) he is looking for.

*This e-mail and any attachments may contain proprietary, confidential or privileged information. If you are not the intended recipient of this e-mail, you must not review, disclose, copy, retransmit or use it. If you have received this e-mail in error, please immediately notify us by return e-mail, delete this e-mail and destroy all copies of it and any attachments. Please be aware that messages sent over the internet may not be secure and Coffee Holding Co., Inc. does not accept any legal responsibility for any errors or omissions in the contents of this message (including any attachments) or for any harm whatsoever that may be caused by viruses being passed. Unless otherwise specifically stated, this e-mail and any attachments shall not form a contract legally binding on Coffee Holding Co., Inc*

--

## Sam Elway

| | |
|---|---|
| **From:** | Ernesto Aguila [eaguila@cafelarica.com] |
| **Sent:** | Tuesday, December 05, 2006 3:28 PM |
| **To:** | Sam Elway |
| **Subject:** | Inventory |

Andy,

First, I wanted to thank you, we will work hard to make it happen.

Sam, here are the needs for the next Two weeks.

| | |
|---|---|
| Victs: | 30,000 lbs |
| Brazils: | 12,000 lbs |
| Colombians: | 7,500 lbs |
| Decaf: | 1,000 lbs |

Sam, call me when you get done with your meeting to review.

Thank you,

Ernesto G. Aguila
Chief Executive Officer

## *Cafe La Rica, LLC*

2131 NW 72nd Avenue
Miami, Florida 33122
Ph.: (305) 591-0040
Fax: (305) 591-0760

--
No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.5.432 / Virus Database: 268.15.9/571 - Release Date: 12/5/2006 11:50 AM

CLR COFFEE NEEDS.xls

### Sam Elway

**From:**     Ernesto Aguila [eaguila@cafelarica.com]
**Sent:**     Friday, December 01, 2006 12:11 PM
**To:**       Sam Elway
**Cc:**        saguila@cafelarica.com; eaguila@cafelarica.com
**Subject:** CLR COFFEE NEEDS.xls

<<...>>

--
No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.5.430 / Virus Database: 268.15.3/562 - Release Date: 12/1/2006 1:12 PM

## CAFÉ LA RICA COFFEE NEEDS:

| CUSTOMERS | ROASTED LBS. | GREEN COFFEE | SELLING PRICE |
|---|---|---|---|
| Diplomat Coffee | 33,000 | 38,823 | $ 1.30 |
| Gourmet Cup | 15,000 | 17,647 | $ 1.80 |
| Farm Stores | 2,200 | 2,750 | $ 2.27 |
| Park Avenue | 4,000 | 4,705 | $ 2.20 |
| International | 1,500 | 1,765 | $ 2.25 |
| A.P.A | 2,000 | 2,352 | $ 1.70 |
| BC Coffee | 1,200 | 1,411 | $ 2.10 |
| C.B.I | 3,000 | 3,529 | $ 3.00 |
| HQM | 5,000 | 5,882 | $ 2.90 |
| Silva Coffee | 2,000 | 2,353 | $ 2.20 |
| Wal-Mart | 8,100 | 10,125 | $ 2.08 |
| C & B International | 4,050 | 5,620 | $ 1.60 |
| Jetro Cash & Carry | 1,000 | 1,176 | $ 2.20 |
| | 82,050 | 98,138 | |

| GREEN COFFEE | POUNDS | RATE | DOLLAR AMOUNT |
|---|---|---|---|
| VIETNAMS 60% | 58,882 | $ 0.80 | $ 47,105.60 |
| BRAZIL 25% | 24,100 | $ 1.10 | $ 26,510.00 |
| COLOMBIAN 15% | 14,460 | $ 1.01 | $ 14,604.60 |

TOTAL DOLLARS    $    88,220.20

**Sam Elway**

**From:**     Ernesto Aguila [eaguila@cafelarica.com]

**Sent:**     Friday, November 03, 2006 1:35 PM

**To:**        Sam Elway

**Subject:** viets

Sam,

Silva one of my customers came in looking for espresso W/B he needed 30 cases and I only have 6 cases.
He order 300 cases that's 3000 lbs for this week. I am 2000 lbs short for Monday delivery for my biggest customer
in Orlando.

Ernesto G. Aguila
Chief Executive Officer

*Cafe' La Rica, LLC*
2131 N.W 72nd Avenue
Miami, Florida 33122
Ph.: (305) 591-0040
Fax: (305) 591-0760

## Sam Elway

**From:**     Ernesto Aguila [eaguila@cafelarica.com]
**Sent:**     Saturday, October 28, 2006 2:40 PM
**To:**       Sam Elway
**Cc:**       Andy Gordon
**Subject:** coffee

Sam,

I just got off the phone with Horacio, and he tells me that he does not have any Viets at this time.
We need for next week Viets for our production. We will need 250 to 300 bags for the month of November.

Please advice,
Have a great weekend.

Ernesto G. Aguila
Chief Executive Officer

## Cafe' La Rica, LLC
2131 N.W 72nd Avenue
Miami, Florida 33122
Ph.: (305) 591-0040
Fax: (305) 591-0760

## Sam Elway

**From:** Ernesto Aguila [eaguila@cafelarica.com]
**Sent:** Friday, September 22, 2006 5:41 AM
**To:** David Gordon
**Cc:** Sam Elway
**Subject:** coffee needs

David good morning,

Going over our coffee needs for next week, we are in need of brazils, Colombians, and Viets. We always close out the month with large production. This week alone we are going to need around 20,000 lbs of green coffee. Sam, when you get in this morning lets discuss the cash flow for green coffee. I will advice on checks coming to NY on Monday.

Thanks,

Ernesto G. Aguila
Chief Executive Officer

### Cafe' La Rica, LLC

2131 N.W 72nd Avenue
Miami, Florida 33122
Ph.: (305) 591-0040
Fax: (305) 591-0760

## Sam Elway

**From:**    Ernesto Aguila [eaguila@cafelarica.com]
**Sent:**    Tuesday, August 22, 2006 12:13 PM
**To:**    David Gordon
**Cc:**    Sam Elway
**Subject:** coffee needs

David good morning,

I only need a couple of pounds this week. I have 5 super sacks of Viets that are WAY to light, and the order that came in for Diplomat 66% Colombian and 33% brazil again was very light and could not use it this week. There is not much that I could do with that coffee until we start roasting here and I could blend it will a darker coffee.

I need 4000 lbs for Viets darker for Diplomat.

I need 2000 lbs 66%colombain / 33% Brazil darker for Diplomat.

I need 1000 lbs Silva espresso 50% brazil / 50% viets

This should cover me until we get going here.

PS: I am running low with La Rica film and I have a big PO to fill early next month. 20 super sacks on their way to NY.

Please advice,

Ernesto G. Aguila
Chief Executive Officer

## Cafe' La Rica, LLC
2131 N.W 72nd Avenue
Miami, Florida 33122
Ph.: (305) 591-0040
Fax: (305) 591-0760

## Sam Elway

| | |
|---|---|
| **From:** | Ernesto Aguila [eaguila@cafelarica.com] |
| **Sent:** | Friday, July 07, 2006 11:24 AM |
| **To:** | David Gordon |
| **Cc:** | Sam Elway |
| **Subject:** | FW: larica_monday_coffee_needed.xls |
| **Importance:** High | |

Ernesto G. Aguila
Chief Executive Officer

## Cafe' La Rica

2131 NW 72nd Avenue
Miami, Florida 33122
Ph.: (305) 591-0040
Fax: (305) 591-0760
Cell: (786) 253-2297

**From:** Ernesto Aguila [mailto:eaguila@cafelarica.com]
**Sent:** Thursday, June 29, 2006 12:56 PM
**To:** 'David Gordon'
**Cc:** 'Sam Elway'; 'cafelaricallc@cafelarica.com'
**Subject:** FW: larica_monday_coffee_needed.xls
**Importance:** High

David, I will send over new sets of samples for all of these products.

Ernesto G. Aguila
Chief Executive Officer

## Cafe' La Rica

2131 NW 72nd Avenue
Miami, Florida 33122
Ph.: (305) 591-0040
Fax: (305) 591-0760
Cell: (786) 253-2297

**From:** Ernesto Aguila [mailto:eaguila@cafelarica.com]
**Sent:** Wednesday, June 28, 2006 12:00 PM
**To:** 'eaguila@cafelarica.com'
**Subject:** FW: larica_monday_coffee_needed.xls
**Importance:** High

| | | | | |
|---|---|---|---|---|
| Coffee Needed by Monday 7/10/2006 in Florida | | | | |
| Diplomat coffee | 66% colombain / 33% brazil | 4800 | super sacks WB | same as last weeks |
| Diplomat coffee | 100% viets | 14,400 | super sacks WB | same as last weeks |
| Silva | 50% viets / 50% brazil | 1000 | super sacks WB | same as last weeks |
| Gourmet cup | 66% viets / 33% brazil | 3000 | super sacks WB | samples on their way |
| Other accts. | Decaf 1/3 blend | 1000 | super sacks WB | samples on their way |

| | | | | |
|---|---|---|---|---|
| Coffee needed by Monday 7/17/2006 in Florida | | | | |
| customer | Blend | # of Pounds | Packing | Color |
| Gourmet cup | 100% Colombain | 2000 | Super Sacks W/B | 2 shades lighter than Diplomat's |

| | | | | |
|---|---|---|---|---|
| Coffee needed by Monday 7/24/2006 in Florida | | | | |
| Diplomat coffee | 66% colombain / 33% brazil | 4800 | super sacks W/B | same color as always |
| Diplomat coffee | 100% Viets | 14,400 | super sacks W/B | same color as always |

# EXHIBIT B

Date:    02/15/07

Time:    10:05

# Profit and Loss Statement from Date  11/01/06 To  11/30/06
## Transaction Cross-Section by         Posting Date

| Account Name | Balance | Current Year |
|---|---|---|
| Revenues | | |
| Revenue - Revenue | | |
| Sales - Sales | | |
| 41010-00-00 - Sales - General | $ 93,077.61 | $ 1,008,818.28 |
| 41015-00-00 - Returns & Allowances | ($ 1,010.96) | ($ 10,648.80) |
| 41025-00-00 - Sales Discounts | ($ 510.33) | ($ 3,371.19) |
| Total Sales - Sales | $ 91,556.32 | $ 994,798.29 |
| | - - - - - - - - - - - - - | - - - - - - - - - - - - - |
| Total Revenue - Revenue | $ 91,556.32 | $ 994,798.29 |
| | - - - - - - - - - - - - - | - - - - - - - - - - - - - |
| Total Revenues | $ 91,556.32 | $ 994,798.29 |
| Cost of sales | | |
| Cost of Sales - Cost of Sales | | |
| COGS - COGS | | |
| 51010-00-00 - COGS - GREEN COFFEE | ($ 32,717.74) | ($ 656,854.87) |
| 51010-00-30 - Cost of Goods (Gen, FS) | ($ 9,161.04) | ($ 91,716.24) |

Printed by SAP Business One

Continue

Date:    02/15/07
Time:    10:05

## Profit and Loss Statement from Date    11/01/06 To    11/30/06

| Account Name | Balance | Current Year |
|---|---|---|
| 51016-03-00 - Freight Out (FL, Gen ) | ($ 2,035.75) | ($ 23,066.87) |
| 51020-03-00 - Freight In (FL, Gen ) | ($ 834.24) | ($ 37,519.02) |
| 51017-03-00 - Warehouse (FL, Gen ) | ($ 184.80) | ($ 3,979.16) |
| 51201-03-00 - FLGS - Packaging (FL, Gen) | ($ 2,051.28) | ($ 23,930.18) |
| 51202-03-00 - FLGS - Film (FL,Gen) | | ($ 50,612.88) |
| 51204-03-00 - FLGS - Equipment  (FL, Gen) | $ 500.18 | ($ 4,594.29) |
| 51205-03-00 - Packaging Development (FL, Gen) | ($ 850.02) | ($ 8,170.02) |
| 51300-00-00 - Inventory Change (Gen, Gen) | ($ 12,779.05) | $ 94,666.49 |
| 51209-00-00 - Commissions (Gen, Gen) | ($ 197.20) | ($ 390.44) |
| | | |
| Total COGS - COGS | ($ 60,310.94) | ($ 806,167.48) |
| | | |
| Total Cost of Sales - Cost of Sales | ($ 60,310.94) | ($ 806,167.48) |
| | | |
| Total Cost of sales | ($ 60,310.94) | ($ 806,167.48) |
| | | |
| Gross Profit | $ 31,245.38 | $ 188,630.81 |
| Expenses | | |
| | | |
| Operating Exp - Operating Expenses | | |
| | | |
| General Exp - General Expenses | | |
| | | |
| 71081-00-00 - Admin Fee to Coffee Holding | ($ 4,653.88) | ($ 49,056.99) |
| 71150-00-00 - Rent | | ($ 3,926.22) |
| 71165-00-00 - Salaries Officers | ($ 11,538.45) | ($ 86,769.14) |

Continue

Date:    02/15/07

Time:    10:05

## Profit and Loss Statement from Date   11/01/06 To   11/30/06

| Account Name | Balance | Current Year |
|---|---|---|
| 71167-03-00 - Salaries Ofice - Florida | ($ 4,326.85) | ($ 39,856.47) |
| 71169-03-00 - Salaries Factory - Florida | ($ 9,539.71) | ($ 93,936.70) |
| 71172-00-00 - Payroll Taxes | ($ 1,849.79) | ($ 18,256.83) |
| 71010-03-00 - Advertising & Promotion (FL, Gen ) | $ 622.40 | ($ 3,083.00) |
| 71020-03-00 - Bank Charges (FL, Gen) | ($ 45.60) | ($ 674.54) |
| 71030-03-00 - Depreclation (FL, Gen ) | ($ 6,295.36) | ($ 29,738.71) |
| 71042-03-00 - Fines & Penalties (FL, Gen ) | | ($ 840.91) |
| 71043-03-00 - Professional Services (LEGAL) (FL, Gen ) | | ($ 24,998.00) |
| 71045-03-00 - Security Service/Expense (FL, Gen ) | | ($ 1,076.36) |
| 71046-03-00 - Accounting and Audit (FL, Gen ) | | ($ 2,610.00) |
| 71050-03-00 - Equipment Rentals (FL, Gen ) | ($ 144.45) | ($ 144.45) |
| 71055-03-00 - Factory Supplies (FL, Gen ) | ($ 1,143.37) | ($ 20,846.86) |
| 71056-03-00 - Gas (FL, Gen ) | ($ 505.88) | ($ 5,859.41) |
| 71062-03-00 - Auto Expense (FL, Gen ) | ($ 679.50) | ($ 5,330.39) |
| 55-03-00 - Insurance  -  Office (FL, Gen ) | $ 220.57 | ($ 39,651.30) |
| 71080-03-00 - Licenses and Fees (FL, Gen ) | ($ 82.50) | ($ 4,343.73) |
| 71110-03-00 - Office Supplies (FL, Gen ) | $ 381.43 | ($ 6,710.68) |
| 71100-03-00 - Miscellaneous – Sundry (FL, Gen) | | ($ 678.75) |
| 71111-03-00 - Office Expense (FL, Gen ) | ($ 595.00) | ($ 4,519.67) |
| 71120-03-00 - Postage - UPS - Fedex - DHL (FL, Gen ) | | ($ 3,273.82) |
| 71130-03-00 - Warehouse Supplies (FL, Gen ) | ($ 1,597.35) | ($ 2,278.53) |
| 71150-03-00 - Rent (FL, Gen ) | ($ 9,063.46) | ($ 59,518.00) |
| 71160-03-00 - Repairs and Maintenance (FL, Gen ) | | ($ 10,429.64) |
| 71180-03-00 - Contract Labor (FL, Gen ) | | ($ 275.00) |
| 71181-03-00 - Payroll Service (FL, Gen ) | ($ 97.30) | ($ 702.50) |
| 71190-03-00 - Telephone (FL, Gen ) | ($ 714.25) | ($ 6,962.83) |
| 71191-03-00 - Utilities - Gas & Electric (FL, Gen ) | | ($ 7,554.29) |
| 71193-03-00 - Cleaning/Sanitation (FL, Gen ) | ($ 506.41) | ($ 4,359.37) |
| 71220-03-00 - Entertainment (FL, Gen ) | | ($ 1,543.19) |

Continue

Date:   02/15/07
Time:   10:05

## Profit and Loss Statement from Date   11/01/06 To   11/30/06

| Account Name | Balance | Current Year |
|---|---|---|
| 71225-03-00 - Travel Expenses (FL, Gen ) | ($ 48.00) | ($ 48.00) |
| 71226-03-00 - Travel - Airlines (FL, Gen ) | | ($ 148.59) |
| 71227-03-00 - Travel - Hotel (FL, Gen ) | $ 5,157.21 | $ 1,884.84 |
| 71228-03-00 - Travel - Food (FL, Gen ) | ($ 65.13) | ($ 7,813.05) |
| 71229-03-00 - Travel - Car Rental/Taxi (FL, Gen ) | | ($ 63.58) |
| 71230-03-00 - Show & Demo (FL, Gen) | | ($ 1,992.97) |
| 99999-00-00 - Miscellaneous | | ($ 76.47) |
| | | |
| Total General Exp - General Expenses | ($ 47,110.63) | ($ 548,064.10) |
| | - - - - - - - - - - - - | - - - - - - - - - - - - - |
| | | |
| | | |
| Total Operating Exp - Operating Expenses | ($ 47,110.63) | ($ 548,064.10) |
| | - - - - - - - - - - - - | - - - - - - - - - - - - - |
| | | |
| 72702-03-00 - Corporation Relocation (FL, Gen) | | ($ 11,451.87) |
| | | |
| Total Expenses | ($ 47,110.63) | ($ 559,515.97) |
| | | |
| | | |
| Operating Profit | ($ 15,865.25) | ($ 370,885.16) |
| Financing | | |
| | | |
| Prov for Taxes - Provision for Taxes | | |
| | | |
| Tax Expenses - Tax Expenses | | |
| | | |
| 91180-00-00 - Interest Income | $ 47.52 | $ 1,244.56 |
| 91110-03-00 - State Income Tax (FL, Gen) | ($ 1,255.00) | ($ 1,255.00) |

Continue

Date:    02/15/07

Time:    10:05

## Profit and Loss Statement from Date   11/01/06 To   11/30/06

| Account Name | Balance | Current Year |
|---|---|---|
| Total Tax Expenses - Tax Expenses | ($ 1,207.48) | ($ 10.44) |
| Total Prov for Taxes - Provision for Taxes | ($ 1,207.48) | ($ 10.44) |
| Total Financing | ($ 1,207.48) | ($ 10.44) |
| Profit After Financing Expenses | ($ 17,072.73) | ($ 370,895.60) |
| Other revenues and expenses | | |
| Total Other revenues and expenses | | |
| Profit Period | ($ 17,072.73) | ($ 370,895.60) |

Printed by SAP Business One

Date:    02/15/07
Time:    10:05

# Profit and Loss Statement from Date    12/01/06 To    12/31/06
## Transaction Cross-Section by
**Posting Date**

| Account Name | Balance | Current Year |
|---|---|---|
| Revenues | | |
| Revenue - Revenue | | |
| Sales - Sales | | |
| 41010-00-00 - Sales - General | $ 153,577.52 | $ 1,162,395.80 |
| 41015-00-00 - Returns & Allowances | ($ 917.11) | ($ 11,565.91) |
| 41025-00-00 - Sales Discounts | ($ 449.25) | ($ 3,820.44) |
| 41027-00-00 - Sales Accrual (Gen, Gen) | $ 9,478.44 | $ 9,478.44 |
| Total Sales - Sales | $ 161,689.60 | $ 1,156,487.89 |
| Total Revenue - Revenue | $ 161,689.60 | $ 1,156,487.89 |
| Total Revenues | $ 161,689.60 | $ 1,156,487.89 |
| Cost of sales | | |
| Cost of Sales - Cost of Sales | | |
| COGS - COGS | | |
| 51010-00-00 - COGS - GREEN COFFEE | ($ 151,930.93) | ($ 808,785.80) |

Continue

Date:   02/15/07

Time:   10:05

## Profit and Loss Statement from Date  12/01/06 To  12/31/06

| Account Name | Balance | Current Year |
|---|---|---|
| 51010-00-30 - Cost of Goods (Gen, FS) | ($ 855.21) | ($ 92,571.45) |
| 51020-00-00 - F R E I G H T  I N | ($ 127.00) | ($ 127.00) |
| 51204-00-00 - COGS - E Q U I P M E N T for RESALE | ($ 2,373.79) | ($ 2,373.79) |
| 51016-03-00 - Freight Out (FL, Gen ) | ($ 2,879.61) | ($ 25,946.48) |
| 51020-03-00 - Freight In (FL, Gen ) | ($ 3,354.19) | ($ 40,873.21) |
| 51017-03-00 - Warehouse (FL, Gen ) | ($ 1,396.44) | ($ 5,375.60) |
| 51201-03-00 - FLGS - Packaging (FL, Gen) | ($ 2,284.02) | ($ 26,214.20) |
| 51202-03-00 - FLGS - Film (FL,Gen) | ($ 4,388.21) | ($ 55,001.09) |
| 51204-03-00 - FLGS - Equipment  (FL, Gen) | | ($ 4,594.29) |
| 51205-03-00 - Packaging Development (FL, Gen) | ($ 850.00) | ($ 9,020.02) |
| 51300-00-00 - Inventory Change (Gen, Gen) | $ 14,022.00 | $ 108,688.49 |
| 51209-00-00 - Commissions (Gen, Gen) | ($ 150.85) | ($ 541.29) |
| | | |
| Total COGS - COGS | ($ 156,568.25) | ($ 962,735.73) |
| | - - - - - - - - - - - - | - - - - - - - - - - - - |
| Total Cost of Sales - Cost of Sales | ($ 156,568.25) | ($ 962,735.73) |
| | - - - - - - - - - - | - - - - - - - - - - - |
| Total Cost of sales | ($ 156,568.25) | ($ 962,735.73) |
| | | |
| Gross Profit | $ 5,121.35 | $ 193,752.16 |
| Expenses | | |
| Operating Exp - Operating Expenses | | |
| General Exp - General Expenses | | |

Continue

Date:    02/15/07
Time:    10:05

## Profit and Loss Statement from Date   12/01/06 To   12/31/06

| Account Name | Balance | Current Year |
|---|---|---|
| 71081-00-00 - Admin Fee to Coffee Holding | ($ 7,610.56) | ($ 56,667.55) |
| 71150-00-00 - Rent | | ($ 3,926.22) |
| 71165-00-00 - Salaries Officers | ($ 8,653.53) | ($ 95,422.67) |
| 71167-03-00 - Salaries Ofice - Florida | ($ 3,461.48) | ($ 43,317.95) |
| 71169-03-00 - Salaries Factory - Florida | ($ 7,936.25) | ($ 101,872.95) |
| 71172-00-00 - Payroll Taxes | ($ 1,458.97) | ($ 19,715.80) |
| 71010-03-00 - Advertising & Promotion (FL, Gen ) | | ($ 3,083.00) |
| 71020-03-00 - Bank Charges (FL, Gen) | ($ 32.00) | ($ 706.54) |
| 71030-03-00 - Depreciation (FL, Gen ) | ($ 6,290.35) | ($ 36,029.06) |
| 71033-03-00 - Depr - Office  Equipment (FL, Gen ) | ($ 391.04) | ($ 391.04) |
| 71042-03-00 - Fines & Penalties (FL, Gen ) | | ($ 840.91) |
| 71043-03-00 - Professional Services (LEGAL) (FL, Gen ) | ($ 1,800.00) | ($ 26,798.00) |
| 71045-03-00 - Security Service/Expense (FL, Gen ) | ($ 150.84) | ($ 1,227.20) |
| 71046-03-00 - Accounting and Audit (FL, Gen ) | | ($ 2,610.00) |
| ;    .0-03-00 - Equipment Rentals (FL, Gen ) | | ($ 144.45) |
| 71055-03-00 - Factory Supplies (FL, Gen ) | ($ 2,866.26) | ($ 23,713.12) |
| 71056-03-00 - Gas (FL, Gen ) | ($ 700.16) | ($ 6,559.57) |
| 71062-03-00 - Auto Expense (FL, Gen ) | ($ 1,219.74) | ($ 6,550.13) |
| 71065-03-00 - Insurance  -  Office (FL, Gen ) | ($ 3,018.50) | ($ 42,669.80) |
| 71080-03-00 - Licenses and Fees (FL, Gen ) | ($ 40.00) | ($ 4,383.73) |
| 71110-03-00 - Office Supplies (FL, Gen ) | ($ 682.17) | ($ 7,392.85) |
| 71100-03-00 - Miscellaneous - Sundry (FL, Gen) | | ($ 678.75) |
| 71111-03-00 - Office Expense (FL, Gen ) | ($ 217.56) | ($ 4,737.23) |
| 71120-03-00 - Postage - UPS - Fedex - DHL (FL, Gen ) | | ($ 3,273.82) |
| 71130-03-00 - Warehouse Supplies (FL, Gen ) | ($ 82.12) | ($ 2,360.65) |
| 71150-03-00 - Rent (FL, Gen ) | ($ 9,063.37) | ($ 68,581.37) |
| 71160-03-00 - Repairs and Maintenance (FL, Gen ) | ($ 240.00) | ($ 10,669.64) |
| 71180-03-00 - Contract Labor (FL, Gen ) | | ($ 275.00) |
| 71181-03-00 - Payroll Service (FL, Gen ) | ($ 87.40) | ($ 789.90) |

Continue

Date:     02/15/07

Time:     10:05

## Profit and Loss Statement from Date     12/01/06 To     12/31/06

| Account Name | Balance | Current Year |
|---|---|---|
| 71190-03-00 - Telephone (FL, Gen ) | ($ 848.85) | ($ 7,811.68) |
| 71191-03-00 - Utilities - Gas & Electric (FL, Gen ) | ($ 4,115.19) | ($ 11,669.48) |
| 71193-03-00 - Cleaning/Sanitation (FL, Gen ) | ($ 980.33) | ($ 5,339.70) |
| 71220-03-00 - Entertainment (FL, Gen ) | ($ 527.13) | ($ 2,070.32) |
| 71225-03-00 - Travel Expenses (FL, Gen ) | ($ 268.20) | ($ 316.20) |
| 71226-03-00 - Travel - Airlines (FL, Gen ) | ($ 368.60) | ($ 517.19) |
| 71227-03-00 - Travel - Hotel (FL, Gen ) | ($ 1,384.85) | $ 499.99 |
| 71228-03-00 - Travel - Food (FL, Gen ) | ($ 248.58) | ($ 8,061.63) |
| 71229-03-00 - Travel - Car Rental/Taxi (FL, Gen ) | | ($ 63.58) |
| 71230-03-00 - Show & Demo (FL, Gen) | | ($ 1,992.97) |
| 99999-00-00 - Miscellaneous | | ($ 76.47) |
| Total General Exp - General Expenses | ($ 64,744.03) | ($ 612,808.13) |
| Total Operating Exp - Operating Expenses | ($ 64,744.03) | ($ 612,808.13) |
| 72702-03-00 - Corporation Relocation (FL, Gen) | | ($ 11,451.87) |
| Total Expenses | ($ 64,744.03) | ($ 624,260.00) |
| Operating Profit | ($ 59,622.68) | ($ 430,507.84) |
| Financing | | |
| Prov for Taxes - Provision for Taxes | | |

Continue

Date:   02/15/07
Time:   10:05

## Profit and Loss Statement from Date   12/01/06 To   12/31/06

| Account Name | Balance | Current Year |
|---|---|---|
| Tax Expenses - Tax Expenses | | |
| 91180-00-00 - Interest Income | $ 138.60 | $ 1,383.16 |
| 91110-03-00 - State Income Tax (FL, Gen) | | ($ 1,255.00) |
| Total Tax Expenses - Tax Expenses | $ 138.60 | $ 128.16 |
| | - - - - - - - - - - - - | - - - - - - - - - - - - |
| Total Prov for Taxes - Provision for Taxes | $ 138.60 | $ 128.16 |
| | - - - - - - - - - - - - | - - - - - - - - - - - - |
| Total Financing | $ 138.60 | $ 128.16 |
| After Financing Expenses | ($ 59,484.08) | ($ 430,379.68) |
| Other revenues and expenses | | |
| Total Other revenues and expenses | | |
| Profit Period | ($ 59,484.08) | ($ 430,379.68) |

Printed by SAP Business One

Coffee Needed by Monday 7/03/2006 in Florida

| Customer | Blend | # of pounds | packing | color |
|---|---|---|---|---|
| Diplomat coffee | 66% colombain / 33% brazil | 4400 | super sacks WB | little darker than sample |
| Diplomat coffee | 100% viets | 8800 | super sacks WB | little darker than sample |

Coffee Needed by Monday 7/10/2006 in Florida

Coffee needed by Monday 7/17/2006 in Florida

| customer | Blend | # of Pounds | Packing | Color |
|---|---|---|---|---|
| Diplomat coffee | 66% colombain / 33% brazil | 4400 | super sacks WB | little darker than sample |
| Diplomat coffee | 100% viets | 8800 | super sacks WB | little darker than sample |

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case No. 07-20389-CIV-MARTINEZ-BANDSTRA

COFFEE BEAN TRADING-ROASTING, LLC, a
Delaware limited liability company,

                               Plaintiff,            Case No. 07-20389

       vs.

COFFEE HOLDING, INC., a Nevada corporation,

                              Defendant.

AFFIDAVIT OF SALVATORE REDA IN OPPOSITION TO MOTION FOR TRO

STATE OF NEW YORK    )
                         ) ss:
COUNTY OF KINGS     )

       SALVATORE REDA, being duly sworn, deposes and says as follows:

       1.     I am a Certified Public Accountant employed by the firm of Citrin Cooperman. &

Company LLP. One of my professional assignments is to review the financial reports of Coffee

Holding, Inc. and Cafe La Rica LLC. On a number of occasions since May 2006, I spoke to

Ernesto Aguila, Chief Executive Officer of Café La Rica concerning the monthly financial

reports of Café La Rica. Those conversations centered upon achieving breakeven status for Café

La Rica which has lost money—over $430,000--- since it began operations. The only specific

objections to expenses raised by Mr. Aguila in those conversations were about the allocation of

professional fees and depreciation expense. As depreciation is a non-cash expense, I believe

these items were approximately $10,000 which would not have a material impact on the

company's profitability. The last such conversation occurred in January 2007. At no time did

Mr. Aquila question the accounts payable to Coffee Holding for coffee purchased from Coffee Holding or the prices charged for such coffee.


Dated: February 16, 2007

_____
SALVATORE REDA

Sworn to before me on this
16th day of February, 2007


_____
NOTARY PUBLIC

- 2 -

Sworn to before me on this
16th day of February, 2007

_____
NOTARY PUBLIC

GERARD DeCAPUA
Notary Public, State of New York
No. 02DE4860807
Qualified in Kings County
Commission Expires May 5, 20 2010

- 5 -

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number:  07-20389-CIV-MARTINEZ-BANDSTRA**

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

     Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada corporation,

     Defendant.

_____/

**<ins>ORDER SETTING HEARING ON PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER</ins>**

THIS CAUSE came before the Court upon Plaintiff's Motion for Temporary Restraining

Order **(D.E. No. 2)**, filed on <ins>**February 13, 2007**</ins>.  It is

**ADJUDGED** that a hearing shall take place before the undersigned, United States

District Judge Jose E. Martinez, at the United States Courthouse, 301 N. Miami Ave., Miami,

Florida 33128 on <ins>**Friday, February 16, 2007 at 3:00 PM**</ins>.  Counsel shall be prepared to address

Plaintiff's Motion for Temporary Restraining Order (D.E. No. 2).  This hearing shall not exceed

thirty (30) minutes.  The parties shall confer prior to the hearing to determine how to split the

allotted time.  If the parties are unable to agree on how to split the allotted time, the Court will

decide how to split the allotted time.

It shall be Plaintiff's responsibility to **immediately** serve a copy of this Order on

Defendant.  Plaintiff shall then certify to the Court in writing that this order was served on

Defendant.  Such certification shall be filed on the record no later than <ins>**February 15, 2007**</ins>.

Defendant is cautioned that a corporation must be represented by counsel and cannot proceed pro se. *Palazzo v. Gulf Oil Corp.*, 764 F.2d 1381, 1385 (11th Cir. 1985).

DONE AND ORDERED in Chambers at Miami, Florida, this 14 day of February, 2007.


_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE


Copies provided to:
Magistrate Judge Bandstra
All Counsel of Record

-2-

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division
**Case Number:  07-20389-CIV-MARTINEZ-BANDSTRA**

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,
      Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,
      Defendant.

_____/

### ORDER DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND DIRECTING EXPEDITED RESPONSE TO DEFENDANT'S MOTION TO ENFORCE A FORUM SELECTION CLAUSE AND TO TRANSFER VENUE

THIS CAUSE came before the Court upon Plaintiff's Motion for Temporary Restraining Order **(D.E. No. 2)**, filed on **February 13, 2007**.  The Court held a hearing on this motion on February 15, 2007.  After considering the arguments of both parties and their submissions, the Court finds that at this time, Plaintiff has failed to demonstrate a substantial threat of irreparable injury.  Therefore, it is hereby:

**ORDERED and ADJUDGED** that

1.      Plaintiff's Motion for Temporary Restraining Order **(D.E. No. 2**) is **DENIED**.

2.      Plaintiff shall respond to Defendant's Motion to Enforce a Forum Selection Clause and to Transfer Venue (D.E. No. 10) on or before **February 23, 2007**.

DONE AND ORDERED in Chambers at Miami, Florida, February 16, 2007.

_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Bandstra
All Counsel of Record

FILED BY _____ D.C.

2007 FEB 15 PM 3: 54

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA - MIA

FILING
PAID $75.00
In Forma
Pauperis
Clarence Maddox, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 07-20389 CIV-MARTINEZ

COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

    Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada corporation,

    Defendant.

_____/

**MOTION FOR ADMISSION**
***PRO HAC VICE* OF CHRISTOPHER F. GRAHAM**

Pursuant to the Rules of the United States District Court for the Southern District of Florida, John

R. Squitero, a member of the bar of this Court, moves for the admission of Christopher F. Graham to practice

before this Court *pro hac vice* for the purpose of representing Coffee Holding, Inc. ("Coffee Holding"), in

this cause.

1.      Chris Graham is an attorney duly licensed to practice law, having been admitted to practice

in New York in 1983, and is admitted to the United States District Court for the Southern and Eastern

Districts of New York; Eastern District of Michigan and District of Hawaii; the United States Tax Court; the

United States Court of Appeals, Second, Fifth and Eighth Circuits and the United States Supreme Court.

2.      Mr. Graham is a partner with the law firm of Thacher Proffitt & Wood LLP, 50 Main Street,

White Plains, New York 10606.

3.      **Mr. Graham seeks to appear before this Court in this matter including at a hearing**

**scheduled by the Court for Friday, February 16, 2007 at 3:00 p.m.**, regarding the **Plaintiff's Motion for**

**Temporary Restraining Order**.

4.      Mr. Graham has reviewed and studied the Local Rules for the United States District Court

CASE NO.: 07-20389 CIV-MARTINEZ

for the Southern District of Florida, and agrees to abide by them. See Certification of Christopher F. Graham

attached hereto and made a part hereof as Exhibit "A". Mr. Graham would also request that he receive all

Notices of Electronic filing at his firm email address, which is cgraham@tpw.com.

     5.     The undersigned shall be the designated member for this Court, with whom the Court and

counsel may communicate regarding the conduct of this case and upon whom papers shall be served. The

undersigned consents to this designation.

     6.     Due to the interests of time, the undersigned has not had the opportunity to consult with all

counsel of record concerning this Motion.

     WHEREFORE, John R. Squitero respectfully moves this Court to admit Christopher F. Graham to

practice before this Court *pro hac vice* and to appear as counsel for Coffee Holding, Inc. in this matter.

Respectfully submitted,

By: _____

Mark S. Auerbacher, Esq.
Florida Bar No. 978220
msa@katzbarron.com
John R. Squitero, Esq.
Florida Bar No. 121196
jrs@katzbarron.com
KATZ BARRON SQUITERO FAUST
2699 S. Bayshore Drive, 7th Floor
Miami, Florida 33133-5408
Telephone:    (305) 856-2444
Facsimile:    (305) 285-9227

February 14, 2007       **COUNSEL FOR DEFENDANT**

- 2 -

CASE NO.: 07-20389 CIV-MARTINEZ

## **CERTIFICATE OF SERVICE**

     I hereby certify that on February 14, 2007, I filed the foregoing with the Clerk of the Court and served via facsimile and U.S. Mail on Jose Ferrer, Esq., Baker & McKenzie, LLP, 111 Brickell Avenue, Suite 1700, Miami, FL 33131, Jose.Ferrer@bakernet.com.

BY: _____

         Mark S. Auerbacher, Esq.
         Florida Bar No. 978220

H:\LIB\DOCS\11042034\LIT\HN8233.WPD

- 3 -

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 07-20389 CIV-MARTINEZ

COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

       Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada corporation,

       Defendant.

_____/

## CERTIFICATION OF CHRISTOPHER F. GRAHAM FOR ADMISSION *PRO HAC VICE*

     Pursuant to Rule 4(B) of the Special Rules Governing the Admission and Practice of Attorneys in the United States District Court for the Southern District of Florida, I, Christopher F. Graham, a member in good standing of the bar of New York and of the United States District Court for the Southern and Eastern Districts of New York, Eastern District of Michigan, District of Hawaii, as well as the United States Court of Appeals for the Second, Fifth and Eighth Circuits, hereby certify that I have reviewed and studied the Local Rules for the United States District Court for the Southern District of Florida, and that I agree to abide by them.

                                       _____
                                         Christopher F. Graham

**EXHIBIT**
"A"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 07-20389 CIV-MARTINEZ

COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

      Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada corporation,

      Defendant.

_____/

## ORDER OF ADMISSION *PRO HAC VICE* OF CHRISTOPHER F. GRAHAM

THIS CAUSE came before the Court upon a Motion, made pursuant to the Rules of the United States District Court for the Southern District of Florida, for the admission of Christopher F. Graham to practice before this Court *pro hac vice* for purposes of representing Coffee Holding, Inc., in this cause and the Court, being fully advised in the premises and having fully reviewed the file, hereby

ORDERED AND ADJUDGED that the motion is GRANTED.

Christopher F. Graham is admitted to practice before this Court *pro hac vice* for purposes of representing Coffee Holding, Inc., in this cause and will receive all Notices of Electronic filing at cgraham@tpw.com.

DONE AND ORDERED in Chambers in Miami, Florida this _____ day of February, 2007.

_____
UNITED STATES DISTRICT JUDGE

Copies to all counsel of record

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**CIVIL MINUTES FOR HON. JOSE E. MARTINEZ**

Date:  February 16, 2007     Case No.   07-20389-CV-Martinez

Clerk:  Ashley Jones        Reporter:   Larry Herr

Title of Case: Coffee Bean Trading -Roasting, LLC

 v.  Coffee-Holding, Inc.,

P. Attorney:   Jose Ferrer

_____

D. Attorney: Christopher Graham, Mark Auerbacher

_____

Reason for hearing:   Motion For TRO

_____

_____

Result of hearing:   Hearing Held; argument heard, order to follow

_____

_____

_____

_____

_____

Misc._____

_____

_____

_____

_____

_____

Case continued to:_____ Time:_____For:_____

_____

_____

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division
**Case Number:  07-20389-CIV-MARTINEZ-BANDSTRA**

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,
     Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada corporation,
     Defendant.

_____/

## ORDER GRANTING MOTION FOR CHRISTOPHER F. GRAHAM TO APPEAR *PRO HAC VICE*

THIS CAUSE came before the Court upon Defendant's Motion for Christopher F. Graham to Appear *Pro Hac Vice* (**D.E. No. 16**), filed on **February 19, 2007**.  The Court has considered the motion and has been sufficiently advised.  It is hereby:

**ORDERED AND ADJUDGED** that

Defendant's Motion for Christopher F. Graham to Appear *Pro Hac Vice* (**D.E. No. 16**) is hereby **GRANTED**.  Designated local counsel, Mark S. Auerbacher and John R. Squitero, shall, pursuant to Rule 4 of the Local Rules Governing Admission and Practice of Attorneys, be served with all papers in this action and ensure counsel who is appearing *pro hac vice* complies with this Court's orders and all applicable rules.

DONE AND ORDERED in Chambers at Miami, Florida, this 23 day of February, 2007.

_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Bandstra
All Counsel of Record

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.:  07-20389-CIV-MARTINEZ/BANDSTRA

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

       Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,

       Defendant.

_____/

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S
### MOTION TO ENFORCE A FORUM SELECTION CLAUSE AND TRANSFER VENUE

Plaintiff, Coffee Bean Trading-Roasting, LLC ("Coffee Bean"), by and through its undersigned counsel, hereby responds in opposition Defendant, Coffee Holding, Inc.'s ("Coffee Holding"), Motion to Enforce a Forum Selection Clause and to Transfer Venue, and states as follows:

### PRELIMINARY STATEMENT[1]

Coffee Holding, pursuant to 28 U.S.C. § 1404(a), seeks to transfer venue of this action to Delaware based solely on a forum selection clause in the operating agreement of Café La Rica, LLC, to which both Coffee Bean and Coffee Holding are parties.  According to Coffee Holding, the forum selection clause required Coffee Bean to have brought this action in the United States District Court for the District of Delaware, and not the Southern District of Florida. However, the clause upon which Coffee Holding relies is permissive, and not mandatory, and therefore does not require that this action have been brought in, or be transferred to, any other Court.

_____

[1] Coffee Bean hereby objects and moves to strike that unsubstantiated portion of Coffee Holding's motion entitled "Statement of Facts" as a gross mischaracterization of the actual facts giving rise to this action.

## MEMORANDUM OF LAW

I.     The Applicable Standard.

Forum selection clauses are classified as either mandatory or permissive.  *Oakwood Homes Corp. v. OHC Liquidation Trust*, 342 B.R. 59, 65 (Bankr. D. Del. 2006).  A mandatory forum selection clause grants exclusive jurisdiction to a selected forum. *Id.*  In contrast, a permissive forum selection clause indicates the contracting parties' consent to resolve their dispute in a given forum, but does not require the dispute to be resolved in that forum.  *Id.*  A forum selection clause that is permissive in its language leaves open the possibility that an action could be brought in any forum where jurisdiction can be obtained.  *Blanco v. Banco Indus. De Venezuela, S.A.*, 997 F.2d 974, 979 (2d Cir. 1993).  This is so even where such a clause is accompanied by a choice of law provision making that state's law applicable to the agreement. *Zokaites v. Land-Cellular Corp.*, 424 F.Supp.2d 824, 835 (W.D. Pa. 2006).  "To argue otherwise 'conflate[s] the concept of forum selection with that of consent to venue and personal jurisdiction.'"  *Id.* (quoting from *Koresko v. Nationwide Ins. Co.*, 403 F.Supp.2d 394, 400 (E.D. Pa. 2005). Courts have consistently interpreted forum selection clauses that contain the words "may" or "should" as permissive.  *Blanco*, 997 F.2d at 979 (interpreting "may be brought" as permissive language); *Proyecfin de Venezuela, S.A. v. Banco Industrial de Venezuela, S.A.*, 760 F.2d 390 (2d Cir. 1985) (same); *McDonnell Douglas Corp. v. Islamic Republic of Iran*, 758 F.2d 341, 346-47 (8th Cir. 1985) (describing the words "should" as permissive and "must" as mandatory); *GMAC Commercial Mortg. Corp. v. LaSalle Bank Nat'l Ass'n*, 242 F.Supp.2d 279, 283 (S.D.N.Y. 2002) (finding use of the word "may" to be permissive); *Quinones v. Swiss Bank Corp.*, 509 So. 2d 273, 274-275 (Fla. 1987) (describing the word "may" as permissive and the words "may only" and "shall" as mandatory).

II.     The Forum Selection Clause of the Operating Agreement is Merely Permissive.

The forum selection clause upon which Coffee Holding relies for its argument that this case was brought in an improper forum reads as follows:

> 14.8  Governing Law; Jurisdiction; Venue.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law principles thereof.  To the fullest extent permitted by law, the parties hereto hereby (i) submit to the jurisdiction of the state and federal courts located in the State of Delaware for purposes of any legal action or proceeding brought under or in connection with this Agreement, (ii) agree that exclusive venue of any such action or proceeding ***may be laid*** in the State of Delaware and (iii) waive any claim that the same is an inconvenient forum.

(emphasis added).  That clause is wholly devoid of any mandatory language.  It merely provides that any legal action with regard to the Operating Agreement "may be laid" in the courts of the State of Delaware.  The use of the permissive language illustrates that the clause does not require, but merely permits, plaintiff to file suit in Delaware.  The permissive nature of the clause is not weakened by the words "exclusive venue" which precede the permissive language in the same sentence.  Read in context, those words merely suggest that exclusive venue "may be laid" in the courts of Delaware, or in any other forum where jurisdiction could otherwise be obtained. *See Proyecfin.*, 760 F.2d 390 (2d Cir. 1985); *see also McDonnell Douglas Corp.*, 758 F.2d 341, 346-47 (8th Cir. 1985); *GMAC*, 242 F.Supp.2d 279, 283 (S.D.N.Y. 2002); *Quinones*, 509 So. 2d 273, 274-275 (Fla. 1987).

III.     The Authorities Relied Upon By Coffee Holding Are Inapplicable To This Case.

Coffee Holding strongly, but unavailingly, relies on a litany of cases which stand simply for the proposition that a forum selection clause is a significant factor that figures heavily in a Court's decision whether to transfer venue under 28 U.S.C. § 1404.  *Stewart Ore., Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988); *P&S Business Machines, Inc. v. Canon USA, Inc.*, 331 F.3d 804, 806 (11th Cir. 2003); *In re Ricoh Corp.*, 870 F.2d 570 (11th Cir. 1989); *Murray v. Quiznos*

*Franchising LLC,* 2006 WL 1529540 at *3 (M.D. Fla. May 26, 2006). Coffee Holding's reliance on those authorities is misplaced. The issue considered in each of those cases was whether a Court, in ruling on a motion brought under 28 U.S.C. § 1404, may generally disregard a valid and enforceable forum selection clause in favor of a more convenient forum. However, none of those cases dealt with, or even discussed, the dichotomy between the mandatory versus permissive nature of forum selection clauses. Consequently, none of those authorities are dispositive of the issues before this Court – mainly, whether, based on the language of the Operating Agreement, the forum selection clause at issue here is mandatory or permissive.

## <u>CONCLUSION</u>

It is clear from the unambiguous language of the parties' Operating Agreement that the forum selection clause does not require, but merely permits, Coffee Bean to file suit in Delaware. There is nothing about litigating in the Southern District of Florida that would work an injustice to any of the parties, particularly where the events giving rise to the dispute took place in Florida, which would require transferring this case to Delaware. Consequently, Coffee Bean respectfully requests the entry of an order denying Coffee Holding's Motion to Enforce a Forum Selection Clause and to Transfer Venue.

Respectfully submitted,

BAKER & McKENZIE LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131
(305) 789-8900
(305) 789-8953 (facsimile)


By:  ___/s/ Jose M. Ferrer_____
        Jose M. Ferrer
        Florida Bar No. 173746

4

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by facsimile and U.S. Mail upon Mark S. Auerbacher, Esq., Katz, Barron, Squitero, Faust, 2699 S. Bayshore Drive, Seventh Floor, Miami, Florida 33133; and Christopher F. Graham, Esq., Thacher Proffitt & Wood LLP, Two World Financial Center, New York, New York 10281.


By:    /s/ Jose M. Ferrer
           Jose M. Ferrer


MIADMS/307038.1

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.:  07-20389-CIV-MARTINEZ/BANDSTRA

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

      Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,

      Defendant.

_____/

### PLAINTIFF'S MOTION TO CONSIDER THE FILING
### OF ITS RESPONSE IN OPPOSITION TO DEFENDANT'S
### MOTION TO TRANSFER VENUE TIMELY

Plaintiff, Coffee Bean Trading-Roasting, LLC ("Coffee Bean"), by and through its undersigned counsel, hereby moves the Court for the entry of an order determining the filing of its Response in Opposition to Defendant's Motion to Enforce a Forum Selection Clause and Transfer Venue to have been timely, and in support thereof states as follows:

1.      On February 15, 2007, Defendant, Coffee Holding, Inc. ("Coffee Holding"), served upon the undersigned by facsimile its Motion to Enforce a Forum Selection Clause and Transfer Venue.  The Motion was never served upon the undersigned other than by facsimile on February 15, 2007.

2.      Upon receiving that Motion, the undersigned's office docketed the response deadline for February 26, 2007 pursuant to S.D. Fla. L.R. 7.1(C)(1)(b) which provides that the

ten-day period for filing an opposing memorandum of law shall not begin to run until "the business day after receipt of the motion[.]"

3.      On February 16, 2007, this Court held an emergency hearing on Coffee Bean's motion for restraining order.  That same day, the Court entered an Order denying the motion for temporary restraining order.  That order also shortened the deadline by which Coffee Bean was required to file its response in opposition to Coffee Holding's Motion to Transfer Venue to Friday, February 23, 2007.  A copy of that Order is attached hereto as Exhibit A.

4.      Due to a docketing error, presumably due to the fact that the new deadline was included in the Order denying Coffee Bean's Motion for Temporary Restraining Order, the original response due date of February 26, 2007 was not changed to February 23, 2007.

5.      Between Wednesday, February 21, 2007 and Friday, February 23, 2007, the parties were engaged in settlement discussions.  Those conversations ultimately broke down on Friday, February 23, 2007.  In an e-mail communicating the cessation of settlement negotiations, the undersigned informed Coffee Holding's counsel, "we will be filing our response in opposition to Coffee Holding's forum motion on Monday [February 26, 2007]."  The email is not attached because it contains privileged settlement negotiations. Coffee Holding's counsel did not respond to the undersigned's e-mail.

6.      Today, the undersigned contacted Coffee Holding's attorney to request his consent to a brief extension to file Coffee Bean's opposing memorandum through Friday, March 2, 2007 due to other pressing concerns that had prevented the undersigned from finalizing the memorandum.

7.      The undersigned first learned of the docketing error when he was informed by Coffee Holding's attorney, in response to the request for the consent to the brief extension, that

the deadline for filing the memorandum had passed on Friday and that they would oppose any motion for an extension of time as untimely. A copy of Coffee Holding's e-mail of even date is attached hereto as Exhibit A. Coffee Holding's refusal to agree to the brief enlargement does not appear to be motivated by any reason other than to gain tactical advantage.

8.      Coffee Bean, contemporaneously herewith, has filed its Response in Opposition to Coffee Holding's Motion to Transfer Venue. Fundamental fairness, due process, and equity militate in favor of accepting Coffee Bean's response as timely.

9.      Coffee Holding will not be prejudiced by the entry of an order granting this motion because Coffee Bean's response was filed less than one full business day after the filing deadline.

WHEREFORE, Coffee Bean respectfully requests the entry of an order determining the filing of its Response in Opposition to Defendant's Motion to Enforce a Forum Selection Clause and Transfer Venue to have been timely and submits the attached as a proposed form.

Respectfully submitted,

BAKER & McKENZIE LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131
(305) 789-8900
(305) 789-8953 (facsimile)


By:   /s/ Jose M. Ferrer
         Jose M. Ferrer
         Florida Bar No. 173746

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by facsimile and U.S. Mail upon Mark S. Auerbacher, Esq., Katz, Barron, Squitero, Faust, 2699 S. Bayshore Drive, Seventh Floor, Miami, Florida 33133; and Christopher F. Graham, Esq., Thacher Proffitt & Wood LLP, Two World Financial Center, New York, New York 10281.


By: ___/s/ Jose M. Ferrer_____
               Jose M. Ferrer

MIADMS/307115.1

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.: 07-20389-CIV-MARTINEZ/BANDSTRA

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

      Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,

      Defendant.

_____/

**ORDER GRANTING PLAINTIFF'S MOTION TO CONSIDER
THE FILING OF ITS RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION TO TRANSFER VENUE TIMELY**

THIS CAUSE, having come before the Court upon Plaintiff's Motion to Consider the
Filing of its Response in Opposition to Defendant's Motion to Transfer Venue Timely, and the
Court, having considered the Motion and being otherwise advised in the premises does hereupon

ORDER AND ADJUDGE that:

1.      Plaintiff's Motion is GRANTED.

2.      Plaintiff's Response in Opposition to Defendant's Motion to Transfer Venue is
considered to have been timely filed.

DONE AND ORDERED in Chambers at Miami, Dade County, Florida this _____ day of
February, 2007.

_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies to:
Magistrate Judge Bandstra
All counsel of Record

MIADMS/307116.1

**Ferrer, Jose M.**

| | |
|---|---|
| **From:** | Doherty, John P. [JDoherty@tpw.com] |
| **Sent:** | Monday, February 26, 2007 2:54 PM |
| **To:** | Ferrer, Jose M. |
| **Cc:** | Helmer, Michael; Graham, Christopher F. |
| **Subject:** | Coffee Bean v. Coffee Holding |

Jose,

Mike Helmer forwarded your voicemail of this afternoon to me.   I am assisting Chris Graham for the next few days on this litigation.  I'm tied up in meetings but wanted to respond quickly to you.

Unfortunately, I can't agree to your request.  Per the Court's order, your client's opposition to the change of venue motion was due Friday, 2/23 (not today).  You didn't reach out to us at all last week about an extension and, at this point, I'm not in a position to join in your request for additional time.  Please also be advised that we will oppose any such motion as untimely.

Rgds,

John P. Doherty
Thacher Proffitt & Wood LLP
Two World Financial Center
New York, NY 10281
Direct: 212.912.7417
Fax: 212.912.7751
jdoherty@tpw.com
www.tpw.com

---------------------------------------------------------------------------
IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the I
* * * * * * * * * * * * *
NOTICE: This e-mail and any attachment contain confidential information that may be

This notice is automatically appended to each e-mail. It is the recipient's responsi
===========================================================================

**EXHIBIT A**

## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF FLORIDA
### Miami Division

### Case Number: 07-20389-CIV-MARTINEZ-BANDSTRA

COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

      Plaintiff,

vs.

COFFEE HOLDING, CO. INC., a Nevada
corporation

      Defendant.

### OBJECTION TO PLAINTIFF'S MOTION TO FILE UNTIMELY OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER VENUE

      Defendant Coffee Holding Co., Inc. ("Coffee Holding"), by and through undersigned counsel, respectfully requests that the Court deny Plaintiff Coffee Bean Trading-Roasting, LLC's ("Coffee Bean") Motion to Consider the Filing of its Response in Opposition to Defendant's Motion to Transfer Venue Timely and in support thereof states as follows:

### ARGUMENT

      The Court should enforce its own deadline and refuse to consider Coffee Bean's late-filed Response in Opposition to Coffee Holding's Motion to Transfer Venue.

      On February 16, 2007, the Court issued an Order setting a February 23, 2007 deadline for Coffee Bean's Response to Coffee Holding's motion. *See* Order, attached as Exhibit A.

      On February 26, 2007, after the deadline passed, Coffee Bean's counsel requested that Coffee Holding's counsel agree to Coffee Bean's request for additional time. That was the first

time Coffee Bean requested an extension in connection with Coffee Holding's motion. Coffee
Holding's counsel promptly responded that it was not in a position to consent to Coffee Bean's
belated request for additional time. *See* E-mail from John P. Doherty, Esq. to Jose Ferrer, Esq.,
attached as Exhibit B.

Coffee Bean's excuses for missing the deadline are not compelling. Coffee Bean does
not get a free pass because it sent an e-mail to Coffee Holding's counsel after the close of
business on February 23rd stating that it would file on February 26th. And, Coffee Bean's effort
to blame an "internal docketing error" is, at best, confusing. Coffee Bean alleges that it docketed
its response due as of February 26th pursuant to S.D. Fla. L.R. 7.1(C)(1)(b). Under that rule,
however, the deadline would have been March 1, 2007. The story, therefore, does not seem to
add up.

Accordingly, Coffee Bean has not shown any reason why this Court should not enforce
its own Order as written and as such the Court should deny Coffee Bean's motion.

WHEREFORE Coffee Holding respectfully requests that the Court deny Coffee Bean's
Motion to File Untimely Opposition to Defendant's Motion to Transfer Venue and grant such
other and further relief as is just and proper.

DATED February 27, 2007

<div style="margin-left:40%">

Respectfully submitted,

/s/ Mark S. Auerbacher, Esq.
Florida Bar No. 978220
msa@katzbarron.com
John R. Squitero, Esq.
Florida Bar No. 121196
jrs@katzbarron.com
KATZ BARRON SQUITERO FAUST
2699 S. Bayshore Drive, 7th Floor
Miami, Florida 33133-5408
Telephone:     (305) 856-2444
Facsimile:     (305) 285-9227

</div>

<div style="text-align:center">2</div>

Thacher Proffitt & Wood LLP
Two World Financial Center
New York, New York 10281
Tel:      (212) 912-7400
Fax:      (212) 912-7751

Christopher F. Graham
CGraham@tpw.com
John P. Doherty
JDoherty@tpw.com

February 27, 2007                    **COUNSEL FOR DEFENDANT**

**CERTIFICATE OF SERVICE**

I hereby certify that on February 27, 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: **Jose.Ferrer@bakernet.com.** **I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following recipients:**

Jose Ferrer, Esq.
Baker & McKenzie, LLP,
1111 Brickell Avenue, Suite 1700
Miami, FL 33131
Telephone:       (305) 789-8900
Facsimile:        (305) 789-8953

                              /s/Mark S. Auerbacher, Esq.

# EXHIBIT A

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division
**Case Number: 07-20389-CIV-MARTINEZ-BANDSTRA**

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,
     Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,
     Defendant.
_____/

## ORDER DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND DIRECTING EXPEDITED RESPONSE TO DEFENDANT'S MOTION TO ENFORCE A FORUM SELECTION CLAUSE AND TO TRANSFER VENUE

THIS CAUSE came before the Court upon Plaintiff's Motion for Temporary Restraining Order (**D.E. No. 2**), filed on **February 13, 2007**. The Court held a hearing on this motion on February 15, 2007. After considering the arguments of both parties and their submissions, the Court finds that at this time, Plaintiff has failed to demonstrate a substantial threat of irreparable injury. Therefore, it is hereby:

**ORDERED and ADJUDGED** that

1.    Plaintiff's Motion for Temporary Restraining Order (**D.E. No. 2**) is **DENIED**.

2.    Plaintiff shall respond to Defendant's Motion to Enforce a Forum Selection Clause and to Transfer Venue (D.E. No. 10) on or before **February 23, 2007**.

DONE AND ORDERED in Chambers at Miami, Florida, February 16, 2007.

_Jose E. Martinez_
_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Bandstra
All Counsel of Record

# EXHIBIT B

## Doherty, John P.

**From:** Doherty, John P.
**Sent:** Monday, February 26, 2007 2:54 PM
**To:** 'jose.ferrer@bakernet.com'
**Cc:** Helmer, Michael; Graham, Christopher F.
**Subject:** Coffee Bean v. Coffee Holding

Jose,

Mike Helmer forwarded your voicemail of this afternoon to me. I am assisting Chris Graham for the next few days on this litigation. I'm tied up in meetings but wanted to respond quickly to you.

Unfortunately, I can't agree to your request. Per the Court's order, your client's opposition to the change of venue motion was due Friday, 2/23 (not today). You didn't reach out to us at all last week about an extension and, at this point, I'm not in a position to join in your request for additional time. Please also be advised that we will oppose any such motion as untimely.

Rgds,

John P. Doherty
Thacher Proffitt & Wood LLP
Two World Financial Center
New York, NY 10281
Direct: 212.912.7417
Fax: 212.912.7751
jdoherty@tpw.com
www.tpw.com

2/27/2007

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.: 07-20389-CIV-MARTINEZ/BANDSTRA

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

       Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,

       Defendant.

_____/

### PLAINTIFF'S REPLY TO DEFENDANT'S OBJECTION TO MOTION
### TO CONSIDER THE FILING OF ITS RESPONSE IN OPPOSITION
### TO DEFENDANT'S MOTION TO TRANSFER VENUE TIMELY

Plaintiff, Coffee Bean Trading-Roasting, LLC ("Coffee Bean"), by and through its
undersigned counsel, hereby replies to Defendant's Objection to Coffee Bean's Motion to
Consider the Filing of its Response in Opposition to Defendant's Motion to Transfer Venue
Timely, and in support thereof states as follows:

### PRELIMINARY STATEMENT

Defendant, Coffee Holding, Inc.'s ("Coffee Holding"), only objection to Coffee Bean's
motion to consider the filing of its response in opposition to Coffee Holding's Motion to
Transfer Venue is that the reason set forth by Coffee Bean regarding why a docketing error was
committed is "confusing" and "does not seem to add up." *See* Coffee Holding's Objection at p.
2. Coffee Holding does not challenge the timeliness of Coffee Bean's Motion. Coffee Holding
does not attempt to explain how it will be prejudiced from a non-jurisdictional filing delay of less

than a full business day. Instead, Coffee Holding urges, in conclusory fashion, that Coffee Bean's Motion should be denied because Coffee Bean has failed to show any reason why this Court should not enforce its own deadline. In fact, Coffee Bean has demonstrated that the failure to file its Response by February 23, 2007 was not the result of malfeasance or deliberate indifference to the Court's order, but was instead a simple and understandable docketing error that has not prejudiced Coffee Holding or had any impact on the judicial proceedings. Coffee Holding's objection does little more than reinforce stereotypical attitudes about the lawyer who plays "hardball" at any cost, and does precious little to promote the interest of the clients or the integrity of the profession.

## MEMORANDUM OF LAW

I.  Applicable Standard.

Pursuant to Rule 6(b) of the Federal Rules of Civil Procedure, "when by ... order of court an acts is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion ... (2) upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect." The word neglect encompasses both simple, faultless omissions to act and, more commonly, omissions caused by carelessness. *See Pioneer Investment Services Co., v. Brunswick Associates Ltd. Partnership, et al.*, 507 U.S. 380, 388, 113 S. Ct. 1489, 1494-95, 123 L.Ed. 2d 74, 85 (1993). By empowering the courts to accept late filings where the failure to act was the result of excusable neglect, Congress plainly contemplated that the court would be permitted, where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control. *Id.* The determination as to what sorts of neglect will be considered "excusable" is at bottom an equitable one, taking account of all

Baker & McKenzie LLP, 1111 Brickell Avenue, Suite 1700, Miami, Florida 33131 – (305) 789-8900

relevant circumstances surrounding the party's omission, including the danger of prejudice to the other parties, the length of the delay and its potential impact on judicial proceedings, the reasons for the delay, and whether the movant acted in good faith. *Pioneer*, 507 US. at 395, 113 S. Ct. at 1498, 123 L.Ed. 2d at 90.

II.   All of the Relevant Factors Militate in Favor of Granting Coffee Bean's Motion.

Applying the equitable criteria described in *Pioneer* to the circumstances presented demonstrates that this Court should grant Coffee Bean's Rule 6(b)(2) motion to consider its response in opposition to Coffee Holding's motion to transfer venue timely. Although Coffee Holding characterizes the docketing error as "confusing" and "not seem[ing] to add up," implying that Coffee Bean's failure to file its brief by February 23, 2007 was the result of malfeasance or deliberate indifference, it has failed to identify anything that would suggest that Coffee Bean acted in bad faith or with deliberate disregard of this Court's order. The docketing error was just that – an error caused by good faith inadvertence, which is precisely the kind of conduct which constitutes excusable neglect under Rule 6 sufficient to justify the enlargement of a court-ordered deadline after the expiration of the specified period. Coffee Bean filed its response less than a full business day after it was due. Consequently, Coffee Holding has not suffered any prejudice whatsoever and the judicial proceedings have not been impacted as a result of Coffee Bean's brief delay in filing its response to Coffee Holding's motion to transfer venue. Under these circumstances, the Court is well within its discretion in granting an enlargement of time.

## CONCLUSION

For all of the foregoing reasons, Coffee Bean respectfully moves for the entry of an order granting its Motion to Consider the Filing of Its Response in Opposition to Defendant's Motion to Transfer Venue Timely.

Respectfully submitted,

BAKER & McKENZIE LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131
(305) 789-8900
(305) 789-8953 (facsimile)


By:   /s/ Jose M. Ferrer
   Jose M. Ferrer
   Florida Bar No. 173746

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served this 2nd day of March, 2007 by facsimile and U.S. Mail upon Mark S. Auerbacher, Esq. and John R. Squitero, Esq., Katz Barron Squitero Faust, 2699 S. Bayshore Drive, Seventh Floor, Miami, Florida 33133; and Christopher F. Graham, Esq. and John P. Doherty, Esq., Thacher Proffitt & Wood LLP, Two World Financial Center, New York, New York 10281.


By:   /s/ Jose M. Ferrer
   Jose M. Ferrer

MIADMS/307167.1

4

# UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF FLORIDA
### Miami Division

### Case Number:  07-20389-CIV-MARTINEZ-BANDSTRA

COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

     Plaintiff,

vs.

COFFEE HOLDING, CO. INC., a Nevada
corporation

     Defendant.

---

### DEFENDANT COFFEE HOLDING, CO. INC'S REPLY IN FURTHER SUPPORT OF ITS MOTION TO ENFORCE A FORUM SELECTION CLAUSE AND TO TRANSFER VENUE

Defendant Coffee Holding Co., Inc ("Coffee Holding"), by and through undersigned counsel, hereby replies[1] to Plaintiff Coffee Bean Trading-Roasting, LLC's ("Coffee Bean") Opposition to Coffee Holding's Motion to Enforce a Forum Selection Clause and Transfer Venue pursuant to 1404(a) and Fed. R. Civ. P. 12(b)(3), and in support thereof states the following:

### PRELIMINARY STATEMENT

Even in light of a clear, unambiguous forum selection clause in which the parties agreed to litigate their disputes *exclusively* in Delaware, Coffee Bean attempts to argue that the forum selection clause is permissive and thus that the case should remain in the Southern District of

---

[1] Coffee Holding has opposed Coffee Bean's late filed Opposition and files this Reply only in the event that the Court grants Coffee Bean's Motion to Consider Timely the Filing of its Response.

Florida. But Coffee Bean blatantly ignores the most important word in the forum selection clause entered into by the parties: That is, ***exclusive***. Even if the Court were to find that the clause was somehow permissive, Coffee Bean still has the burden of demonstrating that the forum selection clause of the Operating Agreement should be ignored. Coffee Bean, however, never even addresses why this case should be litigated in Florida. Moreover, convenience of the parties, governing law and the interests of justice still mandate that this action be transferred to the District Court for the District of Delaware. Thus, the Court should transfer this case to the District Court of Delaware, or in the alternative, dismiss this case pursuant to Fed. R. Civ. P. 12(b)(3) on the basis of improper venue.

## MEMORANDUM OF LAW

### I.     The Forum Selection Clause is Mandatory, Not Permissive

It is true that courts frequently classify forum selection clauses as either "permissive" or "mandatory." Whereas a permissive clause authorizes jurisdiction in a designated forum -- but does not prohibit litigation elsewhere -- a mandatory clause dictates an **exclusive** forum for litigation under the contract. *Global Satellite Communication Co., v. Starmill U.K. Ltd.*, 378 F.3d 1269, 1272 (11th Cir. 2004) (emphasis added), *citing Snapper, Inc. v. Redan*, 171 F.3d 1249 (11th Cir. 1999). Thus, "[w]hen a forum selection clause specifies only the jurisdiction, the clause will generally not be enforced without some further language indicating the parties' intent to make jurisdiction exclusive." *Congress Fin. Corp. v. Bortnick,* No. 00 Civ. 6361, 2000 WL 1634248, at *1 (S.D.N.Y. Oct. 31, 2000); *GMAC Commercial Mortg. Corp. v. LaSalle Bank Nat. Ass'n*, 242 F.Supp. 2d. 279, 282 (S.D.N.Y., 2002) (holding that forum selection clauses will not be interpreted as excluding jurisdiction elsewhere unless it contains specific language of exclusion).

Critically, and contrary to the Coffee Bean's contentions, the word "may" is not dispositive in determining if a forum selection clause is mandatory or permissive. *See AGR Financial L.L.C., v. Ready Staffing, Inc.,* 99 F. Supp. 2d 399, 403 (S.D.N.Y., 2000)  In that case, the non-movants argued that the language in the forum selection clause was permissive because, among other things, the clause provided that "any action *may* be brought in New York state or Federal court." *Id.*  The non-movants, much like Coffee Bean, tried to argue that the term "may" is a permissive term and falls "far short of the mandatory term 'shall.'" *Id.*  The Court, however, found that argument to have no merit.  *Id.*  In fact, the Court held that because the forum selection clause contained the language "the Seller agrees that such jurisdiction shall be **exclusive**, [t]he use of the word 'may' does not negate the mandatory nature of the forum selection clause." *Id.*

Notably, federal courts have held forum selection clauses that use the word "shall" are permissive.  *John Boutari and Son, Wines and Spirits, S.A. v. Attiki Importers and Distribs. Inc.,* 22 F.3d 51, 53 (2d Cir. 1994).  In that case, the forum selection clause provided that "[a]ny dispute arising between the parties hereunder *shall* come within the jurisdiction of the competent Greek Courts." *Id.* at 52.   The court declined to preclude the federal district court from exercising jurisdiction, stating that: "when only jurisdiction is specified the clause will generally not be enforced without some further language indicating the parties' intent to make jurisdiction exclusive." *Id.* at 53.

Crucially, in <u>none</u> the cases Coffee Bean cites is the word "exclusive" contained in the forum selection clause.  To the contrary, the cases Coffee Bean relies upon stand for the above argument – that a forum selection clause containing language of exclusion is controlling. *LaSalle*, 242 F.Supp. 2d 279 at 282 (S.D.N.Y., 2002); *see also Proyecfin de Venezuela S.A. v.*

*Banco Industrial de Venezuela,* 760 F. 2d. 390, 398 (2d Cir. 1985) (distinguishing a permissive forum selection clause from one that used the term "exclusive").

The critical clause in the forum selection clause contained in the Operating Agreement is "the parties hereto herby **agree that exclusive venue** of any such action or proceeding may be laid in the State of Delaware." While Coffee Bean would have the term "may" be dispositive, it is actually the term "exclusive" that dictates that this clause is mandatory as opposed to merely permissive. As stated above, in order to be deemed mandatory, a forum selection clause must "contain specific language of exclusion." *LaSalle*, 242 F.Supp. 2d. 279 at 282. What single term could be more indicative of language of exclusion than the word **exclusive**? Coffee Bean misinterprets the proper context of the word "exclusive" and the word "may." Whereas "may" modifies the action of bringing a case to any court (the parties may, but are not required to file suit) the term exclusive modifies the term venue. Thus, the venue is exclusively limited to courts in the State of Delaware.

Moreover, the forum selection clause provides that Delaware law will govern. It thus makes sense that the parties also intended to litigate the case in Delaware. As such, this is clearly an exclusive, mandatory forum selection clause and the Court should thus properly transfer the action to the District Court for the District of Delaware.

## II. Coffee Bean Has Not Demonstrated Exceptional Reason Why the Forum Selection Clause Should Not Be Enforced

The only argument Coffee Bean has relied on in its Opposition, is that the forum selection clause is permissive, not mandatory, and therefore somehow this case automatically should remain in the Southern District of Florida. However, and as noted in Coffee Bean's Opposition, the cases relied upon by Coffee Holding in it's Motion to Transfer Venue, hold that a forum selection clause weighs heavily in a court's determination of whether to transfer venue.

*See In re Ricoh Corp.*, 870 F. 2d 570 (11th Cir. 1989). This is true regardless of whether the clause is permissive or mandatory. *Stateline Power Corp. v. Kremer*, 404 F. Supp. 2d 1373, 1380-1381 (S.D. Fla. 2005 )(holding a permissive forum selection clause has great weight in venue transfer analysis).

Moreover, when there is a valid forum selection clause, the burden of persuasion shifts to the plaintiff. *See In re Ricoh*, 870 F. 2d 570. As such, Coffee Bean is still required to come forward with some explanation as to why the forum selection clause, a provision Coffee Bean willingly agreed to at the time it signed the Operating Agreement, should not be enforced. But Coffee Bean has furthered no argument as to why the case should remain in Florida – Coffee Bean simply categorically states that because the forum selection clause is permissive, the Court should end its analysis. But, ultimately the Court must balance the various factors – and, in light of the forum selection clause, Coffee Bean bears the burden of demonstrating exceptional facts that the forum selection clause should not be enforced. *Id.* Coffee Bean has done nothing of the sort and thus this Court should enforce the forum selection clause and transfer this action to the District Court for the District of Delaware.[2]

## III.   On Balance, Delaware is a More Convenient Forum

Notwithstanding the exclusive forum selection clause, on balance, convenience and the interests of justice also require this action be tried in Delaware. In a transfer of venue analysis, courts balance various factors. Among these factors are: (1) the convenience of the parties; (2) the convenience of the witnesses; (3) relative familiarity of the court with governing law; (4) access to sources of proof, such as books and records; and (5) the interests of justice. *See 17 Moore's Federal Practice* § 111.3 [1][b] (Matthew Bender 3d Ed.); *see also Jewelmasters, Inc.*

---

[2]      Indeed, Coffee Bean has not stated a single fact in their brief – let alone in an affidavit – that supports its contention that the case should be litigated in Florida.

*v. May Dep't Stores Co.,* 840 F.Supp. 893, 894 (S.D.Fla. 1993); *Jumara v. Statefarm Insurance Company*, 55 F.3d 873, 879 (3d Cir. 1995).

First, there are two parties, Coffee Holding and Coffee Bean, and three main witnesses – Andrew Gordon (president of Coffee Holding), Ernesto Aguila, (Chief Executive Officer of Café La Rica) and Alberto Lensi (Manager of Coffee Bean). Mr. Gordon resides in New York, Mr. Aguila in Florida and Mr. Lensi in Switzerland. On balance, it would be more convenient for all involved if the case were litigated in a neutral forum, such as Delaware. There is nothing about Florida that makes it convenient for the parties and/or the witnesses. Furthermore, both Coffee Bean and Café La Rica are Delaware companies.

Second, as agreed to by the parties and as stated in the forum selection clause, Delaware law governs any disputes between the parties. Courts take into account familiarity with governing law in analyzing a transfer of venue motion. This Court should therefore transfer the action to Delaware as it is eminently practical to have a court in Delaware to interpret and apply Delaware law.

Third, Courts examine the relative ease of access to books and records in a transfer of venue analysis. *Statefarm*, 55 F.3d 873 at 879. In its Verified Complaint, Coffee Bean alleges that Coffee Holding breached the Operating Agreement by failing to produce Financial Statements of Café La Rica to Coffee Bean. Although Coffee Holding did produce Financial Statements to Coffee Bean, these documents and statements will nevertheless be at issue in this case. Importantly, however, many of the documents and statements are in New York and New Jersey, where Coffee Bean's auditors are located, thus Florida could not be a more convenient forum than Delaware.

Finally, it is in the interest of justice to transfer this action to Delaware. Clearly, the

parties, witnesses and documents are spread out among several states and even foreign countries. It was, in fact, in anticipation of this factor, that the parties agreed to submit to jurisdiction in Delaware – the state of Café La Rica's formation and forum in which the governing law applies. It is only just and proper that the Court enforce the parties agreement and thus transfer this case to the District Court for the District of Delaware.

## **CONCLUSION**

Based on the foregoing, Coffee Holding respectfully requests that the Court transfer this case to the United States District Court for the District of Delaware or dismiss this action pursuant to Fed. R. Civ. P. 12 (b) (3), and grant such other and further relief deemed just and proper.

Dated: March 2, 2007

> KATZ, BARRON, SQUITERO, FAUST
> 2699 S. Bayshore Drive, Seventh Floor
> Miami, Florida 33133
> Tel: 305-856-2444
> Fax: 305-285-9227
>
> By: _____
>     Mark S. Auerbacher, Esq.
>     Florida Bar No. 978220
>     msa@katzbarron.com
>     John R. Squitero, Esq.
>     Florida Bar No. 121196
>     jrs@katzbarron.com
>
> Christopher F. Graham
> Mary H. Mulhearn
> Thacher Proffitt & Wood LLP
> Two World Financial Center
> New York, New York 10281
> Tel: (212) 912-7669
> Fax: (212) 912-7751
> CGraham@tpw.com
>
> COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Jose.Ferrer@bakernet.com. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following recipients:

>
> Jose Ferrer, Esq.
> BAKER & McKENZIE LLP
> Mellon Financial Center
> 1111 Brickell Avenue, Suite 1700
> Miami, Florida 33131

*Counsel of Defendants*

<div align="right">/s/Mark S. Auerbacher, Esq.</div>

## AFFIDAVIT OF SERVICE

State of Florida      County of Dade

District Court Court

Case Number: 07-20389-CIV-MARTINEZ

Plaintiff:
**Coffee Bean Trding-Roasting, LLc., a delaware limited liability company,**
vs.
Defendant:
**Coffee Holding, Inc., a Nevada corporation**

For: Jose M. Ferrer, Esq.
     BAKER & MCKENZIE, LLP

Received by CIVIL PROCESS, LLC. on the 14th day of February, 2007 at 3:44 pm to be served on **COFFEE HOLDING, Inc** by serving registered agent CSC Services of Nevada, Inc., 502 East John Street, Room E, Carson City, Nevada 89706. I, _____Jim Rogers_____, being duly sworn, depose and say that on the 21 st day of February, 2007 at 9:05A .m., executed service by delivering a true copy of the **Civil Action Summons and Complaint, Plaintiff's Motion for Temporary Restraining Order and Supporting Memorandum of Law, Notice of Filing Affidavit of Ernesto Aguila in Support of Motion for Temporary Restraining Order, Order Setting Hearing on Plaintiff's Motion for Temporary Restraining Order** in accordance with state statutes in the manner marked below:

( ) PUBLIC AGENCY: By serving _____ as _____ of
the within-named agency.

( ) SUBSTITUTE SERVICE: By serving _____ as
_____

(X) CORPORATE SERVICE: By serving _Jaime Hamtek_ as
_Authorized Person To Accept Service For CSC Services of Nevada._

( ) OTHER SERVICE: As described in the Comments below by serving _____ as
_____

( ) NON SERVICE: For the reason detailed in the Comments below.

**COMMENTS:**

I certify that I have no interest in the above styled action; I am over the age of eighteen (18) years, and have proper authority to serve legal process in the jurisdiction in which this service was made.

Subscribed and Sworn to before me on the 22nd day
of Feb , 2007 by the affiant who is
personally known to me.

_Diana L. Ruby_
NOTARY PUBLIC

PROCESS SERVER # nv 878
Appointed in accordance
with State Statutes

**CIVIL PROCESS, LLC.**
**1501 N.W. 29 Street**
**Miami, FL 33142**
**(305) 375-9111**

Our Job Serial Number: 2007000670

DIANA L. RUBY
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No: 01-70919-2 - Expires September 20, 2009

1992-2005 Database Services, Inc. - Process Server's Toolbox V5.5j

# UNITED STATES DISTRICT COURT

## Southern District of Florida

Case Number: _____

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

                Plaintiff

v.

COFFEE HOLDING, INC., a Nevada
corporation,
                Defendant

## 07-20389

### SUMMONS IN A CIVIL CASE

TO: (Name and address of defendant)

    Coffee Holding, Inc.
    By serving its registered agent:
    CSC Services of Nevada, Inc.
    502 East John Street, Room E
    Carson City, NV  89706

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

    Jose M. Ferrer, Esq.
    Baker & McKenzie LLP
    1111 Brickell Avenue, Suite 1700
    Miami, FL  33131

an answer to the complaint which is herewith served upon you, within _____20_____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

Clarence Maddox

Clarence Maddox

_____
CLERK

_____
(BY) DEPUTY CLERK

2/13/07
_____
DATE

## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF FLORIDA
### Miami Division

### Case Number:  07-20389-CIV-MARTINEZ-BANDSTRA

COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

     Plaintiff,

vs.


COFFEE HOLDING, CO. INC., a Nevada
corporation

     Defendant.

---

### <u>NOTICE OF CORRECTING DOCKET</u>

Defendant Coffee Holding Co., Inc., a foreign corporation ("Coffee Holding"), by and through its undersigned counsel, hereby files this Notice of Correcting Docket and states as follows:

On March 2, 2007, Defendant, Coffee Holding electronically filed its Reply (docket no. 23) to Plaintiff's Response in Opposition (docket no. 19) to Defendant's Motion to Enforce a Forum Selection Clause and Transfer Venue ("Motion to Transfer Venue")(docket no. 10). However, when the Defendant's Reply was filed the related document entry apparently defaulted and identified docket numbers 19 and 20 as containing related documents.  However, docket number 20 involves a separate motion filed by the Plaintiff.  As such, notice is hereby provided that Defendant, Coffee Holding's Reply filed March 2, 2007 relates to docket entry number 10,

Defendant's Motion to Transfer Venue and, in addition, docket entry number 19, which is Plaintiff, Coffee Bean's Response in Opposition.

Dated:   March 5, 2007

KATZ, BARRON, SQUITERO, FAUST
2699 S. Bayshore Drive, Seventh Floor
Miami, Florida 33133
Tel:  305-856-2444
Fax: 305-285-9227

By: _____
        Mark S. Auerbacher, Esq.
        Florida Bar No. 978220
        msa@katzbarron.com
        John R. Squitero, Esq.
        Florida Bar No. 121196
        jrs@katzbarron.com

Christopher F. Graham
Mary H. Mulhearn
Thacher Proffitt & Wood LLP
Two World Financial Center
New York, New York 10281
Tel: (212) 912-7669
Fax: (212) 912-7751
CGraham@tpw.com
COUNSEL FOR DEFENDANT

### CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Jose.Ferrer@bakernet.com.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following recipients:

Jose Ferrer, Esq.
BAKER & McKENZIE LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131
*Counsel of Defendants*

/s/Mark S. Auerbacher, Esq.