CLOSED, TEB

# U.S. District Court
## Southern District of Florida (Miami)
### CIVIL DOCKET FOR CASE #: 1:07-cv-20389-JEM

Coffee Bean Trading-Roasting, LLC v. Coffee Holding, Inc.    Date Filed: 02/13/2007
Assigned to: Judge Jose E. Martinez                          Jury Demand: None
Cause: 28:1332 Diversity-Other Contract                      Nature of Suit: 190 Contract: Other
                                                             Jurisdiction: Diversity

**Plaintiff**

**Coffee Bean Trading-Roasting, LLC**         represented by    **Jose Manuel Ferrer**
*a Delaware limited liability company*                         Baker & McKenzie
                                                               1111 Brickell Avenue
                                                               Suite 1700
                                                               Miami, FL 33131-3214
                                                               305-789-8980
                                                               Fax: 789-8953
                                                               Email: jose.ferrer@bakernet.com
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Coffee Holding, Inc.**                      represented by    **Christopher F. Graham**
*a Nevada corporation*                                         Thacher Proffitt & Wood LLP
                                                               50 Main Street
                                                               White Plains, NY 10606
                                                               US
                                                               Email: cgraham@tpw.com
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **John Roger Squitero**
                                                               Katz Barron Squitero Faust & Berman
                                                               2699 S Bayshore Drive
                                                               7th Floor
                                                               Miami, FL 33133-5408
                                                               305-856-2444
                                                               Fax: 285-9227
                                                               Email: jrs@katzbarron.com
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Mark Shiels Auerbacher**
                                                               Katz Barron Squitero Faust

2699 S Bayshore Drive
7th Floor
Miami, FL 33133-5408
305-856-2444
Fax: 285-9227
Email: msa@katzbarron.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Coffee Holding, Inc.**              represented by  **Mark Shiels Auerbacher**
*a Nevada corporation*                               (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Coffee Bean Trading-Roasting, LLC**
*a Delaware limited liability company*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 02/13/2007 | 1 | VERIFIED COMPLAINT against Coffee Holding, Inc. Filing fee $ 350. Receipt#: 954710, filed by Coffee Bean Trading-Roasting, LLC.(el) (Entered: 02/13/2007) |
| 02/13/2007 | 2 | MOTION for Temporary Restraining Order and Supporting Memorandum of law by Coffee Bean Trading-Roasting, LLC. Responses due by 2/28/2007 (el) (Entered: 02/13/2007) |
| 02/13/2007 | 3 | NOTICE OF FILING AFFIDAVIT signed by : Ernesto Aguila in support of 2 MOTION for Temporary Restraining Order by Coffee Bean Trading-Roasting, LLC. (el) (Entered: 02/13/2007) |
| 02/13/2007 | 4 | Summons Issued as to Coffee Holding, Inc. by serving registered agent: CSC Services of Nevada,Inc. (el) (Entered: 02/13/2007) |
| 02/14/2007 | 5 | ORDER Setting Hearing on Motion 2 MOTION for Temporary Restraining Order: Motion Hearing set for 2/16/2007 03:00 PM in Miami Division before Judge Jose E. Martinez. Signed by Judge Jose E. Martinez on 2/14/2007 (lc1) (Entered: 02/14/2007) |
| 02/14/2007 | 6 | Order Requiring Parties to Meet and File Joint Scheduling Report. Signed by Judge Jose E. Martinez on 02/14/2007 (dq) (Entered: 02/14/2007) |
| 02/14/2007 | 7 | NOTICE of Compliance *WITH COURT ORDER* by Coffee Bean Trading-Roasting, LLC re 5 Order Setting Hearing on Motion (Ferrer, Jose) (Entered: 02/14/2007) |
| 02/15/2007 | 8 | MOTION attend hearing telephonically by Coffee Holding, Inc.. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Text of Proposed Order Order Approving Telephonic Appearance)(Auerbacher, Mark) (Entered: 02/15/2007) |
| 02/15/2007 | 9 | Endorsed ORDER granting 8 Unopposed Motion to Allow Defendant's Attorney, Christopher F. Graham to Attend Hearing on Plaintiff's Motion for Temporary Restraining Order Telephonically Signed by Judge Jose E. Martinez on 2/15/2007 (lc1) (Entered: 02/15/2007) |
| 02/15/2007 | 10 | MOTION Transfer Venue re 1 Complaint, 2 MOTION for Temporary Restraining Order by Coffee Holding, Inc.. (Attachments: # 1 Text of Proposed Order Order Granting Motion to Transfer Venue)(Auerbacher, Mark) (Entered: 02/15/2007) |
| 02/15/2007 | 16 | MOTION for Admission Pro Hac Vice of Christopher F. Graham, Filing Fee $75, Receipt #954943. (cw) (Entered: 02/19/2007) |
| 02/16/2007 | 11 | MOTION Dismiss Motion for Temporary Restraining Order re 2 MOTION for Temporary Restraining Order, 3 Affidavit by Coffee Holding, Inc.. (Auerbacher, Mark) (Entered: 02/16/2007) |
| 02/16/2007 | 12 | AFFIDAVIT in Opposition re 2 MOTION for Temporary Restraining Order, 10 MOTION Transfer Venue re 1 Complaint, 2 MOTION for Temporary Restraining Order, 11 MOTION Dismiss Motion for Temporary Restraining Order re 2 MOTION for Temporary Restraining Order, 3 Affidavit filed by Coffee Holding, Inc.. (Attachments: # 1 Affidavit Andrew Gordon# 2 Exhibit Exhibits A & B# 3 Affidavit Salvatore Reda)(Auerbacher, Mark) (Entered: 02/16/2007) |
| 02/16/2007 | 13 | ORDER denying 2 Motion for Temporary Restraining Order Signed by Judge Jose E. Martinez on 2/16/2007 (lc1) (Entered: 02/16/2007) |
| 02/16/2007 | 14 | Order Denying Plaintiff's Motion for Temporary Restraining Order (D.E. No. 2) and Directing Expedited Response to Defendant's Motion to Enforce a Forum Selection Clause and To Transfer Venue. Signed by Judge Jose E. Martinez on 2/16/2007 (lc1) (Entered: 02/16/2007) |
| 02/16/2007 | 15 | Notice of Docket Correction: The wrong document was attached to docket number 13. The correct document is located at docket number 14. re 13 Order on Motion for Temporary Restraining Order (lc1) (Entered: 02/16/2007) |
| 02/23/2007 | 17 | Minute Entry: for proceedings held before Judge Jose E. Martinez: Motion Hearing held on 2/16/2007 re 2 MOTION for Temporary Restraining Order filed by Coffee Bean Trading-Roasting, LLC, (Court Reporter Larry Herr.) (wh) (Entered: 02/23/2007) |
| 02/23/2007 | 18 | ORDER granting 16 Motion to Appear Pro Hac Vice Name of Attorney Christopher F. Graham for Coffee Holding, Inc. Signed by Judge Jose E. Martinez on 2/23/2007 (ls) (Entered: 02/26/2007) |
| 02/26/2007 | 19 | RESPONSE in Opposition re 10 MOTION Transfer Venue re 1 Complaint, 2 MOTION for Temporary Restraining Order *IN OPPOSITION TO DEFENDANT'S MOTION TO ENFORCE A FORUM SELECTION CLAUSE AND TRANSFER VENUE* filed by Coffee Bean |

| | | Trading-Roasting, LLC. (Ferrer, Jose) (Entered: 02/26/2007) |
|---|---|---|
| 02/26/2007 | 20 | Plaintiff's MOTION TO CONSIDER THE FILING OF ITS RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER VENUE TIMELY re 19 Response in Opposition to Motion, by Coffee Bean Trading-Roasting, LLC. (Attachments: # 1 Exhibit A# 2 Text of Proposed Order)(Ferrer, Jose) (Entered: 02/26/2007) |
| 02/27/2007 | 21 | RESPONSE in Opposition re 20 Plaintiff's MOTION TO CONSIDER THE FILING OF ITS RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER VENUE TIMELY re 19 Response in Opposition to Motion, filed by Coffee Bean Trading-Roasting, Inc.. (Attachments: # 1)(Auerbacher, Mark) (Entered: 02/27/2007) |
| 03/02/2007 | 22 | RESPONSE *Plaintiff's Reply to Defendant's Objection to Motion to Consider the Filing of its Response in Opposition to Defendant's Motion to Transfer Venue Timely* filed by Coffee Bean Trading-Roasting, LLC. (Ferrer, Jose) (Entered: 03/02/2007) |
| 03/02/2007 | 23 | REPLY to Response to Motion re 20 Plaintiff's MOTION TO CONSIDER THE FILING OF ITS RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER VENUE TIMELY re 19 Response in Opposition to Motion, filed by Coffee Holding, Inc.. (Auerbacher, Mark) (Entered: 03/02/2007) |
| 03/05/2007 | 24 | SUMMONS Returned Executed Coffee Holding, Inc. served on 2/21/2007, answer due 3/13/2007. (bs) (Entered: 03/05/2007) |
| 03/05/2007 | 25 | NOTICE by Coffee Holding, Inc. re 23 Reply to Response to Motion, *to Transfer Venue* (Auerbacher, Mark) (Entered: 03/05/2007) |
| 03/06/2007 | 26 | Plaintiff's MOTION to Strike 23 Reply to Response to Motion, *CERTAIN PORTIONS OF DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO ENFORCE A FORUM SELECTION CLAUSE AND TO TRANSFER VENUE OR, ALTERNATIVELY, FOR LEAVE TO FILE SURREPLY* by Coffee Bean Trading-Roasting, LLC. Responses due by 3/20/2007 (Ferrer, Jose) (Entered: 03/06/2007) |
| 03/07/2007 | 27 | RESPONSE in Opposition re 26 Plaintiff's MOTION to Strike 23 Reply to Response to Motion, *CERTAIN PORTIONS OF DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO ENFORCE A FORUM SELECTION CLAUSE AND TO TRANSFER VENUE OR, ALTERNATIVELY, FOR LEAVE TO FILE SURREPLY* filed by Coffee Holding, Inc.. (Auerbacher, Mark) (Entered: 03/07/2007) |
| 03/12/2007 | 28 | RESPONSE to 27 Response in Opposition to Motion, *PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE OR, ALTERNATIVELY, FOR LEAVE TO FILE A SURREPLY* filed by Coffee Bean Trading-Roasting, LLC. (Ferrer, Jose) (Entered: 03/12/2007) |
| 03/13/2007 | 29 | *Coffee Holding, Co. Inc.'s* ANSWER to Complaint *Coffee Bean Trading-Roasting LLC*, First COUNTERCLAIM against Coffee Bean Trading- |

| | | Roasting, LLC by Coffee Holding, Inc..(Auerbacher, Mark) (Entered: 03/13/2007) |
|---|---|---|
| 03/21/2007 | 30 | Corporate Disclosure Statement by Coffee Bean Trading-Roasting, LLC. (Ferrer, Jose) (Entered: 03/21/2007) |
| 03/21/2007 | 31 | NOTICE by Coffee Bean Trading-Roasting, LLC re 30 Corporate Disclosure Statement *OF CORRECTING CERTIFICATE OF SERVICE* (Ferrer, Jose) (Entered: 03/21/2007) |
| 03/21/2007 | 32 | Emergency MOTION for Temporary Restraining Order by Coffee Holding, Inc.. Responses due by 4/4/2007 (Attachments: # 1) (Auerbacher, Mark) (Entered: 03/21/2007) |
| 03/23/2007 | 33 | ORDER REQUIRING RESPONSE TO DEFENDANT'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER. Signed by Judge Jose E. Martinez on 3/23/2007.(lc1) (Entered: 03/23/2007) |
| 03/23/2007 | 34 | Corporate Disclosure Statement by Coffee Holding, Inc., Coffee Holding, Inc.. (Auerbacher, Mark) (Entered: 03/23/2007) |
| 03/23/2007 | | Reset Deadlines as to 32 Emergency MOTION for Temporary Restraining Order. Response due by 4/2/2007 (dm) (Entered: 03/26/2007) |
| 03/27/2007 | 35 | RESPONSE in Opposition re 32 Emergency MOTION for Temporary Restraining Order *and Cross-Motion to Appoint a Receiver to Orderly Dissolve Company* filed by Coffee Bean Trading-Roasting, LLC. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D) (Ferrer, Jose) (Entered: 03/27/2007) |
| 03/27/2007 | 36 | NOTICE by Coffee Bean Trading-Roasting, LLC re 32 Emergency MOTION for Temporary Restraining Order, 35 Response in Opposition to Motion, *of Filing Affidavit of Ernesto Aguila in Opposition to Coffee Holding's Motion for Temporary Restraining Order and in Support of Cross-Motion to Appoint a Receiver* (Attachments: # 1 Affidavit of Ernesto Aguila)(Ferrer, Jose) (Entered: 03/27/2007) |
| 03/29/2007 | 37 | Defendant's MOTION to Strike 36 Notice (Other), Notice (Other), 35 Response in Opposition to Motion, by Coffee Holding, Inc., Coffee Holding, Inc.. Responses due by 4/12/2007 (Auerbacher, Mark) (Entered: 03/29/2007) |
| 04/02/2007 | 38 | *PLAINTIFF'S ANSWER AND AFFIRMATIVE DEFENSES TO COUNTS V AND VI* - ANSWER to Counterclaim by Coffee Bean Trading-Roasting, LLC.(Ferrer, Jose) (Entered: 04/02/2007) |
| 04/02/2007 | 39 | Plaintiff's MOTION to Dismiss 29 Answer to Complaint, Counterclaim - *CERTAIN COUNTS OF DEFENDANT'S COUNTERCLAIM* by Coffee Bean Trading-Roasting, LLC. Responses due by 4/16/2007 (Ferrer, Jose) (Entered: 04/02/2007) |
| 04/02/2007 | 40 | NOTICE by Coffee Bean Trading-Roasting, LLC re 3 Affidavit *PLAINTIFF'S NOTICE OF FILING EXCLUDED EXHIBIT TO* |

| | | |
|---|---|---|
| | | *AFFIDAVIT OF ERNESTO AGUILA* (Attachments: # 1 Exhibit A) (Ferrer, Jose) (Entered: 04/02/2007) |
| 04/03/2007 | 41 | REPLY to Response to Motion re 32 Emergency MOTION for Temporary Restraining Order filed by Coffee Holding, Inc.. (Auerbacher, Mark) (Entered: 04/03/2007) |
| 04/06/2007 | 42 | RESPONSE in Opposition re 37 Defendant's MOTION to Strike 36 Notice (Other), Notice (Other), 35 Response in Opposition to Motion, *for a Temporary Restraining Order* filed by Coffee Bean Trading-Roasting, LLC. (Ferrer, Jose) (Entered: 04/06/2007) |
| 04/10/2007 | 43 | RESPONSE in Opposition re 32 Emergency MOTION for Temporary Restraining Order, 37 Defendant's MOTION to Strike 36 Notice (Other), Notice (Other), 35 Response in Opposition to Motion, *to Plaintiff's Cross-Motion to Appoint a Receiver* filed by Coffee Holding, Inc., Coffee Holding, Inc.. (Auerbacher, Mark) (Entered: 04/10/2007) |
| 04/13/2007 | 44 | REPLY to Response to Motion re 37 Defendant's MOTION to Strike 36 Notice (Other), Notice (Other), 35 Response in Opposition to Motion, *Reply in Further Support* filed by Coffee Holding, Inc., Coffee Holding, Inc.. (Auerbacher, Mark) (Entered: 04/13/2007) |
| 04/13/2007 | 45 | RESPONSE to 43 Response in Opposition to Motion, *PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S CROSS-MOTION TO APPOINT RECEIVER* filed by Coffee Bean Trading-Roasting, LLC. (Ferrer, Jose) (Entered: 04/13/2007) |
| 04/16/2007 | 46 | MEMORANDUM in Opposition re 39 Plaintiff's MOTION to Dismiss 29 Answer to Complaint, Counterclaim *-CERTAIN COUNTS OF DEFENDANT'S COUNTERCLAIM* filed by Coffee Holding, Inc.. (Attachments: # 1 Exhibit A thru C)(Auerbacher, Mark) (Entered: 04/16/2007) |
| 04/19/2007 | 47 | REPORT REGARDING Joint Scheduling by Coffee Bean Trading-Roasting, LLC. (Attachments: # 1 Exhibit PreTrial Deadlines and Trial Date# 2 Exhibit Election to Jurisdiction)(Ferrer, Jose) (Entered: 04/19/2007) |
| 04/19/2007 | 48 | ORDER denying 32 Emergency Motion for Temporary Restraining Order. Signed by Judge Jose E. Martinez on 4/19/2007. (ls) (Entered: 04/20/2007) |
| 04/19/2007 | 49 | ORDER granting 37 Motion to Strike Certain Portions of 35 Response in Opposition to Motion. Signed by Judge Jose E. Martinez on 4/19/2007. (ls) (Entered: 04/20/2007) |
| 04/20/2007 | 50 | ORDER denying as moot 39 Motion to Dismiss, granting 10 Motion to Enforce a Forum Selection Clause and to Transfer Venue, granting 20 Motion to consider the filing of its Response in opposition to defendant's Motion to Transfer Venue timely, denying 26 Motion to Strike certain portions of defendant's Reply in support of its Motion to Enforce a Forum |

|  |  | Selection Clause and to Transfer Venue or, alternatively, for Leave to File Surreply; Directing Clerk to Transfer case to the USDC, District of Delaware; Closing Case. Signed by Judge Jose E. Martinez on 4/20/2007. (ls) (Entered: 04/20/2007) |
| 04/25/2007 | 51 | Transmittal Letter Sent With Certified Copies of Transfer Order and Docket Sheet, To: USDC, District of Delaware (ls) (Entered: 04/25/2007) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 05/02/2007 10:54:34 | | | |
| PACER Login: | ud0037 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:07-cv-20389-JEM |
| Billable Pages: | 4 | Cost: | 0.32 |

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.: 07-20389-CIV-MARTINEZ/BANDSTRA

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

      Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,

      Defendant.

_____/

### PLAINTIFF'S MOTION TO STRIKE CERTAIN PORTIONS OF DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO ENFORCE A FORUM SELECTION CLAUSE AND TO TRANSFER VENUE OR, ALTERNATIVELY, FOR LEAVE TO FILE SURREPLY

Plaintiff, Coffee Bean Trading-Roasting, LLC ("Coffee Bean"), pursuant to S.D. Fla. L.R. 7.1(C), moves the Court for an order striking Section III of Defendant's Reply in Support of its Motion to Enforce a Forum Selection Clause and to Transfer Venue or, alternatively, for leave to file a surreply for the reasons stated in the following memorandum of law:

### PRELIMINARY STATEMENT

On February 15, 2007, Defendant, Coffee Holding, Inc. ("Coffee Holding"), filed its Motion to Enforce a Forum Selection Clause and to Transfer Venue. Coffee Holding's only argument in favor of the relief requested was that a forum selection clause in the parties' operating agreement required Coffee Bean to have brought this action in the United States District Court for the District of Delaware, and not the Southern District of Florida. On February 26, 2007, Coffee Bean filed its response in opposition to Coffee Holding's motion. Coffee Bean's arguments were limited to rebuttal of the arguments raised by Coffee Holding in its

motion – mainly, that the forum selection clause upon which Coffee Holding relies is permissive, rather than mandatory, and, thus, does not require that this action have been brought in, or be transferred to, any other District.

On March 2, 2007, Coffee Holding filed its reply (the "Reply") to Coffee Bean's response. The Reply includes new arguments that were not raised in Coffee Holding's initial motion or Coffee Bean's response in opposition to same. Specifically, in section III of its Reply, Coffee Holding raises a forum non conveniens challenge by arguing that "[n]otwithstanding the exclusive forum selection clause, on balance, convenience and the interests of justice also require this action be tried in Delaware." *See* Coffee Holding's Reply at p. 5. Coffee Holding also makes certain factually unsupported statements regarding the purported location of the witnesses and documents relevant to this case which it argues weigh in favor of transferring venue to the District of Delaware.

## **MEMORANDUM OF LAW**

### I. **The Applicable Standard.**

Rule 83 of the Federal Rules of Civil Procedure provides the framework for the local district rules. Pursuant to that Rule, judges may, and do, vary their interpretation and application of the federal rules so long as there is no inconsistency with the federal and local rules. *See* Fed. R. Civ. P. 83. "Rules of Practice adopted by United States District Courts … have the force and effect of law, and are binding upon the parties and the court which promulgated them until they are changed in the appropriate manner…. A litigant has the right to rely upon the local rules, as the parties and court are bound by them." *Woods Constr. Co. v. Atlas Chemical Industries, Inc.*, 337 F.2d 888, 890-91 (10th Cir. 1964) (citing *Weil v. Neary*, 278 U.S. 160, 49 S. Ct. 144, 73 L. Ed. 243 (1929)). "Local rules, no less than federal rules or Acts of Congress, are part of the

supreme law of the land." *Baylson v. Disciplinary Board of Supreme Court of Pennsylvania*, 764 F.Supp. 328, 348 (E.D. Penn. 1991).

In this District, S.D. Fla. L.R. 7.1 governs the motion practice and permits the parties to file a motion, a memorandum in opposition to the motion, and a reply by the movant. S.D. Fla. L.R. 7.1(c) strictly limits replies to rebuttal of matters raised in the memorandum in opposition to which the reply is addressed. Based on the plain language of this Rule, litigants may not raise new arguments in their reply brief. *See Martinez, v. Weyerhaeuser Mortgage Co.*, 959 F.Supp. 1511, 1515 (S.D. Fla. 1996) (striking reply memorandum that raised new arguments not made in either the initial motion or the memorandum in opposition).

## II.     Section III of Coffee Holding's Reply Must Be Stricken Because It Raises Arguments Not Previously Raised.

Coffee Holding's initial motion was based entirely on the forum selection clause at issue which it argued mandated that this action be brought in the District of Delaware. Coffee Bean's response in opposition to that motion focused solely on the permissive, rather than mandatory, nature of the forum selection clause for the proposition that this action was properly brought in the Southern District of Florida. Section III of Coffee Holding's Reply, however, raises a forum non conveniens challenge in which Coffee Holding argues for the first time that, "*[n]otwithstanding the … forum selection clause,*" the relevant factors weigh in favor of transferring this case to the District of Delaware.

It is well settled that arguments raised for the first time in a reply brief may not be considered. *See Weyerhaeuser Mortgage Co.*, 959 F.Supp. at 1515 ("the Court finds that the movant may not raise new arguments in a reply brief"); *Hardy v. Jim Walter Homes, Inc.*, 2007 U.S. Dist. LEXIS 5253 *8 (S.D. Ala. 2007) ("arguments raised for the first time in a reply brief are ordinarily not considered); *Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 316

n.89 (S.D. Ala. 2006) ("As a procedural matter, this argument is not properly raised because plaintiffs submitted it for the first time in their reply brief."). Section III of Coffee Holding's Reply raises arguments not made in either Coffee Holding's initial motion to transfer venue or Coffee Bean's response in opposition to same. Thus, it violates S.D. Fla. L.R. 7.1(c) and must be stricken. Coffee Bean will be prejudiced if the Court considers arguments that it did not have an opportunity to brief and oppose.

## CONCLUSION

For all of the foregoing reasons, Coffee Bean respectfully requests the entry of an order striking from the Court's consideration Section III of Coffee Holding's Reply. Alternatively, Coffee Bean respectfully requests leave to file a surreply to the new arguments raised by Coffee Holding in its Reply and to provide affidavits contradicting the conclusory and factually unsupported statements made by Coffee Holding regarding the location of the relevant witnesses and documents, which it argues weigh in favor of transferring venue to the District of Delaware.

Respectfully submitted,

BAKER & McKENZIE LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131
Telephone: (305) 789-8900
Facsimile: (305) 789-8953

By: ___/s/ Jose M. Ferrer_____
        Jose M. Ferrer
        Florida Bar No. 173746

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served this 6th day of March, 2007 by facsimile and U.S. Mail upon Mark S. Auerbacher, Esq. and John R. Squitero, Esq., Katz Barron Squitero Faust, 2699 S. Bayshore Drive, Seventh Floor, Miami, Florida 33133; and Christopher F. Graham, Esq. and John P. Doherty, Esq., Thacher Proffitt & Wood LLP, Two World Financial Center, New York, New York 10281.

By:    /s/ Jose M. Ferrer      
         Jose M. Ferrer

MIADMS/307316.1

Baker & McKenzie LLP, 1111 Brickell Avenue, Suite 1700, Miami, Florida 33131 – (305) 789-8900

**UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division**

**Case Number: 07-20389-CIV-MARTINEZ-BANDSTRA**

COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

     Plaintiff,

vs.

COFFEE HOLDING, CO. INC., a Nevada
corporation

     Defendant.

**DEFENDANT COFFEE HOLDING, CO. INC'S OPPOSITION TO
PLAINTIFF'S MOTION TO STRIKE CERTAIN PORTIONS OF
<u>COFFEE HOLDING'S REPLY TO OPPOSITION TO TRANSFER VENUE</u>**

Defendant Coffee Holding Co., Inc ("Coffee Holding"), by and through undersigned

counsel, hereby replies to Plaintiff Coffee Bean Trading-Roasting, LLC's ("Coffee Bean")

Motion to Strike Certain Portions of Defendant's Reply in Support of its Motion to Enforce a

Forum Selection Clause and To Transfer Venue or, Alternatively, for Leave to File a Surreply

("Motion to Strike"), and in support thereof states the following:

<u>**ARGUMENT**</u>

The Court should deny Coffee Bean's Motion to Strike because Coffee Holding's

analysis of the parties' convenience and the interests of justice is not a new argument at all.

Rather, it is a clearly allowed rebuttal to Coffee Bean's single argument that this Court's analysis

must end at deciding whether a forum selection clause is permissive or mandatory.

[TPW: NYLEGAL:648988.2] 19499-00009  03/07/2007 01:35 PM

Coffee Bean, both in its initial Opposition, as well as this baseless Motion to Strike, misapplies the basic law of 28 U.S.C. § 1404(a).  Under Section 1404(a), federal courts are required to balance various factors, including 4 that are relevant to this case: (1) convenience of the parties and witnesses; (2) governing law; (3) the interests of justice; and (4) the presence of a valid forum selection clause.  *See* Coffee Holding's Motion to Enforce a Forum Selection Clause and to Transfer Motion ("Transfer Motion") at 4.  As the Supreme Court and the Eleventh Circuit have held, forum selection clauses -- however, are key, and -- regardless of whether the clause is permissive or mandatory, weigh heavily in a court's transfer of venue decision.

That said, a forum selection clause does not, as Coffee Bean would have it, end a court's analysis.  Rather, it shifts the burden from the defendant to the plaintiff to demonstrate why the action should remain in a venue that is in contravention to the parties' forum selection clause. *See In re Ricoh Corp.*, 870 F. 2d 570 (11th Cir. 1989).

Thus, it is Coffee Bean's burden to demonstrate why the forum selection clause should not be enforced and why this case should remain in Florida.  Any instance of Coffee Holding addressing the convenience of the parties is an effort to rebut Coffee Bean's presumption that even if the forum selection clause is permissive, the Court's analysis ends and the case remains in Florida.  Rather than address what it should have in its initial Opposition, Coffee Bean files this veiled attempt to gain a second bite at the apple to file affidavits it should have filed with its Opposition.

Moreover, in contrast to Coffee Bean's contentions, the convenience of the parties is not a new argument[1] but was raised by Coffee Holding in its original Transfer Motion as provided by the quotation below:

---

[1]     Coffee Bean's characterization of Coffee Holding's Reply as a "*forum non coveniens* challenge" is yet another misunderstanding of the law.  Since the statutory enactment of 28 U.S.C. 1404(a), the common law doctrine

[TPW: NYLEGAL:648988.2] 19499-00009  03/07/2007 01:35 PM

"Additionally, the parties agreed that Delaware law would govern. As stated above, governing law is an important factor in determining forum in a transfer motion. Finally, although some of the events giving rise to the dispute took place in Florida, Coffee Holding at all times operated out of New York, where Mr. Gordon resides. Coffee Bean's manager, who signed the Operating Agreement on behalf of the Plaintiff, resides in Switzerland. Thus, many of the events and some of the witnesses are not in Florida – therefore, **not even convenience dictates that the case should remain in Florida.**"

Coffee Holding's initial Motion to Transfer Venue at 7 (emphasis added).

In sum, Coffee Holding did not raise any new arguments in its Reply but only rebutted Coffee Bean's unsubstantiated legal contention that this Court's analysis must start and end at determining whether a forum selection clause is mandatory or permissive. As such, the Court should deny Coffee Bean's motion to Strike and Leave for a Surreply.

## CONCLUSION

Based on the foregoing, Coffee Holding respectfully requests that the Court deny Coffee Bean's Motion to Strike and Leave for Surreply and transfer this action to the District Court for the District of Delaware.

Dated:  March 7, 2007

KATZ, BARRON, SQUITERO, FAUST
2699 S. Bayshore Drive, Seventh Floor
Miami, Florida 33133
Tel:  305-856-2444
Fax: 305-285-9227

/s/Mark S. Auerbacher, Esq.
Florida Bar No. 978220
msa@katzbarron.com

---

of *forum non conveniens* has been applied only to cases in which the alternative forum is abroad. *17 Moore's Federal Practice* § 111.71 (Matthew Bender 3d Ed.). Therefore, in its Reply, Coffee Holding is not raising a *forum non conveniens* argument but rather addressing the same 1404(a) argument it has always maintained.

John R. Squitero, Esq.
Florida Bar No. 121196
jrs@katzbarron.com

Christopher F. Graham
Mary H. Mulhearn
Thacher Proffitt & Wood LLP
Two World Financial Center
New York, New York 10281
Tel: (212) 912-7669
Fax: (212) 912-7751
CGraham@tpw.com

COUNSEL FOR DEFENDANT

### CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Jose.Ferrer@bakernet.com.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following recipients:

Jose Ferrer, Esq.
BAKER & McKENZIE LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131

*Counsel of Defendants*

/s/Mark S. Auerbacher, Esq.

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.:  07-20389-CIV-MARTINEZ/BANDSTRA

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

     Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,

     Defendant.

_____/

### PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE OR, ALTERNATIVELY, FOR LEAVE TO FILE A SURREPLY

Plaintiff, Coffee Bean Trading-Roasting, LLC ("Coffee Bean"), pursuant to S.D. Fla. L.R. 7.1(C), hereby replies to Defendant, Coffee Holding, Inc.'s ("Coffee Holding"), response in opposition to Coffee Bean's motion to strike certain portions of Coffee Holding's reply in support of its motion to enforce a forum selection clause, or, alternatively, for leave to file a surreply, and in support thereof states as follows:

### STATEMENT AND ARGUMENT

Coffee Holding in its response argues that Section III of its Reply should not be stricken because the arguments contained in that section are merely a continuation of the arguments it made in its initial motion to transfer venue and responsive to Coffee Bean's argument that the forum selection clause does not require that the case be transferred to the District of Delaware. Coffee Holding's disingenuous attempt to recast its motion as a general request to transfer venue, rather than a specific request to enforce a forum selection clause, belies the specific arguments and statements made in, and even the title of, its initial motion.

As its title confirms, Coffee Holding's Motion is a "Motion to **Enforce a Forum Selection Clause** and To Transfer Venue[.]" (emphasis added). The introductory paragraph of Coffee Holding's motion further confirms that the intent of Coffee Holding in bringing the motion is to have the Court "**enforce the parties** [sic] **choice of venue** and transfer this case to the U.S. District Court for the District of Delaware[.]" (emphasis added). At page two of its Motion, Coffee Holding summarizes why it believes this Court should transfer venue by stating, "this case should be transferred to, and litigated in, the U.S. District Court of Delaware **because the parties affirmatively agreed in the Limited Liability Agreement of Café La Rica, LLC (the "Operating Agreement") to litigate any causes of action arising from the Agreement in Delaware**." (emphasis added). Coffee Holding goes on to argue that "[t]he venue mandated by a contractual forum-selection clause rarely will be outweighed by any other factor in a 1404(a) analysis." *See* Motion to Enforce Forum Selection Clause at p. 2. Additionally, all of the cases cited by Coffee Holding in its motion addressed a transfer of venue in the context of a mandatory forum selection clause. Thus, it is clear from even a cursory reading of Coffee Holding's motion that its arguments in support of a transfer of venue were initially based solely and exclusively on the forum selection clause contained in the parties' operating agreement, and not, as it now argues, on the purported convenience of the parties.

Coffee Holding's argument that it specifically raised the convenience of the parties in its initial motion is equally unavailing. Courts have uniformly held that "if the party moving for transfer under § 1404(a) merely makes a general allegation that witnesses will be necessary, without identifying those necessary witnesses and indicating what their testimony at trial will be, the motion for transfer based on convenience of witnesses will be denied." *J.I. Kislak Mortgage Corp. v. Connecticut Bank & Trust Co., N.A.*, 604 F.Supp. 346, 348 (S.D. Fla. 1985) (quoting

from *American Standard, Inc. v. Bendix Corp.*, 487 F.Supp. 254 (W.D. Mo. 1980). "Similarly, as with witnesses, 'general allegations that a transfer is needed because of the location of books and records are not enough. The moving papers [sic] must show the location, difficulty of transportation and importance of the books and records.'" *Kislak*, 604 F.Supp. at 348 (quoting from *Bendix*, 487 F.Supp at 264).

Coffee Holding points to a single sentence in its three-page brief ("not even convenience dictates that the case should remain in Florida") which it argues sufficiently raised the issue. However, Coffee Holding elaborated no arguments on the merits regarding why the District of Delaware is purportedly a more convenient forum than the Southern District of Florida. Under the authorities cited above, Coffee Holding's passing reference cannot be construed as rising to the level of an argument. *See Kislak*, 604 F.Supp. at 348 ("Courts have been uniform in holding such a bald showing as insufficient."). In fact, the surrounding arguments – "Plaintiff has no basis whatsoever to argue that the forum selection clause is somehow not enforceable" and "In sum, in March of 2006, the parties knowingly entered into an agreement that provided that all disputes arising out of that agreement would be exclusively litigated in Delaware under Delaware law" – evidence that Coffee Holding's statement was an extension of its venue challenge based on the relevant forum selection clause, and not an independent challenge based on the convenience of the parties.

## CONCLUSION

For all of the foregoing reasons, Coffee Bean respectfully reiterates its request for the entry of an order striking from the Court's consideration Section III of Coffee Holding's Reply or, alternatively, for leave to file a surreply to the new arguments raised by Coffee Holding and

to provide affidavits contradicting the conclusory and factually unsupported statements made by Coffee Holding regarding the location of the relevant witnesses and documents.

Respectfully submitted,

BAKER & McKENZIE LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131
Telephone: (305) 789-8900
Facsimile: (305) 789-8953

By:    /s/ Jose M. Ferrer
Jose M. Ferrer
Florida Bar No. 173746

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served this 12th day of March, 2007 by facsimile and U.S. Mail upon Mark S. Auerbacher, Esq. and John R. Squitero, Esq., Katz Barron Squitero Faust, 2699 S. Bayshore Drive, Seventh Floor, Miami, Florida 33133; and Christopher F. Graham, Esq. and John P. Doherty, Esq., Thacher Proffitt & Wood LLP, Two World Financial Center, New York, New York 10281.

By:    /s/ Jose M. Ferrer
Jose M. Ferrer

MIADMS/307465.2

**UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

**Case Number: 07-20389-CIV-MARTINEZ-BANDSTRA**

COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

     Plaintiff,

vs.

COFFEE HOLDING, CO. INC., a Nevada
corporation

     Defendant.

## ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM

Defendant, Coffee Holding, Co. Inc., ("Coffee Holding") by and through its undersigned attorneys, do hereby answer the Verified Complaint (the "Complaint") filed by plaintiff Coffee Bean Trading-Roasting LLC ("Coffee Bean") in the captioned matter as follows:

### PARTIES, JURISDICTION AND VENUE

1.    Coffee Holding admits, upon and information and belief, the truth of the allegations contained in paragraph 1 of the Complaint.

2.    Coffee Holding admits, upon and information and belief, the truth of the allegations contained in paragraph 2 of the Complaint.

3.    Paragraph 3 of the Complaint is an allegation of jurisdiction and causes of action and does not require a response from Coffee Holding.

4.      Paragraph 4 of the Complaint is an allegation of venue to which no response is required.  To the extent a response is required, Coffee Holding denies the allegations contained in paragraph 4 of the Complaint and avers that venue is improper in the Southern District of Florida pursuant to an exclusive forum selection clause in the Limited Liability Company Agreement of Café La Rica, LLC (the "Operating Agreement").  Coffee Holding respectfully refers the Court to Coffee Holding's Motion to Enforce a Forum Selection Clause and to Transfer Venue filed with this Court on February 15, 2007.

5.      Paragraph 5 does not require a response from Coffee Holding.

## FACTS COMMON TO ALL CLAIMS

### The Operating Agreement

6.      Coffee Holding admits, upon and information and belief, the truth of the allegations contained in paragraph 6 of the Complaint, but respectfully refers the Court to the "Operating Agreement" for the true and complete terms thereof.

7.      Coffee Holding admits the allegations set forth in paragraph 7 of the Complaint, but respectfully refers the Court to the "Operating Agreement" for the true and complete terms thereof.

8.      Coffee Holding denies the allegations set forth in paragraph 8 of the Complaint, except admits that the Operating Agreement established a Board of Managers responsible for the management of the Company and all decisions concerning the business affairs of the Company and that the Board of Managers was to consist of two managers, each having one vote with respect to all matters requiring the vote of the Board of Directors, but respectfully refers to the Court to the Operating Agreement for the true and complete terms thereof.

9.      Coffee Holding denies the allegations set forth in paragraph 9 of the Complaint except admits, upon information and belief, that the initial Board of Managers of Café La Rica

was comprised of Andrew Gordon and Ernesto Aguila but respectfully refers to the Court to the Operating Agreement for the true and complete terms thereof.

10.     Coffee Holding admits the Operating Agreement shall be governed and construed in accordance with Delaware law as set forth in paragraph 10.

The Expense Sharing Agreement

11.     Coffee Holding admits, upon information and belief, the statements set forth in paragraph 11 of the Complaint but respectfully refers to the Court to the Expense Sharing Agreement for the true and complete terms thereof.

12.     Coffee Holding admits, upon information and belief, the statements set forth in Paragraph 12 of the Complaint but respectfully refers to the Court to the Expense Sharing Agreement for the true and complete terms thereof.

13.     Coffee Holding admits, upon information and belief, the statements set forth in Paragraph 13 of the Complaint but respectfully refers to the Court to the Expense Sharing Agreement for the true and complete terms thereof.

**ANSWERING COUNT I**
***(Breach of the Operating Agreement)***

14.     Coffee Holding realleges and incorporates by reference paragraphs 1 through 13.

15.     Coffee Holding denies the allegations set forth in paragraph 15 of the Complaint.

16.     Coffee Holding admits, upon information and belief, the statements set forth in paragraph 16 of the Complaint but respectfully refers to the Court to the Operating Agreement for the true and complete terms thereof.

17.     Coffee Holding denies the allegations set forth in paragraph 17 of the Complaint.

18.     Coffee Holding denies the allegations set forth in paragraph 18 of the Complaint.

3

## ANSWERING COUNT II
### *(Breach of the Expense Sharing Agreement)*

19.     Coffee Holding incorporates by reference paragraphs 1 through 13 above.

20.     Coffee Holding admits the statements set forth in paragraph 20 of the Complaint but respectfully refers to the Court to the Expense Sharing Agreement for the true and complete terms thereof.

21.     Coffee Holding denies the allegations set forth in paragraph 21 of the Complaint.

22.     Coffee Holding denies the allegations set forth in paragraph 22 of the Complaint.

23.     Coffee Holding denies the allegations set forth in paragraph 23 of the Complaint.

24.     Paragraph 24 of the Complaint is a legal conclusion to which no responsive pleading is required.

## ANSWERING COUNT III
### *(Breach of Fiduciary Duty)*

25.     Coffee Holding incorporates by reference paragraphs 1 through 13 above.

26.     Paragraph 26 of the Complaint is a legal conclusion to which no responsive pleading is required.

27.     Paragraph 27 of the Complaint is a legal conclusion to which no responsive pleading is required.

28.     Coffee Holding denies the allegations set forth in paragraph 28 of the Complaint.

29.     Coffee Holding denies the allegations set forth in paragraph 29 of the Complaint.

30.     Coffee Holding denies the allegations set forth in paragraph 30 of the Complaint.

31.     Coffee Holding denies the allegations set forth in paragraph 31 of the Complaint.

32.     Paragraph 32 is a legal conclusion to which no responsive pleading is required.

[TPW: NYLEGAL:644432.3] 19499-00009  03/13/2007 05:30 PM

## ANSWERING COUNT IV
### *(Breach of the Implied Contractual Covenant of Good Faith and Fair Dealing)*

33.     Coffee Holding incorporates by reference paragraphs 1 through 13.

34.     Paragraph 34 of the Complaint is a legal conclusion to which no responsive pleading is required.

35.     Coffee Holding denies the allegations set forth in paragraph 35 of the Complaint.

36.     Paragraph 36 of the Complaint is a legal conclusion to which no responsive pleading is required.

37.     Coffee Holding  denies the allegations set forth in paragraph 37 of the Complaint.

38.     Coffee Holding denies the allegations set forth in paragraph 38 of the Complaint.

39.     Coffee Holding denies the allegations set forth in paragraph 39 of the Complaint.

40.     Paragraph 40 of the Complaint is a legal conclusion to which no responsive pleading is required.

## ANSWERING COUNT V
### *(Accounting)*

41.     Coffee Holding incorporates by reference paragraphs 1 through 13 above.

42.     Coffee Holding admits, upon information and belief, the statements set forth in paragraph 42 of the Complaint but respectfully refers to the Court to the Expense Sharing Agreement for the true and complete terms thereof.

43.     Paragraph 43 of the Complaint is a legal conclusion to which no responsive pleading is required, to the extent that a response is required, Coffee Holding denies the allegations set forth in paragraph 43 of the Complaint.

44.     Paragraph 44 of the Complaint is a legal conclusion to which no responsive pleading is required.

[TPW: NYLEGAL:644432.3] 19499-00009  03/13/2007 05:30 PM

## ANSWERING COUNT VI
### *(Permanent and Temporary Injunction)*

45.     Coffee Holding incorporates by reference paragraphs 1 through 13 above.

46.     Coffee Holding denies the allegations set forth in paragraph 46 of the Complaint.

47.     Coffee Holding denies the allegations set forth in paragraph 47 of the Complaint.

48.     Coffee Holding denies the allegations set forth in paragraph 48 of the Complaint.

49.     Coffee Holding denies the allegations set forth in paragraph 49 of the Complaint.

50.     Coffee Holding denies the allegations set forth in paragraph 50 of the Complaint except admits that on February 7, 2007, Mr. Gordon sent a fax to Washington Mutual Bank ("Washington Mutual") advising Washington Mutual that Café La Rica had been dissolved.

51.     Coffee Holding denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 51 of the Complaint.

52.     Coffee Holding denies the allegations set forth in paragraph 52 of the Complaint.

53.     Paragraph 53 is a legal conclusion and does not require a responsive pleading of the Complaint.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE
#### *(Plaintiff's, Not Defendant's, Actions Caused Damages)*

Coffee Bean's claims are barred because, to the extent that either Coffee Bean or Café La Rica suffered any damages, no act or omission of Coffee Holding was the proximate cause of any alleged injuries or damages allegedly incurred by Coffee Bean or Café La Rica; rather, the conduct of Coffee Bean and/or Café La Rica proximately caused any such alleged injuries or damages.

6

## SECOND AFFIRMATIVE DEFENSE
### *(Improper Venue)*

Coffee Bean is barred from recovery because venue is improper. Coffee Bean files this Answer without prejudice to the pending Motion to Enforce Forum Selection Clause and Transfer Venue to the District Court for the District of Delaware and Coffee Holding hereby incorporates all objections to venue stated therein.

## THIRD AFFIRMATIVE DEFENSE
### *(Failure to State a Cause of Action)*

Coffee Bean fails to state a claim upon which any relief may be granted.

## FOURTH AFFIRMATIVE DEFENSE
### *(Unclean Hands)*

Coffee Bean is barred from obtaining relief by the doctrine of unclean hands.

## FIFTH AFFIRMATIVE DEFENSE
### *(Lack of Standing)*

To the extent that Café La Rica has suffered any damages, Coffee Bean does not have standing to maintain this action individually or derivatively on behalf of Café La Rica and/or is not the real party in interest.

## SIXTH AFFIRMATIVE DEFENSE
### *(Laches, Waiver and Estoppel)*

Coffee Bean is barred from recovery on the grounds of laches, waiver and estoppel.

## SEVENTH AFFIRMATIVE DEFENSE
### *(No Damages)*

Coffee Bean is barred from recovery on the grounds that Coffee Bean has failed to plead with particularity any damages to either Coffee Bean or Café La Rica as a direct or proximate result of the acts alleged to have been committed by Coffee Holding.

## EIGHTH AFFIRMATIVE DEFENSE
### *(Failure to Mitigate Damages)*

Coffee Bean is barred from recovery on the grounds that Coffee Bean failed to mitigate any damages, if any, sustained by Coffee Bean or Café La Rica.

WHEREFORE, Coffee Holding prays that the Complaint be dismissed in its entirety, together with costs and for such and other further relief as the Court may deem just and proper.

[TPW: NYLEGAL:644432.3] 19499-00009  03/13/2007 05:30 PM

## COUNTERCLAIM

Defendant, Coffee Holding, by and through its undersigned attorneys, for its counterclaim, states as follows:

## INTRODUCTION

In March 2006, the Plaintiff, Coffee Bean, and the Defendant, Coffee Holding, decided to enter into a joint venture. The idea was simple -- together, Coffee Bean and Coffee Holding would form "Café La Rica" a company that would roast, package and sell coffee. Each party would have a 50% interest in Café La Rica and would share in its profits equally. But, as detailed more thoroughly below, the venture was a complete failure. As a result, Coffee Holding simply exercised its rights under the definitive agreement and dissolved Café La Rica. Coffee Bean retaliated by initiating a series of baseless claims against Coffee Holding in this Court, including an ex *parte* Motion for a Temporary Restraining Order.

Moreover, Coffee Bean has continued to operate Café La Rica and collect receivables in violation of the dissolution; in fact, upon information and belief, at least $170,000 has been collected from Café La Rica customers by Coffee Bean and either converted for personal use or deposited into an unauthorized bank account without Coffee Holding's knowledge or permission.

## THE PARTIES

1.      Coffee Bean is a limited liability company organized and operating under the laws of Delaware.

2.      Coffee Holding is a corporation organized and operating under the laws of the State of Nevada.

3.      Café La Rica was a limited liability company organized and operating under the laws of Delaware.

## FACTS AND PROCEDURAL POSTURE

4.     On or about March 10, 2006, Coffee Bean and Coffee Holding entered into the Operating Agreement which created and governs Café La Rica and, among other things, provides the mechanism for dissolution should one or both the parties decide to dissolve Café La Rica.  Specifically, the Operating Agreement provides that should there be a material breach of any agreement between Café La Rica and one of the two members (Coffee Bean or Coffee Holding) or between any two members, Café La Rica would be "…dissolved without further action by the members…."  *See* Operating Agreement at § 13.1 (e).  A copy of the Operating Agreement is attached as Exhibit A of the Plaintiff's Complaint.

5.     The Operating Agreement also provides that if the members enter into a dispute about the interpretation of the Operating Agreement or enter into a dispute with respect to the relations among Members, the parties are required: <u>first</u>, to enter good faith negotiations during a sixty day period to resolve the dispute; <u>second</u>, to refer the dispute to mediation; and <u>only third</u>, bring an action in court in accordance with an exclusive forum selection clause.  *See* Operating Agreement at § 14.13 (emphasis added).

6.     The Operating Agreement provides that the Agreement would be governed by Delaware law and that the parties agreed to exclusive jurisdiction in the state or federal courts of Delaware.  *See* Operating Agreement at § 14.8.

7.     On or about March 10, 2006, Coffee Holding and Café La Rica entered into the Expense Sharing Agreement, which provides, among other things, that Coffee Holding would render certain management services in exchange for 5% of Café La Rica's monthly sales.  The Expense Sharing Agreement also provided that Coffee Holding would sell coffee to Café La

10

Rica at fair market prices. A copy of the Expense Sharing Agreement is attached as Exhibit B of the Plaintiff's Complaint.

8.      From its inception, however, Café La Rica never turned a profit and generated loss after loss. In short, Café La Rica has been a complete failure.

9.      Mr. Ernesto Aguila, managing director of Café La Rica, controlled the day-to-day operations of Café La Rica; importantly, it was <u>Mr. Aguila</u> who was in charge of ordering coffee from Coffee Holding. Mr. Aguila continually placed large orders of coffee that Coffee Holding provided but for which Café La Rica rarely paid.

10.     Not only did Mr. Aguila wholly mismanage and neglect Café La Rica, but he attempted to personally gain from what little profits Café La Rica did make. Among other things, Mr. Aguila leased an unnecessarily expensive car at nearly $700 per month which he charged to Café La Rica. Mr. Aguila also fired key employees and hired family members, including his wife, who he employed at a salary of over $40,000 per year. In fact, upon information and belief, Mr. Aguila accepted cash payments from at least two customers of Café La Rica (Silba Coffee Services and Farm Stores) and converted the cash for personal use.

11.     Coffee Holding, by contrast, did everything it could to keep Café La Rica afloat. Not only did Coffee Holding consistently fulfill Café La Rica's many demands for coffee at fair market value -- notwithstanding the fact that Café La Rica paid for almost none of it -- but time and time again, Coffee Holding contributed cash and equipment to Café La Rica in an attempt to save the failing venture.

12.     In March 2006, Coffee Holding contributed $250,000 in cash and a brick pack packaging machine with a book value of $335,000 to Café La Rica. In December 2006, Coffee Holding furnished Café La Rica with an additional $50,000. Coffee Holding also advanced Café

[TPW: NYLEGAL:644432.3] 19499-00009  03/13/2007 05:30 PM

La Rica a $19,000 security deposit which Café La Rica has still not reimbursed.  Finally, Coffee Holding paid $20,000 for an insurance premium for Café La Rica.

13.     Coffee Holding has sold approximately $530,000 of coffee to Café La Rica; however, due to Mr. Aguila's management of Café la Rica, only $150,000 has been paid.

14.     Coffee Holding always sold coffee to Café La Rica at fair market value.

15.     Mr. Aguila has been kept fully informed of Café La Rica's financial condition by Café La Rica accountants.  Mr. Aguila has been provided with financial reports by Coffee Holding or Café La Rica's accountants.

16.     Currently, Café La Rica's financial statements demonstrate accumulated losses of $430,000.

17.     Upon information and belief, Coffee Bean has never contributed cash or coffee to Café La Rica.  In fact, upon information and belief, Coffee Bean withdrew $5,000 from Café La Rica for payment of rent for a previous business venture with Mr. Aguila without the consent of Coffee Holding.

18.     Despite Coffee Holding's financial support of Café La Rica, the venture failed. And, in order to salvage what little there was left, Coffee Holding had no choice but to exercise its rights under the Operating Agreement and dissolve Café La Rica due to a material breach of the Expense Sharing Agreement.  This material breach consisted of Café La Rica's failure to pay Coffee Holding for the coffee that Coffee Holding continually provided.  By letter dated February 5, 2007 from Andrew Gordon, Coffee Holding rightfully dissolved Café La Rica.

19.     Instead of trying to work with Coffee Holding to develop an amicable winding down process, Mr. Aguila unilaterally changed the passcodes of Café La Rica's bank account, withdrew $20,000 from the same account and, for an extended period, cut off Coffee Holding's

[TPW: NYLEGAL:644432.3] 19499-00009  03/13/2007 05:30 PM

access to Café La Rica's security cameras.  Upon information and belief, Mr. Aguila continues to run Café La Rica and unilaterally dispose of its assets despite being notified of dissolution and the need to wind up.

20.    Mr. Gordon did the only thing he could -- request Washington Mutual to freeze Café La Rica's account so that its remaining assets would not be dissipated.

21.    Instead of seeking to mediate or arbitrate this matter, as required by the Operating Agreement, Coffee Bean filed not only a Complaint, alleging a series of baseless claims, but an *ex parte* Temporary Restraining Order ('TRO") in this Court.  Moreover, the Complaint and TRO were filed in direct contravention to the <u>exclusive</u> Forum Selection Clause of the Operating Agreement.

22.    Coffee Holding filed a Motion to Enforce a Forum Selection Clause and to Transfer Venue on February 15, 2007.

23.    This Court denied Plaintiff's TRO in an Order dated February 16, 2007 on the basis that the Plaintiffs could not demonstrate irreparable harm.

24.    Upon information and belief, since Café La Rica's dissolution, Coffee Bean has taken $170,000 from Café La Rica's customers and deposited the money into Coffee Bean's Bank of America account without the knowledge, let alone the permission of Coffee Holding.

## <u>COUNT I -- BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING</u>

25.    Coffee Holding realleges and reincorporates by reference paragraphs 1 through 24 of the above.

26.    By entering into the Operating Agreement, Coffee Bean implicitly covenanted to deal fairly and in good faith with Coffee Holding and Café La Rica.

13

27.     Coffee Bean's agent, Mr. Aguila has not only knowingly and purposefully mismanaged Café La Rica, but, among other things, has leased an unnecessarily expensive car and employed his own wife as a salaried employee and accepted cash payments from at least two customers of Café La Rica for personal use.

28.     Mr. Lensi, Manager of Coffee Bean, withdrew $5,000 from Café La Rica for payment of rent owed by Coffee Bean for a previous business venture.

29.     Coffee Bean's agent, Mr. Aguila also knowingly and purposefully unilaterally changed the passcodes and withdrew $20,000 from Café La Rica's bank accounts soon after he learned of Café La Rica's dissolution.

30.     Coffee Bean has also knowingly and purposefully constructively ousted Coffee Holding from Café La Rica by shutting off Coffee Holding's access to Café La Rica's security cameras for an extended time.

31.     Coffee Bean and Mr. Aguila have additionally taken at least $170,000 of account receivables from Café La Rica customers which it has either converted for personal use or placed in an unauthorized Coffee Bean bank account without knowledge or permission from Coffee Holding.

32.     Coffee Bean has breached the covenant of good faith and fair dealing by undertaking the above acts.

33.     Coffee Holding has suffered and continues to suffer damages as a direct, foreseeable and proximate result of Coffee Bean's breach of the implied covenant of good faith and fair dealing.

WHEREFORE, Coffee Holding respectfully requests the Court to dismiss Plaintiff's Complaint and enter judgment against Coffee Bean for damages, together with pre and post

14

judgment, interest, costs, and any other and further relief this Court deems equitable, just and proper.

### COUNT II - CONVERSION

34.     Coffee Holding realleges and reincorporates by reference paragraphs 1 through 24 of the above.

35.     Soon after he learned of Café La Rica's dissolution, Coffee Bean's agent, Mr. Aguila, without the permission of Coffee Holding, withdrew $20,000 from Café La Rica's Washington Mutual bank account to which, prior to that, Coffee Holding had maintained full access.  Mr. Aguila also accepted cash payments from two customers for personal use.

36.     Coffee Bean and/or Mr. Aguila has also taken at least $170,000 in accounts receivables without Coffee Bean's knowledge or permission and upon information of belief, deposited such receivables into a Coffee Bean bank account.

37.     Coffee Bean has committed the act of conversion by undertaking the above acts.

38.     Coffee Holding has suffered and continues to suffer damages as a direct, foreseeable, and proximate result of Coffee Bean's tortious conversion.

WHEREFORE, Coffee Holding respectfully requests the Court to dismiss Plaintiff's Complaint and enter judgment against Coffee Bean for damages together with pre and post judgment interest, costs, and any other and further relief this Court deems equitable, just and proper.

### COUNT III - TORTIOUS INTERFERENCE WITH THE EXPENSE SHARING CONTRACT

39.     Coffee Holding realleges and reincorporates by reference paragraphs 1 through 24 of the above.

[TPW: NYLEGAL:644432.3] 19499-00009  03/13/2007 05:30 PM

40. Coffee Bean, through its agent, Mr. Aguila has continually mismanaged Café La Rica causing its financial crisis and its inability to make its payments to Coffee Holding as required by the Expense Sharing Agreement.

41. It was Mr. Aguila who intentionally ordered significant amounts of coffee from Coffee Holding on behalf of Café La Rica knowing that Café La Rica would be unable to pay and therefore would be in breach of the Expense Sharing Agreement – this has resulted in $380,000 worth of unpaid coffee. Additionally, under Mr. Aguila's management, Café La Rica was never able to re-pay to Coffee Holding the $50,000 cash advance, the $19,000 security deposit and the cost of inventory and packaging materials.

42. Mr. Aguila knew of the Expense Sharing Agreement, his actions were a significant factor in the breach of the Expense Sharing Agreement by Café La Rica and he did so without justification.

43. By taking the above actions, Coffee Bean has tortiously interfered with the Expense Sharing Agreement between Coffee Holding and Café La Rica.

44. Coffee Holding has suffered and continues to suffer damages as a direct, foreseeable, and proximate result of Coffee Bean's and Mr. Aguila's tortious interference with the Expense Sharing Agreement between Coffee Holding and Coffee Bean.

WHEREFORE, Coffee Holding respectfully requests the Court to dismiss Plaintiff's Complaint and enter judgment against Coffee Bean for damages, together with pre and post judgment interest, costs, and any other and further relief this Court deems equitable, just and proper.

16

## COUNT IV – TORTIOUS INTERFERENCE WITH COFFEE HOLDING'S BUSINESS RELATIONSHIPS AND PROPERTY

45.     Coffee Holding realleges and reincorporates by reference paragraphs 1 through 24 of the above.

46.     Coffee Bean, through its agent, Mr. Aguila, knowingly and intentionally cut off Coffee Holding's access to the security cameras monitoring Café La Rica's premises almost immediately after Coffee Holding put Coffee Bean on notice of Café La Rica's dissolution.  As such, Coffee Holding has been constructively ousted from the property of Café La Rica.

47.     By taking the above actions, Coffee Bean has interfered with the business relationship between Coffee Holding and Café La Rica and Café La Rica's customers, creditors and vendors.

48.     Coffee Holding has suffered and continues to suffer damages as a direct, foreseeable, and proximate result of Coffee Bean's and Mr. Aguila's tortious interference with the Expense Sharing Agreement between Coffee Holding and Coffee Bean.

WHEREFORE, Coffee Holding respectfully requests the Court to dismiss Plaintiff's Complaint and enter judgment against Coffee Bean for damages, together with pre and post judgment interest, costs, and any other and further relief this Court deems equitable, just and proper.

## COUNT V – BREACH OF THE OPERATING AGREEMENT

49.     Coffee Holding realleges and reincorporates by reference paragraphs 1 through 24 of the above.

50.     Pursuant to the Operating Agreement should the members have a dispute about the interpretation of the Operating Agreement the parties are required first, to attempt good faith negotiations during a sixty day period to resolve the dispute; second, to refer the dispute to

17

mediation and only third, bring an action in any court having jurisdiction pursuant to the exclusive forum selection clause. *See* Operating Agreement at § 14.13.

51.    Clearly, Coffee Bean has a dispute as to how the Operating Agreement should be interpreted. Although it is clear by the plain terms of the Operating Agreement that should there be a breach of an agreement between a member and Café La Rica, Café La Rica should be dissolved without further action Coffee Bean alleges that Coffee Holding "unilaterally" breached the Operating Agreement and that Coffee Holding is not taking the correct steps pursuant to the Operating Agreement.  In fact, in contravention to the dissolution process pursuant to the Operating Agreement, Mr. Aguila continues to run Café La Rica despite being notified of dissolution and the need to wind up.

52.    Although it is clear that Coffee Holding took all the right steps, the Plaintiff's Complaint is clearly based on a dispute of the "interpretation, construction or implementation" of this Agreement…." *See* Operating Agreement at § 14.13.

53.    As such, the Plaintiffs were required first, to attempt a good faith effort to resolve the dispute; second, attempt to mediate the dispute and only third, file a Complaint in a court of law.  Instead, before taking any steps to resolve the dispute in good faith or mediate, Coffee Bean filed this Complaint in this Court.

54.    By taking the above actions, Plaintiff is in breach of the Operating Agreement.

WHEREFORE, Coffee Holding respectfully requests the Court to dismiss Plaintiff's Complaint and enter judgment against Coffee Bean for damages to be determined at trial, attorneys fees, costs and any other and further relief this Court deems equitable, just and proper.

[TPW: NYLEGAL:644432.3] 19499-00009  03/13/2007 05:30 PM

## COUNT VI - PERMANENT AND TEMPORARY INJUNCTION

55.     Coffee Holding realleges and incorporates by reference paragraphs 1 through 24 above.

56.     Upon information and belief, since March 5, 2007, after Coffee Holding rightfully dissolved Café La Rica, Coffee Bean and/or Mr. Ernesto Aguila and Mr. Alberto Lensi have continued to operate Café La Rica by, among other things, continuing to produce and sell coffee to customers and collect accounts receivable.

57.     Upon information and belief, on or about March 9, 2007, Mr. Aguila told Mr. Gordon from Coffee Holding that Café La Rica had no receivables in its account although knowing that Coffee Bean had accepted checks from Café La Rica's customers and deposited them into a Coffee Bean bank account.

58.     Coffee Holding has no other adequate remedy at law to protect its assets because the amount of damage caused by Coffee Bean's continued operation of Café La Rica cannot be remedied by money; moreover, Coffee Bean's acts are likely to continue indefinitely into the future if there is no effort to stop Coffee Bean from operating Café La Rica and wasting what assets remain.

WHEREFORE, Coffee Holding demands judgment for a temporary and permanent injunction restraining Coffee Bean from continuing to operate Café La Rica in violation of Coffee Holding's rightful dissolution.

## PRAYER FOR RELIEF

WHEREFORE, Coffee Holding asks that judgment be entered for Coffee Holding and against Coffee Bean for:

1.     Monetary damages, in an amount to be decided at trial but not below, $1,800,000.

2.      A temporary and permanent injunction restraining Coffee Bean from operating

Café La Rica and/or receiving any money on behalf of Café La Rica.

3.      Attorneys fees, costs and all further relief the Court deems equitable, just and

proper.


DATED this 13th day of March, 2007



KATZ, BARRON, SQUITERO, FAUST
2699 S. Bayshore Drive, Seventh Floor
Miami, Florida 33133
Tel:  305-856-2444
Fax: 305-285-9227

By:  s/Mark S. Auerbacher
        Mark S. Auerbacher, Esq.
        Florida Bar No. 978220
        msa@katzbarron.com
        John R. Squitero, Esq.
        Florida Bar No. 121196
        jrs@katzbarron.com

Christopher F. Graham
Mary H. Mulhearn
Thacher Proffitt & Wood LLP
Two World Financial Center
New York, New York 10281
Tel: (212) 912-7669
Fax: (212) 912-7751
CGraham@tpw.com

COUNSEL FOR DEFENDANT/COUNTERCLAIMANT

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Jose.Ferrer@bakernet.com.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following recipients:

>Jose Ferrer, Esq.
>BAKER & McKENZIE LLP
>Mellon Financial Center
>1111 Brickell Avenue, Suite 1700
>Miami, Florida 33131

*Counsel of Defendant/Counterclaimant*

>/s/Mark S. Auerbacher, Esq.

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.: 07-20389-CIV-MARTINEZ/BANDSTRA

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

       Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,

       Defendant.
_____/

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

       Plaintiff, Coffee Bean Trading-Roasting, LLC, hereby discloses the following pursuant to

this Court's Order directing the parties to file certificates of interested parties:

       1.     The name of each person, attorney, association of persons, firm, law firm,

partnership, and corporation that has or may have an interest in the outcome of this action –

including subsidiaries, conglomerates, affiliates, parent corporations, publicly-traded companies

that own 10% or more of a party's stock, and all other identifiable legal entities related to any

party in the case:

       **Andrew Gordon**

       **Ernesto Aguila**

       **Sonia Aguila**

       **CBT Holdings, Inc.**

       **Baker & McKenzie, LLP**

       **Thacher Proffitt & Wood LLP**

       **Katz, Barron, Squitero, Faust, Terzo, Friedberg, Grady, English & Allen, P.A.**

2.      The name of every other entity whose publicly-traded stock, equity, or debt may be substantially affected by the outcome of the proceedings:

**None known to Plaintiff's counsel.**

3.      The name of every other entity which is likely to be an active participant in the proceedings, including the debtor and members of the creditors' committee (or twenty larges unsecured creditors) in bankruptcy cases:

**None currently known to Plaintiff's counsel.**

4.      The name of each victim (individual or corporate) of civil and criminal conduct alleged to be wrongful, including every person who may be entitled to restitution:

**Plaintiff, Coffee Bean Trading-Roasting, LLC, claims an entitlement to damages in this action based on alleged civil wrongs committed against it by Defendant, Coffee Holding, Inc.**

I hereby certify that, except as disclosed above, I am unaware of any actual or potential conflict of interest involving the district judge and magistrate judge assigned to this case, and will immediately notify the Court in writing on learning of any such conflict.

Respectfully submitted,

BAKER & MCKENZIE LLP
Attorneys for Defendant
Mellon Financial Center, Suite 1700
1111 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 789-8900
Facsimile:  (305) 789-8953


By: _____/s/ Jose M. Ferrer_____
        Jose M. Ferrer
        Florida Bar No. 173746

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served this 12th

day of March, 2007 by facsimile and U.S. Mail upon Mark S. Auerbacher, Esq. and John R.

Squitero, Esq., Katz Barron Squitero Faust, 2699 S. Bayshore Drive, Seventh Floor, Miami,

Florida 33133; and Christopher F. Graham, Esq. and John P. Doherty, Esq., Thacher Proffitt &

Wood LLP, Two World Financial Center, New York, New York 10281.


By:     /s/ Jose M. Ferrer
        Jose M. Ferrer


MIADMS/307793.1

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.:  07-20389-CIV-MARTINEZ/BANDSTRA

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

      Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,

      Defendant.

_____/

### PLAINTIFF'S NOTICE OF CORRECTING CERTIFICATE OF SERVICE

     Plaintiff, Coffee Bean Trading-Roasting, LLC, hereby gives notice that the certificate of service contained in its Certificate of Interested Persons and Corporate Disclosure Statement incorrectly stated that the date of service of that Certificate upon Defendant's counsel was March 12, 2007.  The correct date of service of that Certificate was March 21, 2007.

          Respectfully submitted,

          BAKER & MCKENZIE LLP
          Attorneys for Defendant
          Mellon Financial Center, Suite 1700
          1111 Brickell Avenue
          Miami, Florida 33131
          Telephone: (305) 789-8900
          Facsimile:  (305) 789-8953

          By: ___/s/ Jose M. Ferrer_____
              Jose M. Ferrer
              Florida Bar No. 173746

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served this 21st day of March, 2007 by facsimile and U.S. Mail upon Mark S. Auerbacher, Esq. and John R. Squitero, Esq., Katz Barron Squitero Faust, 2699 S. Bayshore Drive, Seventh Floor, Miami, Florida 33133; and Christopher F. Graham, Esq. and John P. Doherty, Esq., Thacher Proffitt & Wood LLP, Two World Financial Center, New York, New York 10281.

By:  /s/ Jose M. Ferrer
Jose M. Ferrer

MIADMS/307795.1

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
**Miami Division**

**Case Number: 07-20389-CIV-MARTINEZ-BANDSTRA**

COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

     Plaintiff,

vs.

COFFEE HOLDING, CO. INC., a Nevada
corporation

     Defendant.

---

## EMERGENCY MOTION OF DEFENDANT, COFFEE HOLDING, CO. INC. FOR TEMPORARY RESTRAINING ORDER

    Pursuant to Rule 65, Fed. R. Civ. P., and other applicable authority, Defendant, Coffee

Holding, Co. Inc. ("Coffee Holding"), by and through its undersigned attorneys, files its Motion

for a Temporary Restraining Order, and as grounds states as follows:

### I.     PRELIMINARY STATEMENT

    In March 2006, the Plaintiff, Coffee Bean Trading-Roasting, LLC ("Coffee Bean") and

the Defendant, Coffee Holding, entered into a joint venture. Coffee Bean and Coffee Holding

formed "Café La Rica" a company that roasts, packages and sells coffee. Each party has a 50%

interest in Café La Rica and was supposed to share in its profits equally, among other things, as

set forth in the parties' operating agreement. The venture was a complete failure. As a result,

Coffee Holding exercised its rights under the operating agreement and notified Coffee Bean of

Café La Rica's dissolution. Nevertheless, Coffee Bean is continuing to operate Café La Rica and

collect receivables in violation of the dissolution. In fact, it is believed that approximately

$160,000 has been collected from Café La Rica customers by Coffee Bean and either converted for personal use or improperly deposited into a bank account maintained by Coffee Bean, or a Coffee Bean related entity, without Coffee Holding's knowledge or permission. As a result of Coffee Bean's improper actions, this Court should enter a temporary restraining order (TRO) prohibiting Coffee Bean's improper and unauthorized conduct.

## II.   FACTS AND PROCEDURAL HISTORY

### A.   Coffee Holding and Coffee Bean Enter Joint Venture for Café La Rica

1.      On or about March 10, 2006, Coffee Bean and Coffee Holding entered into the Limited Liability Company Agreement of Café La Rica, LLC ( the "Operating Agreement") which created and governs Café La Rica and, among other things, provides the mechanism for dissolution should one or both the parties decide to dissolve Café La Rica. *See* Operating Agreement Exhibit "A." Specifically, the Operating Agreement provides that should there be a material breach of any agreement between Café La Rica and one of the two members (Coffee Bean or Coffee Holding) or between any two members, Café La Rica would be "…dissolved without further action by the members…." Operating Agreement at § 13.1 (e). *Id.*

2.      The Operating Agreement also provides that if the members have a dispute about the interpretation of the Operating Agreement or with respect to the relations among the Members, the parties are required: first, to enter good faith negotiations during a sixty day period to resolve the dispute; second, to refer the dispute to mediation; and only third, bring an action in court in accordance with an exclusive forum selection clause. *See* Operating Agreement at § 14.13 (emphasis added).[1]

---

[1]      The Operating Agreement provides that the Agreement would be governed by Delaware law and that the parties agreed to exclusive jurisdiction in the state or federal courts of Delaware. *See* Operating Agreement at § 14.8. Defendant Coffee Holding filed a Motion to Transfer Venue on February 15, 2007, which has been fully briefed and is *sub judice*.

3.     On or about March 10, 2006, Coffee Holding and Café La Rica entered into the Expense Sharing and Services Agreement between Coffee Holding and Café La Rica (the "Expense Sharing Agreement") which provides, among other things, that Coffee Holding would render certain management services in exchange for 5% of Café La Rica's monthly sales.  *See* Exhibit "B."  The Expense Sharing Agreement also provided that Coffee Holding would sell coffee to Café La Rica at fair market prices.  *See Id.*

### B.     Café La Rica is a Failed Venture

4.     From its inception, however, Café La Rica never turned a profit and generated monthly loss after loss.  Mr. Ernesto Aguila, managing director of Café La Rica, controlled the day-to-day operations of Café La Rica, and still continues to do so.  It was <u>Mr. Aguila</u>, Coffee Bean's prior managing member, who was in charge of ordering coffee from Coffee Holding. Mr. Aguila continually placed large orders of coffee that Coffee Holding provided but for which Café La Rica rarely paid.

5.     Not only did Mr. Aguila wholly mismanage and neglect Café La Rica, but he attempted to personally gain from what little profits Café La Rica did make.  Among other things, Mr. Aguila leased an unnecessarily expensive car at nearly $700 per month which he charged to Café La Rica.  Mr. Aguila also fired key employees and hired family members, including his wife, who he employed at a salary of over $40,000 per year.  Mr. Aguila is also believed to have accepted cash payments from at least two customers of Café La Rica (Silba Coffee Services and Farm Stores) and converted the cash for personal use.

6.     Coffee Holding, by contrast, did everything it could to keep Café La Rica afloat. Not only did Coffee Holding consistently fulfill Café La Rica's many demands for coffee at fair market value -- notwithstanding the fact that Café La Rica paid for almost none of it -- but time and time again, Coffee Holding contributed cash and equipment to Café La Rica.

7. In March 2006, Coffee Holding contributed $250,000 in cash and a brick pack packaging machine with a book value of $335,000 to Café La Rica. In December 2006, Coffee Holding furnished Café La Rica with an additional $50,000. Coffee Holding also advanced Café La Rica a $19,000 security deposit which Café La Rica has still not reimbursed. Finally, Coffee Holding paid $20,000 for an insurance premium for Café La Rica.

8. Coffee Holding sold approximately $530,000 of coffee to Café La Rica, which was always sold at fair market value. However, under Mr. Aguila's management of Café la Rica, only $150,000 has been paid. Mr. Aguila has been kept fully informed of Café La Rica's financial condition by Café La Rica accountants and was also provided with its financial reports. Currently, Café La Rica's financial statements demonstrate accumulated losses of $430,000. Coffee Bean has never contributed cash or coffee to Café La Rica. In fact, upon information and belief, Mr. Lensi, Manager of Coffee Bean, withdrew $5,000 from Café La Rica for payment of rent for a previous business venture without the consent of Coffee Holding.

## C. Coffee Holding Exercises Right to Dissolve Café La Rica

9. Despite Coffee Holding's significant financial support of Café La Rica, the venture failed. And, in order to salvage what little there was left, Coffee Holding had no choice but to exercise its rights under the Operating Agreement and notify Coffee Bean of Café La Rica's dissolution due to a material breach of the Expense Sharing Agreement. This material breach consisted of Café La Rica's failure to pay Coffee Holding for the coffee that Coffee Holding continually provided. By letter dated February 5, 2007 from Andrew Gordon, Coffee Holding notified Coffee Bean of Café La Rica's dissolution. *See* Exhibit "C."

10. Instead of trying to work with Coffee Holding to develop an amicable winding down process, Mr. Aguila unilaterally changed the passcodes of Café La Rica's bank account at Washington Mutual Bank, withdrew $20,000 from the same account and, for an extended period,

cut off Coffee Holding's access to Café La Rica's security cameras.  Mr. Aguila continues to run Café La Rica and unilaterally dispose of its assets despite being notified of dissolution and the need to wind up.

11.　　Mr. Andrew Gordon, president of Coffee Holding, requested that Washington Mutual Bank freeze Café La Rica's account so that its remaining assets would not be dissipated. Instead of seeking to mediate or arbitrate this matter, as required by the Operating Agreement, Coffee Bean filed a Complaint, alleging a series of baseless claims, and sought an *ex parte* TRO in this Court, which was denied after a hearing.

12.　　Coffee Holding filed a Motion to Enforce a Forum Selection Clause and to Transfer Venue on February 15, 2007, which has not been ruled upon by this Court.  This Court denied Coffee Bean's Motion for a TRO in an Order dated February 16, 2007 after a hearing. Additionally, Coffee Holding answered Coffee Bean's Complaint, with affirmative defenses, and filed Counter-Claims, including but not limited to Breach of the Covenant of Good Faith and Fair Dealing as well as Conversion.

**D.　　Coffee Bean and Aguila Continue to Operate Café La Rica and Divert Assets**

13.　　In contravention to the dissolution process set forth in the Operating Agreement, Mr. Aguila continues to operate Café La Rica despite being notified of dissolution and the need to wind up.  Moreover, it is also clear that the two 50% members of Café La Rica are hopelessly deadlocked and there is no ability to properly conduct business and wind up the business as provided under the Operating Agreement without the Court's intervention.

14.　　Since Café La Rica's dissolution, Coffee Bean has taken approximately $160,000 from Café La Rica's customers and deposited the money into a Coffee Bean or a Coffee Bean related entities' Bank of America account (#229004448902) without the knowledge, let alone the permission of Coffee Holding.  *See* Affidavit of Andrew Gordon, attached as Exhibit "D" at ¶ 8.

15.    Since March 5, 2007, after Coffee Holding rightfully dissolved Café La Rica, Coffee Bean and/or Mr. Ernesto Aguila and Mr. Alberto Lensi have continued to operate Café La Rica by, among other things, continuing to produce and sell coffee to customers and collect accounts receivable.  *See* Gordon Affidavit.  On or about March 9, 2007, Mr. Aguila told Mr. Gordon from Coffee Holding that Café La Rica had no receivables in its account although he knew that Coffee Bean had accepted checks from Café La Rica's customers and deposited them into a Coffee Bean related entity bank account, which it maintains at Bank of America. *See* Gordon Affidavit at ¶ 5.

16.    Coffee Holding has no other adequate remedy at law to protect its assets because the amount of damage caused by Coffee Bean's continued operation of Café La Rica cannot be remedied by money since there will be no money left in Café La Rica.  Moreover, Coffee Bean's acts are likely to continue indefinitely into the future if there is no effort to stop Coffee Bean from operating Café La Rica and wasting what assets remain.

17.    Plaintiff, Coffee Bean is wasting and dissipating the above mentioned accounts receivable by using them for personal reasons including paying substantial insider salaries and expenses.  Coffee Holding has no other adequate remedy at law to prevent the waste and dissipation of accounts receivable to protect its interest, as well as equipment it contributed to the venture.

### III.    MEMORANDUM OF LAW IN SUPPORT OF A TRO

**A.    Entry of a Temporary Restraining Order (TRO) to Maintain Status Quo is Appropriate**

**1.    Legal Standard for Obtaining a Temporary Restraining Order**

The standard for an injunction is provided by Federal Rule of Civil Procedure 65. The purpose of a preliminary injunction is to preserve the rights of the parties and to prevent irreparable injury pending a final determination on the merits. *See Riverside Park Realty Co. v. Federal Deposit Ins. Corp.*, 465 F.Supp. 305 (M.D. Tenn. 1978). A court may grant injunctive relief under Rule 65, Fed. R. Civ. P., if the movant shows the following: 1) substantial likelihood of success on the merits; 2) irreparable injury will be suffered unless the injunction issues; 3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and 4) if issued, the injunction would not be adverse to the public interest. *McDonald's Corp. v. Robertson,* 147 F.3d 1301 (11th Cir. 1998). In the instant case, Coffee Holding submits that if the requested TRO is not granted, Coffee Holding will suffer immediate and irreparable injury, loss, and damage as a result of Coffee Bean's breach of the Operating Agreement and frustration of the winding down procedure.

### 2.     Coffee Holding Satisfies the Requirements for Entry of TRO

### a.     Coffee Holding has Demonstrated that it will Suffer Irreparable Harm

As stated above, the standard to establish that a movant will suffer irreparable injury is very stringent. However, in this instance, Coffee Holding can satisfy such an injury. Specifically, Coffee Bean is diverting assets necessary and subject to the dissolution process for Café La Rica. By allowing Coffee Bean to plunder the accounts receivables, there will be no meaningful dissolution of Café La Rica, as it will be stripped to the bone, thereby leaving an empty shell for the proscribed equitable winding down of the business. In *In re Feit & Drexler, Inc.*, 760 F.2d 406 (2nd Cir. 1985), the court stated that "even where the ultimate relief sought is money damages, Federal courts have found preliminary injunctions appropriate where it has been shown that the Defendant 'intended to frustrate any judgment on the merits by transferring assets out' ". (citations omitted). This rationale can be applied by analogy to this case as Coffee

Bean is clearly attempting to frustrate the dissolution process by continuing to conduct business and by purposely diverting Café La Rica assets for its own use. Moreover, absent an issuance of the TRO, there is ample evidence of Café La Rica's imminent bankruptcy. Indeed, in *Signal Capital Corp. v. Frank*, 895 F. Supp. 62 (S.D.N.Y. 1995) the Court determined that "[a] preliminary injunction may issue to preserve assets where the evidence shows that a party intends to frustrate any judgment on the merits by making it uncollectible." *Citing Republic of the Philippines v. Marcos*, 806 F.2d 344, 356 (2d Cir. 1986), *cert. dismissed*, 480 U.S. 942 (1987). Here, by dissipating all of Café La Rica's assets, Coffee Bean will frustrate the dissolution process and, consequently, this satisfies the requirement of showing irreparable harm. Moreover, there is no monitoring of other company accounts or oversight for valuable equipment contributed by Coffee Holding to the venture. The continued operation of the business will necessarily affect creditors and customers of Café La Rica, and these facts necessitate intervention by the Court. Indeed, at the hearing on Coffee Bean's prior Motion for a TRO, counsel for Coffee Bean identified the necessity for an orderly dissolution of Café La Rica as a purported basis to enjoin Coffee Holding's actions. Contrary to these feigned concerns, Coffee Bean's intent was to "buy time" and continue operations while it gutted all of Café La Rica's assets for its own use. For these reasons, the court should restrain Coffee Bean's and Aguila's conduct and order them to stop using Café La Rica's property at all.

       **b.**      **Coffee Holding Has Demonstrated a Substantial Likelihood that it will Prevail on the Underlying Merits of the Case**

In order to obtain a TRO, a party must demonstrate that it will prevail on the merits. Coffee Holding also satisfies this requirement. Pursuant to the clear terms of the Expense Sharing Agreement and the Operating Agreement, Coffee Holding rightfully dissolved Café La Rica due to a material breach by Café La Rica. Café La Rica was seriously deficient in payment

to Coffee Holding and Coffee Holding did the only thing it could to shield itself and other creditors from further serious financial risk – dissolve Café La Rica.  As such, Coffee Holding has demonstrated that it will prevail on the merits.  Coffee Holding is also likely to prevail as it simply protected it rights under the Expense Sharing Agreement.  On the other hand, Coffee Bean's Complaint is without merit as it seeks to force defendant to continue the operation of the failed venture despite mounting losses and member deadlock, which claims will ultimately fail on the merits as there is no substance to their purported claims.

   **c.    Coffee Holding Has Established that the Threatened Injury to it Outweighs the Harm the Injunction May Cause Coffee Bean**

   Coffee Holding has clearly established that the threatened injury to Coffee Holding outweighs the harm such a TRO may cause to Coffee Bean.  First, Ernesto Aguila of Coffee Bean unilaterally changed the account passcodes to the Café La Rica accounts therefore forcing Coffee Holding to contact Washington Mutual in order to regain some control and maintain the status quo of Café La Rica's accounts.  Had Coffee Holding been forced to cease all communications it has with Washington Mutual it would have lost whatever control it did have and thus be more harmed than Coffee Bean.  It is still Coffee Bean and Mr. Aguila's actions that pose a significant risk to Coffee Holding and Café La Rica's other creditors.  Incredibly, they have been systematically depositing Café La Rica's accounts receivables into a Coffee Bean account or that of a related entity, which is maintained at Bank of America.  *See* Gordon Affidavit at ¶ 8.  The amount already transferred out of Café La Rica totals approximately $160,000.  Coffee Bean should not be permitted to act in this manner and all further acts of this type should be restrained by this Court before any further harm occurs.

   **d.    Granting the TRO will Not Disserve the Public Interest**

   There is no doubt that Café La Rica has failed as a venture – and, was failing from its inception.  Therefore, to allow Café La Rica's customers, creditors, and employees to do

business with Café La Rica will only magnify the harm involved. These entities and individuals have the right to know that Café La Rica is, at best, in dire financial circumstances. Thus, to grant the TRO and protect Café La Rica's only apparent liquid assets -- accounts receivables -- will not disserve the public. Instead, the public has an interest in preserving the assets of Café La Rica for purposes of paying creditors. Permitting Coffee Bean to use the funds from Café La Rica's receivables before this proceeding is adjudicated or resolved would greatly threaten the dissolution and creditors interest. As such, the TRO should be granted, to preserve Café La Rica's assets for the orderly and fair dissolution of the venture.

Defendant's counsel conferred with Plaintiff's counsel as required by Rule 7.1 S.D. Fla. L.R., but Plaintiff did not agree to the relief requested herein.

WHEREFORE, for all the reasons set forth above and detailed in Andrew Gordon's Affidavit(s) demonstrating Coffee Bean's malfeasance, Coffee Holding respectfully requests that this Court issue a TRO to prevent Coffee Bean and its members Ernesto Aguila and Alberto Lensi from (1) exercising control over any property of Café La Rica; (2) depositing Café La Rica receivables or other assets in its account(s), or any accounts they or Coffee Bean control; and (3) such other and further relief deemed just and equitable.

DATED this 21st day of March, 2007

> KATZ BARRON SQUITERO FAUST
> 2699 S. Bayshore Drive, Seventh Floor
> Miami, Florida 33133
> Tel: 305-856-2444
> Fax: 305-285-9227
>
> By:   /s/ Mark S. Auerbacher, Esq.
>        Florida Bar No. 978220
>        msa@katzbarron.com
>        John R. Squitero, Esq.
>        Florida Bar No. 121196
>        jrs@katzbarron.com

Christopher F. Graham
Mary H. Mulhearn
Thacher Proffitt & Wood LLP
Two World Financial Center
New York, New York 10281
Tel: (212) 912-7669
Fax: (212) 912-7751
CGraham@tpw.com

COUNSEL FOR DEFENDANT/COUNTERCLAIMANT

## CERTIFICATE OF SERVICE

I hereby certify that on March 21st 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Jose.Ferrer@bakernet.com.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following recipients:

Jose Ferrer, Esq.
BAKER & McKENZIE LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131

*Counsel of Defendant/Counterclaimant*

/s/Mark S. Auerbacher, Esq.

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## CAFÉ LA RICA, LLC

A LIMITED LIABILITY COMPANY

ORGANIZED UNDER THE LAWS OF

THE STATE OF DELAWARE



EXHIBIT

A

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ...............................................................................................1

1.1    Act ...................................................................................................................1
1.2    Additional Capital Contribution ....................................................................1
1.3    Affiliate ...........................................................................................................1
1.4    Agreement .......................................................................................................2
1.5    Annual Independent Audit .............................................................................1
1.6    Assignee or "Transferee" ...............................................................................2
1.7    Bankrupt Member ...........................................................................................2
1.8    Board of Managers .........................................................................................2
1.9    Business Day ...................................................................................................3
1.10   Capital Account ..............................................................................................3
1.11   Capital Contribution .......................................................................................3
1.12   Certificate of Formation .................................................................................3
1.13   Code ................................................................................................................3
1.14   Coffee Bean Trading ......................................................................................2
1.15   Coffee Holding ...............................................................................................2
1.16   Commitment ...................................................................................................3
1.17   Company .........................................................................................................4
1.18   Company Property ..........................................................................................4
1.19   Confidential Information ................................................................................2
1.20   Default Interest Rate ......................................................................................4
1.21   Delinquent Member .......................................................................................4
1.22   Disposition (Dispose) .....................................................................................4
1.23   Dissociation ....................................................................................................5
1.24   Dissolution Event ...........................................................................................5
1.25   Distribution .....................................................................................................5
1.26   Economic Interest ..........................................................................................5
1.27   Effective Date .................................................................................................5
1.28   Equity Offering ...............................................................................................5
1.29   Exhibit A .........................................................................................................5
1.30   Fair Market Value ..........................................................................................5
1.31   Fiscal Year ......................................................................................................6
1.32   Gross Asset Value ..........................................................................................6
1.33   Initial Capital Contribution ...........................................................................8
1.34   Initial Membership Interest ...........................................................................8
1.35   Initial Sharing Ratio .......................................................................................8
1.36   Initial Value ....................................................................................................8
1.37   Management Right ..........................................................................................8
1.38   Manager ..........................................................................................................4
1.39   Member ...........................................................................................................8
1.40   Membership Interest ......................................................................................9
1.41   Minimum Working Capital ............................................................................4
1.42   Net Cash Flow ................................................................................................9
1.43   New Securities ................................................................................................9

| | | |
|---|---|---|
| 1.44 | Offering Allocation | 9 |
| 1.45 | Officer | 9 |
| 1.46 | Organization | 9 |
| 1.47 | Person | 10 |
| 1.48 | Principal Office | 10 |
| 1.49 | Proceeding | 10 |
| 1.50 | Profits and Losses | 10 |
| 1.51 | Property | 12 |
| 1.52 | Regulations | 12 |
| 1.53 | Regulatory Allocations | 12 |
| 1.54 | Related Person | 6 |
| 1.55 | Securities Act | 12 |
| 1.56 | Share | 15 |
| 1.57 | Sharing Ratio | 15 |
| 1.58 | Substitute Member | 15 |
| 1.59 | Tax Characterization and Additional Tax Terms | 15 |
| 1.60 | Winding Up Sale | 17 |

**ARTICLE II FORMATION** ... 18

| | | |
|---|---|---|
| 2.1 | Organization | 18 |
| 2.2 | Agreement | 18 |
| 2.3 | Name | 19 |
| 2.4 | Term | 19 |
| 2.5 | Registered Agent and Office | 19 |
| 2.6 | Principal Office | 20 |

**ARTICLE III PURPOSE; NATURE OF BUSINESS** ... 20

**ARTICLE IV ACCOUNTING AND RECORDS** ... 21

| | | |
|---|---|---|
| 4.1 | Records to be Maintained | 21 |
| 4.2 | Reports to Members | 21 |
| 4.3 | Annual Audit | 9 |
| 4.4 | Tax Returns and Reports | 21 |

**ARTICLE V CLASSES OF MEMBERSHIP; NAMES AND ADDRESSES OF MEMBERS** ... 22

**ARTICLE VI RIGHTS AND DUTIES OF MEMBERS; RESTRICTIVE COVENANTS** ... 22

| | | |
|---|---|---|
| 6.1 | No Management Rights as Members | 22 |
| 6.2 | Liability of Members | 22 |
| 6.3 | Indemnification | 22 |
| 6.4 | Representations, Warranties and Covenants | 22 |
| 6.5 | Conflicts of Interest | 23 |
| 6.6 | Restrictive Covenants | 24 |

**ARTICLE VII BOARD OF MANAGERS AND OFFICERS** ... 26

| | | |
|---|---|---|
| 7.1 | Board of Managers | 26 |
| 7.2 | Voting | 26 |

[TPW: NYLEGAL:460852.1] 19499-00000  03/09/2006 06:00 PM

7.3     Term of Office as a Member of the Board of Managers .................................27
7.4     Incapacitation of a Manager .................................................................................12
7.5     Officers...................................................................................................................27
7.6     Authority to Bind the Company .........................................................................28
7.7     Actions of the Board of Managers ....................................................................30
7.8     Indemnification .....................................................................................................30
7.9     Resignation and Removal; Replacement...........................................................30
7.10    Other Activities .....................................................................................................31
7.11    Distributions ..........................................................................................................31
7.12    Expenses ................................................................................................................31
7.13    Affiliates; Fees ......................................................................................................31

ARTICLE VIII CONTRIBUTIONS AND CAPITAL ACCOUNTS .................................32

8.1     Initial Capital Contributions ...............................................................................32
8.2     Indemnification .....................................................................................................13
8.3     Shares .....................................................................................................................32
8.4     Additional Capital Contributions .......................................................................33
8.5     Enforcement of Commitments ...........................................................................34
8.6     Capital Account .....................................................................................................35
8.7     No Obligation to Restore Deficit Balance.........................................................38
8.8     Withdrawal; Successors ......................................................................................38
8.9     Interest ...................................................................................................................38
8.10    Investment of Capital Contributions and Company Cash................................38
8.11    Repayment of Capital Contribution. ..................................................................39

ARTICLE IX ALLOCATIONS AND DISTRIBUTIONS.................................................40

9.1     Profits and Losses.................................................................................................40
9.2     Profits .....................................................................................................................40
9.3     Special Allocations...............................................................................................40
9.4     Curative Allocations ............................................................................................46
9.5     Section 754 Election.............................................................................................47
9.6     Other Allocation Rules ........................................................................................47
9.7     Distribution of Net Cash Flow. ...........................................................................50
9.8     Allocation of Gain or Loss upon Winding Up. .................................................51

ARTICLE X TAXES ...........................................................................................................53

10.1    Tax Matters Partner..............................................................................................54

ARTICLE XI TRANSFER OF MEMBERSHIP INTEREST ............................................55

11.1    Compliance with Securities Laws and this Agreement....................................55
11.2    Transfer of Shares; Admission of Substitute Member .....................................55
11.3    Dispositions Not in Compliance with this Article Void ..................................56
11.4    Transfer to Affiliate of a Member ......................................................................56
11.5    Future Sales and Preemptive Rights...................................................................57

ARTICLE XII DISSOCIATION OF A MEMBER ............................................................58

12.1    Dissociation ..........................................................................................................58

[TPW: NYLEGAL:460852.1] 19499-00000  03/09/2006 06:00 PM

Page

12.2   Rights of Dissociating Member.................................................................59

ARTICLE XIII DISSOLUTION AND WINDING UP..............................................60

13.1   Dissolution ...................................................................................60
13.2   Effect of Dissolution .........................................................................61
13.3   Distribution of Assets on Dissolution .........................................................61
13.4   Winding Up and Certificate of Dissolution.....................................................63

ARTICLE XIV MISCELLANEOUS ..................................................................63

14.1   Termination of License .......................................................................26
14.2   Notices.......................................................................................63
14.3   Headings......................................................................................64
14.4   Entire Agreement .............................................................................64
14.5   Binding Agreement ............................................................................64
14.6   Saving Clause ................................................................................64
14.7   Counterparts .................................................................................65
14.8   Governing Law ................................................................................65
14.9   No Partnership Intended for Nontax Purposes...................................................65
14.10  No Rights of Creditors and Third Parties.....................................................66
14.11  Customers/Non-Compete ........................................................................27
14.12  Confidentiality..............................................................................27
14.13  Dispute Resolution ...........................................................................66
14.14  General Interpretive Principles..............................................................70

iv

# LIMITED LIABILITY COMPANY AGREEMENT
## OF
## CAFÉ LA RICA, LLC

This Limited Liability Company Agreement of **Café La Rica, LLC,** a limited liability company organized pursuant to the Delaware Limited Liability Company Act, is entered into and shall be effective as of the Effective Date, by and among the Company and the persons executing this Agreement as Members.

## ARTICLE I
## DEFINITIONS

For purposes of this Agreement, unless the context clearly indicates otherwise, the following terms shall have the following meanings:

1.1    **Act.** The Delaware Limited Liability Company Act and all amendments thereto.

1.2    **Additional Capital Contribution.** An additional Capital Contribution payable by a Member to the Company pursuant to Article VIII.

1.3    **Affiliate.** With respect to any Person, any entity controlling, controlled by or under common control with such Person. "Control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of over 50% of the voting securities of such Person, by contract or otherwise.

1.4    **Agreement.** This Limited Liability Company Agreement including all amendments adopted in accordance with this Agreement and the Act.

1.5    **Annual Independent Audit.** Annual Independent Audit shall have the meaning set forth in Section 4.3.

1.6    **Assignee or "Transferee."** A transferee of an Economic Interest who has not been admitted as a Substitute Member. Unless otherwise clear from the context of its use, the term "transferee" is synonymous with the term "Assignee."

1.7    **Bankrupt Member.** A Member who: (a) files a petition in bankruptcy, or is adjudicated as bankrupt or insolvent, or makes an assignment for the benefit of creditors, or an arrangement pursuant to any bankruptcy law; (b) discontinues or dissolves its business; or (c) has a receiver appointed for such Member or such Member's business and such receiver is not discharged within sixty (60) days.

1.8    **Board of Managers.** A Board constituted with those Persons selected to manage the affairs of the Company under Article VII hereof.

1.9    **Business Day.** Any day other than Saturday, Sunday or any legal holiday observed in the State of Delaware.

1.10    **Capital Account.** The account maintained for a Member or an Assignee determined in accordance with Article VIII.

1.11    **Capital Contribution.** A Member's Initial Capital Contribution plus any Additional Capital Contribution made by the Member in accordance with this Agreement. A Capital Contribution includes (a) the amount of any money contributed by the Member to the Company (including liabilities of the Company assumed by the Member as provided in section 1.704-1(b)(2)(iv)(c) of the Regulations), and (b) the Gross Asset Value of any Property contributed to the Company by such Member (net of liabilities secured by such contributed Property that the Company is considered to assume or take subject to under section 752 of the Code).

1.12    **Certificate of Formation.** The Certificate of Formation of the Company, as amended from time to time, filed with the Secretary of State of the State of Delaware.

1.13    **Code.** The Internal Revenue Code of 1986, as amended and in effect from time to time.

1.14    **Coffee Bean Trading.** The Coffee Bean Trading-Roasting LLC, a Delaware limited liability company.

1.15    **Coffee Holding.** Coffee Holding Co., Inc., a Nevada corporation.

1.16    **Commitment.** The Initial Capital Contribution and Additional Capital Contributions that a Member is obligated to make.

1.17    **Company.** Café La Rica, LLC, a limited liability company formed under the laws of Delaware, and any successor limited liability company

1.18    **Company Property.** Any Property owned by the Company.

1.19    **Confidential Information.** Confidential Information shall have the meaning set forth in Section 14.10.

1.20    **Default Interest Rate.** The prime rate published by the Wall Street Journal, New York City edition, for the last Business Day on which a Commitment is payable.

1.21    **Delinquent Member.** Delinquent Member shall have the meaning set forth in Section 8.4.

1.22    **Disposition (Dispose).** Any sale, assignment, exchange, mortgage, pledge, grant, hypothecation or other transfer, absolute or as security or encumbrance (including dispositions by operation of law).

1.23    **Dissociation.** Any action which causes a Person to cease to be a Member as described in Article XIII hereof.

1.24    **Dissolution Event.** An event, the occurrence of which will result in the dissolution of the Company under Article XIII.

1.25    **Distribution.** A transfer of Property to a Member on account of a Membership Interest.

1.26    **Economic Interest.** The right to receive allocations of Profits and Losses, Distributions, returns of capital and distribution of assets upon a dissolution of the Company.

2

1.27    **Effective Date.** March 10, 2006.

1.28    **Equity Offering.** Equity Offering shall have the meaning set forth in Section 11.5.

1.29    **Exhibit A.** Exhibit A to this Agreement setting forth the name, address, Initial Capital Contribution, Initial Membership Interest and Initial Sharing Ratio of each Member.

1.30    **Fair Market Value.**

(a)    As of any date, the fair market value of an asset on such date as determined in good faith by the Board of Managers. For this purpose, the Board of Managers may in its reasonable and prudent discretion value assets that are restricted by law, contract, market conditions (including trading volume relative to the Company's holding) or otherwise as to salability or transferability at an appropriate discount, based on the nature and term of such restrictions.

(b)    With respect to any Membership Interest or Shares, fair market value shall be based on the Company being operated as a going concern without any adjustment for marketability or minority interest. Fair market value shall be determined, in accordance with the preceding sentence, in good faith by the Board of Managers.

1.31    **Fiscal Year.** The twelve month period ending on October 31 of each calendar year.

1.32    **Gross Asset Value.** Gross Asset Value, with respect to any Company asset, means the adjusted basis of such asset for federal income tax purposes, except as follows:

(a)    The initial Gross Asset Value of any Company asset contributed by a Member to the Company shall be the Fair Market Value of such Company asset as of the date of such contribution;

(b)    The Gross Asset Value of each Company asset shall be adjusted to equal its Fair Market Value, as of the following times: (i) the acquisition of an additional Membership Interest by any new or existing Member in exchange for more than a de minimis Capital Contribution unless the Board of Managers determines that such adjustment is not necessary to reflect the relative Economic Interests of the Members in the Company; (ii) the Distribution by the Company to a Member of more than a de minimis amount of Company assets (other than cash) as consideration for all or part of its Membership Interest unless the Board of Managers determines that such adjustment is not necessary to reflect the relative Economic Interests of the Members in the Company; and (iii) the liquidation of the Company within the meaning of section 1.704-1(b)(2)(ii)(g) of the Regulations;

(c)    The Gross Asset Value of a Company asset distributed to any Member shall be the Fair Market Value of such Company asset as of the date of Distribution thereof;

(d)    The Gross Asset Value of each Company asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted basis of such Company asset pursuant to section 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to section 1.704-1(b)(2)(iv)(m) of the Regulations; and

3

(e)     If the Gross Asset Value of a Company asset has been determined or adjusted pursuant to paragraph (a), (b) or (d) above, such Gross Asset Value shall thereafter be adjusted to reflect the depreciation or amortization taken into account with respect to such Company asset for purposes of computing Profits and Losses.

1.33    **Initial Capital Contribution.** With respect to any Member, the Initial Capital Contribution set forth in Exhibit A opposite the name of such Member.

1.34    **Initial Membership Interest.** With respect to any Member, the Initial Membership Interest (as represented in Shares) set forth in Exhibit A opposite the name of such Member.

1.35    **Initial Sharing Ratio.** With respect to any Member, the Initial Sharing Ratio set forth in Exhibit A opposite the name of such Member.

1.36    **Initial Value.** With respect to any Member, the Initial Value set forth on Exhibit A opposite the name of such Member.

1.37    **Management Right.** The right, if any, of a Member to participate in the management of the Company, to vote on any matter and to grant or withhold consent or approval of actions of the Company.

1.38    **Manager.** Manager shall have the meaning set forth in Section 7.1.

1.39    **Member.** A party executing this Agreement and a Substitute Member.

1.40    **Membership Interest.** A Member's Economic Interest and Management Right which shall be represented by Shares of the Company.

1.41    **Minimum Working Capital.** The Minimum Working Capital shall mean $100,000.

1.42    **Net Cash Flow.** Net Cash Flow shall mean, with respect to any fiscal period of the Company, all cash revenues of the Company during that period, decreased by, without duplication, (a) cash expenditures for operating expenses, (b) capital expenditures to the extent not made from reserves, (c) repayment of principal on any financing and (d) taxes.

1.43    **New Securities.** Means any equity interests in the Company issued after the date of this Agreement whether now authorized or not, including, but not limited to, Shares, Membership Interests or any warrants, options, convertible securities or other contracts or rights to purchase Shares, Membership Interests or securities of the Company.

1.44    **Offering Allocation.** Offering Allocation shall have the meaning set forth in Section 11.5.

1.45    **Officer.** Any individual appointed as an officer of the Company in accordance with Section 7.4.

1.46    **Organization.** A Person other than a natural person. Organization includes, without limitation, corporations (both non-profit and other corporations), partnerships (both limited and general), joint ventures, limited liability companies and unincorporated associations, but the term does not include joint tenancies and tenancies by the entirety.

4

1.47    **Person.** An individual, trust, estate or any Organization permitted to be a member of a limited liability company under the laws of the State of Delaware.

1.48    **Principal Office.** The Principal Office of the Company set forth in Section 2.6.

1.49    **Proceeding.** Any administrative, judicial or other adversary proceeding, including, without limitation, litigation, arbitration, administrative adjudication, mediation and appeal or review of any of the foregoing.

1.50    **Profits and Losses.** For each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or period, determined in accordance with section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

      (a)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Section shall be added to such taxable income or loss;

      (b)    Any expenditures of the Company described in section 705(a)(2)(B) of the Code or treated as section 705(a)(2)(B) of the Code expenditures pursuant to section 1.704-1(b)(2)(iv)(i) of the Regulations (other than expenses in respect of which an election is properly made under section 709 of the Code), and not otherwise taken into account in computing Profits or Losses pursuant to this Section, shall be subtracted from such taxable income or loss;

      (c)    In the event the Gross Asset Value of any Company asset is adjusted pursuant to paragraph (b) or (d) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such Company asset for purposes of computing Profits or Losses;

      (d)    Gain or loss resulting from any disposition of any Company asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Company asset disposed of, notwithstanding that the adjusted tax basis of such Company asset may differ from its Gross Asset Value;

      (e)    In accordance with section 1.704-1(b)(2)(iv)(g)(3) of the Regulations, depreciation with respect to any Company asset shall be computed by reference to the adjusted Gross Asset Value of such asset, notwithstanding that the adjusted tax basis of such Company asset differs from its Gross Asset Value; and

      (f)    Notwithstanding any other provisions of this definition, Profits and Losses shall not include allocations under section 704(c) (which are set forth at Section 9.3(i) hereof) or Regulatory Allocations.

1.51    **Property.** Any property, real or personal, tangible or intangible, including money, and any legal or equitable interest in such property, but excluding services and promises to perform services in the future.

1.52    **Regulations.** The final and temporary federal income tax regulations promulgated by the United States Treasury Department under the Code as such regulations may be amended from time to

time, or if no final or temporary regulations with respect to a tax issue are then in effect, proposed regulations then in effect if approved by the Board of Managers. All references herein to a specific section of the Regulations shall be deemed also to refer to any corresponding provision of succeeding Regulations.

1.53    **Regulatory Allocations.** Regulatory Allocations shall mean the allocations set forth at Sections 9.3(a) through (g).

1.54    **Related Person.** Means:

With respect to a particular individual:

(a)    each member of such individual's Family;

(b)    any Person that is directly or indirectly controlled by any one or more members of such individual's Family;

(c)    any Person in which members of such individual's Family hold (individually or in the aggregate) a Material Interest; and

(d)    any Person with respect to which one or more members of such individual's Family serves as a director, officer, partner, executor or trustee (or in a similar capacity).

With respect to a specified Person other than an individual:

(a)    any Person that directly or indirectly controls, is directly or indirectly controlled by or is directly or indirectly under common control with such specified Person;

(b)    any Person that holds a Material Interest in such specified Person;

(c)    each Person that serves as a director, officer, partner, executor or trustee of such specified Person (or in a similar capacity);

(d)    any Person in which such specified Person holds a Material Interest; and

(e)    any Person with respect to which such specified Person serves as a general partner or a trustee (or in a similar capacity).

For purposes of this definition, (a) "control" (including "controlling," "controlled by," and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and shall be construed as such term is used in the rules promulgated under the Securities Act; (b) the "Family" of an individual includes (i) the individual, (ii) the individual's spouse, (iii) any other natural person who is related to the individual or the individual's spouse within the second degree and (iv) any other natural person who resides with such individual; and (c) "Material Interest" means direct or indirect beneficial ownership (as defined in Rule 13d-3 under the Securities Exchange Act of 1934) of voting securities or other voting interests representing at least ten percent (10%) of the outstanding voting power of a Person or equity securities or other equity interests representing at least ten percent (10%) of the outstanding equity securities or equity interests in a Person.

1.55    **Securities Act.** The Securities Act of 1933, as amended.

6

1.56    **Share.** A share of a Membership Interest as described in Section 8.2.

1.57    **Sharing Ratio.** With respect to any Member as of any date, the ratio (expressed as a percentage) of (a) such Member's Shares to (b) the aggregate outstanding Shares of all Members, or such other ratio as shall be agreed by all Members from time to time. The Initial Membership Interest and the Initial Sharing Ratio of each Member are set forth in Exhibit A, and Exhibit A shall be amended as necessary to conform to any changes thereto agreed to by the Members. In the event all or any portion of a Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Membership Interest and Sharing Ratio of the transferor to the extent it relates to the transferred Membership Interest.

1.58    **Substitute Member.** An Assignee who has been admitted to all of the rights of membership pursuant to Section 11.2.

1.59    **Tax Characterization and Additional Tax Terms.** It is intended that the Company be characterized and treated as a partnership for, and solely for, federal, state and local income tax purposes. For such purpose, the Company shall be subject to all of the provisions of subchapter K of chapter 1 of subtitle A of the Code, and all references to a "Partner," to "Partners" and to the "Partnership" in this Agreement (including the provisions of Articles VIII and IX) and in the provisions of the Code and Regulations cited in this Agreement shall be deemed to refer to a Member, the Members and the Company, respectively. In addition, the following terms shall have the following meanings:

(a)    Adjusted Capital Account Deficit shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i)    Credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to section 1.704-1(b)(2)(ii)(c) or the penultimate sentences of sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(ii)    Debit to such Capital Account the items described in sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

(b)    Nonrecourse Deductions has the meaning set forth in section 1.704-2(b)(1) of the Regulations.

(c)    Nonrecourse Liability has the meaning set forth in section 1.704-2(b)(3) of the Regulations.

(d)    Partner Nonrecourse Debt has the meaning set forth in section 1.704-2(b)(4) of the Regulations.

(e)    Partner Nonrecourse Debt Minimum Gain means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with section 1.704-2(i)(3) of the Regulations.

7

(f)    Partner Nonrecourse Deductions has the meaning set forth in sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Regulations.

(g)    Partnership Minimum Gain has the meaning set forth in sections 1.704-2(b)(2) and 1.704-2(d) of the Regulations.

1.60    **Winding Up Sale.** Winding Up Sale shall have the meaning set forth in Section 9.9(a).

# ARTICLE II
# FORMATION

2.1    **Organization.** The Members hereby organize the Company as a Delaware limited liability company pursuant to the provisions of the Act.

2.2    **Agreement.** For and in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members executing this Agreement hereby agree to the terms and conditions of this Agreement, as it may from time to time be amended; provided, however, that this Agreement shall not be effective unless and until the following agreements are fully executed by the appropriate parties: (a) a Lease Agreement between the Company and Perc Enterprises, in form attached hereto as Exhibit B; (b) an Expense Sharing Agreement between the Company and Coffee Holding, in the form attached hereto as Exhibit C; (c) a License Agreement between the Company and Coffee Bean Trading, in the form attached hereto as Exhibit D; (d) a License Agreement between the Company and Coffee Holding, in form attached hereto as Exhibit E; and (e) an Employment Agreement between the Company and Mr. Ernesto Aguila in the form attached hereto as Exhibit F. It is the express intention of the Members that this Agreement shall be the sole source of agreement of the parties with respect to the subject matter hereof, and, except to the extent a provision of this Agreement expressly incorporates federal income tax rules by reference to sections of the Code or Regulations or is expressly prohibited or ineffective under the Act, this Agreement shall govern, even when inconsistent with, or different than, the provisions of the Act or any other law or rule. To the extent any provision of this Agreement is prohibited or ineffective under the Act, this Agreement shall be considered amended to the smallest degree possible in order to make this Agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a way to make any provision of this Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

2.3    **Name.** The name of the Company is Café La Rica, LLC, and all business of the Company shall be conducted under that name or under any other name determined by the Board of Managers but, in any case, only to the extent permitted by applicable law.

2.4    **Term.** The term of the Company shall be perpetual unless the Company shall be sooner dissolved and its affairs wound up in accordance with the Act or this Agreement.

2.5    **Registered Agent and Office.** The registered agent for the service of process and the registered office shall be that Person and location reflected in the Certificate of Formation as filed in the office of the Secretary of State of the State of Delaware. The Board of Managers may, from time to time, change the registered agent or office through appropriate filings with the Secretary of State of the State of Delaware. In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Board of Managers shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be. If the Board of Managers shall fail to designate a

8

replacement registered agent or change of address of the registered office, any Member may designate a replacement registered agent or file a notice of change of address.

    2.6    **Principal Office.** The Principal Office of the Company shall be located at 2131 NW 72nd Avenue, Miami, Florida 33122.

## ARTICLE III
## PURPOSE; NATURE OF BUSINESS

    The purpose of the Company is to engage in the roasting, packaging and sale of Café La Rica and other branded coffee products, and to engage in any other lawful act or activity, as determined by the Board of Managers from time to time, for which limited liability companies may be organized under the Act. The Company shall have the authority to do all things necessary or convenient to accomplish its purposes and operate its business as described in this Article III. The Company exists only for the purposes specified in this Article III. The authority granted to the Board of Managers under this Agreement to bind the Company shall be limited to actions necessary or convenient to the purposes specified in this Article III and to the extent provided by Section 6.6.

## ARTICLE IV
## ACCOUNTING AND RECORDS

    4.1    **Records to be Maintained.** The Company shall maintain at the Principal Office, the Company's books and records, including financial statements of the Company and all other documents and data regarding the Company, which shall be open to inspections by the Members or their agents at any reasonable time.

    4.2    **Reports to Members.** The Board of Managers shall provide reports to the Members, including a balance sheet, a statement of profit and loss and changes in Members' accounts and a statement of cash flows, within fifteen (15) days of the end of each month.

    4.3    **Annual Audit.** Within ninety (90) days of the end of each Fiscal Year, the Board of Managers shall cause the annual financial statements of the Company to be audited by the independent registered public accounting firm responsible for conducting the audit of the financial statements of Coffee Holding for the same period ("**Annual Independent Audit**").

    4.4    **Tax Returns and Reports.** The Board of Managers, at the Company's expense, shall prepare and timely file income tax returns of the Company in all jurisdictions where such filings are required, and shall prepare and deliver to each Member, within the time prescribed by the Code and any extensions applicable thereto, as provided by the Code or applicable regulations, all information returns required by the Code and Company information necessary for the preparation of the Members' federal income tax returns.

## ARTICLE V
## CLASSES OF MEMBERSHIP; NAMES AND ADDRESSES OF MEMBERS

    There shall be only one class of Members. The names and addresses of the Members are as stated on Exhibit A.

[TPW: NYLEGAL:460852.1] 19499-00000  03/09/2006 06:00 PM

## ARTICLE VI
### RIGHTS AND DUTIES OF MEMBERS; RESTRICTIVE COVENANTS

6.1     **No Management Rights as Members.** No Member shall have authority as a Member to bind the Company.

6.2     **Liability of Members.** No Member shall be liable as such for the debts, obligations or liabilities of the Company.

6.3     **Indemnification.** A Member shall indemnify the Company for any costs or damages incurred by the Company as a result of any unauthorized action by such Member.

6.4     **Representations, Warranties and Covenants.** Each Member, and in the case of a trust or other Organization, the person(s) executing this Agreement on behalf of such trust or other Organization, hereby represents and warrants to the Company and to each other Member that: (a) if that Member is a trust or other Organization, it has the requisite power to enter into this Agreement and to perform its obligations hereunder and that the person(s) executing this Agreement on behalf of such trust or other Organization has the requisite power to do so; and (b) the Member is acquiring its interest in the Company for the Member's own account as an investment and without an intent to distribute the interest. The Members acknowledge that their interests in the Company have not been registered under the Securities Act or any state securities laws and may not be resold or transferred without appropriate registration or the availability of an exemption from such requirements.

6.5     **Conflicts of Interest.**

(a)     The Members shall account to the Company and hold as trustee for it any Property, Profit or benefit derived by the Member, without the consent of all of the other Members, in the conduct and winding up of the Company business or from a use or appropriation by the Member of Company Property, including information developed exclusively for the Company and opportunities expressly offered to the Company.

(b)     A Member does not violate a duty or obligation to the Company merely because the Member's conduct furthers the Member's own interest. A Member may lend money to and transact other business with the Company. The rights and obligations of a Member who lends money to or transacts business with the Company are the same as those of a Person who is not a Member, subject to other applicable law. No transaction with the Company shall be voidable solely because a Member has a direct or indirect interest in the transaction if the transaction is fair to the Company.

6.6     **Restrictive Covenants.** Notwithstanding anything contained herein to the contrary, the Company shall not take any of the following actions without the prior written consent of each Member:

(a)     amend the Certificate of Formation or this Agreement;

(b)     purchase any interest in the stock, assets or business of any corporation, partnership or other entity other than in the ordinary course of the Company's business;

(c)     appoint or discharge any members of the Board of Managers of the Company, other than pursuant to the provisions set forth in Article VII;

10

(d) enter into any arrangement which will result in the merger, consolidation, dissolution, liquidation, winding up or cessation of the Company or the business activities of the Company;

(e) dispose of, purchase or lease any asset of the Company other than in the ordinary course of the Company's business;

(f) issue any New Securities;

(g) require Additional Capital Contributions from the Members;

(h) admit any new Members or permit the withdrawal of any existing Member;

(i) file a voluntary petition or otherwise initiate proceedings to have the Company adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Company, or file a petition seeking or consenting to reorganization or relief of the Company as debtor under any applicable federal or state law relating to bankruptcy, insolvency, or other relief for debtors with respect to the Company; or seek or consent to the appointment of any trustee, receiver, conservator, assignee, sequestrator, custodian, liquidator (or other similar official) of the Company or of all or any substantial part of the properties and assets of the Company, or make any general assignment for the benefit of creditors of the Company, or admit in writing the inability of Company to pay its debts generally as they become due or declare or effect a moratorium on the Company debt or take any action in furtherance of any such action;

(j) sell or transfer any asset of the Company to a Related Person unless such sale or transfer is made at Fair Market Value;

(k) increase or decrease the number of Managers the Company is authorized to have; or

(l) authorize additional Shares.

## ARTICLE VII
## BOARD OF MANAGERS AND OFFICERS

7.1    **Board of Managers.** The management of the Company and all decisions concerning the business affairs of the Company shall be made by the Board of Managers. The Board of Managers shall consist of two (2) managers, one of which shall be elected by each of the Members. Each Manager shall have one (1) vote with respect to all matters requiring the vote of the Board of Managers. No individual member of the Board of Managers (a "**Manager**") shall have the right to act on behalf of the Company without the written consent of the other Manager or absent authorization by resolution of the Board of Managers. The initial Board of Managers shall consist of those persons listed on Exhibit G hereto.

7.2    **Voting.** Except as otherwise provided in this Agreement, the affirmative vote of a majority of the members of the Board of Managers shall constitute the act of the Board of Managers. If there are only two members on the Board of Managers, then the affirmative vote of both members shall constitute the act of the Board of Managers.

11

7.3     **Term of Office as a Member of the Board of Managers.**  Each member of the Board of Managers shall serve until his or her removal by the Member who appointed him or her or any resignation of such member of the Board of Managers pursuant to Section 7.8.  A member of the Board of Managers may be removed by the Member who appointed him or her at any time, with or without cause.

7.4     **Incapacitation of a Manager.**  In the event that any Manager becomes incapacitated such that he or she us incapable in any material respect of performing the services required by such Manager in accordance with this Agreement on a regular ongoing basis for a period of sixty (60) days, such Manager shall automatically be removed from the Board of Managers and replaced by a newly elected Manager as shall be determined by the Member who appointed such incapacitated Manager to the Board of Managers.

7.5     **Officers.**  The Board of Managers may appoint one or more Officers of the Company as it shall determine from time to time advisable with such titles as the Board of Managers deems appropriate.  Any two or more offices may be held by the same person.  All Officers shall have such authority and perform such duties in the management and operation of the Company as may be prescribed by the Board of Managers or this Agreement.  Any Officer may be removed at any time, with or without cause, by the Board of Managers, and any vacancy occurring in any office shall be filled by the Board of Managers.  The initial Officers of the Company shall be as set forth on Exhibit H hereto.

7.6     **Authority to Bind the Company.**  The Officers shall have such authority as is granted by the Board of Managers (including, if authorized, the authority to bind the Company), subject to the authority of the Board of Managers.  The Board of Managers has the power, on behalf of the Company, to do all things necessary or convenient to carry out the business and affairs of the Company (as described in Article III), including, without limitation:

> (a)     To institute, prosecute and defend any Proceeding in the Company's name;

> (b)     To conduct the Company's business, establish Company offices and exercise the powers of the Company;

> (c)     To employ, contract and deal with, from time to time, Persons, including any Member or Affiliate of any Member, in connection with the management and operation of the Company's business, including without limitation, suppliers, customers, tradespeople, brokers, accountants and attorneys, on such terms as the Board of Managers shall determine;

> (d)     To purchase liability and other insurance to protect the Company's business and Property;

> (e)     To establish reserve funds of the Company to provide for future requirements for operations, contingencies or any other purpose that the Board of Managers deems necessary or appropriate;

> (f)     To make such elections under the Code and other relevant tax laws as to the treatment of items of Company income, gain, loss, deduction and credit, and as to all other relevant matters as the Board of Managers, with the advice of the Company's accountants and attorneys, deems necessary or appropriate, including without limitation, elections referred to in section 754 of the Code (subject to Section 9.6), the determination of which items of cash outlay shall be capitalized or treated as current expenses, and the selection of the method of accounting and bookkeeping procedures to be used by the Company;

12

(g)    To pay as a Company expense any and all costs or expenses associated with the formation, development, organization and operation of the Company;

(h)    To deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement; and

(i)    To execute, acknowledge and deliver any and all instruments to effectuate the foregoing.

All Company cash shall be deposited in a bank account selected by the Board of Managers, and all disbursements of Company cash shall be approved in advance by those Persons designated by the Board of Managers.

7.7    **Actions of the Board of Managers.** The Board of Managers has the power to bind the Company as provided in this Article VII. No Person dealing with the Company shall have any obligation to inquire into the power or authority of any Person designated by the Board of Managers to act on behalf of the Company.

7.8    **Indemnification.** The Company shall indemnify the Board of Managers and any officers or agents appointed by the Board of Managers for all costs, losses, liabilities and damages paid or incurred in connection with the business of the Company, to the fullest extent provided or allowed by the laws of the State of Delaware.

7.9    **Resignation and Removal; Replacement.** Any member of the Board of Managers may resign upon at least 30 days' prior written notice to the Members. In the event of the resignation or removal of any member of the Board of Managers, the Member who appointed such member of the Board of Managers shall appoint a replacement member of the Board of Managers.

7.10    **Other Activities.** The members of the Board of Managers, in their capacity as such, shall not be required to devote their full time to the management of the Company business, but only so much of their time as the Board of Managers deems necessary or appropriate for the proper management of such business. The members of the Board of Managers, and any of their Affiliates, may engage or possess an interest, independently or with others, in other businesses or ventures of every nature and description, and neither the Company nor any Member shall have any rights in or to such ventures or the income or profits derived therefrom.

7.11    **Distributions.** Each Member shall look solely to the assets of the Company for all Distributions and a share of Profits or Losses and shall have no recourse therefor (upon dissolution or otherwise) against the Board of Managers or any of the other Members.

7.12    **Expenses.** The Company shall pay directly or reimburse the Board of Managers for certain expenses of the Company incurred by the Board of Managers in the management of the Company's business. Such expenses may include but are not limited to: (a) costs of borrowed money and taxes applicable to the Company; (b) fees and expenses paid to suppliers, tradespeople, brokers, consultants and other agents; (c) costs of insurance as required in connection with the conduct of the business of the Company; and (d) expenses incurred by the Company for tax return preparation.

7.13    **Affiliates; Fees.** The Board of Managers is specifically authorized to employ, contract and deal with, from time to time, any Member or Affiliate of any Member, and in connection therewith to pay such Person's fees, prices or other compensation; provided that such employment, contracts and dealings are necessary or appropriate for the Company's purposes, and the fees, prices or other

13

compensation paid by the Company therefor is, in the judgment of the Board of Managers, reasonable and typical or competitive with the fees, prices or other compensation customarily paid for similar Property or services.

Nothing herein contained shall be construed as a guaranty by the Board of Managers of the performance by any Affiliate, designee or nominee of its obligations under any contract between any such Affiliate, designee or nominee and the Company.

## ARTICLE VIII
## CONTRIBUTIONS AND CAPITAL ACCOUNTS

8.1    **Initial Capital Contributions.** Concurrently with the execution and delivery of this Agreement, each Member shall make the Initial Capital Contribution described for that Member on Exhibit A. No Member shall have the right to withdraw or be repaid any Capital Contribution except as provided in this Agreement.

8.2    **Indemnification.** Each Member shall indemnify the other Members and the Company against any and all liabilities of such indemnifying Member which are imputed to the other Members or the Company.

8.3    **Shares.** The Company shall issue Shares to represent each Member's Membership Interest. The total number of Shares that the Company is authorized to issue is one thousand (1,000) Shares. The Company may authorize additional Shares only with the written consent of, and with terms and conditions approved by, the Board of Managers and subject to the provisions of Section 11.5. The initial number of issued and outstanding Shares is set forth on Exhibit A.

8.4    **Additional Capital Contributions.** In the event the Board of Managers determines that the Company does not have sufficient operating revenues or other available funds to pay any amount which the Board of Managers determines to be required for any Company purpose, the Board of Managers shall, if reasonable under the circumstances, attempt to obtain financing in the amount required; *provided, however,* that the Board of Managers shall not obtain such financing if it would cause a default under any Company obligation. If such financing cannot be obtained within a reasonable time and upon terms and conditions approved by the Board of Managers, the Board of Managers may, pursuant to Section 6.6 above, solicit and accept on behalf of the Company Additional Capital Contributions from the Members. Unless otherwise agreed by all Members, any Additional Capital Contribution shall be made by the Members pro rata, based on their respective Sharing Ratios. In the event that a Member does not make such an Additional Capital Contribution, then its Membership Interest, including its Sharing Ratio, in the Company shall be diluted as a result of the Additional Capital Contributions then being made by the other Members. A Member is not obligated to make an Additional Capital Contribution unless such Member affirmatively agrees to such obligation in writing.

8.5    **Enforcement of Commitments.** In the event any Member (a "**Delinquent Member**") fails to perform the Delinquent Member's Commitment, the Board of Managers shall give the Delinquent Member a notice of such failure. If the Delinquent Member fails to perform the Commitment (including the payment of any costs associated with the failure and interest at the Default Interest Rate) within ten Business Days of the giving of such notice, the Board of Managers may take such action as it deems appropriate, including but not limited to:

14

(a)     Enforcing the Commitment in the court of appropriate jurisdiction in the state in which the Principal Office is located or the state of the Delinquent Member's address as reflected in this Agreement; *provided, however,* that a Member shall have no personal liability for any Additional Capital Contribution and, in any proceeding to enforce the obligation of a Member to make all or part of any such Additional Capital Contribution, the Board of Managers shall have recourse solely to the Delinquent Member's interest in the Company. Each Member expressly agrees to the jurisdiction of such courts but only for purposes of such enforcement.

(b)     Selling the Delinquent Member's Shares, including a sale to another Member or to another Person.

(c)     Allowing Members, except the Delinquent Member, to make Additional Capital Contributions and adjusting the Sharing Ratios and Shares of the Members in proportion to the new Capital Contribution levels.

(d)     Reducing the Delinquent Member's Membership Interest and Shares.

(e)     Issuing new Shares to Members who make Additional Capital Contributions in place of the Delinquent Member; provided that such Shares may be entitled to a priority return and such other rights as shall be determined by the Board of Managers.

8.6     **Capital Account.** A separate capital account shall be maintained for each Member throughout the term of the Company in accordance with the rules of section 1.704-1(b)(2)(iv) of the Regulations as in effect from time to time. Except as otherwise provided in section 1.704-1(b)(2)(iv) of the Regulations, each Member's Capital Account shall initially consist of such Member's Initial Capital Contribution, and shall be maintained in accordance with the following provisions:

(a)     Each Member's Capital Account shall be credited with: (i) such Member's Additional Capital Contributions; and (ii) such Member's share of Profits and items of income and gain that are specially allocated to such Member pursuant to Article IX (other than any income or gain allocated to such Member pursuant to Section 9.3(i) in accordance with section 704(c) of the Code).

(b)     Each Member's Capital Account shall be debited with: (i) the amount of money distributed to such Member by the Company (including liabilities of such Member assumed by the Company as provided in section 1.704-1(b)(2)(iv)(c) of the Regulations) other than amounts which are in repayment of debt obligations of the Company to such Member; (ii) the Gross Asset Value of Property distributed to such Member (net of liabilities secured by such distributed Property that such Member is considered to assume or take subject to under section 752 of the Code); and (iii) such Member's share of Losses and items of loss and deduction that are specially allocated to such Member pursuant to Article IX (other than any deduction or loss allocated to such Member pursuant to Section 9.3(i) in accordance with section 704(c) of the Code).

(c)     If the Gross Asset Value of a Company asset differs from its adjusted tax basis, the Members' Capital Accounts shall be adjusted to reflect only allocations to them of depreciation, amortization and gain or loss as computed for book purposes (and not for tax purposes) with respect to such Company asset. In such event, items of book depreciation, amortization and gain or loss shall be calculated in conformity with the rules of section 1.704-1(b)(2)(iv)(g) of the Regulations.

15

(d)     All such contributions, allocations and Distributions shall be credited or charged, as the case may be, to the appropriate Capital Accounts of the respective Members to whom they apply as of the time the contributions, allocations or Distributions are made.

(e)     The Capital Account of a transferee Member shall include the appropriate portion of the Capital Account of the Member from whom the transferee Member's interest was obtained.

(f)     In determining the amount of any liability, there shall be taken into account section 752 of the Code and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with section 1.704-1(b) of the Regulations, and shall be interpreted and applied in a manner consistent with such Regulations. Consistent with such intention, the value of any Property (other than cash) (i) contributed to the Company by a Member, (ii) distributed to a Member from the Company or (iii) owned by the Company and subject to a revaluation upon the occurrence of certain events shall be the Fair Market Value of such Property (net of liabilities secured by such Property that the Company or such Member, as the case may be, is considered to assume or take subject to under section 752 of the Code) on the date of contribution, Distribution or revaluation, as applicable.

8.7     **No Obligation to Restore Deficit Balance.** No Member shall be required to restore any deficit balance in its Capital Account.

8.8     **Withdrawal; Successors.** A Member shall not be entitled to withdraw any part of its Capital Account or to receive any Distribution from the Company, except as specifically provided in this Agreement.   Any Member, including any additional or substitute Member, who shall receive a Membership Interest or whose Membership Interest shall be increased by means of a transfer to it of all or part of the Membership Interest of another Member, shall have a Capital Account with respect to such interest initially equal to the Capital Account with respect to such interest of the Member from whom such interest is acquired.

8.9     **Interest.** Except as otherwise provided in this Agreement, no Member shall be entitled to interest or other return on such Member's Capital Contribution or on any Profits retained by the Company.

8.10    **Investment of Capital Contributions and Company Cash.** The Capital Contributions of the Members and any cash held by the Company from time to time shall be invested, until such time as such funds shall be used for other Company purposes, in demand, money market or time deposits or obligations, securities, investments or other instruments constituting cash equivalents. Such investments shall be made by the Board of Managers for the benefit of the Company.

8.11    Repayment of Capital Contribution.

(a)     The members of the Board of Managers shall have no personal liability for the repayment of any Capital Contributions of any Member, and no Member shall have liability for the repayment of any Capital Contributions of any other Member. The repayment of any Capital Contribution shall be made only to the extent of available Company assets in accordance with the terms of this Agreement.

16

(b)     Except as otherwise provided in this Agreement, no Member shall have priority over any other Member as to the return of its Capital Contribution or as to Distributions of cash made by the Company.

(c)     Except as otherwise provided in this Agreement, a Member shall not be entitled to (i) demand or receive Property other than cash in return for its Capital Contribution or (ii) receive any funds or Property of the Company.

## ARTICLE IX
## ALLOCATIONS AND DISTRIBUTIONS

9.1     **Profits and Losses.** Profits and Losses, and each item of Company income, gain, loss, deduction, credit and tax preference with respect thereto, for each Fiscal Year (or shorter period in respect of which such items are to be allocated) shall be allocated among the Members as provided in this Article IX.

9.2     **Allocation of Profits and Losses.** All items of Profits and Losses for any Fiscal Year shall be allocated to the Members in proportion to their respective Sharing Ratios.

9.3     **Special Allocations.** The following special allocations shall be made:

(a)     <u>Loss Limitation</u>.  The Losses allocated pursuant to Section 9.2 shall not exceed the maximum amount of Losses that may be allocated to a Member without causing such Member to have an Adjusted Capital Account Deficit at the end of the Fiscal Year. If some, but not all of the Members would have adjusted Capital Account Deficits as a consequence of the allocations of Losses pursuant to Section 9.2, the limitation in this Section 9.3(a) shall be applied by allocating Losses pursuant to Section 9.3(a) only to those Members (allocated pro rata if more than one) who would not have an Adjusted Capital Account Deficit as a consequence of receiving such an allocation.  All Losses in excess of the limitations set forth in this Section 9.3(a) shall be allocated among the Members in proportion to their respective Sharing Ratios.

(b)     <u>Minimum Gain Chargeback</u>.  Except as otherwise provided in section 1.704-2(f) of the Regulations, notwithstanding any other provision of this Article IX, if there is a net decrease in Partnership Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Partnership Minimum Gain, determined in accordance with section 1.704-2(g) of the Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Regulations.  This Section 9.3(b) is intended to comply with the minimum gain chargeback requirement in section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

(c)     <u>Partner Minimum Gain Chargeback</u>.  Except as otherwise provided in section 1.704-2(i)(4) of the Regulations, notwithstanding any other provision of this Article IX, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Partner Nonrecourse Debt Minimum Gain as of the beginning of the Fiscal Year attributable to such Partner Nonrecourse Debt, determined in accordance with section 1.704-2(i)(5) of the Regulations, shall be specially

17

allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with section 1.704-2(i)(4) of the Regulations.  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Regulations.  This Section 9.3(c) is intended to comply with the minimum gain chargeback requirement in section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently therewith.

(d)     Qualified Income Offset.  In the event any Member unexpectedly receives any adjustments, allocations or Distributions described in section 1.704-1(b)(2)(ii)(d)(4), section 1.704-1(b)(2)(ii)(d)(5) or section 1.704-1(b)(2)(ii)(d)(6) of the Regulations which increase a Member's Adjusted Capital Account Deficit, items of Company income and gain shall be specially allocated to the Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible, provided that an allocation pursuant to this Section 9.3(d) shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IX have been tentatively made as if this Section 9.3(d) were not in this Agreement.

(e)     Gross Income Allocation.  In the event any Member has an Adjusted Capital Account Deficit, such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 9.3(e) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IX have been made as if Section 9.3(d) and this Section 9.3(e) were not in this Agreement.

(f)     Nonrecourse Deductions.  Nonrecourse Deductions for any Fiscal Year shall be specially allocated among the Members in proportion to their Sharing Ratios.

(g)     Partner Nonrecourse Deductions.  Any Partner Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with section 1.704-2(i)(1) of the Regulations.

(h)     Certain Book-ups.  To the extent an adjustment to (i) the adjusted tax basis of any Company asset pursuant to section 734(b) or section 743(b) of the Code is required to be taken into account in determining Capital Accounts or (ii) pursuant to section 1.704-1(b)(2)(iv)(f) of the Regulations, the Gross Asset Value of any Company asset is permitted to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated, as provided in section 1.704-1(b)(2)(iv)(m) or section 1.704-1(b)(2)(iv)(g) of the Regulations, respectively, as an item of Profit (if the adjustment increases such basis or Gross Asset Value of the asset) or Loss (if the adjustment decreases such basis or Gross Asset Value), and such Profit or Loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Regulations.

18

      (i)       <u>Mandatory Allocations under Section 704(c) of the Code</u>.

           (i)     In the event section 704(c) of the Code or the principles of section 704(c) of the Code applicable under section 1.704-1(b)(2)(iv) of the Regulations require allocations of income, gain, deduction or loss in a manner different than that set forth above, the provisions of section 704(c) of the Code and the Regulations thereunder shall control such allocations among the Members. Any item of Company income, gain, loss and deduction with respect to any Property (other than cash) that has been contributed by a Member to the capital of the Company and which is required or permitted to be allocated to such Member for income tax purposes under section 704(c) of the Code so as to take into account the variation between the tax basis of such Property and its Fair Market Value at the time of its contribution shall be allocated solely for income tax purposes in the manner so required or permitted under section 704(c) of the Code using the "traditional method" described in section 1.704-3(b) of the Regulations; *provided, however,* that any other method allowable under applicable Regulations may be used for any contribution of Property if the contributing Member and the Board of Managers agree as to the use of such other method.

           (ii)    In the event the Gross Asset Value of any Company asset is adjusted pursuant to Section 9.3(h) in accordance with section 1.704-1(b)(2)(iv)(f) of the Regulations, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in a manner consistent with Section 9.3(i)(i).

           (iii)   Except as provided in Sections 9.4(h)(i) and (ii), for United States federal, state and local income tax purposes, the income, gains, losses and deductions of the Company shall, for each taxable period, be allocated among the Members in the same manner and in the same proportion that such items have been allocated among the Members' respective Capital Accounts.

    **9.4**    **Curative Allocations.** The Regulatory Allocations are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction. Therefore, notwithstanding any other provision of this Article IX (other than the Regulatory Allocations), the Board of Managers shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Section 9.2. In exercising its discretion under this Section 9, the Board of Managers shall take into account future Regulatory Allocations under Sections 9.3(b) and 9.3(c) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 9.3(f) and 9.3(g).

    **9.5**    **Section 754 Election.** Upon a transfer by a Member of an interest in the Company, which transfer is permitted by the terms of this Agreement, or upon the death of a Member or the Distribution of any Company Property to one or more Members, the Board of Managers, upon the request of one or more of the transferees or distributees, shall cause the Company to file an election on behalf of the Company to cause the basis of the Company's Property to be adjusted for federal income tax purposes in the manner prescribed in section 734 or 743 of the Code, as the case may be. The cost of preparing

[TPW: NYLEGAL:460852.1] 19499-00000 03/09/2006 06:00 PM

such election and any additional accounting expenses of the Company occasioned by such election shall be borne by such transferees or distributees.

9.6    Other Allocation Rules.

(a)    For purposes of determining the Profits, Losses or any other item allocable to any period (including allocations to take into account any changes in any Member's Sharing Ratio during a Fiscal Year and any transfer of any interest in the Company), Profits, Losses and any such other item shall be determined on a daily, monthly or other basis, as determined by the Board of Managers using any permissible method under section 706 of the Code and the Regulations thereunder.

(b)    Notwithstanding the above, allocations made pursuant to this Article IX shall be made annually within one hundred and five (105) days after the end of the Fiscal Year, but in no event may such allocations be made later than required by the Code.

(c)    The Members are aware of the income tax consequences of the allocations made by this Article IX and hereby agree to be bound by the provisions of this Article IX in reporting their shares of Company income and loss for income tax purposes.

(d)    Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of section 1.752-3(a)(3) of the Regulations, the Members' interests in Company Profits are in proportion to their Sharing Ratios.

(e)    To the extent permitted by section 1.704-2(h)(3) of the Regulations, the Board of Managers shall endeavor to treat Distributions made from the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt as Distributions that are not allocable to an increase in minimum gain to the extent that such Distributions would not cause or increase an Adjusted Capital Account Deficit for any Member.

(f)    Except as otherwise provided in this Article IX, an allocation of Company Profits or Losses to a Member shall be treated as an allocation to such Member of the same share of each item of income, gain, loss and deduction taken into account in computing such Profits or Losses.

(g)    For purposes of determining the character (as ordinary income or capital gain) of any Profits allocated to the Members pursuant to this Article IX, such portion of Profits that is treated as ordinary income attributable to the recapture of depreciation shall, to the extent possible, be allocated among the Members in the proportion which (i) the amount of depreciation previously allocated to each Member bears to (ii) the total of such depreciation allocated to all Members. This Section 9.6(g) shall not alter the amount of allocations among the Members pursuant to this Article IX, but merely the character of income so allocated.

(h)    Except for arrangements expressly described in this Agreement, no Member shall enter into (or permit any Person related to the Member to enter into) any arrangement with respect to any liability of the Company that would result in such Member (or a person related to such Member under section 1.752-4(b) of the Regulations) bearing the economic risk of loss (within the meaning of section 1.752-2 of the Regulations) with respect to such liability unless such arrangement has been approved by all Members. To the extent a Member is permitted to guarantee the repayment of any Company indebtedness under this Agreement, each of the other

20

Members shall be afforded the opportunity to guarantee such Member's pro rata share of such indebtedness, determined in accordance with the Members' respective Sharing Ratios.

9.7     **Distribution of Net Cash Flow.**

(a)     <u>Amounts and Timing</u>.  Provided that the Company's working capital shall not fall below the Minimum Working Capital level, and subject to the provisions of Section 13.3 and applicable law, Net Cash Flow for each Fiscal Year of the Company, shall be distributed to the Members in proportion to their respective Sharing Ratios within 30 days of the completion of the Annual Independent Audit, or at such earlier time or times as may be designated by the Board of Managers.

(b)     <u>Amounts Withheld</u>.  The Board of Managers is authorized to withhold from Distributions, or with respect to allocations, to the Members and to pay over to any federal, state or local government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local tax law.  Any amounts required to be withheld pursuant to the Code or any provision of any state or local tax law with respect to any payment, distribution or allocation to the Company or the Members shall be treated as an amount distributed to the Member with respect to which such amount was withheld pursuant to this Section 9.7 for all purposes under this Agreement.

(c)     <u>Draws for Payment of Estimated Taxes</u>.  The Company shall pay to each Member an annual draw, not to exceed the amount reasonably necessary to provide for payment by the Members of any federal, state and local estimated taxes with respect to Profits allocated to the Members pursuant to this Article IX, and each such draw, if any, shall be treated as a loan from the Company to each Member receiving such draw and shall be deemed repaid by reducing the amount of each subsequent Distribution to the Member receiving such draw pursuant to this Section 9.7 by the lesser of (i) the entire amount otherwise distributable to the Member receiving such draw and (ii) the entire amount of any unrepaid draws pursuant to this Section 9.7(c).

9.8     **Allocation of Gain or Loss upon Winding Up.**

(a)     <u>Gain or Loss Realized on Sale of Company Property</u>.  Upon the winding up of the Company, as provided in Article XIII, net gain or loss realized on the sale or sales of Company Property (each such sale a "**Winding Up Sale**") shall be allocated among the Members in accordance with Section 9.2.

(b)     <u>Distributions in Kind</u>.  In the event that, upon a winding up of the Company, pursuant to Section 13.3, either (i) any Company Property is required to be distributed in kind, or (ii) the Board of Managers elects to distribute any Company Property in kind, the book value of such Property shall be adjusted to its Fair Market Value as of the date of such Distribution, and the amount of such adjustments shall be allocated to the Members' Capital Accounts in the manner provided in Section 9.8(a) as though such Property had been sold at its Fair Market Value and gain or loss had been realized.

[TPW: NYLEGAL:460852.1] 19499-00000  03/09/2006 06:00 PM

## ARTICLE X
## TAXES

10.1   **Tax Matters Partner.** Coffee Holding shall be the Tax Matters Partner of the Company pursuant to section 6231(a)(7) of the Code. If Coffee Holdingshall cease to act as the Tax Matters Partner for any reason, the Members shall select another Member (subject to such Member's approval) to be the Tax Matters Partner. The Tax Matters Partner shall receive no additional compensation from the Company for its services in that capacity, but all expenses incurred by the Tax Matters Partner in such capacity shall be borne by the Company. The Tax Matters Partner is authorized to employ such accountants, attorneys and agents as it, in its sole discretion, determines is necessary to or useful in the performance of its duties. The Tax Matters Partner is authorized to represent the Company before the Internal Revenue Service and any other governmental agency with jurisdiction, and to sign such consents and to enter into settlements and other agreements with such agencies as the Tax Matters Partner or its duly authorized officer deems necessary or advisable. Each Member shall give prompt notice to each other Member of any and all notices it receives from the Internal Revenue Service concerning the Company, including any notice of a 30 day appeal letter and any notice of deficiency in tax concerning the Company's federal income tax returns. The Tax Matters Partner shall give each Member periodic status reports regarding any negotiations between the Internal Revenue Service and the Company. The Tax Matters Partner shall serve in a similar capacity with respect to any similar tax related or other election provided by state or local laws.

## ARTICLE XI
## TRANSFER OF MEMBERSHIP INTEREST

11.1   **Compliance with Securities Laws and this Agreement.** No Shares have been registered under the Securities Act or under any applicable state securities laws. A Member may not transfer (a transfer, for purposes of this Agreement, shall be deemed to include, but not be limited to, any sale, transfer, assignment, pledge, creation of a security interest or other disposition) any Shares, except upon compliance with the applicable federal and state securities laws and this Agreement. The Board of Managers shall have no obligation to register any Shares under the Securities Act or under any applicable state securities laws, or to make any exemption therefrom available to any Member except to the extent provided in any Registration Rights Agreement entered into by the Company with respect thereto.

11.2   **Transfer of Shares; Admission of Substitute Member.** Except for those transfers permitted by this Article XI, a Member may transfer Shares and give the transferee the right to become a Member only after the following terms and conditions have been satisfied:

(a)   The transferee shall also be the transferee of all or part of the transferor's Economic Interest or shall be the owner of an Economic Interest;

(b)   The Members holding all of the Shares that are not the subject of the transfer shall have consented in writing to the transfer of such Shares and the admission of the Substitute Member;

(c)   The transferor and the transferee shall have complied with such other requirements as the non-transferring Members may reasonably impose, including the conditions that the transferee:

(i)   Adopt and approve in writing all the terms and provisions of this Agreement then in effect; and

22

(ii)    Pay such fees as the Board of Managers may reasonably require to pay the costs of the Company in effecting such substitution; and

(d)    The Board of Managers shall have consented to the transfer.

**11.3    Dispositions Not in Compliance with this Article Void.** Any attempted Disposition of a Membership Interest, or any part thereof, not in compliance with this Article shall be void when made and ineffectual and shall not bind the Company.

**11.4    Transfer to Affiliate of a Member.** Notwithstanding anything herein to the contrary, any Member may transfer its Shares to any Affiliate or direct or indirect subsidiary thereof that is controlled by or under common control with it, and any such transferee shall have the right to become a Substitute Member, subject to compliance with Section 11.1.

**11.5    Future Sales and Preemptive Rights.**

(a)    The Company will not offer or sell any New Securities (an **"Equity Offering"**) unless it first offers to each Member the right to purchase a portion of such New Securities which is equal to the total number of New Securities to be sold in the Equity Offering multiplied by a fraction, the numerator of which is the number of Shares owned by such Member on a fully diluted basis, and the denominator of which is the total number of Shares of the Company then outstanding on a fully diluted basis (an **"Offering Allocation"**). The Company shall immediately notify each Member of the terms or the proposed terms of an Equity Offering (the **"Company's Notice"**). The Company's Notice shall include the Offering Allocation for each Member. If the Member wishes to purchase New Securities pursuant to the Company's Notice, such Member shall notify the Company in writing within thirty (30) days after receipt of the Company's Notice stating how many of such New Securities such Member desires to purchase. Each Member shall be entitled to purchase up to that number of New Securities equal to such Member's respective Offering Allocation. To the extent the Members do not elect to purchase any or all of such New Securities, the Company shall have up to ninety (90) days to complete the Equity Offering upon the same terms specified in the Company's Notice. If the Company later changes the terms of the Equity Offering in any material respect, the Company shall first re-offer such New Securities to the Members pursuant to the procedure set forth above. Any New Securities which are offered or sold (or issued) by the Company in the Equity Offering shall, unless otherwise consented to in writing by each Member, be sold to any purchaser only for cash.

(b)    The closing of the purchase of New Securities by the Members pursuant to this Section 11.5 shall occur at the Principal Office of the Company concurrently with the closing of the Equity Offering, or at such other time as the Company and the Members may mutually determine.

## ARTICLE XII
## DISSOCIATION OF A MEMBER

**12.1    Dissociation.** A Person shall cease to be a Member upon the happening of any of the following events:

(a)    The resignation or withdrawal of the Member;

(b)    The Member becoming a Bankrupt Member;

23

(c)     The Member breaching this Agreement and not curing such breach within sixty (60) days of a non-breaching Member providing written notice of such breach pursuant to Section 13.1(c) below;

(d)     In the case of a Member who is a natural person, the death of the Member or the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's personal estate;

(e)     In the case of a Member that is a trust or who is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

(f)     In the case of a Member that is a separate Organization other than a corporation, the dissolution and commencement of winding up of the separate Organization;

(g)     In the case of a Member that is a corporation, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter; or

(h)     In the case of a Member that is an estate, the distribution by the fiduciary of the estate's entire interest in the Company.

**12.2     Rights of Dissociating Member.** In the event any Member dissociates prior to the expiration of the term of this Agreement, such Member shall be entitled to participate in the dissolution and winding up of the Company pursuant to Article XIII, to the same extent as any other Member except that, if such Dissociation results from a withdrawal of the Member in violation of this Agreement, any Distributions to which such Member would have been entitled shall be reduced by that portion of the damages, if any, sustained by the Company as a result of the Dissolution Event and winding up that is chargeable to the Capital Accounts of the other Members.

## ARTICLE XIII
## DISSOLUTION AND WINDING UP

**13.1     Dissolution.** The Company shall be dissolved without further action by the Members and its affairs wound up upon the first to occur of any of the following events (each of which shall constitute a Dissolution Event):

(a)     The unanimous written consent of the Members;

(b)     A Member materially breaches this Agreement and a non-breaching Member provides sixty (60) days written notice to the other Members of such breach, during which sixty (60) day period, the breaching Member shall have the opportunity to cure such breach; provided, however, that, the other Members shall have the opportunity to elect to continue the Company without the breaching Member, in which case the breaching Member shall be dissociated pursuant to Article XII above;

(c)     A Member ceases to be a Member pursuant to Article XII above;

(d)     A Member becomes a Bankrupt Member;

24

(e)    A material breach of any agreement between the Company and a Member or between Members; or

(f)    A Member elects to dissolve the Company pursuant to Section 14.12 below.

13.2    **Effect of Dissolution.** Upon dissolution, the Company shall not be terminated and shall continue until the winding up of the affairs of the Company is completed and a certificate of dissolution has been issued by the Secretary of State of the State of Delaware.

13.3    **Distribution of Assets on Dissolution.** Upon the winding up of the Company, the Board of Managers shall take full account of the assets and liabilities of the Company, and shall apply and distribute the assets and any proceeds therefrom in the following order:

(a)    First, to the payment of the debts and liabilities of the Company to creditors, including Members and affiliates of Members who are creditors, to the extent permitted by law, in satisfaction of such debts and liabilities, and to the payment of necessary expenses of liquidation;

(b)    Second, to the setting up of any reserves which the Board of Managers may deem necessary or appropriate for any anticipated obligations or contingencies of the Company arising out of or in connection with the operation or business of the Company. Such reserves may be paid over by the Board of Managers to an escrow agent or trustee selected by the Board of Managers to be disbursed by such escrow agent or trustee in payment of any of the aforementioned obligations or contingencies and, if any balance remains at the expiration of such period as the Board of Managers shall deem advisable, shall be distributed by such escrow agent or trustee in the manner hereinafter provided; and

(c)    Then, to the Members in accordance with positive Capital Account balances taking into account all Capital Account adjustments for the Company's taxable year in which the liquidation occurs. Liquidation proceeds shall be paid within sixty (60) days of the end of the Company's taxable year in which the liquidation occurs. Such Distributions shall be in cash or Property (which need not be distributed proportionately) or partly in both, as determined by the Board of Managers.

To the extent possible after making all distributions under Sections 13.3(a) and (b) (and without violating Section 13.3(c)), the assets contributed to the Company by each Member shall be distributed to such contributing Member. In the event that the Company is unable to comply with the obligations set forth in Sections 13.3(a) and (b) above without liquidating such assets, the Board of Managers shall determine which assets to liquidate to comply with such obligations. In such case, the remainder of the assets shall be distributed to the contributing Member of such assets.

13.4    **Winding Up and Certificate of Dissolution.** The winding up of the Company shall be completed when all debts, liabilities and obligations of the Company have been paid and discharged or reasonably adequate provision therefor has been made, and all of the remaining Property of the Company has been distributed to the Members. Upon the completion of the winding up of the Company, a certificate of dissolution shall be delivered to the Secretary of State of the State of Delaware for filing. The certificate of dissolution shall set forth the information required by the Act.

25

# ARTICLE XIV
## MISCELLANEOUS

14.1    **Termination of License.** In the event that the certain License Agreement between the Company and Coffee Bean Trading, dated as of the date hereof, is terminated for any reason, the Company shall change its name from Café La Rica as soon as reasonably possible.

14.2    **Notices.** Notices to the Board of Managers shall be sent to the Principal Office of the Company with a copy to Matthew Dyckman, Esq., Thacher Proffitt & Wood LLP, 1700 Pennsylvania Avenue, NW, Suite 800, Washington, DC 20006 and Robert F. Hudson, Jr., Esq., Baker & McKenzie LLP, Mellon Financial Center, 1111 Brickell Avenue, Suite 1700, Miami, Florida, 33131. Notices to the other Members shall be sent to their addresses set forth on Exhibit A. Any Member may require notices to be sent to a different address by giving notice to the other Members in accordance with this Section 14.1. Any notice or other communication required or permitted hereunder shall be in writing, and shall be deemed to have been given with receipt confirmed if and when delivered personally, or when sent by a recognized overnight delivery service, delivered by courier, or sent by facsimile, to such Members at such address.

14.3    **Headings.** All Article and Section headings in this Agreement are for convenience of reference only and are not intended to qualify the meaning of any Article or Section.

14.4    **Entire Agreement.** This Agreement constitutes the entire agreement among the parties and supersedes any prior agreement or understanding among them respecting the subject matter of this Agreement except as specifically provided herein.

14.5    **Binding Agreement.** This Agreement shall be binding upon, and inure to the benefit of, the parties hereto, their successors, heirs, legatees, devisees, assigns, legal representatives, executors and administrators, except as otherwise provided herein.

14.6    **Saving Clause.** If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid, shall not be affected thereby. If the operation of any provision of this Agreement would contravene the provisions of the Act, such provision shall be void and ineffectual.

14.7    **Counterparts.** This Agreement may be executed in several counterparts, and all so executed shall constitute one agreement, binding on all the parties hereto, even though all parties are not signatories to the original or the same counterpart. Any counterpart of either this Agreement or the Certificate of Formation shall for all purposes be deemed a fully executed instrument. For purposes of this Agreement, facsimile as well as scanned and emailed signatures shall be deemed to be original signatures.

14.8    **Governing Law; Jurisdiction; Venue.** This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of laws principles thereof. To the fullest extent permitted by law, the parties hereto hereby (i) submit to the jurisdiction of the state and federal courts located in the State of Delaware for purposes of any legal action or proceeding brought under or in connection with this Agreement, (ii) agree that exclusive venue of any such action or proceeding may be laid in the State of Delaware and (iii) waive any claim that the same is an inconvenient forum.

[TPW: NYLEGAL:460852.1] 19499-00000  03/09/2006 06:00 PM

14.9 **No Partnership Intended for Nontax Purposes.** The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership under either the Delaware Uniform Partnership Act or the Delaware Uniform Limited Partnership Act. The Members do not intend to be partners one to another or partners as to any third party. To the extent any Member, by word or action, represents to another person that any Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Members who incur personal liability by reason of such wrongful representation.

14.10 **No Rights of Creditors and Third Parties.** This Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members and their permitted successors and assignees. This Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person. Except and only to the extent provided by applicable statute, no such creditor or any third party shall have any rights under this Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

14.11 **Customers/Non-compete.**

(a)    In the event that the Company is dissolved, each Member shall retain the exclusive right to conduct business with the customers such Member introduced to the Company and the Members agree to divide the Company's new customers evenly among the Members.

(b)    Throughout the duration of this Agreement, neither Coffee Bean nor any of its Affiliates will render any services directly related to the roasting, packaging or sale of coffee either, as an independent contractor to or joint venture partner with any entity that is in direct competition with Coffee Holding or the Company.

(c)    Throughout the duration of this Agreement, Coffee Holding shall not engage Mr. Ernesto Aguila in employment.

14.12 **Confidentiality.** It is recognized that during their work on behalf of the Company, the Members may have occasion to conceive, create, develop, review, or receive information that is considered by the Company or another Member to be confidential or proprietary, including without limitation information relating to the business of the Company, including inventions, patent, trademark and copyright applications, improvements, know-how, specifications, drawings, cost data, process flow diagrams, customer and supplier lists, bills, ideas, and/or any other written material referring to the same ("**Confidential Information**"). Both during the term of this Agreement and thereafter, the Members agree to maintain the confidence of the Confidential Information unless or until such Confidential Information has been made public by an act or omission of a Member other than itself.

14.13 Dispute Resolution.

(a)    Whenever the Members shall have any dispute among themselves relating to the interpretation, construction or implementation of this Agreement, the Members shall resolve such dispute as follows:

(i)    First, each Member involved in such dispute shall use its good faith efforts to negotiate a resolution thereof by engaging in discussions with the other Members so involved at reasonable times and places, by telephone or otherwise, during the sixty (60) day period following notice by a Member to each of the other Members of its belief that there is a dispute which requires resolution in such manner;

27

(ii)     Second, if the Members are unable to resolve such dispute through good faith negotiations during the sixty (60) day period provided in Section 14.11(a)(i), the Members shall refer the dispute to mediation in accordance with the Judicial Arbitration and Mediation Services, Inc. (J·A·M·S) (www.jamsadr.com) mediation procedures; and

(iii)     Third, if the Members are unable to resolve such dispute through mediation, any Member involved in such dispute may bring an action or proceeding in any court having jurisdiction thereof pursuant to Section 14.7; provided that each Member waives its right to trial by jury and its right to consequential, special and/or punitive damages.

(b)     Whenever the Members shall be deadlocked or shall otherwise be in dispute with respect to the relations among the Members or between the Members and the Company or any other matter related thereto, the Members shall resolve such dispute as follows:

(i)     First, each Member involved in such dispute shall use its good faith efforts to negotiate a resolution thereof by engaging in discussions with the other Members so involved at reasonable times and places, by telephone or otherwise, during the sixty (60) day period following notice by a Member to each of the other Members of its belief that there is a dispute which requires resolution in such manner;

(ii)     Second, if the Members are unable to resolve such dispute through good faith negotiations during the sixty (60) day period provided in Section 14.12(b)(i), the Members shall refer the dispute to mediation in accordance with the Judicial Arbitration and Mediation Services, Inc. (J·A·M·S) (www.jamsadr.com) mediation procedures; and

(iii)     Third, if the Members are unable to resolve such dispute through mediation, any Member involved in such dispute may elect to dissolve the Company, in which case the Company shall dissolve in accordance with Article XIII above.

14.14   **General Interpretive Principles.**  For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)     The terms defined in this Agreement include the plural as well as the singular;

(b)     Accounting terms not otherwise defined herein have the meanings given to them in accordance with generally accepted accounting principles in the United States;

(c)     References herein to "Sections," "paragraphs" and other subdivisions without reference to a document are to designated Sections, paragraphs and other subdivisions of this Agreement;

(d)     A reference to a paragraph without further reference to a Section is a reference to such paragraph as contained in the same Section in which the reference appears, and this rule shall also apply to other sub-divisions;

(e)     The words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

28

    (f)      The term "include" or "including" shall mean without limitation by reason of enumeration.

29

MAR-14-2006 10:22 From:COFFEE HOLDING CO.    17187684731    To:2217893    P.2/2

MAR-10-2006 13:59 From:COFFEE HOLDING CO.    17187684731    To:2217893    P.3/6

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective
Date.

THE COMPANY:

Caffè La Rica, LLC

By: _____
    Name: ANDREW GARWIN
    Title: MANAGER

MEMBERS:

Coffee Holding Co., Inc

By: _____
    Name: ANDREW GARWIN
    Title: PRESIDENT/CEO

The Coffee Bean Trading-Roasting LLC

By: _____
    Name:
    Title:

[TPW:NYLEGAL:605852.1] 19499-00000 03/09/2006 06:00 PM

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

**THE COMPANY:**

Café La Rica, LLC

By:_____
     Name:
     Title:

**MEMBERS:**

Coffee Holding Co., Inc.

By:_____
     Name:
     Title:

The Coffee Bean Trading-Roasting LLC

By:_____
     Name: Alberto Lensi
     Title: Manager

[TPW: NYLEGAL:460452.1] 19499-00000 03/09/2006 06:00 PM

**EXHIBIT A**

| Name and Address of Member | Initial Capital Contribution | Initial Membership Interest (as represented by number of Shares) | Initial Sharing Ratio |
|---|---|---|---|
| Coffee Holding Co., Inc.<br><br>4401 First Avenue<br>Brooklyn, NY 11232<br>Attn: Andrew Gordon, President and Chief Executive Officer<br><br>Phone: (718) 832-0800<br>Fax: (718) 832-0892<br>Email: agordon@coffeeholding.com | $250,000 in cash, plus the equipment specified in Exhibit I attached to the Agreement | 500 | 50% |
| The Coffee Bean Trading-Roasting LLC<br><br>c/o Comjet AG,<br>Dubihuus<br>3780 Gstaad<br>Switzerland<br><br>Phone: 011-41-33-748-6620<br>Telecopier: 011-41-33-748-6621<br><br>and:<br><br>5701 Miami Lakes Drive East<br>Miami Lakes, FL 33014<br>Attn: Sonia Aguila | All intellectual property, equipment and coffee inventory and packaging materials specified in Exhibit J attached to the Agreement | 500 | 50% |
| | | | |
| **TOTAL** | | **1,000** | **100%** |

**EXHIBIT B**

[Form of Lease Agreement between the Company and Perc Enterprises]

**EXHIBIT C**

[Form of Expense Sharing Agreement between the Company and Coffee Holding]

**EXHIBIT D**

[Form of License Agreement between the Company and Coffee Bean Trading]

**EXHIBIT E**

**[Form of License Agreement between the Company and Coffee Holding]**

**EXHIBIT F**

**[Form of Employment Agreement between the Company and Mr. Ernesto Aguila]**

**EXHIBIT G**

The initial Board of Managers of the Company shall consist of the following persons:

    1. Ernesto Aguila

    2. Andrew Gordon

# EXHIBIT H

The initial Officers of the Company shall be as follows:

**Name**                    **Title**

David Gordon            Production Manager

**EXHIBIT I**

**Capital Contributions of Coffee Holding Co, Inc.**

| **Item** |
|---|
| Cash |
| Equipment:<br><br>1. One brand new ICA Hi-Vac 50 brick pack machine – this will be ready to ship directly to Miami from Genoa, Italy the first week of May<br><br>2. One Jabez Burns 23R – 4 bag roaster plus two additional that need to be refurbished and assembled<br><br>3. Two Modern Processing 888 grinders<br><br>4. Various screw conveyors – elevators and stainless steel coffee hoppers<br><br>5. One Key Pack fractional machine – this is an older model but will add to our capacity none the less<br><br>6. Two 3M box taping machines |
| Lease Subject to Condition Subsequent – License for use of the Café Caribe trademark under the terms set forth in the licensing agreement |

**EXHIBIT J**

## Capital Contributions of Coffee Bean Trading Roasting LLC

| **Item** |
|---|
| Equipment: |
|     1.    Sample Roaster STS |
|     2.    Roll Tad Machine |
|     3.    Sample Grinder |
|     4.    Pour Over Machine |
|     5.    Roaster JB 23-R |
|     6.    Holding Bins x4 |
|     7.    Grinder 777 |
|     8.    Grinder JB |
|     9.    Frac Pack Machine |
|     10.    Frac Pack Printer |
|     11.    Box Tunnel |
|     12.    Action Pack Machine |
|     13.    Heat Sealer |
|     14.    Transport Equipment |
|     15.    Hi/Lo Machine |
| Inventory |
| Packaging |
| Office Equipment |
| Air Compressor |
| License Subject to Condition Subsequent – License for use of the Café La Rica trademark under the terms set forth in the licensing agreement |

## EXPENSE SHARING AND SERVICES AGREEMENT

This Expense Sharing and Services Agreement (the "Agreement") is made as of this _10_ day of March, 2006, by and between Coffee Holding, Co., Inc., a Nevada corporation (the "Company"), and Café La Rica, LLC (the "Venture"), a Delaware limited liability company.

WHEREAS, the Company and Coffee Bean Trading-Roasting LLC, a Delaware limited liability company ("CBT") entered into an operating agreement governing the operation of the Venture on March _10_, 2006 (the "Operating Agreement");

WHEREAS, the Venture engages in the roasting, grinding, packaging and sale of Café La Rica and other branded coffee products;

WHEREAS, other than as set forth herein, the Company and CBT will share in the profits of all activities of the Venture pursuant to their respective Sharing Ratios;

WHEREAS, the Company has entered into a license with the Venture, permitting the Venture to roast, grind, package and sell its Café Caribe brand of coffee;

WHEREAS, as further set forth herein, in certain geographic areas and on certain routes the Members of the Venture will share in the profits for the sale of Café Caribe, and in certain geographic areas and on certain routes, the Venture will instead receive a fee from the Company for the roasting, grinding and packaging of Café Caribe;

WHEREAS, the Company and its employees will perform certain services on behalf of the Venture and incur costs associated with such services;

WHEREAS, the Company will also supply certain products, including coffee beans, to the Venture; and

WHEREAS, the Company and the Venture have agreed to formalize the method for sharing the expenses discussed above.

NOW, THEREFORE, the Company and the Venture agree as follows:

### SECTION 1

### SERVICES PROVIDED BY THE COMPANY TO THE VENTURE

1.1     Services Provided by the Company to the Venture:

The Company shall provide to the Venture certain services, including:

(a)     administrative services and support, including the use of the personnel, office space and equipment of the Company, including photocopy machines, computers and other equipment, primarily in connection with the Venture's back office operations;

(b)     bookkeeping, accounting and similar services;

[TPW: WA:3151734.5] 19499-00000  03/09/2006 10:42 AM

**EXHIBIT**

_B_

(c)     participation in the Company's employee benefit plans by the Venture's employees;

(d)     payment of slotting fees for the Venture by the Company; and

(e)     certain other services agreed upon by the Venture and the Company.

1.2    Reimbursement of Expenses:

As set forth herein, the Venture shall reimburse the Company for the provision of the services set forth in Section 1.1 above. Because the Venture and the Company agree that it is difficult to determine the exact cost of such services to the Company, the Venture and the Company agree that the Venture shall pay to the Company on a monthly basis an amount equal to 5.0% of the Venture's monthly sales (the "Expense Reimbursement"). The Venture and the Company agree that the payment of the Expense Reimbursement to the Company by the Venture shall satisfy all of the Venture's obligations to the Company for the provision of the services set forth in Section 1.1 above, including any salaries or fees attributable to the provision of such services by the Company to the Venture.

## SECTION 2

## SUPPLIES PROVIDED BY THE COMPANY TO THE VENTURE

The Company agrees to supply the Venture with as much coffee inventory as requested by the Venture, of commercially reasonable quality, at fair market prices, to be paid by the Venture within fifteen (15) business days of the end of each month.

## SECTION 3

## SERVICES PROVIDED BY THE VENTURE TO THE COMPANY

The Venture shall generally engage in the roasting, grinding, packaging and sale of Café La Rica and other coffee products. However, the Venture may also, at the election of the Venture, roast, grind and package certain other coffee products for the Company, including the Company's Café Caribe brand, for a fee, instead of sharing in the profits for the sale of such coffee pursuant to the Members' respective Sharing Ratios.

For the roasting, grinding and packaging by the Venture of any other coffee brands of the Company, including the Café Caribe brand, the Company agrees to pay a monthly fee for such services within fifteen (15) business days of the end of each month, in an amount equal to (i) $0.18 per each 10 oz. brick of coffee.

Notwithstanding anything to the contrary in this Agreement, the Members shall share in the profits for all roasting, grinding, packaging and sales of the Café Caribe brand by the Venture for sale on all DSD routes, as well as to all WalMart stores and distribution centers and all Publix stores and distribution centers, within the State of Florida, pursuant to their respective Sharing Ratios.

[TPW: WA:3151734.5] 19499-00000 03/09/2006 10:42 AM

## SECTION 4

## AMENDMENTS

This Agreement may be amended or modified at any time by mutual agreement of the Company and the Venture, subject to the prior approval of the Board of Directors of the Company and the Members of the Venture.

## SECTION 5

## TERMINATION

This Agreement shall remain in effect until the earlier of the dissolution or winding up of the Venture, the dissociation or withdrawal of a Member from the Venture, a material breach, termination or expiration of the Operating Agreement, the sale or transfer of any interest in the Venture (other than pursuant to the terms of the Operating Agreement) or the mutual written agreement of the parties hereto to terminate this Agreement.

## SECTION 6

## PERIODIC REVIEWS; RECORDS

Both parties to this Agreement shall periodically review the overall allocation of expenses between the Company and the Venture, and shall maintain appropriate written records and documentation with respect to amounts reimbursed by and among the Company and the Venture pursuant to this Agreement.

## SECTION 7

## MISCELLANEOUS

7.1     All terms not defined herein shall have the meaning set forth in the Operating Agreement.

7.2     All Article and Section headings in this Agreement are for convenience of reference only and are not intended to qualify the meaning of any Article or Section.

7.3     This Agreement constitutes the entire agreement among the parties and supersedes any prior agreement or understanding among them respecting the subject matter of this Agreement except as specifically provided herein.

7.4     This Agreement shall be binding upon, and inure to the benefit of, the parties hereto, their successors, heirs, legatees, devisees, assigns, legal representatives, executors and administrators, except as otherwise provided herein.

7.5     This Agreement may be executed in several counterparts, and all so executed shall constitute one agreement, binding on all the parties hereto, even though all parties are not signatories to the original or the same counterpart. For purposes of this Agreement, facsimile as well as scanned and emailed signatures shall be deemed to be original signatures.

3

7.6    All notices under this Agreement, including any and all amendments to the exhibits which comprise a part of this Agreement, shall, unless specified to the contrary, be in writing and shall be addressed as follows:

If to the Venture, to:

_____

_____

_____

If to the Company, to:

_____

_____

_____

or to such other address as such party shall designate by written notice given to the other party. All notices required hereunder will be delivered personally or sent by facsimile or certified or registered mail or via overnight courier service unless otherwise specified herein to authorized personnel of the addressee. If given personally, the notice will be deemed effective on the date of delivery. If sent by facsimile, the notice will be deemed effective on the date successfully sent. If sent by overnight courier, the notice will be deemed effective on the second following business day in the jurisdiction to which sent. If sent by mail, the notice will be deemed effective on the tenth day following posting or on the actual date of receipt, whichever is earlier.

7.7    This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of laws principles thereof.

7.8    The failure of any provision of this Agreement shall in no manner affect the right to enforce the same, and the waiver by any party of any breach of any provision of this Agreement shall not be construed to be a waiver by such party of any succeeding breach of such provision or a waiver by such party of any breach of any other provision. The failure on the part of either party hereto to exercise or enforce any right conferred upon it hereunder shall not be deemed to be a waiver of any such rights or operate to bar the exercise or enforcement thereof at any time or times thereafter.

7.9    The article headings are placed herein merely as a matter of convenience and are not to be construed as a part of this Agreement.

7.10    This Agreement shall not be assignable by either party without the written consent of the other party hereto.

[TPW: WA:3151734.5] 19499-00000 03/09/2006 10:42 AM

IN WITNESS WHEREOF, the Company and the Venture have executed this Expense Sharing and Services Agreement by their duly authorized officers or managers as of the date first written above

COFFEE HOLDING CO., INC.

By:_____

Andrew Gordon
President and Chief Executive Officer

CAFÉ LA RICA, LLC

By:_____

Ernesto Aguila
Manager

5

IN WITNESS WHEREOF, the Company and the Venture have executed this Expense Sharing and Services Agreement by their duly authorized officers or managers as of the date first written above.

COFFEE HOLDING CO., INC.

By:_____
    Andrew Gordon
    President and Chief Executive Officer

CAFÉ LA RICA, LLC

By:_____
    Ernesto Aguila
    Manager

**Coffee Holding Co., Inc.**
4401 First Avenue
Brooklyn, NY 11232
U.S.A.

February 5, 2007

**VIA FACSIMILE &
OVERNIGHT COURIER**

Board of Managers of Café La Rica, LLC
Attn: Ernesto Aguila
Café La Rica , LLC
2131 NW 72nd Avenue
Miami, FL 33122

The Coffee Been Trading-Roasting LLC
c/o Comjet AG
Dubihuus
3780 Gstaad
SWITZERLAND
011-41-33-748-6621 (facsimile)
and
5701 Miami Lakes Drive East
Miami Lakes, FL 33014
Attn: Sonia Aguila

    Re:   **Dissolution and Winding Up of Café La Rica, LLC**

Ladies and Gentlemen:

    Please be advised that in accordance with Section 13.1(c) of the Limited Liability Company Agreement of Café La Rica, LLC (the "***LLC Agreement***"), Café La Rica, LLC a Delaware limited liability company, (the "***LLC***") has been dissolved due to a material breach of that certain Expense Sharing Agreement dated March 2006 between the LLC and its member, Coffee Holding Co., Inc. ("***CHC***").

    Please have your attorneys contact CHC's attorneys at Thacher Proffitt & Wood LLP (Matthew Dyckman at (202) 347-5647 or Michael Helmer at (908) 598-5757) to discuss an orderly winding up of the LLC business and liquidation of the LLC's assets.

TPW: NYLEGAL:634432.1 19499-00009 02/05/2007 08:51 AM



**EXHIBIT**

C

In accordance with Section 13.2 of the LLC Agreement, you are further put on notice to continue to operate the LLC in the normal course of business and to not dispose of any assets of the LLC until the plan of liquidation has been agreed upon.

Sincerely,

COFFEE HOLDING CO., INC.

By: _____

Name:  Andrew Gordon
Title:  President and CEO

cc:    Matthew Dyckman, Esq.
       Thacher Proffitt & Wood LLP
       1700 Pennsylvania Avenue, NW, Suite 800
       Washington, DC  20006

       Michael E. Helmer, Esq.
       Thacher Proffitt & Wood LLP
       25 DeForest Avenue
       Summit, NJ  07901

       Robert F. Hudson, Jr. Esq.
       Baker & McKenzie LLP
       Mellon Financial Center
       1111 Brickell Avenue, Suite 1700
       Miami, FL  33131

       Coffee Holding Co. Inc.
       4401 First Avenue
       Brooklyn, NY  11232
       Attn: Andrew Gordon, President & CEO
       718-832-0892 (facsimile)

**UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division**

**Case Number: 07-20389-CIV-MARTINEZ-BANDSTRA**

COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

      Plaintiff,

vs.

COFFEE HOLDING, CO. INC., a Nevada
corporation

      Defendant - Counterclaimant.

---

**AFFIDAVIT OF ANDREW GORDON IN SUPPORT OF MOTION FOR A
TEMPORARY RESTRAINING ORDER**

STATE OF NEW YORK    )
                  ) ss:
COUNTY OF KINGS     )

ANDREW GORDON, being duly sworn, deposes and says:

1.    I am the president of Defendant-Counterclaimant Coffee Holding, Co. Inc. ("Coffee Holding"), a Nevada corporation, and have personal knowledge of the facts stated herein.

2.    Café La Rica is Delaware limited liability company formed between Coffee Holding and the Plaintiff, Coffee Bean Trading-Roasting, LLC ("Coffee Bean").

3.    Café La Rica has been losing money since its inception. On February 5, 2007, I sent a letter to Coffee Bean notifying it of the dissolution of Café La Rica due to Café La Rica's prior material breach of the Expense Sharing Agreement between Café La Rica and Coffee Holding. After Café La Rica had been dissolved, Ernesto Aguila, CEO of Café La Rica, not only



withdrew $20,000 from Café La Rica's Washington Mutual bank account but unilaterally changed the passwords. As a result, I wrote to Washington Mutual asking it to freeze the Café La Rica account, which it properly did.

4.     I expected the managers of Coffee Bean -- Ernesto Aguila and Alberto Lensi -- to cooperate with me in order to wind down Café La Rica equitably and fairly so that each member received its fair share of Café La Rica. This has not happened.

5.     Because Café La Rica had been rightfully dissolved and its bank account frozen, it was also my understanding that Café La Rica had ceased producing, packaging and selling coffee. In fact, in a phone conversation with Mr. Aguila, I was told that Café La Rica had no receivables in its account. However, during the week of March 11, 2007, I spoke with four Café La Rica customers who told me that each was still conducting on-going business with Café La Rica.

6.     That week, I spoke with Charles Bullard of Diplomat Coffee who told me that Diplomat Coffee has actually sent several checks to Café La Rica since February 5, 2007. *See* Exhibit A.

7.     I also spoke with an individual from Park Avenue Office Services ("Park Avenue") who told me that Park Avenue has also paid for coffee and made checks out to Café La Rica. Additionally, I spoke to individuals at Javalution and Gourmet Cup, who said that they each had issued checks to Café La Rica after February 5, 2007.

8.     Even more troubling, Mr. Bullard told me that the checks Diplomat has made out to Café La Rica have been deposited into a Bank of America bank account (#229004448902) in the name of a Coffee Bean related entity. *See* Exhibit A.

9.      On March 20, 2007, through Coffee Bean's counsel, I received an accounting of that Bank of America bank account.  *See* Exhibit B.  It is very clear that Mr. Aguila, through an account related to Coffee Bean, whose manager is Mr. Lensi, is continuing to run Café La Rica. The accounting also demonstrates that Mr. Aguila and his wife Sonia have been withdrawing money from the account. *See Id.*  Additionally, checks have been deposited from a variety of Café La Rica clients. *See Id.*

10.     Thus, Mr. Aguila and Mr. Lensi have knowingly and illicitly misappropriated Café La Rica's receivables and placed the money into a separate account of an entity that is not even a party to the Operating Agreement between Coffee Bean and Coffee Holding.

11.     Finally, it has come to my attention, and the attention of Sam Elway, Café La Rica's accountant, that Café La Rica's security cameras have been systematically shut off throughout the past few weeks blocking my knowledge of the activities of Café La Rica as it is being run by Mr. Aguila.

12.     Mr. Aguila's, Mr. Lensi's and Coffee Bean's actions pose a significant threat of irreparable harm to both Coffee Holding and Café La Rica.  Mr. Aguila and Mr. Lensi cannot continue to misappropriate money owed to Café La Rica and deposit it improperly into a Coffee Bean related account.  Café La Rica must be wound down equitably and fairly.  This Court should grant an immediate TRO in order to ensure that Mr. Aguila, Mr. Lensi and Coffee Bean

cease their wrongful operation and control of Café La Rica as well as their misappropriation of

Café La Rica monies.

ANDREW GORDON

Sworn to before me this
21 day of March, 2007

Notary Public

GENARD DeCAPUA
Notary Public, State of New York
No. 01DE4808887
Qualified in Kings County
Commission Expires May 5, 2010

4

EXHIBIT A



CPR HOLDING INC
D/B/A DIPLOMAT COFFEE
PO BOX 953164
LAKE MARY, FL 32795-3154

ABSOUTH BANK
LAKE MARY, FL 32795-3154
63-466/631

9692

PAY TO THE
ORDER OF _____ Cafe La Rica

Nine Thousand Eight Hundred Sixty-Five and 56/100***********

CAFE LA RICA
2131 NW 72ND AVENUE
MIAMI, FL 33122
Ernesto Aguila

2/5/2007

$ **9,865.56

DOLLARS

MEMO

229004448902

√#9692



CPR HOLDING INC
D/B/A DIPLOMAT COFFEE
PO BOX 953154
LAKE MARY, FL 32795-3154

9720

AMSOUTH BANK
LAKE MARY, FL 32765-3154
63-408/631

2/12/2007

PAY TO THE
ORDER OF    Cafe La Rica                                      $ **13,881.84

Thirteen Thousand Eight Hundred Eighty-One and 84/100************************************ DOLLARS

CAFE LA RICA
2131 NW 72ND AVENUE
MIAMI, FL 33122
Ernesto Aguila

MEMO

© 2006 BEFUN INC. # 673  1-800-633-8810

"009720"  "063408688"  37201399B"



22900444 8902

√# 9720



CPR HOLDING INC
D/B/A DIPLOMAT COFFEE
PO BOX 953154
LAKE MARY, FL 32795-3154

9730

AMSOUTH BANK
LAKE MARY, FL 32795-3154
63-460/631

2/19/2001

PAY TO THE
ORDER OF ___ Cafe La Rica ___ $ **5,189.64

Five Thousand One Hundred Eighty-Nine and 64/100************************************************************ DOLLARS

CAFE LA RICA
2131 NW 72ND AVENUE
MIAMI, FL 33122
Ernesto Aguila

MEMO _____

#009730#  #063104603#  3701131369#

**00005189000#

PAY TO THE ORDER OF
BANK OF AMERICA
Miami, FL 33166
FOR DEPOSIT ONLY
THE COFFEE BEAN TRADING-ROASTING
LLC
229004448902

√ #9730

# EXHIBIT B

## Cafe La Rica, LLC

3/19/2007 6:00 PM

Register: Bank A
From 02/01/2007 through 03/19/2007
Sorted by: Date, Type, Number/Ref

| Date | Number | Payee | Account | Memo | Payment | C | Deposit | Balance |
|------|--------|-------|---------|------|---------|---|---------|---------|
| 02/14/2007 | | | -split- | Deposit | | X | 15,097.90 | 15,097.90 |
| 02/15/2007 | | | -split- | Deposit | | X | 31,105.86 | 46,203.76 |
| 02/16/2007 | 0991 | ARNOLD MORALES | 2000 · Accounts Payable | | 1,613.27 | X | | 44,590.49 |
| 02/16/2007 | 0992 | CESAR JARA | 2000 · Accounts Payable | | 763.28 | X | | 43,827.21 |
| 02/16/2007 | 0993 | VICTOR ANSON | 2000 · Accounts Payable | | 665.40 | X | | 43,161.81 |
| 02/16/2007 | 0994 | SONIA AGUILA | 2000 · Accounts Payable | | 1,414.36 | X | | 41,747.45 |
| 02/16/2007 | 0995 | ERNESTO G. AGUI... | 2000 · Accounts Payable | | 4,262.30 | X | | 37,485.15 |
| 02/17/2007 | | | -split- | Deposit | | | 4,927.95 | 42,413.10 |
| 02/19/2007 | 0996 | GENERAL PACKA... | 2000 · Accounts Payable | | 452.46 | X | | 41,960.64 |
| 02/21/2007 | 1002 | ALBERT'S DELIVE... | 2000 · Accounts Payable | | 220.00 | X | | 41,740.64 |
| 02/23/2007 | | | -split- | Deposit | | X | 14,727.98 | 56,468.62 |
| 02/23/2007 | 1003 | EDICT SYSTEMS | 2000 · Accounts Payable | | 161.50 | | | 56,307.12 |
| 02/23/2007 | 1004 | SONIA AGUILA | 2000 · Accounts Payable | | 707.18 | X | | 55,599.94 |
| 02/23/2007 | 1005 | ERNESTO G. AGUI... | 2000 · Accounts Payable | | 2,131.15 | X | | 53,468.79 |
| 02/23/2007 | 1006 | ARNOLD MORALES | 2000 · Accounts Payable | | 709.94 | X | | 52,758.85 |
| 02/23/2007 | 1007 | CESAR JARA | 2000 · Accounts Payable | | 439.22 | X | | 52,319.63 |
| 02/23/2007 | 1008 | VICTOR ANSON | 2000 · Accounts Payable | | 343.40 | | | 51,976.23 |
| 02/26/2007 | 1001 | COEX COFFEE INT... | 2000 · Accounts Payable | | 20,000.00 | X | | 31,976.23 |
| 02/26/2007 | 1009 | BC Coffee & Supplie... | 2000 · Accounts Payable | | 1,179.50 | | | 30,796.73 |
| 02/26/2007 | 1010 | BELLSOUTH | 2000 · Accounts Payable | | 656.79 | | | 30,139.94 |
| 02/26/2007 | 1011 | BENTON EXPRESS | 2000 · Accounts Payable | | 1,065.50 | | | 29,074.44 |
| 02/26/2007 | 1012 | Carton Sales & Maa... | 2000 · Accounts Payable | | 2,009.50 | | | 27,064.94 |
| 02/26/2007 | 1013 | CH ROBINSON | 2000 · Accounts Payable | | 427.45 | | | 26,637.49 |
| 02/26/2007 | 1014 | ECONOCARIBE C... | 2000 · Accounts Payable | | 100.00 | | | 26,537.49 |
| 02/26/2007 | 1015 | FLORIGAS | 2000 · Accounts Payable | | 1,670.72 | | | 24,866.77 |
| 02/26/2007 | 1016 | KONICA MINOLTA | 2000 · Accounts Payable | | 182.12 | | | 24,684.65 |
| 02/26/2007 | 1017 | MOUNTAIN VALL... | 2000 · Accounts Payable | | 55.60 | | | 24,629.05 |
| 02/26/2007 | 1018 | Pack Plus Converting... | 2000 · Accounts Payable | | 489.96 | | | 24,139.09 |
| 02/26/2007 | 1019 | Ultra Flex Packaging... | 2000 · Accounts Payable | | 1,332.12 | | | 22,806.97 |
| 02/26/2007 | 1020 | VERIZON WIRELE... | 2000 · Accounts Payable | | 80.52 | | | 22,726.45 |
| 02/27/2007 | WITHDR... | FCCI INSURANCE ... | 2000 · Accounts Payable | | 1,561.98 | X | | 21,164.47 |
| 02/27/2007 | 1021 | ALBERT'S DELIVE... | 6000 · Freight:6002 - F... | | 105.00 | | | 21,059.47 |
| 02/27/2007 | 1022 | South Florida Sampli... | 5000 · Cost of Goods S... | Inv #3764 | 5,523.50 | | | 15,535.97 |
| 03/01/2007 | | | -split- | Deposit | | | 2,242.00 | 17,777.97 |
| 03/01/2007 | | | -split- | Deposit | | | 5,695.91 | 23,473.88 |
| 03/01/2007 | | | -split- | Deposit | | | 1,600.00 | 25,073.88 |
| 03/02/2007 | Withdrawal | CHRYSLER FINAN... | 2000 · Accounts Payable | | 679.50 | | | 24,394.38 |
| 03/02/2007 | 1024 | South Florida Sampli... | 5000 · Cost of Goods S... | INVOICE #3768 | 6,125.00 | | | 18,269.38 |
| 03/02/2007 | 1025 | South Florida Sampli... | 5000 · Cost of Goods S... | INVOICE #3769 | 2,793.10 | | | 15,476.28 |
| 03/02/2007 | 1026 | ERNESTO G. AGUI... | 2000 · Accounts Payable | | 2,131.15 | | | 13,345.13 |

## Cafe La Rica, LLC

3/19/2007 6:00 PM

Register: Bank A
From 02/01/2007 through 03/19/2007
Sorted by: Date, Type, Number/Ref

| Date | Number | Payee | Account | Memo | Payment | C | Deposit | Balance |
|------|--------|-------|---------|------|---------|---|---------|---------|
| 03/02/2007 | 1027 | SONIA AGUILA | 2000 · Accounts Payable | | 707.18 | | | 12,637.95 |
| 03/02/2007 | 1028 | ARNOLD MORALES | 2000 · Accounts Payable | | 709.26 | | | 11,928.69 |
| 03/02/2007 | 1029 | CESAR JARA | 2000 · Accounts Payable | | 439.22 | | | 11,489.47 |
| 03/02/2007 | 1030 | VICTOR ANSON | 2000 · Accounts Payable | | 350.32 | | | 11,139.15 |
| 03/02/2007 | 1031 | ARNOLD MORALES | 6180 · Insurance:6181 · ... | | 200.00 | | | 10,939.15 |
| 03/05/2007 | | | -split- | Deposit | | | 2,453.85 | 13,393.00 |
| 03/05/2007 | 1032 | CONTINENTAL RE... | 2000 · Accounts Payable | Cashier's Check | 8,409.09 | | | 4,983.91 |
| 03/05/2007 | 54 | | 6111 · FUEL CHARGES | | 46.06 | | | 4,937.85 |
| 03/07/2007 | | | 1499 · Undeposited Fu... | Deposit | | | 1,071.00 | 6,008.85 |
| 03/08/2007 | | | 1499 · Undeposited Fu... | Deposit | | | 4,090.33 | 10,099.18 |
| 03/08/2007 | Withdrawal | T-MOBILE | 2000 · Accounts Payable | | 21.35 | | | 10,077.83 |
| 03/08/2007 | 1034 | ALBERT'S DELIVE... | 2000 · Accounts Payable | | 60.00 | | | 10,017.83 |
| 03/08/2007 | 59 | | Bank A [split] | ALL 4 WIREL... | 21.35 | | | 9,996.48 |
| 03/08/2007 | 59 | | -split- | ALL 4 WIREL... | 288.30 | | | 9,708.18 |
| 03/09/2007 | | | 1499 · Undeposited Fu... | Deposit | | | 10,089.36 | 19,797.54 |
| 03/09/2007 | | | -split- | | | | 5,210.66 | 25,008.20 |
| 03/09/2007 | 1035 | ARNOLD MORALES | 2000 · Accounts Payable | | 776.16 | | | 24,232.04 |
| 03/09/2007 | 1036 | CESAR JARA | 2000 · Accounts Payable | | 493.25 | | | 23,738.79 |
| 03/09/2007 | 1037 | VICTOR ANSON | 2000 · Accounts Payable | | 350.32 | | | 23,388.47 |
| 03/09/2007 | 1038 | ERNESTO G. AGUI... | 2000 · Accounts Payable | | 2,131.15 | | | 21,257.32 |
| 03/09/2007 | 1039 | SONIA AGUILA | 2000 · Accounts Payable | | 707.18 | | | 20,550.14 |
| 03/12/2007 | | | 1499 · Undeposited Fu... | Deposit | | | 8,761.80 | 29,311.94 |
| 03/12/2007 | 1033 | MIAMI FOODS & P... | 2000 · Accounts Payable | | 6,429.72 | | | 22,882.22 |
| 03/12/2007 | 1040 | Flexo Print, Inc. | 2000 · Accounts Payable | | 2,025.00 | | | 20,857.22 |
| 03/12/2007 | 1041 | Carton Sales & Man... | 2000 · Accounts Payable | | 2,191.04 | | | 18,666.18 |
| 03/12/2007 | 1042 | FLORIGAS | 2000 · Accounts Payable | | 3,400.93 | | | 15,265.25 |
| 03/13/2007 | | | -split- | Deposit | | | 5,949.75 | 21,215.00 |
| 03/13/2007 | 1043 | KONICA MINOLTA | 2000 · Accounts Payable | | 817.42 | | | 20,397.58 |
| 03/14/2007 | 1044 | BENTON EXPRESS | 2000 · Accounts Payable | | 3,086.28 | | | 17,311.30 |
| 03/15/2007 | Withdrawal | T-MOBILE | 2000 · Accounts Payable | | 265.01 | | | 17,046.29 |
| 03/15/2007 | 1045 | ALLIED CONTAIN... | 2000 · Accounts Payable | | 1,173.00 | | | 15,873.29 |
| 03/15/2007 | 1046 | WORLD WASTE S... | 2000 · Accounts Payable | | 365.99 | | | 15,507.30 |
| 03/16/2007 | 1047 | ARNOLD MORALES | 2000 · Accounts Payable | | 815.22 | | | 14,692.08 |
| 03/16/2007 | 1048 | CESAR JARA | 2000 · Accounts Payable | | 441.22 | | | 14,250.86 |
| 03/16/2007 | 1049 | VICTOR ANSON | 2000 · Accounts Payable | | 337.16 | | | 13,913.70 |
| 03/16/2007 | 1050 | ERNESTO G. AGUI... | 2000 · Accounts Payable | | 2,131.15 | | | 11,782.55 |
| 03/16/2007 | 1051 | SONIA AGUILA | 2000 · Accounts Payable | | 707.18 | | | 11,075.37 |
| 03/16/2007 | 1052 | ALBERT'S DELIVE... | 2000 · Accounts Payable | | 140.00 | | | 10,935.37 |
| 03/17/2007 | 1053 | South Florida Sampli... | 2000 · Accounts Payable | | 5,768.50 | | | 5,166.87 |
| 03/17/2007 | 1054 | WILLIAMS POWER | 2000 · Accounts Payable | | 195.00 | | | 4,971.87 |

Page 2

## Cafe La Rica, LLC

3/19/2007 6:00 PM

Register: Bank A
From 02/01/2007 through 03/19/2007
Sorted by: Date, Type, Number/Ref

| Date | Number | Payee | Account | Memo | Payment | C | Deposit | Balance |
|------|--------|-------|---------|------|---------|---|---------|---------|
| 03/19/2007 | | | -split- | Deposit | | | 42,853.53 | 47,825.40 |
| 03/19/2007 | | | 1499 · Undeposited Fu... | Deposit | | | 2,262.00 | 50,087.40 |
| 03/19/2007 | 1056 | COEX COFFEE INT... | 2000 · Accounts Payable | | 38,310.10 | | | 11,777.30 |
| 03/19/2007 | 1057 | Flavor Dynamics Inc. | 2000 · Accounts Payable | | 764.99 | | | 11,012.31 |

Page 3

# Deposit Summary

3/19/2007 6:00 PM

Summary of Deposits to Bank A on 02/14/2007

| Chk No. | PmtMethod | Rcd From | Memo | Amount |
|---------|-----------|----------|------|--------|
| 2410 | Check | Gourmet Cup | | 13,867.25 |
| 39688 | Check | BC Coffee & Supplies, Inc. | | 1,230.65 |

Less Cash Back:

**Deposit Total:** 15,097.90

Mar 19 2007 18:05     CAFE LA RICA LLC          3055910760              P.6

## Deposit Summary                                        3/19/2007 6:00 PM

Summary of Deposits to Bank A on 02/15/2007

| Chk No. | PmtMethod | Rcd From | Memo | Amount |
|---|---|---|---|---|
| | | | | 13,881.84 |
| 9720 | Check | Diplomat Coffee | | 9,865.56 |
| 9692 | Check | Diplomat Coffee | | 500.00 |
| 3540 | Check | El Recreo Bakery | | 1,139.20 |
| 39595 | Check | BC Coffee & Supplies, Inc. | | 5,128.37 |
| 3532761 | Check | Wal-Mart DC 6020R-Regular | | 93.60 |
| 3532761 | Check | Wal-Mart DC 6010 | | 529.06 |
| 1323475 | Check | Jetro Cash & Carry | | |
| | | | | 31.77 |
| **Less Cash Back:** | | | | |
| | | | | 31,105.86 |
| **Deposit Total:** | | | | |

Page 1

## Deposit Summary

3/19/2007 6:00 PM

Summary of Deposits to Bank A on 02/17/2007

| Chk No. | PmtMethod | Rcd From | Memo | Amount |
|---------|-----------|----------|------|--------|
| 16638 | Check | A.P.A Victoria L'Originale | | 2,979.00 |
| 13659 | Check | Gourmet Cup | | 1,948.95 |

**Less Cash Back:**

**Deposit Total:**                                                                4,927.95

## Deposit Summary

3/19/2007 6:00 PM

Summary of Deposits to Bank A on 02/23/2007

| Chk No. | PmtMethod | Rcd From | Memo | Amount |
|---------|-----------|----------|------|--------|
| 13614 | Check | Gourmet Cup | | 1,624.70 |
| 3319 | Check | Javalution Coffee Company | | 2,045.24 |
| 3320 | Check | Javalution Coffee Company | | 5,868.40 |
| 9730 | Check | Diplomat Coffee | | 5,189.64 |

**Less Cash Back:**

**Deposit Total:** 14,727.98

Mar 19 2007 18:05    CAFE LA RICA LLC         3055910760          P.9

# Deposit Summary

3/19/2007 6:00 PM

Summary of Deposits to Bank A on 03/01/2007

| Chk No. | PmtMethod | Red From | Memo | Amount |
|---------|-----------|----------|------|--------|
| | | | | 1,692.00 |
| 8026 | Check | International Food & Franchise | | 550.00 |
| 3679 | Check | Mia Aps Latin Cafe | | |

**Less Cash Back:**

**Deposit Total:**                                                    2,242.00

## Deposit Summary

3/19/2007 6:00 PM

Summary of Deposits to Bank A on 03/01/2007

| Chk No. | PmtMethod | Recd From | Memo | Amount |
|---------|-----------|-----------|------|--------|
| 9753 | Check | Diplomat Coffee | | 4,691.76 |
| 39797 | Check | BC Coffee & Supplies, Inc. | | 1,004.15 |

**Less Cash Back:**

**Deposit Total:**      5,695.91

## Deposit Summary

3/19/2007 6:00 PM

Summary of Deposits to Bank A on 03/01/2007

| Chk No. | PmtMethod | Rcd From | Memo | Amount |
|---------|-----------|----------|------|--------|
| | Cash | Silva Coffee Service | | 568.00 |
| | Cash | Silva Coffee Service | | 1,950.00 |
| | Cash | Silva Coffee Service | | 770.00 |
| | Cash | Silva Coffee Service | | 10.00 |
| | | | | 1,698.00 |
| **Less Cash Back:** | | | | |
| | | | | 1,600.00 |
| **Deposit Total:** | | | | |

Mar 19 2007 18:06    CAFE LA RICA LLC        3055910760              p.12

## Deposit Summary

3/19/2007 6:00 PM

Summary of Deposits to Bank A on 03/05/2007

| Chk No. | PmtMethod | Recd From | Memo | Amount |
|---------|-----------|-----------|------|--------|
| | | | | 1,525.10 |
| 288372 | Check | Cheney Brothers, Inc. | | 928.75 |
| 1336493 | Check | Jetro Cash & Carry | | |

Less Cash Back:

2,453.85

**Deposit Total:**

Page 1

## Deposit Summary

Summary of Deposits to Bank A on 03/07/2007

| Chk No. | PmtMethod | Rcd From | Memo | Amount |
|---------|-----------|----------|------|--------|
| | | | | 1,071.00 |
| 0007772034 | Check | Park Avenue Office Services | | |

Less Cash Back:

Deposit Total:                                                    1,071.00

Mar 19 2007 18:06     CAFE LA RICA LLC          3055910760            P.14

## Deposit Summary
3/19/2007 6:00 PM

Summary of Deposits to Bank A on 03/08/2007

| Chk No. | PmtMethod | Recd From | Memo | Amount |
|---------|-----------|-----------|------|--------|
| 4133892 | Check | Copper Moon Coffee Company | | 4,090.33 |

Less Cash Back:

Deposit Total:                                                      4,090.33

Mar 19 2007 18:06    CAFE LA RICA LLC         3055910760            P.15

Deposit Summary

3/19/2007 6:00 PM

Summary of Deposits to Bank A on 03/09/2007

| Chk No. | PmtMethod | Rcd From | Memo | Amount |
|---------|-----------|----------|------|--------|
| 9787 | Check | Diplomat Coffee | | 10,089.36 |

Less Cash Back:

Deposit Total:                                                      10,089.36

Page 1

Mar 19 2007 18:06     CAFE LA RICA LLC          3055910760              P.16

Deposit Summary

3/19/2007 6:01 PM

Summary of Deposits to Bank A on 03/09/2007

| Chk No. | PmtMethod | Rcd From | Memo | Amount |
|---------|-----------|----------|------|--------|
| | | | | 4,904.90 |
| 3632595 | Check | Wal-Mart DC 6020R-Regular | | |
| 3632595 | Check | Wal-Mart DC 6010 | | 305.76 |

**Less Cash Back:**

**Deposit Total:**                                                 5,210.66

## Deposit Summary

3/19/2007 6:01 PM

Summary of Deposits to Bank A on 03/12/2007

| Chk No. | PmtMethod | Rcd From | Memo | Amount |
|---------|-----------|----------|------|--------|
| 0007788411 | Check | Park Avenue Office Services | | 8,761.80 |

Less Cash Back:

Deposit Total:                                                                      8,761.80

## Deposit Summary

3/19/2007 6:01 PM

Summary of Deposits to Bank A on 03/13/2007

| Chk No. | PmtMethod | Rcd From | Memo | Amount |
|---------|-----------|----------|------|--------|
| | Cash | Silva Coffee Service | | 1,067.00 |
| | Cash | Silva Coffee Service | | 700.00 |
| | Cash | Silva Coffee Service | | 315.00 |
| 39915 | Check | BC Coffee & Supplies, Inc. | | 440.40 |
| 13682 | Check | Gourmet Cup | | 4,009.35 |
| | | | | |
| **Less Cash Back:** | | | | 582.00 |
| | | | | |
| **Deposit Total:** | | | | 5,949.75 |

Page 1

## Deposit Summary

3/19/2007 6:01 PM

Summary of Deposits to Bank A on 03/19/2007

| Chk No. | PmtMethod | Rcd From | Memo | Amount |
|---------|-----------|----------|------|--------|
| 18996 | Check | Petal Productions | | 383.50 |
| 39961 | Check | BC Coffee & Supplies, Inc. | | 584.60 |
| 3673698 | Check | Wal-Mart DC 6010 | | 29.33 |
| 3673698 | Check | Wal-Mart DC 6010 | | 107.02 |
| 3673698 | Check | Wal-Mart DC 7038 | | 5,289.57 |
| 432535 | Check | Navarro Distribution Center, Inc. | | 36,459.51 |

**Less Cash Back:**

**Deposit Total:**                                                   42,853.53

## Deposit Summary

3/19/2007 6:01 PM

Summary of Deposits to Bank A on 03/19/2007

| Chk. No. | PmtMethod | Rcd From | Memo | Amount |
|----------|-----------|----------|------|--------|
| 3378 | Check | Javalution Coffee Company | | 2,262.00 |

**Less Cash Back:**

**Deposit Total:**                                                          2,262.00

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

## Case Number:  07-20389-CIV-MARTINEZ-BANDSTRA

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

     Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,

     Defendant.

_____/

## <u>ORDER REQUIRING RESPONSE TO DEFENDANT'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER</u>

THIS CAUSE came before the Court upon Defendant's Emergency Motion for

Temporary Restraining Order **(D.E. No. 32),** filed on <u>**March 21, 2007**</u>. The Court has carefully

considered the motion and is otherwise duly advised.  It is hereby:

**ORDERED and ADJUDGED** that

Plaintiff shall respond to Defendant's Emergency Motion for Temporary Restraining

Order **(D.E. No. 32) on or before** <u>**April 2, 2007.**</u>

DONE AND ORDERED in Chambers at Miami, Florida, March 23, 2007.

_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Bandstra
All Counsel of Record

## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF FLORIDA
### Miami Division

### Case Number: 07-20389-CIV-MARTINEZ-BANDSTRA

COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

     Plaintiff,

vs.

COFFEE HOLDING, CO. INC., a Nevada
Corporation,

     Defendant.

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Defendant, Coffee Holding, Co. Inc., ("Coffee Holding") hereby discloses the following pursuant to this Court's Order directing the parties to file certificates of interested parties:

1.    The name of each person, attorney, association of persons, firm, law firm, partnership, and corporation that has or may have an interest in the outcome of this action - - including subsidiaries, conglomerates, affiliates, parent corporations, publicly-traded companies that own 10% or more of a party's stock, and all other identifiable legal entities related to any party in this case:

    Andrew Gordon, David Gordon, Sterling Gordon, Rachelle Gordon

    Alberto Lensi

    Ernesto Aguila

    Sonia Aguila

    CBT Holdings, Inc.

Cafe La Rica, LLC

Generations Coffee Company, LLC

Baker & McKenzie, LLP

Thacher Proffitt & Wood LLP

Katz Barron Squitero Faust Terzo Friedberg Grady English & Allen, P.A.

2.     The name of every other entity whose publicly-traded stock, equity, or debt may be substantially affected by the outcome of the proceedings:

**None known to Coffee Holding's counsel.**

3.     The name of every other entity which is likely to be an active participant in the proceedings, including the debtor and members of the creditors' committee (or twenty largest unsecured creditors) in bankruptcy cases:

**Café La Rica, LLC.**

4.     The name of each victim (individual or corporate) of civil and criminal conduct alleged to be wrongful, including every person who may be entitled to restitution:

**Defendant/Counterclaimant, Coffee Holding seeks damages in this action against Plaintiff/Counter-Defendant, Coffee Bean Trading-Roasting, LLC.**

I hereby certify that, except as disclosed above, I am unaware of any actual or potential conflict of interest involving the district judge and magistrate judge assigned to this case, and will immediately notify the Court in writing on learning of any such conflict.

DATED this 23rd day of March, 2007

KATZ BARRON SQUITERO FAUST
2699 S. Bayshore Drive, Seventh Floor
Miami, Florida 33133
Tel:  305-856-2444
Fax: 305-285-9227

By:     /s/ Mark S. Auerbacher, Esq.
          Florida Bar No. 978220

msa@katzbarron.com
John R. Squitero, Esq.
Florida Bar No. 121196
jrs@katzbarron.com
Christopher F. Graham
Mary H. Mulhearn
Thacher Proffitt & Wood LLP
Two World Financial Center
New York, New York 10281
Tel: (212) 912-7669
Fax: (212) 912-7751
CGraham@tpw.com

COUNSEL FOR DEFENDANT/COUNTERCLAIMANT

## CERTIFICATE OF SERVICE

I hereby certify that on March 23rd 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Jose.Ferrer@bakernet.com. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following recipients:

Jose Ferrer, Esq.
BAKER & McKENZIE LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131

*Counsel of Defendant/Counterclaimant*

/s/Mark S. Auerbacher, Esq.

H:\LIB\DOCS\03281001\PLDG\HQ6270.DOC

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.: 07-20389-CIV-MARTINEZ/BANDSTRA

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

      Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,

      Defendant.

_____/

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND CROSS-MOTION TO APPOINT A RECEIVER TO ORDERLY DISSOLVE COMPANY

Plaintiff, Coffee Bean Trading-Roasting, LLC ("Coffee Bean"), by and through its undersigned counsel, hereby responds in opposition to Defendant's Emergency Motion for Temporary Restraining Order, and, pursuant to Rule 66 of the Federal Rules of Civil Procedure and the Court's inherent power to grant full and equitable relief, moves for an order appointing a receiver to orderly dissolve and wind up the business and affairs of Café La Rica, LLC ("Café La Rica"), and in furtherance thereof states as follows:

### INTRODUCTION

Coffee Holding, Inc. ("Coffee Holding") seeks by its motion to enjoin Coffee Bean from exercising control over Café La Rica and from depositing Café La Rica's receivables into Coffee Bean's accounts. Coffee Holding attempts to play the role of an aggrieved member in Café La Rica seeking only the orderly winding up of the business and affairs of Café La Rica. To the contrary, Coffee Holding's motion is actually a veiled attempt to <u>avoid</u> an orderly winding up of Café La Rica in order to force a preferential payment to itself of amounts it claims Café La Rica

owes it.  Coffee Holding purposefully attempts to mislead the Court by claiming that its efforts to orderly wind up Cafe La Rica have been entirely ignored by Coffee Bean Trading.  In fact, the undersigned has for over a month been asking Coffee Holding to propose a plan to orderly dissolve Cafe La Rica, which requests have been specifically and categorically rejected by Coffee Holding's counsel.  Coffee Bean agrees that the business and affairs of Café La Rica should be wound up.  However, under the circumstances presented, and for the reasons set forth in more detail below, the Court should deny Coffee Holding's motion and appoint a neutral receiver to orderly wind up the business and affairs of Café La Rica.

## THE RELEVANT FACTS

I.      The Parties.

Coffee Bean is a limited liability company organized and operating under the laws of the State of Delaware.  Coffee Holding is a corporation organized and operating under the laws of the State of Nevada.  Coffee Bean and Coffee Holding each own a fifty (50) percent membership interest in Café La Rica, a Delaware limited liability company operating and doing business in Miami-Dade County, Florida.  *See* Affidavit of Ernesto Aguila in Opposition to Coffee Holding's Motion for Temporary Restraining Order ("Aguila Affidavit") at ¶ 3.

II.     The Operating Agreement.

On or about March 10, 2006, Coffee Bean and Coffee Holding entered into that certain Limited Liability Company Agreement of Café La Rica, LLC (the "Operating Agreement") pursuant to which the parties formed and organized Café La Rica for the purpose of "engag[ing] in the roasting, packaging and sale of Café La Rica and other branded coffee products, and to engage in any other lawful act or activity, as determined by the Board of Managers from time to time, for which limited liability companies may be organized under the [Delaware Limited

Liability Company Act]." A copy of the Operating Agreement is attached to Coffee Bean's Complaint in this action as Exhibit A.

The Operating Agreement established, amongst other things, a Board of Managers (the "Board of Managers") responsible for "[t]he management of the Company and all decisions concerning the business affairs of the Company[.]" The Board of Managers was to consist of two managers, each having one vote with respect to all matters requiring the vote of the Board of Managers. Moreover, no individual manager was to have the right to act unilaterally on behalf of Café La Rica without the written consent of the other manager absent authorization by resolution of the Board of Managers. *See* Operating Agreement at ¶ 7.1. Coffee Holding, through Andrew Gordon, who is also Coffee Holding's President and Chief Executive Officer, has at all times relevant to this action acted as Café La Rica's de facto manager with full control over all of its operations, except for the day-to-day sales and collection activities which Mr. Aguila has handled from Florida. *See* Aguila Affidavit at ¶ 4.

With regard to the winding up of Café La Rica, the Operating Agreement specifically provides that "[t]he winding up of the Company shall be completed when all debts, liabilities and obligations of the Company have been paid and discharged or reasonably adequate provisions therefor has been made, and all of the remaining Property of the Company has been distributed to the Members." *See* Operating Agreement at ¶ 13.4. Thus, under the clear terms of the Operating Agreement, there can be no winding up of the business and affairs of Café La Rica by merely "locking the doors and walking away." The Operating Agreement requires an orderly method that will garner Café La Rica's assets, pay off its creditors and distribute any remaining assets to its members.

### III.   The Expense Sharing Agreement.

On March 10, 2006, contemporaneously with the execution of the Operating Agreement, Coffee Holding and Café La Rica entered into that certain Expense Sharing and Services Agreement (the "Expense Sharing Agreement") pursuant to which Coffee Holding agreed to provide certain management, accounting and administrative services on behalf of and supply certain products to Café La Rica. A copy of the Expense Sharing Agreement is attached to Coffee Bean's Complaint in this action as Exhibit B. Specifically, Coffee Holding agreed, amongst other things, to supply Café La Rica with as much coffee inventory as requested by Café La Rica at fair market prices. *See* Expense Sharing Agreement at §§ 1, 2. Thus, Coffee Holding occupies dual roles as both the manager and, by virtue of the Expense Sharing Agreement, a supplier and creditor of Café La Rica.

### IV.   Coffee Holding's Attempts to Force a Preferential Payment to Itself.

Since March 2006, Coffee Holding has sold coffee to Café La Rica pursuant to the Expense Sharing Agreement. Coffee Holding, in its role as the Manager of Café La Rica, was solely responsible for making payments to itself and to the other creditors of Café La Rica. Coffee Holding unilaterally permitted balances to build up on its own account. *See* Aguila Affidavit at ¶ 5.

In February 2007, Coffee Holding began threatening to make a preferential payment to itself of the entire accumulated balance on its account in disregard of Café La Rica's other creditors and payroll obligations. When Coffee Bean refused to consent to such preferential treatment of Coffee Holding's accounts payable, Andrew Gordon threatened to close down Cafe La Rica unilaterally. Consistent with his threats, Mr. Gordon unilaterally declared Café La Rica

dissolved and began notifying Café La Rica's customers, suppliers, vendors and potential investors that Café La Rica "has closed down." *See* Aguila Affidavit at ¶¶ 6, 7.

On February 7, 2007, Mr. Gordon sent a fax to Washington Mutual Bank ("Washington Mutual"), where Café La Rica maintains its operating account, advising Washington Mutual that Café La Rica had purportedly been dissolved and wound up – a claim that is blatantly false – and instructing it to prevent Mr. Aguila, who has traditionally controlled Café La Rica's operating account with Washington Mutual, from exerting any control over that bank account. Based on Mr. Gordon's false representations, Washington Mutual froze the account, preventing Café La Rica from paying its vendors and suppliers and meeting its payroll obligations. *See* Aguila Affidavit at ¶ 8. Copies of Mr. Gordon's letter of February 7, 2007 and Washington Mutual's letter of February 8, 2007 in response to same are attached hereto as Composite Exhibit A.

Once the Washington Mutual account was frozen, Café La Rica had no choice but to open a new account into which to deposit Café La Rica's receivables, and from which to pay Café La Rica's current obligations, such as accrued salaries and payables. *See* Aguila Affidavit at ¶¶ 9, 10. However, Coffee Bean has rendered a full accounting to Coffee Holding of all deposits into and payments out of that account from the time that it was opened. *See* Aguila Affidavit at ¶ 11. Coffee Holding, through the undersigned, has offered to place the account under the joint control of the parties. That offer was rejected by Coffee Holding's counsel who insisted instead that Café La Rica should be "shut down immediately, its assets secured, and the doors locked."

5

V.    Blatant Misrepresentations Contained in Coffee Holding's Motion.

Coffee Holding's motion for a restraining order contains a series of blatant and purposeful misrepresentations that in fairness must be debunked in order to provide the Court with a full and accurate basis on which to frame its ruling.

First, at paragraph 10 of its motion, Coffee Holding purposefully misrepresents to the Court that Coffee Bean has failed to work with Coffee Holding to develop an amicable winding up process for Café La Rica and at page 8 accuses the undersigned of "feigning" his concern for an orderly dissolution of Café La Rica in an attempt to buy time to allow Coffee Bean to "gut" Café La Rica's assets for itself.  To the contrary, the undersigned's office has repeatedly invited counsel for Coffee Holding to propose a plan to orderly dissolve Cafe La Rica.  Attached hereto as Composite Exhibit B is a sampling of various e-mail correspondence between the undersigned and Coffee Holding's counsel (edited to exclude confidential settlement negotiations) wherein the undersigned assures them that Coffee Bean will work together with Coffee Holding to orderly wind up Café La Rica, and repeatedly asks them to provide Coffee Bean with financial statements in order to verify the amounts owed by Café La Rica.  As evidenced by Composite Exhibit B, the financial statements were not provided until March 6, 2007.

On March 14, 2007, the undersigned had a conversation with Mr. Gordon and one of his attorneys, Michael Helmer, during which, again, the undersigned requested instructions regarding how Coffee Holding proposed to wind up Café La Rica.  Mr. Helmer responded by stating that he would not propose any plan and that the matter would ultimately resolve itself through litigation.  On March 19, 2007, in the absence of any proposal from Coffee Holding's counsel regarding how to wind up Café La Rica, the undersigned proposed to another of Coffee Holding's attorneys, Christopher Graham, that the appointment of a receiver would provide an

6

orderly way of winding up the business. *See* Composite Exhibit B. That proposal was also rejected. Mr. Graham explained that the costs of having a receiver appointed would purportedly leave too little remaining to pay off the balance allegedly owed to its client, confirming that Coffee Holding's main concern is to force a preferential payment to itself of the balance it claims it is owed, and not, as it claims in its motion, to orderly wind up Café La Rica for the benefit of its members and creditors at large. The undersigned's invitation for an alternative proposal was answered by Coffee Holding's filing of its motion for a restraining order. Coffee Holding's naked and factually unsupported statements regarding Coffee Bean's purported reluctance to participate in the winding up of Café La Rica and its offensive accusations regarding the undersigned's motives for requesting an orderly dissolution are baseless and entirely improper.

Second, at paragraph 11 of its motion, Coffee Holding accuses Coffee Bean of running off to Court in disregard of the dispute resolution process outlined in the Operating Agreement. That same alleged failure is the basis of Coffee Holding's breach of contract counterclaim against Coffee Bean in this action. That accusation, however, is wholly inaccurate. On February 8, 2007, before this lawsuit was even filed, the undersigned wrote a letter to Coffee Holding's counsel attempting to invoke the dispute resolution process by stating, "Given the present dispute between our clients regarding the existence *vel non* of a material breach to justify the dissolution of Café La Rica, *our client hereby invokes the dispute resolution procedure set forth in to [sic] paragraph 14.13(b) of the Agreement.*" A copy of the undersigned's letter of February 8, 2007 is attached hereto as Exhibit C (emphasis added). By letter dated February 13, 2007, Coffee Holding's counsel rejected Coffee Bean's request by stating as follows:

> For good order's sake, please note that we consider the letter from Coffee Holding dated February 5, 2007 dissolving Café La Rica to be of full force and effect. *Therefore, your purported notice invoking the dispute resolution procedures contained in paragraph 14.13(b) of the Café La Rica Limited Liability Company*

*Agreement is misplaced.* Café La Rica is now in dissolution and the only acts consistent with dissolution are an orderly winding up process. Furthermore, your letter cannot be deemed good notice under the LLC agreement.

(emphasis added). A copy of Christopher Grahams' February 13, 2007 to the undersigned is attached hereto as Exhibit D. Thus, it was Coffee Holding, and not Coffee Bean, that breached the Operating Agreement by failing to participate in the dispute resolution process. Coffee Bean was left with no choice but to bring this action. Coffee Holding's misrepresentations to the contrary are shocking considering that Mr. Graham, who drafted Coffee Holding's motion for a restraining order accusing Coffee Bean of disregarding the Operating Agreement, is the same attorney that wrote the letter to Coffee Bean unequivocally rejecting Coffee Bean's request to resolve this matter through the dispute resolution process outlined therein.

## MEMORANDUM OF LAW

I.  Coffee Holding Has Failed to Carry Its Burden in Support of a Preliminary Injunction.

A.  The Applicable Standard.

To qualify for a preliminary injunction, the movant has to show: (1) a substantial likelihood of success on the merits; (2) that they would suffer irreparable injury without the injunction; (3) that the threatened injury outweighs whatever damage the injunction would cause the nonmoving party; and (4) that, if issue, the injunction would not be adverse to the public interest. *See Four Seasons Hotels & Resorts v. Consorcio Barr*, 320 F.3d 1205, 1210 (11th Cir. 2003). Injunctive relief is an extraordinary and drastic remedy that should not be granted unless the movant, by a clear showing, carries the burden of persuasion as to each of these four elements. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting from 11A C. Wright, A. Miller, & M, Kane, Federal Practice and Procedure § 2948, pp. 129-130 (2d ed. 1995)). "Indeed, proof to support a preliminary injunction must be strong and clear in view of the restraint put

upon the defendant at a time before his liability has actually been adjudged." *Societe Comptoir de L'Industrie Cotonniere, Etablissements Boussac v. Alexander's Department Stores, Inc.*, 190 F.Supp. 594, 601-602 (S.D. N.Y. 1961). A verified complaint or supporting affidavits may afford the basis for a preliminary injunction, but if the facts so appearing consist largely or general assertions which are substantially contested by counter-affidavits, a court should not grant such relief unless the moving party makes a further showing sufficient to demonstrate that he will probably succeed on the merits. *K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1088-89 (9th Cir. 1972). Coffee Holding has failed to demonstrate that it is entitled to the injunctive relief it seeks.

> B.    Coffee Holding Has Failed to Show How It Will Be Irreparably Harmed Without the Injunction.

"To demonstrate irreparable harm, a [movant] must show that it has no adequate remedy at law, *meaning that its injury 'cannot be undone through monetary remedies.'*" *Owner-Operator Indep. Drivers Ass'n v. 4 Points Logistics, LLC*, 05-CV-440, 2005 U.S. Dist. LEXIS 34397, at *9 (M.D. Fla. 2005) (quoting from *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987) (emphasis added). Coffee Holding attempts to meet their burden by arguing that Coffee Bean is plundering assets necessary and subject to the dissolution process for Café La Rica. Coffee Bean has not plundered any assets and has provided a full accounting to Coffee Holding of all monies deposited into Café La Rica's operating account. However, even if assuming *arguendo* this were true, it would not rise to the level of irreparable harm such that preliminary injunctive relief is warranted. Any injury suffered by Coffee Holding in this regard "would be sufficiently calculable so that if [Coffee Holdings] were to prevail on the underlying claims it could be properly redressed with money damages." *Owner-Operator*, 2005 U.S. Dist. LEXIS at

*10 (quoting from *Morris Communications Corp. v. PGA Tour, Inc.*, 117 F.Supp.2d 1322, 1330 M.D. Fla. 2000)).

Coffee Holding relies on a line of cases generally holding that a preliminary injunction may issue to preserve assets where the evidence shows that a party intends to frustrate any judgment on the merits by disposing itself of money and making the judgment uncollectible. Coffee Holding attempts to argue by analogy that because Coffee Bean has been depositing Café La Rica's money in its account, a preliminary injunction should likewise issue in this case. However, that argument is logically flawed because the reverse situation is arguably true in this case. Coffee Holding's counterclaim is against Coffee Bean, not Café La Rica. Any judgment that may ultimately be rendered on the counterclaim will be against Coffee Bean, not Café La Rica. Thus, by depositing money in its account, Coffee Bean is arguably making itself more collectible, and not, as Coffee Holding argues, disposing itself of any assets.

Coffee Holding also argues in conclusory fashion that "absent the issuance of the TRO, there is ample evidence of Café La Rica's imminent bankruptcy." *See* Motion for Restraining Order at p. 8. However, Coffee Holding comes forward with no evidence whatsoever to substantiate that argument. Such factually unsupported claims cannot constitute the strong and clear proof required to sustain a preliminary injunction. *See K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1088-89 (9th Cir. 1972).

C.   Coffee Holding Has Failed to Demonstrate a Substantial Likelihood of Success on the Merits.

Coffee Holding has also failed to demonstrate a substantial likelihood of success on the merits. Coffee Holding argues in conclusory and circular fashion that because Café La Rica failed to pay amounts allegedly owed to Coffee Holding under the Expense Sharing Agreement – to which Coffee Bean is not a party – it has demonstrated that it will prevail on the merits. That

argument makes no sense. Even if, assuming *arguendo*, those allegations regarding Café La Rica's breach of the Expense Sharing Agreement are true, there is nothing about that breach standing alone that would establish any of the causes of action alleged by Coffee Holding in its counterclaim against Coffee Bean. Coffee Bean is not a party to the Expense Sharing Agreement and cannot be held liable for any purported breaches by Café La Rica under that agreement.

> D.      Coffee Holding Has Failed to Show How the Purported Threatened Injury to It Outweighs the Harm the Injunction Will Cause Coffee Bean.

The only injuries that Coffee Holding identifies in its Motion as warranting the issuance of a preliminary injunction are the purported unilateral changing by Mr. Aguila of the passcodes on Café La Rica's Washington Mutual account and the "systematic" depositing of Café La Rica's accounts receivables into Café La Rica's new account with Bank of America. Neither of those "injuries" justifies the imposition of a preliminary injunction. First, the Washington Mutual account has already been frozen at Mr. Gordon's request. Thus, there is no injury threatened regarding the funds remaining in that account. Second, Café La Rica has rendered a full accounting of the amounts in the Bank of America account to Coffee Holding and is hereby asking the Court to appoint a neutral receiver with full control over that account. Consequently, there is no injury threatened to any of the accounts receivables that have thus far been deposited in that account.

> II.     The Appointment of a Receiver in this Case is Warranted.

> A.      Applicable Standard.

Federal courts have inherent equitable authority to wind up the business of even a solvent, going company and to appoint a receiver for the protection of its shareholders and members. *Campbell v. Pennsylvania Industries, Inc.*, 99 F.Supp. 199, 204-05 (D. Del. 1951); *Whitman v. Fuqua*, 549 F.Supp. 315, 322 (W. D. Penn. 1982); *see also Drob v. National*

*Memorial Park, Inc.,* 28 Del. Ch. 254, 41 A.2d 589, 598 (1945); *The Lichens Co. v. Standard*

*Commercial Tobacco Co.*, 28 Del. Ch. 220, 40 A.2d 447 (1944); *Thoroughgood v. Georgetown*

*Water Co.*, 9 Del. Ch. 330, 82 A. 689 (1912); *Maxwell v. Enterprise Wall Paper Mfg. Co.*, 131

F.2d 400 (3d Cir. 1942). Federal courts have appointed receivers for corporations in the exercise

of its equitable jurisdiction where, in the board of directors and the administration there was a

deep-seated division which could not be healed, disagreement of the members of the board of

directors of a corporation who are equally divided in number results in a suspension of the

business of the company, and where it appears that parties cannot agree upon the management of

the business, and under existing circumstances neither one is authorized to impose its views upon

the other. *See Fuqua*, 549 F.Supp at 322 (quoting from *D.A. Tompkins Co. v. Mills*, 82 F. 780,

785 (C.C. S.C. 1897); *Masters v. Hartmann*, 45 App. D.C. 253, 257 (D.C. Cir. 1916), *overruled*

*on other grounds, Saltz v. Saltz Bros.*, 84 F.2d 246 (D.C. Cir. 1936)). The appointment of a

receiver or custodian is also appropriate where, as here, a deadlock exists with respect to the

management of a company which threatens the legal functioning of the company, or danger of

loss, justifying the appointment of a receiver with the power to preserve its affairs for the benefit

of the stockholders or members. *See Fuqua*, 549 F.Supp. at 322 (citing to *Edison v. Edison*

*United Phonograph Co.*, 52 N.J. Eq. 620, 29 A. 195 (1894) (appointing a receiver over a

corporation where "there are such dissensions in its governing body as to make it impossible for

the corporation to carry on its business with advantage to its stockholders[.]"); *Sternberg v.*

*Wolff*, 56 N.J. Eq. 389, 39 A. 397 (1898) (appointing a receiver where "by reason of dissensions

among the directors of a trading corporation, there is deadlock in the management of its business

by them[.]"); *Elevator Supplies Co. v. Wylde*, 106 N.J. Eq. 163, 150 A. 347 (1930) (appointing a

receiver over a corporation where the governing body, is "crippled by dissension[.]" )).

Federal courts may grant a receiver powers that include the day-to-day management of the business entity, including the authority to liquidate assets, the authority to pursue claims, and the authority to file for bankruptcy. *See S.E.C. v. Credit Bancorp, Ltd.*, 297 F.3d 127, 130 (2d Cir. 2002) (affirming lower court's appointment of receiver "who was granted broad powers to, inter alia, issue subpoenas, marshal [corporate] assets, liquidate those assets, and reinvest the proceeds in Treasury instruments."); *Consol. Rail Corp. v. Fore River Ry. Co.*, 861 F.2d 322, 326 (1st Cir. 1988) ("A receiver was appointed ... to take control and management of [the corporate] property to ensure the preservation of the assets pending final disposition of this suit."); *In re Manhattan Inv. Fund, Ltd.*, 310 B.R. 500, 503 (Bankr. S.D. N.Y. 2002) (recognizing receiver's capacity to file Chapter 11 bankruptcy petition).

    B.    <u>The Growing Dissension Among the Members and Management of Café La Rica Justifies the Appointment of a Receiver.</u>

Coffee Holding admits in its brief, and Coffee Bean agrees, that "the two 50% members of Café La Rica are hopelessly deadlocked and there is no ability to properly conduct business and wind up the business as provided under the Operating Agreement without the Court's intervention." *See* Coffee Holding's Motion for Restraining Order at ¶ 13. These are precisely the circumstances that, under the authorities cited above, justify the Court's use of its inherent equitable authority to appoint a receiver for the protection of Café La Rica's members and creditors. The appointment of a neutral receiver in this case will result in an orderly winding up of Café La Rica in a manner that is consistent with the Operating Agreement which specifically provides as follows regarding what acts need to occur before Cafe La Rica can be wound up:

> **Winding Up and Certificate of Dissolution.** The winding up of the Company shall be completed when all debts, liabilities and obligations of the Company have been paid and discharged or reasonably adequate provision therefore has been made, and all of the remaining Property of the Company has been distributed to the Members.

*See* Operating Agreement at ¶ 13.4.

The appointment of a receiver is a reasonable alternative to the option which Coffee Holding appears to advance in its motion of simply walking away and locking the doors. That course of action would leave too many questions unanswered – Who will garner Cafe La Rica's remaining receivables? Who will fill the remaining orders? Who will be responsible for paying its current obligations? Who will liquidate its assets? Etcetera – and would be contrary to the orderly winding up process contemplated under the Operating Agreement. Moreover, the appointment of a receiver would not necessarily be inconsistent with the stated purposes of Coffee Holding's motion for a restraining order – i.e., preventing Coffee Bean and Ernesto Aguila from (1) exercising control over any of Café La Rica's property, and (2) depositing any of Café La Rica's receivables or other assets in accounts that Coffee Bean controls – because "[a]n order directing the receiver to take control of all the property of the company and to assume entire management of its affairs has the practical effect of an injunction against the continuance of the duties of the officers of the corporation." *Bayou Group, LLC v. Adams*, No. 06-22306, 2007 U.S. Dist. LEXIS 9395, at *23-24 (S.D. N.Y. 2007) (quoting from 19 C.J.S. Corporations § 779 (2006)).

## CONCLUSION

For all of the foregoing reasons, Coffee Bean respectfully requests the entry of an order denying Coffee Holding's motion for a restraining order and granting Coffee Bean's cross motion for the appointment of a receiver to manage and wind up the operations of Café La Rica in an orderly manner consistent with the Operating Agreement.

Respectfully submitted,

BAKER & McKENZIE LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131
Telephone: (305) 789-8900
Facsimile:  (305) 789-8953

By:   /s/ Jose M. Ferrer
        Jose M. Ferrer
        Florida Bar No. 173746

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served this 27th day of March, 2007 by facsimile and U.S. Mail upon Mark S. Auerbacher, Esq. and John R. Squitero, Esq., Katz Barron Squitero Faust, 2699 S. Bayshore Drive, Seventh Floor, Miami, Florida 33133; and Christopher F. Graham, Esq., Thacher Proffitt & Wood LLP, Two World Financial Center, New York, New York 10281.

By:   /s/ Jose M. Ferrer
        Jose M. Ferrer

MIADMS/307805.2

Feb-08-2007  03:50pm  From-                                    T-738  P.002  F-744



# Coffee Holding Company Inc.

Roasters & Packers
4401 FIRST AVENUE ~ P.O. BOX 320208
OUTSIDE N.Y. STATE 1-800-458-2233

Telephone: 718-832-0800
Fax:    718-332-8892

Email: coffeeholding2AOl.com
Web Site: www.Coffeeholding.com

To: Washington Mutual
Attn: Sidney Hernandez
Fax: 305-825-8195

Fax: 718-768-4731

This is a 4 page fax, including cover page.

Please take the necessary steps to stop ~~~~~~~~ from controlling this bank account.

I have enclosed information about the LLC account statement of authority and the letter of dissolution and winding up of café La Rica, LLC.

Regards,

Andrew Gordon

*95k 382-0138*
*Anabel*



**Washington Mutual**

Legal Services Department
8050 S.W. 10th Street
Building 4 – Suite 1000
Plantation, Florida 33324
Telephone: (954) 382-0438
Fax: (954) 382-4369



February 8, 2007

VIA FEDERAL EXPRESS
TO BOTH ADDRESSEES

Mr. Andrew Gordon
4401 First Avenue
Brooklyn, NY 11232

Mr. Ernesto Aguila
2131 N.W. 72nd Avenue
Miami, FL 33122

Re:   **Café La Rica, LLC, account ending 551**

Dear Messrs. Gordon and Aguila:

The undersigned represents Washington Mutual Bank (hereinafter "the Bank"). A copy of Mr. Gordon's letter dated February 7, 2007, addressed to Signey Hernandez, has been forwarded to me, a copy of which is enclosed.

Please be advised that pursuant the Conflicting Demands and Disputes section (pages 38 and 39) of our Business Account Disclosures and Regulations, which govern the above entity's account with the Bank, we have placed a restraint on the above referenced account.

The Bank does not wish to be embroiled in this dispute, therefore, we propose the following alternatives regarding the above account:

1.    Each of you agrees, in writing, that the funds shall remain frozen until this dispute is resolved by and between you. Final disbursement of these funds would occur upon delivery of a document signed by each of you, together with the appropriate documentation from the state of Delaware, evidencing that Café La Rica, LLC, has been dissolved; or

2.    A Court Order from a court of proper jurisdiction for release or such other instructions regarding the subject account.

Alternatively, if you are not able to agree to this escrow type arrangement, the Bank will commence an interpleader action and deliver the funds to the Registry of the Court. You can then litigate the issue of ownership before the Court. In accordance with Florida law, the Bank would request attorneys' fees and costs in conjunction with such an action.

A collective decision on this matter must be communicated in writing to the undersigned on or before February 16, 2007. I look forward to hearing from you so that we can amicably resolve this matter.

Very truly yours,

LUCIA A. SANTOS
Vice President and Counsel

LAS/ms

Generally, your account is assigned to the financial center at which you open your account if opened in person. Your account opening documents may identify the state or other pricing region to which your account has been assigned. If you are uncertain to which financial center your account is assigned in our records, contact us at the number shown at the end of these *Account Disclosures and Regulations*.

If you move to another state in which we (the bank holding your account) have financial centers or otherwise wish to change your financial center of assignment, you may request and we, at our option, may agree to a change your financial center of assignment and the state or other pricing region to which your account is assigned. Such change will not automatically occur when you change your address in our records.

## Cash Vouchers and Cash Dispensing Machines

At some of our financial centers, certain tellers do not have access to cash for processing withdrawals or other cash back transactions. If you complete a transaction with one of these tellers, you will receive a voucher for any cash payable to you. Your account records, however, will reflect a debit for the amount of the voucher. Your cash will be dispensed to you at the cash dispensing machine at that same financial center of which you conducted the related transaction. Your use of the access number to receive the cash is a separate non-account based transaction.

The voucher will include an access number. This number is used on the keypad or scanner at the cash dispensing machine. You must use the access number within the time frame noted on the voucher (or by the financial center closing time on the calendar day you conduct the transaction, if earlier). If you do not receive your cash related to a voucher within that time frame noted, the access number will expire. If you return your original voucher to us, a new access number will be issued (if such request is made before the financial center closes that calendar day and the voucher has not been used). If the voucher is not redeemed by the time we close the financial center on the calendar day it is issued, an official check will be issued in the amount due under the voucher; the official check may, at our option, be held at the financial center for your pick up, mailed to you at the address of record for the account related to the transaction for which the voucher was issued, or deposited to any of your accounts with us (immediately or at a later time, without interest).

You must safeguard this voucher as you would cash. If you loose the voucher, tell us immediately so we may invalidate the voucher. If the voucher has not been redeemed, it is the same calendar day as the voucher was issued and we have not closed the financial center for the day, the voucher will be reissued. If we determine that the voucher has been redeemed, whether by you or a third party, at our option, the voucher may not be replaced and you may not be reimbursed. The voucher is not transferable or negotiable.

At some of our Financial Centers, we may offer electronic processes to expedite your deposit and withdrawal transaction(s) with the teller or other representative, including use of an electronic pad to identify you and your account, and to confirm the transaction in place of paper tickets. These ticketless transactions are teller-initiated transactions and are not considered electronic funds transfers. By initiating deposits and withdrawals at these financial centers, you agree to the electronic processing and record of the transaction in place of a paper record.

## Changes to Your Account Type

If you have an account with us and choose to change from one account type to another, we may, at our option, require you to close your existing account and open a *new* account with a new account number or change the product features to the new account type and

maintain the existing account number. If we allow or require you to maintain the same account number, previous activity on your prior account will apply to the new account, unless we, at our option, decide otherwise. This means, for example, that if you are required to maintain a minimum balance or average balance to avoid a monthly fee on the new account type, the balance for the entire statement cycle, including the balance prior to the change to the new account, will apply in the balance calculation. If the new account is a Limited Transaction Account, we may count transactions that posted to the account prior to the change and you may be assessed excess activity fees based on activity occurring prior to the change. If you are assessed Overdraft Charges or Non-Sufficient Funds Charges based on the number of NSF Transactions during a prior period (e.g., the prior 12 months), we may consider NSF Transaction activity prior to the date of the change in determining whether and the amount of charges to be assessed.

## Collections

In our discretion, we can help you collect bond coupons, checks, or drafts in U.S. or foreign currency or other items which we determine, at our discretion, are not suitable for automated collection procedures. If we do, we accept these items "for collection" which means we will send the check, draft or item directly to the issuer's bank for payment. When we receive payment, we will credit your account. If the item is lost, stolen, or destroyed in the collection process, we will not credit your account for the item nor will we otherwise be liable for the item. If the collection item is returned to us unpaid, we will return the item to you (as soon as we receive it).

Checks or drafts accepted, received or sent by the Bank from or to another financial institution to be processed for collection, whether or not paid, will be assessed a collection fee by the Bank, as set forth in the Statement of Fees, and may be assessed a collection and other fees and costs by the other financial institution. In the event you request special handling of a collection item, such as tracking or expedited delivery, you will also be charged any out-of-pocket expense. Any such fees and costs will be deducted from your account or from the amount of the proceeds remitted to or from your account, as applicable.

## Conflicting Demands and Disputes

Nothing in these *Account Disclosures and Regulations* shall be deemed to require the Bank, and the Bank shall not be required, to make payment from or provide services related to an account to a depositor, or to any trust or P.O.D. account beneficiary or payee, or any other person claiming an interest in any funds deposited in the account, if the Bank has actual knowledge (as defined in the *Account Ownership* section of these *Account Disclosures and Regulations*) of, or otherwise believes there may be, a dispute between the depositors, beneficiaries, payees, or other persons concerning the account including, without limit, their respective rights of ownership to or authority to act with respect to the funds contained in or proposed to be withdrawn or previously withdrawn from the account, or in the event the Bank is otherwise uncertain as to who is entitled to the funds pursuant to the contract of deposit, or otherwise receives instructions which Bank determines, in its discretion, to be unclear or conflicting. In any such case, the Bank may, at its option and without liability, notify all depositors, beneficiaries, payees, or other persons claiming an interest in the account of either its uncertainty as to who is entitled to the distributions or the existence of any dispute, and may also, without notice and without liability, refuse to disburse any funds contained in the account to or on the instruction of any depositor and/or trust or P.O.D. account beneficiary or payee thereof, and/or other persons claiming an interest therein, return items presented

against the account m ... "Refer to Maker" or similar notation, that such time as, at our o_

(1) All such depositors, beneficiaries, payees and/or other persons claiming an interest in the account have consented, in writing or other form satisfactory to Bank, to the requested payment; or

(2) The payment is authorized or directed by a court of proper jurisdiction; or

(3) Where one of the parties to the account has notified the Bank of the dispute, that party withdraws the notice; or

(4) Where the dispute involves a deceased accountholder, the successor of the deceased accountholder agrees in writing to the distribution (if permitted by State Law); or

(5) We receive proof satisfactory to us in our sole discretion that the dispute has been resolved, or other satisfactory documentation or assurances are received by us; or

(6) Subject to the *Resolution of Disputes* section in this publication, request instructions from a court of competent jurisdiction, or arbitrator, or referee regarding distribution of the account.

We may also, at our discretion, request instructions from a court and/or interplead the funds in the account at your expense. However, the Bank may, at its option and without liability, pay or permit withdrawal of any funds on deposit in an account to a depositor and/or agent of a depositor and/or trust or P.O.D. account beneficiary or payee, and/or other person claiming an interest therein, even when the Bank has actual knowledge of the existence of the dispute, if the payee shall execute to the Bank, in form and with security (in Idaho, "sureties") acceptable to it, which, except in Idaho, at Bank option may be a bond in an amount which is double either the amount of deposit or the adverse claim, whichever is less) an indemnification indemnifying the Bank from any and all liability, loss, damage, costs, and expenses, for and on account of the payment of the adverse claim or the dishonor of the check or other order of the person in whose name the deposit stands on the books of the Bank. In no event will we be liable for any delay or refusal to follow instructions which occur as a result of a dispute over the authority or control of your account.

## Credit Reporting Agencies/Reporting/Verification

By requesting to open an account with the Bank, or by agreeing to be a signer on an account or obtaining any other service from us, you (and, if acting in a representative capacity, individually and for such entity or principal) agree that we may obtain credit information from check or credit reporting agencies, and/or by any other means. We may do so at the time you open the account, request the service, at any time while your account is open, or the service is available, or after your account or service is closed if you owe us any amounts related to your account or service, and may use such information for any purpose in our discretion except as prohibited by law, including, without limit, for review of your eligibility to obtain or retain an account or service requested by you or which we may, at our option, wish to consider offering you.

Without limiting anything else to the contrary herein, if you do not handle your account or service in a satisfactory manner and/or we to charge off your account as a loss, or as otherwise permitted by law, we may report such negative information to check or credit reporting agencies.

39

You agree to ... se reasonable control over all bank checks, unissued checks, time or certificates of deposit, passbooks, cards (of any kind), personal and user identification numbers and codes and access devices and any other item, instrument or card related to any of the above It is your responsibility to keep all of the above information and items safe and secure and to promptly discover and immediately report if any of them are, or believed to be at risk of becoming, missing in time to prevent misuse.

You agree to notify us immediately if any of these items may be lost, stolen or used without your authorization, or if you believe there is an error in your periodic statement or that an unauthorized transaction has occurred or may occur on your account or otherwise may be related to any of the above. In addition to any other liability you may have hereunder, and except as limited by applicable law, if you give your Personal Identification Number (PIN), User ID and any other code or other access device to anyone, you will be liable for any use made of such until you advise us that such person is not authorized to use them. You acknowledge that your account, service or any of the above may have to be closed if any of these events occurs. In addition, you assume full responsibility for the monitoring and reviewing the work of your employees, agents (including Authorized Signers) and accountants.

You are responsible for exercising reasonable promptness and care in examining your account statements, and, if provided, originals or imaged copies of cancelled checks, advices of debit or credit, transaction reports, or your account activity through the internet if we provide you such access via online banking services, to determine whether any payment or debit was not authorized because of an alteration of an item or because a signature or endorsement on the item was unauthorized, or for any error, forgery, alteration, unauthorized transaction, including an unauthorized payment order, or other problem (collectively, a Problem). The parties agree that reasonable promptness means within fourteen (14) calendar days from the date that the statement, advice or transaction report or other information is sent or otherwise made available to you, whichever first occurs.

If you discover or should have discovered a Problem, you must promptly notify us in writing of the relevant facts. You should also report the Problem to us orally by contacting your branch of account or the telephone number at the end of these *Account Disclosures and Regulations*. However, your oral report shall not relieve you of your obligation to report the Problem to us in writing, except where required by law. Your written report must identify the specific items, debits or credits that you are challenging and the nature of the Problem.

In addition, if your claim involves a series of items containing unauthorized signatures or alterations by the same wrongdoer, you shall be precluded from asserting against us any unauthorized signature or alteration by the same wrongdoer on any item paid in good faith that you do not report within fourteen (14) calendar days after the first item in the series or first statement containing that item was sent or made available to you, whichever first occurs. By these provisions, the parties intend to define a reasonable time period for the "Repeater Rule," as provided in §4-406(d) of the UCC.

Without regard to the care or lack of care of either you or us, without limiting the foregoing: (a) if you fail within thirty (30) calendar days after the statement or item is sent or made available to you, whichever occurs first, to discover and report with respect to an item (i) your unauthorized signature, (ii) any unauthorized or missing endorsement, or (iii) any alteration on an item, you shall be precluded from asserting against us the unauthorized signature, the unauthorized or missing endorsement or alteration on that item; (b) if you fail within thirty (30) calendar days after the statement or other advice of debit or execution of a wire transfer Payment Order is sent or made

40

## Ferrer, Jose M.

| | |
|---|---|
| **From:** | Ferrer, Jose M. |
| **Sent:** | Tuesday, March 20, 2007 12:29 PM |
| **To:** | Graham, Christopher F. |
| **Cc:** | Taubman, Fred; Hudson, Bob; Milian, Susana; 'Ernesto Aguila' |
| **Subject:** | Coffe Bean Trading-Roasting, LLC v. Coffee Holding, Inc. |
| **Attachments:** | Receivables and Payables for Cafe La Rica.pdf |

Chris,

As promised, attached please find a bank register and itemized deposit spreadsheet for the account that Cafe La Rica has been using for its operations since Andrew Gordon caused a hold to be placed on the Washington Mutual account. Please advise me at your earliest convenience regarding your client's position with respect to the appointment of a receiver.

Sincerely,

Jose



**Ferrer, Jose M.**

| | |
|---|---|
| **From:** | Dyckman, Matthew [MDyckman@tpw.com] |
| **Sent:** | Tuesday, March 06, 2007 12:52 PM |
| **To:** | Ferrer, Jose M.; Helmer, Michael |
| **Cc:** | Graham, Christopher F.; Taubman, Fred; Hudson, Bob; Milian, Susana; Doherty, John P. |
| **Subject:** | RE: Coffee Bean v. Coffee Holding—Without Prejudice settlement Proposal. |
| **Attachments:** | Cafe La Rica 10 31 06 Financials.pdf; CLR 12 31 06.pdf |

Jose,

Our client is currently considering your client's settlement offer.

Per your request, the audited financial statements for Cafe La Rica for the year ended October 31, 2006, as sent by the auditors to Ernesto Aguila this morning, are attached. As previously indicated, we wanted to send them to you as soon as they became available to us. We have also attached unaudited financial statements through December 31, 2006.

We are hopeful that the provision of this information will facilitate resolution of this matter.

Regards.

Matthew Dyckman
Thacher Proffitt & Wood LLP
1700 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20006
Telephone: 202-626-5647
Fax: 202-626-1930
E-mail: mdyckman@tpw.com

## Ferrer, Jose M.

| | |
|---|---|
| **From:** | Ferrer, Jose M. |
| **Sent:** | Monday, March 05, 2007 3:17 PM |
| **To:** | 'Helmer, Michael' |
| **Cc:** | Graham, Christopher F.; Taubman, Fred; Hudson, Bob; Milian, Susana; Dyckman, Matthew; Doherty, John P. |
| **Subject:** | RE: Coffee Bean v. Coffee Holding---Without Prejudice settlement Proposal. |

Mike,

My client has authorized me to make the following settlement offer:



Please convey the offer to your client and get back to me as soon as possible.  Additionally, your client has yet to provide us with financial statements.  Please do so immediately.

Sincerely,

Jose

**Ferrer, Jose M.**

| From: | Ferrer, Jose M. |
|---|---|
| Sent: | Friday, February 23, 2007 6:41 PM |
| To: | 'Helmer, Michael' |
| Cc: | Graham, Christopher F.; Taubman, Fred; Hudson, Bob; Milian, Susana; Dyckman, Matthew; Doherty, John P.; Milian, Susana |
| Subject: | RE: Coffee Bean v. Coffee Holding---Without Prejudice settlement Proposal. |

Dear Mike,

I take exception to your comment that my client's offer was made in bad faith. Additionally, I disagree with you that my client's offer is "significantly worse" than any prior offer by my client. As a preliminary matter, my e-mail to Chris Graham of February 21, 2007 was not a settlement offer. It was merely a request for confirmation of a settlement offer that we understood your client had made indirectly through Ernesto Aguila. Additionally, I fail to see how an offer to pay ███ more than what your client had originally proposed can be interpreted as a "significantly worse" offer.

Coffee Bean hereby rejects your client's rehashed settlement offer of Wednesday and is abandoning any further efforts to settle this matter by endeavoring to buy your client's interest in Café La Rica. We will work with you to proceed with dissolution in an amicable and orderly fashion, which can only happen if Coffee Holding agrees to immediately provide current financial statements for Café La Rica. You will agree with me that you cannot wind down any business without determining what is validly owed. Providing this information should not be a difficult task for your client given that, at least as of the date of Chris Graham's letter to me of February 13, 2007, "the latest financials [were] being prepared for [my] review and as part of the dissolution and winding up process."

Additionally, pursuant to the terms of the Trademark License Agreement between Coffee Bean and Cafe La Rica, the grant of the license to Café La Rica to use certain trademarks and intellectual property belonging to Coffee Bean has been automatically terminated from the date of your client's claim of dissolution of Café La Rica.

Lastly, we will be filing our response in opposition to Coffee Holding's forum motion on Monday.

Sincerely,

Jose

**Ferrer, Jose M.**

| | |
|---|---|
| **From:** | Ferrer, Jose M. |
| **Sent:** | Friday, February 23, 2007 10:59 AM |
| **To:** | Helmer, Michael |
| **Cc:** | 'Graham, Christopher F.'; Taubman, Fred; Hudson, Bob; Milian, Susana |
| **Subject:** | FW: Coffee Bean v. Coffee Holding---Without Prejudice settlement Proposal. |

Dear Mike,

I received a voice mail message from Chris Graham yesterday informing me that he would be out of the office for a few days and I should communicate with you regarding Coffee Bean's response to Coffee Holding's offer below. My client rejects the offer as stated. However, it proposes to settle this matter under the following terms:



1.

2.

The above is our client's good faith offer to settle Coffee Holding's unsubstantiated claims to a receivable. Should your client reject the offer, it should understand that it will not have a quick resolution of its claims. We have yet to be provided with any financials to determine the validity of Coffee Holding's purported receivables. The matter is now in litigation, a long and costly process, and we cannot proceed to an orderly liquidation until your client provides us with the necessary predicates to verify its receivables.

Please let me know by the close of business Monday, February 26, whether this offer is acceptable to your client.

Sincerely,

Jose

**BAKER & McKENZIE**

Baker & McKenzie LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131, USA

Tel: +1 305 789 8900
Fax: +1 305 789 8953
www.bakernet.com

Asia
Pacific
Bangkok
Beijing
Hanoi
Ho Chi Minh City
Hong Kong
Jakarta
Kuala Lumpur
Manila
Melbourne
Shanghai
Singapore
Sydney
Taipei
Tokyo

Europe &
Middle East
Almaty
Amsterdam
Antwerp
Bahrain
Baku
Barcelona
Berlin
Bologna
Brussels
Budapest
Cairo
Dusseldorf
Frankfurt / Main
Geneva
Kyiv
London
Madrid
Milan
Moscow
Munich
Paris
Prague
Riyadh
Rome
St. Petersburg
Stockholm
Vienna
Warsaw
Zurich

North & South
America
Bogota
Brasilia
Buenos Aires
Calgary
Caracas
Chicago
Chihuahua
Dallas
Guadalajara
Houston
Juarez
Mexico City
Miami
Monterrey
New York
Palo Alto
Porto Alegre
Rio de Janeiro
San Diego
San Francisco
Santiago
Sao Paulo
Tijuana
Toronto
Valencia
Washington, DC

Jose M. Ferrer
Tel: +1 305 789 8980
jose.ferrer@bakernet.com

**Via Facsimile and U.S. Mail**

February 8, 2007

Matthew Dyckman, Esq.
Thacher Proffitt & Wood LLP
1700 Pennsylvania Avenue, N.W., Suite 800
Washington, DC 20006

Dear Mr. Dyckman:

As you know, this firm represents the Coffee Bean Trading-Roasting, LLC ("Coffee Bean Trading"). I write to follow up on our telephone conversation of yesterday regarding your client's, Coffee Holding Co., Inc. ("Coffee Holding"), letter of February 5, 2007 purporting to dissolve Café La Rica, LLC ("Café La Rica").

Section 13.1 of the Limited Liability Company Agreement (the "Agreement"), upon which your client relies, specifically requires a "material breach of any agreement between the Company and a Member or between Members" before the company may be dissolved. We understand, from our conversation yesterday and today, that your client believes it is justified in dissolving Café La Rica because it claims that Café La Rica materially breached the Expense Sharing and Services Agreement by failing to pay Coffee Holding for coffee that Coffee Holdings claims it sold to Café La Rica. Because we have not been provided with financial information that would support the bona fides of this asserted account receivable of Coffee Holdings, nor an accounting of what Coffee Holdings has done with the funds of Café La Rica to cause such an alleged deficiency in payments, we can not acknowledge the validity of the claimed breach of the Expense Sharing and Services Agreement. Thus, we do not agree that you have established that there has been a material breach by Café La Rica with respect to that agreement, and we further reject Coffee Holding's letter purporting to dissolve Café La Rica, because it fails to establish a necessary prerequisite to your asserted position.

As a preliminary matter, it is important to highlight the rather obvious fact that Coffee Holding is not merely a creditor of Café La Rica's, but is also its de facto managing member. Coffee Holding, except for sales and collections, has always been in control of all of the operations of Café La Rica. In its role as managing member, Coffee Holding was solely responsible for, amongst other things, purchasing coffee from itself on behalf of Café La Rica. Coffee Holding never has consulted with Coffee Bean Trading or anyone else at Café La Rica with respect to any purchases of coffee by Café La Rica. In fact, as early as September 5, 2006, when this issue first surfaced, we wrote you requesting financial and other documentary support to substantiate the purported receivables in favor of Coffee Holding. To date, you have failed to provide us with any information or to otherwise contact



**BAKER & McKENZIE**

us in that regard. As we stated in our initial letter to you of August 14, 2006 (which also went unanswered), Coffee Holding has unilaterally permitted balances to build up on its own account. Having created the risk of loss by its credit practices, Coffee Holding cannot now recast its own management failures as a breach by Café La Rica.

Given the present dispute between our clients regarding the existence *vel non* of a material breach to justify the dissolution of Café La Rica, our client hereby invokes the dispute resolution procedure set forth in to paragraph 14.13(b) of the Agreement. Pursuant to that provision, our client will use its good faith efforts to resolve this dispute, as well as other related disputes pertaining to Coffee Holding's failure to seek financing pursuant to section 8.4 of the Agreement and charging to Café La Rica amounts for services that were clearly to be included in the 5% Expense Reimbursement fee provided for under the Expense Sharing and Services Agreement. Toward that end, we reiterate our request for full financial statements for Café La Rica, including the most current profit and loss statements and balance sheets, as well as a current list of receivables and payables, check ledgers and bank statements.

Additionally, contrary to the allegations made yesterday by Messrs. Mike Helmer, Matt Carlson and Chris Graham of your office regarding Mr. Ernesto Aguila's purported recent actions, we have investigated and have learned that Mr. Aguila has not taken any hostile or adverse actions against Coffee Holding. Specifically, Mr. Aguila has not turned off any security cameras. Two of the cameras are still operational, and the other cameras have been broken for approximately six months. Mr. Andrew Gordon has been aware that the cameras are broken, but has refused to pay to have them fixed. Mr. Aguila did confirm that he changed the passwords on the Miami bank account. However, this action was taken only after he was advised by Mr. Gordon of his intent to make a preferential payment to Coffee Holding in disregard of Café La Rica's other creditors and payroll obligations. Mr. Aguila's action with respect to the bank account was therefore taken as a loyal employee of Café La Rica to protect the interest of Café La Rica as a whole versus the interest of one particular creditor. As discussed with Mr. Helmer and Mr. Graham this morning, we have endeavored to encourage Mr. Aguila to agree to institute a joint control of the bank account so that the funds can continue to be used in the best interest of Café La Rica as a whole and he seems amenable. We understand that he has since done so.

In addition, we have learned today that Mr. Gordon has informed various suppliers, including Miami Foods, a coffee vendor, and customers of Café La Rica that the "the company, as of Monday, has closed down." This information follows on the heels of Mr. Gordon's specific threats to Mr. Aguila that Coffee Holding would seek to take away all of Café La Rica's customers. Furthermore, we have learned that another current supplier of coffee (Coex Coffee International) called Mr. Gordon earlier today, and Mr. Gordon told him that Café La Rica's is closing. Coex Coffee International had been one of the potential investors in Café La Rica, but based on these statements by Mr. Gordon, Coex has now stated that it is not interested in making an offer until this matter is settled. Thus, Mr.

Matthew Dyckman, Esq.                                                                                      Page 2
February 8, 2007

**BAKER & McKENZIE**

Gordon's conduct is not only destroying Café La Rica's customer base, but also scaring off potential investors. Thus, Coffee Holding must immediately cease and desist from making any such patently false and damaging statements. Coffee Bean Trading intends to hold Coffee Holding fully accountable for any damages it suffers as a result of your client's unjustified acts. We strongly urge you to advise your client of the serious consequences of breaching its fiduciary obligations as managing member of Café La Rica or tortiously interfering with Café La Rica's business and financial affairs.

Yours truly,

Jose M. Ferrer

cc:    Alberto Lensi
       Ernesto Aguila
       Robert F. Hudson, Jr., Esq.
       Fredric P. Taubman, Esq.
       Michael Helmer, Esq.
       Matthew Carlson, Esq.
       Chris Graham, Esq.

MIADMS/306560.1



Thacher Proffitt & Wood LLP
Two World Financial Center
New York, NY 10281
212.912.7400

Fax: 212.912.7751
www.tpw.com

Direct Dial: (212) 912-7669
cgraham@tpw.com
Admitted in NY

February 13, 2007

**VIA FACSIMILE AND ELECTRONIC MAIL**

Jose M. Ferrer, Esq.
Baker & McKenzie LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131-2827

      Re:    <u>Dissolution of Café La Rica LLC ("Café La Rica")</u>

Dear Mr. Ferrer:

    As you are aware this firm acts as counsel to Coffee Holding Co., Inc. ("Coffee Holding").

    This letter is in response to your letter of February 8, 2007, to my partner, Matthew Dyckman. Please understand that our client considers many of the statements contained in your letter to be both false and actionable.

    For good order's sake, please note that we consider the letter from Coffee Holding dated February 5, 2007 dissolving Café La Rica to be of full force and effect. Therefore, your purported notice invoking the dispute resolution procedures contained in paragraph 14.13(b) of the Café La Rica Limited Liability Company Agreement is misplaced. Café La Rica is now in dissolution and the only acts consistent with dissolution are an orderly winding up process. Furthermore, your letter cannot be deemed good notice under the LLC agreement.

    As per your statement questioning the "bona fides" of the account receivables of Coffee Holding and your allegations "what Coffee Holding has done with the funds of Café La Rica" please provide the basis for such allegations. Reference to Mr. Gordon's "management failures" is similarly baseless and inopposite to the facts. Please note that Mr. Gordon only entered the Café La Rica venture at the separate requests of both Mr. Aguilla and Mr. Lensi.

    Far from being the "managing member" of Café La Rica as you state, Coffee Holding has been acting as the bank for Café La Rica. Your client, Coffee Bean Trading, has refused to insert any capital into Café La Rica even as it capital needs were mounting. In contrast, our client advanced $19,000 to Café La Rica for the security deposit under its lease and an additional $50,000 for working capital neither of which have been reimbursed. Coffee Holding also advanced $60,000 for Café La Rica's insurance, $20,000 of which is still owed to Coffee



Jose M. Ferrer, Esq.
February 13, 2007                                          Page 2.

Holding. The string of correspondence that you referred to does not relate to any request for financial information, but rather to a dispute amongst our respective clients over the future funding of Café La Rica. Since your client refused, the inevitable dissolution of the Café La Rica venture was preordained. It is clear that you never requested any such detailed financial information until after the notice of dissolution. In any event, the latest financials are being prepared for your review and as part of the dissolution and winding up process.

As to your investigations into the actions of Mr. Ernesto Aguila, our information has determined that, indeed, the security cameras are not working properly. If the security cameras have been broken, Mr. Aguila or someone working with Mr. Aguila should have fixed them. Contrary to your allegations, Mr. Gordon had no knowledge that the security cameras were broken. We were mystified by your statement that Mr. Gordon "has refused to pay or has not fixed" which implies a personal obligation of Mr. Gordon, which is clearly an obligation of Café La Rica, to maintain its own security cameras. We reiterate that Mr. Aguila did not have the right to change the passwords on the Miami bank account. Our client has no intentions of making any preferential payments and has never sought any payments other than the payments that are due it for coffee shipped in accordance with the contracts between the parties. However, since dissolution, there should be no ongoing payroll obligations other than to wind down the business. As you said the company has nearly $500,000 in current assets, which should be more than enough to pay all of the creditors including Coffee Holding.

In that regard, should your client desire to pay the trade debt of Coffee Holding which currently totals $412,112.63 plus $89,000 in additional advances and return the Coffee Holding equipment located at Café La Rica, Coffee Holding would be prepared to convey its 50 percent ownership interest in Café La Rica to your client in full and final resolution of all disputes between the parties. This is a good faith settlement offer designed to reach a global resolution of all disputes. It is anticipated that the parties would exchange mutual releases excepting only the obligations under the equipment note.

Please consider the foregoing with your client and respond to us within two business days.

Very truly yours,

Christopher F. Graham

Enclosure

cc:     Robert F. Hudson, Jr., Esq.
        Fredric P. Taubman, Esq.
        Michael Helmer, Esq.
        Matthew Carlson, Esq.
        Matthew Dyckman, Esq.

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.: 07-20389-CIV-MARTINEZ/BANDSTRA

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

      Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,

      Defendant.

_____/

### NOTICE OF FILING AFFIDAVIT OF ERNESTO AGUILA IN OPPOSITION TO COFFEE HOLDING'S MOTION FOR TEMPORARY RESTRAINING ORDER AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION TO APPOINT A RECEIVER TO ORDERLY DISSOLVE COMPANY

Please take notice that, pursuant to S.D. Fla. L.R. 5.1(E), Plaintiff, Coffee Bean Trading-Roasting, LLC, does hereby file the attached Affidavit of Ernesto Aguila in Opposition to Coffee Holding's Motion for Temporary Restraining Order and In Support of Plaintiff's Cross-Motion to Appoint a Receiver to Orderly Dissolve Company.

      Respectfully submitted,

      BAKER & McKENZIE LLP
      Mellon Financial Center
      1111 Brickell Avenue, Suite 1700
      Miami, Florida 33131
      Telephone: (305) 789-8900
      Facsimile: (305) 789-8953

      By: /s/ Jose M. Ferrer
          Jose M. Ferrer
          Florida Bar No. 173746

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served this 27th day of March, 2007 by facsimile and U.S. Mail upon Mark S. Auerbacher, Esq. and John R. Squitero, Esq., Katz Barron Squitero Faust, 2699 S. Bayshore Drive, Seventh Floor, Miami, Florida 33133; and Christopher F. Graham, Esq., Thacher Proffitt & Wood LLP, Two World Financial Center, New York, New York 10281.

By:   /s/ Jose M. Ferrer
       Jose M. Ferrer

MIADMS/307944.1

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.: 07-20389-CIV-MARTINEZ/BANDSTRA

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

       Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,

       Defendant.

_____/

### AFFIDAVIT OF ERNESTO AGUILA IN OPPOSITION TO
### COFFEE HOLDING'S MOTION FOR TEMPORARY RESTRAINING
### ORDER AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION
### TO APPOINT A RECEIVER TO ORDERLY DISSOLVE COMPANY

1.     I am the Sales Manager of Café La Rica, LLC ("Café La Rica") and am of legal age and capacity.  I became employed in that capacity pursuant to a letter agreement dated March 10, 2006, a true and correct copy of which I attach hereto as Exhibit A.

2.     I make this affidavit based on my personal knowledge of the facts as stated herein, or the facts as they appear in the memoranda, reports, records or data compilations of Café La Rica made at or neat the time of the occurrence of the facts or events, by, or from information transmitted by, persons with knowledge of the facts, whose regular practice it was to make and keep such records in the course of the regularly conducted business activity of Café La Rica.  I routinely rely on such records in the usual course of my business.

3.     Café La Rica is a Delaware limited liability company with its principal place of business in Miami-Dade County, Florida.  Coffee Bean is a limited liability company organized and operating under the laws of the State of Delaware.  Coffee Holding is a corporation

organized and operating under the laws of the State of Nevada. Coffee Bean and Coffee Holding each own a fifty (50) percent membership interest in Café La Rica.

4.     Coffee Holding, through Mr. Gordon, has at all times relevant to this action acted as Café La Rica's de facto manager with full control over all of its operations, except for the day-to-day sales and collection activities which I have handled from Miami.

5.     Since March, 2006, Coffee Holding has sold coffee to Café La Rica. Coffee Holding, in its role as the Manager of Café La Rica, was solely responsible for making payments to itself and to the other creditors of Café La Rica. Coffee Holding unilaterally permitted balances to build up on its own account.

6.     In February, 2007, Mr. Gordon began threatening to make a preferential payment to Coffee Holding of the entire accumulated balance on Coffee Holding's account in disregard of Café La Rica's other creditors and payroll obligations. When Coffee Bean's Manager, Alberto Lensi, and I refused to consent to such preferential treatment of Coffee Holding's account payable, Mr. Gordon threatened to close down Café La Rica unilaterally.

7.     Consistent with his threats, on or about February 5, 2007, I received a letter from Mr. Gordon advising me that Coffee Holding had unilaterally dissolved Café La Rica. Mr. Gordon thereafter began notifying Café La Rica's customers, suppliers, vendors and potential investors that Café La Rica "has closed down."

8.     Café La Rica has traditionally maintained its operating account at Washington Mutual Bank ("Washington Mutual Bank"). I have traditionally controlled Café la Rica's operating account with Washington Mutual. On February 7, 2007, Mr. Gordon sent a fax to Washington Mutual, advising Washington Mutual that Café La Rica had purportedly been dissolved and wound up – a claim that is blatantly false – and instructing it to prevent me from

2

exerting any control over that bank account. Based on Mr. Gordon's false representations, Washington Mutual froze the account, preventing Café La Rica from paying its vendors and suppliers and meeting its payroll obligations.

9. Once the Washington Mutual account was frozen, Café La Rica was left without a bank account into which to deposit Café La Rica's receivables and from which to pay Café La Rica's current obligations, such as accrued salaries and payables. I had no choice but to open a new account. I opened the new account at Bank of America under the name of "Coffee Bean Trading/Café La Rica."

10. I have not used any of the money deposited in that account for personal reasons, other than to pay my wife and myself our respective salaries and the monthly lease payment on my company car. That account has been used strictly to deposit Café La Rica's receivables as they come in and to pay its obligations, including its payroll obligations to its other employees, as they come due.

11. On March 19, 2007, I provided Coffee Bean's attorney, Jose M. Ferrer, with a QuickBooks bank register and itemized deposit spreadsheet detailing each deposit made into and each payment made out of the new account from the date that it was opened. I understand from conversations I have since had with Mr. Ferrer that he provided that information to Coffee Holding's attorney on March 20, 2007.

12. Café La Rica has never refused to pay any amounts legitimately owed to Coffee Holding. In fact, Café La Rica has repeatedly requested from Coffee Holding in writing financial information to support the amount of their asserted account payable. Despite Café La Rica's repeated demands, Coffee Holding did not provide any information in that regard until

3

March 6, 2007. The information provided remains incomplete as it fails to provide the necessary backup for the amounts claimed owed.

13.     The amount purportedly due to Coffee Holding from Café La Rica as reflected in the financial statements provided by Coffee Holding on March 6, 2007 is significantly higher than the amount purportedly due to Coffee Holding from Café La Rica as reflected in a form 8-K filed by Coffee Holding with the Securities and Exchange Commission on March 20, 2007.

Under penalties of perjury, I declare that I have read the foregoing affidavit and the facts stated in it are true to the best of my knowledge and belief.

_____
ERNESTO AGUILA

STATE OF FLORIDA            )
                           ) ss
COUNTY OF MIAMI-DADE  )

BEFORE ME, the undersigned authority personally appeared ERNESTO AGUILA, who is personally known to me or who has produced his _drivers license_ as identification and who did (did not) take an oath.

SWORN TO AND SUBSCRIBED BEFORE ME this 26th day of March, 2007.

_____
NOTARY PUBLIC STATE OF FLORIDA

My Commission Expires:

MIADMS/307906.1

4

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
**Miami Division**

**Case Number: 07-20389-CIV-MARTINEZ-BANDSTRA**

COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

     Plaintiff,

vs.

COFFEE HOLDING, CO. INC., a Nevada
corporation

     Defendant-Counter-claimant

**DEFENDANT AND COUNTER-CLAIMANT COFFEE HOLDING, CO.
INC'S MOTION TO STRIKE CERTAIN PORTIONS OF PLAINTIFF
COFFEE BEAN'S RESPONSE IN OPPOSITION TO DEFENDANT'S
<u>MOTION FOR A TEMPORARY RESTRAINING ORDER</u>**

     Defendant and Counterclaimant Coffee Holding Co., Inc ("Coffee Holding"), by and

through its undersigned counsel, hereby moves, pursuant to Rule 408 of the Fed. R. of Evid., to

strike certain portions of Plaintiff Coffee Bean Trading-Roasting, LLC's ("Coffee Bean")

Response in Opposition to Defendant's Motion for a Temporary Restraining Order and Cross-

Motion to Appoint a Receiver to Orderly Dissolve the Company ("Response") and in support

thereof states the following:

<u>**PRELIMINARY STATEMENT**</u>

     On March 27, 2007, Coffee Bean filed its Response to Coffee Holding's Motion for a

Temporary Restraining Order. Throughout its motion, however, and in blatant disregard of the

Federal Rules of Evidence, Coffee Bean refers to, cites and even attaches selective e-mails

pertaining to confidential settlement negotiations between Coffee Holding's counsel and Coffee Bean's counsel. Not only are these settlement discussions not relevant to the motion, but they also violate Fed. R. Evid. 408 which prohibits the admission of settlement discussions and negotiations. As such, Coffee Holding respectfully requests the Court to strike from the record the portions of the Response referencing any settlement discussions as well the e-mails in attached Composite Exhibit B reflecting settlement discussions.

## ARGUMENT

Pursuant to Rule 408 of the Federal Rules of Evidence, evidence of conduct or statements made in compromise negotiations regarding the claim are inadmissible. *See* Fed. R. Evid. § 408 (a)(2). The purpose of Rule 408, very simply, is to encourage parties to reach amicable settlements. "The fear is that settlement negotiations will be inhibited if the parties know that their statements may later be used as admissions of liability." *Central Soya Co. v. Epstein Fisheries, Inc.,* 676 F.2d 939, 944 (7th Cir. 1982); *see also Braman v. Woodfield Gardens Ass'n. Realcorp Investors,* 715 F.Supp. 226, 230 (N.D. Ill. 1989) (granting the defendant's motion to strike finding that the underlying purpose behind Rule 408 would be undermined if the court were to admit statements made during settlement negotiations).

The settlement discussions may not be used to prove liability. *See Berry v. Lee*, 428 F. Supp. 2d 546 (N.D. Tex. 2006); *see also Agnew v. Aydin Corp.,* 1988 WL 92872, *4 (E.D.Pa. Sept. 6, 1988) (striking parts of complaint pursuant to Rule 408 because they referenced settlement negotiations for purpose of showing liability). Additionally, a court may strike evidence of settlement negotiations if the statements are immaterial or prejudicial. *Kelly v. L.L. Cool J.,* 145 F.R.D. 32, 40 (S.D.N.Y.1992) (granting defendant's motion to strike portions of

complaint that referenced settlement discussions under Rule 408 as immaterial and potentially prejudicial).

In the instant case, there is no doubt that several of the e-mails attached as Composite Exhibit B constitute settlement negotiations and offers to compromise. Just one example is the statement made in an e-mail from Mr. Jose Ferrer to Mr. Michael Helmer, dated February 23, 2007, stating "The above is our client's good faith offer to settle…." (Emphasis added). Although the actual settlement amounts are redacted, the surrounding discussion is clearly one of settlement and negotiation and therefore must be stricken from the record.

Likewise, the Court must strike the "quote" of Christopher Graham on page 5 of Coffee Bean's Response. Much like the above e-mails, this discussion between Coffee Bean's counsel and Coffee Holding's counsel is clearly a settlement negotiation and thus inadmissible as evidence. Moreover, Coffee Bean alleges that Mr. Graham stated: "Café La Rica should be 'shut down immediately, its assets secured, and the doors locked.'" Not only is this statement taken out of context, but it is simply misquoted. Such blatant disregard for the rules of evidence should not be tolerated by this Court – particularly when the rules are disregarded solely to prejudice the Court against one party's counsel.

Coffee Bean uses these e-mails, and uncited references to discussions between counsel, to further its argument that Coffee Holding is somehow unwilling to participate in an orderly winding down process. Although this argument has no merit (Coffee Holding has at all times sought to cooperate in a winding down of Café La Rica) Coffee Bean has used these statements to support its claim of Coffee Holding's liability. That is, for purposes of Coffee Bean's Response, liability is rooted in the notion that Coffee Holding is refusing to cooperate in the

winding down of the company. Thus, because the statements are used to prove liability, introducing these statements and e-mails is impermissible.

Finally, with respect to Coffee Holding's motion for a TRO, which requests the Court to restrain Coffee Bean from wasting Café La Rica's assets, any discussion of settlement or negotiation is both immaterial and irrelevant.

There have been multiple attempts by the parties and their counsel seek a settlement. Plaintiff cannot "cherry pick" selective communications to advance its claims in a case in which it initiated. Tellingly, although there were multiple e-mails with regard to settlement from Coffee Holding's counsel to Plaintiff's counsel, the only e-mails Plaintiff attaches that reference settlement discussions are e-mails from Mr. Ferrer.

As such, the Court must strike the e-mails referencing settlement talks in Composite Exhibit B, as well as the portion of page 5 of Coffee Bean's Response referring to the settlement discussion between counsel. To allow these statements to remain as part of the record would undermine the very purpose of Rule 408 and work to chill any more settlement discussions, compromise or negotiation between Coffee Bean and Coffee Holding.

## CONCLUSION

Based on the foregoing, Coffee Holding respectfully requests that the Court strike from the record the referenced portions of the Response as well as the e-mails found in Composite Exhibit B that discuss settlement, and grant any such further relief deemed just and equitable.

Dated:  March 29, 2007

> KATZ, BARRON, SQUITERO, FAUST
> 2699 S. Bayshore Drive, Seventh Floor
> Miami, Florida 33133
> Tel:  305-856-2444
> Fax: 305-285-9227

4

/s/Mark S. Auerbacher, Esq.
Florida Bar No. 978220
msa@katzbarron.com
John R. Squitero, Esq.
Florida Bar No. 121196
jrs@katzbarron.com

Christopher F. Graham, Esq.
Mary H. Mulhearn, Esq.
Thacher Proffitt & Wood LLP
Two World Financial Center
New York, New York 10281
Tel: (212) 912-7669
Fax: (212) 912-7751
CGraham@tpw.com

COUNSEL FOR DEFENDANT-COUNTERCLAIMANT

5

## CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Jose.Ferrer@bakernet.com.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following recipients:

> Jose Ferrer, Esq.
> BAKER & McKENZIE LLP
> Mellon Financial Center
> 1111 Brickell Avenue, Suite 1700
> Miami, Florida 33131

*Counsel of Defendants*

/s/Mark S. Auerbacher, Esq.

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.:  07-20389-CIV-MARTINEZ/BANDSTRA

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

      Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,

      Defendant.

_____/

### PLAINTIFF'S ANSWER AND AFFIRMATIVE DEFENSES
### TO COUNTS V AND VI OF DEFENDANT'S COUNTERCLAIM

Plaintiff, Coffee Bean Trading-Roasting, LLC ("Coffee Bean"), by and through its

undersigned counsel, and pursuant to Rule 12 of the Federal Rules of Civil Procedure, hereby

responds as follows as to the correspondingly numbered paragraphs of Defendant, Coffee

Holding, Inc.'s ("Coffee Holding"), counterclaim:

1.      Admitted.

2.      Admitted.

3.      Admitted that Café La Rica, LLC is a limited liability company organized under

the laws of Delaware, but having its principal place of business in Miami-Dade County, Florida.

4.      Admitted that on or about March 10, 2006, Coffee Bean and Coffee Holding

entered into the Operating Agreement which governs Café La Rica and provides a mechanism

for dissolving Café La Rica.  Admitted also that the Operating Agreement speaks for itself.

Denied as to all other allegations not specifically admitted.

5.      Admitted that the Operating Agreement contains a dispute resolution procedure and the Operating Agreement speaks for itself.  Denied as to all other allegations not specifically admitted.

6.      Admitted that the Operating Agreement provides that the law of Delaware would govern any dispute between the parties.  Admitted that the Operating Agreement provides a permissive forum selection clause designating Delaware as one of the forums in which disputes between the parties could be brought.  Denied as to all other allegations not specifically admitted.

7.      Admitted that on or about March 10, 2006, contemporaneously with the execution of the Operating Agreement, Coffee Holding and Cafe La Rica entered into that certain Expense Sharing and Services Agreement pursuant to which Coffee Holding agreed to provide certain services on behalf of, and supply certain coffee products to, Café La Rica.  Denied as to all other allegations not specifically admitted.

8.      Denied.

9.      Denied.

10.     Denied.

11.     Denied.

12.     Without knowledge or information sufficient to form a belief as to the truth of the allegations.

13.     Without knowledge or information sufficient to form a belief as to the truth of the allegations.

14.     Denied.

15.     Denied.

16.     Without knowledge or information sufficient to form a belief as to the truth of the allegations.

17.     Denied.

18.     Admitted that Coffee Holding has attempted to unilaterally dissolve Café La Rica. Denied as to all other allegations not specifically admitted.

19.     Denied.

20.     Admitted that Mr. Gordon requested Washington Mutual to freeze Café La Rica's account.  Denied as to all other allegations not specifically admitted.

21.     Denied.

22.     Admitted.

23.     Admitted that the Court denied Coffee Bean's motion for a restraining order by order dated February 16, 2007.  Denied as to all other allegations not specifically admitted.

24.     Denied.

Coffee Bean does not hereby respond to paragraphs 25 through 48, which comprise Counts I through IV of Coffee Holding's counterclaim, because those Counts are the subject of a currently-pending motion to dismiss.

49.     Coffee Bean realleges its answers to paragraphs 1 through 24 above.

50.     Admitted that the Operating Agreement requires the parties to first attempt to resolve their disputes through methods other than litigation before instituting a lawsuit.  Denied as to all other allegations not specifically admitted.

51.     Admitted that Coffee Bean and Coffee Holding have a dispute regarding, among other things, how certain portions of the Operating Agreement should be interpreted.  Admitted that Coffee Bean attempted to invoke the dispute resolution process and that Coffee Holding

3

categorically rejected that request, prompting Coffee Bean to bring this action. Denied as to all other allegations not specifically admitted.

52. Denied.

53. Admitted that the Operating Agreement requires the parties to first attempt to resolve their disputes through methods other than litigation before instituting a lawsuit. Admitted that Coffee Bean attempted to invoke the dispute resolution process and that Coffee Holding categorically rejected that request, prompting Coffee Bean to bring this action. Denied as to all other allegations not specifically admitted.

54. Denied.

55. Coffee Bean realleges its answers to paragraphs 1 through 24 above.

56. Denied.

57. Without knowledge or information sufficient to form a belief as to the truth of the allegations.

58. Denied.

## **AFFIRMATIVE DEFENSES**

### **First Affirmative Defense**

59. Coffee Holding's is estopped and is otherwise barred from claiming a breach of the Operating Agreement because Coffee Holding rejected Coffee Bean's attempts to invoke the dispute resolution process set forth in the Operating Agreement.

### **Second Affirmative Defense**

60. Coffee Holding's claims for temporary and permanent injunction relief are barred because Coffee Holding has an adequate remedy at law.

Baker & McKenzie LLP, 1111 Brickell Avenue, Suite 1700, Miami, Florida 33131 – (305) 789-8900

Respectfully submitted,

BAKER & McKENZIE LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131
Telephone:  (305) 789-8900
Facsimile:  (305) 789-8953


By: ___/s/ Jose M. Ferrer_____
     Jose M. Ferrer
     Florida Bar No. 173746

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served this 2nd day of April, 2007 by facsimile and U.S. Mail upon Mark S. Auerbacher, Esq. and John R. Squitero, Esq., Katz Barron Squitero Faust, 2699 S. Bayshore Drive, Seventh Floor, Miami, Florida 33133; and Christopher F. Graham, Esq., Thacher Proffitt & Wood LLP, Two World Financial Center, New York, New York 10281.


By: ___/s Jose M. Ferrer_____
     Jose M. Ferrer

MIADMS/308130.1

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.: 07-20389-CIV-MARTINEZ/BANDSTRA

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

       Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,

       Defendant.
_____/

## PLAINTIFF'S MOTION TO DISMISS CERTAIN
## COUNTS OF DEFENDANT'S COUNTERCLAIM

Plaintiff, Coffee Bean Trading-Roasting, LLC ("Coffee Bean"), pursuant to Rule 12 of the Federal Rules of Civil Procedure, moves to dismiss Counts I through IV of Defendant, Coffee Holding, Inc.'s ("Coffee Holding"), counterclaim and in support thereof states as follows:

### INTRODUCTION

Coffee Holding, a fifty percent member in Café La Rica, LLC ("Café La Rica"), has filed a counterclaim against Coffee Bean, the other fifty percent member in Café La Rica, for alleged tortious conduct and breach of contract. The counterclaim, which includes counts for breach of the implied covenant of good faith and fair dealing (Count I), conversion (Count II), tortious interference with a contract (Count III), tortious interference with a business relationship (Count IV), breach of contract (Count V), and injunctive relief (Count VI), alleges that Coffee Holding sustained damages when Café La Rica's sales manager, Ernesto Aguila, mismanaged Café La Rica and converted its receivables. Coffee Bean cannot be held liable for breach of the implied covenant of good faith and fair dealing, conversion, or tortious interference because the

actionable conduct was allegedly undertaken by Ernesto Aguila over whom Coffee Bean is not alleged to have had any control. Additionally, Coffee Holding has failed to state and has no standing to assert a claim for conversion against Coffee Bean. Lastly, Coffee Holding's claims for tortious interference must be dismissed because the alleged acts that support those causes of action were performed by Café La Rica's sales manager within the scope of his employment and are not alleged to have induced or caused the termination of the relationship between Coffee Holding and Café La Rica. Accordingly, Counts I through IV of the Coffee Holding's counterclaim must be dismissed with prejudice.

## **MEMORANDUM OF LAW**

### I.     The Applicable Standard.

To state a cause of action, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and "a demand for judgment for the relief the pleader seeks." Fed. R. Civ. P. 8(a). A motion to dismiss is the usual and proper method of testing the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993); *Hopkins v. Pusey*, 2007 U.S. Dist. LEXIS 13158, at *5 (D. Del. 2007); *Baylis v. Taylor*, 2007 U.S. Dist. LEXIS 13173, at *5 (D. Del. 2007); *Laskey v. Legates*, 2007 U.S. Dist. LEXIS 11971, at *4 (D. Del. 2007); *Langdon v. Google, Inc.*, 2007 U.S. Dist. LEXIS 11902, *9 (D. Del. 2007). In considering a motion to dismiss, the Court must assume that all factual allegations in the complaint are true, and draw all reasonable factual inferences in the light most favorable to plaintiff. *Id.* "However, the court should reject 'unsupported allegations,' 'bald assertions,' or 'legal conclusions.'" *Pusey*, 2007 U.S. Dist. LEXIS, at *5; *Taylor*, 2007 U.S. Dist. LEXIS, at *5, *Legates*, 2007 U.S. Dist. LEXIS, at *4; *Google, Inc.*, 2007 U.S. Dist. LEXIS, at *9; *see also Kost*, 1 F.3d at 183 (The Court is "not required to accept legal conclusions either alleged or

inferred from the pleaded facts."); *Weiss v. Leewards Creative Crafts, Inc.*, 1993 Del. Ch. LEXIS 73, at *6 (1993) ("[A]llegations must be more than merely conclusory."). "[W]hen on the basis of a dispositive issue of law no construction of the factual allegations will support the cause of action, dismissal of the complaint is appropriate." *Excess Risk*, 208 F. Supp. 2d at 1313 (citing to *Marshall County Bd. of Educ. v. Marshall County Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993)).

II.     None Of The Acts Complained of In Counts I Through IV Are Attributable To Coffee Bean.

According to the counterclaim, "Mr. Ernesto Aguila, managing director of Café La Rica, controlled the day-to-day operations of Café La Rica[.]"  *See* Counterclaim at ¶ 9.  Coffee Holding alleges that "it was Mr. Aguila who was in charge of ordering coffee from Coffee Holding" and "continually placed large orders of coffee that Coffee Holding provided but for which Café La Rica rarely paid."  It is allegedly due to Mr. Aguila's mismanagement that Café La Rica has paid Coffee Holding only $150,000 of the approximately $530,000 of coffee that Coffee Holding alleges it sold Café La Rica.  *See* Counterclaim at ¶ 13.  Moreover, it was Mr. Aguila who allegedly "unilaterally changed the passcodes of Café La Rica's bank account, withdrew $20,000 from the same account and, for an extended period, cut off Coffee Holding's access to Café La Rica's security cameras."  *See* Counterclaim at ¶ 19.

Even when read in the light most favorable to Coffee Holding, Counts I through IV of the counterclaim fail to state an actionable claim against Coffee Bean.  It is evident from the allegations in the counterclaim that Coffee Holding is attempting to hold Coffee Bean liable for Ernesto Aguila's alleged acts.  All of the acts complained of are attributable to Ernesto Aguila individually as the "managing director of Café La Rica[,]" over whom Coffee Bean is not alleged to have any control.  *See* Counterclaim at ¶ 9.  Although Coffee Holding begins each of its

Baker & McKenzie LLP, 1111 Brickell Avenue, Suite 1700, Miami, Florida 33131 – (305) 789-8900

counts by alleging generally that Mr. Aguila was acting as Coffee Bean's agent, *see* ¶¶ 27, 35, 40, and 46, the counterclaim is devoid of any factual allegations explaining why it is that Mr. Aguila is Coffee Bean's agent or why the actions of Mr. Aguila should be otherwise attributed to Coffee Bean. In the absence of any factual allegations to that effect, the Court must dismiss Counts I through IV as conclusory. *See Pusey*, 2007 U.S. Dist. LEXIS, at *5 ("the court should reject 'unsupported allegations,' 'bald assertions,' or 'legal conclusions.'"); *Taylor*, 2007 U.S. Dist. LEXIS, at *5 (same), *Legates*, 2007 U.S. Dist. LEXIS, at *4 (same); *Google, Inc.*, 2007 U.S. Dist. LEXIS, at *9 (same); *see also Stucker v. American Stores Co.*, 35 Del. 586, 591, 159 A. 848, 851 (Sup. Ct. Del. 1932) ("It is a general rule that it is not necessary to plead evidence but enough facts must be stated for the rights of the plaintiff against a defendant to fairly appear. Anything else constitutes an unwarranted conclusion on the part of the pleader.") (citations omitted).

III.   Coffee Holding Has Failed To Sufficiently Allege And Lacks Standing To Bring A Conversion Claim Against Coffee Bean.

"Conversion is an 'act of dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent with it.'" *Arnold v. Society for Sav. Bancorp*, 678 A.2d 533, 536 (Del. 1996) (quoting *Drug, Inc. v. Hunt*, 35 Del. 339, 168 A. 87, 93-94 (1933)). "In a conversion action, the plaintiff seeks to vindicate his superior title to the property in the defendant's possession." *Id.* In order to successfully plead conversion, an aggrieved party must allege that at the time of the alleged conversion (a) it held an interest in the property allegedly converted, (b) it had a right to possession of the property, and (c) defendant converted the property. *Facciolo Const. Co. v. Bank of Delaware*, 514 A.2d 413 (Del. 1986); *Arnold v. Society for Sav. Bancorp*, 678 A.2d 533, 536 (Del. 1996); *Quinn v. Carrion*, 2000 Del. C.P. LEXIS 22, at *3 (2000).

"The term 'standing' refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or to redress a grievance." *Barry v. Town of Dewey Beach*, 2006 Del. Ch. LEXIS 115, at *17 (2006) (quoting *Dover Historical Soc'y v. City of Dover Planning Comm'n*, 838 A.2d 1103, 1110 (Del. 2003)). A court must answer the "threshold question" of standing affirmatively in order to "ensure that the litigation before the tribunal is a 'case or controversy' that is appropriate for the exercise of the court's judicial powers." *Id.* The claimant bears the burden of demonstrating that they have standing. *Id.* A claimant that has no right to possession of property allegedly converted has no standing to sue for conversion. *Facciolo Const. Co. v. Bank of Delaware*, 514 A.2d 413 (Del. 1986).

In Count II of the counterclaim, Coffee Holding attempts to assert a claim for conversion against Coffee Bean based on Mr. Aguila's alleged acts in withdrawing without permission $20,000 from Café La Rica's Washington Mutual account and taking at least $170,000 of Café La Rica's account receivables and depositing them into Coffee Bean's account. In addition to the reasons set forth above in the preceding section regarding why that claim fails, the conversion claim also fails because Coffee Holding has failed to allege that at the time of the alleged conversion it had an interest in or a right to possession of the property. Instead, it alleges that the money belonged to Café La Rica. *See* Counterclaim at ¶¶ 35, 36. Inasmuch as Coffee Holding is not alleged to have ever had an interest in or a right to possession of the property allegedly converted, Coffee Holding has failed to state and has no standing to assert a claim for conversion against Coffee Bean and its claim must be dismissed. *Facciolo Const. Co.*, 514 A.2d at 413.

IV.    Coffee Bean Cannot Be Held Liable For Café La Rica's Breach Of The Expense Sharing Agreement.

In Count III of the counterclaim, Coffee Holding attempts to allege tortious interference by Coffee Bean with the Service Agreement between Coffee Holding and Café La Rica. Coffee Holding's claim is entirely based on the actions of Ernesto Aguila, whom it claims caused Café La Rica not to pay Coffee Holding $380,000 for coffee sold by Coffee Holding to Café La Rica under the parties Expense Sharing Agreement. *Wallace v. Wood*, 752 A.2d 1175, 1182 (Del. Ch. 1999). As set forth in more detail above, other than the factually unsupported allegations claiming that Mr. Aguila is Coffee Bean's agent, the counterclaim does not allege sufficient facts to impute Mr. Aguila's actions to Coffee Bean. However, even if assuming *arguendo* Coffee Holding had alleged sufficient facts to that effect, Mr. Aguila's actions would nevertheless not be actionable because they were alleged to have been taken by him, not as an agent for Coffee Bean, but instead within the scope of his employment as the "managing director of Café La Rica[.]" *See* Counterclaim at ¶ 9. As a matter of law, employees of a company can only be liable for tortious interference with their own company's contract if they exceeded the scope of their employment. *Wallace*, 752 A.2d at 1182-83 ("Employees acting within the scope of their employment are identified with the defendant himself so that they may ordinarily advise the defendant to breach his own contract without themselves incurring liability in tort."). Clearly, the ordering of "significant amounts of coffee from Coffee Holding knowing that Café La Rica would be unable to pay," *see* Counterclaim at ¶ 41, would fall within the scope of Mr. Aguila's employment, which included "ordering coffee from Coffee Holding[,]" s*ee* Counterclaim at ¶ 9, and therefore Coffee Bean cannot be liable for tortious interference with a contract as to which Mr. Aguila was acting, in that capacity, as a party.

6

V.    Coffee Holding Has Failed To Allege The Prima Facie Elements Of A Claim For
      Tortious Interference With A Business Relationship.

The basic elements which establish a prima facie tortious interference with a business

relationship are (1) the existence of a valid business relationship (not necessarily evidenced by an

enforceable contract) or expectancy; (2) knowledge of the relationship or expectancy on the part

of the interferer; (3) an intentional interference inducing or causing a breach or termination of the

relationship or expectancy; and (4) resultant damage to the party whose relationship or

expectancy has been disrupted.  *Bowl-Mor Co., Inc. v. Brunswick Corp.*, 297 A.2d 61, 65 (Del.

Ch. 1972) (quoting from 45 Am.Jur.2d, Interference § 50).  One is liable for commission of this

tort who interferes with the business relations of another, both existing and prospective, by

inducing a business relation with another or by preventing a third person from continuing a

business relation with another.  *Id.*

In Count IV of the counterclaim, Coffee Holding alleges that Mr. Aguila, shortly after

being notified by Coffee Holding that Café La Rica had been dissolved, cut off Coffee Holding's

access to the security cameras thereby "constructively oust[ing]" Coffee Holding from Café La

Rica's property.  Coffee Holding alleges that these acts by Mr. Aguila, over whom, again, Coffee

Bean is not alleged to have had any control, constitute tortious interference by Coffee Bean "with

the business relationship between Coffee Holding and Café La Rica and Café La Rica's

customers, creditors and vendors."  *See* Counterclaim at ¶¶ 46, 47.  Coffee Holding fails to

allege, however, that Coffee Bean had any knowledge of Mr. Aguila's alleged actions.

Additionally, Coffee Holding fails to allege that Mr. Aguila's alleged interference – i.e., the

turning off of the security cameras – induced or caused a breach or termination of the

relationship between Coffee Holding and Café La Rica.  On the contrary, Coffee Holding clearly

alleges that the termination of that relationship occurred when Coffee Holding unilaterally

exercised its purported rights under the Operating Agreement to dissolve Café La Rica due to the alleged material breach by Café La Rica of the Expense Sharing Agreement. *See* Counterclaim at ¶ 18. Thus, Coffee Holding has failed to allege the prima facie elements of a claim for tortious interference.

## **CONCLUSION**

For all of the foregoing reasons, dismissal of Counts I through IV of Coffee Holding's counterclaim is appropriate because no construction of the factual allegations upon which Coffee Holdings bases its counterclaim will support those causes of action. *See Excess Risk*, 208 F. Supp. 2d at 1313 (citing to *Marshall County Bd. of Educ. v. Marshall County Gas Dist*., 992 F.2d 1171, 1174 (11th Cir. 1993)) ("[W]hen on the basis of a dispositive issue of law no construction of the factual allegations will support the cause of action, dismissal of the complaint is appropriate.").

Respectfully submitted,

BAKER & McKENZIE LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131
Telephone: (305) 789-8900
Facsimile: (305) 789-8953


By: ___/s/ Jose M. Ferrer_____
        Jose M. Ferrer
        Florida Bar No. 173746

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served this 2nd day of April, 2007 by facsimile and U.S. Mail upon Mark S. Auerbacher, Esq. and John R. Squitero, Esq., Katz Barron Squitero Faust, 2699 S. Bayshore Drive, Seventh Floor, Miami, Florida 33133; and Christopher F. Graham, Esq., Thacher Proffitt & Wood LLP, Two World Financial Center, New York, New York 10281.


By:    /s/ Jose M. Ferrer             
                 Jose M. Ferrer

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.: 07-20389-CIV-MARTINEZ/BANDSTRA

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

      Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,

      Defendant.

_____/

**PLAINTIFF'S NOTICE OF FILING EXCLUDED
EXHIBIT TO AFFIDAVIT OF ERNESTO AGUILA**

      Plaintiff, Coffee Bean Trading-Roasting, LLC, hereby gives notice of filing Exhibit A to

the Affidavit of Ernesto Aguila in Opposition to Coffee Holding's Motion for Temporary

Restraining Order and in Support of Plaintiff's Cross-Motion to Appoint a Receiver to Orderly

Dissolve Company, which was inadvertently excluded at the time the affidavit was filed.

                        Respectfully submitted,

                        BAKER & McKENZIE LLP
                        Mellon Financial Center
                        1111 Brickell Avenue, Suite 1700
                        Miami, Florida 33131
                        Telephone: (305) 789-8900
                        Facsimile: (305) 789-8953

                        By: ___/s/ Jose M. Ferrer_____
                                Jose M. Ferrer
                                Florida Bar No. 173746

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served this 2nd day of April, 2007 by facsimile and U.S. Mail upon Mark S. Auerbacher, Esq. and John R. Squitero, Esq., Katz Barron Squitero Faust, 2699 S. Bayshore Drive, Seventh Floor, Miami, Florida 33133; and Christopher F. Graham, Esq., Thacher Proffitt & Wood LLP, Two World Financial Center, New York, New York 10281.


By: ___/s/ Jose M. Ferrer_____
      Jose M. Ferrer

MIADMS/308136.1

March 10, 2006

***PERSONAL & CONFIDENTIAL***

Mr. Ernesto Aguila
7030 North Augusta Drive
Miami, FL 33015

Dear Ernesto:

I am pleased that you will be joining Café La Rica, LLC (the "Company") as Sales Manager and the Company would like to set forth below the terms of your employment in this letter agreement, as follows:

1.  You will be employed by the Company as Sales Manager and will also be on the Board of Managers of the Company pursuant to the operating agreement governing the Company (the "Operating Agreement").

2.  Your annual compensation on a salary basis shall be at the annual rate of ONE HUNDRED TWENTY THOUSAND DOLLARS ($120,000) per year, payable in installments in accordance with the prevailing payroll practices of the Company, and you will be entitled to a discretionary annual bonus based upon performance objectives as determined by the Board of Managers of the Company.

3.  You will be included in the hospitalization and other insurance plans of Coffee Holding Co., Inc. You will be subject to all of the terms and conditions of those plans, including eligibility provisions and applicable contribution requirements.

4.  Your employment will be on at "at-will" basis, meaning that either you or the Company may terminate employment relationship at any time with or without notice or cause; *provided however*, that if your employment is terminated by the Company for any reason other than "cause" (as defined herein) prior to the dissolution of the Company, the Company shall pay to you your annual rate of compensation (as of the date of termination of employment) for one (1) year payable in installments in accordance with the prevailing payroll practices of the Company. Your employment with the Company shall automatically terminate upon the dissolution of the Company (with no amounts payable to you under this letter agreement after such dissolution) or upon the determination by the Board of Managers of the Company (for this purpose the Board of Managers shall consist of those Managers other than yourself with your position as Manager being



MAR-10-2006 13:59 From:COFFEE HOLDING CO.   17186594731          To:2217693          P.4/6

Mr. Ernesto Aguila                                                    Page 2
March 10, 2006

substituted for any other member of The Coffee Bean Trading-Roasting LLC) that you have, through omission, act or action or series of omissions, acts or actions, created grounds for termination for "cause" which shall mean:

      (i)    your material dishonesty including, without limitation, theft, fraud, embezzlement, financial misrepresentation or other similar behavior or action in his dealings with or with respect to the Company or any Venture Member (as such term is defined in the Operating Agreement) or any entity with which the Company or Venture Member, shall be engaged in or be attempting to engage in commerce; or

      (ii)    your conviction for, or your entry of a plea of guilty or *nolo contendere* to, the commission of a felony.

5.    The amounts and benefits described hereunder shall be owed by the Company.

Ernesto, please review this letter, sign and date the original in the space provided below, and return the original in the attached, stamped, self-addressed envelope. An extra copy is attached for you.

               Sincerely,

               Andrew Gordon
               On behalf of
               Café La Rica, LLC

Agreed: _____

Date: _____

Mr. Ernesto Aguila
March 10, 2006                                                                    Page 2.

substituted for any other member of The Coffee Bean Trading-Roasting LLC) that you have, through omission, act or action or series of omissions, acts or actions, created grounds for termination for "cause" which shall mean:

      (i)     your material dishonesty including, without limitation, theft, fraud, embezzlement, financial misrepresentation or other similar behavior or action in his dealings with or with respect to the Company or any Venture Member (as such term is defined in the Operating Agreement) or any entity with which the Company or Venture Member, shall be engaged in or be attempting to engage in commerce; or

      (ii)    your conviction for, or your entry of a plea of guilty or *nolo contendere* to, the commission of a felony.

5.    The amounts and benefits described hereunder shall be owed by the Company.

Ernesto, please review this letter, sign and date the original in the space provided below, and return the original in the attached, stamped, self-addressed envelope. An extra copy is attached for you.

Sincerely,


Andrew Gordon
On behalf of
Café La Rica, LLC


Agreed: _____

Date: 3-10-06 _____

## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF FLORIDA
### Miami Division

### Case Number:  07-20389-CIV-MARTINEZ-BANDSTRA

COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

     Plaintiff,

vs.

COFFEE HOLDING, CO. INC., a Nevada
corporation

     Defendant-Counterclaimant

---

### DEFENDANT-COUNTERCLAIMANT COFFEE HOLDING, CO. INC'S
### REPLY IN FURTHER SUPPORT OF IT'S MOTION FOR
### <u>A TEMPORARY RESTRAINING ORDER</u>

Defendant Coffee Holding Co., Inc ("Coffee Holding"), by and through its undersigned

counsel, hereby replies to Plaintiff Coffee Bean Trading-Roasting, LLC's ("Coffee Bean")

Opposition to Coffee Holding's Motion for a Temporary Restraining Order.

### <u>PRELIMINARY STATEMENT</u>

In its Response in Opposition to Coffee Holding's Motion for a Temporary Restraining

Order, Coffee Bean attempts to minimize Coffee Holding's good faith attempts to proceed with

an orderly wind-up of Café La Rica.  Coffee Bean, by submitting confidential, privileged and

inadmissible settlement discussions, tries to recharacterize Coffee Holding's actions as efforts to

"force preferential payment to itself."  This characterization could not be further from the truth.

Since Coffee Holding informed Coffee Bean of Café La Rica's dissolution, Mr. Andrew Gordon

has only done what is best for all the parties affiliated with Café La Rica. To that extent, Mr. Gordon and his counsel have repeatedly requested that Café La Rica's operations cease and desist so that its assets can be distributed to its creditors fairly. But, in blatant disregard for any attempt to amicably dissolve and wind-up operations, Café La Rica's CEO, Ernesto Aguila, and Coffee Bean's manager, Alberto Lensi, have simply continued operating the business in defiance of Coffee Holding by: (1) opening up a joint Café La Rica-Coffee Bean bank account without even informing Coffee Holding; (2) endorsing and depositing checks from Café La Rica's customers into that account; and (3) perhaps most outrageously, paying Mr. Aguila and his wife a salary. Café La Rica has failed as a company – all Coffee Holding asks is that this Court enjoin Mr. Aguila and Coffee Bean from operating Café La Rica so that Coffee Holding – which is owed nearly $500,000 – and the rest of Café La Rica's creditors, can be paid.

## I.    Coffee Holding is the Only Entity Proceeding with Dissolution

As Coffee Bean states, the Limited Liability Company Agreement of Café La Rica, LLC (the "Operating Agreement") provides that "[t]he winding-up of the Company shall be completed when all debts, liabilities and obligations of the Company have been paid and discharged or reasonably adequate provisions therfor has been made, and all the remaining Property of the Company has been distributed to its Members." Operating Agreement at ¶ 13.4. This is exactly what Coffee Holding is attempting to move toward. Only by ceasing operations can the parties properly assess the value of Café La Rica and begin to distribute its assets fairly to all of its creditors. Coffee Bean and Mr. Aguila, on the other hand, have refused to recognize that Café La Rica is dissolved and have continued to operate Café La Rica unilaterally in disregard of any meaningful wind-up process.

What could be more contradictory to an orderly winding up process than the continued operation of Café La Rica, and moreover, the opening of a new bank account to collect its receivables without even notifying Coffee Holding?  Coffee Bean attempts to argue that it provided the accounting of this bank account – what Coffee Bean fails to mention, however, is that this accounting was not provided until <u>after</u> Mr. Gordon discovered the account through a conversation with a customer  and subsequently requested the accounting.

Coffee Bean states that Coffee Holding is somehow attempting to force "preferential" payments to itself – this is a gross mischaracterization of Coffee Holding's request to be compensated for, among other things, the $410,000 it is owed for coffee and expenses.  The payments Coffee Holding requests are not preferential, rather they are the payments properly due to Coffee Holding as a result of its previous and continued financial support of Café La Rica.

## II.   Coffee Bean, by Filing an Action with this Court, Breached the Operating Agreement

Coffee Bean would have the Court believe that it was Coffee Holding (and not Coffee Bean) that breached the Operating Agreement by failing to participate in the dispute resolution process.  Although it is true that Christopher Graham wrote to Coffee Bean's counsel on February 13, 2007, confirming the dissolution of Café La Rica, it is Coffee Bean that breached the Operating Agreement by immediately filing suit.  Instead of proceeding to dissolve the company, or in the alternative, mediate the dispute, Coffee Bean, that very same day, not only filed a Complaint in this Court, but filed a Temporary Restraining Order against Coffee Holding. Having started this federal case, Coffee Bean cannot now purport to have complied with any sort of organized and amicable process to either work out a dispute or wind-down the company.

## III. The Only Support that Coffee Bean has for its Contentions are Confidential Conversations between Counsel

In order to support its contentions that Coffee Holding is somehow blocking the orderly winding up of Café La Rica, Coffee Bean cites to conversations and e-mails between Coffee Bean's counsel and Coffee Holding's counsel.  Not only do these conversations and e-mails demonstrate that Coffee Holding was eager to start actually winding down Café La Rica, as opposed to continuing with the status quo, these statements are taken out of context, misquoted and moreover, inadmissible settlement discussions.  The best proof, however, as to who is responsible for blocking attempts to wind down Café La Rica, is evidenced by Mr. Aguila's and Coffee Bean's actions – that is, the continued illegal operation of Café La Rica – including the unauthorized opening of a Coffee Bean-Café La Rica bank account without the knowledge or permission of Coffee Holding.

## IV. Coffee Holding's Request for a TRO Must be Granted

Since Mr. Gordon's February 5, 2007 letter to Coffee Bean notifying it of Café La Rica's dissolution, there has been absolutely no action taken by Coffee Bean or Café La Rica to begin to wind-down Café La Rica.  Instead, Mr. Aguila continues to run Café La Rica and, with each passing day, Coffee Holding is increasingly deprived of any remaining assets it is rightfully owed.  Accordingly, Coffee Holding respectfully requests the Court to grant its motion for a TRO in order to prevent Coffee Bean and Mr. Aguila from (1) exercising control over any property of Café La Rica; (2) depositing Café La Rica receivables or other assets in its account(s), or any accounts they or Coffee Bean control;  and (3) such other and further relief deemed just and equitable.

Dated:   April 3, 2007

KATZ, BARRON, SQUITERO, FAUST
2699 S. Bayshore Drive, Seventh Floor
Miami, Florida 33133
Tel:  305-856-2444
Fax: 305-285-9227

By:  /s/Mark S. Auerbaher_____
      Mark S. Auerbacher, Esq.
      Florida Bar No. 978220
      msa@katzbarron.com
      John R. Squitero, Esq.
      Florida Bar No. 121196
      jrs@katzbarron.com

Christopher F. Graham, Esq.
Mary H. Mulhearn, Esq.
Thacher Proffitt & Wood LLP
Two World Financial Center
New York, New York 10281
Tel: (212) 912-7669
Fax: (212) 912-7751
CGraham@tpw.com

COUNSEL FOR DEFENDANT-COUNTERCLAIMANT

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Jose.Ferrer@bakernet.com.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following recipients:

Jose Ferrer, Esq.
BAKER & McKENZIE LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131

*Counsel of Defendants*

/s/Mark S. Auerbacher, Esq.

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.: 07-20389-CIV-MARTINEZ/BANDSTRA

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

      Plaintiff,

vs.

COFFEE HOLDING CO., INC., a Nevada
corporation,

      Defendant.

_____/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO
STRIKE CERTAIN PORTIONS OF PLAINTIFF'S RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION FOR A TEMPORARY RESTRAINING ORDER**

      Plaintiff, Coffee Bean Trading-Roasting, LLC ("Coffee Bean"), by and through its
undersigned counsel, hereby responds in opposition to Defendant, Coffee Holding Co., Inc.'s
("Coffee Holding"), Motion to Strike Certain Portions of Coffee Bean's Response in Opposition
to Defendant's Motion for a Temporary Restraining Order and Cross-Motion to Appoint a
Receiver to Orderly Dissolve Company ("Response"), and in furtherance thereof states as
follows:

**PRELIMINARY STATEMENT**

      On or about March 21, 2007, Coffee Holding filed its Emergency Motion for a
Temporary Restraining Order pursuant to which it sought to enjoin Coffee Bean from exercising
control over Café La Rica and from depositing Café La Rica's receivables into Coffee Bean's
accounts. At paragraph 10 of its motion, Coffee Holding represented to the Court that Coffee
Bean had failed to work with Coffee Holding to develop an amicable winding up process for
Café La Rica and at page 8 accused the undersigned of "feigning" his concern for an orderly

dissolution of Café La Rica in an attempt to buy time to allow Coffee Bean to "gut" Café La Rica's assets for itself. Coffee Holding's representations in that regard were apparently made in support of its argument that, due to Coffee Bean's purported refusal to acquiesce to an orderly dissolution of Café La Rica, Coffee Holding would suffer irreparable harm unless the preliminary injunction was granted.

On March 27, 2007, Coffee Bean filed its Response to which it attached a series of e-mail communications between the undersigned and Coffee Holding's counsel. In those e-mails, the undersigned assures Coffee Holding's counsel that Coffee Bean will work together with Coffee Holding to orderly wind up Café La Rica and repeatedly asks them to provide Coffee Bean with financial statements in order to verify the amounts owed by Café La Rica. The e-mails were redacted to exclude specific settlement terms.

Coffee Bean's Response also refers to a conversation between the undersigned and Coffee Holding's attorneys, Christopher Graham, during which Mr. Graham, in response to the undersigned's request for instructions regarding how Coffee Holding proposed to wind up Café La Rica, insisted that Café La Rica should be "shut down immediately, its assets secured, and the doors locked." The e-mails and the reference to Mr. Graham's comments were obviously intended to contradict Coffee Holding's accusations that Coffee Bean and its counsel had purposefully obstructed the winding down of Café La Rica and challenge Coffee Holding's argument that it will suffer irreparable injury without the injunction.

In a desperate attempt to stave off the denial of its "emergency" motion for a protective order, and consistent with a pattern of over-litigating this matter, Coffee Holding now seeks to strike from the Court's consideration the e-mails attached by Coffee Bean to and the references to the conversation with Mr. Graham made in Coffee Bean's Response. Coffee Holding argues

Baker & McKenzie LLP, 1111 Brickell Avenue, Suite 1700, Miami, Florida 33131 – (305) 789-8900

that those e-mails and that conversation are inadmissible "evidence of conduct or statements made in compromise negotiations regarding the claim[.]" *See* Motion to Strike at p. 2. Coffee Holding relies on Rule 408 of the Federal Rules of Evidence which generally prohibits the admission of evidence of offers to compromise when offered to prove the validity or invalidity of a disputed claim.

Coffee Holding's arguments are misplaced. As a preliminary matter, Coffee Holding cannot use Rule 408 to shield the Court from considering proof negating Coffee Holding's misrepresentations contained in its motion for a restraining order concerning Coffee Bean's purported reluctance to cooperate with Coffee Holding in an orderly dissolution process. Moreover, the challenged communications are not inadmissible under Rule 408 because they are not offered to prove the validity or invalidity of the disputed claims in this action, but instead to rebut Coffee Holding's accusations that Coffee Bean and its counsel have purposefully obstructed the winding down of Café La Rica and challenge Coffee Holding's argument that it will suffer irreparable injury without the injunction.

## **MEMORANDUM OF LAW**

### I.     The Applicable Standard.

Federal Rule of Evidence 408 bars admission of evidence of an offer to compromise a claim if offered to prove the validity or invalidity of a disputed claim. The sole prohibition in the Rule is the use of settlement statements for purposes of proving the validity or invalidity or the amount of a disputed claim. *See also Ausherman v. Bank of Am. Corp.*, 212 F.Supp.2d 435, 454 (D. Md. 2002). Use of this evidence for any other relevant and otherwise admissible purpose is permitted. Fed. R. Evid. 408(b); *see Ausherman*, 212 F.Supp.2d at 454; *Seafarers Int'l Union of N. Am. v. Thomas*, 42 F.Supp.2d 547, 559 (D.V.I. App. Div. 1999) (allowing admission of

3

testimony and exhibits describing settlement negotiations that took place between union and employer because evidence was not offered to prove validity of claim that was subject of settlement negotiations but rather to show conduct of union in pursuing negotiations); *Athey v. Farmers Ins. Exch.*, 234 F.3d 357, 362 (8th Cir. 2000); *Council for the National Register of Health Service Providers in Psychology v. American Home Assurance Co.*, 632 F.Supp. 144, 146 n. 1 (D.D.C. 1985) (allowing evidence relating to settlement negotiations to negate claims of bad faith on the party of the insurer); *Towerridge, Inc. v. T.A.O., Inc.*, 111 F.3d 758, 770 (10th Cir. 1997) (upholding admission of evidence relating to settlement to show defendant acted in bad faith); *Breuer Elec. Mfg. Co. v. Toronado Sys. of Am., Inc.*, 687 F.2d 182, 185 (7th Cir. 1982) (upholding admission of settlement evidence to rebut defendants' assertion of ignorance as to certain issues until suit was filed); *Coakley & Williams v. Structural Concrete Equip.,* 973 F.2d 349 (4th Cir. 1992) (evidence of settlement is not precluded by Rule 408 where offered to prove a party's intent with respect to the scope of a release); *Cates v. Morgan Portable Bldg. Corp.,* 708 F.2d 683 (7th Cir. 1985) (Rule 408 does not bar evidence of a settlement when offered to prove a breach of the settlement agreement, as the purpose of the evidence is to prove the fact of settlement as opposed to the validity or amount of the underlying claim); *Uforma/Shelby Bus. Forms, Inc. v. NLRB,* 111 F.3d 1284 (6th Cir. 1997) (threats made in settlement negotiations were admissible; Rule 408 is inapplicable when the claim is based upon a wrong that is committed during the course of settlement negotiations). "The listed examples of permissible use are illustrative and not exclusive." *Ausherman*, 212 F.Supp.2d at 454.

Baker & McKenzie LLP, 1111 Brickell Avenue, Suite 1700, Miami, Florida  33131 – (305) 789-8900

II.  <u>The Challenged Communications Are Admissible to Prove that Coffee Bean Has
     Made Efforts to Participate In the Winding Up of Café La Rica.</u>

The e-mails attached and the communications with Coffee Holding's counsel referenced

by Coffee Bean in its Response are not inadmissible under Rule 408.  Those communications are

not, as Coffee Holding argues, intended to "further [Coffee Bean's] argument that Coffee

Holding is somehow unwilling to participate in an orderly winding down process."  See Motion

to Strike at p. 3.  Indeed, Coffee Bean has made no such argument in its Response.  Instead,

those communications are obviously intended to contradict Coffee Holding's accusations that

Coffee Bean and its counsel have purposefully obstructed the winding down of Café La Rica,

and were instead fully willing to cooperate in an orderly dissolution of the Company, and

challenge Coffee Holding's argument that it will suffer irreparable injury without the injunction.

Coffee Bean's use of that evidence for that purpose violates neither the spirit nor the letter of

Rule 408 because it was not offered to prove the validity or invalidity, or the amount of any of

the claims asserted by the parties in this action.

III.  <u>Coffee Holding's Motion Is a Blatant Attempt to Shield From the Court the
      Glaring Misrepresentations Contained in Its Motion for Restraining Order.</u>

Coffee Holding, by its motion, attempts to prevent the Court from considering proof

negating Coffee Holding's misrepresentations to the Court concerning Coffee Bean's purported

reluctance to cooperate with Coffee Holding in an orderly dissolution process.  However, Rule

408 cannot be used to shield from the court's scrutiny deliberate misrepresentations made by a

lawyer in his pleadings.  *See Ausherman*, 212 F.Supp.2d at 437 ("For those who see within Evid.

Rule 408 the reflection of their own ingenuity at having discovered a means to lie, threaten, or

coerce with impunity … the sanctuary they perceive is illusory.").  To exclude such evidence,

which is both relevant and probative of Coffee Holding's misrepresentations to the Court, merely

5

because the challenged communications were exchanged in a settlement context would be to "allow a rule intended to promote the fair resolution of disputes to be perverted by a use that would undermine the very reason for its existence. *See id.* at 455.

### CONCLUSION

Based on the foregoing, Coffee Bean respectfully requests that the Court deny Coffee Holding's motion to strike the challenged communications referenced in Coffee Bean's Response.

Respectfully submitted,

BAKER & McKENZIE LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131
Telephone: (305) 789-8900
Facsimile: (305) 789-8953

By: ___/s/ Jose M. Ferrer_____
   Jose M. Ferrer
   Florida Bar No. 173746

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served this 5th day of April, 2007 by facsimile and U.S. Mail upon Mark S. Auerbacher, Esq. and John R. Squitero, Esq., Katz Barron Squitero Faust, 2699 S. Bayshore Drive, Seventh Floor, Miami, Florida 33133; and Christopher F. Graham, Esq., Thacher Proffitt & Wood LLP, Two World Financial Center, New York, New York 10281.

By: ___/s/ Jose M. Ferrer_____
   Jose M. Ferrer

MIADMS/308164.2

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
**Miami Division**

Case Number: 07-20389-CIV-MARTINEZ-BANDSTRA

COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

    Plaintiff,

vs.

COFFEE HOLDING, CO. INC., a Nevada
corporation

      Defendant-Counterclaimant

**DEFENDANT-COUNTERCLAIMANT COFFEE HOLDING, CO. INC'S RESPONSE
IN OPPOSITION TO PLAINTIFF'S CROSS-MOTION TO APPOINT A RECEIVER**

Defendant Coffee Holding Co., Inc ("Coffee Holding"), by and through its undersigned counsel, hereby responds to Plaintiff Coffee Bean Trading-Roasting, LLC's ("Coffee Bean") Cross-Motion to Appoint a Receiver and in support thereof states the following:

## I. PRELIMINARY STATEMENT

The only party to this lawsuit with a legitimate stake in the outcome of the case is Coffee Holding. Since its inception, Coffee Bean has contributed no capital, assets or administrative support to Café La Rica. In fact, the only action Coffee Bean has taken with respect to Café La Rica is to initiate very expensive litigation. In short, Coffee Bean is now attempting to get something from nothing.

As a such, whether Café La Rica is wound down by a receiver, or by the parties, is of no concern to Coffee Bean. And yet, Coffee Bean claims to know what is best for Café La Rica and

moves for the appointment of a receiver to supervise the winding down process of Café La Rica. A receiver, however, will be unnecessarily costly as their fees will eat away at the very few assets Café La Rica has left.

Thus, the Court has a choice between equitable remedies.  On the one hand, it can appoint a likely expensive and inefficient receiver; on the other hand, it can simply enjoin Coffee Bean and Ernesto Aguila, CEO of Café La Rica, from continuing to operate Café La Rica so that it can be wound down in the most fair and efficient method as possible.

The choice is easy.  The most equitable remedy for all of Café La Rica's creditors is a temporary restraining order enjoining Coffee Bean and Ernesto Aguila from exercising control over Café La Rica and depositing receivables into an unauthorized bank account.  Thus, the Court should deny Coffee Bean's cross-motion for a receiver and grant Coffee Holding's motion for a TRO.

## II.  <u>RELEVANT FACTS</u>

Coffee Holding respectfully refers the Court to its Motion for a Temporary Restraining Order for a complete recitation of the relevant facts.  Below are the facts most pertinent to this Response.

In March 2006, Coffee Bean and Coffee Holding entered into the Limited Liability Company Agreement of Café La Rica, LCC (the "Operating Agreement") which formed and governs the entity Café La Rica, an LLC comprised of two members: Coffee Bean and Coffee Holding.  Since the inception of Café La Rica, Coffee Holding has single-handedly financed its operations.  In March 2006, Coffee Holding contributed $250,000 in cash and a brick pack machine with a book value of $335,000.  In December 2006, Coffee Holding furnished $50,000 in additional cash to Café La Rica.  Coffee Holding also provided a $19,000 security deposit and

a $20,000 insurance policy to Café La Rica.  Finally, and most importantly, Coffee Holding, in compliance with the Expense Sharing and Services Agreement between Coffee Holding and Café La Rica, has sold approximately $530,000 worth of coffee to Café La Rica, of which only $150,000 has been paid.

Coffee Bean, by stark contrast, even in its position as a 50% member, has contributed nothing but a license to Café La Rica.

Café La Rica has failed.  The entity, however, that has lost money is Coffee Holding, not Coffee Bean.  As such, Coffee Holding has done the only thing it can to salvage what few assets are left: request this Court grant a TRO enjoining both Coffee Bean and Ernesto Aguila from exercising control over any property of Café La Rica including any bank accounts in the control of either Café La Rica or Coffee Bean.  Coffee Bean, on the other hand, seeks this Court to appoint a receiver, a receiver who will inevitably cost money and eat into what little assets Café La Rica has left.  Coffee Holding thus urges the Court to deny Coffee Bean's cross-motion for a receiver and grant Coffee Holding's motion for a TRO.

### III.  <u>MEMORANDUM OF LAW</u>

**A.**  <u>A TRO, Not a Receiver, is the Proper Form of Injunctive Relief</u>

As stated in Coffee Holding's motion for a TRO, preliminary injunctive relief in this case is warranted in order to preserve the rights of Coffee Holding and prevent irreparable injury to Coffee Holding pending a final determination on the merits.  *See Riverside Park Realty Co. v. Federal Deposit Ins. Corp.*, 465 F. Supp 305 (M.D. Tenn. 1978).  This Court should grant the injunctive relief because Coffee Holding has demonstrated all of the requirements for injunctive relief: (1) a substantial likelihood of prevailing on the merits; (2) irreparable injury will be suffered by Coffee Holding unless the injunction issues; (3) the threatened injury to Coffee

Holding outweighs whatever damage the proposed injunction would cause the other party; (4) if issued, the proposed injunction will not be adverse to the public interest. *See McDonald's Corp. v. Robertson*, 147 F.3d 1301 (11th Cir. 1998).

The remaining question is thus not whether injunctive relief should be granted but rather what kind of injunctive relief is appropriate – that is: whether a TRO or a court appointed receiver is the more equitable and proper relief.

The standard for appointing a receiver in federal court requires factors in addition to ordinary injunctive relief. However, as Coffee Bean's own cases state, although federal courts do recognize their inherent right to appoint a receiver, such appointment is exceedingly rare. *See Drob v. National Memorial Park, Inc.*, Del Ch. 254, 270 (1945) ("But a receiver will never be appointed except under special circumstances of great exigency and when some real beneficial purpose will be served thereby."); *see also Campbell v. Pennsylvania Industries*, 99 F. Supp. 199, 204 (D. Del. 1951) (denying plaintiff's motion to appoint a receiver and stating that a receiver would only be appointed "...where there is no other course available to remedy a situation that is inequitable….").

Factors a federal court analyses to justify appointing a receiver include: (1) existence of a valid claim by the moving party; (2) probability that fraudulent conduct has occurred; (3) imminent danger that property will be lost; (4) lack of a less drastic equitable remedy; and (5) the likelihood that appointment of a receiver will do more harm than good. *Meyer Jewelry Co. v. Meyer Holdings*, 906 F. Supp. 428, 432 (E. D. Mich. 1995). The last two factors are most important for the Court's consideration in this case as the first three have already been argued by Coffee Holding.

The facts of this case dictate that the granting of a TRO is less drastic because of the

4

relatively few creditors – namely Coffee Holding which is owed substantially more than all other creditors combined – and the relatively few assets that need to be distributed. All Coffee Holding is requesting is that Café La Rica suspend operations so that Coffee Holding can be paid. Appointing a receiver complicates and adds unnecessary time and expense to the process of winding down.

As previously stated, the appointment of a receiver will also do more harm than good – the receiver will likely exhaust what few assets are left of Café La Rica, depriving Coffee Holding (effectively Café La Rica's only creditor) of a significant percentage of the assets to pay its own fees and expenses.

Moreover, in a typical case in which a federal court appoints a receiver, the movant, or plaintiff, has been defrauded or has suffered some inequitable misconduct, such as a breach of fiduciary duty, as a result of the defendant's actions. *See Drob*, Del Ch. at 272. Thus, the purpose of the receiver is to protect the party that has been wronged by the defendant's misconduct. In this case, as evidenced by Coffee Holding's motion for a TRO, it is Coffee Holding, not Coffee Bean, which has been defrauded and harmed by Mr. Aguila's activities. The only party that needs protection is Coffee Holding – the party that invested significant amounts of money and property into Café La Rica – only for that money and property to be mismanaged and converted.

In light of the above, the Court should deny Coffee Bean's cross-motion to appoint a receiver and instead grant Coffee Holding's motion for a TRO in order that Café La Rica be wound up by the most cost effective method possible.

## CONCLUSION

Based on the foregoing, Coffee Holding respectfully requests that the Court: (1) deny Coffee Bean's cross-motion for the appointment of a receiver; (2) grant Coffee Holding's motion for a TRO; and (3) grant such other and further relief deemed just and proper.

Dated:   April 10, 2007

KATZ, BARRON, SQUITERO, FAUST
2699 S. Bayshore Drive, Seventh Floor
Miami, Florida 33133
Tel:  305-856-2444
Fax: 305-285-9227

By:     /s/Mark S. Auerbacher, Esq.
Florida Bar No. 978220
msa@katzbarron.com
John R. Squitero, Esq.
Florida Bar No. 121196
jrs@katzbarron.com

Christopher F. Graham, Esq.
Mary H. Mulhearn, Esq.
Thacher Proffitt & Wood LLP
Two World Financial Center
New York, New York 10281
Tel: (212) 912-7669
Fax: (212) 912-7751
CGraham@tpw.com

CO-COUNSEL FOR DEFENDANT-COUNTERCLAIMANT

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Jose.Ferrer@bakernet.com. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following recipients:

Jose Ferrer, Esq.
BAKER & McKENZIE LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131

*Counsel of Defendants*

/s/Mark S. Auerbacher, Esq.

# UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF FLORIDA
### Miami Division

### Case Number: 07-20389-CIV-MARTINEZ-BANDSTRA

COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

     Plaintiff,

vs.

COFFEE HOLDING, CO. INC., a Nevada
corporation

     Defendant-Counterclaimant

**DEFENDANT-COUNTERCLAIMANT'S REPLY IN FURTHER SUPPORT
OF DEFENDANT'S MOTION TO STRIKE CERTAIN PORTIONS
OF PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S
<u>MOTION FOR A TEMPORARY RESTRAINING ORDER</u>**

Defendant Coffee Holding Co., Inc ("Coffee Holding"), by and through its undersigned

counsel, hereby replies to Plaintiff Coffee Bean Trading-Roasting, LLC's ("Coffee Bean")

Response in Opposition to Defendant's Motion to Strike Certain Portions of Plaintiff's

Opposition to Defendant's Motion for a Temporary Restraining Order and in support thereof

states the following:

## I.    <u>PRELIMINARY STATEMENT</u>

In Coffee Bean's Opposition to Coffee Holding's Motion for a TRO, Coffee Bean, in an

attempt to divert the Court's attention from its own blatant disregard for the fact that Café La

Rica has been dissolved, introduced confidential, privileged e-mails among Coffee Holding's

counsel and Coffee Bean's counsel. Additionally, Coffee Bean misstated and took out of context a quote of Coffee Holding's counsel, Christopher Graham, made during settlement discussions.

Coffee Bean, in an effort to re-argue the merits of the case, continually misrepresents to the Court that it is Coffee Holding, and not Coffee Bean, who has interfered with the orderly wind-up of Café La Rica. There is no question, however, that although Coffee Bean may <u>say</u> that it is amenable to winding-down Café La Rica, its actions indicate that Coffee Bean, in conjunction with Mr. Ernesto Aguila, wants only one thing -- to go on operating Café La Rica to the exclusion of Coffee Holding.

Moreover, by focusing the Court on the roles the parties have played with respect to the winding-down of Café La Rica, Coffee Bean, yet again, shifts the Court's attention away from the only real matter at issue with respect to Coffee Holding's Motion to Strike – the inadmissibility of settlement negotiations pursuant to Fed. R. Evid. 408.

## II. <u>ARGUMENT</u>

### A. <u>The Privileged and Confidential Settlement Discussions are Clearly Inadmissible</u>

As stated in Coffee Holding's Motion to Strike, Pursuant to Rule 408 of the Fed. R. of Evid., evidence of conduct or statements made in compromise negotiations regarding the claim are inadmissible. *See* Fed. R. Evid. § 408 (a)(2).

Coffee Bean states that settlement discussions can be used for any purpose other than introducing the validity or invalidity or the amount of a disputed claim. (Response at 3). Coffee Bean then goes on to argue that because the settlement discussions are merely a rebuttal to the claims of Coffee Holding, the discussions are admissible. (Response at 5). This interpretation of the law is misguided.

Coffee Bean cannot introduce settlement discussions that go to the root of what Coffee Bean is trying to prove – that is that Coffee Holding, and not Coffee Bean, is the entity that is frustrating the process of winding-up Café La Rica. The argument is very simple, Coffee Bean cannot simply introduce clearly privileged and confidential settlement discussions purely to further the validity of its own claim.

In its Response, Coffee Bean states that it has not used the settlement discussions to further the argument that Coffee Holding is somehow unwilling to participate in an orderly winding down process – but rather only to contradict the "accusations" of Coffee Holding. First, Coffee Holding cannot flip its argument for its own goals. It is very clear that by contradicting Coffee Holding's argument, Coffee Bean is implying that it is Coffee Holding that has disrupted the winding-down process. This in turn furthers Coffee Bean's argument that Coffee Holding is somehow liable and is therefore a prohibited use of settlement discussions.

Moreover, the purpose of Rule 408 is to encourage parties to reach amicable settlements, not, as Coffee Bean would have it, only to protect the parties from introducing the validity or invalidity or the amount of a disputed claim. *See Central Soya Co. v. Epstein Fisheries, Inc.,* 676 F.2d 939, 944 (7th Cir. 1982); *see also Braman v. Woodfield Gardens Ass'n. Realcorp Investors,* 715 F.Supp. 226, 230 (N.D. Ill. 1989). If the Court were to allow all these settlement negotiations into evidence, the parties would surely be chilled from further settlement discussions for fear that anything said would be admissible.

Finally, Coffee Bean's accusations that Coffee Holding has somehow "made deliberate misrepresentations to the Court" is blatantly false. Coffee Holding's Motion for a TRO simply states the undisputed fact that Coffee Bean and Mr. Aguila continue to operate Café La Rica to the exclusion of Coffee Holding. As a result, Coffee Holding had no choice but to move for a

TRO in order to protect its remaining assets.  If anything, it has been Coffee Bean, not Coffee

Holding that has been misleading the Court.

In light of the above, the Court should grant Coffee Holding's Motion to Strike and deem

inadmissible the confidential, privileged settlement discussions introduced by Coffee Bean.

## <u>CONCLUSION</u>

Based on the foregoing, Coffee Holding respectfully requests that the Court strike and

deem inadmissible the settlement discussions submitted by Coffee Bean and grant other such

relief as is just and proper.

Dated:   April 13, 2007

KATZ, BARRON, SQUITERO, FAUST
2699 S. Bayshore Drive, Seventh Floor
Miami, Florida 33133
Tel:  305-856-2444
Fax: 305-285-9227

By: /s/  Mark S. Auerbacher, Esq.
      Florida Bar No. 978220
      msa@katzbarron.com
      John R. Squitero, Esq.
      Florida Bar No. 121196
      jrs@katzbarron.com

Christopher F. Graham, Esq.
Mary H. Mulhearn, Esq.
Thacher Proffitt & Wood LLP
Two World Financial Center
New York, New York 10281
Tel: (212) 912-7669
Fax: (212) 912-7751
CGraham@tpw.com

COUNSEL FOR DEFENDANT-COUNTERCLAIMANT

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Jose.Ferrer@bakernet.com.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following recipients:

> Jose Ferrer, Esq.
> BAKER & McKENZIE LLP
> Mellon Financial Center
> 1111 Brickell Avenue, Suite 1700
> Miami, Florida 33131

*Counsel of Defendants*

/s/Mark S. Auerbacher, Esq.

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.:  07-20389-CIV-MARTINEZ/BANDSTRA

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

       Plaintiff,

vs.

COFFEE HOLDING, CO., INC., a Nevada
corporation,

       Defendant.

_____/

### PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE IN
### OPPOSITION TO PLAINTIFF'S CROSS-MOTION TO APPOINT A RECEIVER

       Plaintiff, Coffee Bean Trading-Roasting, LLC ("Coffee Bean"), by and through its

undersigned counsel, hereby replies to Defendant, Coffee Holding, Co., Inc.'s ("Coffee

Holding"), Response (the "Response") in Opposition to Coffee Bean's Cross Motion to Appoint

a Receiver and states the following in support:

### PRELIMINARY STATEMENT

       Coffee Holding, in its Response, almost completely ignores Coffee Bean's arguments,

instead choosing to focus principally on the same inapposite and conclusory assertion made in its

Emergency Motion for Restraining Order that the only equitable remedy to orderly wind down

Café La Rica is to simply enjoin "Coffee Bean and Ernesto Aguila from exercising control over

Café La Rica[.]"  Coffee Holding's Response fails, however, to explain how simply enjoining

Mr. Aguila and Coffee Bean from exercising control over Café La Rica will contribute to the

orderly winding up of Café La Rica for the benefit of both of its members and all of its creditors.

Coffee Holding also fails to substantively address the ample body of case law cited in Coffee

Bean's Cross Motion which conclusively holds that the appointment of a receiver is appropriate where, as here, a deadlock exists with respect to the management of a company. To the contrary, Coffee Holding's only real argument is that the receiver should not be appointed because doing so would exhaust Café La Rica's assets to which Coffee Holding claims exclusive entitlement as the purported largest creditor of Café La Rica. Coffee Holding's arguments are entirely devoid of merit.

## ARGUMENT

1. <u>Merely Shutting Down Café La Rica Will Not Accomplish Its Winding Up.</u>

Coffee Holding's argument that simply shutting down Café La Rica, by enjoining Coffee Bean and Mr. Aguila from exerting control over it, is a better and less expensive option to wind up Café La Rica than the appointment of a receiver entirely ignores the winding up process set forth in the Operating Agreement. With regard to the winding up of Café La Rica, the Operating Agreement specifically provides that "[t]he winding up of the Company shall be completed when all debts, liabilities and obligations of the Company have been paid and discharged or reasonably adequate provisions therefore has been made, and all of the remaining Property of the Company has been distributed to the Members." *See* Operating Agreement at ¶ 13.4. It is not enough to simply shut down the operations of Café La Rica. In order to adequately accomplish the winding up of the Company, its assets must be garnered, its creditors and liabilities paid, and its remaining assets distributed to its members.

The Operating Agreement thus implicitly requires a certain level of cooperation between the members of Café La Rica in order to effectuate the winding up process. Decisions have to be made regarding what Café La Rica's assets are, what its liabilities are, who its current creditors are, and how much, if anything, is left for distribution to its members. Yet, because of the

undeniable deadlock that exists between Café La Rica's members, there can be no consensus regarding those decisions. The only reasonable alternative is for the Court to appoint a neutral third party that can perform those functions in the best interest of Café La Rica's creditors and members at large.

    2.    <u>Coffee Holding Has Failed To Rebut the Legal Arguments Made By Coffee Bean in Its Motion.</u>

Coffee Holding fails to address the ample body of case law cited by Coffee Bean in its Motion to Appoint Receiver which conclusively holds that the appointment of a receiver is appropriate where, as here, a deadlock exists with respect to the management of a company. Instead, Coffee Holding relies on a single case, *Meyer Jewelry Co. v. Meyer Holdings*, 906 F. Supp. 428, 432 (E.D. Mich. 1995), which simply lays out some of the factors that typically influence the district court's exercise of discretion when appointing a receiver, including "the existence of a valid claim by the moving party; the probability that fraudulent conduct has occurred or will occur to frustrate the claim; imminent danger that property will be lost, concealed, or diminished in value, inadequacy of legal remedies; lack of a less drastic equitable remedy; and the likelihood that appointment of a receiver will do more harm than good." Based on this holding, Coffee Holding argues that Coffee Bean's motion to appoint a receiver should be denied in favor of the purportedly less drastic remedy afforded by simply enjoining Coffee Bean and Mr. Aguila from exerting control over Coffee Bean. However, for the reasons more fully set forth above, simply shutting down the operations of Café La Rica, by enjoining the actions of Mr. Aguila and Coffee Bean, will not result in the orderly winding up of Café La Rica contemplated under the Operating Agreement.

Coffee Holding also argues that this case does not present the typical case in which a federal court appoints a receiver because Coffee Bean does not claim to have "been defrauded or

have suffered some inequitable misconduct, such as a breach of fiduciary duty, as a result of [Coffee Holding's] actions." *See* Response at p. 5. Coffee Holding argues that "[t]he only party that needs protection is Coffee Holding[,]" given its purported greater investment of money in Café La Rica than Coffee Bean and its purported status as Café La Rica's largest creditor. *See* Response at p. 5. Coffee Holding's argument has no basis in fact or law.

First, Coffee Holding has failed to substantiate any of its assertions regarding the amount of its purported investment in Cafe La Rica or the amounts purportedly owed to it by Café La Rica with any evidentiary support. Such naked and factually unsupported claims cannot justify the denial of Coffee Bean's motion to appoint a receiver. Second, if the threshold requirement for the appointment of a receiver is alleging a breach of fiduciary duty (which Coffee Bean disagrees is even a prerequisite for the appointment of a receiver), then Coffee Bean has met this requirement by having sued Coffee Holding in this action for, among other things, breach of fiduciary duty. Third, to the extent that Coffee Holding is in fact the largest creditor of Café La Rica and needs to be "protected," the appointment of a receiver will serve to protect its interests as well as those of all other creditors of Café La Rica alike.

## CONCLUSION

Coffee Holding concedes that its true motive for opposing the appointment of a receiver is its desire to force a preferential payment to itself to the detriment of Coffee Bean and Café La Rica's other creditors. *See* Response at p. 5 ("All Coffee Holding is requesting is that Café La Rica suspend operations so that Coffee Holding can be paid."). Coffee Holding is simply not entitled to priority or preference of payment over Coffee Bean or the other creditors of Café La Rica. Under the circumstances presented, and for the reasons more fully set forth in Coffee

Bean's Motion to Appoint Receiver and this Reply, the Court should appoint a neutral receiver to orderly wind up the business and affairs of Café La Rica.

Respectfully submitted,

BAKER & McKENZIE LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131
Telephone: (305) 789-8900
Facsimile: (305) 789-8953

By: ____/s/ Jose M. Ferrer_____
Jose M. Ferrer
Florida Bar No. 173746

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served this 13th day of April, 2007 by facsimile and U.S. Mail upon Mark S. Auerbacher, Esq. and John R. Squitero, Esq., Katz Barron Squitero Faust, 2699 S. Bayshore Drive, Seventh Floor, Miami, Florida 33133; and Christopher F. Graham, Esq., Thacher Proffitt & Wood LLP, Two World Financial Center, New York, New York 10281.

By: ____/s/ Jose M. Ferrer_____
Jose M. Ferrer

MIADMS/308416.1

5

**UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

**Case Number:  07-20389-CIV-MARTINEZ-BANDSTRA**

COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

      Plaintiff,

vs.


COFFEE HOLDING, CO. INC., a Nevada
corporation

      Defendant-Counterclaimant.

---

**DEFENDANT-COUNTERCLAIMANT COFFEE HOLDING, CO. INC.'S**
**OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS CERTAIN**
**COUNTS OF DEFENDANT'S COUNTERCLAIM**

      Defendant-Counterclaimant Coffee Holding Co., Inc ("Coffee Holding") hereby opposes

Plaintiff Coffee Bean Trading-Roasting LLC's ("Coffee Bean") Motion to Dismiss Certain

Counts of Defendant's Counterclaims and in support thereof states as follows:

<h2 style="text-align:center">I.     <u>PRELIMINARY STATEMENT</u></h2>

      Coffee Bean's Motion to Dismiss Coffee Holding's Counterclaims is based upon one

argument – that somehow, Mr. Ernesto Aguila, a member of Coffee Bean, did not act as an agent

for Coffee Bean, and as a result, Coffee Bean cannot be held liable for any of his acts.  This

argument is nothing short of absurd.  Mr. Aguila has always acted as a representative and agent

of Coffee Bean.  It is impossible to now argue that Coffee Bean and its CEO, Alberto Lensi, did

not have knowledge and control over the actions of Mr. Aguila.  First, Mr. Lensi and Mr. Aguila

approached Mr. Gordon of Coffee Holding jointly on behalf of Coffee Bean. Second, Mr. Aguila always acted as a representative of Coffee Bean. Finally, as stated in Mr. Aguila's own affidavit filed with this Court, he and Mr. Lensi acted in concert when they refused to make the payments owed to Coffee Holding after Café La Rica's dissolution, and together initiated this lawsuit. To suddenly transform Mr. Aguila's role from managing member and agent of Coffee Bean to rogue employee is a blatant misrepresentation used by Coffee Bean to conveniently shield itself from liability. As such, the Court should properly deny Coffee Bean's motion to dismiss.

## II.     STATEMENT OF FACTS

The Court is respectfully referred to Coffee Holding's Answer, Affirmative Defenses and Counterclaims, as well as other motions and affidavits filed with this Court, for a complete recitation of the facts pertinent to this case. For purposes of this motion, the facts are as follows below.

In early 2006, Mr. Lensi, Mr. Aguila and Mr. Andrew Gordon, CEO of Coffee Holding, decided to form a new LLC -- Café La Rica. (*See* Exhibit A). Café La Rica was to have two members: Coffee Bean Trading-Roasting, LLC (owned by Mr. Lensi and Mr. Aguila) and Coffee Holding. *See Id*. Mr. Aguila was to manage the day-to-day affairs of the new company; Mr. Gordon, who was intended to be a strategic partner, was to provide certain management services, including accounting. *See Id*; s*ee also* March 19, 2007 Affidavit of Andrew Gordon ("Gordon Affidavit"). It is important to note that although Mr. Lensi did communicate via e-mail with Mr. Gordon, Mr. Lensi has never met Mr. Gordon and it was Mr. Aguila who engaged in all negotiations on behalf of Coffee Bean.

2

Each member of Café La Rica was to have a role in its management – Coffee Holding would be represented through Mr. Gordon, and Coffee Bean would be represented through Mr. Aguila. In fact, pursuant to a letter dated March 10, 2006, outlining the terms of Mr. Aguila's employment with Café La Rica, Mr. Aguila is referred to as a Member of the Board of Managers of Café La Rica. Should Mr. Aguila be considered for termination, however, his position on the Board of Managers would be "substituted for <u>any other member of The Coffee Bean Trading-Roasting LLC</u>…" (*See* Exhibit B). Thus, it was clear, from the inception of Café La Rica, that Mr. Aguila would serve as a representative of Coffee Bean.

Over the course of the year, however, Café La Rica failed. (Gordon Affidavit at ¶ 3). As such, by letter dated February 5, 2007, Mr. Gordon informed both Café La Rica and Coffee Bean that due to a material breach of the Expense Sharing and Services Agreement, Café La Rica had been dissolved.[1] *Id.*

Almost immediately, Mr. Aguila and Mr. Lensi decided to refuse to pay Mr. Gordon's company, Coffee Holding, what is was owed. *See* February 13, 2007 Affidavit of Ernesto Aguila at ¶ 6 ("Aguila Affidavit"). Mr. Aguila then changed the passcodes of Café La Rica's Washington Mutual bank account and withdrew $20,000 from the same account. (Gordon Affidavit at ¶ 3). Moreover, Mr. Aguila set up another bank account in the joint name of Café La Rica and Coffee Bean Roasting, LLC. (*Id.* at ¶ 7).

On February 13, 2007, Coffee Bean and Mr. Lensi, in concert with Mr. Aguila, filed with this Court an *ex parte* Motion for a Temporary Restraining Order ("TRO") and a Verified Complaint alleging various baseless claims against Coffee Holding including, among others,

---

[1]     It should be noted that Mr. Gordon addressed his letter to Café La Rica, with attention to Mr. Ernesto Aguila and addressed his letter to Coffee Bean, with attention to both Mr. Lensi, at a Swiss address, <u>and</u> Ms. Sonja Aguila, Ernesto's wife (who at that time was actually also an employee of Café La Rica) at a Miami address. *See* Exhibit C.

breach of contract and breach of fiduciary duty. On February 16, 2007, pursuant to a court hearing, this Court denied Coffee Bean's motion for a TRO.

Importantly, Mr. Aguila attended that hearing as a representative of both Coffee Bean and Café La Rica. At least, at a minimum, it appeared to Mr. Gordon, that Mr. Aguila was at that hearing on behalf of both Coffee Bean and Café La Rica. Now, Coffee Bean, in a blatant attempt to hide behind the corporate form of Café La Rica, argues that it had no control over Mr. Aguila and thus cannot be held accountable for his acts.

## III.    MEMORANDUM OF LAW

### A.    Plaintiff Has Not Met the Legal Standard for a Motion to Dismiss

As a threshold matter, federal courts apply a rigorous legal standard when deciding a motion to dismiss pursuant to Rule 12 of the Federal Rules of Civil Procedure. In fact, a court should not grant a motion to dismiss "unless it appears *beyond doubt* that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Financial Security Assur., Inc. v. Stephens, Inc.* 450 F.3d 1257, 1262 (11th Cir. 2006) *citing Conley v. Gibson,* 355 U.S. 41, 45-46 (1957) (emphasis added). On a motion to dismiss, the court must construe the complaint in the light most favorable to the plaintiff and accept the factual allegations as true. *SEC v. ESM Group, Inc.,* 835 F.2d 270, 272 (11th Cir. 1988); *South Fla. Water Mgmt. Dist. v. Montalvo,* 84 F.3d 402, 406 (11th Cir. 1996). Moreover, a motion to dismiss for failure to state a claim merely tests the sufficiency of the complaint, it does not decide the merits of the case. *See Milburn v. United States,* 734 F.2d 762, 765 (11th Cir. 1984).

In the instant case, Plaintiff falls far short of the standard for a motion to dismiss. All of Coffee Holding's counterclaims have been properly pled. Coffee Bean's sole argument rests on its refusal to accept the fact that Mr. Aguila, in his role as the manager of Café La Rica acted

with, at a minimum, apparent authority on behalf of Coffee Bean.  Coffee Holding, throughout

its counterclaims, has properly asserted that Mr. Aguila was Coffee Bean's agent.  As such, Mr.

Aguila's actions can be imputed to Coffee Bean and the Court should properly deny Coffee

Bean's motion to dismiss.

**B.**      **Mr. Aguila Acted in the Capacity of Coffee Bean's Agent**

    1.    Coffee Bean Granted Mr. Aguila Implied Authority to Act on its Behalf

It is a fundamental tenet of law that one who delegates power to act is responsible for

what is done with that authority.  *See Mechell v. Palmer*, 343 A. 2d 620 (1975).  Thus, provided

an agent is acting within the scope its authority, a principal may be held liable for the acts of its

agent.  *In re Brandywine Volkswagen,* 306 A.2d 24, 27, *aff'd,* Del.Supr., 312 A.2d 632 (1973).

The authority of an agent may fall generally into two categories: actual and apparent.

*Petition of Mulco Products*, 123 A. 2d 95, 103 (Del. Super. 1956).  Actual authority is divided

into express and implied authority.  *Id.*  Express authority is authority given directly from the

principal to the agent.  *Id.*  Implied authority, however, is actual authority to act which is implied

from the circumstances and the relationship between the principal and agent – it does not depend

directly on any express grant of authority.  *See Guyer v. Haveg Corporation*, 205 A.2d 176, 180

(Del. Super. 1964).  Thus, the issue of actual authority, whether express or implied, is a fact

based analysis and is decided by scrutinizing the relationship of the principal and agent.  *Mulco*

*Products*, 123 A. 2d at 103; *see also Mechell v. Palmer*, 343 A. 2d 620, 620 (Del. 1975) (holding

that a delegation of power to act on another's behalf may be proved by deductions or inferences,

including words and conduct of the parties).

In scrutinizing the relationship between Coffee Bean and Mr. Aguila it is clear that not

only did Coffee Bean grant implied authority to Mr. Aguila, but that all of Mr. Aguila's actions

were done within the scope of that authority.

First, Mr. Lensi, CEO of Coffee Bean, and Mr. Aguila acted and made decisions together and on behalf of Coffee Bean. *See* Aguila Affidavit at ¶ 6. Second, Café La Rica was managed by two different entities. Mr. Gordon took on certain management functions such as providing accounting. Importantly, as a manager of Café La Rica but a member of Coffee Holding, Mr. Gordon necessarily represented the interests of Coffee Holding. Mr. Aguila, similarly, through his status of manager of Café La Rica but member of Coffee Bean, represented the interests of Coffee Bean.

Thus, Mr. Aguila acted on behalf of Coffee Bean and represented Coffee Bean's interests – as a result, Coffee Bean delegated, at a minimum, implied authority to Mr. Aguila to act on its behalf and should thus be held liable for Mr. Aguila's actions.

Finally, everything that Mr. Aguila did was within the scope of the implied authority delegated to him by Coffee Bean. All of Mr. Aguila's actions, including converting $20,000 and opening up a new joint bank account between Café La Rica and Coffee Bean Roasting were done in order to ensure the continuation of Café La Rica despite its dissolution for the benefit of Coffee Bean.

As such, Coffee Holding has sufficiently pled that Mr. Aguila acted as the agent of Coffee Bean and that his actions were taken within that authority -- the Court should thus deny Coffee Bean's motion to dismiss.

2. Mr. Aguila, at a Minimum, had Apparent Authority to act on Behalf of Coffee Bean

Although Mr. Aguila was not an employee of Coffee Bean, it is clear that Mr. Aguila, in his role as member of Coffee Bean acted with, at a minimum, apparent authority on behalf of Coffee Bean. Apparent authority, or whether one is the "apparent servant or agent" of another

6

depends not on the technical employment status of a particular individual but rather on manifestations by one party which lead <u>third</u> parties to believe another is his agent. *Billops v. Magness Const. Co.*, 391 A. 2d 196, 198 (1978) (emphasis added).

When dealing with apparent authority, the emphasis shifts to a third party's reliance on the words or conduct of the agent, as opposed to any express or implied grant of authority by the principal. *Id.* The dispositive factor, therefore, in determining whether a principal is bound by the acts of his agent when dealing with a third person is not so much upon the actual authority given, or intended to be given by the principal, but what the <u>third person</u> was led to believe by the agent. *Frye v. E. I. DuPont de Nemours & Co*., 151 A. 537, 540 (1930).

Although apparent authority is not actual authority, once the authority of the agent has been established, and it is shown that the third party relying on the apparent authority relied in good faith and was justified from all the circumstances in so relying, the principal is bound to the same extent as though actual authority had existed. *See Id.*

In this case, it is very clear that Mr. Aguila acted as if he were the agent of Coffee Bean. More importantly, the third party, Mr. Gordon, was led to believe that everything Mr. Aguila did was done in concert with Mr. Lensi, CEO of Coffee Bean, and on behalf of Coffee Bean.

First, Mr. Aguila and Mr. Lensi approached Mr. Gordon together as members of Coffee Bean. Second, throughout Café La Rica's existence, Mr. Aguila led Mr. Gordon to believe that all of his actions were taken on behalf of Coffee Bean. In fact, it was Mr. Aguila who negotiated the original terms of Café La Rica with Mr. Gordon. As stated above, Mr. Aguila's employment agreement indicated that he served on the Board of Managers as a representative of Coffee Bean. And, importantly, when Mr. Aguila opened up a new unauthorized bank account for Café La Rica, he opened a joint account in the names of Café La Rica <u>and</u> Coffee Bean Roasting.

7

Finally, when Coffee Bean first initiated this lawsuit against Coffee Holding, Mr. Gordon understood that it was Mr. Aguila and Mr. Lensi who had brought the action on behalf of Coffee Bean; it was Mr. Aguila who attended the hearing.

Only now, out of convenience, does Coffee Bean attempt to argue that it had no authority, control or knowledge over Mr. Aguila and thus cannot be held liable for his actions. Mr. Aguila and Coffee Bean have always acted together – to now claim otherwise is simply a blatant attempt by Coffee Bean to shield itself behind the corporate veil of Café La Rica in order to escape liability.

**C.     Coffee Holding has Standing to Bring a Claim of Conversion Against Coffee Bean**

In a conclusory fashion, Coffee Bean asserts that Coffee Holding has no standing to bring a conversion claim against Coffee Bean.  Coffee Bean states that Coffee Holding has "failed to allege that at the time of the alleged conversion it had an interest in or a right to possession of the property." (Motion to Dismiss at 7).  This argument is simply not grounded in either fact or law. Coffee Holding not only has alleged that is it a member of Café La Rica, with a 50% ownership interest, but that Coffee Holding is owed, among other things, over $400,000 from Café La Rica. (*See* Counterclaim at p. 9 and ¶¶ 12, 13).  Thus, clearly, Coffee Holding has sufficiently alleged that it has an interest in Café La Rica and has therefore properly pled its conversion claim against Coffee Bean.  In light of the above, the Court should deny Coffee Bean's Motion to Dismiss.

[TPW: NYLEGAL:662656.3] 19499-00009  04/16/2007 05:10 PM

# CONCLUSION

Based on the foregoing, Coffee Holding respectfully requests that the Court deny Plaintiff's Motion to Dismiss Certain Counts of Defendant's Counterclaim and grant such other and further relief deemed just and proper.

Dated: April 16, 2007
Miami, Florida

Katz, Barron, Squitero, Faust
2699 S. Bayshore Drive, Seventh Floor
Miami, Florida 33133
Tel:  305-856-2444
Fax: 305-285-9227

By:   /s/Mark S. Auerbacher
Mark S. Auerbacher, Esq.
Florida Bar No. 978220
msa@katzbarron.com
John R. Squitero, Esq.
Florida Bar No. 121196
jrs@katzbarron.com

Christopher F. Graham, Esq.
CGraham@tpw.com
Mary H. Mulhearn, Esq.
Mmulhearn@tpw.com

Thacher Proffitt & Wood LLP
Two World Financial Center
New York, New York 10281
Tel: (212) 912-7669
Fax: (212) 912-7751

COUNSEL FOR DEFENDANT-COUNTERCLAIMANT

[TPW: NYLEGAL:662656.3] 19499-00009  04/16/2007 05:10 PM

## CERTIFICATE OF SERVICE

I hereby certify that on April 16, 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Jose.Ferrer@bakernet.com. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following recipients:

Jose Ferrer, Esq.
BAKER & McKENZIE LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131

*Counsel of Defendants-Counterclaimants*

/s/Mark S. Auerbacher, Esq.

[TPW: NYLEGAL:662656.3] 19499-00009  04/16/2007 05:10 PM

# EXHIBIT A

Case 2:07-cv-03289-JE Document 46-2 Filed 10/26/2007 Page 2 of 8
Partnership Case 2:07-cv-03289-JE Document 52-30 Filed 05/20/2004/16/2007 Page 2 of Page 2 of 8

**From:** HEC [mailto:comjet@bluewin.ch]
**Sent:** Friday, January 13, 2006 12:05 PM
**To:** Andy Gordon
**Cc:** eaguila@cafelarica.com
**Subject:** Partnership

My name is Alberto Lensi. Our company „Coffee Bean Trading Holding LLC" owns 50% of "Coffee Bean Trading and Roasting LLC" the other 50%, are owned by Ernesto and Sonja Aguila. We are the only investors at the moment on the company that also owns the trade name "Café La Rica".

I just received your e-mail regarding Coffee Holding Company Inc.'s interest to make an investment to become 50% partner in our company.

Our company has been looking for some time for a partner and you could be our ideal strategic partner. I am very pleased to directly discuss with you the term of the partnership that you proposed, in more details.

Following your proposal, I will need the following clarifications:

1.) __Installing a new brick pack machine__

I will need to know the value of the machine, if it is a new or a used one and the production that this machine will do.

Note: We will eventually need, to growth, other equipments as another grinder, another roaster and another fractional packing machine, to add to our existing equipments in function of the production that you are foreseeing for the company expansion. Are those equipments, if needed, also part of your investment, even if you already have some of this equipment in your facility which you could relocate in our new warehouse?

2.) __Purchasing green coffee and packaging material__
I will need to know which amount of pounds and dollars you think you will invest at the beginning to start the production, for "Café La Rica" and other clients, our and yours.

3.) __Other working capital as need__
Looking at our monthly expenses and with the addition of some other personnel to run

4/16/2007

Case 1:07-cv-20389-JEM Document 18-2 Entered on FLSD Docket 04/16/2007 Page 3 of 8

the company, the rent of the new warehouse, and all other additional expenses we will need, could you tell   me what you think will be your investment, as needed?

### New items to clarify

**4.)**    New warehouse – what size do you think will we need for our production plus the addition of new business coming also from your company?

**5.)**    What amount of your business and new business you expect to be roasted and packaged by the new facility, beside our actual production?

**6.)**    For new business you will provide to the new facility as partners, what margin will be por pound as average to cover production and all operating expenses    and profit?

**7.)**    For eventual toll roasting, from your existing business or other, which margin will be for the facility towards production and all operation expenses and profit?

**8.)**    Please clarify, as Ernesto gave to me unclear information, if part of your investment to purchase 50% of our company, you are willing to pay also a lump sum to our company, Ernesto was telling   me about $ 250'000.--, is this  correct or wrong?

I think that we can conclude an agreement in short time. In order to accelerate negotiations please deal directly with me, to avoid any possible misunderstandings.

My best regards,

Alberto Lensi

My contacts:   Dubihuus
                3780 Gstaad
                Switzerland

                Mobile: +33 612 26 6000
                Fax: +41 33 748 66 21
                E-mail: comjet@bluewin.ch

4/16/2007

# EXHIBIT B

March 10, 2006

**_PERSONAL & CONFIDENTIAL_**

Mr. Ernesto Aguila
7030 North Augusta Drive
Miami, FL 33015

Dear Ernesto:

I am pleased that you will be joining Café La Rica, LLC (the "Company") as Sales Manager and the Company would like to set forth below the terms of your employment in this letter agreement, as follows:

1.  You will be employed by the Company as Sales Manager and will also be on the Board of Managers of the Company pursuant to the operating agreement governing the Company (the "Operating Agreement").

2.  Your annual compensation on a salary basis shall be at the annual rate of ONE HUNDRED TWENTY THOUSAND DOLLARS ($120,000) per year, payable in installments in accordance with the prevailing payroll practices of the Company, and you will be entitled to a discretionary annual bonus based upon performance objectives as determined by the Board of Managers of the Company.

3.  You will be included in the hospitalization and other insurance plans of Coffee Holding Co., Inc. You will be subject to all of the terms and conditions of those plans, including eligibility provisions and applicable contribution requirements.

4.  Your employment will be on at "at-will" basis, meaning that either you or the Company may terminate employment relationship at any time with or without notice or cause; *provided however*, that if your employment is terminated by the Company for any reason other than "cause" (as defined herein) prior to the dissolution of the Company, the Company shall pay to you your annual rate of compensation (as of the date of termination of employment) for one (1) year payable in installments in accordance with the prevailing payroll practices of the Company. Your employment with the Company shall automatically terminate upon the dissolution of the Company (with no amounts payable to you under this letter agreement after such dissolution) or upon the determination by the Board of Managers of the Company (for this purpose the Board of Managers shall consist of those Managers other than yourself with your position as Manager being

Mr. Ernesto Aguila
March 10, 2006

Page 2.

substituted for any other member of The Coffee Bean Trading-Roasting LLC) that you have, through omission, act or action or series of omissions, acts or actions, created grounds for termination for "cause" which shall mean:

      (i)     your material dishonesty including, without limitation, theft, fraud, embezzlement, financial misrepresentation or other similar behavior or action in his dealings with or with respect to the Company or any Venture Member (as such term is defined in the Operating Agreement) or any entity with which the Company or Venture Member, shall be engaged in or be attempting to engage in commerce; or

      (ii)    your conviction for, or your entry of a plea of guilty or *nolo contendere* to, the commission of a felony.

5.     The amounts and benefits described hereunder shall be owed by the Company.

Ernesto, please review this letter, sign and date the original in the space provided below, and return the original in the attached, stamped, self-addressed envelope. An extra copy is attached for you.

Sincerely,


Andrew Gordon
On behalf of
Café La Rica, LLC



Agreed: _____

Date: _____

# EXHIBIT C

**Coffee Holding Co., Inc.**
**4401 First Avenue**
**Brooklyn, NY  11232**
**U.S.A.**

February 5, 2007

**VIA FACSIMILE &**
**OVERNIGHT COURIER**

Board of Managers of Café La Rica, LLC
Attn:   Ernesto Aguila
Café La Rica , LLC
2131 NW 72nd Avenue
Miami, FL  33122

The Coffee Been Trading-Roasting LLC
c/o Comjet AG
Dubihuus
3780 Gstaad
SWITZERLAND
011-41-33-748-6621 (facsimile)
and
5701 Miami Lakes Drive East
Miami Lakes, FL  33014
Attn:  Sonia Aguila

Re:     **Dissolution and Winding Up of Café La Rica, LLC**

Ladies and Gentlemen:

Please be advised that in accordance with Section 13.1(e) of the Limited Liability Company Agreement of Café La Rica, LLC (the "*LLC Agreement*"), Café La Rica, LLC a Delaware limited liability company, (the "*LLC*") has been dissolved due to a material breach of that certain Expense Sharing Agreement dated March 2006 between the LLC and its member, Coffee Holding Co., Inc. ("*CHC*").

Please have your attorneys contact CHC's attorneys at Thacher Proffitt & Wood LLP (Matthew Dyckman at (202) 347-5647 or Michael Helmer at (908) 598-5757) to discuss an orderly winding up of the LLC business and liquidation of the LLC's assets.

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.: 07-20389-CIV-MARTINEZ/BANDSTRA

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

       Plaintiff,

vs.

COFFEE HOLDING, CO., INC., a Nevada
corporation,

       Defendant.

_____/

## JOINT SCHEDULING REPORT

      Plaintiff, Coffee Bean Trading-Roasting, LLC ("Coffee Bean"), and Defendant, Coffee

Holding Co., Inc. ("Coffee Holding"), pursuant to this Court's February 14, 2007 Order

Requiring Parties to Meet and File Joint Scheduling Report and Proposed Order and Directing

Parties to File Certificates of Interested Parties (the "Order"), requiring compliance pursuant to

S.D. Fla. L.R. 16.1, and following a joint scheduling conference held telephonically on April 18,

2007, file their Joint Scheduling Report as follows:

      1.    <u>The likelihood of settlement</u>:  The parties have discussed settlement and will

further explore settlement alternatives.  However, it is too early in the litigation to determine the

likelihood of settlement.

      2.    <u>The likelihood of appearance in the action of additional parties</u>:  Coffee Bean

does not currently anticipate having to join additional parties in this litigation.  Coffee Holding

may assert additional claims against Ernesto Aguila in his individual capacity.

      3.    <u>Proposed limits on the time</u>:

         (i)    <u>To join other parties and to amend the pleadings</u>: August 7, 2007.

    (ii)    <u>To file and hear motions</u>:  All pretrial motions, except motions for summary judgment, shall be filed not later than November 9, 2007. Motions for summary judgment shall be filed not later than October 8, 2007.

    (iii)    <u>To complete discovery</u>:  Discovery, including expert discovery, shall be completed not later than October 2, 2007.

4.    <u>Proposals for the formation and simplification of issues, including the elimination of frivolous claims or defenses</u>:  The parties have no such proposals at this time.

5.    <u>The necessity or desirability of amendments to the pleadings</u>:  Neither party presently foresees having to amend their pleadings, other than as necessary to add additional parties as discussed above.

6.    <u>The possibility of obtaining admissions of facts and of documents which will avoid unnecessary proof, stipulations regarding authenticity of documents and the need for advanced rulings from the Court on admissibility of evidence</u>:  Plaintiff believes that there is a possibility that the parties will admit or stipulate to certain facts as pleaded and as to the authenticity of certain documents.  The parties do not anticipate the need for any advanced rulings from the Court on admissibility of evidence.

7.    <u>Suggestions for the avoidance of unnecessary proof and of cumulative evidence</u>:  The parties agree that they will cooperate to attempt to avoid unnecessary proof concerning facts and documents.

8.    <u>Suggestions on the advisability of referring matters to a magistrate, judge or master</u>:  The parties agree to have all non-dispositive matters referred to a magistrate judge or special master.

9.    A preliminary estimate of the time required for trial: The parties' preliminary estimate of the time required for trial is one (1) to three (3) days.

10.    Requested date or dates for conference before trial, a final pre-trial conference and trial: The parties request a pre-trial conference not earlier than on November 30, 2007 and a trial date during the week commencing on December 17, 2007.

11.    Any other information that might be helpful to the Court in setting the case or status and pre-trial conference: The parties have no further information to report at this time.

12.    Whether the Trial will be Jury or Non-Jury: The trial of this cause will be non-jury.

13.    An outline of the legal elements of each claim and defense raised by the pleadings: Coffee Bean has sued Coffee Holding for alleged tortious conduct and breaches of contract. Coffee Bean's complaint includes both individual claims and derivative claims asserted on behalf of Café La Rica. The complaint asserts counts for breach of contract, breach of fiduciary duty, breach of the implied contractual covenant of good faith and fair dealing, and accounting. Coffee Bean alleges that Coffee Holding has (1) breached the parties' operating agreement by failing to provide Coffee Bean with certain required financial statements; (2) breached its fiduciary duties to Coffee Bean and Café La Rica by overcharging Café La Rica for certain management services that Coffee Holding provided and coffee that Coffee Holding sold to Café La Rica; and (3) breached its fiduciary duty to Coffee Bean and Café La Rica, and breached an implied contractual covenant of good faith and fair dealing, by exaggerating the amounts of coffee it sold to Café La Rica and/or invoicing Café La Rica for coffee that Coffee Holding never delivered. Coffee Bean has requested an accounting of all amounts claimed due by Coffee Holding for its purported sales of coffee to Café La Rica.

Coffee Holding has raised the following affirmative defenses to Coffee Bean's claims: (1) that Coffee Bean, not Coffee Holding, was the proximate cause of any damages suffered; (2) that the action was brought in an improper venue, (3) that Coffee Bean has failed to state a claim upon which relief may be granted, (4) that Coffee Bean is barred from obtaining relief by the doctrine of unclean hands, (5) that Coffee Bean does not have standing to maintain its claims individually or derivatively on behalf of Café La Rica, (6) the Coffee Bean is barred from recovery based on the doctrines of laches, waiver and estoppel, (7) that Coffee Bean has failed to plead it claims with reasonable particularity, and (8) that Coffee Bean failed to mitigate any damages sustained by Coffee Bean or Café La Rica.

Coffee Holding has filed a counterclaim against Coffee Bean also for alleged tortious conduct and breach of contract. Coffee Holding's counterclaim contains six counts pursuant to which Coffee Holding seeks to recover money damages from Coffee Bean which Coffee Holding claims to have suffered when Café La Rica's sales manager, Ernesto Aguila, allegedly mismanaged Café La Rica and converted its receivables to his own use. Specifically, Coffee Holding alleges that Coffee Bean, through Mr. Aguila, (1) changed the passcodes on Café La Rica's operating account, withdrew $20,000 from that operating account, converted $170,000 worth of account receivables for his personal use or the use by Coffee Bean, and mismanaged corporate assets by leasing a car that costs Café La Rica $700 a month and hiring his wife at an annual salary of $40,000; (2) tortiously interfered with an expense sharing agreement between Coffee Holding and Café La Rica, and otherwise with the business relationship that existed between Coffee Holding and Café La Rica, by intentionally ordering significant amounts of coffee from Coffee Holding knowing that Café La Rica would be unable to pay Coffee Holding and by cutting off Coffee Holding's online access to the security cameras that Coffee Holding

uses to monitor Café La Rica's premises; and (3) breached the Operating Agreement by bringing this action prior to having exhausted the dispute resolution procedure set forth in the Operating Agreement. Coffee Holding also seeks permanent and preliminary injunctive relief to enjoin Coffee Bean and Mr. Aguila from continuing to operate the business of Café La Rica.

Coffee Bean has moved to dismiss Counts I through VI of Coffee Holding's counterclaim, arguing that the alleged acts that form the basis of those counts were allegedly taken by Mr. Aguila, either individually or within the scope of his employment as Café La Rica's sales manager. Coffee Bean also argues that Coffee Holding has no standing to allege conversion against Coffee Bean since the money allegedly stolen never belonged to Coffee Holding. With respect to the remaining counts of Coffee Holding's counterclaim, Coffee Bean has asserted the following two affirmative defenses: (1) that Coffee Holding is estopped and is otherwise barred from claiming a breach of the parties' operating agreement because Coffee Holding rejected Coffee Bean's attempts to invoke the dispute resolution process set forth in the operating agreement; and (2) that Coffee Holding's claims for temporary and permanent injunctive relief are barred because Coffee Holding has an adequate remedy at law.

14.    <u>A good faith estimate of the specific dollar valuation of actual damages and other relief at issue</u>: The parties are unable at this early stage of the proceedings to determine the specific dollar value of actual damages suffered as a result of the alleged acts described in the pleadings.

15.    <u>The need for variance from the discovery limitations imposed by Local Rule and/or the Federal Rules of Civil Procedure, including the grounds supporting the requested variance</u>: At this time, the parties do not foresee the need for any changes in the limitations on

discovery imposed by the Federal Rules of Civil Procedure or the Local Rules of the United

States District Court for the Southern District of Florida.

Respectfully submitted and dated by the parties this ____ day of April, 2007.

BAKER & McKENZIE LLP
Counsel for Plaintiff
Mellon Financial Center, Suite 1700
1111 Brickell Avenue
Miami, Florida 33131
Tel:   (305) 789-8900
Fax:   (305) 789-8953


By: _____
        Jose M. Ferrer
        Florida Bar No. 173746

KATZ, BARRON, SQUITERO, FAUST
Counsel for Defendant
2699 S. Bayshore Drive, Seventh Floor
Miami, Florida 33133
Tel:   (305) 856-2444
Fax:   (305) 285-9227


By: _____ FBN 0181145
        Mark S. Auerbacher
        Florida Bar No. 978220
        John R. Squitero
        Florida Bar No. 121196

Co-counsel:

Christopher F. Graham
Thacher, Proffitt & Wood, LLP
Two World Financial Center
New York, New York 10281
Tel:   (212) 912-7669
Fax:   (212) 912-7751


MIADMS/308576.1

<u>Pretrial Deadlines and Trial Date</u>

**DATE**
month/day/year

August 7, 2007   Joinder of Additional Parties and motions for class certification.

August 17, 2007   Parties shall exchange expert witness summaries and reports as required by Local Rule 16.1.K.

August 27, 2007   Parties shall exchange written lists containing the names and addresses of all witnesses intended to be called at trial and only those witnesses listed shall be permitted to testify.

September 7, 2007   Parties exchange rebuttal expert witness summaries and reports as required by Local Rule 16.1.K. <u>Note</u>: These provisions pertaining to <u>expert</u> witnesses do not apply to treating physicians, psychologists or other health providers (if a <u>Daubert</u> or <u>Markman</u> hearing may be necessary, the parties are to add that as an additional deadline at the bottom of Attachment A).

October 2, 2007   All discovery, including expert discovery, shall be completed.

October 17, 2007   A mediator must be selected.

October 8, 2007   All summary judgment, *Daubert,* and other dispositive motions must be filed.  A <u>minimum of eight (8) weeks</u> is required for the Court to review dispositive motions prior to filing of the joint pretrial stipulation.  If <u>no</u> dispositive motions will be filed, clearly note this fact in the Joint Scheduling Report.

November 19, 2007   Mediation shall be completed.

November 16, 2007   All Pretrial Motions and Memoranda of Law must be filed.

December 7, 2007   Joint Pretrial Stipulation must be filed.

December 10, 2007   Proposed jury instructions and/or proposed findings of fact and conclusions of law must be filed.

December 14, 2007   Deposition designations must be filed.

December 17, 2007   Beginning of Trial Period.

None _____   Additional deadlines (please specify).

[Attachment A]

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case Number: 07-20389-CIV-MARTINEZ-BANDSTRA

COFFEE BEAN TRADING-ROASTING, LLC, a
Delaware limited liability company,

    Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada corporation,

    Defendant                /

## ELECTION TO JURISDICTION BY A UNITED STATES
## MAGISTRATE JUDGE FOR FINAL DISPOSITION OF MOTIONS

In accordance with the provisions of 28 U.S.C. §636(c), the undersigned parties to the above-captioned civil matter hereby jointly and voluntarily elect to have a United States Magistrate Judge decide the following motions and issue a final order or judgment with respect thereto:

| | | Yes | No |
|---|---|---|---|
| 1. | Motions for Costs | ✓ | |
| 2. | Motions for Attorney's Fees | ✓ | |
| 3. | Motions for Sanctions | ✓ | |
| 4. | Motions to Dismiss | | ✓ |
| 5. | Motions for Summary Judgment | | ✓ |
| 6. | Other (specify) _____ | | |

4-18-07
(Date)

_____
(Signature—Plaintiff's Counsel)

_____
(Date)

_____
(Signature—Plaintiff's Counsel)

4-19-07
(Date)

_____  FBN: 0181145
(Signature—Defendant's Counsel)

_____
(Date)

_____
(Signature—Defendant's Counsel)

[Attachment D]

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 07-20389-CIV-MARTINEZ-BANDSTRA**

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

       Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,

       Defendant.

_____/

## ORDER DENYING DEFENDANT'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

       THIS CAUSE came before the Court upon the Emergency Motion of Defendant, Coffee

Holding, Co. Inc. for Temporary Restraining Order **(D.E. No. 32).** The Eleventh Circuit has

stated:

> A district court may grant injunctive relief if the movant shows the following: (1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *See All Care Nursing Service, Inc. v. Bethesda Memorial Hospital, Inc*., 887 F.2d 1535, 1537 (11th Cir.1989) (citing *Baker*, 856 F.2d at 169 (citing *Jefferson County*, 720 F.2d at 1519)). In this Circuit, "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' " as to the four requisites. *Id*. (citations omitted).

*McDonald's Corp. v. Robertson*, 147 F. 3d 1301, 1306 (11th Cir. 1998) (internal footnote

omitted). Here, the Court finds Defendant has failed to demonstrate that it will suffer irreparable

injury unless the injunction issues.[1] Therefore, it is hereby:

**ORDERED and ADJUDGED** that

The Emergency Motion of Defendant, Coffee Holding, Co. Inc. for Temporary

Restraining Order **(D.E. No. 32)** is **DENIED.**

DONE AND ORDERED in Chambers at Miami, Florida, April 19, 2007.

_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Bandstra
All Counsel of Record

---

[1]Although Defendant has titled this motion as one for a temporary restraining order, from the arguments made by Defendant in the motion and as this motion was filed long after all parties had appeared in this case, it is apparent that Defendant is actually seeking a preliminary injunction. *See* Fed. R. of Civ. Pro. 65. However, whether Defendant is seeking a temporary restraining order or a preliminary injunction is irrelevant as the movant must demonstrate a substantial threat of irreparable harm when seeking either type of injunction.

-2-

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 07-20389-CIV-MARTINEZ-BANDSTRA**

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

     Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,

     Defendant.

_____/

**ORDER GRANTING DEFENDANT'S MOTION TO STRIKE CERTAIN PORTIONS OF
PLAINTIFF COFFEE  BEAN'S RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR A TEMPORARY RESTRAINING ORDER**

THIS CAUSE came before the Court upon Defendant Coffee Holding, Co. Inc.'s Motion
to Strike Certain Portions of Plaintiff Coffee Bean's Response in Opposition to Defendant's
Motion for a Temporary Restraining Order **(D.E. No. 37)**. The Court has carefully considered the
motion and finds that any references to settlement discussions in Plaintiff's Response or the
exhibits attached thereto should be stricken.  *See* Fed. R. Evid. 408.  Therefore, it is hereby:

     **ORDERED and ADJUDGED** that

     Defendant Coffee Holding, Co. Inc.'s Motion to Strike Certain Portions of Plaintiff
Coffee Bean's Response in Opposition to Defendant's Motion for a Temporary Restraining Order
**(D.E. No. 37)** is **GRANTED.**  Any references to settlement discussions in Plaintiff Coffee
Bean's Response in Opposition to Defendant's Motion for a Temporary Restraining Order (D.E.
No. 35) or in the exhibits attached thereto are hereby **STRICKEN**.  The Court will not consider

such references in ruling on the Emergency Motion of Defendant, Coffee Holding, Co. Inc. for

Temporary Restraining Order.

      DONE AND ORDERED in Chambers at Miami, Florida, April 19, 2007.

 

                            _____

                            JOSE E. MARTINEZ
                            UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Bandstra
All Counsel of Record

-2-

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 07-20389-CIV-MARTINEZ-BANDSTRA**

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

      Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,

      Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION TO ENFORCE A FORUM SELECTION CLAUSE AND TO TRANSFER VENUE

THIS CAUSE came before the Court upon Defendant Coffee Holding, Co. Inc.'s Motion to Enforce a Forum Selection Clause and to Transfer Venue **(D.E. No. 10)**. On March 10, 2006, Plaintiff Coffee Bean Trading-Roasting, LLC ("Plaintiff" or "Coffee Bean Trading") and Defendant Coffee Holding, Inc. ("Defendant" or "Coffee Holding") entered into the Limited Liability Company Agreement of Café La Rica, LLC ("Operating Agreement") to form Café La Rica, LLC ("Café La Rica") for the purpose of "'engag[ing] in the roasting, packaging and sale of Café la Rica and other branded coffee products." (D.E. No. 1 at 2) (quoting the Operating Agreement). On March 10, 2006, Coffee Holding and Café La Rica also entered into an Expense Sharing Agreement pursuant to which Coffee Holding agreed to provide certain administrative services, such as bookkeeping, to Café La Rica and to supply certain coffee products to, Café La Rica. Coffee Bean Trading has now brought suit against Coffee Holding in a six-count Complaint.

In Count I, Coffee Bean Trading alleges a breach of the Operating Agreement stating that Coffee Holding has failed to provided Coffee Bean Trading with the financial statements for Café La Rica. In Count II, Coffee Bean Trading alleges a breach of the Expense Sharing Agreement. Specifically, Coffee Bean Trading alleges that Coffee Holding has breached the agreement by paying itself in amounts in excess of the "[e]xpense [r]eimbursement for services that clearly fall within the class of services covered by the Expense Sharing Agreement." *Id*. at 5. Coffee Bean Trading also alleges that Coffee Holding has breached the agreement by selling coffee to Café La Rica at prices well above fair market value. In Count III, Coffee Bean Trading alleges a breach of fiduciary duty because it alleges Coffee Holding "consistently purchased from itself more coffee than Café la Rica needed" and "invoiced Café la Rica for coffee that was never delivered." *Id*. at 6. In Count IV, Plaintiff has alleged a breach of the implied contractual covenant of good faith and fair dealing for the same reasons as discussed above. In Count V, Plaintiff demands an accounting of all amounts claimed due by Coffee Holding for sales of coffee to Café La Rica and in Count VI, Plaintiff asks for both permanent and temporary injunctions. The Court now considers Defendant's motion to enforce the forum selection clause in the Operating Agreement and transfer venue pursuant to 28 U.S.C. § 1404(a).

Pursuant to 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Where a motion is filed pursuant to section 1404(a) to enforce a valid forum selection clause, "the venue mandated by a choice of forum clause rarely will be outweighed by other 1404(a) factors." *In re Ricoh Corp*., 870 F. 2d 570, 573 (11th Cir. 1989). The opponent to the motion to enforce the forum selection clause, here the plaintiff,

-2-

"bears the burden of persuading the court that the contractual forum is sufficiently inconvenient to justify retention of the dispute." *Id*. Here, Plaintiff has not argued that the contractual forum is inconvenient. Instead, Plaintiff has argued that the forum selection clause is permissive rather than mandatory and thus, should not foreclose Plaintiff's right to bring this suit in Florida. This Court disagrees.

"A permissive clause authorizes jurisdiction in a designated forum but does not prohibit litigation elsewhere. A mandatory clause, in contrast, 'dictates an exclusive forum for litigation under the contract.'" *Global Satellite Communication Co. v. Starmill U.K. Ltd.*, 378 F.3d. 1269, 1272 (11th Cir. 2004) (quoting *Snapper, Inc. v. Redan*, 171 F.2d 1249, 1261 (11th Cir. 1999)). Here, the forum selection clause in the Operating Agreement states:

> This Agreement shall be governed by and construed in accordance with the law of the State of Delaware, without regard to the conflicts of laws principles thereof. To the fullest extent permitted by law, the parties hereto hereby (i) submit to the jurisdiction of the state and federal courts located in the State of Delaware for purposes of any legal action or proceeding brought under or in connection with this Agreement, (ii) agree that exclusive venue of any such action or proceeding may be laid in the State of Delaware and (iii) waive any claim that the same is an inconvenient forum.

(D.E. No. 2, Exh. A § 14.8). Plaintiff focuses on the use of the words "may be laid in the State of Delaware" in subsection (ii) to argue that this forum selection clause is permissive. However, this phrase must be read in the context of the rest of the provision which clearly states that the parties are submitting to "the state and federal courts located in the States of Delaware *for any legal action or proceeding brought in connection with this Agreement*" and that "*exclusive* venue" of such actions "may be laid in the State of Delaware." *Id*. (emphasis added). The emphasized language makes it clear that the State of Delaware is the exclusive venue for actions arising in connection with the Operating Agreement. Thus, the forum selection clause is mandatory and

-3-

the Court grants Defendant's motion.

**ORDERED and ADJUDGED** that

1.    Defendant Coffee Holding, Co. Inc.'s Motion to Enforce a Forum Selection

Clause and to Transfer Venue **(D.E. No. 10)** is **GRANTED**.  **The Clerk is DIRECTED to**

**TRANSFER this case to the United States District Court for the District of Delaware.**

2.    Plaintiff's Motion to Consider the Filing of its Response in opposition to

Defendant's Motion to Transfer Venue Timely **(D.E. No. 20)** is **GRANTED**.

3.    Plaintiff's Motion to Strike Certain Portions of Defendant's Reply in Support of its

Motion to Enforce a Forum Selection Clause and to Transfer Venue or, Alternatively, for Leave

to File Surreply (D.E. No. 26) is **DENIED**.

4.    This Case is **CLOSED** and all pending motions are **DENIED** as **MOOT**.

DONE AND ORDERED in Chambers at Miami, Florida, April 20, 2007.

_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Bandstra
All Counsel of Record
Clerk of the United States District Court of the District of Delaware

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 07-20389-CIV-JEM

**Coffee Bean Trading-Roasting, LLC,**

      Plaintiff(s),

v.

**Coffee Holding, Inc.,**

      Defendant(s),

> FILED by _____ D.C.
>
> **Apr 25, 2007**
>
> CLARENCE MADDOX
> CLERK U.S. DIST. CT.
> S.D. OF FLA.

### CLERK'S NOTICE OF TRANSFER TO OTHER DISTRICT

Pursuant to the Order of Transfer entered on **April 20, 2007**, the above-styled case is hereby transferred to the **USDC, District of Delaware**. Enclosed are certified copies of the Order of Transfer and the Court's docket sheet. The case record is [ ] **a combined paper and electronic file or** [√] **an electronic file** and the imaged documents can be obtained at **PACER.USCOURTS.GOV** by using your Pacer **(not CM/ECF)** login and password. If you do not have a pacer login, please contact the Pacer Center at 1-800-676-6856.

DONE at the Federal Courthouse, Fort Lauderdale, Florida, this 25 day of April 2007.

      CLARENCE MADDOX,
      Court Administrator • Clerk of Court

By: _Lisa I. Streets_
      Lisa I. Streets
      Deputy Clerk

---

**Please acknowledge receipt of this transfer by returning a time-stamped copy of this Notice to:**

United States District Court
Southern District of Florida
299 East Broward Boulevard Room #108
Fort Lauderdale, FL 33301

**Received By:** _____

**New Case No.** _____