UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.: 07-20389

CIV-MARTINEZ

MAGISTRATE
BANDSTRA



COFFEE BEAN TRADING-ROASTING,
LLC, a Delaware limited liability company,

    Plaintiff,

vs.

COFFEE HOLDING, INC., a Nevada
corporation,

    Defendant.

_____/

## VERIFIED COMPLAINT

Plaintiff, Coffee Bean Trading-Roasting, LLC ("Coffee Bean"), sues defendant, Coffee

Holding, Inc. ("Coffee Holding"), and alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1.    Coffee Bean is a limited liability company organized and operating under the laws

of the State of Delaware.

2.    Coffee Holding is a corporation organized and operating under the laws of the

State of Nevada.

3.    This action involves claims of breach of contract, breach of fiduciary duty, breach

of the implied contractual covenant of good faith and fair dealing, and injunctive relief where the

matter in controversy exceeds the sum or value of $75,000 and is between citizens of different

states, and this Court, therefore, has original jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

4.      Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. §§ 1391(a)(2) because a substantial part of the events or omissions giving rise to the claims occurred, and the property that is the subject of the action is situated, in the Southern District of Florida.

5.      Coffee Bean has retained the undersigned to represent it in this action and has agreed to pay them a reasonable fee for their services.

## FACTS COMMON TO ALL CLAIMS

### The Operating Agreement

6.      On or about March 10, 2006, Coffee Bean and Coffee Holding entered into that certain Limited Liability Company Agreement of Café La Rica, LLC (the "Operating Agreement") pursuant to which the parties formed and organized Café La Rica, LLC ("Café La Rica") for the purpose of "engag[ing] in the roasting, packaging and sale of Café La Rica and other branded coffee products, and to engage in any other lawful act or activity, as determined by the Board of Managers from time to time, for which limited liability companies may be organized under the [Delaware Limited Liability Company Act]." A true and correct copy of the Operating Agreement is attached hereto as Exhibit A.

7.      The Operating Agreement was intended to be "the sole source of agreement" of the members of Café La Rica which, at all times relevant to this action, have been Coffee Bean and Coffee Holding, each owning a fifty (50) percent interest in the Company. *See* Operating Agreement at ¶ 2.2.

8.      The Operating Agreement established, amongst other things, a Board of Managers (the "Board of Managers") responsible for "[t]he management of the Company and all decisions concerning the business affairs of the Company[.]" The Board of Managers was to consist of

two managers, each having one vote with respect to all matters requiring the vote of the Board of Managers. Moreover, no individual manager was to have the right to act unilaterally on behalf of Café La Rica without the written consent of the other manager absent authorization by resolution of the Board of Managers. *See* Operating Agreement at ¶ 7.1.

9.  The initial Board of Managers of Café La Rica was comprised of Andrew Gordon, who is also the President and Chief Executive Officer of Coffee Holding (based in New York, NY), and Ernesto Aguila (based in Miami, FL). However, Coffee Holding, through Mr. Gordon, has at all times relevant to this action acted as Café La Rica's de facto manager with full control over all of its business and financial operations, except for the day-to-day sales and collection activities which Mr. Aguila has handled from Miami, FL.

10.  The Operating Agreement provides that it shall be governed and construed in accordance with the laws of the State of Delaware. *See* Operating Agreement at ¶ 14.8.

<u>The Expense Sharing Agreement</u>

11.  On March 10, 2006, contemporaneously with the execution of the Operating Agreement, Coffee Holding and Café La Rica entered into that certain Expense Sharing and Services Agreement (the "Expense Sharing Agreement") pursuant to which Coffee Holding agreed to provide certain services on behalf of, and the supply of certain coffee products to, Café La Rica. A copy of the Expense Sharing Agreement is attached hereto as Exhibit B.

12.  Specifically, Coffee Holding agreed (1) to provide, amongst other services, administrative services and support, and other bookkeeping, accounting and similar services, in exchange for a payment to Coffee Holding by Café La Rica in an amount equal to 5% of Café La Rica's monthly sales; and (2) to supply Café La Rica with as much coffee inventory as requested by Café La Rica at fair market prices. *See* Expense Sharing Agreement at §§ 1, 2.

13. The Expense Sharing Agreement required Coffee Holding to "maintain appropriate written records and documentation with respect to amounts reimbursed by and among [Coffee Holding] and [Café La Rica]" pursuant to the Expense Sharing Agreement. *See* Expense Sharing Agreement at § 6.

## COUNT I – BREACH OF THE OPERATING AGREEMENT

14. Coffee Bean realleges and incorporates by reference paragraphs 1 through 13 above.

15. Coffee Holding, as manager of Café La Rica, has always had exclusive access to Café La Rica's financial statements, including its balance sheet, statement of profit and loss and changes in Members' accounts, and statement of cash flows.

16. Pursuant to the Operating Agreement, Coffee Holding was required to "provide reports to the Members, including a balance sheet, a statement of profit and loss and changes in Members' accounts and a statement of cash flows [the "Financial Statements"], within fifteen (15) days of the end of each month." *See* Operating Agreement at ¶ 4.2.

17. Coffee Holding has breached the Operating Agreement by failing, despite repeated written requests, to provide Coffee Bean with the Financial Statements or to otherwise provide any financial information and documentation to Coffee Bean.

18. Coffee Bean has suffered and continues to suffer significant financial damages as a direct, foreseeable, and proximate result of Coffee Holding's breach of the Operating Agreement.

WHEREFORE, Coffee Bean demands judgment against Coffee Holding for damages, together with pre and post judgment interest, costs, and any other and further relief this Court deems equitable, just and proper.

## <u>COUNT II – BREACH OF THE EXPENSE SHARING AGREEMENT</u>

19.     Coffee Bean realleges and incorporates by reference paragraphs 1 through 13 above.

20.     Under the Expense Sharing Agreement, Coffee Holding agreed to (1) provide administrative services and support, and other bookkeeping, accounting and similar services, in exchange for a payment to Coffee Holding by Café La Rica in an amount equal to 5% of Café La Rica's monthly sales (the "Expense Reimbursement"); and (2) to supply Café La Rica with as much coffee inventory as requested by Café La Rica at fair market prices.

21.     Coffee Holding has breached the Expense Sharing Agreement by charging Café La Rica, and, as the Manager of Café La Rica, paying itself amounts in excess of the Expense Reimbursement for services that clearly fall within the class of services covered by the Expense Sharing Agreement.   Coffee Holding also has failed to keep adequate records to justify the payments it has made to itself pursuant to the Expense Sharing Agreement.

22.     Coffee Holding has also breached the Expense Sharing Agreement by selling coffee to Café La Rica at prices well above fair market prices.

23.     Café La Rica has suffered and continues to suffer damages as a direct, foreseeable, and proximate result of Coffee Holding's breach of the Expense Sharing Agreement.

24.     Coffee Bean brings this action derivatively in the right of Café La Rica to recover a judgment in its favor and against Coffee Holding for its breaches of the Expense Sharing Agreement.   Any effort to cause Coffee Holding to bring this action is not likely to succeed because Coffee Holding is unlikely to agree to sue itself.

Baker & McKenzie LLP, 1111 Brickell Avenue, Suite 1700, Miami, Florida  33131 – (305) 789-8900

WHEREFORE, Coffee Bean demands judgment against Coffee Holding for damages, together with pre and post judgment interest, costs, and any other and further relief this Court deems equitable, just and proper.

## COUNT III – BREACH OF FIDUCIARY DUTY

25.     Coffee Bean realleges and incorporates by reference paragraphs 1 through 13 above.

26.     Coffee Holding, by virtue of its role as manager of Café La Rica and otherwise, owes Café La Rica and Coffee Bean a fiduciary duty to act in the best interest of Café La Rica and its members as a whole.

27.     Under the Expense Sharing Agreement, Coffee Holding agreed to supply Café La Rica with as much coffee inventory as requested by Café La Rica at fair market prices.  Thus, Coffee Holding occupies dual roles as both the manager and, by virtue of the Expense Sharing Agreement, a supplier of Café La Rica.

28.     Coffee Holding, in its role as manager of Café La Rica, was solely responsible for, and never consulted with Coffee Bean or anyone at Café La Rica with respect to, its purchases of coffee from itself on behalf of Café La Rica.

29.     Beginning in or about March, 2006, Coffee Holding consistently purchased from itself more coffee than Café La Rica needed for its operations.  Coffee Holding did this knowingly and purposefully in order to create grossly exaggerated accounts payables in favor of itself to the detriment of Café La Rica.  Coffee Holding has also knowingly and purposefully invoiced Café La Rica for coffee that was never delivered.

Baker & McKenzie LLP, 1111 Brickell Avenue, Suite 1700, Miami, Florida   33131 – (305) 789-8900

30.     Coffee Holding has breached its fiduciary duties to Café La Rica and Coffee Bean by intentionally undertaking the above-described actions, essentially putting its interests over the interests of Café La Rica and its members as a whole.

31.     Café La Rica and Coffee Bean have suffered and continue to suffer damages as a direct, foreseeable, and proximate result of Coffee Holding's breach of its fiduciary duties to Café La Rica and Coffee Bean.

32.     Coffee Bean brings this action individually and derivatively in the right of Café La Rica to recover a judgment in its favor and against Coffee Holding for its breach of the fiduciary duties Coffee Holding owes Café La Rica and Coffee Bean.  Any effort to cause Coffee Holding to bring this action is not likely to succeed because Coffee Holding is unlikely to agree to sue itself.

WHEREFORE, Coffee Bean demands judgment against Coffee Holding for damages, together with pre and post judgment interest, costs, and any other and further relief this Court deems equitable, just and proper.

## COUNT IV – BREACH OF THE IMPLIED
## CONTRACTUAL COVENANT OF GOOD FAITH AND FAIR DEALING

33.     Coffee Bean realleges and incorporates by reference paragraphs 1 through 13 above.

34.     Under the Expense Sharing Agreement, Coffee Holding agreed to supply Café La Rica with as much coffee inventory as requested by Café La Rica at fair market prices.  Thus, Coffee Holding occupies dual roles as both the manager and, by virtue of the Expense Sharing Agreement, a supplier of Café La Rica.

Baker & McKenzie LLP, 1111 Brickell Avenue, Suite 1700, Miami, Florida  33131 – (305) 789-8900

35.     Coffee Holding, in its role as manager of Café La Rica, was solely responsible for, and never consulted with Coffee Bean or anyone at Café La Rica with respect to, its purchases of coffee from itself on behalf of Café La Rica.

36.     By entering into the Expense Sharing Agreement, Coffee Holding implicitly covenanted to deal fairly and in good faith with Café La Rica with respect to any purchases of coffee it made from itself on behalf of Café La Rica.

37.     Beginning in or about March, 2006, Coffee Holding consistently purchased from itself more coffee than Café La Rica needed for its operations.  Coffee Holding did this knowingly and purposefully in order to create grossly exaggerated accounts payables in favor of itself to the detriment of Café La Rica.  Coffee Holding has also knowingly and purposefully invoiced Café La Rica for coffee that was never delivered.

38.     Coffee Holding breached the covenant of good faith and fair dealing implied in the Expense Sharing Agreement by undertaking the above-described acts.

39.     Café La Rica has suffered and continues to suffer damages as a direct, foreseeable, and proximate result of Coffee Holding's breach of the implied covenant of good faith and fair dealing.

40.     Coffee Bean brings this action derivatively in the right of Café La Rica to recover a judgment in its favor and against Coffee Holding for its breaches of the implied contractual covenant of good faith and fair dealing.  Any effort to cause Coffee Holding to bring this action is not likely to succeed because Coffee Holding is unlikely to agree to sue itself.

WHEREFORE, Coffee Bean demands judgment against Coffee Holding for damages, together with pre and post judgment interest, costs, and any other and further relief this Court deems equitable, just and proper.

## COUNT V – ACCOUNTING

41.     Coffee Bean realleges and incorporates by reference paragraphs 1 through 13 above.

42.     Coffee Holding is required to "maintain appropriate written records and documentation with respect to amounts reimbursed by and among [Coffee Holding] and [Café La Rica]" pursuant to the Expense Sharing Agreement. *See* Expense Sharing Agreement at § 6.

43.     Coffee Holding has, at all time material to this action, had direct supervision and control of written records and documentation for the amounts it claims it is owed for sales of coffee to Café La Rica, but has failed to account to Café la Rica and Coffee Bean for those amounts.   A fiduciary relationship exists between the parties and a duty rests upon Coffee Holding to render an account of those amounts to Café La Rica and Coffee Bean.

44.     In light of the foregoing, Café La Rica's and Coffee Bean's remedies at law are inadequate.

WHEREFORE, Café La Rica and Coffee Bean demand an accounting of all amounts claimed due, if any, by Coffee Holding for sales of coffee to Café La Rica.

## COUNT VI – PERMANENT AND TEMPORARY INJUNCTION

45.     Coffee Bean realleges and incorporates by reference paragraphs 1 through 13 above.

46.     Since in or about March, 2006, when Café La Rica began doing business, it has become an established and successful business with substantial relationships and numerous customers and additional prospective customers, and has developed significant good will with various vendors and suppliers.

47.     Coffee Holdings has, under the Expense Sharing Agreement, purchased from itself more coffee than Café La Rica needed for its operations.  Coffee Holding did this knowingly and purposefully in order to create grossly exaggerated accounts payables in favor of itself and unilaterally permitted balances to build up on its own account.

48.     In or about February, 2007, Coffee Holding began threatening to make a preferential payment to itself of the entire accumulated balance on its account in disregard of Café La Rica's other creditors and payroll obligations.

49.     When Coffee Bean refused to consent to such preferential treatment of Coffee Holding's account payable, Coffee Holding unilaterally declared Café La Rica dissolved and began notifying Café La Rica's customers, suppliers, vendors and potential investors that Café La Rica "has closed down."  Based on Mr. Gordon's statements, at least one potential investor has already stated that it is not interested in making an offer to invest in Café La Rica until this matter is settled.

50.     On February 7, 2007, Mr. Gordon sent a fax to Washington Mutual Bank ("Washington Mutual"), where Café La Rica maintains its Miami operating account, advising Washington Mutual that Café La Rica has purportedly been dissolved – a claim that is blatantly false – and instructing it to prevent Mr. Aguila, who has traditionally controlled Café La Rica's operating account with Washington Mutual, from exerting any control over that bank account.

51.     Based on Mr. Gordon's false representations, Washington Mutual froze the account, preventing Café La Rica from paying its vendors and suppliers and meeting its payroll obligations.  Copies of Mr. Gordon's letter of February 7, 2007 and Washington Mutual's letter of February 8, 2007 in response to same are attached hereto as Composite Exhibit C.

52. Café La Rica has no adequate remedy at law because the amount of the damage caused by the lost profits and good will that will result from Coffee Holding's continued interference are impossible to determine and of a character that cannot be remedied by money. Moreover, since the acts of Coffee Holding will continue in the future unless restrained, Café La Rica has no adequate remedy at law for damages. Coffee Holding's acts are irreparably harming Café La Rica by destroying Café La Rica's customer base, ruining its relationship with its customers, vendors, and potential investors, risking the loss of its work staff, and basically causing it to go out of business.

53. Coffee Bean brings this action derivatively in the right of Café La Rica to recover a judgment in its favor and against Coffee Holding for its breaches of the fiduciary duties Coffee Holding owes Café La Rica and Coffee Bean. Any effort to cause Coffee Holding to bring this action is not likely to succeed because Coffee Holding is unlikely to agree to sue itself.

WHEREFORE, Coffee Bean demands judgment for a temporary and permanent injunction restraining Coffee Holding and Mr. Gordon from further interfering with Café La Rica's business and affairs.

DATED this 13th day of February, 2007.

Respectfully submitted,

BAKER & McKENZIE LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131
Telephone: (305) 789-8900
Facsimile: (305) 789-8953

By: _____
Jose M. Ferrer
Florida Bar No. 173746

MIADMS/306621.4

11

# LIMITED LIABILITY COMPANY AGREEMENT

# OF

# CAFÉ LA RICA, LLC

A LIMITED LIABILITY COMPANY

ORGANIZED UNDER THE LAWS OF

THE STATE OF DELAWARE

[TPW: NYLEGAL:460852.1] 19499-00000  03/09/2006 06:00 PM



EXHIBIT

A

Case 1:07-cv-20389-JEM   Document 53   Filed 05/31/2007   Page 13 of 69

Page

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ....................................................................................................1

| | | |
|---|---|---|
| 1.1 | Act | 1 |
| 1.2 | Additional Capital Contribution | 1 |
| 1.3 | Affiliate | 1 |
| 1.4 | Agreement | 2 |
| 1.5 | Annual Independent Audit | 2 |
| 1.6 | Assignee or "Transferee" | 2 |
| 1.7 | Bankrupt Member | 2 |
| 1.8 | Board of Managers | 2 |
| 1.9 | Business Day | 3 |
| 1.10 | Capital Account | 3 |
| 1.11 | Capital Contribution | 3 |
| 1.12 | Certificate of Formation | 3 |
| 1.13 | Code | 3 |
| 1.14 | Coffee Bean Trading | 2 |
| 1.15 | Coffee Holding | 2 |
| 1.16 | Commitment | 3 |
| 1.17 | Company | 4 |
| 1.18 | Company Property | 4 |
| 1.19 | Confidential Information | 2 |
| 1.20 | Default Interest Rate | 4 |
| 1.21 | Delinquent Member | 4 |
| 1.22 | Disposition (Dispose) | 4 |
| 1.23 | Dissociation | 5 |
| 1.24 | Dissolution Event | 5 |
| 1.25 | Distribution | 5 |
| 1.26 | Economic Interest | 5 |
| 1.27 | Effective Date | 5 |
| 1.28 | Equity Offering | 5 |
| 1.29 | Exhibit A | 5 |
| 1.30 | Fair Market Value | 5 |
| 1.31 | Fiscal Year | 6 |
| 1.32 | Gross Asset Value | 6 |
| 1.33 | Initial Capital Contribution | 8 |
| 1.34 | Initial Membership Interest | 8 |
| 1.35 | Initial Sharing Ratio | 8 |
| 1.36 | Initial Value | 8 |
| 1.37 | Management Right | 8 |
| 1.38 | Manager | 4 |
| 1.39 | Member | 8 |
| 1.40 | Membership Interest | 9 |
| 1.41 | Minimum Working Capital | 4 |
| 1.42 | Net Cash Flow | 9 |
| 1.43 | New Securities | 9 |

i

| | | |
|---|---|---|
| 1.44 | Offering Allocation | 9 |
| 1.45 | Officer | 9 |
| 1.46 | Organization | 9 |
| 1.47 | Person | 10 |
| 1.48 | Principal Office | 10 |
| 1.49 | Proceeding | 10 |
| 1.50 | Profits and Losses | 10 |
| 1.51 | Property | 12 |
| 1.52 | Regulations | 12 |
| 1.53 | Regulatory Allocations | 12 |
| 1.54 | Related Person | 6 |
| 1.55 | Securities Act | 12 |
| 1.56 | Share | 15 |
| 1.57 | Sharing Ratio | 15 |
| 1.58 | Substitute Member | 15 |
| 1.59 | Tax Characterization and Additional Tax Terms | 15 |
| 1.60 | Winding Up Sale | 17 |

**ARTICLE II FORMATION** ..... 18

| | | |
|---|---|---|
| 2.1 | Organization | 18 |
| 2.2 | Agreement | 18 |
| 2.3 | Name | 19 |
| 2.4 | Term | 19 |
| 2.5 | Registered Agent and Office | 19 |
| 2.6 | Principal Office | 20 |

**ARTICLE III PURPOSE; NATURE OF BUSINESS** ..... 20

**ARTICLE IV ACCOUNTING AND RECORDS** ..... 21

| | | |
|---|---|---|
| 4.1 | Records to be Maintained | 21 |
| 4.2 | Reports to Members | 21 |
| 4.3 | Annual Audit | 9 |
| 4.4 | Tax Returns and Reports | 21 |

**ARTICLE V CLASSES OF MEMBERSHIP; NAMES AND ADDRESSES OF MEMBERS** ... 22

**ARTICLE VI RIGHTS AND DUTIES OF MEMBERS; RESTRICTIVE COVENANTS** ..... 22

| | | |
|---|---|---|
| 6.1 | No Management Rights as Members | 22 |
| 6.2 | Liability of Members | 22 |
| 6.3 | Indemnification | 22 |
| 6.4 | Representations, Warranties and Covenants | 22 |
| 6.5 | Conflicts of Interest | 23 |
| 6.6 | Restrictive Covenants | 24 |

**ARTICLE VII BOARD OF MANAGERS AND OFFICERS** ..... 26

| | | |
|---|---|---|
| 7.1 | Board of Managers | 26 |
| 7.2 | Voting | 26 |

[TPW: NYLEGAL:460852.1] 19499-00000  03/09/2006 06:00 PM

| | | |
|---|---|---|
| 7.3 | Term of Office as a Member of the Board of Managers | 27 |
| 7.4 | Incapacitation of a Manager | 12 |
| 7.5 | Officers | 27 |
| 7.6 | Authority to Bind the Company | 28 |
| 7.7 | Actions of the Board of Managers | 30 |
| 7.8 | Indemnification | 30 |
| 7.9 | Resignation and Removal; Replacement | 30 |
| 7.10 | Other Activities | 31 |
| 7.11 | Distributions | 31 |
| 7.12 | Expenses | 31 |
| 7.13 | Affiliates; Fees | 31 |

**ARTICLE VIII CONTRIBUTIONS AND CAPITAL ACCOUNTS** ........ 32

| | | |
|---|---|---|
| 8.1 | Initial Capital Contributions | 32 |
| 8.2 | Indemnification | 13 |
| 8.3 | Shares | 32 |
| 8.4 | Additional Capital Contributions | 33 |
| 8.5 | Enforcement of Commitments | 34 |
| 8.6 | Capital Account | 35 |
| 8.7 | No Obligation to Restore Deficit Balance | 38 |
| 8.8 | Withdrawal; Successors | 38 |
| 8.9 | Interest | 38 |
| 8.10 | Investment of Capital Contributions and Company Cash | 38 |
| 8.11 | Repayment of Capital Contribution. | 39 |

**ARTICLE IX ALLOCATIONS AND DISTRIBUTIONS** ................. 40

| | | |
|---|---|---|
| 9.1 | Profits and Losses | 40 |
| 9.2 | Profits | 40 |
| 9.3 | Special Allocations | 40 |
| 9.4 | Curative Allocations | 46 |
| 9.5 | Section 754 Election | 47 |
| 9.6 | Other Allocation Rules | 47 |
| 9.7 | Distribution of Net Cash Flow. | 50 |
| 9.8 | Allocation of Gain or Loss upon Winding Up. | 51 |

**ARTICLE X TAXES** ...................................................... 53

| | | |
|---|---|---|
| 10.1 | Tax Matters Partner | 54 |

**ARTICLE XI TRANSFER OF MEMBERSHIP INTEREST** ............ 55

| | | |
|---|---|---|
| 11.1 | Compliance with Securities Laws and this Agreement | 55 |
| 11.2 | Transfer of Shares; Admission of Substitute Member | 55 |
| 11.3 | Dispositions Not in Compliance with this Article Void | 56 |
| 11.4 | Transfer to Affiliate of a Member | 56 |
| 11.5 | Future Sales and Preemptive Rights | 57 |

**ARTICLE XII DISSOCIATION OF A MEMBER** ....................... 58

| | | |
|---|---|---|
| 12.1 | Dissociation | 58 |

[TPW: NYLEGAL:460852.1] 19499-00000 03/09/2006 06:00 PM

12.2     Rights of Dissociating Member....................................................................59

ARTICLE XIII DISSOLUTION AND WINDING UP............................................................60

13.1     Dissolution ................................................................................................60
13.2     Effect of Dissolution .................................................................................61
13.3     Distribution of Assets on Dissolution ......................................................61
13.4     Winding Up and Certificate of Dissolution...............................................63

ARTICLE XIV MISCELLANEOUS ...................................................................................63

14.1     Termination of License .............................................................................26
14.2     Notices.......................................................................................................63
14.3     Headings....................................................................................................64
14.4     Entire Agreement ......................................................................................64
14.5     Binding Agreement ...................................................................................64
14.6     Saving Clause ...........................................................................................64
14.7     Counterparts ..............................................................................................65
14.8     Governing Law ..........................................................................................65
14.9     No Partnership Intended for Nontax Purposes ..........................................65
14.10    No Rights of Creditors and Third Parties..................................................66
14.11    Customers/Non-Compete ..........................................................................27
14.12    Confidentiality...........................................................................................27
14.13    Dispute Resolution....................................................................................66
14.14    General Interpretive Principles..................................................................70

# LIMITED LIABILITY COMPANY AGREEMENT
## OF
## CAFÉ LA RICA, LLC

This Limited Liability Company Agreement of **Café La Rica, LLC,** a limited liability company organized pursuant to the Delaware Limited Liability Company Act, is entered into and shall be effective as of the Effective Date, by and among the Company and the persons executing this Agreement as Members.

## ARTICLE I
## DEFINITIONS

For purposes of this Agreement, unless the context clearly indicates otherwise, the following terms shall have the following meanings:

1.1 **Act.** The Delaware Limited Liability Company Act and all amendments thereto.

1.2 **Additional Capital Contribution.** An additional Capital Contribution payable by a Member to the Company pursuant to Article VIII.

1.3 **Affiliate.** With respect to any Person, any entity controlling, controlled by or under common control with such Person. "Control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of over 50% of the voting securities of such Person, by contract or otherwise.

1.4 **Agreement.** This Limited Liability Company Agreement including all amendments adopted in accordance with this Agreement and the Act.

1.5 **Annual Independent Audit.** Annual Independent Audit shall have the meaning set forth in Section 4.3.

1.6 **Assignee or "Transferee."** A transferee of an Economic Interest who has not been admitted as a Substitute Member. Unless otherwise clear from the context of its use, the term "transferee" is synonymous with the term "Assignee."

1.7 **Bankrupt Member.** A Member who: (a) files a petition in bankruptcy, or is adjudicated as bankrupt or insolvent, or makes an assignment for the benefit of creditors, or an arrangement pursuant to any bankruptcy law; (b) discontinues or dissolves its business; or (c) has a receiver appointed for such Member or such Member's business and such receiver is not discharged within sixty (60) days.

1.8 **Board of Managers.** A Board constituted with those Persons selected to manage the affairs of the Company under Article VII hereof.

1.9 **Business Day.** Any day other than Saturday, Sunday or any legal holiday observed in the State of Delaware.

1.10 **Capital Account.** The account maintained for a Member or an Assignee determined in accordance with Article VIII.

1.11    **Capital Contribution.** A Member's Initial Capital Contribution plus any Additional Capital Contribution made by the Member in accordance with this Agreement. A Capital Contribution includes (a) the amount of any money contributed by the Member to the Company (including liabilities of the Company assumed by the Member as provided in section 1.704-1(b)(2)(iv)(c) of the Regulations), and (b) the Gross Asset Value of any Property contributed to the Company by such Member (net of liabilities secured by such contributed Property that the Company is considered to assume or take subject to under section 752 of the Code).

1.12    **Certificate of Formation.** The Certificate of Formation of the Company, as amended from time to time, filed with the Secretary of State of the State of Delaware.

1.13    **Code.** The Internal Revenue Code of 1986, as amended and in effect from time to time.

1.14    **Coffee Bean Trading.** The Coffee Bean Trading-Roasting LLC, a Delaware limited liability company.

1.15    **Coffee Holding.** Coffee Holding Co., Inc., a Nevada corporation.

1.16    **Commitment.** The Initial Capital Contribution and Additional Capital Contributions that a Member is obligated to make.

1.17    **Company.** Café La Rica, LLC, a limited liability company formed under the laws of Delaware, and any successor limited liability company

1.18    **Company Property.** Any Property owned by the Company.

1.19    **Confidential Information.** Confidential Information shall have the meaning set forth in Section 14.10.

1.20    **Default Interest Rate.** The prime rate published by the Wall Street Journal, New York City edition, for the last Business Day on which a Commitment is payable.

1.21    **Delinquent Member.** Delinquent Member shall have the meaning set forth in Section 8.4.

1.22    **Disposition (Dispose).** Any sale, assignment, exchange, mortgage, pledge, grant, hypothecation or other transfer, absolute or as security or encumbrance (including dispositions by operation of law).

1.23    **Dissociation.** Any action which causes a Person to cease to be a Member as described in Article XIII hereof.

1.24    **Dissolution Event.** An event, the occurrence of which will result in the dissolution of the Company under Article XIII.

1.25    **Distribution.** A transfer of Property to a Member on account of a Membership Interest.

1.26    **Economic Interest.** The right to receive allocations of Profits and Losses, Distributions, returns of capital and distribution of assets upon a dissolution of the Company.

2

1.27    **Effective Date.** March 10, 2006.

1.28    **Equity Offering.** Equity Offering shall have the meaning set forth in Section 11.5.

1.29    **Exhibit A.** Exhibit A to this Agreement setting forth the name, address, Initial Capital Contribution, Initial Membership Interest and Initial Sharing Ratio of each Member.

1.30    **Fair Market Value.**

(a)    As of any date, the fair market value of an asset on such date as determined in good faith by the Board of Managers. For this purpose, the Board of Managers may in its reasonable and prudent discretion value assets that are restricted by law, contract, market conditions (including trading volume relative to the Company's holding) or otherwise as to salability or transferability at an appropriate discount, based on the nature and term of such restrictions.

(b)    With respect to any Membership Interest or Shares, fair market value shall be based on the Company being operated as a going concern without any adjustment for marketability or minority interest. Fair market value shall be determined, in accordance with the preceding sentence, in good faith by the Board of Managers.

1.31    **Fiscal Year.** The twelve month period ending on October 31 of each calendar year.

1.32    **Gross Asset Value.** Gross Asset Value, with respect to any Company asset, means the adjusted basis of such asset for federal income tax purposes, except as follows:

(a)    The initial Gross Asset Value of any Company asset contributed by a Member to the Company shall be the Fair Market Value of such Company asset as of the date of such contribution;

(b)    The Gross Asset Value of each Company asset shall be adjusted to equal its Fair Market Value, as of the following times: (i) the acquisition of an additional Membership Interest by any new or existing Member in exchange for more than a de minimis Capital Contribution unless the Board of Managers determines that such adjustment is not necessary to reflect the relative Economic Interests of the Members in the Company; (ii) the Distribution by the Company to a Member of more than a de minimis amount of Company assets (other than cash) as consideration for all or part of its Membership Interest unless the Board of Managers determines that such adjustment is not necessary to reflect the relative Economic Interests of the Members in the Company; and (iii) the liquidation of the Company within the meaning of section 1.704-1(b)(2)(ii)(g) of the Regulations;

(c)    The Gross Asset Value of a Company asset distributed to any Member shall be the Fair Market Value of such Company asset as of the date of Distribution thereof;

(d)    The Gross Asset Value of each Company asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted basis of such Company asset pursuant to section 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to section 1.704-1(b)(2)(iv)(m) of the Regulations; and

(e)     If the Gross Asset Value of a Company asset has been determined or adjusted pursuant to paragraph (a), (b) or (d) above, such Gross Asset Value shall thereafter be adjusted to reflect the depreciation or amortization taken into account with respect to such Company asset for purposes of computing Profits and Losses.

1.33     **Initial Capital Contribution.** With respect to any Member, the Initial Capital Contribution set forth in Exhibit A opposite the name of such Member.

1.34     **Initial Membership Interest.** With respect to any Member, the Initial Membership Interest (as represented in Shares) set forth in Exhibit A opposite the name of such Member.

1.35     **Initial Sharing Ratio.** With respect to any Member, the Initial Sharing Ratio set forth in Exhibit A opposite the name of such Member.

1.36     **Initial Value.** With respect to any Member, the Initial Value set forth on Exhibit A opposite the name of such Member.

1.37     **Management Right.** The right, if any, of a Member to participate in the management of the Company, to vote on any matter and to grant or withhold consent or approval of actions of the Company.

1.38     **Manager.** Manager shall have the meaning set forth in Section 7.1.

1.39     **Member.** A party executing this Agreement and a Substitute Member.

1.40     **Membership Interest.** A Member's Economic Interest and Management Right which shall be represented by Shares of the Company.

1.41     **Minimum Working Capital.** The Minimum Working Capital shall mean $100,000.

1.42     **Net Cash Flow.** Net Cash Flow shall mean, with respect to any fiscal period of the Company, all cash revenues of the Company during that period, decreased by, without duplication, (a) cash expenditures for operating expenses, (b) capital expenditures to the extent not made from reserves, (c) repayment of principal on any financing and (d) taxes.

1.43     **New Securities.** Means any equity interests in the Company issued after the date of this Agreement whether now authorized or not, including, but not limited to, Shares, Membership Interests or any warrants, options, convertible securities or other contracts or rights to purchase Shares, Membership Interests or securities of the Company.

1.44     **Offering Allocation.** Offering Allocation shall have the meaning set forth in Section 11.5.

1.45     **Officer.** Any individual appointed as an officer of the Company in accordance with Section 7.4.

1.46     **Organization.** A Person other than a natural person. Organization includes, without limitation, corporations (both non-profit and other corporations), partnerships (both limited and general), joint ventures, limited liability companies and unincorporated associations, but the term does not include joint tenancies and tenancies by the entirety.

4

1.47 **Person.** An individual, trust, estate or any Organization permitted to be a member of a limited liability company under the laws of the State of Delaware.

1.48 **Principal Office.** The Principal Office of the Company set forth in Section 2.6.

1.49 **Proceeding.** Any administrative, judicial or other adversary proceeding, including, without limitation, litigation, arbitration, administrative adjudication, mediation and appeal or review of any of the foregoing.

1.50 **Profits and Losses.** For each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or period, determined in accordance with section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

    (a) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Section shall be added to such taxable income or loss;

    (b) Any expenditures of the Company described in section 705(a)(2)(B) of the Code or treated as section 705(a)(2)(B) of the Code expenditures pursuant to section 1.704-1(b)(2)(iv)(i) of the Regulations (other than expenses in respect of which an election is properly made under section 709 of the Code), and not otherwise taken into account in computing Profits or Losses pursuant to this Section, shall be subtracted from such taxable income or loss;

    (c) In the event the Gross Asset Value of any Company asset is adjusted pursuant to paragraph (b) or (d) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such Company asset for purposes of computing Profits or Losses;

    (d) Gain or loss resulting from any disposition of any Company asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Company asset disposed of, notwithstanding that the adjusted tax basis of such Company asset may differ from its Gross Asset Value;

    (e) In accordance with section 1.704-1(b)(2)(iv)(g)(3) of the Regulations, depreciation with respect to any Company asset shall be computed by reference to the adjusted Gross Asset Value of such asset, notwithstanding that the adjusted tax basis of such Company asset differs from its Gross Asset Value; and

    (f) Notwithstanding any other provisions of this definition, Profits and Losses shall not include allocations under section 704(c) (which are set forth at Section 9.3(i) hereof) or Regulatory Allocations.

1.51 **Property.** Any property, real or personal, tangible or intangible, including money, and any legal or equitable interest in such property, but excluding services and promises to perform services in the future.

1.52 **Regulations.** The final and temporary federal income tax regulations promulgated by the United States Treasury Department under the Code as such regulations may be amended from time to

time, or if no final or temporary regulations with respect to a tax issue are then in effect, proposed regulations then in effect if approved by the Board of Managers. All references herein to a specific section of the Regulations shall be deemed also to refer to any corresponding provision of succeeding Regulations.

1.53 **Regulatory Allocations.** Regulatory Allocations shall mean the allocations set forth at Sections 9.3(a) through (g).

1.54 **Related Person.** Means:

With respect to a particular individual:

(a)     each member of such individual's Family;

(b)     any Person that is directly or indirectly controlled by any one or more members of such individual's Family;

(c)     any Person in which members of such individual's Family hold (individually or in the aggregate) a Material Interest; and

(d)     any Person with respect to which one or more members of such individual's Family serves as a director, officer, partner, executor or trustee (or in a similar capacity).

With respect to a specified Person other than an individual:

(a)     any Person that directly or indirectly controls, is directly or indirectly controlled by or is directly or indirectly under common control with such specified Person;

(b)     any Person that holds a Material Interest in such specified Person;

(c)     each Person that serves as a director, officer, partner, executor or trustee of such specified Person (or in a similar capacity);

(d)     any Person in which such specified Person holds a Material Interest; and

(e)     any Person with respect to which such specified Person serves as a general partner or a trustee (or in a similar capacity).

For purposes of this definition, (a) "control" (including "controlling," "controlled by," and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and shall be construed as such term is used in the rules promulgated under the Securities Act; (b) the "Family" of an individual includes (i) the individual, (ii) the individual's spouse, (iii) any other natural person who is related to the individual or the individual's spouse within the second degree and (iv) any other natural person who resides with such individual; and (c) "Material Interest" means direct or indirect beneficial ownership (as defined in Rule 13d-3 under the Securities Exchange Act of 1934) of voting securities or other voting interests representing at least ten percent (10%) of the outstanding voting power of a Person or equity securities or other equity interests representing at least ten percent (10%) of the outstanding equity securities or equity interests in a Person.

1.55 **Securities Act.** The Securities Act of 1933, as amended.

[TPW: NYLEGAL:460852.1] 19499-00000 03/09/2006 06:00 PM

1.56 **Share.** A share of a Membership Interest as described in Section 8.2.

1.57 **Sharing Ratio.** With respect to any Member as of any date, the ratio (expressed as a percentage) of (a) such Member's Shares to (b) the aggregate outstanding Shares of all Members, or such other ratio as shall be agreed by all Members from time to time. The Initial Membership Interest and the Initial Sharing Ratio of each Member are set forth in <u>Exhibit A</u>, and <u>Exhibit A</u> shall be amended as necessary to conform to any changes thereto agreed to by the Members. In the event all or any portion of a Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Membership Interest and Sharing Ratio of the transferor to the extent it relates to the transferred Membership Interest.

1.58 **Substitute Member.** An Assignee who has been admitted to all of the rights of membership pursuant to Section 11.2.

1.59 **Tax Characterization and Additional Tax Terms.** It is intended that the Company be characterized and treated as a partnership for, and solely for, federal, state and local income tax purposes. For such purpose, the Company shall be subject to all of the provisions of subchapter K of chapter 1 of subtitle A of the Code, and all references to a "Partner," to "Partners" and to the "Partnership" in this Agreement (including the provisions of Articles VIII and IX) and in the provisions of the Code and Regulations cited in this Agreement shall be deemed to refer to a Member, the Members and the Company, respectively. In addition, the following terms shall have the following meanings:

(a) <u>Adjusted Capital Account Deficit</u> shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i) Credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to section 1.704-1(b)(2)(ii)(c) or the penultimate sentences of sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(ii) Debit to such Capital Account the items described in sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

(b) <u>Nonrecourse Deductions</u> has the meaning set forth in section 1.704-2(b)(1) of the Regulations.

(c) <u>Nonrecourse Liability</u> has the meaning set forth in section 1.704-2(b)(3) of the Regulations.

(d) <u>Partner Nonrecourse Debt</u> has the meaning set forth in section 1.704-2(b)(4) of the Regulations.

(e) <u>Partner Nonrecourse Debt Minimum Gain</u> means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with section 1.704-2(i)(3) of the Regulations.

(f)    Partner Nonrecourse Deductions has the meaning set forth in sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Regulations.

(g)    Partnership Minimum Gain has the meaning set forth in sections 1.704-2(b)(2) and 1.704-2(d) of the Regulations.

1.60    **Winding Up Sale.** Winding Up Sale shall have the meaning set forth in Section 9.9(a).

## ARTICLE II
## FORMATION

2.1    **Organization.** The Members hereby organize the Company as a Delaware limited liability company pursuant to the provisions of the Act.

2.2    **Agreement.** For and in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members executing this Agreement hereby agree to the terms and conditions of this Agreement, as it may from time to time be amended; provided, however, that this Agreement shall not be effective unless and until the following agreements are fully executed by the appropriate parties: (a) a Lease Agreement between the Company and Perc Enterprises, in form attached hereto as Exhibit B; (b) an Expense Sharing Agreement between the Company and Coffee Holding, in the form attached hereto as Exhibit C; (c) a License Agreement between the Company and Coffee Bean Trading, in the form attached hereto as Exhibit D; (d) a License Agreement between the Company and Coffee Holding, in form attached hereto as Exhibit E; and (e) an Employment Agreement between the Company and Mr. Ernesto Aguila in the form attached hereto as Exhibit F. It is the express intention of the Members that this Agreement shall be the sole source of agreement of the parties with respect to the subject matter hereof, and, except to the extent a provision of this Agreement expressly incorporates federal income tax rules by reference to sections of the Code or Regulations or is expressly prohibited or ineffective under the Act, this Agreement shall govern, even when inconsistent with, or different than, the provisions of the Act or any other law or rule. To the extent any provision of this Agreement is prohibited or ineffective under the Act, this Agreement shall be considered amended to the smallest degree possible in order to make this Agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a way to make any provision of this Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

2.3    **Name.** The name of the Company is Café La Rica, LLC, and all business of the Company shall be conducted under that name or under any other name determined by the Board of Managers but, in any case, only to the extent permitted by applicable law.

2.4    **Term.** The term of the Company shall be perpetual unless the Company shall be sooner dissolved and its affairs wound up in accordance with the Act or this Agreement.

2.5    **Registered Agent and Office.** The registered agent for the service of process and the registered office shall be that Person and location reflected in the Certificate of Formation as filed in the office of the Secretary of State of the State of Delaware. The Board of Managers may, from time to time, change the registered agent or office through appropriate filings with the Secretary of State of the State of Delaware. In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Board of Managers shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be. If the Board of Managers shall fail to designate a

8

replacement registered agent or change of address of the registered office, any Member may designate a replacement registered agent or file a notice of change of address.

2.6    **Principal Office.**  The Principal Office of the Company shall be located at 2131 NW 72nd Avenue, Miami, Florida 33122.

## ARTICLE III
## PURPOSE; NATURE OF BUSINESS

The purpose of the Company is to engage in the roasting, packaging and sale of Café La Rica and other branded coffee products, and to engage in any other lawful act or activity, as determined by the Board of Managers from time to time, for which limited liability companies may be organized under the Act.  The Company shall have the authority to do all things necessary or convenient to accomplish its purposes and operate its business as described in this Article III.  The Company exists only for the purposes specified in this Article III.  The authority granted to the Board of Managers under this Agreement to bind the Company shall be limited to actions necessary or convenient to the purposes specified in this Article III and to the extent provided by Section 6.6.

## ARTICLE IV
## ACCOUNTING AND RECORDS

4.1    **Records to be Maintained.**  The Company shall maintain at the Principal Office, the Company's books and records, including financial statements of the Company and all other documents and data regarding the Company, which shall be open to inspections by the Members or their agents at any reasonable time.

4.2    **Reports to Members.**  The Board of Managers shall provide reports to the Members, including a balance sheet, a statement of profit and loss and changes in Members' accounts and a statement of cash flows, within fifteen (15) days of the end of each month.

4.3    **Annual Audit.**  Within ninety (90) days of the end of each Fiscal Year, the Board of Managers shall cause the annual financial statements of the Company to be audited by the independent registered public accounting firm responsible for conducting the audit of the financial statements of Coffee Holding for the same period ("**Annual Independent Audit**").

4.4    **Tax Returns and Reports.**  The Board of Managers, at the Company's expense, shall prepare and timely file income tax returns of the Company in all jurisdictions where such filings are required, and shall prepare and deliver to each Member, within the time prescribed by the Code and any extensions applicable thereto, as provided by the Code or applicable regulations, all information returns required by the Code and Company information necessary for the preparation of the Members' federal income tax returns.

## ARTICLE V
## CLASSES OF MEMBERSHIP; NAMES AND ADDRESSES OF MEMBERS

There shall be only one class of Members.  The names and addresses of the Members are as stated on Exhibit A.

[TPW: NYLEGAL:460852.1] 19499-00000  03/09/2006 06:00 PM

## ARTICLE VI
## RIGHTS AND DUTIES OF MEMBERS; RESTRICTIVE COVENANTS

6.1 **No Management Rights as Members.** No Member shall have authority as a Member to bind the Company.

6.2 **Liability of Members.** No Member shall be liable as such for the debts, obligations or liabilities of the Company.

6.3 **Indemnification.** A Member shall indemnify the Company for any costs or damages incurred by the Company as a result of any unauthorized action by such Member.

6.4 **Representations, Warranties and Covenants.** Each Member, and in the case of a trust or other Organization, the person(s) executing this Agreement on behalf of such trust or other Organization, hereby represents and warrants to the Company and to each other Member that: (a) if that Member is a trust or other Organization, it has the requisite power to enter into this Agreement and to perform its obligations hereunder and that the person(s) executing this Agreement on behalf of such trust or other Organization has the requisite power to do so; and (b) the Member is acquiring its interest in the Company for the Member's own account as an investment and without an intent to distribute the interest. The Members acknowledge that their interests in the Company have not been registered under the Securities Act or any state securities laws and may not be resold or transferred without appropriate registration or the availability of an exemption from such requirements.

6.5 **Conflicts of Interest.**

(a) The Members shall account to the Company and hold as trustee for it any Property, Profit or benefit derived by the Member, without the consent of all of the other Members, in the conduct and winding up of the Company business or from a use or appropriation by the Member of Company Property, including information developed exclusively for the Company and opportunities expressly offered to the Company.

(b) A Member does not violate a duty or obligation to the Company merely because the Member's conduct furthers the Member's own interest. A Member may lend money to and transact other business with the Company. The rights and obligations of a Member who lends money to or transacts business with the Company are the same as those of a Person who is not a Member, subject to other applicable law. No transaction with the Company shall be voidable solely because a Member has a direct or indirect interest in the transaction if the transaction is fair to the Company.

6.6 **Restrictive Covenants.** Notwithstanding anything contained herein to the contrary, the Company shall not take any of the following actions without the prior written consent of each Member:

(a) amend the Certificate of Formation or this Agreement;

(b) purchase any interest in the stock, assets or business of any corporation, partnership or other entity other than in the ordinary course of the Company's business;

(c) appoint or discharge any members of the Board of Managers of the Company, other than pursuant to the provisions set forth in Article VII;

10

(d)     enter into any arrangement which will result in the merger, consolidation, dissolution, liquidation, winding up or cessation of the Company or the business activities of the Company;

(e)     dispose of, purchase or lease any asset of the Company other than in the ordinary course of the Company's business;

(f)     issue any New Securities;

(g)     require Additional Capital Contributions from the Members;

(h)     admit any new Members or permit the withdrawal of any existing Member;

(i)     file a voluntary petition or otherwise initiate proceedings to have the Company adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Company, or file a petition seeking or consenting to reorganization or relief of the Company as debtor under any applicable federal or state law relating to bankruptcy, insolvency, or other relief for debtors with respect to the Company; or seek or consent to the appointment of any trustee, receiver, conservator, assignee, sequestrator, custodian, liquidator (or other similar official) of the Company or of all or any substantial part of the properties and assets of the Company, or make any general assignment for the benefit of creditors of the Company, or admit in writing the inability of Company to pay its debts generally as they become due or declare or effect a moratorium on the Company debt or take any action in furtherance of any such action;

(j)     sell or transfer any asset of the Company to a Related Person unless such sale or transfer is made at Fair Market Value;

(k)     increase or decrease the number of Managers the Company is authorized to have; or

(l)     authorize additional Shares.

## ARTICLE VII
## BOARD OF MANAGERS AND OFFICERS

7.1     **Board of Managers.** The management of the Company and all decisions concerning the business affairs of the Company shall be made by the Board of Managers. The Board of Managers shall consist of two (2) managers, one of which shall be elected by each of the Members. Each Manager shall have one (1) vote with respect to all matters requiring the vote of the Board of Managers. No individual member of the Board of Managers (a "**Manager**") shall have the right to act on behalf of the Company without the written consent of the other Manager or absent authorization by resolution of the Board of Managers. The initial Board of Managers shall consist of those persons listed on Exhibit G hereto.

7.2     **Voting.** Except as otherwise provided in this Agreement, the affirmative vote of a majority of the members of the Board of Managers shall constitute the act of the Board of Managers. If there are only two members on the Board of Managers, then the affirmative vote of both members shall constitute the act of the Board of Managers.

[TPW: NYLEGAL:460852.1] 19499-00000  03/09/2006 06:00 PM

7.3     **Term of Office as a Member of the Board of Managers.**  Each member of the Board of Managers shall serve until his or her removal by the Member who appointed him or her or any resignation of such member of the Board of Managers pursuant to Section 7.8.  A member of the Board of Managers may be removed by the Member who appointed him or her at any time, with or without cause.

7.4     **Incapacitation of a Manager.**  In the event that any Manager becomes incapacitated such that he or she us incapable in any material respect of performing the services required by such Manager in accordance with this Agreement on a regular ongoing basis for a period of sixty (60) days, such Manager shall automatically be removed from the Board of Managers and replaced by a newly elected Manager as shall be determined by the Member who appointed such incapacitated Manager to the Board of Managers.

7.5     **Officers.**  The Board of Managers may appoint one or more Officers of the Company as it shall determine from time to time advisable with such titles as the Board of Managers deems appropriate.  Any two or more offices may be held by the same person.  All Officers shall have such authority and perform such duties in the management and operation of the Company as may be prescribed by the Board of Managers or this Agreement.  Any Officer may be removed at any time, with or without cause, by the Board of Managers, and any vacancy occurring in any office shall be filled by the Board of Managers.  The initial Officers of the Company shall be as set forth on Exhibit H hereto.

7.6     **Authority to Bind the Company.**  The Officers shall have such authority as is granted by the Board of Managers (including, if authorized, the authority to bind the Company), subject to the authority of the Board of Managers.  The Board of Managers has the power, on behalf of the Company, to do all things necessary or convenient to carry out the business and affairs of the Company (as described in Article III), including, without limitation:

(a)     To institute, prosecute and defend any Proceeding in the Company's name;

(b)     To conduct the Company's business, establish Company offices and exercise the powers of the Company;

(c)     To employ, contract and deal with, from time to time, Persons, including any Member or Affiliate of any Member, in connection with the management and operation of the Company's business, including without limitation, suppliers, customers, tradespeople, brokers, accountants and attorneys, on such terms as the Board of Managers shall determine;

(d)     To purchase liability and other insurance to protect the Company's business and Property;

(e)     To establish reserve funds of the Company to provide for future requirements for operations, contingencies or any other purpose that the Board of Managers deems necessary or appropriate;

(f)     To make such elections under the Code and other relevant tax laws as to the treatment of items of Company income, gain, loss, deduction and credit, and as to all other relevant matters as the Board of Managers, with the advice of the Company's accountants and attorneys, deems necessary or appropriate, including without limitation, elections referred to in section 754 of the Code (subject to Section 9.6), the determination of which items of cash outlay shall be capitalized or treated as current expenses, and the selection of the method of accounting and bookkeeping procedures to be used by the Company;

12

(g)     To pay as a Company expense any and all costs or expenses associated with the formation, development, organization and operation of the Company;

(h)     To deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement; and

(i)     To execute, acknowledge and deliver any and all instruments to effectuate the foregoing.

All Company cash shall be deposited in a bank account selected by the Board of Managers, and all disbursements of Company cash shall be approved in advance by those Persons designated by the Board of Managers.

7.7     **Actions of the Board of Managers.** The Board of Managers has the power to bind the Company as provided in this Article VII. No Person dealing with the Company shall have any obligation to inquire into the power or authority of any Person designated by the Board of Managers to act on behalf of the Company.

7.8     **Indemnification.** The Company shall indemnify the Board of Managers and any officers or agents appointed by the Board of Managers for all costs, losses, liabilities and damages paid or incurred in connection with the business of the Company, to the fullest extent provided or allowed by the laws of the State of Delaware.

7.9     **Resignation and Removal; Replacement.** Any member of the Board of Managers may resign upon at least 30 days' prior written notice to the Members. In the event of the resignation or removal of any member of the Board of Managers, the Member who appointed such member of the Board of Managers shall appoint a replacement member of the Board of Managers.

7.10    **Other Activities.** The members of the Board of Managers, in their capacity as such, shall not be required to devote their full time to the management of the Company business, but only so much of their time as the Board of Managers deems necessary or appropriate for the proper management of such business. The members of the Board of Managers, and any of their Affiliates, may engage or possess an interest, independently or with others, in other businesses or ventures of every nature and description, and neither the Company nor any Member shall have any rights in or to such ventures or the income or profits derived therefrom.

7.11    **Distributions.** Each Member shall look solely to the assets of the Company for all Distributions and a share of Profits or Losses and shall have no recourse therefor (upon dissolution or otherwise) against the Board of Managers or any of the other Members.

7.12    **Expenses.** The Company shall pay directly or reimburse the Board of Managers for certain expenses of the Company incurred by the Board of Managers in the management of the Company's business. Such expenses may include but are not limited to: (a) costs of borrowed money and taxes applicable to the Company; (b) fees and expenses paid to suppliers, tradespeople, brokers, consultants and other agents; (c) costs of insurance as required in connection with the conduct of the business of the Company; and (d) expenses incurred by the Company for tax return preparation.

7.13    **Affiliates; Fees.** The Board of Managers is specifically authorized to employ, contract and deal with, from time to time, any Member or Affiliate of any Member, and in connection therewith to pay such Person's fees, prices or other compensation; provided that such employment, contracts and dealings are necessary or appropriate for the Company's purposes, and the fees, prices or other

13

compensation paid by the Company therefor is, in the judgment of the Board of Managers, reasonable and typical or competitive with the fees, prices or other compensation customarily paid for similar Property or services.

Nothing herein contained shall be construed as a guaranty by the Board of Managers of the performance by any Affiliate, designee or nominee of its obligations under any contract between any such Affiliate, designee or nominee and the Company.

## ARTICLE VIII
## CONTRIBUTIONS AND CAPITAL ACCOUNTS

8.1 **Initial Capital Contributions.** Concurrently with the execution and delivery of this Agreement, each Member shall make the Initial Capital Contribution described for that Member on Exhibit A. No Member shall have the right to withdraw or be repaid any Capital Contribution except as provided in this Agreement.

8.2 **Indemnification.** Each Member shall indemnify the other Members and the Company against any and all liabilities of such indemnifying Member which are imputed to the other Members or the Company.

8.3 **Shares.** The Company shall issue Shares to represent each Member's Membership Interest. The total number of Shares that the Company is authorized to issue is one thousand (1,000) Shares. The Company may authorize additional Shares only with the written consent of, and with terms and conditions approved by, the Board of Managers and subject to the provisions of Section 11.5. The initial number of issued and outstanding Shares is set forth on Exhibit A.

8.4 **Additional Capital Contributions.** In the event the Board of Managers determines that the Company does not have sufficient operating revenues or other available funds to pay any amount which the Board of Managers determines to be required for any Company purpose, the Board of Managers shall, if reasonable under the circumstances, attempt to obtain financing in the amount required; *provided, however,* that the Board of Managers shall not obtain such financing if it would cause a default under any Company obligation. If such financing cannot be obtained within a reasonable time and upon terms and conditions approved by the Board of Managers, the Board of Managers may, pursuant to Section 6.6 above, solicit and accept on behalf of the Company Additional Capital Contributions from the Members. Unless otherwise agreed by all Members, any Additional Capital Contribution shall be made by the Members pro rata, based on their respective Sharing Ratios. In the event that a Member does not make such an Additional Capital Contribution, then its Membership Interest, including its Sharing Ratio, in the Company shall be diluted as a result of the Additional Capital Contributions then being made by the other Members. A Member is not obligated to make an Additional Capital Contribution unless such Member affirmatively agrees to such obligation in writing.

8.5 **Enforcement of Commitments.** In the event any Member (a "**Delinquent Member**") fails to perform the Delinquent Member's Commitment, the Board of Managers shall give the Delinquent Member a notice of such failure. If the Delinquent Member fails to perform the Commitment (including the payment of any costs associated with the failure and interest at the Default Interest Rate) within ten Business Days of the giving of such notice, the Board of Managers may take such action as it deems appropriate, including but not limited to:

(a) Enforcing the Commitment in the court of appropriate jurisdiction in the state in which the Principal Office is located or the state of the Delinquent Member's address as reflected in this Agreement; *provided, however,* that a Member shall have no personal liability for any Additional Capital Contribution and, in any proceeding to enforce the obligation of a Member to make all or part of any such Additional Capital Contribution, the Board of Managers shall have recourse solely to the Delinquent Member's interest in the Company. Each Member expressly agrees to the jurisdiction of such courts but only for purposes of such enforcement.

(b) Selling the Delinquent Member's Shares, including a sale to another Member or to another Person.

(c) Allowing Members, except the Delinquent Member, to make Additional Capital Contributions and adjusting the Sharing Ratios and Shares of the Members in proportion to the new Capital Contribution levels.

(d) Reducing the Delinquent Member's Membership Interest and Shares.

(e) Issuing new Shares to Members who make Additional Capital Contributions in place of the Delinquent Member; provided that such Shares may be entitled to a priority return and such other rights as shall be determined by the Board of Managers.

8.6 **Capital Account.** A separate capital account shall be maintained for each Member throughout the term of the Company in accordance with the rules of section 1.704-1(b)(2)(iv) of the Regulations as in effect from time to time. Except as otherwise provided in section 1.704-1(b)(2)(iv) of the Regulations, each Member's Capital Account shall initially consist of such Member's Initial Capital Contribution, and shall be maintained in accordance with the following provisions:

(a) Each Member's Capital Account shall be credited with: (i) such Member's Additional Capital Contributions; and (ii) such Member's share of Profits and items of income and gain that are specially allocated to such Member pursuant to Article IX (other than any income or gain allocated to such Member pursuant to Section 9.3(i) in accordance with section 704(c) of the Code).

(b) Each Member's Capital Account shall be debited with: (i) the amount of money distributed to such Member by the Company (including liabilities of such Member assumed by the Company as provided in section 1.704-1(b)(2)(iv)(c) of the Regulations) other than amounts which are in repayment of debt obligations of the Company to such Member; (ii) the Gross Asset Value of Property distributed to such Member (net of liabilities secured by such distributed Property that such Member is considered to assume or take subject to under section 752 of the Code); and (iii) such Member's share of Losses and items of loss and deduction that are specially allocated to such Member pursuant to Article IX (other than any deduction or loss allocated to such Member pursuant to Section 9.3(i) in accordance with section 704(c) of the Code).

(c) If the Gross Asset Value of a Company asset differs from its adjusted tax basis, the Members' Capital Accounts shall be adjusted to reflect only allocations to them of depreciation, amortization and gain or loss as computed for book purposes (and not for tax purposes) with respect to such Company asset. In such event, items of book depreciation, amortization and gain or loss shall be calculated in conformity with the rules of section 1.704-1(b)(2)(iv)(g) of the Regulations.

[TPW: NYLEGAL:460852.1] 19499-00000 03/09/2006 06:00 PM

(d)     All such contributions, allocations and Distributions shall be credited or charged, as the case may be, to the appropriate Capital Accounts of the respective Members to whom they apply as of the time the contributions, allocations or Distributions are made.

(e)     The Capital Account of a transferee Member shall include the appropriate portion of the Capital Account of the Member from whom the transferee Member's interest was obtained.

(f)     In determining the amount of any liability, there shall be taken into account section 752 of the Code and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with section 1.704-1(b) of the Regulations, and shall be interpreted and applied in a manner consistent with such Regulations. Consistent with such intention, the value of any Property (other than cash) (i) contributed to the Company by a Member, (ii) distributed to a Member from the Company or (iii) owned by the Company and subject to a revaluation upon the occurrence of certain events shall be the Fair Market Value of such Property (net of liabilities secured by such Property that the Company or such Member, as the case may be, is considered to assume or take subject to under section 752 of the Code) on the date of contribution, Distribution or revaluation, as applicable.

8.7     **No Obligation to Restore Deficit Balance.**  No Member shall be required to restore any deficit balance in its Capital Account.

8.8     **Withdrawal; Successors.**  A Member shall not be entitled to withdraw any part of its Capital Account or to receive any Distribution from the Company, except as specifically provided in this Agreement.  Any Member, including any additional or substitute Member, who shall receive a Membership Interest or whose Membership Interest shall be increased by means of a transfer to it of all or part of the Membership Interest of another Member, shall have a Capital Account with respect to such interest initially equal to the Capital Account with respect to such interest of the Member from whom such interest is acquired.

8.9     **Interest.**  Except as otherwise provided in this Agreement, no Member shall be entitled to interest or other return on such Member's Capital Contribution or on any Profits retained by the Company.

8.10     **Investment of Capital Contributions and Company Cash.**  The Capital Contributions of the Members and any cash held by the Company from time to time shall be invested, until such time as such funds shall be used for other Company purposes, in demand, money market or time deposits or obligations, securities, investments or other instruments constituting cash equivalents.  Such investments shall be made by the Board of Managers for the benefit of the Company.

8.11     Repayment of Capital Contribution.

(a)     The members of the Board of Managers shall have no personal liability for the repayment of any Capital Contributions of any Member, and no Member shall have liability for the repayment of any Capital Contributions of any other Member.  The repayment of any Capital Contribution shall be made only to the extent of available Company assets in accordance with the terms of this Agreement.

[TPW: NYLEGAL:460852.1] 19499-00000  03/09/2006 06:00 PM

(b)      Except as otherwise provided in this Agreement, no Member shall have priority over any other Member as to the return of its Capital Contribution or as to Distributions of cash made by the Company.

(c)      Except as otherwise provided in this Agreement, a Member shall not be entitled to (i) demand or receive Property other than cash in return for its Capital Contribution or (ii) receive any funds or Property of the Company.

## ARTICLE IX
## ALLOCATIONS AND DISTRIBUTIONS

9.1      **Profits and Losses.** Profits and Losses, and each item of Company income, gain, loss, deduction, credit and tax preference with respect thereto, for each Fiscal Year (or shorter period in respect of which such items are to be allocated) shall be allocated among the Members as provided in this Article IX.

9.2      **Allocation of Profits and Losses.** All items of Profits and Losses for any Fiscal Year shall be allocated to the Members in proportion to their respective Sharing Ratios.

9.3      **Special Allocations.** The following special allocations shall be made:

(a)      <u>Loss Limitation</u>. The Losses allocated pursuant to Section 9.2 shall not exceed the maximum amount of Losses that may be allocated to a Member without causing such Member to have an Adjusted Capital Account Deficit at the end of the Fiscal Year. If some, but not all of the Members would have adjusted Capital Account Deficits as a consequence of the allocations of Losses pursuant to Section 9.2, the limitation in this Section 9.3(a) shall be applied by allocating Losses pursuant to Section 9.3(a) only to those Members (allocated pro rata if more than one) who would not have an Adjusted Capital Account Deficit as a consequence of receiving such an allocation. All Losses in excess of the limitations set forth in this Section 9.3(a) shall be allocated among the Members in proportion to their respective Sharing Ratios.

(b)      <u>Minimum Gain Chargeback</u>. Except as otherwise provided in section 1.704-2(f) of the Regulations, notwithstanding any other provision of this Article IX, if there is a net decrease in Partnership Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Partnership Minimum Gain, determined in accordance with section 1.704-2(g) of the Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Regulations. This Section 9.3(b) is intended to comply with the minimum gain chargeback requirement in section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

(c)      <u>Partner Minimum Gain Chargeback</u>. Except as otherwise provided in section 1.704-2(i)(4) of the Regulations, notwithstanding any other provision of this Article IX, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Partner Nonrecourse Debt Minimum Gain as of the beginning of the Fiscal Year attributable to such Partner Nonrecourse Debt, determined in accordance with section 1.704-2(i)(5) of the Regulations, shall be specially

allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with section 1.704-2(i)(4) of the Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Regulations. This Section 9.3(c) is intended to comply with the minimum gain chargeback requirement in section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently therewith.

(d)     Qualified Income Offset.  In the event any Member unexpectedly receives any adjustments, allocations or Distributions described in section 1.704-1(b)(2)(ii)(d)(4), section 1.704-1(b)(2)(ii)(d)(5) or section 1.704-1(b)(2)(ii)(d)(6) of the Regulations which increase a Member's Adjusted Capital Account Deficit, items of Company income and gain shall be specially allocated to the Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible, provided that an allocation pursuant to this Section 9.3(d) shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IX have been tentatively made as if this Section 9.3(d) were not in this Agreement.

(e)     Gross Income Allocation.  In the event any Member has an Adjusted Capital Account Deficit, such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 9.3(e) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IX have been made as if Section 9.3(d) and this Section 9.3(e) were not in this Agreement.

(f)     Nonrecourse Deductions.  Nonrecourse Deductions for any Fiscal Year shall be specially allocated among the Members in proportion to their Sharing Ratios.

(g)     Partner Nonrecourse Deductions.  Any Partner Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with section 1.704-2(i)(1) of the Regulations.

(h)     Certain Book-ups.  To the extent an adjustment to (i) the adjusted tax basis of any Company asset pursuant to section 734(b) or section 743(b) of the Code is required to be taken into account in determining Capital Accounts or (ii) pursuant to section 1.704-1(b)(2)(iv)(f) of the Regulations, the Gross Asset Value of any Company asset is permitted to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated, as provided in section 1.704-1(b)(2)(iv)(m) or section 1.704-1(b)(2)(iv)(g) of the Regulations, respectively, as an item of Profit (if the adjustment increases such basis or Gross Asset Value of the asset) or Loss (if the adjustment decreases such basis or Gross Asset Value), and such Profit or Loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Regulations.

[TPW: NYLEGAL:460852.1] 19499-00000  03/09/2006 06:00 PM

(i)    <u>Mandatory Allocations under Section 704(c) of the Code.</u>

(i)    In the event section 704(c) of the Code or the principles of section 704(c) of the Code applicable under section 1.704-1(b)(2)(iv) of the Regulations require allocations of income, gain, deduction or loss in a manner different than that set forth above, the provisions of section 704(c) of the Code and the Regulations thereunder shall control such allocations among the Members. Any item of Company income, gain, loss and deduction with respect to any Property (other than cash) that has been contributed by a Member to the capital of the Company and which is required or permitted to be allocated to such Member for income tax purposes under section 704(c) of the Code so as to take into account the variation between the tax basis of such Property and its Fair Market Value at the time of its contribution shall be allocated solely for income tax purposes in the manner so required or permitted under section 704(c) of the Code using the "traditional method" described in section 1.704-3(b) of the Regulations; *provided, however,* that any other method allowable under applicable Regulations may be used for any contribution of Property if the contributing Member and the Board of Managers agree as to the use of such other method.

(ii)    In the event the Gross Asset Value of any Company asset is adjusted pursuant to Section 9.3(h) in accordance with section 1.704-1(b)(2)(iv)(f) of the Regulations, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in a manner consistent with Section 9.3(i)(i).

(iii)    Except as provided in Sections 9.4(h)(i) and (ii), for United States federal, state and local income tax purposes, the income, gains, losses and deductions of the Company shall, for each taxable period, be allocated among the Members in the same manner and in the same proportion that such items have been allocated among the Members' respective Capital Accounts.

9.4    **Curative Allocations.** The Regulatory Allocations are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction. Therefore, notwithstanding any other provision of this Article IX (other than the Regulatory Allocations), the Board of Managers shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Section 9.2. In exercising its discretion under this Section 9, the Board of Managers shall take into account future Regulatory Allocations under Sections 9.3(b) and 9.3(c) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 9.3(f) and 9.3(g).

9.5    **Section 754 Election.** Upon a transfer by a Member of an interest in the Company, which transfer is permitted by the terms of this Agreement, or upon the death of a Member or the Distribution of any Company Property to one or more Members, the Board of Managers, upon the request of one or more of the transferees or distributees, shall cause the Company to file an election on behalf of the Company to cause the basis of the Company's Property to be adjusted for federal income tax purposes in the manner prescribed in section 734 or 743 of the Code, as the case may be. The cost of preparing

such election and any additional accounting expenses of the Company occasioned by such election shall be borne by such transferees or distributees.

9.6     Other Allocation Rules.

(a)     For purposes of determining the Profits, Losses or any other item allocable to any period (including allocations to take into account any changes in any Member's Sharing Ratio during a Fiscal Year and any transfer of any interest in the Company), Profits, Losses and any such other item shall be determined on a daily, monthly or other basis, as determined by the Board of Managers using any permissible method under section 706 of the Code and the Regulations thereunder.

(b)     Notwithstanding the above, allocations made pursuant to this Article IX shall be made annually within one hundred and five (105) days after the end of the Fiscal Year, but in no event may such allocations be made later than required by the Code.

(c)     The Members are aware of the income tax consequences of the allocations made by this Article IX and hereby agree to be bound by the provisions of this Article IX in reporting their shares of Company income and loss for income tax purposes.

(d)     Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of section 1.752-3(a)(3) of the Regulations, the Members' interests in Company Profits are in proportion to their Sharing Ratios.

(e)     To the extent permitted by section 1.704-2(h)(3) of the Regulations, the Board of Managers shall endeavor to treat Distributions made from the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt as Distributions that are not allocable to an increase in minimum gain to the extent that such Distributions would not cause or increase an Adjusted Capital Account Deficit for any Member.

(f)     Except as otherwise provided in this Article IX, an allocation of Company Profits or Losses to a Member shall be treated as an allocation to such Member of the same share of each item of income, gain, loss and deduction taken into account in computing such Profits or Losses.

(g)     For purposes of determining the character (as ordinary income or capital gain) of any Profits allocated to the Members pursuant to this Article IX, such portion of Profits that is treated as ordinary income attributable to the recapture of depreciation shall, to the extent possible, be allocated among the Members in the proportion which (i) the amount of depreciation previously allocated to each Member bears to (ii) the total of such depreciation allocated to all Members. This Section 9.6(g) shall not alter the amount of allocations among the Members pursuant to this Article IX, but merely the character of income so allocated.

(h)     Except for arrangements expressly described in this Agreement, no Member shall enter into (or permit any Person related to the Member to enter into) any arrangement with respect to any liability of the Company that would result in such Member (or a person related to such Member under section 1.752-4(b) of the Regulations) bearing the economic risk of loss (within the meaning of section 1.752-2 of the Regulations) with respect to such liability unless such arrangement has been approved by all Members. To the extent a Member is permitted to guarantee the repayment of any Company indebtedness under this Agreement, each of the other

20

Members shall be afforded the opportunity to guarantee such Member's pro rata share of such indebtedness, determined in accordance with the Members' respective Sharing Ratios.

9.7    **Distribution of Net Cash Flow.**

(a)    <u>Amounts and Timing</u>.  Provided that the Company's working capital shall not fall below the Minimum Working Capital level, and subject to the provisions of Section 13.3 and applicable law, Net Cash Flow for each Fiscal Year of the Company, shall be distributed to the Members in proportion to their respective Sharing Ratios within 30 days of the completion of the Annual Independent Audit, or at such earlier time or times as may be designated by the Board of Managers.

(b)    <u>Amounts Withheld</u>.  The Board of Managers is authorized to withhold from Distributions, or with respect to allocations, to the Members and to pay over to any federal, state or local government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local tax law.  Any amounts required to be withheld pursuant to the Code or any provision of any state or local tax law with respect to any payment, distribution or allocation to the Company or the Members shall be treated as an amount distributed to the Member with respect to which such amount was withheld pursuant to this Section 9.7 for all purposes under this Agreement.

(c)    <u>Draws for Payment of Estimated Taxes</u>.  The Company shall pay to each Member an annual draw, not to exceed the amount reasonably necessary to provide for payment by the Members of any federal, state and local estimated taxes with respect to Profits allocated to the Members pursuant to this Article IX, and each such draw, if any, shall be treated as a loan from the Company to each Member receiving such draw and shall be deemed repaid by reducing the amount of each subsequent Distribution to the Member receiving such draw pursuant to this Section 9.7 by the lesser of (i) the entire amount otherwise distributable to the Member receiving such draw and (ii) the entire amount of any unrepaid draws pursuant to this Section 9.7(c).

9.8    **Allocation of Gain or Loss upon Winding Up.**

(a)    <u>Gain or Loss Realized on Sale of Company Property</u>.  Upon the winding up of the Company, as provided in Article XIII, net gain or loss realized on the sale or sales of Company Property (each such sale a "**Winding Up Sale**") shall be allocated among the Members in accordance with Section 9.2.

(b)    <u>Distributions in Kind</u>.  In the event that, upon a winding up of the Company, pursuant to Section 13.3, either (i) any Company Property is required to be distributed in kind, or (ii) the Board of Managers elects to distribute any Company Property in kind, the book value of such Property shall be adjusted to its Fair Market Value as of the date of such Distribution, and the amount of such adjustments shall be allocated to the Members' Capital Accounts in the manner provided in Section 9.8(a) as though such Property had been sold at its Fair Market Value and gain or loss had been realized.

21

# ARTICLE X
## TAXES

10.1 **Tax Matters Partner.** Coffee Holding shall be the Tax Matters Partner of the Company pursuant to section 6231(a)(7) of the Code. If Coffee Holdingshall cease to act as the Tax Matters Partner for any reason, the Members shall select another Member (subject to such Member's approval) to be the Tax Matters Partner. The Tax Matters Partner shall receive no additional compensation from the Company for its services in that capacity, but all expenses incurred by the Tax Matters Partner in such capacity shall be borne by the Company. The Tax Matters Partner is authorized to employ such accountants, attorneys and agents as it, in its sole discretion, determines is necessary to or useful in the performance of its duties. The Tax Matters Partner is authorized to represent the Company before the Internal Revenue Service and any other governmental agency with jurisdiction, and to sign such consents and to enter into settlements and other agreements with such agencies as the Tax Matters Partner or its duly authorized officer deems necessary or advisable. Each Member shall give prompt notice to each other Member of any and all notices it receives from the Internal Revenue Service concerning the Company, including any notice of a 30 day appeal letter and any notice of deficiency in tax concerning the Company's federal income tax returns. The Tax Matters Partner shall give each Member periodic status reports regarding any negotiations between the Internal Revenue Service and the Company. The Tax Matters Partner shall serve in a similar capacity with respect to any similar tax related or other election provided by state or local laws.

# ARTICLE XI
## TRANSFER OF MEMBERSHIP INTEREST

11.1 **Compliance with Securities Laws and this Agreement.** No Shares have been registered under the Securities Act or under any applicable state securities laws. A Member may not transfer (a transfer, for purposes of this Agreement, shall be deemed to include, but not be limited to, any sale, transfer, assignment, pledge, creation of a security interest or other disposition) any Shares, except upon compliance with the applicable federal and state securities laws and this Agreement. The Board of Managers shall have no obligation to register any Shares under the Securities Act or under any applicable state securities laws, or to make any exemption therefrom available to any Member except to the extent provided in any Registration Rights Agreement entered into by the Company with respect thereto.

11.2 **Transfer of Shares; Admission of Substitute Member.** Except for those transfers permitted by this Article XI, a Member may transfer Shares and give the transferee the right to become a Member only after the following terms and conditions have been satisfied:

(a) The transferee shall also be the transferee of all or part of the transferor's Economic Interest or shall be the owner of an Economic Interest;

(b) The Members holding all of the Shares that are not the subject of the transfer shall have consented in writing to the transfer of such Shares and the admission of the Substitute Member;

(c) The transferor and the transferee shall have complied with such other requirements as the non-transferring Members may reasonably impose, including the conditions that the transferee:

(i) Adopt and approve in writing all the terms and provisions of this Agreement then in effect; and

22

(ii)    Pay such fees as the Board of Managers may reasonably require to pay the costs of the Company in effecting such substitution; and

(d)    The Board of Managers shall have consented to the transfer.

11.3    **Dispositions Not in Compliance with this Article Void.**  Any attempted Disposition of a Membership Interest, or any part thereof, not in compliance with this Article shall be void when made and ineffectual and shall not bind the Company.

11.4    **Transfer to Affiliate of a Member.**  Notwithstanding anything herein to the contrary, any Member may transfer its Shares to any Affiliate or direct or indirect subsidiary thereof that is controlled by or under common control with it, and any such transferee shall have the right to become a Substitute Member, subject to compliance with Section 11.1.

11.5    **Future Sales and Preemptive Rights**.

(a)    The Company will not offer or sell any New Securities (an "**Equity Offering**") unless it first offers to each Member the right to purchase a portion of such New Securities which is equal to the total number of New Securities to be sold in the Equity Offering multiplied by a fraction, the numerator of which is the number of Shares owned by such Member on a fully diluted basis, and the denominator of which is the total number of Shares of the Company then outstanding on a fully diluted basis (an "**Offering Allocation**").  The Company shall immediately notify each Member of the terms or the proposed terms of an Equity Offering (the "**Company's Notice**").  The Company's Notice shall include the Offering Allocation for each Member.  If the Member wishes to purchase New Securities pursuant to the Company's Notice, such Member shall notify the Company in writing within thirty (30) days after receipt of the Company's Notice stating how many of such New Securities such Member desires to purchase.  Each Member shall be entitled to purchase up to that number of New Securities equal to such Member's respective Offering Allocation.  To the extent the Members do not elect to purchase any or all of such New Securities, the Company shall have up to ninety (90) days to complete the Equity Offering upon the same terms specified in the Company's Notice.  If the Company later changes the terms of the Equity Offering in any material respect, the Company shall first re-offer such New Securities to the Members pursuant to the procedure set forth above.  Any New Securities which are offered or sold (or issued) by the Company in the Equity Offering shall, unless otherwise consented to in writing by each Member, be sold to any purchaser only for cash.

(b)    The closing of the purchase of New Securities by the Members pursuant to this Section 11.5 shall occur at the Principal Office of the Company concurrently with the closing of the Equity Offering, or at such other time as the Company and the Members may mutually determine.

## ARTICLE XII
## DISSOCIATION OF A MEMBER

12.1    **Dissociation.**  A Person shall cease to be a Member upon the happening of any of the following events:

(a)    The resignation or withdrawal of the Member;

(b)    The Member becoming a Bankrupt Member;

23

(c)     The Member breaching this Agreement and not curing such breach within sixty (60) days of a non-breaching Member providing written notice of such breach pursuant to Section 13.1(c) below;

(d)     In the case of a Member who is a natural person, the death of the Member or the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's personal estate;

(e)     In the case of a Member that is a trust or who is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

(f)     In the case of a Member that is a separate Organization other than a corporation, the dissolution and commencement of winding up of the separate Organization;

(g)     In the case of a Member that is a corporation, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter; or

(h)     In the case of a Member that is an estate, the distribution by the fiduciary of the estate's entire interest in the Company.

12.2    **Rights of Dissociating Member.** In the event any Member dissociates prior to the expiration of the term of this Agreement, such Member shall be entitled to participate in the dissolution and winding up of the Company pursuant to Article XIII, to the same extent as any other Member except that, if such Dissociation results from a withdrawal of the Member in violation of this Agreement, any Distributions to which such Member would have been entitled shall be reduced by that portion of the damages, if any, sustained by the Company as a result of the Dissolution Event and winding up that is chargeable to the Capital Accounts of the other Members.

## ARTICLE XIII
## DISSOLUTION AND WINDING UP

13.1    **Dissolution.** The Company shall be dissolved without further action by the Members and its affairs wound up upon the first to occur of any of the following events (each of which shall constitute a Dissolution Event):

(a)     The unanimous written consent of the Members;

(b)     A Member materially breaches this Agreement and a non-breaching Member provides sixty (60) days written notice to the other Members of such breach, during which sixty (60) day period, the breaching Member shall have the opportunity to cure such breach; provided, however, that, the other Members shall have the opportunity to elect to continue the Company without the breaching Member, in which case the breaching Member shall be dissociated pursuant to Article XII above;

(c)     A Member ceases to be a Member pursuant to Article XII above;

(d)     A Member becomes a Bankrupt Member;

       (e)     A material breach of any agreement between the Company and a Member or between Members; or

       (f)     A Member elects to dissolve the Company pursuant to Section 14.12 below.

13.2    **Effect of Dissolution.** Upon dissolution, the Company shall not be terminated and shall continue until the winding up of the affairs of the Company is completed and a certificate of dissolution has been issued by the Secretary of State of the State of Delaware.

13.3    **Distribution of Assets on Dissolution.** Upon the winding up of the Company, the Board of Managers shall take full account of the assets and liabilities of the Company, and shall apply and distribute the assets and any proceeds therefrom in the following order:

       (a)     First, to the payment of the debts and liabilities of the Company to creditors, including Members and affiliates of Members who are creditors, to the extent permitted by law, in satisfaction of such debts and liabilities, and to the payment of necessary expenses of liquidation;

       (b)     Second, to the setting up of any reserves which the Board of Managers may deem necessary or appropriate for any anticipated obligations or contingencies of the Company arising out of or in connection with the operation or business of the Company. Such reserves may be paid over by the Board of Managers to an escrow agent or trustee selected by the Board of Managers to be disbursed by such escrow agent or trustee in payment of any of the aforementioned obligations or contingencies and, if any balance remains at the expiration of such period as the Board of Managers shall deem advisable, shall be distributed by such escrow agent or trustee in the manner hereinafter provided; and

       (c)     Then, to the Members in accordance with positive Capital Account balances taking into account all Capital Account adjustments for the Company's taxable year in which the liquidation occurs. Liquidation proceeds shall be paid within sixty (60) days of the end of the Company's taxable year in which the liquidation occurs. Such Distributions shall be in cash or Property (which need not be distributed proportionately) or partly in both, as determined by the Board of Managers.

To the extent possible after making all distributions under Sections 13.3(a) and (b) (and without violating Section 13.3(c)), the assets contributed to the Company by each Member shall be distributed to such contributing Member. In the event that the Company is unable to comply with the obligations set forth in Sections 13.3(a) and (b) above without liquidating such assets, the Board of Managers shall determine which assets to liquidate to comply with such obligations. In such case, the remainder of the assets shall be distributed to the contributing Member of such assets.

13.4    **Winding Up and Certificate of Dissolution.** The winding up of the Company shall be completed when all debts, liabilities and obligations of the Company have been paid and discharged or reasonably adequate provision therefor has been made, and all of the remaining Property of the Company has been distributed to the Members. Upon the completion of the winding up of the Company, a certificate of dissolution shall be delivered to the Secretary of State of the State of Delaware for filing. The certificate of dissolution shall set forth the information required by the Act.

## ARTICLE XIV
## MISCELLANEOUS

14.1 **Termination of License.** In the event that the certain License Agreement between the Company and Coffee Bean Trading, dated as of the date hereof, is terminated for any reason, the Company shall change its name from Café La Rica as soon as reasonably possible.

14.2 **Notices.** Notices to the Board of Managers shall be sent to the Principal Office of the Company with a copy to Matthew Dyckman, Esq., Thacher Proffitt & Wood LLP, 1700 Pennsylvania Avenue, NW, Suite 800, Washington, DC 20006 and Robert F. Hudson, Jr., Esq., Baker & McKenzie LLP, Mellon Financial Center, 1111 Brickell Avenue, Suite 1700, Miami, Florida, 33131. Notices to the other Members shall be sent to their addresses set forth on Exhibit A. Any Member may require notices to be sent to a different address by giving notice to the other Members in accordance with this Section 14.1. Any notice or other communication required or permitted hereunder shall be in writing, and shall be deemed to have been given with receipt confirmed if and when delivered personally, or when sent by a recognized overnight delivery service, delivered by courier, or sent by facsimile, to such Members at such address.

14.3 **Headings.** All Article and Section headings in this Agreement are for convenience of reference only and are not intended to qualify the meaning of any Article or Section.

14.4 **Entire Agreement.** This Agreement constitutes the entire agreement among the parties and supersedes any prior agreement or understanding among them respecting the subject matter of this Agreement except as specifically provided herein.

14.5 **Binding Agreement.** This Agreement shall be binding upon, and inure to the benefit of, the parties hereto, their successors, heirs, legatees, devisees, assigns, legal representatives, executors and administrators, except as otherwise provided herein.

14.6 **Saving Clause.** If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid, shall not be affected thereby. If the operation of any provision of this Agreement would contravene the provisions of the Act, such provision shall be void and ineffectual.

14.7 **Counterparts.** This Agreement may be executed in several counterparts, and all so executed shall constitute one agreement, binding on all the parties hereto, even though all parties are not signatories to the original or the same counterpart. Any counterpart of either this Agreement or the Certificate of Formation shall for all purposes be deemed a fully executed instrument. For purposes of this Agreement, facsimile as well as scanned and emailed signatures shall be deemed to be original signatures.

14.8 **Governing Law; Jurisdiction; Venue.** This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of laws principles thereof. To the fullest extent permitted by law, the parties hereto hereby (i) submit to the jurisdiction of the state and federal courts located in the State of Delaware for purposes of any legal action or proceeding brought under or in connection with this Agreement, (ii) agree that exclusive venue of any such action or proceeding may be laid in the State of Delaware and (iii) waive any claim that the same is an inconvenient forum.

14.9  **No Partnership Intended for Nontax Purposes.** The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership under either the Delaware Uniform Partnership Act or the Delaware Uniform Limited Partnership Act. The Members do not intend to be partners one to another or partners as to any third party. To the extent any Member, by word or action, represents to another person that any Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Members who incur personal liability by reason of such wrongful representation.

14.10  **No Rights of Creditors and Third Parties.** This Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members and their permitted successors and assignees. This Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person. Except and only to the extent provided by applicable statute, no such creditor or any third party shall have any rights under this Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

14.11  **Customers/Non-compete.**

(a)  In the event that the Company is dissolved, each Member shall retain the exclusive right to conduct business with the customers such Member introduced to the Company and the Members agree to divide the Company's new customers evenly among the Members.

(b)  Throughout the duration of this Agreement, neither Coffee Bean nor any of its Affiliates will render any services directly related to the roasting, packaging or sale of coffee either, as an independent contractor to or joint venture partner with any entity that is in direct competition with Coffee Holding or the Company.

(c)  Throughout the duration of this Agreement, Coffee Holding shall not engage Mr. Ernesto Aguila in employment.

14.12  **Confidentiality.** It is recognized that during their work on behalf of the Company, the Members may have occasion to conceive, create, develop, review, or receive information that is considered by the Company or another Member to be confidential or proprietary, including without limitation information relating to the business of the Company, including inventions, patent, trademark and copyright applications, improvements, know-how, specifications, drawings, cost data, process flow diagrams, customer and supplier lists, bills, ideas, and/or any other written material referring to the same ("**Confidential Information**"). Both during the term of this Agreement and thereafter, the Members agree to maintain the confidence of the Confidential Information unless or until such Confidential Information has been made public by an act or omission of a Member other than itself.

14.13  Dispute Resolution.

(a)  Whenever the Members shall have any dispute among themselves relating to the interpretation, construction or implementation of this Agreement, the Members shall resolve such dispute as follows:

(i)  First, each Member involved in such dispute shall use its good faith efforts to negotiate a resolution thereof by engaging in discussions with the other Members so involved at reasonable times and places, by telephone or otherwise, during the sixty (60) day period following notice by a Member to each of the other Members of its belief that there is a dispute which requires resolution in such manner;

27

(ii)     Second, if the Members are unable to resolve such dispute through good faith negotiations during the sixty (60) day period provided in Section 14.11(a)(i), the Members shall refer the dispute to mediation in accordance with the Judicial Arbitration and Mediation Services, Inc. (J·A·M·S) (www.jamsadr.com) mediation procedures; and

(iii)     Third, if the Members are unable to resolve such dispute through mediation, any Member involved in such dispute may bring an action or proceeding in any court having jurisdiction thereof pursuant to Section 14.7; provided that each Member waives its right to trial by jury and its right to consequential, special and/or punitive damages.

(b)     Whenever the Members shall be deadlocked or shall otherwise be in dispute with respect to the relations among the Members or between the Members and the Company or any other matter related thereto, the Members shall resolve such dispute as follows:

(i)     First, each Member involved in such dispute shall use its good faith efforts to negotiate a resolution thereof by engaging in discussions with the other Members so involved at reasonable times and places, by telephone or otherwise, during the sixty (60) day period following notice by a Member to each of the other Members of its belief that there is a dispute which requires resolution in such manner;

(ii)     Second, if the Members are unable to resolve such dispute through good faith negotiations during the sixty (60) day period provided in Section 14.12(b)(i), the Members shall refer the dispute to mediation in accordance with the Judicial Arbitration and Mediation Services, Inc. (J·A·M·S) (www.jamsadr.com) mediation procedures; and

(iii)     Third, if the Members are unable to resolve such dispute through mediation, any Member involved in such dispute may elect to dissolve the Company, in which case the Company shall dissolve in accordance with Article XIII above.

14.14   **General Interpretive Principles.**  For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)     The terms defined in this Agreement include the plural as well as the singular;

(b)     Accounting terms not otherwise defined herein have the meanings given to them in accordance with generally accepted accounting principles in the United States;

(c)     References herein to "Sections," "paragraphs" and other subdivisions without reference to a document are to designated Sections, paragraphs and other subdivisions of this Agreement;

(d)     A reference to a paragraph without further reference to a Section is a reference to such paragraph as contained in the same Section in which the reference appears, and this rule shall also apply to other sub-divisions;

(e)     The words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

[TPW: NYLEGAL:460852.1] 19499-00000  03/09/2006 06:00 PM

(f)      The term "include" or "including" shall mean without limitation by reason of enumeration.

[TPW: NYLEGAL:460852.1] 19499-00000  03/09/2006 06:00 PM

MAR-14-2006 10:22 From:COFFEE HOLDING CO.    17187684731                To:2217693                P.2/2

MAR-10-2006 13:59 From:COFFEE HOLDING CO.    17187684731                To:2217693                P.3/6

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date

THE COMPANY:

Café La Rica, LLC

By: _____
     Name: ANDREW GOWAN
     Title: MANAGER

MEMBERS:

Coffee Holding Co., Inc

By: _____
     Name: ANDREW GORDON
     Title: PRESIDENT/CEO

The Coffee Bean Trading-Roasting LLC

By: _____
     Name:
     Title:

[TPW: NYLEGAL:460852 1] 19459-00000 03/09/2006 06:00 PM

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

THE COMPANY:

Café La Rica, LLC

By: _____
    Name:
    Title:

MEMBERS:

Coffee Holding Co., Inc.

By: _____
    Name:
    Title:

The Coffee Bean Trading-Roasting LLC

By: _____
    Name: Alberto Lensi
    Title: Manager

[TPW: NYLEGAL:460832.1] 19499-00000 03/09/2006 06:00 PM

## EXHIBIT A

| Name and Address of Member | Initial Capital Contribution | Initial Membership Interest (as represented by number of Shares) | Initial Sharing Ratio |
|---|---|---|---|
| Coffee Holding Co., Inc.<br><br>4401 First Avenue<br>Brooklyn, NY 11232<br>Attn: Andrew Gordon, President and Chief Executive Officer<br><br>Phone: (718) 832-0800<br>Fax: (718) 832-0892<br>Email: agordon@coffeeholding.com | $250,000 in cash, plus the equipment specified in Exhibit I attached to the Agreement | 500 | 50% |
| The Coffee Bean Trading-Roasting LLC<br><br>c/o Comjet AG,<br>Dubihuus<br>3780 Gstaad<br>Switzerland<br><br>Phone: 011-41-33-748-6620<br>Telecopier: 011-41-33-748-6621<br><br>and:<br><br>5701 Miami Lakes Drive East<br>Miami Lakes, FL 33014<br>Attn: Sonia Aguila | All intellectual property, equipment and coffee inventory and packaging materials specified in Exhibit J attached to the Agreement | 500 | 50% |
| | | | |
| **TOTAL** | | **1,000** | **100%** |

**EXHIBIT B**

[Form of Lease Agreement between the Company and Perc Enterprises]

**EXHIBIT C**

**[Form of Expense Sharing Agreement between the Company and Coffee Holding]**

**EXHIBIT D**

**[Form of License Agreement between the Company and Coffee Bean Trading]**

**EXHIBIT E**

**[Form of License Agreement between the Company and Coffee Holding]**

**EXHIBIT F**

**[Form of Employment Agreement between the Company and Mr. Ernesto Aguila]**

## EXHIBIT G

The initial Board of Managers of the Company shall consist of the following persons:

1. Ernesto Aguila

2. Andrew Gordon

**EXHIBIT H**

The initial Officers of the Company shall be as follows:

| Name | Title |
|------|-------|
| David Gordon | Production Manager |

## EXHIBIT I

**Capital Contributions of Coffee Holding Co, Inc.**

| Item |
|---|
| Cash |
| Equipment:<br><br>1.  One brand new ICA Hi-Vac 50 brick pack machine – this will be ready to ship directly to Miami from Genoa, Italy the first week of May<br><br>2.  One Jabez Burns 23R – 4 bag roaster plus two additional that need to be refurbished and assembled<br><br>3.  Two Modern Processing 888 grinders<br><br>4.  Various screw conveyors – elevators and stainless steel coffee hoppers<br><br>5.  One Key Pack fractional machine – this is an older model but will add to our capacity none the less<br><br>6.  Two 3M box taping machines |
| Lease Subject to Condition Subsequent – License for use of the Café Caribe trademark under the terms set forth in the licensing agreement |

**EXHIBIT J**

**Capital Contributions of Coffee Bean Trading Roasting LLC**

| **Item** |
|---|
| Equipment: |
|         1.     Sample Roaster STS |
|         2.     Roll Tad Machine |
|         3.     Sample Grinder |
|         4.     Pour Over Machine |
|         5.     Roaster JB 23-R |
|         6.     Holding Bins x4 |
|         7.     Grinder 777 |
|         8.     Grinder JB |
|         9.     Frac Pack Machine |
|         10.    Frac Pack Printer |
|         11.    Box Tunnel |
|         12.    Action Pack Machine |
|         13.    Heat Sealer |
|         14.    Transport Equipment |
|         15.    Hi/Lo Machine |
| Inventory |
| Packaging |
| Office Equipment |
| Air Compressor |
| License Subject to Condition Subsequent – License for use of the Café La Rica trademark under the terms set forth in the licensing agreement |

## EXPENSE SHARING AND SERVICES AGREEMENT

This Expense Sharing and Services Agreement (the "Agreement") is made as of this _10_ day of March, 2006, by and between Coffee Holding, Co., Inc., a Nevada corporation (the "Company"), and Café La Rica, LLC (the "Venture"), a Delaware limited liability company.

WHEREAS, the Company and Coffee Bean Trading-Roasting LLC, a Delaware limited liability company ("CBT") entered into an operating agreement governing the operation of the Venture on March _10_, 2006 (the "Operating Agreement");

WHEREAS, the Venture engages in the roasting, grinding, packaging and sale of Café La Rica and other branded coffee products;

WHEREAS, other than as set forth herein, the Company and CBT will share in the profits of all activities of the Venture pursuant to their respective Sharing Ratios;

WHEREAS, the Company has entered into a license with the Venture, permitting the Venture to roast, grind, package and sell its Café Caribe brand of coffee;

WHEREAS, as further set forth herein, in certain geographic areas and on certain routes the Members of the Venture will share in the profits for the sale of Café Caribe, and in certain geographic areas and on certain routes, the Venture will instead receive a fee from the Company for the roasting, grinding and packaging of Café Caribe;

WHEREAS, the Company and its employees will perform certain services on behalf of the Venture and incur costs associated with such services;

WHEREAS, the Company will also supply certain products, including coffee beans, to the Venture; and

WHEREAS, the Company and the Venture have agreed to formalize the method for sharing the expenses discussed above.

NOW, THEREFORE, the Company and the Venture agree as follows:

### SECTION 1

### SERVICES PROVIDED BY THE COMPANY TO THE VENTURE

1.1    Services Provided by the Company to the Venture:

The Company shall provide to the Venture certain services, including:

(a)    administrative services and support, including the use of the personnel, office space and equipment of the Company, including photocopy machines, computers and other equipment, primarily in connection with the Venture's back office operations;

(b)    bookkeeping, accounting and similar services;

[TPW: WA:3151734.5] 19499-00000  03/09/2006 10:42 AM



EXHIBIT

B

(c)     participation in the Company's employee benefit plans by the Venture's employees;

(d)     payment of slotting fees for the Venture by the Company; and

(e)     certain other services agreed upon by the Venture and the Company.

1.2     Reimbursement of Expenses:

As set forth herein, the Venture shall reimburse the Company for the provision of the services set forth in Section 1.1 above. Because the Venture and the Company agree that it is difficult to determine the exact cost of such services to the Company, the Venture and the Company agree that the Venture shall pay to the Company on a monthly basis an amount equal to 5.0% of the Venture's monthly sales (the "Expense Reimbursement"). The Venture and the Company agree that the payment of the Expense Reimbursement to the Company by the Venture shall satisfy all of the Venture's obligations to the Company for the provision of the services set forth in Section 1.1 above, including any salaries or fees attributable to the provision of such services by the Company to the Venture.

## SECTION 2

### SUPPLIES PROVIDED BY THE COMPANY TO THE VENTURE

The Company agrees to supply the Venture with as much coffee inventory as requested by the Venture, of commercially reasonable quality, at fair market prices, to be paid by the Venture within fifteen (15) business days of the end of each month.

## SECTION 3

### SERVICES PROVIDED BY THE VENTURE TO THE COMPANY

The Venture shall generally engage in the roasting, grinding, packaging and sale of Café La Rica and other coffee products. However, the Venture may also, at the election of the Venture, roast, grind and package certain other coffee products for the Company, including the Company's Café Caribe brand, for a fee, instead of sharing in the profits for the sale of such coffee pursuant to the Members' respective Sharing Ratios.

For the roasting, grinding and packaging by the Venture of any other coffee brands of the Company, including the Café Caribe brand, the Company agrees to pay a monthly fee for such services within fifteen (15) business days of the end of each month, in an amount equal to (i) $0.18 per each 10 oz. brick of coffee.

Notwithstanding anything to the contrary in this Agreement, the Members shall share in the profits for all roasting, grinding, packaging and sales of the Café Caribe brand by the Venture for sale on all DSD routes, as well as to all WalMart stores and distribution centers and all Publix stores and distribution centers, within the State of Florida, pursuant to their respective Sharing Ratios.

[TPW: WA:3151734.5] 19499-00000  03/09/2006 10:42 AM

## SECTION 4

## AMENDMENTS

This Agreement may be amended or modified at any time by mutual agreement of the Company and the Venture, subject to the prior approval of the Board of Directors of the Company and the Members of the Venture.

## SECTION 5

## TERMINATION

This Agreement shall remain in effect until the earlier of the dissolution or winding up of the Venture, the dissociation or withdrawal of a Member from the Venture, a material breach, termination or expiration of the Operating Agreement, the sale or transfer of any interest in the Venture (other than pursuant to the terms of the Operating Agreement) or the mutual written agreement of the parties hereto to terminate this Agreement.

## SECTION 6

## PERIODIC REVIEWS; RECORDS

Both parties to this Agreement shall periodically review the overall allocation of expenses between the Company and the Venture, and shall maintain appropriate written records and documentation with respect to amounts reimbursed by and among the Company and the Venture pursuant to this Agreement.

## SECTION 7

## MISCELLANEOUS

7.1    All terms not defined herein shall have the meaning set forth in the Operating Agreement.

7.2    All Article and Section headings in this Agreement are for convenience of reference only and are not intended to qualify the meaning of any Article or Section.

7.3    This Agreement constitutes the entire agreement among the parties and supersedes any prior agreement or understanding among them respecting the subject matter of this Agreement except as specifically provided herein.

7.4    This Agreement shall be binding upon, and inure to the benefit of, the parties hereto, their successors, heirs, legatees, devisees, assigns, legal representatives, executors and administrators, except as otherwise provided herein.

7.5    This Agreement may be executed in several counterparts, and all so executed shall constitute one agreement, binding on all the parties hereto, even though all parties are not signatories to the original or the same counterpart. For purposes of this Agreement, facsimile as well as scanned and emailed signatures shall be deemed to be original signatures.

3

[TPW: WA:3151734.5] 19499-00000  03/09/2006 10:42 AM

7.6     All notices under this Agreement, including any and all amendments to the exhibits which comprise a part of this Agreement, shall, unless specified to the contrary, be in writing and shall be addressed as follows:

If to the Venture, to:

_____

_____

_____

If to the Company, to:

_____

_____

_____

or to such other address as such party shall designate by written notice given to the other party. All notices required hereunder will be delivered personally or sent by facsimile or certified or registered mail or via overnight courier service unless otherwise specified herein to authorized personnel of the addressee. If given personally, the notice will be deemed effective on the date of delivery. If sent by facsimile, the notice will be deemed effective on the date successfully sent. If sent by overnight courier, the notice will be deemed effective on the second following business day in the jurisdiction to which sent. If sent by mail, the notice will be deemed effective on the tenth day following posting or on the actual date of receipt, whichever is earlier.

7.7     This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of laws principles thereof.

7.8     The failure of any provision of this Agreement shall in no manner affect the right to enforce the same, and the waiver by any party of any breach of any provision of this Agreement shall not be construed to be a waiver by such party of any succeeding breach of such provision or a waiver by such party of any breach of any other provision. The failure on the part of either party hereto to exercise or enforce any right conferred upon it hereunder shall not be deemed to be a waiver of any such rights or operate to bar the exercise or enforcement thereof at any time or times thereafter.

7.9     The article headings are placed herein merely as a matter of convenience and are not to be construed as a part of this Agreement.

7.10    This Agreement shall not be assignable by either party without the written consent of the other party hereto.

4

MAR-10-2006 13:59 From:COFFEE HOLDING CO.   17187684731                To:2217693                P.576

IN WITNESS WHEREOF, the Company and the Venture have executed this Expense Sharing and Services Agreement by their duly authorized officers or managers as of the date first written above

**COFFEE HOLDING CO., INC.**

By:_____

    Andrew Gordon
    President and Chief Executive Officer

**CAFÉ LA RICA, LLC**

By:_____

    Ernesto Aguila
    Manager

5

IN WITNESS WHEREOF, the Company and the Venture have executed this Expense Sharing and Services Agreement by their duly authorized officers or managers as of the date first written above.

**COFFEE HOLDING CO., INC.**

By:_____
    Andrew Gordon
    President and Chief Executive Officer

**CAFÉ LA RICA, LLC**

By:_____
    Ernesto Aguila
    Manager

[TPW: WA:3151734.5] 19499-00000  03/09/2006 10:42 AM

Feb-08-2007 03:50pm From- T-738 P.002 F-744

# Coffee Holding Company Inc.

### Roasters & Packers
### 4401 FIRST AVENUE – P.O. BOX 320208
### OUTSIDE N.Y. STATE 1-800-458-2233

Telephone: 718-832-0800
Fax :718-832-8892

Email: coffeeholding@AOL.com
Web Site: www.Coffeeholding.com

To: Washington Mutual
Attn: Signey Hernandez
Fax: 305-825-8195

Fax: 718-768-4731

This is a 4 page fax, including cover page.

Please take the necessary steps to stop ~~Simon Aguila~~ from controlling this bank account.

I have enclosed information about the LLC account statement of authority and the letter of dissolution and winding up of café La Rica, LLC.

Regards,

Andrew Gordon

95M-382-0438
Anabel

```
EXHIBIT

  C
```

**Washington Mutual**

Legal Services Department
8050 S.W. 10th Street
Building 4 – Suite 1000
Plantation, Florida 33324
Telephone: (954) 382-0438
Fax: (954) 382-4369



February 8, 2007

VIA FEDERAL EXPRESS
TO BOTH ADDRESSEES

Mr. Andrew Gordon
4401 First Avenue
Brooklyn, NY 11232

Mr. Ernesto Aguila
2131 N.W. 72nd Avenue
Miami, FL 33122

Re:    **Café La Rica, LLC, account ending 551**

Dear Messrs. Gordon and Aguila:

The undersigned represents Washington Mutual Bank (hereinafter "the Bank"). A copy of Mr. Gordon's letter dated February 7, 2007, addressed to Signey Hernandez, has been forwarded to me, a copy of which is enclosed.

Please be advised that pursuant the Conflicting Demands and Disputes section (pages 38 and 39) of our Business Account Disclosures and Regulations, which govern the above entity's account with the Bank, we have placed a restraint on the above referenced account.

The Bank does not wish to be embroiled in this dispute, therefore, we propose the following alternatives regarding the above account:

1.     Each of you agrees, in writing, that the funds shall remain frozen until this dispute is resolved by and between you. Final disbursement of these funds would occur upon delivery of a document signed by each of you, together with the appropriate documentation from the state of Delaware, evidencing that Café La Rica, LLC, has been dissolved; or

2.     A Court Order from a court of proper jurisdiction for release or such other instructions regarding the subject account.

Alternatively, if you are not able to agree to this escrow type arrangement, the Bank will commence an interpleader action and deliver the funds to the Registry of the Court. You can then litigate the issue of ownership before the Court. In accordance with Florida law, the Bank would request attorneys' fees and costs in conjunction with such an action.

A collective decision on this matter must be communicated in writing to the undersigned on or before February 16, 2007. I look forward to hearing from you so that we can amicably resolve this matter.

Very truly yours,

LUCIA A. SANTOS
Vice President and Counsel

LAS/ms

Generally, your account is assigned to the financial center at which you open your account if opened in person. Your account opening documents may identify the state or other pricing region to which your account has been assigned. If you are uncertain to which financial center your account is assigned in our records, contact us at the number shown at the end of these *Account Disclosures and Regulations*.

If you move to another state in which we (the bank holding your account) have financial centers or otherwise wish to change your financial center of assignment, you may request and we, at our option, may agree to change your financial center of assignment and the state or other pricing region to which your account is assigned. Such change will not automatically occur when you change your address in our records.

## Cash Vouchers and Cash Dispensing Machines

At some of our financial centers, certain tellers do not have access to cash for processing withdrawals or other cash back transactions. If you complete a transaction with one of these tellers, you will receive a voucher for any cash payable to you. Your account records, however, will reflect a debit for the amount of the voucher. Your cash will be dispensed to you at the cash dispensing machine at that same financial center at which you conducted the related transaction. Your use of the access number to receive the cash is a separate non-account based transaction.

The voucher will include an access number. This number is used on the keypad or scanner at the cash dispensing machine. You must use the access number within the time frame noted on the voucher (or by the financial center closing time on the calendar day you conduct the transaction, if earlier). If you do not receive your cash related to a voucher within that time frame noted, the access number will expire. If you return your original voucher to us, a new access number will be issued if such request is made before the financial center closes that calendar day and the voucher has not been used. If the voucher is not redeemed by the time we close the financial center on the calendar day it is issued, an official check will be issued in the amount due under the voucher; the official check may, at our option, be held at the financial center for your pick up, mailed to you at the address of record for the account related to the transaction for which the voucher was issued, or deposited to any of your accounts with us (immediately or at a later time, without interest).

You must safeguard this voucher as you would cash. If you loose the voucher, tell us immediately so we may invalidate the voucher. If the voucher has not been redeemed, it is the same calendar day as the voucher was issued and we have not closed the financial center for the day, the voucher will be reissued. If we determine that the voucher has been redeemed, whether by you or a third party, at our option, the voucher may not be replaced and you may not be reimbursed. The voucher is not transferable or negotiable.

At some of our Financial Centers, we may offer electronic processes to expedite your deposit and withdrawal transaction(s) with the teller or other representative, including use of an electronic pad to identify you and your account, and to confirm the transaction in place of paper tickets. These ticketless transactions are teller-initiated transactions and are not considered electronic funds transfers. By initiating deposits and withdrawals at these financial centers, you agree to the electronic processing and record of the transaction in place of a paper record.

## Changes to Your Account Type

If you have an account with us and choose to change from one account type to another, we may, at our option, require you to close your existing account and open a new account with a new account number or change the product features to the new account type and

37

maintain the existing account number. If we allow or require you to maintain the same account number, previous activity on your prior account will apply to the new account, unless we, at our option, decide otherwise. This means, for example, that if you are required to maintain a minimum balance or average balance to avoid a monthly fee on the new account type, the balance for the entire statement cycle, including the balance prior to the change to the new account, will apply in the balance calculation. If the new account is a Limited Transaction Account, we may count transactions that posted to the account prior to the change and you may be assessed excess activity fees based on activity occurring prior to the change. If you are assessed Overdraft Charges or Non-Sufficient Funds Charges based on the number of NSF Transactions during a prior period (e.g., the prior 12 months), we may consider NSF Transaction activity prior to the date of the change in determining whether and the amount of charges to be assessed.

## Collections

In our discretion, we can help you collect bond coupons, checks, or drafts in U.S. or foreign currency or other items which we determine, at our discretion, are not suitable for automated collection procedures. If we do, we accept these items "for collection" which means we will send the check, draft or item directly to the issuer's bank for payment. When we receive payment, we will credit your account. If the item is lost, stolen, or destroyed in the collection process, we will not credit your account for the item nor will we otherwise be liable for the item. If the collection item is returned to us unpaid, we will return the item to you (as soon as we receive it).

Checks or drafts accepted, received or sent by the Bank from or to another financial institution to be processed for collection, whether or not paid, will be assessed a collection fee by the Bank, as set forth in the *Statement of Fees*, and may be assessed a collection and other fees and costs by the other financial institution. In the event you request special handling of a collection item, such as tracking or expedited delivery, you will also be charged any out-of-pocket expense. Any such fees and costs will be deducted from your account or from the amount of the proceeds remitted to or from your account, as applicable.

## Conflicting Demands and Disputes

Nothing in these *Account Disclosures and Regulations* shall be deemed to require the Bank, and the Bank shall not be required, to make payment from or provide services related to an account to a depositor, or to any trust or P.O.D. account beneficiary or payee, or any other person claiming an interest in any funds deposited in the account, if the Bank has actual knowledge (as defined in the *Account Ownership* section of these *Account Disclosures and Regulations*) of, or otherwise believes there may be, a dispute between the depositors, beneficiaries, payees, or other persons concerning the account including, without limit, their respective rights of ownership to or authority to act with respect to the funds contained in or proposed to be withdrawn or previously withdrawn from the account, or in the event the Bank is otherwise uncertain as to who is entitled to the funds pursuant to the contract of deposit, or otherwise receives instructions which Bank determines, in its discretion, to be unclear or conflicting. In any such case, the Bank may, at its option and without liability, notify all depositors, beneficiaries, payees, or other persons claiming an interest in the account of either its uncertainty as to who is entitled to the distributions or the existence of any dispute, and may also, without notice and without liability, refuse to disburse any funds contained in the account to or on the instruction of any depositor and/or trust or P.O.D. account beneficiary or payee thereof, and/or other persons claiming an interest therein, return items presented

38

against the account _____ "Refer To Maker" or similar notation until such time as, at our o_____

(1) All such depositors, beneficiaries, payees and/or other persons claiming an interest in the account have consented, in writing or other form satisfactory to Bank, to the requested payment; or

(2) The payment is authorized or directed by a court of proper jurisdiction; or

(3) Where one of the parties to the account has notified the Bank of the dispute, that party withdraws the notice; or

(4) Where the dispute involves a deceased accountholder, the successor of the deceased accountholder agrees in writing to the distribution (if permitted by State Law); or

(5) We receive proof satisfactory to us in our sole discretion that the dispute has been resolved, or other satisfactory documentation or assurances are received by us; or

(6) Subject to the *Resolution of Disputes* section in this publication, request instructions from a court of competent jurisdiction, or arbitrator, or referee regarding distribution of the account.

We may also, at our discretion, request instructions from a court and/or interplead the funds in the account at your expense. However, the Bank may, at its option and without liability, pay or permit withdrawal of any funds on deposit in an account to a depositor and/or agent of a depositor and/or trust or P.O.D. account beneficiary or payee, and/or other person claiming an interest therein, even when the Bank has actual knowledge of the existence of the dispute, if the payee shall execute to the Bank, in form and with security (in Idaho, "sureties") acceptable to it, which, except in Idaho, at Bank option may be a bond in an amount which is double the amount of deposit or the adverse claim, whichever is less) an indemnification indemnifying the Bank from any and all liability, loss, damage, costs, and expenses, for and on account of the payment of the adverse claim or the dishonor of the check or other order of the person in whose name the deposit stands on the books of the Bank. In no event will we be liable for any delay or refusal to follow instructions which occur as a result of a dispute over the authority or control of your account.

## Credit Reporting Agencies/Reporting/Verification

By requesting to open an account with the Bank, or by agreeing to be a signer on an account or obtaining any other service from us, you (and, if acting in a representative capacity, individually and for such entity or principal) agree that we may obtain credit information from check or credit reporting agencies, and/or by any other means. We may do so at the time you open the account, request the service, at any time while your account is open, or the service is available, or after your account or service is closed if you owe us any amounts related to your account or service, and may use such information for any purpose in our discretion except as prohibited by law, including, without limit, for review of your eligibility to obtain or retain an account or service requested by you or which we may, at our option, wish to consider offering you.

Without limiting anything else to the contrary herein, if you do not handle your account or service in a satisfactory manner and/or we to charge off your account as a loss, or as otherwise permitted by law, we may report such negative information to check or credit reporting agencies.

39

## Customer Responsibilities and Limit on Time to Assert Claims

You agree to exercise reasonable control over all bank checks, unissued checks, time or certificates of deposit, passbooks, cards (of any kind), personal and user identification numbers and codes and access devices and any other item, instrument or card related to any of the above It is your responsibility to keep all of the above information and items safe and secure and to promptly discover and immediately report if any of them are, or believed to be at risk of becoming, missing in time to prevent misuse.

You agree to notify us immediately if any of these items may be lost, stolen or used without your authorization, or if you believe there is an error in your periodic statement or that an unauthorized transaction has occurred or may occur on your account or otherwise may be related to any of the above. In addition to any other liability you may have hereunder, and except as limited by applicable law, if you give your Personal Identification Number (PIN), User ID and any other code or other access device to anyone, you will be liable for any use made of such until you advise us that such person is not authorized to use them. You acknowledge that your account, service or any of the above may have to be closed if any of these events occurs. In addition, you assume full responsibility for the monitoring and reviewing the work of your employees, agents (including Authorized Signers) and accountants.

You are responsible for exercising reasonable promptness and care in examining your account statements, and, if provided, originals or imaged copies of cancelled checks, advices of debit or credit, transaction reports, or your account activity through the internet if we provide you such access via online banking services, to determine whether any payment or debit was not authorized because of an alteration of an item or because a signature or endorsement on the item was unauthorized, or for any error, forgery, alteration, unauthorized transaction, including an unauthorized payment order, or other problem (collectively, a Problem). The parties agree that reasonable promptness means within fourteen (14) calendar days from the date that the statement, advice or transaction report or other information is sent or otherwise made available to you, whichever first occurs.

If you discover or should have discovered a Problem, you must promptly notify us in writing of the relevant facts. You should also report the Problem to us orally by contacting your branch of account or the telephone number at the end of these *Account Disclosures and Regulations.* However, your oral report shall not relieve you of your obligation to report the Problem to us in writing, except where required by law. Your written report must identify the specific items, debits or credits that you are challenging and the nature of the Problem.

In addition, if your claim involves a series of items containing unauthorized signatures or alterations by the same wrongdoer, you shall be precluded from asserting against us any unauthorized signature or alteration by the same wrongdoer on any item paid in good faith that you do not report within fourteen (14) calendar days after the first item in the series or first statement containing that item was sent or made available to you, whichever first occurs. By these provisions, the parties intend to define a reasonable time period for the "Repeater Rule," as provided in §4-406(d) of the UCC.

Without regard to the care or lack of care of either you or us, without limiting the foregoing: (a) if you fail within thirty (30) calendar days after the statement or item is sent or made available to you, whichever occurs first, to discover and report with respect to an item (i) your unauthorized signature, (ii) any unauthorized or missing endorsement, or (iii) any alteration on an item, you shall be precluded from asserting against us the unauthorized signature, the unauthorized or missing endorsement or alteration on that item; (b) if you fail within thirty (30) calendar days after the statement or other advice of debit or execution of a wire transfer Payment Order is sent or made

40

JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

## I. (a) PLAINTIFFS

COFFEE BEAN TRADING-ROASTING, LLC,
a Delaware limited liability company,

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Jose M. Ferrer, Esq.
Baker & McKenzie LLP
1111 Brickell Avenue, Suite 1700
Miami, FL 33131

**(d)** Check County Where Action Arose: ☒ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE ☐ HIGHLANDS

## DEFENDANTS

COFFEE HOLDING, INC., a Nevada corporation,

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED

Attorneys (If Known)

07 20389

CIV-MARTINEZ MAGISTRATE BANDSTRA

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

1:2007 CV20389/JEM/TEB

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☑ 4 | ☐ 4 |
| Citizen of Another State | ☑ 2 | ☑ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☑ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

**PERSONAL INJURY**
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 440 Other Civil Rights

### PRISONER PETITIONS
☐ 510 Motions to Vacate Sentence
Habeas Corpus:
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

### FORFEITURE/PENALTY
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt.Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).
(See instructions second page):
a) Re-filed Case ☐ YES ☐ NO     b) Related Cases ☐ YES ☐ NO
JUDGE _____ DOCKET NUMBER _____

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

Breach of Limited Liability Operating Agreement.

LENGTH OF TRIAL via 5 days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☑ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE 2-13-07

FOR OFFICE USE ONLY
AMOUNT 350 —    RECEIPT # 954710    IFP